WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200
(212) 354-8113 (Fax)
Thomas E Lauria (*pro hac vice admission pending*)
Gerard Uzzi
J. Christopher Shore
Elizabeth Feld

Proposed Special Counsel to the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DYNEGY HOLDINGS, LLC, <u>et al.</u>,[1] | ) | Case No. 11- 38111 (___) |
| | ) | |
| | ) | Joint Administration Pending |
| Debtors. | ) | |
| | ) | |

**MOTION OF THE DEBTORS PURSUANT TO SECTION 365 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULE 6006 FOR ENTRY OF AN ORDER
<u>AUTHORIZING THE DEBTORS TO REJECT THE LEASE DOCUMENTS</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Dynegy Holdings, LLC ("<u>Holdings</u>"), and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by and

though their undersigned counsel, hereby file this motion (the "<u>Motion</u>") for the entry of an order

authorizing the Debtors to reject the Facility Leases (as defined herein) and certain other related

executory agreements and unexpired leases set forth on Exhibit A hereto (together with the

Facility Leases, the "<u>Lease Documents</u>").  In support of the Motion, the Debtors respectfully

state as follows:

---

[1]  The Debtors in these chapter 11 cases are Dynegy Holdings, LLC, Dynegy Northeast Generation, Inc., Hudson
Power LLC, Dynegy Danskammer, L.L.C. and Dynegy Roseton, L.L.C.

## Background

1.      On November 7, 2011 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Additional information regarding the relief sought in this Motion is contained in the Declaration of Martin W. Daley in Support of the Motion (the "Daley Declaration") and the Declaration of Kent R. Stephenson in Support of First Day Motions (the "Stephenson Declaration"), each of which has been filed contemporaneously herewith.

3.      The Debtors have also filed a Motion Pursuant to Section 365(d)(3) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9014 to Extend the Debtors' Time for Performance Under the Lease Documents (the "Motion to Extend"), and an order to show cause and accompanying declaration requesting that the Court shorten notice to schedule an expedited hearing on the Motion to Extend for a date before November 15, 2011.

## Jurisdiction and Venue

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      Pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, the Debtors hereby seek the entry of an order authorizing the rejection of the Lease Documents, deemed effective as of the date of filing of this Motion on November 7, 2011.

## Statement of Facts

6.      On or about May 8, 2001 (the "<u>Closing Date</u>"), Debtors Dynegy Roseton,

L.L.C. ("<u>Dynegy Roseton</u>") and Dynegy Danskammer, L.L.C. ("<u>Dynegy Danskammer</u>," and,

together with Dynegy Roseton, the "<u>Debtor Lessees</u>" and individually, a "<u>Debtor Lessee</u>") each

entered into a sale-and-leaseback transaction pertaining to, respectively, Roseton power-

generating Units 1 and 2  (collectively, the "<u>Roseton Facility</u>") and Danskammer power-

generating Units 3 and 4 (collectively, the "<u>Danskammer Facility</u>", and together with the

Roseton Facility, the "<u>Leased Facilities</u>").  <u>See</u> Dynegy Holdings, LLC, Registration Form (Form

S-4), at 9-10 (July 10, 2001) ("<u>Holdings S-4</u>").

7.      On the Closing Date, two special purpose entities – Roseton OL LLC and

Danskammer OL LLC (each, an "<u>Owner Lessor</u>" and collectively, the "<u>Owner Lessors</u>") –

purchased the Roseton Facility and the Danskammer Facility, respectively, and in each case an

interest in the related common facilities, from Dynegy Roseton and Dynegy Danskammer,

respectively.  The Owner Lessors are subsidiaries of Resource Capital Management Corporation

(the "<u>Equity Investor</u>"), a third party investor and a wholly-owned subsidiary of PSEG Resources

Inc. (which is an indirect subsidiary of Public Service Enterprise Group, a company engaged in

various aspects of the electric power business) ("<u>PSEG</u>" and, together with the Equity Investor,

the Owner Lessors, Roseton OP LLC, as Owner Participant, and Danskammer OP LLC, as

Owner Participant, the "<u>PSEG Entities</u>").

8.      The purchase price of the Danskammer Facility was approximately $300

million.  The purchase price of the Roseton Facility was approximately $620 million.  To fund

their purchases of the respective Leased Facilities from Dynegy Danskammer and Dynegy

Roseton, the Owner Lessors used $138 million in equity funding from certain of the other PSEG

Entities, and financed the remaining $800 million of the purchase price and the related transaction expenses through a private offering of pass-through trust certificates (the "Pass-Through Trust Certificates"), which were sold to qualified institutional buyers (the "Pass-Through Certificate Holders").  The proceeds thereof were then used to purchase debt instruments from the Owner Lessors, which are held, together with the Pass-Through Trust Certificates, for the benefit of the Pass-Through Certificate Holders by U.S. Bank National Association, in its capacity as Successor Lease Indenture Trustee under the Indentures of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to each Facility (the "Indenture Trustee").

