SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599
James F. Conlan (*pro hac vice admission pending*)
Sophia P. Mullen
Paul S. Caruso (*pro hac vice admission pending*)
Brian J. Lohan (*pro hac vice admission pending*)

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                                         :
In re:                                                   :         Chapter 11
                                                         :
DYNEGY HOLDINGS, LLC, et al.,[1]                         :         Case No. 11-38111 (     )
                                                         :
                                                         :         Joint Administration Requested
                          Debtors.                       :
-------------------------------------------------------- x

**DEBTORS' MOTION FOR AN INTERIM AND FINAL ORDER
(I) AUTHORIZING DYNEGY HOLDINGS, LLC TO PROVIDE INTERCOMPANY
POST-PETITION FINANCING TO ITS DEBTOR SUBSIDIARIES UNDER SECTIONS
362, 363 AND 364 OF THE BANKRUPTCY CODE, (II) SCHEDULING
A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c),
AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (each a

"Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, hereby

move this Court (the "Motion") for the entry of an interim order, in substantially the form

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are Dynegy Holdings, LLC (8415); Dynegy Northeast Generation, Inc. (6760); Hudson Power, L.L.C. (NONE); Dynegy Danskammer, L.L.C. (9301); and Dynegy Roseton, L.L.C. (9299). The location of the Debtors' corporate headquarters and the service address for Dynegy Holdings, LLC, Dynegy Northeast Generation, Inc. and Hudson Power, L.L.C. is 1000 Louisiana Street, Suite 5800, Houston, Texas 77002. The location of the service address for Dynegy Roseton, L.L.C. is 992 River Road, Newburgh, New York 12550. The location of the service address for Dynegy Danskammer, L.L.C. is 994 River Road, Newburgh, New York 12550.

NY1 7880062

attached hereto as <u>Exhibit A</u> (the "<u>Interim Order</u>"),[2] and a final order (the "<u>Final Order</u>" and,

together with the Interim Order, the "<u>Financing Orders</u>"), pursuant to sections 105, 362, 363 and

364 of the Bankruptcy Code (as defined herein), Rules 4001, 6003, 6004 and 9013 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 4001-2 and 9013-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

Southern District of New York (the "<u>Local Rules</u>"), (i) authorizing (a) the Lender and Borrower

Debtors (each as defined below) to enter into post-petition financing arrangements (the

"<u>Intercompany Credit Facility</u>"), pursuant to which Debtor Dynegy Holdings, LLC ("<u>Dynegy</u>

<u>Holdings</u>" or the "<u>Lender</u>") will provide intercompany financing on a revolving post-petition

basis to Debtors Dynegy Northeast Generation, Inc. ("<u>DNE</u>"), Hudson Power, L.L.C. ("<u>Hudson</u>

<u>Power</u>"), Dynegy Danskammer, L.L.C. ("<u>Danskammer</u>") and Dynegy Roseton, L.L.C.

("<u>Roseton</u>", and together with DNE, Hudson Power and Danskammer, the "<u>Borrower Debtors</u>"),

and (b) the Borrower Debtors to guaranty, on a joint and several basis, the obligations arising

under the Intercompany Credit Facility; (ii) granting liens and providing superpriority

administrative status; (iii) scheduling a hearing to consider entry of the Final Order pursuant to

Bankruptcy Rule 4001; and (iv) granting related relief.  In further support of this Motion, the

Debtors respectfully represent as follows:

## BACKGROUND

1.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced

a voluntary case (collectively, the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>").  The Debtors are authorized to operate their businesses

and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

---

[2] Capitalized terms used but not otherwise defined in this Motion have the meanings assigned to them in the Interim Order or the Stephenson Declaration (as defined herein) , as applicable.

NY1 7880062

the Bankruptcy Code.  Contemporaneously herewith, the Debtors filed a motion seeking joint

administration of their Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

## JURISDICTION AND VENUE

2.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§

157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## DEBTORS' BUSINESSES

3.    Debtor Dynegy Holdings is a direct subsidiary of Dynegy Inc., a public

company which is not a debtor in these chapter 11 proceedings, and is the direct or indirect

parent of each of the other four (4) debtors in these Chapter 11 Cases.  As of the Petition Date,

Dynegy Holdings has approximately $3,570.3 million in outstanding unsecured indebtedness

arising under seven (7) different series of notes, debentures, and subordinated capital income

securities, with varying maturities.

4.    The business operations of DNE and Hudson Power are wholly conducted

through Debtors Roseton and Danskammer at their respective power generation facilities

(individually, a "Facility" and collectively, the "Facilities").  Danskammer owns four (4) of the

six (6) power generation units located at the Danskammer Facility and leases the additional two

(2) units (the "Danskammer Leased Facility").  The Danskammer Facility uses coal, natural gas

and fuel oil as its primary fuels.  Roseton leases each of the two (2) units located at the Roseton

Facility (the "Roseton Leased Facility", together with the Danskammer Leased Facility, the

"Leased Facilities").  The Roseton Leased Facility uses natural gas and fuel oil as its primary

fuels.  The units at the Facilities have a combined generating capacity of approximately 1,693

MW, with the units at the Leased Facilities comprising approximately 1,570 MW of this capacity.

5.     The Leased Facilities are leased pursuant to sale-leaseback transactions under which Danskammer and Roseton make semiannual lease payments to a trustee for the benefit of pass-through trust certificate holders and the Owner Lessors (as defined below). Dynegy Holdings guarantees the lease obligations of Danskammer and Roseton under the leases. As of the Petition Date, there are approximately $794.0 million in future payments to be made under the leases.