9.      Also on the Closing Date, each of the Owner Lessors simultaneously leased its Facility to the respective Debtor Lessee pursuant to a facility lease (the "Danskammer Lease" and the "Roseton Lease", respectively, and, together the "Facility Leases").  Absent early termination, the Danskammer Lease and the Roseton Lease expire on May 8, 2031, and February 8, 2035, respectively.

10.      Under the Facility Leases, rent is paid in advance in semi-annual payments.  These lease payments under the Facility Leases are used by the Owner Lessors to support the principal and interest payments on the Pass-Through Trust Certificates, which are secured by, among other things, an assignment of the Facility Leases and a mortgage on the underlying Leased Facilities.  See Holdings S-4 at 9.  Lease payments in excess of the amounts required to service the Pass-Through Certificates are available for distribution to the Equity Investor.  Id.

11. In addition to each Facility Lease, the Debtors seek to reject, to the extent executory, each of the following related material agreements:[2]

- the "<u>Guarantees</u>," <u>i.e.</u>, the two substantially identical Guarantees entered into by Holdings for the benefit of the Indenture Trustee and the Pass-Through Trust Certificate Holders on May 1, 2001, among other parties, including the Owner Lessors;

- the "<u>Participation Agreements</u>," <u>i.e.</u>, the two substantially identical Participation Agreements entered into on May 1, 2001 by each Debtor Lessee and its respective Owner Lessor and Owner Participant, Wilmington Trust Company (as lessor manager), and the Indenture Trustee, which set forth the manner in which the parties agreed to participate in the transaction, the conditions precedent to such participation, the representations and warranties of such parties and certain covenants and indemnities of the parties made in connection with the transaction;

- the "<u>Pass-Through Trust Agreement</u>," <u>i.e.</u>, the agreement between both Debtor Lessees and the Indenture Trustee, dated May 1, 2001, that created the trust which issued the Pass-Through Trust Certificates; and

- the "<u>Tax Indemnity Agreements</u>," <u>i.e.</u>, the two substantially identical Tax Indemnity Agreements entered into on the Closing Date between each Debtor Lessee and its respective Owner Lessor, the Owner Participant, Resources Capital Management Corp. and PSEGR Newburgh Holdings LLC, pursuant to which each Debtor Lessee agreed to indemnify Resources Capital Management Corp. for any adverse tax consequences that may be caused by certain acts or failures to act by the Debtor Lessee.

12. Prior to the Petition Date, the Debtors had attempted to reduce the burdens of the Lease Documents, but were unsuccessful. Indeed, despite extensive efforts to sell the Debtor Lessees' interests in the Leased Facilities, only one potential buyer expressed preliminary

---

[2] Due to their substantial volume, true and correct copies of the Lease Documents and the public filings cited herein will be provided to the Court prior to the hearing on the Motion and to any other interested parties upon request. To the extent any material agreement has been inadvertently omitted from the list of Lease Documents identified on Exhibit A, the Debtors reserve the right as appropriate to supplement Exhibit A and deem any such agreement as included in the definition of Lease Documents and subject to treatment identical to that of the other Lease Documents.

interest. That buyer would have required that the Debtor Lessees pay it $200-300 million to relieve them of their Facility Lease obligations. <u>See</u> Daley Declaration ¶ 12.

13. Furthermore, before the Petition Date, the Debtors engaged in discussions with both the PSEG Entities and the Pass-Through Certificate Holders seeking a consensual restructuring of their obligations under the Lease Documents. These discussions ultimately proved unsuccessful. <u>See</u> Stephenson Declaration ¶ 62. During those discussions, the Debtors indicated that, absent a consensual resolution, a bankruptcy filing by the Debtors was likely and that, in such case, rejection of the Lease Documents was probable. <u>See id</u>. Upon information and belief, both the Pass-Through Certificate Holders and the PSEG Entities have analyzed and prepared substantially for the relief requested herein.

14. This Motion seeks entry of an order rejecting the Lease Documents effective as of November 7, 2011. As explained in greater detail below, federal and state regulations place restrictions on any change of control of the Leased Facilities without regulatory approval. As a result, regardless of whether the Court grants rejection with retroactive effect, the Debtor Lessees must continue to operate the Leased Facilities until the appropriate regulatory authorities approve the Owner Lessors' taking control of the Leased Facilities. <u>See</u> Daley Declaration ¶ 18.

<b><u>Basis for Relief</u></b>

15. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." <u>See</u> 11 U.S.C. § 365(a). "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon

burdensome property.'" <u>Orion Pictures Corp.</u> v. <u>Showtime Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095, 1098 (2d Cir. 1993) (internal quotations omitted).  Courts apply the debtor's business judgment as the standard for determining whether to approve rejection of an executory contract or unexpired lease.  <u>See</u> <u>NLRB</u> v. <u>Bildisco & Bildisco</u>, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to approve rejection of executory contracts).