6.     As set forth in the Declaration of Martin W. Daley in Support of the Motion of the Debtors Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 for Entry of an Order Authorizing the Debtors to Reject the Lease Documents (the "Daley Declaration"), the Debtors have filed a motion seeking to immediately reject the leases of the Leased Facilities, with such rejection to be effective as of November 7, 2011.  Applicable regulatory requirements prevent the Debtors from simply "handing over the keys" to the owners of the Leased Facilities, Roseton OL LLC and Danskammer OL LLC (collectively, the "Owner Lessors")[3] immediately upon entry of an order authorizing the rejection of the leases.  Rather, the Debtors will be required to retain operational control of the Leased Facilities until the Owner Lessors are authorized to take over such operational control.  The Debtors intend to take all steps necessary to transition operation of the Leased Facilities to the Owner Lessors as soon as practicable in accordance with all applicable Federal and state regulatory requirements.  The Debtors further intend to operate the Facilities in accordance with prudent operating standards and as necessary to comply with all applicable Federal and state regulatory requirements until the

---

[3] The Owner Lessors, upon information and belief, are affiliates of Public Service Enterprise Group Incorporated ("PSEG").

NY1 7880062

Debtors receive approval to transition operational control of the Leased Facilities to the Owner Lessors.

7.    The Debtors have faced a number of issues, including (i) decreasing liquidity due to declining revenues (resulting from sustained low power prices over the past two (2) years), (ii) an over-leveraged balance sheet, and (iii) economically unfavorable leases for the Leased Facilities.  To address the issue of Dynegy Holdings' over-leveraged balance sheet, the Debtors engaged in discussions with holders of its public bond debt.  After extensive negotiations, Dynegy Holdings was able to reach an agreement with holders of approximately $1.4 billion of Dynegy Holdings' outstanding public bond debt on the principal terms of a restructuring effectuated through a chapter 11 plan of reorganization (the "Restructuring"). Additional details on the terms of the Restructuring can be found in the Stephenson Declaration (as defined herein).  The Debtors filed these Chapter 11 Cases to implement the terms of the Restructuring and address the burdensome lease obligations with respect to the Leased Facilities.

8.    Additional information regarding the Debtors' businesses, capital structure and the circumstances leading to these chapter 11 filings is contained in the Declaration of Kent R. Stephenson Pursuant to Local Bankruptcy Rule 1007-2 in Support of the First Day Motions and Applications (the "Stephenson Declaration") filed contemporaneously herewith.

**RELIEF REQUESTED**[4]

9.    By this Motion, the Debtors request that this Court enter the Interim Order, substantially in the form attached hereto as Exhibit A, and the Final Order:

    (A)    authorizing the Lender, pursuant to section 363(b)(1) of the Bankruptcy Code, and the Borrower Debtors, pursuant to sections 363 and 364 of the Bankruptcy Code, to execute and

---

[4] The statutory predicates for the relief sought herein are sections 105, 362, 363(c), 364(c)(1), 364(c)(2) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 4001, 6003, 6004(a) and (h) and 9013, and Local Rules 4001-2 and 9013-1.

NY1 7880062

enter into that certain Intercompany Revolving Loan Agreement, by and among the Borrower Debtors and the Lender, in substantially the form attached hereto as <u>Exhibit B</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "<u>Intercompany Credit Agreement</u>"), providing for intercompany financing on a revolving post-petition basis (the "<u>Intercompany Credit Facility</u>"), to be made available to the Borrower Debtors in the aggregate principal amount of $15,000,000, out of which $7,500,000 may be used on an interim basis pending the Final Hearing (as defined below);

(B)     authorizing the Debtors to perform their respective obligations under the Intercompany Credit Agreement and such other and further acts as may be required in connection with the Intercompany Credit Agreement, including, without limitation, the joint and several guaranty by the Borrower Debtors of payment of all of their obligations under the Intercompany Credit Agreement and the Financing Orders as such amounts become due and payable;

(C)     authorizing the Borrower Debtors to use proceeds from the Intercompany Credit Facility for working capital and other corporate needs, and paying certain administrative costs, including certain fees and expenses of the professionals retained by the Debtors, during the pendency of these Chapter 11 Cases, subject to the Intercompany Credit Agreement and Financing Orders, including the Approved Budget;

(D)     authorizing the Borrower Debtors to grant security interests, liens, and provide superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, and liens pursuant to section 364(c)(2) of the Bankruptcy Code) to the Lender, to secure all obligations of the Borrower Debtors under and with respect to the Intercompany Credit Facility and the Financing Orders (collectively, the "<u>Intercompany Credit Facility Obligations</u>"), as more fully set forth in the Interim Order;

(E)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested herein on a final basis;

(F)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Intercompany Credit Agreement and the Financing Orders; and

6

(G)        granting such other relief as is described in the Interim Order.

## CONCISE STATEMENT OF BANKRUPTCY
## RULE 4001 AND LOCAL RULE 4001-2[5]

10.    Material provisions of the Intercompany Credit Agreement are set forth at

the following sections of the Intercompany Credit Agreement and/or the Interim Order, pursuant

to Bankruptcy Rules 4001(c)(1)(B)(i)-(xi) and (b)(1)(B)(i)-(iv) and Local Rule 4001-2 (relating

to obtaining credit):

| MATERIAL TERMS OF INTERCOMPANY CREDIT FACILITY[6] | |
| --- | --- |
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | DNE, Hudson Power, Danskammer and Roseton.  **See Intercompany Credit Agreement at Preamble, Interim Order Intro.** |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rules 4001-2(a)(14) and (e) | DNE, Hudson Power, Danskammer and Roseton shall guaranty, on a joint and several basis, the Intercompany Credit Facility Obligations.  **See Intercompany Credit Agreement § 10(a), Interim Order Intro.** |
| **Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Dynegy Holdings.  **See Intercompany Credit Agreement at Preamble, Interim Order Intro.** |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B) | The Intercompany Credit Facility shall be used by the Borrower Debtors pursuant to the terms of the Intercompany Credit Agreement, Financing Orders and the Approved Budget for (i) working capital and other corporate needs during the pendency of these Chapter 11 Cases, and (ii) administrative expenses related to their Chapter 11 Cases, including certain fees and expenses of the professionals retained by the Debtors in these Chapter 11 Cases.  **See Intercompany Credit Agreement § 5(d); Interim Order Intro., ¶¶ 3(b) and 5.** |
| **Limitation on the Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(9) | No portion of the Intercompany Credit Facility or the Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Lender, including, without limitation, challenging the |