16.     A debtor satisfies the "business judgment" test by showing that the rejection of an unexpired lease will benefit the debtor's estate.  <u>See</u>, <u>e.g.</u>, <u>In re Old Carco LLC</u>, 406 B.R. 180, 193 (Bankr. S.D.N.Y. 2009) (stating "the scope of the Court's inquiry is limited" and "[u]nder the business judgment standard, the Court must determine whether rejection will benefit the Debtors' estates"); <u>In re Helm</u>, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must establish that rejection will benefit the estate") (internal quotations omitted); <u>In re Balco Equities Ltd., Inc.</u>, 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate") (quoting <u>In re G Survivor Corp.</u>, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994)).

A.     **Rejection of the Lease Documents Is a Sound Exercise of the Debtors' Business Judgment**

17.     The Debtors' decision to reject the Lease Documents satisfies the "business judgment" standard.  In an effort to maximize the value of their estates and reduce their administrative costs in these chapter 11 cases, the Debtors have determined, in their business judgment, that the Lease Documents are significantly burdensome, provide no economic value to their estates and will impair the Debtors' ability to reorganize absent rejection.

18.     The Leased Facilities earn revenue principally in three ways:  (i) the sale of electricity and related services to either the New York Independent System Operator ("NYISO") or through third-party bilateral agreements; (ii) the sale of their "capacity" to either the NYISO or through third-party bilateral agreements; and (iii) to a lesser extent, the sale of ancillary electrical services.  With respect to the sale of electricity, the NYISO dispatches power generated at the Leased Facilities to meet real-time electricity demand in New York.  Pricing for the electricity is generally determined by the least efficient unit that the NYISO needs to meet demand for a respective zone.  For the Debtors to earn revenue from generating electricity, their costs for fuel and operations must remain lower than the least efficient unit needed by NYISO.  To sell "capacity," non-debtor affiliate Dynegy Power Marketing, LLC markets its commitment for the units to be available as needed during future market periods.  Pricing for these sales is calculated as a function of NYISO's annual required reserve margin, the estimated net cost of "new entrant" generation, estimated peak demand, and the actual amount of capacity bid into the market at or below the demand curve.  Lastly, the Debtors receive a relatively small amount of revenue in exchange for providing miscellaneous electrical services. See Daley Declaration ¶ 14.

19.     The economic performance of the Leased Facilities does not support continued operation by the Debtors.  Even excluding rent payments due under the Lease Documents, total gross margin at the plant level between August and December 2011 is projected to fall short of total operating expenses at the plant level by approximately $3 million.  Cash payment obligations arising under the Lease Documents by themselves add an additional expense of approximately $82.5 million during that period.  See Daley Declaration ¶ 15.

20.     Absent rejection of the Lease Documents, the financial outlook for the Leased Facilities remains bleak.  The onerous terms of the Lease Documents impede any

possible improvement in the Debtors' financial health. In addition to cash payments totaling approximately $82.5 million due on November 8, 2011,[3] the Lease Documents require future payments of approximately $179 million in 2012, $142 million in 2013, $143 million in 2014, $143 million in 2015 and $105 million in the aggregate due from 2016 through lease expiration (February 8, 2035 for Dynegy Roseton and May 8, 2031 for Dynegy Danskammer). See Daley Declaration ¶ 16; Dynegy Inc., Annual Report (Form 10-K), at 60 (Mar. 8, 2011). These upcoming lease payments dwarf all forecasts for potential cash flow that could be generated from the Leased Facilities over the remaining terms of the Facility Leases.

21.     In addition to such large semiannual rent payments, the Lease Documents impose significant ongoing operational costs on the Debtors. Among other things, the Debtor Lessees must maintain the Leased Facilities in accordance with "prudent industry practice" and in compliance with environmental laws, which requires the Debtor Lessees to make substantial capital expenditures to comply with environmental upgrade and regulatory requirements, as well as to make needed repairs. See Danskammer Lease § 7; Roseton Lease § 7. In particular, the Lease Documents require that Dynegy Danskammer comply with newly enacted environmental regulations mandating upgrades to the Danskammer Facility by 2014 at a cost of approximately $375 million. While these capital costs could be avoided by completely switching the plants to natural-gas operations, conversion would require additional upgrades to the gas delivery systems at the Leased Facilities (which could entail capital costs in an amount approaching $10-15 million) and, in any event, would significantly diminish the amount of revenue generated by the Leased Facilities. Dynegy Roseton would likewise have to make substantial capital expenditures

---

[3]  The relief requested herein is without prejudice to the Debtors' rights to make any objection or assert any position in the future with respect to the payments due November 8, 2011 or any other pre- or post-petition obligation allegedly owed by the Debtors. Following November 8, 2011, a five (5) business day grace period exists during which the Debtor Lessees may make the November 8th Lease Payments and avoid triggering an event of default under the Lease Documents. See Daley Declaration ¶ 16 n. 3.

pursuant to the Lease Documents to upgrade the Roseton Facility to comply with a number of federal and state regulations scheduled to become effective in the next few years. These ongoing expenses exacerbate the economic burden to the Debtors caused by the Lease Documents. See Daley Declaration ¶ 17.