---

[5] Certain provisions referenced in Bankruptcy Rule 4001 and in Local Rule 4001-2 are not applicable here, and are thus not detailed in the "Material Terms of Intercompany Credit Facility" chart in this Motion.

[6] This concise statement is qualified in its entirety by reference to the applicable provisions of the Intercompany Credit Agreement or the Financing Orders, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the Intercompany Credit Agreement or the Financing Orders, the provisions of the Intercompany Credit Agreement or the Financing Orders shall control.

7

|  | amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Intercompany Credit Facility Obligations, the Intercompany Credit Facility, the Intercompany Credit Facility Superpriority Claims or security interests and liens of the Lender in respect thereof, or (ii) asserting any claims or causes of action, including, without limitation, claims, proceedings or actions that might hinder or delay the Lender's  assertion, enforcement, realization or remedy on or against the Collateral in accordance with the applicable Intercompany Credit Agreement and Financing Order.  **See Interim Order ¶ 12.** |
|---|---|
| **Facility** <br> Bankruptcy Rule 4001(c)(1)(B); Local Rules 4001-2(a)(1) and (g) | The Intercompany Credit Facility will consist of a revolving credit facility pursuant to which Lender shall advance funds in an aggregate amount no greater than $15,000,000 on a final basis, with $7,500,000 of such aggregate amount to be used on an interim basis pending the Final Hearing.  **See Intercompany Credit Agreement § 1; Interim Order Intro.** |
| **Maturity and Termination Date** <br> Bankruptcy Rule 4001(c)(1)(B) | "Maturity Date" means the earliest of (a) May 6, 2012, (b) the date of acceleration of the Obligations of the Borrower Debtors pursuant to the Intercompany Credit Facility Obligations pursuant to section 7 of the Intercompany Credit Agreement, and (c) the date of the closing of a sale of all or substantially all of any Borrower Debtors' assets pursuant to section 363 of the Bankruptcy Code or confirmation of a plan of reorganization with respect to any Borrower Debtor.  **See Intercompany Credit Agreement § 1.** |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3) | None. |
| **Interest Rate** <br> Bankruptcy Rule 4001(c)(1)(B) | All outstanding principal balances under the Intercompany Credit Facility shall bear interest at 9.25%.  **See Intercompany Credit Agreement § 2(c).** |
| **Prepayments** <br> Local Rule 4001-2(a)(13) | Borrower Debtors may voluntarily prepay any amounts outstanding under the Intercompany Credit Facility.  In addition, if at any time the unrestricted cash of Borrower Debtors shall exceed $1,000,000 in the aggregate, Borrower Debtors shall notify Lender and, immediately upon the request of Lender, make a prepayment of the "Loans" as defined and referred to in the Intercompany Credit Agreement in an aggregate amount equal to such excess.  **See Intercompany Credit Agreement §§ 3(b) and 3(c).** |
| **Collateral and Priority** <br> Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(4) | To secure all obligations of the Credit Parties under the Intercompany Credit Facility, the Lender shall receive, pursuant to section 364(c)(2) of the Bankruptcy Code and through the Financing Orders (effective upon the date of the Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the Lender) valid and perfected security interests in, and liens upon, all of the Borrower Debtors' rights, title and interest in, to and under (the "Intercompany Credit Facility Liens"), all accounts, instruments, chattel paper, payment intangibles and other |

| | |
|---|---|
| | accounts receivable or rights to payment arising from the sale of electricity and related products and services or otherwise arising under any electricity sale contract, all supporting obligations in respect thereof and all proceeds and products of any or all of the foregoing (the "Collateral").  **See Interim Order ¶ 7.** |
| **Superpriority Administrative Expense Claim** Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(4) | The Intercompany Credit Facility Obligations shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.  **See Interim Order ¶ 6.** |
| **Indemnification of any Entity** Bankruptcy Rule 4001(c)(1)(B)(ix) | Borrower Debtors agree, jointly and severally, to indemnify, defend, and hold and save harmless Lender and its employees, agents, directors, members, management, officers or other affiliates (collectively, "Indemnitees") from any losses, damages, claims, actions, demands, or lawsuits of any kind whatsoever (including reasonable attorneys' fees) arising in any way directly or indirectly out of the transactions contemplated in the Intercompany Credit Agreement, except such as may be caused by the gross negligence or willful misconduct of the applicable Indemnitee.  **See Intercompany Credit Agreement § 8.** |
| **Conditions to Closing** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | The Intercompany Credit Agreement shall become effective upon satisfaction or waiver of each of the following:  (i) Intercompany Credit Agreement or counterparts hereof shall have been duly executed by, and delivered to, the Debtors; (ii) Lender shall have received satisfactory evidence that Borrower Debtors have obtained all required consents and approvals of all persons, including all requisite governmental authorities, to the execution, delivery and performance of the Intercompany Credit Agreement; (iii) the automatic stay shall have been modified to permit the creation and perfection of the Intercompany Credit Facility Liens, as more fully set forth in the Interim Order; (iv) entry by the Bankruptcy Court of the Interim Order in form and substance satisfactory to Lender; (v) Lender shall have received a cash forecast for Borrower Debtors for the 13-week period commencing on the Petition Date setting forth projected cash flows and disbursements, to be in form, scope and substance acceptable to the Lender.  **See Intercompany Credit Agreement § 4.** |
| **Budget Covenant** Bankruptcy Rule 4001(c)(1)(B); Local Rules 4001-2(a)(2) and (h) | Commencing with the calendar week ending December 23, 2011, Borrower Debtors shall not permit, as of the end of any calendar week, either (i) the aggregate cash receipts of Borrower Debtors for the period from November 14, 2011 through the end of such calendar week to be less than 75% of the aggregate cash receipts of Borrower Debtors set forth in the Approved Budget for such period or (ii) the aggregate operating cash disbursements of Borrower Debtors for the period from November 14, 2011 through the end of such calendar week to be greater than 125% of the aggregate operating cash disbursements of Borrower Debtors set forth in the Approved Budget for such period.  **See Intercompany Credit Agreement § 5(c).** |