**B.** ***Nunc Pro Tunc* Relief Is Appropriate**

22.     The Debtors request that the Court deem the rejection, if granted, to have retroactive effect to the date of filing of this Motion on November 7, 2011. The Court may grant <u>nunc</u> <u>pro</u> <u>tunc</u> relief on a debtor's motion to reject a lease when such relief is equitable. <u>See</u> 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title .…"); <u>see</u> <u>also</u> <u>Constant Ltd. P'ship</u> v. <u>Jamesway Corp. (In re Jamesway Corp.)</u>, 179 B.R. 33, 36-39 (S.D.N.Y. 1995) (finding that the retroactive rejection of an unexpired lease was appropriate where the lessor caused an unnecessary delay in the approval of the rejection); <u>Pac. Shores Dev., LLC</u> v. <u>At Home Corp. (In re At Home Corp.)</u>, 392 F.3d 1064, 1071-72 (9th Cir. 2004) (affirming bankruptcy court's exercise of its equitable authority to approve retroactive rejection under section 365); <u>Thinking Machs. Corp.</u> v. <u>Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs. Corp.)</u>, 67 F.3d 1021, 1028 (1st Cir. 1995) (recognizing that bankruptcy courts have discretion to approve rejection retroactive under section 365 when equities permit).

23.     Courts determine whether retroactive effect is appropriate on a case-by-case basis. <u>In re Thinking Machs. Corp.</u>, 67 F.3d at 1029 n. 9 ("[W]e eschew any attempt to spell out the range of circumstances that might justify the use of a bankruptcy court's equitable powers in this fashion. That exercise is best handled on a case-by-case basis"). In making such determination, courts have examined, among other things:

- The potential harm to the estate of denying retroactive relief;

- Whether advance notice of rejection was provided by the debtor;

- The absence of delay on the part of the debtor in moving for relief;

- The lessor's role and motivation in delaying the rejection; and

- Whether there is prejudice to the lessor's ability to relet the property.

See, e.g., Adelphia Bus. Solutions Inc. v. Abnos, 482 F.3d 602, 608-09 (2d Cir. 2007) (upholding retroactive effect of rejection where the lessor's failure to relet the premises was caused by its own inaction and not by the debtor-lessee); In re Jamesway Corp., 179 B.R. at 38 (upholding retroactive application of lease rejection where delay in the bankruptcy court's determination was caused by the lessor); BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 6419 (NRB), 2002 WL 31548723, *6 (S.D.N.Y. Nov. 15, 2002) (upholding retroactive effect of rejection where, among other things, (i) filing placed the contract counterparty "on advance notice of the [rejection] effective date," (ii) higher than current pricing under the contract resulted in potential losses to the debtor's estate and creditors, and (iii) the debtor made alternative arrangements beginning one day after proposed effective date and repeatedly asked counterparty to stop making deliveries pursuant to the contract after such date); In re At Home Corp., 392 F.3d at 1073-75 (affirming retroactive approval of lease rejection to date of filing of rejection motion, on basis that debtor had filed its motion on the first day of the case and scheduled the hearing for the "earliest practicable date," as well as the fact that the rent payments under the lease were costly, the lessor's objection to rejection appeared to be motivated by its wish to continue collecting rent under the existing lease terms, and the lessor was not obstructed from reletting the property); In re 1 Potato 2, Inc., 58 B.R. 752, 755 (Bankr. D. Minn. 1986) (deeming rejection to be retroactively effective notwithstanding an ongoing

dispute regarding whether the debtor had completely removed its fixtures from the premises); In re S. Lincoln Med. Grp., P.C., Case No. BK07-41636-TLS, 2008 Bankr. LEXIS 468, *7-8 (Bankr. D. Neb. Feb. 21, 2008) (granting retroactive effect to rejection notwithstanding that certain of debtor's medical equipment remained on premises and hindered lessor from reletting the property).

24.     Here, equitable considerations support the retroactive rejection of the Lease Documents effective as of November 7, 2011.

(a)     The Debtors Will Be Harmed if Retroactive Effect Is Not Granted

25.     The Court's decision whether to grant retroactive effect to the rejection to the date of filing of this Motion on November 7, 2011 has potentially significant consequences to the Debtors' estates.  Upon rejection, the Debtors will seek to cap any damages arising therefrom under section 502(b)(6) of the Bankruptcy Code.[4]  Unless the rejection is deemed effective as of November 7, 2011, the Owner Lessors will likely claim that the approximately $82.5 million payment coming due on November 8, 2011 is owing as an administrative expense and is not subject to the limitation on damages under section 502(b)(6).  Denying retroactive effect would therefore prejudice the Debtors by expanding the scope of the Owner Lessors' potential arguments and potentially increasing the Debtors' administrative expenses to the detriment of their other stakeholders.