| | |
|---|---|
| **Events of Default and Remedies**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(10) | Events of Default:<br><br>(a)      failure to make any payment under any "Loan" (as referred to and defined in the Intercompany Credit Agreement) when due and payable pursuant to the Intercompany Credit Agreement; or<br><br>(b)      failure of Borrower Debtors to comply with the "Budget Covenant" described above; or<br><br>(c)      failure of any Borrower Debtor to perform or observe any other term, covenant or agreement contained in the Intercompany Credit Agreement and such default shall continue unremedied for a period of five (5) Business Days; or<br><br>(d)      the occurrence of any "Change of Control" (as referred to and defined in the Intercompany Credit Agreement); or<br><br>(e)      any Borrower Debtor shall have failed to receive, as and when required, any consent or approval from any governmental authority necessary in order for such party to perform its obligations hereunder in accordance with all applicable laws, rules and regulations; or<br><br>(f)      the occurrence of any of the following in any Chapter 11 Case:<br><br>(i)      the entry of, or any Borrower Debtors shall seek, an order amending, supplementing, staying, vacating or otherwise modifying the Intercompany Credit Agreement or the Interim Order or the Final Order without the written consent of Lender (other than the replacement of the Interim Order with the Final Order);<br><br>(ii)      the appointment of an interim or permanent trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower Debtor;<br><br>(iii)      the dismissal of any Borrower Debtor's Chapter 11 Case, or conversion from one under chapter 11 to one under chapter 7 of the Bankruptcy Code;<br><br>(iv)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on any Collateral or (y) to permit the perfection of any lien on the Collateral;<br><br>(v)      the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Intercompany Credit Facility Obligations owing under the Intercompany Credit Agreement; |

NY1 7880062

|  | (vi)    the entry of an order granting any other superpriority administrative claim or lien equal or superior to that granted to Lender in the Collateral; or |
|  | (vii)    the Interim Order or Final Order, as applicable, ceases to be in full force and effect. |
|  | **See Intercompany Credit Agreement § 6, Interim Order ¶ 11(b).** |
|  | Remedies: |
|  | If any "Event of Default" as defined and referred to in the Intercompany Credit Agreement shall occur and be continuing, upon compliance with the terms and conditions of the Financing Orders, then Lender may, in its sole discretion (i) by notice in writing to Borrower Debtors, (A) declare its commitment to make additional Loans under the Intercompany Credit Agreement to be terminated and (B) declare all or any part of the unpaid balance of the Loans then outstanding to be immediately due and payable and (ii) exercise any rights and remedies provided to Lender under the Intercompany Credit Agreement, under the Financing Orders or at law or equity.   Upon the occurrence and during the continuance of an Event of Default, the Lender shall have, in addition to all other rights and remedies provided in the Intercompany Credit Agreement, in the Financing Order or at law or equity, the rights and remedies of a secured party under the Uniform Commercial Code as in effect in the State of New York. |
|  | **See Intercompany Credit Agreement § 7(a), Interim Order ¶ 8.** |
| **Change of Control**<br>Local Rule 4001-2(a)(11) | "Change of Control" shall occur under the Intercompany Credit Agreement if Lender shall fail to own or control, directly or indirectly, 100% of the outstanding capital stock or membership interests, as applicable, of any Borrower Debtor.  **See Intercompany Credit Agreement § 1.** |
| **Automatic Stay**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | Lender may exercise remedies, pursuant to the terms and conditions of the Financing Orders, upon the occurrence and during the continue of any Event of Default notwithstanding the provisions of section 362 of the Bankruptcy Code.  **See Interim Order ¶ 8.** |

## BACKGROUND TO THE MOTION

### A.    Prepetition Funding of Borrower Debtors

11.    Prior to the Petition Date, the Borrower Debtors funded their operations through cash flows generated by their business and certain intercompany funding provided by Dynegy Holdings.  Without such intercompany funding provided by Dynegy Holdings, DNE,

NY1 7880062

Hudson Power and their operating subsidiaries, Danskammer and Roseton, would not have had

the ability to continue operations at their power-producing facilities and to continue to generate

revenues through the sale of such power.