---

[4]  The Lease Documents constitute unexpired leases of nonresidential real property.  Thus, any rejection damages will be subject to the cap set forth in section 502(b)(6).  This position surely will be heavily disputed later in the proceedings in the context of fixing the Owner Lessors' rejection damages claims.  The Debtors expressly reserve all rights with respect to any future disputes regarding the Owner Lessors' damages claim and the application of the cap under section 502(b)(6).  However, any issues as to the application of the section 502(b)(6) cap simply are not relevant to the Court's determination of rejection at this time.

(b)     The Debtors Did Not Delay in Seeking Rejection and Provided Advance Notice

26.     The Debtors moved for rejection immediately upon commencing their chapter 11 cases and are providing the Owner Lessors with advance notice of the relief requested herein. These facts support granting retroactive relief. See Bethlehem Steel, 2002 WL 31548723, at *6 (emphasizing that debtor provided "advance notice" when it filed its motion to reject on February 28, 2002 seeking a rejection date of March 5, 2002); In re At Home Corp., 392 F.3d at 1072-73 (granting retroactive effect in part because debtor filed its motion on the first day of the case and scheduled the hearing for the "earliest practicable date").

27.     In addition, the Indenture Trustee, the Pass-Through Certificate Holders and the PSEG Entities have previously commenced litigation to obstruct actions taken by the Debtors and their affiliates to improve their overall financial position.[5] The premise underlying all of these pleadings is that the Roseton and Danskammer Facilities do not provide sufficient income to cover the obligations under the Lease Documents. Thus, the Indenture Trustee, the Pass-Through Certificate Holders, and the PSEG Entities have been aware of the burdensome nature of the Lease Documents since at least July of this year.

28.     In fact, the Owner Lessors have had several months' notice of the Debtors' precarious financial situation and the likelihood that the Debtors would be forced to seek the relief sought herein if an acceptable out-of-court restructuring could not be accomplished. Public filings issued by the Debtors' affiliates were clear on this point. See Dynegy Inc., Current Report (Form 8-K), Ex. 99.2, at 1 (Sept. 16, 2011) ("In the absence of

---

[5]  The litigation commenced by the Indenture Trustee is currently pending in the New York Supreme Court. The PSEG Entities sought injunctive relief in a lawsuit filed in the Delaware Chancery Court in July. The Delaware court denied plaintiffs' request and both the Chancery court and the Delaware Supreme Court denied plaintiffs' requests for interlocutory appeal. Plaintiffs' then voluntarily dismissed the Delaware action in August, 2011. The same PSEG entities filed another lawsuit in New York Supreme Court on November 4, 2011 asserting many of the same claims which the Delaware court found unlikely to succeed. That lawsuit remains pending. The Pass-Through Certificate Holders' case was voluntarily dismissed in favor of the Delaware action.

further successful debt restructuring and/or refinancing, there can be no assurance that

[Holdings] or its subsidiaries responsible for the Roseton and Danskammer lease obligations

(i.e., Dynegy Roseton, L.L.C. and Dynegy Danskammer, L.L.C.) will have sufficient resources

to pay existing indebtedness, including lease obligations, and, as a result, may become the

subject of a voluntary or involuntary bankruptcy case."); Dynegy Inc. Current Report (Form 8-

K), Ex. 99.2, at 6 (July 11, 2011) ("[Holdings] will remain highly leveraged following the

closing of the GasCo Term Loan and CoalCo Term Loan . . . as the issuer of $3.5 billion of

senior unsecured notes and as a guarantor of the lease obligations associated with the Roseton

and Danskammer facilities. In the absence of successful debt restructuring and/or refinancing,

there can be no assurance that [Holdings] or any of its subsidiaries will have sufficient resources

to pay existing indebtedness").

(c)     No Legitimate Basis Exists for Delaying Rejection

29.     In previous discussions with the Debtors, the Owner Lessors have

indicated that they have no interest in taking control of the Leased Facilities.  See Stephenson

Declaration ¶ 64.  By the same token, they have admitted that the Debtors' obligations under the

Lease Documents exceed the value that the Debtors receive from operating the Facilities.  Thus,

to the extent any objection is filed to the Motion to Reject, the goal of that objection would be to

delay rejection so as to strengthen the Owner Lessors' purported entitlement to the payment due

on November 8, 2011 outside of the section 502(b)(6) cap.  Improving one's parochial economic

position is not, however, a legitimate basis for denying the relief or delaying the effectiveness of

the rejection.  See, e.g., In re Jamesway Corp., 179 B.R. at 38 (granting retroactive effect to

rejection where landlord's objection caused delay in the issuance of rejection order and "was

only to the timing of rejection and not as to whether rejection was an unsound business

decision"); <u>In re At Home Corp.</u>, 392 F.3d at 1072 (granting retroactive effect to rejection in part because the landlord's objection to rejection appeared to be motivated by its wish to continue collecting rent under the existing lease terms).