**B.      Borrower Debtors' Critical Need for Funding Through the Intercompany Credit Facility**

12.      As described in the Stephenson Declaration, the Borrower Debtors have

an immediate need to obtain funding under the Intercompany Credit Facility in order to permit

the continuation of their business operations and implement the orderly transition of the Leased

Facilities to the Owner Lessors.  The Debtors intend to operate the Facilities, including the

Leased Facilities, in accordance with prudent operating standards and as necessary to comply

with all applicable Federal and state regulatory requirements.  To that end, various regulatory

agencies require the Facilities to be available to operate for, among other reasons, reliability

purposes.  Thus, the Borrower Debtors will need to continue making payroll and other required

expenditures, and will need to expend resources in order to meet such regulatory requirements

with respect to the transition.  In addition, they will have other working capital and

administrative funding needs (including certain amounts related to these Chapter 11 Cases) –

without the ability to make such payments absent an infusion of cash – within the first few days

after the Petition Date.  Although Danskammer and Roseton have historically funded much of

their own operations, because of, among other things, recent declines in market pricing for

electric energy and capacity, and certain added costs of the transition of the Leased Facilities and

the Chapter 11 Cases, they will not have sufficient cash flows for working capital and other costs

without obtaining post-petition funding.

13.      It is important that the Borrower Debtors preserve and maintain their

estates during the transition period.  In the absence of immediate borrowing availability under

the Intercompany Credit Facility, the Borrower Debtors could be compelled to curtail or even

terminate their operations prior to the orderly transition of the Leased Facilities – to the material

detriment of all of the Debtors' creditors, employees and other parties in interest.  In other words,

any Loans advanced pursuant to the Intercompany Credit Facility are critical to the orderly

transition of the Leased Facilities, and to preserving value for Dynegy Holdings' stakeholders in

connection with Dynegy Holdings' reorganization.

          **C.**      **Dynegy Holdings is the Only Likely Post-Petition Lender**

          14.      Based on the facts and circumstances of these Chapter 11 Cases and the

Borrower Debtors' operational performance, after carefully considering the limited alternatives

that might have been available, it was evident to the Debtors that (i) the Borrower Debtors would

be unable to obtain post-petition financing from sources other than the Lender on terms as or

more favorable as those under the Intercompany Credit Facility, and (ii) any additional credit

from the Lender should be provided to the Borrower Debtors with certain protections provided

under the Bankruptcy Code to post-petition lenders, including superpriority claims and liens on

certain unencumbered assets of the Borrower Debtors.  The Debtors' internal analysis, combined

with reference to historical practice, culminated with the Lender agreeing to provide the Debtors

with superpriority secured post-petition revolving financing under the Intercompany Credit

Facility, subject to the terms and conditions set forth in the Intercompany Credit Agreement.

          15.      The Intercompany Credit Facility represents the best financing option

available to the Borrower Debtors and was extended in good faith because, among other things,

(a) it will provide the Borrower Debtors with sufficient liquidity to continue their operations

during the operational transition of the Leased Facilities to the Owner Lessors and potentially

limit additional claims against the Debtors' estates, (b) the proposed liens will not prejudice any

creditors of the Borrower Debtors, and (c) the Intercompany Credit Facility is a reasonable and

13

fair financing on market terms that does not require the payment of fees nor any restrictive

covenants or onerous case milestones.

    **D.**    <u>**Use of the Intercompany Credit Facility**</u>

    16.    Proceeds of the Intercompany Credit Facility will be used for the payment

of certain expenditures to the extent set forth in the Approved Budget, an initial copy of which is

attached to the Interim Order as <u>Schedule 1</u>, subject to a variance in accordance with the terms of

the Intercompany Credit Agreement, and the Financing Orders, (a) for the payment of working

capital, including, but not limited to, the transition costs associated with the Leased Facilities

(including prepetition payments to certain critical vendors, employees and other parties identified

by the Debtors in the First Day Motions and to the extent set forth in the Approved Budget and

as authorized by the Bankruptcy Court pursuant to orders approving the First Day Motions), and

other general corporate needs of the Borrower Debtors in the ordinary course of business, and (b)

for the payment of certain chapter 11 expenses.[7]

## BASIS FOR RELIEF

    **A.**    <u>**The Lender Should Be Permitted to Continue to Provide**</u>
        <u>**Intercompany Loans to the Borrower Debtors Pursuant to the**</u>
        <u>**Terms of the Intercompany Credit Facility**</u>

    17.    Prior to the Petition Date, in the ordinary course of their respective

business operations, DNE, Danskammer and Roseton would from time to time require additional

funds to make up the short-fall between the operating expenses and revenues generated by their

---

[7] In addition, as expressly provided in the Interim Order, no portion of the Intercompany Credit Facility or the
Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the
Debtors or any Committee, in connection with (i) the initiation or prosecution of any claims, causes of action,
adversary proceedings, or other litigation against the Lender, including, without limitation, challenging the amount,
validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the
Intercompany Credit Facility Obligations, the Intercompany Credit Facility, the Intercompany Credit Facility
Superpriority Claims or security interests and liens of the Lender in respect thereof, or (ii) asserting any claims or
causes of action, including, without limitation, claims, proceedings or actions that might hinder or delay the
Lender's  assertion, enforcement, realization or remedy on or against the Collateral in accordance with the
applicable Intercompany Credit Agreement and Financing Order.

operations and, at times, Dynegy Holdings provided such funding pursuant to unsecured intercompany loans (the "Intercompany Transactions").  To alleviate any concerns related to the Lender continuing to provide such funds to the Borrower Debtors during the pendency of these Chapter 11 Cases, the Lender is now availing itself of section 364 of the Bankruptcy Code to provide security for the repayment of such funding advances post-petition.  In addition, as further protection to the Lender's estate and stakeholders, pursuant to the terms of the Intercompany Credit Agreement, the Borrower Debtors will, under certain circumstances, be able to make payments of principal or interest incurred under the Intercompany Credit Facility without further approval of this Court pursuant to section 363 of the Bankruptcy Code.  In essence, the Debtors are merely seeking authority to continue engaging in Intercompany Transactions following the Petition Date.  The Lender asserts that under these circumstances, the proposed Intercompany Credit Facility is a sound exercise of its business judgment.