    (d)    <u>There Is No Prejudice to the Owner Lessors' Ability to Relet the Facilities</u>

    30.    In addressing retroactivity, one factor courts have considered is whether any delay in obtaining rejection interfered with the ability of the lessor to cover its damages by, for example, releasing the property at issue. If such interference exists, retroactive effect would harm the lessor by essentially converting its claim against the estate on account of any delay from administrative to general unsecured status. That is not the case here.

    31.    Granting retroactive relief will not prejudice the Owner Lessors because, regardless of when the Lease Documents are rejected, the Owner Lessors are ineligible to assume control of the Facilities – and thus incapable of reletting them – until they have obtained necessary federal and state regulatory approval. Section 203 of the Federal Power Act ("<u>FPA</u>") requires that public utilities such as the Debtor Lessees obtain prior authorization from the Federal Energy Regulatory Commission ("<u>FERC</u>") before altering control of facilities[6] such as the Leased Facilities; and the Owner Lessors, who will become "public utilities" upon acquiring control of the Leased Facilities, must obtain prior authorization from FERC to acquire control of these existing generation facilities. <u>See</u> 16 U.S.C. §§ 824b(a)(1)(A), 824b(a)(1)(D), 824(e); <u>Calpine Fox LLC</u>, 116 F.E.R.C. ¶ 61,261 at P1 (2006) (authorizing, <u>inter alia</u>, shifting control over facility from the lessee to the lessor). New York state law similarly requires that the Owner

---

[6] Specifically, the "facilities" subject to the jurisdiction of FERC are the interconnection facilities that connect each of the Danskammer Facility and the Roseton Facility, respectively, to the transmission system and, since the Debtor Lessees are seeking to dispose of the plants and the associated interconnection facilities, the Debtor Lessees' proposed disposition is within the scope of section 203 of the FPA. <u>See, e.g.</u>, <u>Mesquite Investors L.L.C.</u>, 111 F.E.R.C. ¶ 61,162 at P1 (2005) (identifying "interconnection facilities appurtenant to generating facilities" as among the jurisdictional facilities in a proposed Section 203 transaction).

Lessors obtain regulatory approval from the New York State Public Service Commission ("NYPSC") before taking control of the Leased Facilities.  See N.Y. Pub. Serv. Law § 70(1) (McKinney 2009) (providing that no "electric corporation shall transfer or lease its franchise, works or system or any part of such franchise, works or system to any other person or corporation or contract for the operation of its work and system, without the written consent of the [NYPSC]"); Case 00-E-1643, Dynegy Power Corporation, Dynegy Danskammer, LLC and Dynegy Roseton, LLC – Petition on Regulation, Order Providing for Lightened Regulation (NYPSC Dec. 20, 2000).

32.     Because the Owner Lessors are not currently permitted by law to receive the Leased Facilities, even after rejection, the Debtor Lessees must temporarily retain operational control of the Leased Facilities to comply with applicable regulations, including market rules and reliability standards that are enforceable under the FPA.  Any such continued operating control of the Leased Facilities, however, is not for the benefit of the Debtors or their estates, but instead to serve a public need, to preserve the value of the Pass-Through Certificate Holders' collateral (i.e., the Leased Facilities and related support agreements), and to fulfill applicable regulatory requirements. For example, if the Debtor Lessees fail to continue to certify or sell the Leased Facilities' unforced capacity, then the NYISO could increase the Leased Facilities' "Equivalent Demand Forced Outage Rate" and thereby effectively diminish the amount of unforced capacity that the Facilities may certify and sell in the future.  Because the Owner Lessors are ineligible to accept immediate operational control of the Leased Facilities, the Debtors' control and limited operation benefits the Owner Lessors through the continued maintenance of the operational

integrity of the Leased Facilities, pending receipt of the necessary regulatory approvals for the Owner Lessors to take over the Leased Facilities.[7]