18.    Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Pursuant to section 363 of the Bankruptcy Code, a court may authorize a debtor to make intercompany loans to another debtor and non-debtor affiliate in the ordinary course of business so long as such actions fall within the debtor's business judgment as being in the best interests of their estates and creditors.  See In re Natural Products Group, LLC, et al., Case No. 10-10239 (BLS) (Bankr. D. Del. Jan. 28, 2010) [Docket No. 33] (stating that pursuant to section 363 of the Bankruptcy Code, debtor may continue to provide funding to non-debtor affiliates "in the ordinary course of business, consistent with past practice, in the form of intercompany loans or payables/receivables if the Debtors determine, in the exercise of their business judgment, that such funding would be in the best interests of their estates and

15

creditors"); <u>In re AbitiBowater Inc., et al.</u>, 2009 Bankr. LEXIS 5137 (Bankr. D. Del. June 22,

2009) (same); <u>In re ASARCO LLC, et al.</u>, Case No. 05-21207 (RSS) (Bankr. S.D. Tex. May 1,

2009) [Docket No. 11094] (allowing Debtor to make debtor-in-possession loan to its subsidiary

debtors pursuant to section 363(b)(1) of Bankruptcy Code).[8]

19.    Generally, upon a debtor's articulation of a valid business justification for

its actions, courts in the Southern District of New York have given "great deference to the

substance of the directors' decision and will not invalidate the decision, will not examine its

reasonableness, and will not substitute its views for those of the board if the latter's decision can

be attributed to any rational business purpose."  <u>In re Global Crossing Ltd.</u>, 295 B.R. 726, 744

(Bankr. S.D.N.Y. 2003) (<u>citing</u> <u>Paramount Commc'ns Inc. v. QVC Network Inc.</u>, 637 A.2d 34,

45 n.17 (Del. 1994) (<u>citing</u> <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)); <u>accord</u>

<u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res.,

Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (noting that the business judgment rule is based on the

presumption that in making a business decision the directors of the debtor "acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company").

20.    Because this intercompany financing is simply the continuation of the

Intercompany Transactions that occurred between Dynegy Holdings and the Borrower Debtors

prior to the Petition Date, it is arguably an ordinary course transaction within the meaning of

section 363(c)(1) of the Bankruptcy Code.  However, due to the chapter 11 overlay of these

Chapter 11 Cases and the protections afforded post-petition lenders under the Bankruptcy Code,

Dynegy Holdings believes that it is prudent, in order to protect its stakeholders and the value of

---

[8] Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the
Motion.  Copies of these orders are available upon request made to Debtors' counsel.

NY1 7880062

its estate, to avail itself of such provisions of the Bankruptcy Code in exchange for the

contemplated post-petition financing of the Borrower Debtors.  Accordingly, it is an exercise of

the Lender's sound business judgment to continue its prepetition practice of providing certain

funding to the Borrower Debtors necessary to maintain the value of the Debtors' estates, and

considering the added protections to be furnished by the Borrower Debtors for the repayment of

such advances.

> **B.**      **The Borrower Debtors Satisfy the Requirements for Obtaining**
> **Post-petition Credit on a Secured and Superpriority Basis Pursuant**
> **to Section 364(c) of the Bankruptcy Code**

21.      The statutory requirement for obtaining post-petition credit under section

364(c) of the Bankruptcy Code[9] is a finding, made after notice and a hearing, that the debtors in

possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the

Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); see generally, In re Photo

Promotion Assocs., Inc., 881 F.2d 6, 8 (2d Cir. 1989) (secured credit under section 364(c)(2) of

the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured

credit cannot be obtained); see In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr.

S.D.N.Y. 1992) (discussing financing options under section 364); In re Ames Dept. Stores, Inc.,

115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (stating that debtor must show that it has made a

reasonable effort to seek other sources of financing under sections 364(a) and (b) of the

Bankruptcy Code).

---

[9] Section 364(c) of the Bankruptcy Code provides that:

(c)      If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

    (1)      with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

    (2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3)      secured by a junior lien on property of the estate that is subject to a lien.

22.     Here, the Borrower Debtors propose to incur indebtedness as a superpriority administrative expense, which is secured by a senior lien on certain of the Borrower Debtors' unencumbered assets.  The Court should approve the Intercompany Credit Facility because:  (i) the Borrower Debtors could not obtain financing other than under the Intercompany Credit Facility; (ii) the proposed financing is on market terms and does not include payment of any fees or other onerous terms and is a sound exercise of the Borrower Debtors' business judgment; and (iii) approval of the Intercompany Credit Facility is fair and reasonable and in the best interests of the Debtors' estates.

*(i)     The Intercompany Credit Facility is the Best Credit Available to the Borrower Debtors*

23.     To show that the credit required is not obtainable on an unsecured basis, the debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); 495 Cent. Park Ave., 136 B.R. at 630-31.  Where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

24.     As set forth in the Stephenson Declaration, here the Borrower Debtors' ability to obtain post-petition financing from a third-party source on the same or better terms than those obtained from the Lender would have been extremely unlikely given , among other things, the Debtors' decision to transition operations at the Leased Facilities to the Owner Lessors.  Simply put, in light of the Borrower Debtors' financial performance and fact that the

Debtors will only continue to operate the Leased Facilities for a finite period of time, obtaining third-party financing – much less unsecured financing – was not a valid alternative.  Because there was little, if any, chance of obtaining traditional third-party financing, and because the Borrower Debtors had received funding in the ordinary course from Dynegy Holdings prepetition that could be, with the provision of minimal added protections (the contemplated Intercompany Credit Facility Liens and Superpriority Claims), extended on a post-petition basis, running an involved "process" to obtain outside financing did not appear to be a viable course of action or prudent expenditure of time and resources.  The Borrower Debtors therefore believe that they have made the requisite showing that post-petition credit is not available on an unsecured basis, and that the proposal offered by Lender is the best available post-petition financing available to them at this time.