33.      Importantly, it is the Owner Lessors' legal inability to assume control of the Facilities – and not the Debtor Lessees' limited control of the Leased Facilities post-rejection – that prevents the Owner Lessors from reletting the premises. Even in the absence of the commencement of these chapter 11 cases, had the terms of the Facility Leases simply expired of their own accord, the Owner Lessors would be unable to take control of the Leased Facilities (and thus be able to relet them) without first fulfilling the regulatory requirements for obtaining such control. Indeed, even if these chapter 11 cases had never commenced, the Owner Lessors (or the Pass-Through Certificate Holders through foreclosure or deed-in-lieu) would be unable without regulatory approval to relet the Leased Facilities in the event of a default under the Lease Documents. Nevada Solar One, LLC, 119 F.E.R.C. ¶ 61,285 at P14 (2007) (approving a sale-leaseback transaction and finding that the lenders, owner lessor and owner participants will not be "public utilities" under the FPA as a result of their interests, provided that to the extent that they "propose to operate the Facility in order to make sales of electric energy at wholesale or to engage in transmission in interstate commerce, whether as the result of a default or for some other reason, they would first be required to make the appropriate filings with the Commission pursuant to sections 203 and 205 of the FPA"). Therefore, whether or when the Lease Documents are rejected or terminated does not affect who controls the Leased Facilities.

34.      To be clear, the Debtor Lessees are taking steps to facilitate an orderly and expeditious transition of operational control of the Leased Facilities. To that end, the Debtor

---

[7] In addition, the Debtor Lessees have developed an operating protocol, which sets forth the proposed terms and conditions pursuant to which the Debtor Lessees will continue to operate the Leased Facilities after the Lease Documents are rejected and until the Owner Lessors become eligible themselves to control the Leased Facilities. See Stephenson Declaration ¶ 66.

Lessees intend promptly to file an application with FERC requesting approval for the Owner Lessors to assume operational control of the plants and the associated interconnection facilities. The Debtor Lessees intend to take similar steps to obtain eligibility for the Owner Lessors under New York state law. Specifically, the Debtor Lessees intend to file a verified petition with the NYPSC requesting a declaratory ruling disclaiming jurisdiction over the change in control or, in the alternative, expedited approval for the termination of the leasehold interests in the Leased Facilities and the reversion of the Leased Facilities and control over their operation to the Owner Lessors. See Stephenson Declaration ¶ 63.

35. Notably, the Owner Lessors have not, to the Debtors' knowledge, made any effort to plan for an inevitable transition of the Leased Facilities. On October 6, 2011, the Debtors approached PSEG to devise consensual contingency plans in the event of a transition of control of the Facilities to the Owner Lessors (or Pass-Through Certificate Holders). See Stephenson Declaration ¶ 64. The Owner Lessors rebuffed these proposals to obtain joint approval for a transfer of the Leased Facilities and instead indicated that they had no desire to participate in any efforts to transition operational control of the Leased Facilities back to them. Id. In the absence of cooperation, the Debtor Lessees have been forced to seek independent regulatory approval on behalf of the Owner Lessors and, as discussed above and in the Stephenson Declaration, intend to file an application with FERC, as well as with the appropriate state regulatory authorities, requesting approval of the Owner Lessors as permitted controllers of the plants and the associated interconnection facilities. Id. Nonetheless, there are additional actions that the Owner Lessors, or any other owner of the Leased Facilities, must take on their own, such as securing rate authority from FERC, before they will be authorized to sell the power generated. See 16 U.S.C. § 824d(c); Daley Declaration ¶ 20. In any event, the Debtor Lessees'

entitlement to retroactive relief should not be dependent on the Owner Lessors' failure to take any steps to cover.  See Adelphia Bus. Solutions, Inc., 482 F.3d at 609 ("Assuming that the bankruptcy courts have the authority to issue orders like the one at issue, we must give them generous latitude to shape equitable relief under § 365, and see no reason to make landlord culpability a requirement for retroactivity").

36.     Given that the Owner Lessors are ineligible to take control of the Leased Facilities until they receive the necessary regulatory approvals to do so, they will not suffer any prejudice from the Debtor Lessees' post-rejection operational control pending receipt of such regulatory approvals.    In light of the lack of prejudice, denying retroactive relief because the Debtor Lessees retain temporary operational control of the Leased Facilities during the transition period would bestow an inequitable windfall upon the Owner Lessors.  Accordingly, the Debtor Lessees' continued temporary control during the transition period, in accordance with applicable regulatory requirements and pending receipt of all regulatory approvals necessary to transition operation of the Leased Facilities to the Owner Lessors, should not constitute grounds for denying equitable retroactive relief.

**Notice**

37.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the Attorney General for the State of New York; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the ad hoc group of the holders of Holdings' prepetition unsecured notes; (vii) Wilmington Trust Company, the indenture trustee for each series of Holdings' prepetition unsecured notes; (viii) counsel to U.S.

Bank National Association, the successor lease indenture trustee for the pass-through certificate holders; (ix) counsel to PSEG; (x) Local Union 320 of the International Brotherhood of Electrical Workers, AFL-CIO; and (xi) the Owner Lessors.   The Debtors submit that no other or further notice need be provided.  No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order, in a form substantially similar to Exhibit B attached hereto, deeming the Lease Documents rejected as of the date of the filing of this Motion on November 7, 2011, and (ii) grant such other and further relief as the Court deems appropriate.