> (ii)    *The Intercompany Credit Facility Is on Market Terms and the Debtors are Entering Into the Intercompany Credit Facility in Their Sound Business Judgment*

25.    As stated above, the Debtors submit that the Intercompany Credit Facility is fair and reasonable, and represents terms favorable – and unobtainable from third-parties – to the Borrower Debtors.  Further, the Debtors submit that the terms and conditions of the Intercompany Credit Facility reflect the Borrower Debtors' (and, as discussed herein, the Lender's) exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

26.    A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See Ames Dep't Stores, 115 B.R. at 40 (noting that courts defer to a debtor's business judgment "so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").  The

business judgment standard is a deferential one.  In the context of post-petition financing, courts

have held that it is appropriate to interfere with a debtor's business judgment only if a decision is

clearly erroneous, or is made arbitrarily, in bad faith, with fraudulent intent, on the basis of

inadequate information, in violation of fiduciary duties, or in violation of the Bankruptcy Code.

See, e.g., In re Mid-State Raceway, Inc., 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); see also In re

Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[B]usiness judgments should be left to

the board room and not to this Court.").

> 27.    Here, the Borrower Debtors' decision to enter into the Intercompany

Credit Facility is an exercise of the Borrower Debtors' sound business judgment.  Before the

Petition Date, the Borrower Debtors undertook a thorough review as to their projected financing

needs during the Chapter 11 Cases, including the costs of administration and transition of the

Leased Facilities as well as the likely cash flows from their business operations, the results of

which are reflected in the Approved Budget attached to the Interim Order.  The Borrower

Debtors have determined that the amounts available under the Intercompany Credit Facility

should be sufficient to fund the transition of the Leased Facilities, and the administration of these

Chapter 11 Cases.  This, in turn, will inure to the benefit of their stakeholders, by helping to

prevent the unnecessary accrual of additional claims against their estates, and will support the

Debtors' efforts to reorganize and restructure.  In addition, as discussed above, financing on

better terms (or any terms) was not likely available to the Borrower Debtors, and as discussed

below, the terms of the Intercompany Credit Facility are fair and reasonable, especially given the

circumstances surrounding the Borrower Debtors' Chapter 11 Cases.  Consistent with the

authority in this circuit, the Debtors respectfully submit that the Court should approve the

Borrower Debtors' business judgment and decision to accept and enter into the Intercompany

Credit Facility.

> ### (iii)    *Approval of the Intercompany Credit Facility is Fair and Reasonable and in the Best Interests of the Borrower Debtors' Estates*

28.    The proposed terms of the Intercompany Credit Facility are fair,

reasonable and adequate.  This funding will provide the Borrower Debtors with adequate

financing to support their working capital needs, as set forth in the Approved Budget.  Further, it

is a fair and reasonable transaction, both from the perspective of the Lender, who will be paid a

reasonable rate of interest based on past lending practices among the Debtors, granted certain

liens and provided superpriority claims by the Borrower Debtors, and for the Borrower Debtors,

who will receive funding – at market rates and without any fees or onerous terms – that would

otherwise be unavailable from traditional third-party "DIP" lenders.  In addition, the Collateral to

be provided to the Lender under the facility is limited to certain unencumbered collateral, and

will not prejudice any of the Borrower Debtors' creditors.

29.    In considering whether the terms of post-petition financing are fair and

reasonable, courts "examine all the facts and circumstances," and will generally permit

"reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process or powers or its purpose is not so much to

benefit the estate as it is to benefit a party-in-interest."  In re Ames Dept. Stores, Inc., 115 B.R. at

39-40; see also In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003)

(evaluating reasonableness of terms in light of the "relative circumstances of the parties").  In

addition, courts have often granted superpriority status to post-petition intercompany claims.  See

In re MF Global Holdings Ltd., et al., Case No. 11-15059 (MG) (Bankr. S.D.N.Y. Nov. 2, 2011)

[Docket No. 25]; In re Centaur PA Land, LP, et al., Case No. 09-13760 (KJC) (Bankr. D. Del.

Nov. 23, 2009) [Docket No. 49]; In re Graceway Pharmaceuticals, LLC, et al., Case No. 11-13036 (MFW) (Bankr. D. Del. Sept. 30, 2011) [Docket No. 52]; In re Petrorig I Pte Ltd, et al., Case No. 09-13083 (JMP) (Bankr. S.D.N.Y. July 17, 2009, Aug. 6, 2009) [Docket Nos. 101, 135]; In re ASARCO, LLC et al., Case No. 05-21207 (RSS) (Bankr. S.D. Tex. Sept. 19, 2008) [Docket No. 11094]; In re Worldcom, Inc., et al., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Oct. 15, 2002) [Docket No. 1603]; In re United Airlines Inc., 2002 Bankr. LEXIS 1942, *7 (Bankr. N.D. Ill. Dec. 9, 2002).