Dated:  November 7, 2011
        New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Thomas E Lauria (*pro hac vice admission pending*)
Gerard Uzzi
J. Christopher Shore
Elizabeth Feld

By:  */s/ J. Christopher Shore*

Proposed Special Counsel to the Debtors

# EXHIBIT A

# (List of Lease Documents)

1.      Facility Lease Agreement, dated as of May 8, 2001, between Roseton OL LLC, as Owner Lessor, and Dynegy Roseton, L.L.C., as Facility Lessee.

2.      Facility Lease Agreement, dated as of May 8, 2001, between Danskammer OL LLC, as Owner Lessor, and Dynegy Danskammer, L.L.C., as Facility Lessee.

3.      Participation Agreement, dated as of May 1, 2001, among Dynegy Roseton, L.L.C., Roseton OL LLC, Wilmington Trust Company in its capacity as Lessor Manager, Roseton OP LLC, The Chase Manhattan Bank in its capacity as Lease Indenture Trustee, and The Chase Manhattan Bank in its capacity as Pass Through Trustee.

4.      Participation Agreement, dated as of May 1, 2001, among Dynegy Danskammer, L.L.C., Danskammer OL LLC, Wilmington Trust Company in its capacity as Lessor Manager, Danskammer OP LLC, The Chase Manhattan Bank in its capacity as Lease Indenture Trustee, and The Chase Manhattan Bank in its capacity as Pass Through Trustee.

5.      Pass-Through Trust Agreement, dated as of May 1, 2001, among Dynegy Roseton, L.L.C., Dynegy Danskammer, L.L.C., and The Chase Manhattan Bank in its capacity as Pass Through Trustee.

6.      Tax Indemnity Agreement, dated as of May 8, 2001, among Dynegy Roseton, L.L.C., Resources Capital Management Corporation, PSEGR Newburgh Holdings LLC, Roseton OP LLC and Roseton OL LLC.

7.      Tax Indemnity Agreement, dated as of May 8, 2001, among Dynegy Danskammer, L.L.C., Resources Capital Management Corporation, PSEGR Newburgh Holdings LLC, Danskammer OP LLC, and Danskammer OL LLC.

8.      Guaranty, dated as of May 1, 2001, by Dynegy Holdings Inc., as guarantor, in connection with Roseton Units 1 and 2.

9.      Guaranty, dated as of May 1, 2001, by Dynegy Holdings Inc., as guarantor, in connection with Danskammer Units 3 and 4.

# EXHIBIT B

# (Proposed Order)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DYNEGY HOLDINGS, LLC, <u>et al.</u>,[1] | ) | Case No. 11- 38111 (___) |
|  | ) |  |
|  | ) | Joint Administration Pending |
| Debtors. | ) |  |
|  | ) |  |

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006 FOR ENTRY OF AN ORDER <u>AUTHORIZING THE DEBTORS TO REJECT THE LEASE DOCUMENTS</u>

Upon the Motion,[2] dated November 7, 2011, of Dynegy Holdings, LLC and its affiliated

debtors in the above-captioned chapter 11 cases (together, the "<u>Debtors</u>"), requesting entry of an

order authorizing the Debtors to reject the Facility Leases and certain other related executory

agreements and unexpired leases as set forth therein (the "<u>Motion</u>"); and the Court having

reviewed the Motion and the Supporting Declaration of Martin W. Daley (the "<u>Daley</u>

<u>Declaration</u>") and the Declaration of Kent R. Stephenson in Support of First Day Motions (the

"<u>Stephenson Declaration</u>"); and it appearing and the Court having found and determined that (i)

the Court has jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.), (ii) the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b),

(iii) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409, and (iv) in

accordance with Bankruptcy Rule 9014 and Local Bankruptcy Rule 6006-1, due and proper

---

[1]  The Debtors in these chapter 11 cases are Dynegy Holdings, LLC, Dynegy Northeast Generation, Inc., Hudson Power LLC, Dynegy Danskammer, L.L.C. and Dynegy Roseton, L.L.C.

[2]  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

notice of the Motion has been provided to the Notice Parties; and it appearing that no other or further notice need be provided; and a hearing having been held on November _, 2011 to consider the relief requested in the Motion; and the Court having found and determined based upon the Motion, the Daley Declaration, the Stephenson Declaration and the entire record of the proceedings including at the hearing on the Motion, that rejection of the Lease Documents is an exercise of sound business judgment by the Debtors, that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and that the legal and factual bases set forth in the Motion and supporting Declarations establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor; IT IS HEREBY

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Debtors are hereby authorized to reject the Facility Leases and each of the other Lease Documents identified on Exhibit A to the Motion effective nunc pro tunc to November 7, 2011; and it is further

ORDERED, that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated: _____ ___, 2011          _____
      Poughkeepsie, New York          UNITED STATES BANKRUPTCY JUDGE