30.     Here, the terms of the Intercompany Credit Facility are not unreasonable and the Borrower Debtors have each determined to enter into this transaction in a clear exercise of their business judgment.  Moreover, and as discussed in more detail above, the Intercompany Credit Facility should be approved not only because comparable financing terms are not available elsewhere, "but also because the credit acquired is of significant benefit to the debtor's estate and [because] the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere."  In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

31.     The Intercompany Credit Facility is vital to the orderly administration of the Borrower Debtors' estates (including, most notably, the transition of the Leased Facilities). Moreover, it is critical that the Borrower Debtors immediately obtain access to sufficient post-petition financing during the interim period as contemplated under the Intercompany Credit Facility.  Absent this Court's approval of the relief sought herein, the Borrower Debtors face a substantial risk of severe disruption to their business operations and inability to carry out their plan to transition control of the Leased Facilities, and Dynegy Holdings is at risk of letting estate value dissipate.  For all of these reasons, the Intercompany Credit Facility is in the best interests

NY1 7880062

of the Debtors' estates, and the Debtors submit that ample justification exists for the relief

requested herein.

## REQUEST FOR INTERIM RELIEF[10]

32.    Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for

authority to obtain financing during the 14-day period following the filing of a motion for such

authority "as is necessary to avoid immediate and irreparable harm to the estate pending a final

hearing."  Fed. R. Bankr. P. 4001(c)(2).  In examining such requests under Bankruptcy Rule

4001, courts apply the same business judgment standard as is applicable to other business

decisions.  See, e.g., In re Ames Dep't Stores, 115 B.R. at 38.

33.    The importance of a debtor's ability to secure post-petition financing to

prevent immediate and irreparable harm to its estate has been repeatedly recognized in this

district in similar circumstances.  See, e.g., In re Tronox Inc., Ch. 11 Case No. 09-10156 (ALG)

(Bankr. S.D.N.Y. Jan. 13, 2009, Feb. 6, 2009) [Docket Nos. 46, 148] (orders approving post-

petition financing on an interim, and a final, basis); In re Lyondell Chem. Co., Ch. 11 Case No.

09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009, Mar. 1, 2009) [Docket Nos. 79, 1002] (same);

In re Lenox Sales, Inc., Ch. 11 Case No. 08-14679 (ALG) (Bankr. S.D.N.Y. Nov. 25, 2008, Dec.

16, 2008) [Docket Nos. 34, 129] (same); In re Wellman, Inc., Ch. 11 Case No. 08-10595 (SMB)

(Bankr. S.D.N.Y. Feb. 27, 2008, Apr. 7, 2008) [Docket Nos. 60, 181] (same).  Accordingly, for

all of the reasons set forth above, prompt entry and effectiveness of the Interim Order is

---

[10] Local Rule 4001-2(g) provides that a motion that seeks entry of an emergency or interim order before a final
hearing under Bankruptcy Rule 4001(b)(2) or (c)(2) shall describe the amount and purpose of funds sought to be
used or borrowed on an emergency or interim basis and shall set forth facts to support a finding that immediate or
irreparable harm will be caused to the estate if immediate relief is not granted before the final hearing.

necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with,

and warranted under, Bankruptcy Rules 4001(c)(2) and 6003(b).[11]

### REQUEST FOR FINAL HEARING

34.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors respectfully request

that the Court set a date for the Final Hearing that is no sooner than fourteen (14) days following

the date of this Motion, and no later than thirty (30) days after the entry of the Interim Order, to

hold a hearing to consider entry of the Final Order.  The Debtors also request authority to serve a

copy of the signed Interim Order, which fixes the time and date for the filing of objections, if

any, to entry of the Final Order, by first class mail upon the notice parties listed below, and

further request that the Court deem service thereof sufficient notice of the hearing on the final

Order under Bankruptcy Rule 4001(c)(2).

35.     To implement the requested relief immediately, the Debtors seek a waiver

of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an

order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE

36.     No trustee, examiner or creditors' committee has been appointed in these

Chapter 11 Cases.  Notice of this Motion has been provided to:  (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

Attorney General for the State of New York; (iv) the Internal Revenue Service; (v) the Debtors'

thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the Ad Hoc

---

[11] The Debtors submit that they have also satisfied the requirements of Bankruptcy Rule 6003 and, accordingly, the
Court should grant the relief requested herein.  Bankruptcy Rule 6003(b) permits a court to approve within 21 days
after the filing of the petition a debtor's request to use, sell, lease or otherwise incur an obligation regarding property
of the debtor's estate, including a motion to pay all or part of a pre-petition claim, if such relief is necessary to avoid
immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  For the reasons set forth herein, the relief sought is
also warranted under Bankruptcy Rule 6003(b) because such relief is necessary to avoid immediate and irreparable
harm.

Bondholder Committee; (vii) Wilmington Trust Company, the indenture trustee for each series of Dynegy Holdings, LLC's prepetition unsecured notes; (viii) counsel to U.S. Bank National Association, the successor lease indenture trustee for the pass-through certificate holders; (ix) counsel to PSEG; and (x) the representative of Local Union 320 of the International Brotherhood of Electrical Workers, AFL-CIO.  The Debtors submit that no other or further notice need be provided.  No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## <u>NO PRIOR REQUEST</u>

37.    No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of Page Left Intentionally Blank]*

NY1 7880062

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

Order, in substantially the form attached hereto as <u>Exhibit A</u>, and grant such other and further

relief as is just and proper.


Dated:  Poughkeepsie, New York          Respectfully submitted,
          November 7, 2011

                                   /s/ Sophia P. Mullen

                                   SIDLEY AUSTIN LLP
                                   787 Seventh Avenue
                                   New York, New York 10019
                                   Telephone: (212) 839-5300
                                   Facsimile: (212) 839-5599
                                   James F. Conlan (*pro hac vice admission pending*)
                                   Sophia P. Mullen
                                   Paul S. Caruso (*pro hac vice admission pending*)
                                   Brian J. Lohan (*pro hac vice admission pending*)

                                   *Proposed Counsel for Debtors and*
                                   *Debtors in Possession*

NY1 7880062