SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
James F. Conlan (*pro hac vice admission pending*)
Steven M. Bierman
John G. Hutchinson
Matthew A. Clemente (*pro hac vice admission pending*)
Brian J. Lohan (*pro hac vice admission pending*)

Proposed Counsel for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
In re:                                                   :     Chapter 11
                                                         :
DYNEGY HOLDINGS, LLC, *et al.*,[1]                       :     Case No. 11-38111 (___)
                                                         :
                      Debtors.                           :     Joint Administration Requested
                                                         :
-------------------------------------------------------- X

## DECLARATION OF KENT R. STEPHENSON PURSUANT TO
## LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST DAY MOTIONS

     Kent R. Stephenson declares, pursuant to section 1746 of title 28 of the United States

Code, as follows:

     1.     I am the Executive Vice President of each of the above-captioned debtors and

debtors in possession (each a "Debtor" and collectively, the "Debtors"). I have served in this

role since August 2011.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are Dynegy Holdings, LLC (8415); Dynegy Northeast Generation, Inc. (6760); Hudson Power, L.L.C. (NONE); Dynegy Danskammer, L.L.C. (9301); and Dynegy Roseton, L.L.C. (9299). The location of the Debtors' corporate headquarters and the service address for Dynegy Holdings, LLC, Dynegy Northeast Generation, Inc. and Hudson Power, L.L.C. is 1000 Louisiana Street, Suite 5800, Houston, Texas 77002. The location of the service address for Dynegy Roseton, L.L.C. is 992 River Road, Newburgh, New York 12550. The location of the service address for Dynegy Danskammer, L.L.C. is 994 River Road, Newburgh, New York 12550.

2.     I have also held numerous other positions for the Debtors and Dynegy Inc., the Debtors' ultimate corporate parent, and a non-debtor in these chapter 11 cases (the "Chapter 11 Cases").  In July 2006, I became the Senior Vice President and Group General Counsel for Dynegy Inc.  In May 2007, I became Senior Vice President and Deputy General Counsel of the Debtors and their non-debtor affiliates.  In February 2011, I became Executive Vice President and General Counsel of the Debtors and their non-debtor affiliates, a position I held until September 2011.

3.     The Debtors in these Chapter 11 Cases are as follows: (i) Dynegy Holdings, LLC ("Dynegy Holdings"); (ii) Dynegy Northeast Generation, Inc. ("DNE"); (iii) Hudson Power, L.L.C. ("Hudson Power"); (iv) Dynegy Danskammer, L.L.C. ("Dynegy Danskammer"); and (v) Dynegy Roseton, L.L.C. ("Dynegy Roseton", and collectively with Dynegy Holdings, DNE, Hudson Power, Dynegy Danskammer and Dynegy Roseton, the "Debtors").

4.     None of Dynegy Holdings' other subsidiaries, nor Dynegy Inc., its parent, are Debtors in these Chapter 11 Cases.  Attached hereto as Exhibit 1 and incorporated herein by reference is a corporate structure chart showing each of the Debtors and each of their non-debtor affiliated entities, with the boxes for each of the Debtors being shaded for ease of reference.

5.     I submit this declaration ("Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Cases on November 7, 2011 (the "Petition Date") and in support of:  (i) the Debtors' petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and (ii) the relief, in the form of various motions and applications described further below, that the Debtors have requested of the Court, including

those motions commonly referred to as first day motions (collectively, the "First Day Motions") as well as the Motion of the Debtors Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 for Entry of an Order Authorizing the Debtors to Reject the Lease Documents (the "Rejection Motion" and together with the First Day Motions, the "Motions").

6.       I am generally familiar with the Debtors' operations, business affairs, books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.  If called upon to testify, I would testify to the facts set forth herein.

7.       As discussed more fully below, the Debtors' only operations (as distinct from the operations of Dynegy Holdings' non-debtor subsidiaries and other affiliates) consist of those at the Roseton and Danskammer facilities which are the subject of facility leases which the Debtors are seeking to reject pursuant to the Rejection Motion.  Although the Debtors are prepared to surrender the Roseton and Danskammer facilities immediately upon entry of an order authorizing the rejection of the leases, applicable federal and state regulatory requirements prevent the Debtors from doing so.  Therefore, the Debtors intend to operate the facilities in accordance with prudent operating standards and as necessary to comply with applicable federal and state regulatory requirements until the Debtors receive approval to transition operational control of the leased facilities to the owners.  To this end, the First Day Motions are designed to ensure that the Debtors are able to operate in such a fashion after the Petition Date.  The achievement of this goal, along with achieving a restructuring of the balance sheet of Dynegy Holdings, will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

8.	Sections I through III of this Declaration provide a general overview of (i) the Debtors' business, organizational structure and capital structure, (ii) the circumstances giving rise to the commencement of these Chapter 11 Cases, and (iii) certain of the Debtors' restructuring goals.  Section IV contains certain factual background with respect to the Rejection Motion and the Transition Plan (as defined below).  Section V summarizes the relief requested in each of the First Day Motions.  Finally, Section VI lists the schedules of information required by Local Bankruptcy Rule 1007-2.

**I.**

**DYNEGY HOLDINGS' BUSINESS**

9.	Dynegy Holdings began operations as Natural Gas Clearinghouse ("Clearinghouse") in 1985.  From the inception of its operations until 1990, Clearinghouse's activities related primarily to natural gas marketing.  Starting in 1990, Clearinghouse began expanding its core business operations through acquisitions and strategic alliances resulting in the formation of a midstream energy asset business, and it established energy marketing operations in both Canada and the United Kingdom.  In 1994, Clearinghouse initiated electric power marketing operations in order to take advantage of opportunities created by the deregulation of the domestic electric power industry, and in March 1995, Clearinghouse merged with Trident NGL Holding, Inc., a fully integrated natural gas liquids company, with the surviving entity named NGC Corporation ("NGC").  Approximately one year later, NGC completed a strategic combination with Chevron U.S.A. Inc. and certain of its affiliates (collectively, "Chevron") whereby substantially all of Chevron's midstream assets merged with NGC.  In 1998, NGC changed its name to Dynegy Inc. in order to reflect its evolution from a natural gas marketing company to an energy services company capable of meeting the growing

demands and diverse challenges of the dynamic energy market of the 21st century.  In early 2000, Dynegy Inc. acquired Illinova Corporation, and as part of this acquisition, Dynegy Inc. changed its name to Dynegy Holdings Inc. and became a wholly-owned subsidiary of a new holding company, now referred to as Dynegy Inc.  On September 1, 2011, Dynegy Holdings changed its corporate form from a Delaware corporation to a Delaware limited liability company pursuant to the General Corporation Law of the State of Delaware.

10.     The Debtors and their non-debtor subsidiaries and affiliates sell electric energy, capacity and ancillary services on a wholesale basis from their power generation facilities. Energy is the actual output of electricity and is measured in megawatt hours.  The capacity of a power generation facility is its electricity production capability, measured in megawatts ("MW"). Wholesale electricity customers will, for reliability reasons and to meet regulatory requirements, contract for rights to capacity from generating units.  Ancillary services are the products of a power generation facility that support the transmission grid operation, follow real-time changes in load, and provide emergency reserves for major changes to the balance of generation and load. The Debtors and their non-debtor subsidiaries and affiliates sell these products individually or in combination to customers under short-, medium- and long-term contractual agreements or tariffs.

11.     These customers include regional transmission organizations ("RTOs") and independent system operators ("ISOs"), integrated utilities, municipalities, electric cooperatives, transmission and distribution utilities, industrial customers, power marketers, financial participants such as banks and hedge funds, other power generators, and commercial end-users. All products are sold on a wholesale basis for various lengths of time from hourly to multi-year transactions.  Some customers, such as municipalities or integrated utilities, purchase products for resale in order to serve their retail, commercial and industrial customers.  Other customers,

such as some power marketers, may buy products and related services to serve their own wholesale or retail customers or as a hedge against power sales they have made.

12.     Dynegy Holdings is a holding company that conducts its business operations through its direct and indirect subsidiaries.  The primary business of Dynegy Holdings and its operating subsidiaries is the production and sale of electric energy, capacity and ancillary services from a fleet of 10 operating power plants in six states totaling approximately 9,903 MW of generating capacity.  Despite the size of Dynegy Holdings' footprint and generating capacity across its subsidiaries' enterprise, the Debtors' direct operations consist of only two of these plants – at Dynegy Danskammer and Dynegy Roseton – which have a combined generating capacity of 1,693 MW.

13.     The Debtors rely on certain non-debtor subsidiaries of Dynegy Holdings for essential functions.  For example, Dynegy Administrative Services Company, a Delaware corporation ("DAS"), generally manages the segregated cash management systems for Dynegy Holdings and its subsidiaries.  Dynegy Power Marketing, LLC, a Texas limited liability company ("DPM"), performs various functions, including marketing power and capacity, coordinating the power output of the various generation facilities, and providing fuel management services.  The Debtors have service agreements with various non-debtor affiliates, under which the Debtors provide compensation to such affiliates for their services.

14.     The Debtors employ approximately 152 full-time employees, of whom approximately 126 are represented by Local Union 320 of the International Brotherhood of Electrical Workers, AFL-CIO.  The remaining employees are not represented by a union and are predominantly administrative and managerial employees.  All of these employees are employed

in connection with the operation of the Danskammer and Roseton power generation facilities, and all but one are employees of DNE.[2]

## A.  *Dynegy Holdings' Debtor Subsidiaries*

### i.  **Dynegy Danskammer, L.L.C.**

15.     Dynegy Danskammer, a Delaware limited liability company, owns the 185-acre site in Newburgh, New York, on which the Danskammer power generation facility sits, adjacent to the Roseton site.  There are six (6) units at Dynegy Danskammer's power generation facility – four of which are owned by Dynegy Danskammer, and two of which are leased by Dynegy Danskammer from Danskammer OL LLC ("Danskammer OL"), an indirect subsidiary of Public Service Enterprise Group, Inc., an unaffiliated entity.  A further description of Dynegy Danskammer's operations is set forth below.

### ii.  **Dynegy Roseton, L.L.C.**

16.     Dynegy Roseton, a Delaware limited liability company, owns the 195-acre site in Newburgh, New York, on which the Roseton power generation facility sits, adjacent to the Danskammer site.  Dynegy Roseton operates the two (2) units at the power generation facility.  It leases these units from Roseton OL LLC ("Roseton OL" and, together with Danskammer OL, the "Owner Lessors"), an indirect subsidiary of PSEG (defined below).  A further description of Dynegy Roseton's operations is set forth below.

### iii.  **Hudson Power, L.L.C.**

17.     Hudson Power is a Delaware limited liability company that has no operations and holds 100% of the interests in Dynegy Danskammer and Dynegy Roseton.

---

[2] One employee, the Managing Director of Plant Operations at the Danskammer and Roseton power generating facilities, is employed by Dynegy Operating Company ("DOC"), a non-debtor affiliate.

       **iv.**      **Dynegy Northeast Generation, Inc.**

18.      DNE is a Delaware corporation that holds 100% of the interests in Hudson Power and provides administrative support for the operation of the Danskammer and Roseton power generation facilities.

**B.**    *The Operations of Dynegy Danskammer and Dynegy Roseton*

19.      Dynegy Danskammer owns units 1, 2, 5, and 6 at the Danskammer power generation facility.  Units 1 and 2 are "peakers" (power plants that generally run only during periods of peak demand for electricity) with a net capacity of 123 MW.  They use natural gas and fuel oil as their primary fuels.  Units 5 and 6 are emergency diesel generators with negligible net capacity and currently are not in operation and are not connected to the power grid.  Dynegy Danskammer leases units 3 and 4 from Danskammer OL; these units are "baseload" power plants (power plants that generally run at all times, providing the amount of electricity generally needed to meet customer demand) with a net capacity of 370 MW.  They use coal and natural gas as their primary fuels.

20.      Dynegy Roseton leases both units at the Roseton power generation facility from Roseton OL; these units are "peakers" with a net capacity of 1,200 MW.  They use natural gas and fuel oil as their primary fuels.

21.      The Danskammer and Roseton power generation facilities are connected to the Northeast Power Coordinating Council, one of the 10 regional reliability councils that form the North American Electric Reliability Council.  They compete primarily in the New York wholesale market, operated and maintained by the New York Independent System Operator (the "<u>NYISO</u>"), although the power generated at the Danskammer and Roseton facilities may be sold

into the Pennsylvania/New Jersey/Maryland Power Pool, as well as to New England, Quebec, and Ontario.

22.    The operations of Dynegy Danskammer and Dynegy Roseton are subject to extensive federal, state, and local statutes, rules and regulations, including the Public Utility Regulatory Policies Act of 1978 ("PURPA"), the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the Superfund Amendments and Reauthorization Act ("SARA"), the Resource Conservation and Recovery Act ("RCRA"), and the Occupational Safety and Health Act ("OSHA").  Its regulators include the Federal Energy Regulatory Commission ( "FERC"), the New York Public Service Commission ("NYPSC"), and the Environmental Protection Agency ("EPA").

23.    Dynegy Danskammer and Dynegy Roseton have no employees; the workers at the facility are employed by DNE.[3]  Their major liabilities consist of semiannual rent payments to Danskammer OL and Roseton OL, respectively.  In addition to the land on which the units sit and the units or leaseholds therein, their assets consist of various capital spare parts, emissions credits, emissions control and monitoring equipment, fuel supply equipment, communications equipment and licenses, vehicles, a locomotive, administrative buildings, and similar items. Substantially all of Dynegy Danskammer's and Dynegy Roseton's revenues are derived from sales to the NYISO through DPM, a non-debtor affiliate.  Due to NYISO regulations, DPM, rather than one of the Debtors, is a party to energy supply contracts with the NYISO.  Because none of the Debtors are currently authorized NYISO market participants/customers,[4] DPM, an

---

[3] As noted above, the Managing Director of Plant Operations at the Danskammer and Roseton power generating facilities is employed by DOC.

[4] Each of Dynegy Roseton and Dynegy Danskammer filed new customer applications that are currently pending with NYISO.  No action is expected with respect to these applications until after December 1, 2011, although it is unclear what impact the bankruptcy proceedings and rejection of the Lease Documents (defined below) will have on such applications.

energy marketer that is a registered NYISO customer and market participant and is authorized to sell energy, capacity and certain ancillary services at market-based rates, provides energy management services to Dynegy Roseton and Dynegy Danskammer.  Among other things, DPM sells the energy generated by the Facilities into the NYISO markets.

**II.**

**CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS[5]**

*A.    Equity*

24.    As of the Petition Date, Dynegy Holdings is a wholly-owned subsidiary of Dynegy Inc., with Dynegy Inc. holding 100% of the membership interests in Dynegy Holdings. The remaining Debtors are wholly-owned direct or indirect subsidiaries of Dynegy Holdings.

*B.    Prepetition Debt*

**i.    Unsecured Obligations**

25.    As of the Petition Date, Dynegy Holdings is obligated under seven (7) different series of notes, debentures, and subordinated capital income securities (collectively, the "Old Notes") in the outstanding aggregate principal amount of $3,570.3 million.

**Senior Unsecured Notes/Debentures**

26.    Dynegy Holdings has, from time to time, issued various series of senior unsecured notes under the Indenture dated September 26, 1996, as amended and restated as of March 23, 1998, as amended and restated as of March 14, 2001, and under the First through Sixth Supplemental Indentures thereto, between Dynegy Holdings and Wilmington Trust Company (as successor to JP Morgan Chase Bank, N.A., successor to Bank One Trust Company, National

---

[5] Nothing herein constitutes a concession or acknowledgment of any amount owed or as to the validity of any debt, claim or lien.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth herein and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

Association) (the "<u>Indenture</u>").  The following series of notes issued under the Indenture are outstanding:

- 8.75% senior unsecured notes in the outstanding aggregate principal amount of $88.5 million, due February 15, 2012;

- 7.5% senior unsecured notes in the outstanding aggregate principal amount of $785 million, due June 1, 2015;

- 8.375% senior unsecured notes in the outstanding aggregate principal amount of $1,046.8 million, due May 1, 2016;

- 7.75% senior unsecured notes in the outstanding aggregate principal amount of $1,100 million, due June 1, 2019;

- 7.125% senior debentures in the outstanding aggregate principal amount of $175 million due May 15, 2018; and

- 7.625% senior debentures in the outstanding aggregate principal amount of $175 million due October 15, 2026.

**<u>Subordinated Debentures</u>**

27.     In May 1997, NGC Corporation Capital Trust I issued Series A 8.316% Subordinated Capital Income Securities ("<u>SKIS</u>") through a Rule 144A offering to qualified institutional buyers.  In September 1997, Series B 8.316% SKIS were exchanged for the outstanding Series A 8.316% SKIS.  The Series B 8.316% SKIS in the aggregate principal amount of $200 million due June 1, 2027 remain outstanding, and are an unsecured obligation of Dynegy Holdings.  The SKIS rank subordinate and junior in right of payment to all senior indebtedness of Dynegy Holdings.

**Bilateral Contingent Letter of Credit Facility**

28.     On May 21, 2010, Dynegy Holdings executed a $150 million unsecured bilateral contingent letter of credit facility with Morgan Stanley Capital Group Inc.  Availability under the facility is tied to increases in spark spreads and power prices for 2012 positions.  The facility matures on December 31, 2012.  A facility fee accrues on the unutilized portion of the facility at an annual rate of 0.6% and letters of credit availability accrue fees at an annual rate of 7.25%.  The are currently no amounts outstanding under the facility.

**ii.     $1.25 Billion Intercompany Promissory Note**

29.     As described further below, on September 1, 2011, Dynegy Holdings issued a $1.25 billion promissory note (the "Promissory Note") to its non-debtor subsidiary, Dynegy Gas Investments, LLC ("DGIN"), in exchange for DGIN transferring to Dynegy Holdings its rights in an undertaking in the same amount.  The Promissory Note bears annual interest at a rate of 4.24%, payable upon the maturity date, September 1, 2027.

**iii.     Cash Collateralized Letter of Credit Facility**

30.     On August 5, 2011, Dynegy Holdings and Credit Suisse AG, Cayman Islands Branch ("Credit Suisse Cayman"), entered into a Letter of Credit Reimbursement and Collateral Agreement, dated as of August 5, 2011 (the "LC Agreement"), for a $26,217,318 cash collateralized Letter of Credit Facility ("LC Facility") under which Credit Suisse Cayman would maintain five then-existing letters of credit (one of which expired on October 28, 2011).  The letters of credit under the LC Facility are issued (i) to various New York state regulatory agencies for certain environmental liabilities related to Dynegy Danskammer and (ii) to backstop certain obligations under the Debtors' workers compensation insurance programs, as well as various surety bonds posted in connection with litigation matters.  The LC Facility is

collateralized by an account maintained by Bank of New York Mellon holding the sum of $27,003,837.54, which amount may be withdrawn only in accordance with the LC Agreement.

### iv. Credit Agreement

31. On April 2, 2007, Dynegy Holdings, Dynegy Inc. (as guarantor), and certain of their direct and indirect subsidiaries (as guarantors) entered into a Fifth Amended and Restated Credit Agreement (as amended from time to time, the "Credit Agreement"). Under the Credit Agreement, Dynegy Holdings had access to a $1.15 billion revolving credit facility, an $850 million term letter of credit facility, and a $70 million senior secured term loan facility. The obligations under the Credit Agreement were secured by substantially all of the assets of Dynegy Holdings. The obligations under the Credit Agreement were guaranteed by Dynegy Inc. and by certain of their direct and indirect subsidiaries, and secured by substantially all of the assets of the guarantors. As set forth below, Dynegy Holdings repaid all obligations under the Credit Agreement in August 2011.

### v. Danskammer and Roseton Leases

32. In May 2001, in connection with the acquisition of the Roseton and Danskammer power generation facilities, Dynegy Danskammer and Dynegy Roseton (each a "Debtor Lessee" and, together, the "Debtor Lessees") each entered into a sale-leaseback transaction pertaining to, respectively, Danskammer power-generating Units 3 and 4 (collectively, the "Danskammer Leased Facility") and Roseton power-generating Units 1 and 2 (collectively, the "Roseton Leased Facility" and, together with the Danskammer Facility, the "Leased Facilities").

33. On the Closing Date, the Owner Lessors purchased the Danskammer Facility and the Roseton Facility, respectively, and in each case an interest in the related common facilities, from Dynegy Danskammer and Dynegy Roseton, respectively. The Owner Lessors are

subsidiaries of Resource Capital Management Corporation (the "Equity Investor"), an unrelated third party investor and a wholly-owned subsidiary of PSEG Resources Inc. (which is an indirect subsidiary of Public Service Enterprise Group, a company engaged in various aspects of the electric power business) ("PSEG" and, together with the Equity Investor, the Owner Lessors, Roseton OP LLC as Owner Participant, and Danskammer OP LLC as Owner Participant, the "PSEG Entities").

34.     The purchase price with respect to the Danskammer Leased Facility was approximately $300 million.  The purchase price with respect to the Roseton Leased Facility was approximately $620 million.  To fund their purchases of the Leased Facilities, the Owner Lessors used $138 million in equity funding from certain of the other PSEG Entities, and financed the remaining $800 million of the purchase price and the related transaction expenses through a private offering of pass-through trust certificates (the "Pass-Through Trust Certificates"), which were sold to qualified institutional buyers (the "Pass-Through Certificate Holders").  The proceeds thereof were then used to purchase debt instruments from the Owner Lessors, which are held together with the Pass-Through Trust Certificates for the benefit of the Pass-Through Certificate Holders by U.S. Bank National Association, in its capacity as Successor Lease Indenture Trustee under the Indentures of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to each Leased Facility (the "Indenture Trustee").  Both Debtor Lessees entered into a Pass-Through Trust Agreement on May 1, 2001 with the Indenture Trustee.  The Pass-Through Trust Agreement created the trust which issued the Pass-Through Trust Certificates.  The Pass-Through Trust Certificates are secured by mortgages on each of the Leased Facilities granted by the Owner Lessors as well as certain other collateral including,

without limitation, the assignment of rights granted under the related site leases, subleases, and related interconnection and support agreements pertaining to the Leased Facilities.

35.     Also on the closing date of the purchase, each of the Owner Lessors simultaneously leased its Leased Facility to the respective Debtor Lessee pursuant to a facility lease (the "<u>Danskammer Lease</u>" and the "<u>Roseton Lease</u>", respectively, and, together the "<u>Facility Leases</u>").  Absent early termination, the Danskammer Lease expires May 8, 2031 and the Roseton Lease expires on February 8, 2035.

36.     The lease payments under the Facility Leases support the principal and interest payments on the Pass-Through Trust Certificates, which are secured by, among other things, an assignment of the Facility Leases and a mortgage on the underlying Leased Facilities.  Rental payments in excess of the amounts required to service the Pass-Through Certificates are available for distribution to the Equity Investor.

37.     In connection with each sale-leaseback transaction, each Debtor Lessee, each Owner Lessor, Wilmington Trust Company (as lessor manager), the Owner Participant, and the Indenture Trustee entered into participation agreements dated as of May 1, 2001 (collectively, the "<u>Participation Agreements</u>").  The Participation Agreements set forth the manner in which the parties agreed to participate in the sale-leaseback transaction, the conditions precedent to such participation, the representations and warranties of such parties, and certain covenants and indemnities of the parties made in connection with the transaction.

38.     Also on the Closing Date, each Owner Lessor entered into substantially identical site subleases, pursuant to which each Owner Lessor subleased the land on which its Leased Facility is located to each respective Debtor Lessee (together, the "<u>Site Subleases</u>").  Each Site Sublease is for a term coextensive with its corresponding Facility Lease, and grants each

respective Debtor Lessee the right to use the cross-easement rights granted to it under that Facility Lease.

39.     Also on the Closing Date, each Debtor Lessee, each Owner Lessor, and DNE entered into an Assignment and Reassignment of Collective Bargaining Agreement.  Pursuant to this agreement, the Debtor Lessees assigned their rights under that certain 1998 Collective Bargaining Agreement Between DNE and the International Brotherhood of Electrical Workers Local 320 AFL-CIO to the Owner Lessors, and the Owner Lessors reassigned such rights back to the Debtor Lessees.

40.     Also on the Closing Date, each Debtor Lessee and its respective Owner Lessor entered into substantially identical tax indemnity agreements between each Debtor Lessee and its respective Owner Lessor, the Owner Participant, Resources Capital Management Corp. and PSEGR Newburgh Holdings LLC (collectively, the "Tax Indemnity Agreements").

41.     Each Debtor Lessee's obligations under its respective Facility Lease and the other operative documents to which it is a party are guaranteed by Dynegy Holdings pursuant to guarantees (the "Guarantees") dated as of May 1, 2001, entered into for the benefit of the Indenture Trustee, among other parties, including the Owner Lessors.  The Guarantees are on a senior unsecured basis, *pari passu* with all other senior unsecured indebtedness of Dynegy Holdings.

42.     The Debtor Lessees are responsible for maintenance of the Facilities, compliance with all environmental laws applicable to the Leased Facilities, and modifications as required by law and any required insurance policy.

43.     The Debtor Lessees must make periodic rent payments on May 8 and November 8 of each year, Dynegy Danskammer through 2030 and Dynegy Roseton through 2034.  Any

payments by the Debtor Lessees or the Guarantor are applied *pro rata* to the Facility Leases, and neither Facility Lease may be preferred over the other. The next three rent payments due for each Leased Facility, as well as the total rent payments remaining until the end of the Lease terms, are shown in the following table.

| Facility | Nov. 8, 2011 | May 8, 2012 | Nov. 8, 2012 | Nov. 8, 2011 through end of term |
|---|---|---|---|---|
| **Danskammer** | $3,888,713.75 | $3,888,713.75 | $78,574,842.00 | $102,991,141.25 |
| **Roseton** | $78,594,126.25 | $51,629,366.25 | $44,623,745.00 | $691,030,741.42 |
| *Total* | *$82,482,840.00* | *$55,518,080.00* | *$123,198,587.00* | *$794,021,882.67* |

44.     Under the sale-leaseback arrangements, the rent payments paid by the Debtor Lessees are assigned to the Indenture Trustee for the respective Facility. The Indenture Trustee then pays a portion of that payment to each of two pass-through trusts, the Series A Pass-Through Trust (the "Series A Trust") and the Series B Pass Through Trust (the "Series B Trust" and, together with the Series A Trust, the "Pass-Through Trusts"). The Pass-Through Trusts pay these amounts to the Pass-Through Certificate Holders. Amounts paid in excess of the amounts due to the Pass-Through Certificate Holders are paid by the Indenture Trustee to the Owner Lessor Entity for the respective Leased Facility.

45.     The Series A Trust certificates, representing a total obligation of $250 million, bore interest at 7.27%, and had a final distribution on November 8, 2010 and have been defeased. The Series B Trust certificates, representing a total obligation of $550.4 million, bear interest at 7.67%, and have a final distribution on November 8, 2016. The current total outstanding principal of the Series B Trust certificates as of the Petition Date is $550.4 million.

**III.**

## RECENT EVENTS LEADING TO BANKRUPTCY

46.     A combination of dwindling liquidity due to declining revenues (resulting from low power prices over the past two years) and unfavorable leases at the Danskammer and Roseton Facilities caused the Debtors to seek bankruptcy protection.

47.     Overall, sustained low power prices over the past two years have had a significant adverse impact on the Debtors' business and continue to negatively impact their projected future liquidity.  Specifically, Dynegy Holdings' annual consolidated revenue peaked in the year ending December 31, 2008 (FY08) at $3.324 billion, and has since declined to $2.468 billion in FY09 and $2.323 billion in FY10.  As further illustration of the steep decline in revenue, for the six-month period ending June 30, 2010, Dynegy Holdings reported consolidated revenues of $1.097 billion, and for the six-month period ending June 30, 2011, Dynegy Holdings reported consolidated revenues of $831 million.

48.     In an attempt to address these issues, Dynegy Inc. and its subsidiaries implemented a number of cost-cutting initiatives.  In February 2011, Dynegy Inc. and its subsidiaries eliminated approximately 135 positions across all functional and geographic areas, resulting in an expected annual savings of approximately $50 million.

49.     While helpful, the cost-cutting initiatives were not enough, and as Dynegy Holdings' ratio of secured debt to EBITDA increased, its ability to draw on the revolving credit facility under the Credit Agreement became more problematic.  Further strain on Dynegy Holdings' liquidity came in March as S&P downgraded Dynegy Holdings to "CC" and placed it on CreditWatch with negative implications.  Similarly, on March 28, 2011, Moody's downgraded Dynegy Holdings from "Caa1" to "Caa3", representing Moody's fourth downgrade of Dynegy Holdings since the beginning of 2009 (when it was rated "B1"), citing the uncertainty

around Dynegy Inc.'s corporate governance and possible covenant defaults. These downgrades caused various counterparties to demand additional collateral in support of certain of the Debtors' operational agreements.

### The 2011 Reorganization

50. On August 4, 2011, Dynegy Inc., Dynegy Holdings, and certain of their direct and indirect subsidiaries underwent a reorganization and restructuring (the "Reorganization") to, among other things, facilitate certain credit facilities and maximize their flexibility to address leverage and liquidity issues and to preserve the value of their assets. As part of the Reorganization, Dynegy Holdings and certain of its direct and indirect subsidiaries effected transactions to cause, *inter alia*, (a) substantially all of the coal-fired power generation facilities to continue to be held by Dynegy Midwest Generation, LLC ("CoalCo"), an indirect subsidiary of Dynegy Holdings, (b) substantially all of the gas-fired power generation facilities to be held by Dynegy Power, LLC ("GasCo"), an indirect subsidiary of Dynegy Holdings, and (c) 100% of the ownership interests of DNE, the entity that indirectly holds the equity interests in Dynegy Danskammer and Dynegy Roseton, to be held directly by Dynegy Holdings.

51. One of the primary goals of the Reorganization was to facilitate obtaining new financing for GasCo and CoalCo at a lower cost than otherwise would have been available but for the Reorganization. Dynegy Holdings believed (and it turned out to be the case) that the Reorganization would result in the credit rating agencies assigning a better credit rating to these entities and result in a lower cost of raising capital to fund their operations. On August 5, 2011, GasCo and its parent, a non-debtor subsidiary of Dynegy Holdings, entered into a $1.1 billion, five-year senior secured term loan facility (the "GasCo Facility"). The same day, CoalCo and its parent, a non-debtor subsidiary of Dynegy Holdings, entered into a $600 million, five-year senior

secured term loan facility (the "CoalCo Facility" and, together with the GasCo Facility, the "OpCo Facilities").  Proceeds from the OpCo Facilities were used, *inter alia*, to (a) repay an intercompany obligation of a GasCo subsidiary to Dynegy Holdings, which ultimately enabled Dynegy Holdings to repay its outstanding indebtedness under the Credit Agreement, and (b) fund additional cash to the balance sheets of GasCo and CoalCo to be used for general working capital and general corporate purposes.

52.     From and after the closing of the OpCo Facilities, none of the entities within the GasCo or CoalCo silos of companies guaranteed any of Dynegy Holdings' debt, nor did Dynegy Holdings guarantee any of the debt of the entities within the GasCo or CoalCo silos.

53.     On September 1, 2011, Dynegy Inc. and DGIN, a direct wholly-owned subsidiary of Dynegy Holdings, entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") whereby DGIN sold 100% of the outstanding membership interests of Dynegy Coal HoldCo, LLC, a Delaware limited liability company ("Coal HoldCo") and wholly-owned subsidiary of DGIN, to Dynegy Inc.  Coal HoldCo indirectly owns CoalCo.

54.     In exchange for DGIN's membership interests in Coal HoldCo, Dynegy Inc. issued an undertaking to DGIN (the "Undertaking Agreement") pursuant to which Dynegy Inc. agreed to make certain specified payments over time which coincide in timing and amount to the payments of principal and interest that Dynegy Holdings is obligated to make under a portion of its Old Notes.

55.     DGIN assigned its right to receive payments under the Undertaking Agreement to Dynegy Holdings in exchange for a promissory note (the "Note") in the amount of $1.25 billion that matures in 2027 (the "Assignment").  The Note bears annual interest at a rate of 4.24%, which will be payable upon maturity.  As a condition to Dynegy Inc.'s consent to the assignment

of the Undertaking Agreement, the agreement was amended and restated to be between Dynegy Holdings and Dynegy Inc. and to provide for the reduction of Dynegy Inc.'s obligations if the outstanding principal amount of any of Dynegy Holdings' $3.5 billion of outstanding notes and debentures is decreased as a result of any exchange offer, tender offer or other purchase or repayment by Dynegy Inc. or its subsidiaries (other than Dynegy Holdings and its subsidiaries, unless Dynegy Inc. guarantees the debt securities of Dynegy Holdings or such subsidiary in connection with such exchange offer, tender offer or other purchase or repayment); provided, that such principal amount is retired, cancelled or otherwise forgiven without the payment of any money by Dynegy Holdings or any of its subsidiaries in exchange for such retirement, cancellation or forgiveness.

56.     By undertaking these corporate and financial restructuring steps in 2011, Dynegy Holdings and its Debtor and non-debtor affiliated entities were able to avoid defaults under their then-current financing arrangements, obtain additional liquidity and flexibility and refinance the obligations outstanding under the Credit Agreement.

### The Exchange Offer

57.     In September, Dynegy Inc. offered to pay a combination of cash and its own new 10% Senior Secured Notes due 2018 (the "New Notes") in exchange for the tender of up to $1.25 billion of Old Notes (the "Exchange Offer").  Total consideration would range from $400 to $720 per $1,000 principal amount of Old Notes, and the exact combination of cash and New Notes would vary, depending on the series of Old Notes being exchanged and the date of tender. The Exchange Offer, after being extended several times, was terminated on November 3, 2011. Holders of an insufficient amount of Old Notes tendered their notes, and the exchange offer was not consummated.

58.     In light of the failed Exchange Offer, Dynegy Holdings is facing a liquidity crisis with approximately $43.8 million of unpaid interest payments due and approximately $278.1 million of interest payments coming due in the next twelve months.  In addition, approximately $82.48 million in payments are coming due under the Danskammer and Roseton Facility Leases on November 8, 2011.  In summary, in the face of ratings downgrades, decreased revenues and resulting reductions in cash flow, and their inability to restructure Dynegy Holdings' unsecured bond debt and the economically unsustainable Danskammer and Roseton Facility Leases, the Debtors determined to commence these Chapter 11 Cases.[6]

### The Restructuring Support Agreement

59.     To address the issues discussed immediately above, prior to the Petition Date the Debtors engaged in extensive discussions related to a potential consensual restructuring with holders of  Dynegy Holdings' outstanding public bond debt.   After several weeks of active arm's-length negotiations, the Debtors and Dynegy Inc., in consultation with their advisors, reached an agreement with a group of investors holding over $1.4 billion of senior notes issued by Dynegy Holdings (the "Consenting Noteholders"), regarding a framework for the consensual restructuring of over $4.0 billion of obligations owed by Dynegy Holdings.

60.     The principal terms of the pre-arranged restructuring plan are evidenced by a prepetition Restructuring Support Agreement (the "RSA"), a copy of which is attached hereto as Exhibit 2, together with an accompanying term sheet (the "Term Sheet"), executed by Dynegy Holdings, Dynegy Inc., and the Consenting Noteholders.  If the transactions described in the

---

[6] Dynegy Holdings is a Defendant, along with certain affiliates, in three recently-filed cases filed in New York Supreme Court relating to certain of the above transactions.  These cases are Avenue Investments, L.P., et al. v. Dynegy Inc., et al. Index No. 652599/2011 (New York County, filed Sept. 21, 2011); The Successor Lease Indenture Trustee, et al. v. Dynegy Inc., et al. Index No. 652642/2011 (New York County, filed Sept. 27, 2011); and Resources Capital Management Corp., et al. v. Dynegy Inc., et al. Index No. 653067/2011 (New York County, filed Nov. 4, 2011).  On October 31, 2011 Defendants filed motions to dismiss the first two of these complaints in their entirety.

RSA are successfully effectuated through a confirmed chapter 11 plan, it will significantly reduce the amount of debt on the consolidated balance sheet of the Debtors and their affiliates.

61.     The Debtors have filed these Chapter 11 Cases in order to implement the RSA and the Term Sheet and address the burdensome lease obligations at Debtors Dynegy Danskammer and Dynegy Roseton.   The RSA, together with the Term Sheet, lays a solid foundation for a consensual plan of reorganization to be filed by the Debtors in these Chapter 11 Cases and should significantly facilitate these proceedings and the Debtors' objective of preserving and enhancing value for the benefit of their stakeholders.

62.     The pre-arranged plan, which is subject in all respects to the specific terms set forth in the Term Sheet attached to the RSA and the negotiation and execution of definitive documentation, calls for, among other things, the exchange of all unsecured obligations of Dynegy Holdings, including all of the Old Notes (except for the SKIS), for (a) a $400 million cash payment; (b) $1 billion aggregate principal amount of senior secured notes (the "New Secured Notes") to be issued by Dynegy Inc. (or an additional cash payment of $1 billion, if Dynegy Inc. determines it can obtain the financing elsewhere on more favorable terms); and (c) $2.1 billion of convertible PIK notes to be issued by Dynegy Inc.  The RSA contemplates the negotiation of definitive documents by December 7, 2011, and implementation of the transaction pursuant to a chapter 11 plan for Dynegy Holdings that must become effective by August 1, 2012.  The parties may terminate the agreement if the definitive documents are not agreed to or if certain milestones to consummation are not achieved.

# IV.

## REJECTION OF LEASE DOCUMENTS AND TRANSITION TO OWNER LESSORS

63.     On the Petition Date, the Debtors filed the Rejection Motion and also a related motion seeking an extension of the Debtors' time for performance under the Lease Documents (as defined in the Rejection Motion).  Concurrent therewith, the Debtors filed the Declaration of Martin W. Daley in Support of the Motion of the Debtors Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 for Entry of an Order Authorizing the Debtors to Reject the Lease Documents (the "Daley Declaration").

### *Rejection of the Lease Documents is a Sound Exercise of the Debtors' Business Judgment*

64.     In an effort to maximize the value of their estates and reduce their administrative costs in these chapter 11 cases, the Debtors have determined, in their business judgment, that the Lease Documents are significantly burdensome, provide no economic value to their estates and will impair the Debtors' ability to reorganize absent rejection.    To that end, on the Petition Date, the Debtors have filed the Rejection Motion.

65.     For the foregoing reasons, and the reasons set forth in the Daley Declaration, the Debtors believe, and I agree, that it is in the best interests of the Debtors and their estates that an order be entered rejecting the Facility Leases and other Lease Documents, *nunc pro tunc* to the Petition Date.

### *Efforts to Discuss Transition with the Owner Lessors*

66.     It is my understanding that, before the commencement of these chapter 11 cases, the Debtors engaged in discussions with representatives of both the PSEG Entities and certain of the Pass-Through Certificate Holders seeking to consensually restructure their obligations under the Lease Documents.  These discussions ultimately proved unsuccessful.  During those

discussions, the Debtors indicated that, absent a consensual resolution, a bankruptcy filing by the

Debtors was likely and that, in such case, rejection of the Lease Documents was probable.  Upon

information and belief, representatives of both the Pass-Through Certificate Holders and the

PSEG Entities have analyzed and prepared substantially for the relief requested in the Motion to

Reject.  In fact, the Owner Lessors have had several months' notice of the Debtors' precarious

financial situation and the likelihood that the Debtors would be forced to seek the relief sought

herein if an acceptable out-of-court restructuring could not be accomplished.  Public filings

issued by the Debtors' affiliates were clear on this point.

67.     The Debtors are taking steps to facilitate an orderly and expeditious transition of

operational control of the Leased Facilities.  To that end, the Debtors intend promptly to file an

application with FERC requesting approval for the Owner Lessors to assume operational control

of the plants and the associated interconnection facilities.  The Debtors intend to take similar

steps to obtain eligibility for the Owner Lessors under New York state law.  Specifically, the

Debtors intend to file a verified petition with the NYPSC requesting a declaratory ruling

disclaiming jurisdiction over the transfer of the Leased Facilities.

68.     Notably, the Owner Lessors have not, to the Debtors' knowledge, made any effort

to plan for an inevitable transition of the Leased Facilities.  On October 6, 2011, the Debtors

approached PSEG to devise consensual contingency plans in the event of a transition of control

of the Leased Facilities to the Owner Lessors (or Pass-Through Certificate Holders).  The Owner

Lessors rebuffed these proposals to obtain joint approval for a transfer of the Leased Facilities

and instead indicated that they had no desire to participate in any efforts to transition operational

control of the Leased Facilities to them.  In the absence of cooperation, the Debtors have been

forced to seek independent regulatory approval on behalf of the Owner Lessors and, as discussed

below, intend to file an application with FERC, as well as with the appropriate state regulatory authorities, requesting approval of the Owner Lessors as permitted controllers of the plants and the associated interconnection facilities.  In any event, the Owner Lessors have indicated that they have little interest in taking control of the Leased Facilities regardless of whether the Court approves the rejection.

### *The Transition Plan*

69.     As set forth above, the Debtors have made the determination, in the exercise of their sound business judgment, that the Facility Leases and other Lease Documents are substantially burdensome to the Debtors and their estates, and that it is no longer in their economic interest to continue operating the Leased Facilities pursuant to the Lease Documents. The Debtors have therefore sought to reject the Lease Documents through the Rejection Motion, effective as of November 7, 2011.

70.     The Debtors are prepared to surrender the Leased Facilities back to the Owner Lessors immediately upon entry of an order of the Court authorizing the rejection of the Lease Documents.  However, the operations of Dynegy Danskammer and Dynegy Roseton are subject to extensive federal, state, and local statutes, rules and regulations that must be complied with. In order to satisfy these requirements, the Debtors have developed and are in the process of implementing a plan (the "Transition Plan"), which is attached hereto as Exhibit 3.  During this transition period (including following rejection of the Lease Documents), the Debtors intend to operate the Leased Facilities in accordance with prudent operating standards and as necessary to comply with all applicable federal and state regulatory requirements.  The Debtors are assuming that they will need to proceed with the Transition Plan without the cooperation of the Owner Lessors and their common equity owner, PSEG.  However, upon obtaining the necessary

regulatory approvals, and following the subsequent completion of the transition, the Debtors believe that the transition of operational control of the Leased Facilities back to the Owner Lessors will be fully effective even in the absence of cooperation from the Owner Lessors.

## V.

## FIRST DAY MOTIONS AND APPLICATIONS[7]

71.     Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions, consisting of administrative motions and motions relating to the Debtors' business operations.  The Debtors believe, and I agree, that approval of each First Day Motion is an important element of their reorganization efforts and is necessary to ensure a smooth transition into chapter 11.  I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to achieve a successful reorganization.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.  Capitalized terms, to the extent not defined herein, have the meaning as defined in the respective First Day Motions.

*A.*     *Administrative Motions*

   **i.**     **Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) Requesting Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")**

72.     Given the provisions of the Bankruptcy Code and the Bankruptcy Rules, as well as the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expenses and resources.  The relief requested will not adversely affect creditors' rights, as the Joint Administration Motion

---

[7] All capitalized terms not defined in the following summary shall have the meanings ascribed to them in the applicable First Day Motion.

requests only the administrative, not the substantive, consolidation of the estates. In fact, the reduced costs that will result from the joint administration of the Chapter 11 Cases will inure to the benefit of all creditors. The relief requested will also relieve the Court of the burden of entering duplicative orders and maintaining duplicative files, as well as simplify supervision of the administrative aspects of the Chapter 11 Cases by the U.S. Trustee.

73.     For these reasons, and for the reasons discussed in the Joint Administration Motion, the Debtors believe, and I agree, that the relief requested in the Joint Administration Motion should be granted.

**ii.     Debtors' Motion for an Administrative Order Establishing Case Management Procedures (the "<u>Case Management Motion</u>")**

74.     The Debtors and I anticipate that these Chapter 11 Cases will be large and complex, involving many secured and unsecured claims – some of which may be actively litigated. The Debtors have thousands of potential creditors, given the number of holders of their public bond debt, and anticipate that hundreds of parties will request notice under Bankruptcy Rule 2002. Given the size and scope of these Chapter 11 Cases, the Case Management Procedures will permit less burdensome and costly service of Court Papers which, in turn, will maximize the efficiency and orderly administration of these Chapter 11 Cases, and will conserve the resources of the Court, the estates and all parties in interest, while still ensuring that appropriate notice is provided. Additionally, the proposed Notice Procedures will save the estates a significant amount of time and expense relating to the copying and service of paper documents.

75.     Moreover, due to the anticipated number of motions and other pleadings that will be filed in the Chapter 11 Cases, the Debtors believe, and I agree, that special hearing procedures should be established to assist in administering the case docket and rationalize the scheduling of

hearings before this Court.  The proposed Hearing Procedures will allow the Debtors and other parties in interest to efficiently schedule matters before the Court through the establishment of Omnibus Hearing Dates, certain filing and response deadlines and detailed hearing agendas.

76.     For these reasons, and for the reasons discussed in the Case Management Motion, the Debtors believe, and I agree, that the relief requested in the Case Management Motion should be granted.

### iii.     Debtors' Motion for an Order Pursuant to Bankruptcy Rules 1007(c) and 9006(b) Granting the Debtors Additional Time to File Schedules and Statements of Financial Affairs (the "<u>Schedules Motion</u>")

77.     The Debtors believe, and I agree, that cause exists to extend the deadline for the filing of the Schedules and Statements by an additional thirty-one (31) days based on (i) the size and complexity of the Debtors' businesses, (ii) the number of the Debtors and the number of potential creditors of the Debtors, and (iii) the numerous burdens imposed by the Debtors' reorganization efforts, particularly in the early days of the Chapter 11 Cases.  The Debtors' management and employees, together with their outside legal and financial advisors, have been working diligently to compile the information necessary for the Schedules and Statements.  The Debtors believe, though, and I agree, that the Schedules and Statements cannot be properly and accurately completed within the fourteen (14) day time period.

78.     The relief requested in the Schedules Motion will not prejudice or adversely affect the rights of the Debtors' creditors or other parties in interest.  No bar date for the filing of proofs of claim has yet been set in these cases and the Debtors do not anticipate asking the Court to set a bar date in the near term.  Rather, the extension requested herein will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of these Chapter 11 Cases.

79.     For the foregoing reasons, and for the reasons discussed in the Schedules Motion, the Debtors believe, and I agree, that it is in the best interest of the Debtors and their estates that the relief requested in the Schedules Motion be granted.

iv.     **Debtors' Motion for an Order (I) Authorizing the Debtors to Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors, and (III) Approving the Form and Manner of Notice of Commencement of the Debtors' Chapter 11 Cases (the "<u>Motion to Limit Service</u>")**

80.     Because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the creditor matrix requirements would be an exceptionally burdensome task and would greatly increase the risk of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

81.     After consulting with Epiq, the Debtors believe, and I agree, that preparing the consolidated list of creditors in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit Epiq to promptly provide notices to all appropriate parties.  Accordingly, the Debtors believe, and I agree, that maintaining their lists of creditors in electronic format rather than preparing and filing separate matrices is warranted under the circumstances and will maximize efficiency, increase accuracy, and reduce costs to the benefit of the estates.

82.     Because the top twenty (20) creditor lists of several of the Debtors would overlap, and certain other Debtors may have fewer than twenty (20) identifiable unsecured creditors, the Debtors submit that filing separate top twenty (20) lists would be of limited utility.  In addition, the exercise of compiling separate top twenty (20) creditor lists for each individual Debtor would consume an excessive amount of the Debtors' time and resources.  Further, the Debtors believe, and I agree, that a single, consolidated list of the Debtors' thirty (30) largest unsecured, non-

insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors and is appropriate under the facts and circumstances.

83.     The Debtors believe, and I agree, that publication of the Commencement Notice is the most practical method by which to notify those creditors who do not receive the Commencement Notice by mail and other creditors and parties in interest of the commencement of these Chapter 11 Cases and will ensure an efficient use of estate resources.

84.     For the foregoing reasons, and the reasons discussed in the Motion to Limit Service, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors, and that it is beneficial to the Court and the Clerk's office, that the Motion to Limit Service be granted.

**v.     Application for an Order Authorizing and Approving Employment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors *Nunc Pro Tunc* to the Petition Date (the "<u>Claims Agent Application</u>") and Debtors' Application to Authorize and Approve the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Administrative Agent for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (the "<u>Administrative Agent Application</u>")**

85.     The Debtors have complex businesses, with thousands of creditors, equity security holders and other parties in interest expected to be involved in these Chapter 11 Cases. Accordingly, the appointment of a claims and noticing agent, and additionally, an administrative agent, is both necessary and in the best interests of both the Debtors' estates and their creditors. By appointing Epiq to such role, the distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administration burden of processing what may be an overwhelming number of claims. Additionally, the Debtors will be relieved of some of the burdens of carrying out their duties in these Chapter 11 Cases.

86.     The Debtors believe, and I agree, that their selection of Epiq to act as their claims and noticing agent is consistent with the requirements of the Court's *Protocol for the Employment of Claims and Noticing Agents*, in that the Debtors have obtained and reviewed at least three engagement proposals from Court-approved claims and noticing agents to ensure selection through a competitive process.  Indeed, the Debtors conducted a review and competitive comparison of two other firms and reviewed the rates of two other firms prior to selecting Epiq as agent in accordance with the terms of the Court's protocol.  Moreover, the Debtors believe, and I agree, that based on all engagement proposals obtained and reviewed, Epiq will provide the most cost-effective and efficient service as a claims and noticing agent for these Chapter 11 Cases.  The Debtors believe, and I agree, that Epiq's rates are competitive and comparable to the rates Epiq's competitors charge for similar services.  The Debtors believe, and I agree, that Epiq's rates are reasonable given the quality of Epiq's services and Epiq's prior bankruptcy expertise.

87.     For the foregoing reasons, and the reasons discussed in the Claims Agent Application and the Administrative Agent Application, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors, and that it is beneficial to the Court and the Clerk's office, that the Claims Agent Application and the Administrative Agent Application be granted.

**B.      *Motions Related to the Debtors' Business Operations***

   **i.      Motion of the Debtors for the Entry of Interim and Final Orders (I) Authorizing Dynegy Holdings, LLC to Provide Intercompany Post-Petition Financing to its Debtor Subsidiaries Under Sections 362, 363 and 364 of the Bankruptcy Code, (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c), and (III) Granting Related Relief (the "<u>Intercompany Funding Motion</u>")**

88.     Prior to the Petition Date, the Borrower Debtors funded their operations through cash flows generated by their business and certain intercompany funding provided by Dynegy Holdings.  Without such intercompany funding provided by Dynegy Holdings, DNE, Hudson Power and their operating subsidiaries, Dynegy Danskammer and Dynegy Roseton, would not have had the ability to continue operations at their power-producing Facilities and to continue to generate revenues through the sale of such power.

89.     The Borrower Debtors' decision to enter into the Intercompany Credit Facility is an exercise of each Borrower Debtor's respective sound business judgment following an internal analysis and reference to historical practice.  Before the Petition Date, the Borrower Debtors undertook a thorough review as to their projected financing needs during these Chapter 11 Cases, including the costs of administration and transition of the Leased Facilities as well as the likely cash flows from their business operations, the results of which are reflected in the Approved Budget.  The Borrower Debtors have determined that the amounts available under the Intercompany Credit Facility should be sufficient to fund the transition of the Leased Facilities, and the administration of these Chapter 11 Cases.  I agree with this determination.

90.     The Borrower Debtors have an immediate need to obtain funding under the Intercompany Credit Facility in order to permit the continuation of their business operations, implement the orderly transition of the Leased Facilities to the Owner Lessors and preserve value for Dynegy Holdings' interest holders.  Thus, the Borrower Debtors will need to continue making payroll and other required expenditures, and will need to expend resources in order to meet the Debtors' regulatory requirements and ensure that the Borrower Debtors need not curtail, or even terminate, their business operations.  In addition, they will have working capital and administrative funding needs (including certain amounts related to these Chapter 11 Cases) –

without the ability to make such payments absent an infusion of cash – within the first few days after the Petition Date.  Although Dynegy Danskammer and Dynegy Roseton have historically funded much of their own operations, because of, among other things, recent declines in market pricing for electric energy, and certain added costs of the transition of the Facilities and the Chapter 11 Cases, they will not have sufficient cash flows for working capital and other costs without obtaining post-petition funding.  The Intercompany Credit Facility will be used for all such funding and expenditures, in accordance with the Approved Budget.

91.     Based on the facts and circumstances of these Chapter 11 Cases and the Borrower Debtors' operational performance, after carefully considering the limited alternatives that might have been available, the Borrower Debtors concluded that they would be unable obtain sufficient interim and long-term financing from sources other than the Lender on terms as or more favorable than under the Intercompany Credit Facility.

92.     The Debtors believe, and I agree, that (a) the Intercompany Credit Facility will provide the Borrower Debtors with sufficient liquidity to continue their operations during the operational transition of the Leased Facilities to the Owner Lessors and it will potentially limit additional claims against the Borrower Debtors' estates, (b) the proposed liens will not prejudice any creditors of the Borrower Debtors, and (c) the Intercompany Credit Facility is a reasonable and fair financing on market terms that does not require the payment of fees nor any restrictive covenants or onerous case milestones.

93.     Prior to the Petition Date, in the ordinary course of their respective business operations, Dynegy Holdings made unsecured intercompany loans (the "Intercompany Transactions") to DNE, Dynegy Danskammer and Dynegy Roseton to make up for shortfalls between operating expenses and revenues generated by the Debtors' business operations.  The

Debtors are seeking authority to continue engaging in Intercompany Transactions following the Petition Date.

94.     This intercompany financing is simply the continuation of the Intercompany Transactions that occurred between Dynegy Holdings and the Borrower Debtors prior to the Petition Date.  It is an exercise of the Lender's sound business judgment to continue its prepetition practice of providing certain funding to the Borrower Debtors necessary to maintain the value of the Debtors' estates, and considering the added protections for the repayment of such advances.

95.     I believe that the Court should approve the Intercompany Credit Facility and the requested use of Cash Collateral because:  (i) the Borrower Debtors could not obtain financing from a third-party source or on the same or better terms than those obtained from the Lender; (ii) the proposed financing is on market terms and does not include payment of any fees or other onerous terms and is a sound exercise of the Borrower Debtors' business judgment; and (iii) approval of the Intercompany Credit Facility is fair and reasonable and in the best interests of the Debtors' estates.

96.     Absent this Court's approval of the relief sought in the Intercompany Funding Motion, the Debtors believe that the Borrower Debtors face a substantial risk of severe disruption to their business operations and inability to carry out their plan to transition control of the Facilities, and that Dynegy Holdings is at risk of letting estate value dissipate.  I concur in that assessment.

97.     For the foregoing reasons, and the reasons discussed in the Intercompany Funding Motion, the Debtors have determined, and I agree, that it is in the best interest of the Debtors,

their estates and their creditors that all relief requested in the Intercompany Funding Motion be granted.

     **ii.**     **Debtors' Motion for an Interim and Final Order Authorizing (I) Continued Use of the Existing Cash Management System, (II) Continuation of Certain Intercompany Transactions, and (III) Continued Use of the Existing Bank Accounts (the "<u>Cash Management Motion</u>")**

<u>The Cash Management System</u>

98.     The Cash Management System used by the Debtors consists of two (2) separate segregated cash management systems, one each for Dynegy Holdings and DNE.  The Cash Management System for DNE is autonomously managed pursuant to the terms of the cash management agreement ("<u>CMA</u>") between DNE and certain of its non-debtor affiliates, the cash management system for Dynegy Holdings is not governed by a written agreement, but the accounts in each system are carefully managed through oversight procedures and controls implemented by Dynegy Inc.  Through their use of the Cash Management System pursuant to the CMA, and such procedures and controls, the Debtors are able to facilitate cash forecasting and reporting, monitor collections and disbursements of funds, and maintain control over the administration of various bank accounts that are required to effect the collection, disbursement, and movement of cash.  A diagram outlining the structure of the Debtors' Cash Management System is attached to the Cash Management Motion.

*Description of the DH Segregated Cash Management System*

99.     Dynegy Holdings maintains (i) a concentration account (the "<u>DH Concentration Account</u>") at JPMorgan Chase Bank ("<u>JPM</u>") for purposes of, among other things, servicing Dynegy Holdings' debt obligations and making other payments, and (ii) a cash account (the "<u>Cash Collateral Account</u>") at The Bank of New York Mellon ("<u>BNY</u>") for purposes of providing collateral and security to certain third parties under a letter of credit facility under

which BNY is the collateral account bank (the "L/C Facility").  The Cash Collateral Account is subject to a deposit control agreement with Credit Suisse AG, Cayman Islands Branch, the issuer of all of the letters of credit (the "LCs") under the L/C Facility.  As of the Petition Date, the DH Concentration Account has a balance of approximately $11 million.  Such amounts are unencumbered and are available to help fund these Chapter 11 Cases.

100.    As of the Petition Date, the Cash Collateral Account has a balance of approximately $27.0 million, which represents 103% of the total face value of the LCs issued under the L/C Facility.  Approximately 50% of the total balance is collateral for an LC issued to various New York state regulatory agencies for certain environmental liabilities related to Dynegy Danskammer.[8]  The remainder of the Cash Collateral Account balance cash collateralizes LCs issued to backstop certain obligations under DNE's workers compensation insurance programs, as well as various surety bonds posted in connection with litigation matters.

*Description of the DNE Segregated Cash Management System*

101.    The segregated cash management system used by DNE consists of a master concentration account (the "DNE Concentration Account") and the following four (4) junior "zero balance accounts" (the "ZBAs"):  (i) the gross margin and clearing ZBA (the "Gross Margin & Clearing ZBA"); (ii) the general and administrative ZBA (the "G&A ZBA"), (iii) the payroll ZBA (the "Payroll ZBA"); and (iv) the payroll tax ZBA (the "Payroll Tax ZBA").  Depending on whether the ZBAs have a positive or negative balance at the end of the day, funds may flow in or out of such accounts from or to the DNE Concentration Account in order to

---

[8] This LC was issued to, and is the property of, a trust established pursuant to that certain trust agreement dated April 22, 2009 by and between Dynegy Danskammer and JPMorgan Chase Bank, N.A., as trustee (the "Trust Agreement").  In the event the LC is drawn, the proceeds thereof will be deposited in a trust account pursuant to the Trust Agreement and such funds will be used by the trustee to pay the costs of closure of Dynegy Danskammer's solid waste management facility.

maintain zero closing balances for each of the ZBAs.  As of the Petition Date, the DNE

Concentration Account has a balance of approximately $1.1 million.

### *Gross Margin & Clearing ZBA*

102.    Pursuant to certain Energy Management Services Agreements between DPM and

each of Dynegy Danskammer and Dynegy Roseton (the "EMAs"), DPM provides various

services to the Debtors, including power management services, fuel management services,

emissions allowances management services and risk management services.  More specifically,

the power management portion of DPM's services consists of marketing power and capacity,

capturing pricing arbitrage, scheduling dispatch of power, communicating with ISOs or RTOs,

purchasing replacement power, and reconciling and settling the ISOs' invoices.  In connection

with its services under the EMAs, DPM transacts directly with third parties on Dynegy

Danskammer's and Dynegy Roseton's behalf for purposes of energy sale transactions.  As the

counterparty, DPM collects the proceeds of such transactions and then remits the proceeds (net

of any proceeds required in DPM's trading activity with respect to Dynegy Danskammer and

Dynegy Roseton, to the extent applicable) into the Gross Margin & Clearing ZBA, which

amounts are used to fund, among other things, the Debtors' purchase of coal and fuel from third

parties.

103.    Most cash outflows from the Gross Margin & Clearing ZBA take the form of wire

or Automated Clearing House ("ACH") transfers.  To the extent checks are issued, funds in the

DNE Concentration Account are automatically swept into the Gross Margin & Clearing ZBA,

when and as needed, for clearing purposes (the same procedure applies with respect to checks

processed through the G&A ZBA, Payroll ZBA and Payroll Tax ZBA).  Any end-of-day balance

in the Gross Margin & Clearing ZBA is automatically swept up into the DNE Concentration

Account.  The DNE Concentration Account collects such excess revenue and automatically distributes funds to the other ZBAs for purposes of satisfying each of their respective expense and payroll obligations.

### *G&A ZBA*

104.  The G&A ZBA is used to pay obligations that are directly related to the Debtors' operating and capital expenditures, as well as general administration of the Debtors' business operations (such as supplies, regular procurement (other than goods that are paid from the Gross Margin & Clearing ZBA), etc.), including obligations that DNE pays to Dynegy Inc. and other non-debtor affiliates under the following:  (i) a general Services Agreement by and between Dynegy Inc. and DNE (the "GSA"); (ii) the CMA by and among DAS, DNE and DPM; and (iii) the EMAs (together with the GSA and CMA, the "Services Agreements").

105.  Pursuant to the GSA, Dynegy Inc. and certain affiliated non-debtors, including DAS (collectively, the "Services Providers"), perform key administrative services for the Debtors (collectively, the "Services Recipients").  More particularly, under the GSA, the Services Providers provide the following types of services to the Services Recipients: (i) maintenance of books, records and accounts; (ii) administration of tax and accounting; (iii) coordination of government approvals and proceedings; (iv) administration and management of public relations, business development and commercial matters; (v) administration and management of legal, compliance and ethics matters; (vi) administration and management of environmental matters; (vii) supply of officers, directors and managers; (viii) administration and management of human resources and business services; (ix) provision of information technology, operation and maintenance support services; (x) administration and management of insurance

matters; and (xi) other miscellaneous additional services that may benefit the Services Recipients, as and when requested.

106.    Pursuant to the CMA, DAS performs cash management services for DNE and its subsidiary Debtors, including Dynegy Danskammer, Dynegy Roseton and Hudson Power (collectively, the "Cash Management Beneficiaries").  Under the CMA, the Cash Management Beneficiaries are provided the following services:  (i) establishment of accounts; (ii) transfer and/or deposit of receipts into such accounts; (iii) payments by or on behalf of Cash Management Beneficiaries; (iv) investment of cash pursuant to Dynegy Holdings' investment policies;[9] (v) settlement of intercompany obligations; and (vi) other miscellaneous additional services that may benefit the Cash Management Beneficiaries, as and when requested.

107.    As discussed above, DPM also provides a wide range of key energy management services to the Debtors via the EMAs with Dynegy Danskammer and Dynegy Roseton.

108.    DNE currently pays approximately $712,000 per month, in the aggregate, to various non-debtor affiliates under the Services Agreements.  Amounts owing in connection with the Services Agreements are allocated on a gross allocation basis pursuant to established internal policies.[10]  The services provided to the Debtors under the Services Agreements ensure efficient operation and support the generation of additional revenue to the Debtors.  Therefore, the Debtors' failure to contribute their allocated portion of the shared expenses would negatively impact the Debtors, and the Debtors believe, and I agree, that continued performance under each

---

[9] The Debtors do not have any investments, nor do they intend to invest their cash balances during the pendency of these Chapter 11 Cases.  However, as set forth in the Cash Management Motion, to the extent the Debtors desire to invest cash pursuant to section 345 of the Bankruptcy Code, the Debtors have agreed to provide notification of such investment to the U.S. Trustee.

[10] Similar services agreements are in effect among non-debtor affiliates, and all costs associated with all service agreements are allocated on a gross allocation basis in line with the internal policies governing the Debtors as well as their non-debtor affiliates.

of the GSA, CMA and EMA is necessary and provides the most cost-efficient means of administering the Debtors' estates during these Chapter 11 Cases.

### *Payroll-Related ZBAs*

109. The Payroll ZBA is funded to process and meet the Debtors' payroll obligations. Most of these obligations are satisfied through ACH transfers, which are prepared by the Debtors' payroll department following approval by the appropriate internal channels. Certain payroll-related taxes are subsequently disbursed to various taxing authorities and other third parties through the Payroll Tax ZBA, as appropriate.

### *The Existing Cash Management System Is Necessary to the Debtors' Business Efforts*

110. I believe it is critical that the Debtors' cash is managed and all transfers of funds are coordinated for the efficient and effective operation of their businesses. In addition, disrupting the Debtors' current cash management procedures would impair the Debtors' ability to operate the Facilities, including the Leased Facilities, during the transition of operations of the Leased Facilities to the Owner Lessors.

111. The Debtors believe, and I agree, that any disruption in the Cash Management System would likely cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their business operations, to the detriment of the Debtors' employees, customers and suppliers.

112. The Cash Management System allows the Debtors to manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. Furthermore, DAS manages the Cash Management System on the Debtors' behalf in an automated environment using treasury

management software and bank account structures to guard against fraud and to protect the integrity of the overall system. The treasury systems used by the Debtors automatically report and continuously calculate the Debtors' cash position. Fraud protection remains a high priority through the use of "positive pay" programs and debit blocks. Any changes to the bank accounts or treasury systems that report on account activity and generate wire transfers would be disruptive to the Debtors' business operations and could undermine the effectiveness of such systems. Therefore, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Cash Management System be maintained.

*Authorization of the Continued Use of the Cash Management*
*System Is Warranted*

113.     In connection with their use of the Cash Management System, the Debtors incur periodic service charges and other fees to the participating banks, including the L/C Facility bank (collectively, the "Cash Management Banks") for the maintenance of such system (the "Service Charges"), which average approximately $7,000 per month. While the Service Charges are generally debited automatically from the respective bank account on a monthly basis, certain of the Service Charges are paid in arrears, with the next payment due after the Petition Date for a period that will include prepetition services. Payment of the prepetition Service Charges is in the best interests of the Debtors and all parties in interest in these Chapter 11 Cases as it will prevent any disruption to the Cash Management System.

114.     In order to streamline the process of purchasing activities by plant-level management employees on behalf of the Debtors, DAS issued approximately thirty-four (34) P Cards to such Debtor employees in connection with the GSA. These P Cards are utilized to charge expenses for goods and services purchased for, or incidental to, the maintenance and operation of the Debtors' Facilities. Expenses incurred on the P Cards ("Purchase Charges") are

billed directly to DAS, and then passed on to the Debtors. On average, the Debtors spend approximately $25,000 per month in reimbursements to DAS for Purchase Charges directly attributable to the Debtors. I believe that it is vital to the sustained operation of the Debtors' businesses during the transition period that they be permitted to continue using P Cards to pay for essential goods and services at their Facilities.

115.     Additionally, the Debtors believe, and I agree, that the protections provided to Cash Management Banks that honor prepetition checks or other items drawn on accounts subject of the Cash Management Motion, as detailed in the Cash Management Motion, are necessary in order to induce the Cash Management Banks to continue providing cash management services to the Debtors without additional credit exposure.

*Maintenance of the Debtors' Existing Bank Accounts Is Warranted*

116.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors maintained the bank accounts listed on Exhibit A to the Cash Management Motion.

117.     I am informed that the U.S. Trustee's Operating Guidelines mandate the closure of the Debtors' prepetition bank accounts and the opening of new accounts. If the Debtors were required to comply with these guidelines, their operations would be immediately harmed by the disruption, confusion, delay and cost that would most certainly result therefrom. The Debtors believe, and I agree, therefore, that their transition to chapter 11 will be more orderly, with a minimum of harm and at minimal cost, if all Bank Accounts are continued following the Petition Date with the same account number.

118.     If the Debtors are not permitted to maintain and utilize their Bank Accounts, I believe that the resulting prejudice will include, among other things, significant (i) disruption of the ordinary financial affairs and business operations of the Debtors, (ii) delay in the

administration of the Debtors' estates, and (iii) costs to the estates to set up new systems and open new accounts, all of which would be harmful to the Debtors' ability to operate the Facilities, including the Leased Facilities until the Debtors are able to transition operational control of such Leased Facilities to the Owner Lessors. The Debtors believe, and I concur, that absent authority for the Debtors to continue to use their existing Bank Accounts, they would be immediately harmed.

119. For the foregoing reasons and the reasons discussed in the Cash Management Motion, the Debtors believe, and I agree, that it is in the best interests of the Debtors, their estates and their creditors that all relief requested in the Cash Management Motion be granted.

### iii. Debtors' Motion for an Interim and Final Order Authorizing Payment of Certain Prepetition Taxes and Assessments (the "Tax Motion")

120. The Debtors estimate that the total amount of prepetition Taxes and Assessments owing to the various Taxing Authorities will not exceed approximately $350,000.

Sales and Use Taxes

121. In certain instances during the ordinary course of their businesses, the Debtors collect sales taxes from their customers in connection with the sale of energy (the "Sales Taxes") and periodically remit them to the applicable Taxing Authority. The process and frequency by which the Debtors remit the Sales Taxes varies, depending on the particular Taxing Authority to be paid. Because most of the Debtors' sales are wholesale sales of power, most of which is resold, the amount of owed Sales Taxes is also limited.

122. The Debtors also incur use taxes (the "Use Taxes") in connection with the Debtors' power generation business activities, such as when the Debtors purchase tangible personal property and certain services, including power generation-related equipment. These Use Taxes arise when the Debtors purchase such items or services from a vendor who is not

registered to collect sales taxes for the state in which the property is delivered, or the services are provided. In this circumstance, such vendors are not obligated to charge or remit Sales Taxes. Nevertheless, under the state laws governing Use Taxes, the Debtors, as purchasers, are obligated to self-assess and pay the Use Taxes, when applicable, to New York State. The Debtors pay Use Taxes in arrears and the timing and payment of Use Taxes varies. The Debtors estimate that in the aggregate, as of the Petition Date, approximately $1,000 in prepetition Sales Taxes and Use Taxes have accrued, but have not yet been paid.

123.    In the ordinary course of business, the Debtors from time to time undergo audits and reviews conducted by the various Taxing Authorities. While the current estimate is based on a good faith assessment of such amounts due on a prepetition basis, because of such audit rights, there is a possibility that one or more of the various Taxing Authorities may determine at some later date that the Debtors owe additional prepetition Sales Taxes and/or Use Taxes.

Property Taxes

124.    The Debtors own certain real and personal property located in the jurisdictions in which they operate. The Debtors' real and personal property is subject to State and local property taxes (collectively, the "Property Taxes"). Property Taxes are typically either paid annually, semi-annually, or quarterly. The Debtors estimate that, as of the Petition Date, approximately $168,000 in Property Taxes have accrued, but have not been paid.

Other Taxes

125.    In addition to the various Taxes described above, certain Taxing Authorities impose a tax on the Debtors for their use of petroleum, coal, natural gas and certain other hydrocarbons in connection with their generation of power (the "Fuel Taxes"). The Debtors also pay franchise taxes (the "Franchise Taxes") to certain Taxing Authorities to operate or otherwise

do business in the applicable taxing jurisdiction. Some states assess a flat Franchise Tax on all businesses, some states assess a Franchise Tax based upon net operating income, and other states assess a Franchise Tax on capital employed in the business. While the Debtors are generally current with respect to the Franchise Taxes, they estimate that they may owe approximately $5,000 with respect to the Franchise Taxes incurred prior to the Petition Date.

126.     Finally, due to the nature of the Debtors' businesses, the federal government, as well as various municipal and county governments, require the Debtors to obtain permits or other business licenses and pay fees associated with such permits or licenses in order to conduct operations in their jurisdiction (the "<u>Business License Fees</u>"). The manner in which Business License Fees are computed, and the requirements for obtaining them, vary greatly according to the governing law in each jurisdiction. The Debtors estimate that the amounts owed with respect to the Business License Fees related to the periods prior to the Petition Date are approximately $103,000.

127.     The Debtors believe, and I agree, that ample cause exists to authorize the payment of the prepetition Taxes and Assessments, including based upon the following factors as more fully set forth in the Tax Motion:  (i) it is my understanding that certain of the Taxes and Assessments are not property of the Debtors' estates because they are trust fund taxes; (ii) it is my understanding that certain of the Taxes and Assessments may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code; (iii) if unpaid, many of the Taxes and Assessments may impact director and officer liability and governmental entities may sue the Debtors' (and/or their non-debtor affiliates') directors and officers, thereby distracting them from the administration of these Chapter 11 Cases and the reorganization of the Debtors' business; (iv) if unpaid, certain Franchise Taxes or Business License Fees may impact upon the Debtors'

ability to operate the Facilities; (v) if unpaid, Taxing Authorities might take precipitous action, including, but not limited to filing liens, preventing the Debtors from conducting business in the applicable jurisdiction, and seeking to lift the automatic stay; (vi) failure to pay Taxes and Assessments could trigger unwarranted governmental action such as audits, which would be disruptive, costly and time-consuming; (vii) interest and penalties may accrue on certain unpaid Taxes and Assessments even after the Petition Date; and (viii) it is my understanding that the relief sought in the Tax Motion is authorized under the Bankruptcy Code and the Court's general equitable powers.

128.     Certain of the Debtors' Sales Taxes and Franchise Taxes are expected to come due during the interim period.  As a result of the frequency with which the Debtors must make such payments to various Taxing Authorities, it is essential that they be authorized to make such payments as they become due.  If the Debtors are not authorized to make such payments, their failure to remit owed amounts may result, as described above, in director or officer liability, additional interest on unpaid amounts, and penalties.

129.     For the foregoing reasons, and the reasons discussed in the Tax Motion, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors that all relief requested in the Tax Motion be granted.

**iv.     Debtors' Motion for an Interim and Final Order Authorizing Payment of Certain Prepetition Claims of Critical Vendors, Shippers and Other Lien Claimants and Certain Related Relief (the "<u>CV/Shippers Motion</u>")**

130.     While operating the Facilities for the benefit of PSEG until the transition of operational control, the Debtors must ensure continuous delivery of goods and services necessary to ensure compliance with applicable regulatory requirements.  Collectively, the Debtors' vendors and service providers ensure that the Debtors receive all of the fuel, goods, equipment

and other materials necessary to operate the Danskammer and Roseton Facilities in accordance with prudent operating standards and applicable law. Any significant disruption in the Debtors' vendor network, such as a vendor halting delivery of certain necessary materials or fuel, or a vendor refusing to perform duties necessary for the Debtors to comply with the multi-faceted regulatory regime governing the Debtors' businesses, could result in one or both of the Facilities shutting down, potentially causing blackouts in the New York state area. Such a result would have a devastating impact on the Debtors' ability to maintain operations in accordance with prudent operating standards and regulatory requirements, pending regulatory approval to transition operational control of the Leased Facilities to the Owner Lessors.

### The Vendor/Shipper Claimants and Outstanding Orders

#### *Critical Vendors*

#### ***Identification of the Critical Vendors***

131. The Debtors have examined whether the payment of Critical Vendor Claims is necessary. Specifically, the Debtors have reviewed their accounts payable and have undertaken a process to identify those vendors who are essential to ensuring that the Debtors are able to operate the Danskammer and Roseton Facilities consistent with prudent operating standards and with all applicable regulations. The Debtors have further developed certain procedures that I believe, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a post-petition basis and in accordance with the terms of the parties' prepetition dealings.

132. Upon information and belief, and as described in the CV/Shippers Motion, the Debtors consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria, including,

without limitation, whether: (a) a vendor is required for the Debtors to remain compliant with applicable law; (b) the vendor in question is a sole- or limited-source or high-volume supplier; (c) certain customizations prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; (d) vendors provide the Debtors with advantageous pricing or other terms such that replacing those vendors post-petition would result in significantly higher costs to the Debtors; (e) if the vendor is not a sole- or limited-source provider, the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured; and (f) a vendor meeting the standards of (a), (b), (c) or (d) is likely to refuse to continue providing goods or services to the Debtors post-petition if its prepetition outstanding balances are not paid. After carefully assessing the universe of vendors under the foregoing criteria and examining each through the lens of being necessary to comply with applicable regulations, the Debtors estimated the total payments necessary to ensure the continued supply of critical goods and services to the Debtors following the Petition Date in calculating the Vendor/Shipper Cap. The Debtors estimate, and I agree, that the outstanding Vendor/Shipper Claims total approximately $300,000.00.

### *Description of the Critical Vendors*

133.    The Critical Vendors generally, but not exclusively, fall into the following categories: (i) Regulatory Compliance Vendors; (ii) Fuels; (iii) Sole or Limited Source Vendors; and (iv) Plant Maintenance and Repair, each of which is described in further detail below and in the CV/Shippers Motion.

### Regulatory Compliance Vendors

134.    In the ordinary course of their businesses, the Debtors rely on a number of Critical Vendors to assist the Debtors in complying with applicable governmental laws and regulations

(collectively, the "Regulatory Compliance Vendors").  For example, the Debtors rely on certain disposal and sewage treatment companies to properly remove regulated waste and chemicals from the Facilities, companies that perform emissions testing, companies that provide materials for the Debtors' continuous emissions monitoring system ("CEMS"), and companies that provide on-site security services.  Since the Regulatory Compliance Vendors are typically employed and/or licensed by the state or local governments in jurisdictions where the Debtors operate, the Debtors may not be able to quickly obtain qualified service from any other source.

135.   The Debtors believe, and I agree, that some of the Regulatory Compliance Vendors will refuse to perform post-petition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations.  Any such potential violation of applicable governmental laws and regulations could cause governmental entities to attempt to levy fines or penalties against the Debtors or require closure of the Facilities.  In addition, proper disposal of the regulated waste and chemicals on an uninterrupted basis will help to protect the environment and benefit the public health, including the health and safety of the Debtors' employees.

136.   Because of the nature of the Debtors' operations – power generation – the Debtors are required to comply with applicable governmental laws and regulations on a post-petition basis.  The Debtors cannot afford the potentially irreparable damage to the Facilities that would be caused by adverse governmental action for regulatory noncompliance.  As such, the Debtors believe, and I agree, that their ability, in their sole discretion, to pay the Regulatory Compliance Vendors is essential.

**Fuels**

137.     Coal, natural gas and fuel oil are essential to the operation of the two Facilities. The Danskammer and Roseton Facilities need to burn these fuels in order to produce electricity.[11]  Consequently, the Debtors must be able to obtain these fuels promptly in order to ensure the Debtors have access to sufficient quantities of these fuels to continue generating electricity.  The Debtors currently have arrangements to procure these fuels, and the Debtors believe, and I agree, that they would be unable to obtain similar terms in the current coal, gas and fuel oil market for the cost-efficient supply of a sufficient quantity, quality or reliability of fuel on a timely basis.  The Debtors believe, and I agree, that they are current on all prepetition payments for fuel, especially with respect to coal and fuel oil.  Upon information and belief, the Debtors are current on all prepetition payments for natural gas.[12]  Without fuel, the Debtors simply cannot continue to produce electricity and maintain their operations of the Facilities during the transition period in a manner that is in compliance with all applicable Regulations.

**Sole or Limited Source Vendors**

138.     In the ordinary course of their businesses, the Debtors rely on a number of Critical Vendors to supply essential raw materials, specialized replacement parts and supplies, operations consumables and certain other goods and services required to operate the Roseton and Danskammer Facilities and ensure continuous business operations, in accordance with prudent operating standards and in order to comply with the applicable laws and regulations (collectively, the "Sole or Limited Source Goods").  Typically, the Sole or Limited Source Goods are available

---

[11] The Roseton Facility primarily uses natural gas.  Of the four (4) primary units at the Danskammer Facility, two (2) units primarily use natural gas and the other two (2) units primarily use coal.

[12] The Debtors' obligations to their natural gas vendor(s) are fully cash collateralized.  To the extent there are amounts outstanding on account of prepetition natural gas purchases, the Debtors and I believe such amounts are fully secured.

only from the Debtors' existing suppliers that are Critical Vendors (collectively, the "Sole or Limited Source Vendors").

139.     In some cases, alternate suppliers cannot supply the required Sole or Limited Source Goods in sufficient quantity, quality or reliability, or they are unable to supply the required Sole or Limited Source Goods on a cost-efficient and timely basis in the appropriate geographic area.  Because the Debtors either have limited or no viable alternatives to obtain substitute Sole or Limited Source Goods from other suppliers in a timely fashion, they have determined, and I concur, that they must be able to satisfy the prepetition claims of these Sole or Limited Source Vendors, in the Debtors' discretion, to ensure the continued delivery of the Sole or Limited Source Goods to their Facilities so that the Facilities can operate without interruption.

### Plant Maintenance and Repair

140.     To ensure that the wide range of specialized equipment required for energy production and pollution control, including, without limitation, boilers, turbines, pumps and other ancillary equipment, operates in an effective, safe and efficient manner consistent with regulatory requirements, the Debtors rely on vendors that perform specialized maintenance and repair services provided by certain Critical Vendors (collectively, the "Maintenance Vendors").

141.     The Danskammer Facility recently completed scheduled maintenance and repair (the "Outage").  Maintenance Vendors, including those involved in the Outage, may be able to assert mechanics' or other possessory liens and thus may also qualify as Lien Claimants, as discussed below.

142.     Due to the specialized and often hazardous nature of some of the services involved, certain of the services can only be obtained by the Debtors from the Maintenance Vendors with permits or licenses as required by state or federal laws and regulations.  The

Debtors believe, and I agree, that some of the Maintenance Vendors will refuse to provide post-petition goods and services to the Debtors if all or a portion of their prepetition claims are not satisfied. Such a situation would be devastating if one of the Facilities experienced an unplanned outage post-petition. It is vitally important that the equipment required for energy production and pollution control be maintained in an appropriate manner to reduce the risk of disruption to the Debtors' operations during the transition period, so as to ensure compliance with existing Regulations. It is therefore crucial that the Debtors have the authority to satisfy the prepetition claims of the Maintenance Vendors, either as Critical Vendors or Lien Claimants.

*Shippers*

143.     The operations of the Danskammer and Roseton Facilities rely upon the use of reputable common carriers, dedicated carriers, rail carriers, less-than-truckload carriers, freight-forwarders, ocean carriers, parcel carriers, and non-asset based carriers (brokers) (collectively, "Shippers") to deliver goods and materials to the Facilities in a timely fashion. These shipments, which include equipment, fuels and chemicals necessary to operate the two Facilities, originate from various manufacturers, suppliers and distributors that are located throughout the United States and abroad. In the ordinary course of business, Shippers regularly have possession of materials and supplies intended for delivery to the Facilities currently operated by the Debtors. The Debtors expect, as do I, that, as of the Petition Date, certain of the Shippers will have outstanding invoices for goods that were delivered to the Debtors prior to the Petition Date.[13]

144.     The Debtors believe, and I agree, that the value of the goods and materials in the possession of the Shippers, and the potential injury to the operation of the Facilities if they are

---

[13] In order to coordinate the import of goods and materials into the United States and the payment of Customs Duties, the Debtors have engaged Pangea Logistics Inc. (the "Customs Broker") to take all actions necessary, including making payment, to obtain the release of imported goods for delivery to the Debtors. The Debtors estimate that, as of the Petition Date, there is nothing owing in Customs Duties and fees for the Customs Broker.

not timely released, is likely to substantially exceed the amount of Shippers Claims asserted by such parties. Indeed, even if the Shippers did not have valid liens under applicable state law, their possession (and retention) of the Debtors' goods could severely disrupt the operation of the Danskammer and Roseton Facilities. For these reasons, the Debtors therefore believe, and I agree, that it is necessary that they be permitted to make payments on account of certain Shippers Claims in order to ensure that the Facilities continue to operate in accordance with prudent operating standards and applicable regulations.

*Lien Claimants*

145.     The Debtors routinely transact business with a number of other third parties (collectively, the "Lien Claimants", and together with the Critical Vendors and the Shippers, the "Vendor/Shipper Claimants") who, under applicable state law, may have the potential to assert liens, including possessory liens, against certain real and/or personal property relating to the Debtors if the Debtors fail to pay for goods delivered or services rendered prior to the Petition Date ("Statutory Liens"). In the ordinary course of business, the Debtors engage a number of Lien Claimants to provide equipment and perform various services for the Debtors, including rendering essential maintenance and repair services related to the Outage.

146.     Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, some of the Lien Claimants may not have been paid in full for certain prepetition goods, equipment and services.

147.     At any given time, certain third party Lien Claimants may be providing services at the Danskammer and Roseton Facilities, and may therefore have the right to perfect statutory liens related to the Debtors' property, including liens on account of a Lien Claimant's possession of the Debtors' property. The Debtors have engaged numerous contractors in order to perform

maintenance on the Danskammer and Roseton Facilities.  In particular, the Debtors have engaged contractors to perform various services in connection with the Outage.  In order to, among other things, ensure that the Debtors are able to safely bring the Danskammer Facility back on-line according to schedule and in compliance with all applicable Regulations, the Debtors must be allowed to pay Lien Claimants for the goods and services that they have provided in maintenance and repair of the Danskammer Facility during the Outage.

*Outstanding Orders*

148.    As of the Petition Date, and in the ordinary course of their businesses, the Debtors have certain prepetition purchase or service orders outstanding (the "Outstanding Orders") with the certain vendors (collectively the "<u>Outstanding Order Vendors</u>").  The Debtors believe, and I agree, that Outstanding Order Vendors may refuse to provide goods or services to the Debtors until the Debtors obtain an order of the Court deeming all undisputed obligations arising from the Debtors' post-petition acceptance of goods and services pursuant to the Outstanding Orders to be administrative expense claims.  Further, absent the relief requested in the CV/Shipper Motion, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of their administrative priority.  The attendant disruption to the continuous and timely flow of the goods and services necessary to operate the Facilities during the transition period could damage the Debtors' ability to comply with applicable laws and force a premature shutdown of one or both of the Facilities, to the detriment of the Debtors, New York state, the regulatory authorities and the Owner Lessors.

*Ample Authority Exists to Support Paying the Vendor/Shipper Claims*

149.    Failure to satisfy the Shipping Claims and the Lien Claimant Claims could have a material adverse effect on the Debtors' day-to-day business operations and relationships with

their customers during the transition period.  Should any Critical Vendor stop supplying the Debtors, the operation of the Danskammer and Roseton Facilities could be significantly disrupted because the Debtors would lack the requisite materials and services needed to operate their Facilities in accordance with applicable law.  Such a scenario could lead to, among other things, significant regulatory penalties and damage claims against the Debtors.  As such, the Debtors submit, and I agree, that the amount of the Vendor/Shipper Cap is small relative to the potential damage to the Debtors' operations and estates should the relief requested herein not be granted.

150.    The Debtors strongly believe, and I agree, that the payment of the Vendor/Shipper Claims is essential to ensuring continued compliance with prudent operating standards and applicable Regulations.  The harm that would stem from the failure to pay any of the Vendor/Shipper Claimants is disproportionate to the amount of the prepetition claims that the Debtors are seeking to pay in the CV/Shipper Motion and the potential disruption to the regulatory process seeking the approval.  Moreover, with respect to each Vendor/Shipper Claimant, the Debtors have examined other options short of payment of such Vendor/Shipper Claims and have determined that to avoid significant disruption of the Debtors' ability to operate consistent with its Regulatory obligations, there exists no practical or legal alternative to payment of the Vendor/Shipper Claims.

151.    The Debtors have sufficient funds to pay the amounts described in the CV/Shipper Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to financing.  Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment on account of the Vendor/Shipper Claims.

152.    Without satisfaction of the Vendor/Shipper Claims, the Debtors believe, and I agree, that the Critical Vendors, Shippers and Lien Claimants will significantly downgrade trade terms and may stop supplying them with critical goods and services necessary in their operations, thereby hampering the Debtors' ability to successfully operate in accordance with applicable laws.

153.    For the foregoing reasons, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors that all relief requested in the CV/Shippers Motion be granted.

    **v.**      **Debtors' Motion for an Interim and Final Order Authorizing Debtors to (I) Pay Certain Prepetition Employee Obligations and Expenses, (II) Maintain and Continue Employee Benefits and Programs in their Ordinary Course, and (III) Authorizing and Directing Applicable Banks to Honor all Checks and Transfers Drawn on the Debtors' Accounts (the "Wages/Benefits Motion")**

154.    DNE currently employs approximately 152 full-time employees[14] (each an "Employee," and collectively, the "Employees"), comprising 126 hourly Employees and 26 salaried Employees.[15]  Approximately 120 of the Employees are represented by a union (the "Union Employees") and are covered by that certain 2008 Collective Bargaining Agreement Between the International Brotherhood of Electrical Workers Local 320-AFL-CIO and Dynegy Northeast Generation, Inc. (the "CBA").  The CBA expires on January 31, 2012.  The remainder of the Debtors' Employees (the "Non-Union Employees") are not subject to the terms of the

---

[14] One of these 152 Employees is on long-term disability; this individual was paid on an hourly basis prior to going on long-term disability and is, therefore, reflected as an hourly Employee in the following count.  Health and welfare benefit costs for this individual are approximately $13,000 annually.  Additionally, this individual participates in the Dynegy Northeast Generation, Inc. Retirement Income Plan, accruing a traditional pension benefit under the plan.

[15] DNE employs all of the employees at the Danskammer and Roseton Facilities,  with the exception of one employee, the Managing Director of Plant Operations at the Facilities, who is employed by Dynegy Operating Company, a non-debtor affiliate.  In addition, DNE is a participating employer in certain employee plans and programs sponsored by Dynegy Inc.  In such situations, Dynegy Inc. (or another non-debtor affiliate) may provide the benefit directly to the Employee, and DNE, as a participating employer, reimburses Dynegy Inc. for the value of the benefit provided to the DNE Employee.

CBA.  The expertise and experience developed by the Employees is a critical component of the Debtors' ability to operate the Facilities, in accordance with all applicable regulatory requirements.

Prepetition  Employee Obligations

*Employee Compensation*

155.    The Debtors' average gross monthly compensation for their Employees, including wages, salaries, commissions and other compensation, is approximately $1.109 million. Approximately 121 Union Employees are paid by direct deposit through electronic transfers of funds directly into their bank accounts on a weekly basis, with the remainder of the Union Employees being paid by checks issued weekly through the Debtors' in-house payroll administration.  Approximately 26 Non-Union Employees are paid by direct deposit through electronic transfers of funds directly into their bank accounts on a bi-weekly basis, with certain of these Non-Union Employees also being paid certain amounts by checks issued bi-weekly through the Debtors' in-house payroll administration.

156.    As of the Petition Date, the aggregate amount of unpaid base wages (including base salary but excluding paid time-off, leave and certain Deductions and Withholdings, each as discussed below) earned prior to the Petition Date that remain unpaid to the Employees is approximately $342,000 (the "Unpaid Wages").  Upon information and belief, if the Wages/Benefits Motion were granted, no Employee would be paid more than $11,725 for any such Unpaid Wages.

157.    The Debtors typically utilize the services of approximately 30 temporary workers and independent contractors (each a "Temporary Worker" and collectively, the "Temporary Workforce") to perform an array of services for the Debtors' businesses.  The Debtors estimate

that prepetition amounts owed to any Temporary Worker, if any, are *de minimis*. Upon information and belief, if the Wages/Benefits Motion were granted, payments would not exceed $11,725 on account of any individual Temporary Worker.

*Employee Benefits*

158.    The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with the Employee Benefits, including but not limited to: (i) a broad range of medical and health care programs; (ii) vacation, sick, holiday and leave, and similar benefits; (iii) certain savings and pension plans; and (iv) a number of other specific employee benefits, described in greater detail below and in the Wages/Benefits Motion.

**Health Care Programs**

159.    The Debtors offer several health and welfare programs to both the Union Employees and Non-Union Employees, including medical, prescription drug, dental and vision care coverage, whether through third party insurers or otherwise (the "Health Care Benefits"). Certain of the Health Care Benefits are provided through self-insured programs administered by third parties, such as Blue Cross Blue Shield of Illinois ("BCBS"), which administers the medical program; Medco and Prime Therapeutics,[16] which administer the prescription drug coverage; and Delta Dental, which administers the dental program.[17] Vision coverage is fully-insured and provided by VSP. BCBS administers employee medical benefits for both Union and

---

[16] Medco administers the prescription drug coverage under all the medical coverage options, except the PPO 3 option, which is administered by Prime Therapeutics; Prime Therapeutics is also referred to as "BlueScripts."

[17] A self-insured group health plan (also called a self-funded plan) is one in which the employer assumes the financial risk for providing health care benefits to its employees by generally paying claims out-of-pocket rather than paying a fixed premium to an insurance carrier. As is common in these types of arrangements, the Debtors have purchased stop-loss coverage to limit their exposure under their self-insured medical program. An employer often contracts with a third party administrator to administer self-insured group health plans, as has been done for the medical, prescription drug and dental coverage by contracting with BCBS, Medco and Prime Therapeutics, and Delta Dental, respectively. By contracting with a third party administrator such as BCBS, the Debtors are able to provide their employees with access to the BCBS network of healthcare providers and get the benefit of the discounted provider rates negotiated by BCBS for healthcare services provided to covered employees .

Non-Union Employees.  The Health Care Benefits for the Union Employees and Non-Union Employees are similar in structure.  The Non-Union Employee Health Care Benefits, on average, have higher monthly premiums, annual deductibles and out-of-pocket maximums.  For example, a Non-Union Employee with family coverage for the Health Care Benefits, on average, has $582 deducted from his or her paycheck on a monthly basis to fund the employee portion of the benefits, and a Union Employee with family coverage, on average, has $180 deducted monthly from his or her paycheck for this coverage.  A Non-Union Employee with individual coverage for the Health Care Benefits, on average, has $196 deducted from his or her paycheck on a monthly basis, and a Union Employee with individual coverage, on average, has $61 deducted monthly from his or her paycheck for this coverage.  DNE funds the program as claims are received and, on average, pays 70% of all medical costs incurred by Non-Union Employees and 80% of all medical costs incurred by Union Employees as well as 70% of all dental costs incurred by both Non-Union and Union Employees.  Vision coverage is fully Employee paid.

160.    On average the Debtors pay approximately $166,145 per month for the Health Care Benefits.  In addition, the Debtors' average monthly administrative fees currently paid in connection with all Health Care Benefits total approximately $8,600.  As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the Health Care Benefits to be approximately $57,000 (approximately two (2) weeks of the Health Care Benefits noted above).

### *Vacation, Sick, Holiday and Leave Benefits*

161.    The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time").  The amount of Vacation Time varies based on the Employee's amount of time employed by the Debtors and predecessors thereof and, with regard to Union Employees,

is governed by the CBA. When used, Union Employees are generally paid for Vacation Time at their salaried rates for eight (8) hours for each vacation day. Pursuant to the CBA, up to ten (10) days of accrued but unused Vacation Time carries over to the following calendar year. Union Employees generally cannot receive payment in cash in lieu of earned Vacation Time, except upon termination of their employment, pursuant to the CBA or under applicable state law. However, in a layoff situation, a Union Employee must choose between a cash payment for any eligible and unused vacation and the separation allowance as provided by Article IV, n.1. of the CBA (for further details, see Section (vii) of the Wages/Benefits Motion). Non-Union Employees are similarly paid for Vacation Time at their salaried rates for eight (8) hours for each vacation day. Pursuant to the Personal Paid Time policy for Non-Union Employees, up to forty (40) hours of accrued but unused Vacation Time may be carried over to the next calendar year. In the event that business needs result in a Non-Union Employee having more than forty (40) hours of accrued but unused Vacation Time, a Non-Union Employee may request an exception to carry over more than forty (40) hours to the next calendar year. At termination of employment, Non-Union Employees are paid for any unused portion of their accrued Vacation Time.

162. In the ordinary course of business, the Debtors provide sick leave ("Sick Leave") to certain of their Employees. Under the Sick Leave policy, at the start of their employment, full-time Non-Union Employees receive a bank of thirteen (13) weeks to be used for their own occasional or extended non-occupational injury or illness, or for pregnancy. Non-Union Employees who qualify for Sick Leave are paid their regular base salaries during their leave periods. If a disability lasts longer than thirteen (13) weeks, the Non-Union Employee is not paid for any additional time and is placed on non-working status for pay purposes. However, unused accrued Vacation Time can be utilized by a Non-Union Employee in such instances. Annually,

Union Employees receive 100% of base pay for ten (10) days for non-occupational related illness or injury. Any unused sick time may be rolled over to the following calendar year; however, the available paid time in any calendar year cannot exceed thirty-five (35) days. At the Debtors' discretion, paid sick time may be extended beyond a Union Employee's accrued sick time.

163. The Debtors also generally provide eleven (11) fixed and two (2) floating paid holidays for eligible full-time Union Employees and offer additional compensation ("Holiday Pay") to Union Employees who work on holidays. With respect to Union Employees, the day the paid holiday(s) is observed and the provisions governing Holiday Pay are governed by the CBA and may vary based on the shift worked. Full-time Non-Union Employees are generally eligible for ten (10) paid holidays per year.

164. All full-time Non-Union Employees are eligible to receive benefits for eligible absences from work under certain leave policies ("Leave"). Leave includes eligible absences from work under the policies described in the following paragraphs.

165. Under the "Court Attendance and Jury Duty Policy," a full-time Non-Union Employee who either attends court or appears as a witness at a hearing at the Debtors' request, or who is subpoenaed to give testimony on behalf of the Debtors, is paid for time lost. The eligible Non-Union Employee is paid for the time which would have been worked on the Employee's regular schedule at the applicable base salary or regular base rate of pay. Additionally, Non-Union Employees who are required to attend court for jury selection or service are paid at the Employee's base salary or regular base rate of pay for time which the Employee would have worked. Income received by the Non-Union Employee from the court for jury duty is not offset against the Employee's regular pay. Union Employees serving on jury duty are eligible to receive a leave of absence for those days during their normal workweek when they are serving

on jury duty.  If the jury rate paid for jury service is less than the Union Employee's normal daily rate of pay, the Debtors pay the difference.

166.     All full-time Non-Union Employees are also eligible for "Bereavement Leave." In case of a death in the immediate family of an eligible Non-Union Employee, the Employee is allowed up to three (3) days (twenty-four (24) work hours) of paid leave, at the Employee's regular salary or regular base rate of pay.  Union Employees who have had at least six (6) months of continuous employment may be absent without loss of pay for up to five (5) working days per year because of the death of a father, mother, brother, sister, husband, wife, child, father-in-law or mother-in-law, and up to three (3) days because of the death of a grandparent or grandchild.

167.     Under the "Family Illness Leave Policy," a bank of three (3) eight (8)-hour days per calendar year is available to all full-time Non-Union Employees who are required to be absent from work to care for a sick or injured spouse, child or parent.  Non-Union Employees who qualify for Family Illness Leave are paid their regular base wages.

168.     Pursuant to the "Maternity Leave Policy," all full-time and part-time Non-Union Employees who are birth mothers are entitled to paid maternity leave for up to twelve (12) weeks following the delivery of a child.  Benefits are paid as a percentage of base salary, ranging from one-hundred to fifty percent.  Under the "New Parent Leave Policy," Non-Union Employee birth fathers and adoptive/foster parents are granted up to two (2) consecutive weeks of paid leave following the birth of a child of the Employee/father or the placement of a child under the age of six (6) with the Employee for adoption or foster care.  As with the Maternity Leave Policy, benefits are paid as a percentage of base salary, one-hundred percent for the first week of leave and fifty percent for the second week of leave.

169.    Pursuant to the "Personal Leave Policy," Union Employees who have had at least one (1) year of continuous service may be absent without loss of pay for two (2) working days (plus any unused personal time carried over from prior years) in any year in the event of sickness in the family or for personal business of a nature that cannot be taken care of in other than normal working hours. Union Employees are allowed to carry over up to one week's worth of "unused" personal time from one year to the next.

170.    Pursuant to the "Military Leave Policy," full-time Non-Union Employees who are members of the National Guard or Reserve Corps are allowed up to two (2) weeks of paid leave at the Employee's regular base salary or base rate of pay for annual tour-of-duty or reserve training, and are paid his or her base rate of pay for a maximum of thirty (30) days annually.[18] Upon the Non-Union Employee's return to work, the Employee is required to remit the pay received from the military for the time period in which the Employee was paid by the company. Union Employees who are members of the National Guard or Reserve Corps are allowed up to four (4) weeks leave of absence without pay, except that if such military duty is required of such members to maintain their status in the National Guard or Reserve Corps and such service is paid for by the Government, and the rate paid for such service is less than the Union Employee's normal daily compensation, the Employee receives the difference for each day while on military duty, but not in excess of ten (10) days.

171.    In addition, both full-time Union and Non-Union Employees, if called to active duty status with the U.S. Army, Navy, Air Force, Marine Corps, Coast Guard, National Guard, the commissioned corps of the Public Health Service and any other category of persons designated by the President of the United States in such time of war or national emergency, will

---

[18] Pursuant to the Military Leave Policy, if company work assignments have prevented the Non-Union Employee from regularly participating in required training, a longer period of leave may be granted. Special leaves of absence will be granted to full-time Non-Union Employees who are required to serve short tours of emergency military duty.

be paid at the Employee's regular base salary or base rate of pay for a period of twelve (12) months from the beginning of the leave period ("Military Leave").[19]  The Debtors currently have one (1) Union Employee on Military Leave that receives approximately $1,651 in gross wages per week and has approximately 44.5 weeks of eligible Military Leave benefits remaining.

### *Employee Pension and Savings Plans*

172.    Prior to the Petition Date, and in the ordinary course of business, DNE was a participating employer under several of Dynegy Inc.'s 401(k) plans, including the Dynegy Inc. 401(k) Savings Plan and the Dynegy Northeast Generation, Inc. Savings Incentive Plan (collectively, the "401(k) Plans").  The 401(k) Plans generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck.  Approximately 136 Employees currently participate in the 401(k) Plans, and they contributed approximately $1,023,052 of their own funds into the 401(k) Plans during 2010.  DNE also makes (either directly or indirectly via payment to Dynegy Inc.) certain "matching" contributions to the 401(k) Plans for certain participating Employees. Matching contributions made on behalf of DNE Employees during 2010 to these 401(k) Plans were approximately $445,094.

173.    In addition to the 401(k) Plans, DNE is a participating employer under certain Dynegy Inc.-sponsored pension plans for the benefit of their eligible Employees, including the Dynegy Inc. Retirement Plan (specifically, the Portable Retirement Benefit under that plan) and the Dynegy Northeast Generation, Inc. Retirement Income Plan (collectively, the "Pension Plans").  The Debtors estimate that the aggregate amount of contributions that remained unpaid

---

[19] If otherwise eligible, any Employees on Military Leave will be eligible for consideration for incentive compensation based on the plan the Employee participated in, if any, prior to his or her call to active duty, based on the period the Employee worked prior to his or her call to duty.

to the Pension Plans as of the Petition Date was approximately $802,392 (the "Unpaid Pension Contributions").[20]

### *Workers' Compensation*

174.  Under the laws of New York, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors (the "Workers' Compensation Programs").  The Debtors pay approximately $68,000 in premiums on an annual basis on account of such coverage, and are currently fully up to date on all premiums due as of the petition date under the Workers' Compensation Programs.

175.  As of the Petition Date, there were approximately six (6) workers' compensation claims (the "Workers' Compensation Claims") open against the Debtors arising out of alleged injuries incurred by Employees during the course of their employment with DNE, which the Debtors expect to continue to resolve in the ordinary course of business.  The Debtors paid approximately $41,000 to cover Workers' Compensation Programs claims in 2010.  The Debtors are responsible for the first $250,000 of any workers' compensation claim filed by an employee of the Debtors.  Once the Debtors have paid this amount on an individual claim, the remainder of the cost is paid by the workers' compensation insurance carrier.  The Debtors expect to continue to resolve any Workers' Compensation Claims in the ordinary course of business in accordance with applicable New York state law.

---

[20] These are contributions to be made in 2012 for the 2011 year and are based on an estimate as of October 10, 2011, as the formal contribution schedule will not be finalized until December 2011.

***Other Benefit Plans and Programs***

**Life and AD&D Insurance**

176.     The Debtors provide primary life and accidental death and dismemberment
insurance coverage for all eligible Union Employees and Non-Union Employees through
Prudential at no cost to Employees (the "<u>Life and AD&D Insurance</u>").  The Life and AD&D
Insurance coverage costs the Debtors approximately $3,000 per month.  As of the Petition Date,
there is no accrued and outstanding prepetition amount on account of the Life and AD&D
Insurance, payment for the coverage is fully up to date.

**Long-Term Disability Benefits**

177.     The Debtors provide eligible Employees, including both Union and Non-Union
Employees, with long-term disability benefits at no cost to Employees (the "<u>Long-Term
Disability Program</u>").  The program includes two component programs.  First, the Debtors
provide fully insured long-term disability coverage through Prudential (the "<u>Insured Long-Term
Disability Program</u>").  This coverage generally provides an eligible Employee up to 60% of his
or her pre-disability base pay, up to a maximum benefit of $25,000 per month if the employee
becomes totally disabled for longer than 90 days.  Second, DNE provides a self-funded disability
benefit for certain eligible Employees under the Dynegy Northeast Generation, Inc. Long-Term
Disability Plan, which was frozen to new participation in January 2006 (the "<u>Self-Funded Long-
Term Disability Program</u>").  The benefit under the Self-Funded Long-Term Disability Program
is based on a formula that takes into account an eligible Employee's age 60 pension plan
monthly benefit, age 65 Social Security monthly benefit, certain factors based on an Employee's
age plus years of service at the date of disability and other benefits the employee is receiving
(such as primary Social Security benefits, Workers' Compensation benefits, statutory disability

insurance benefits and other similar benefits).  If an Employee is eligible for benefits under both the Insured and Self-Funded Long-Term Disability Programs, he or she is offered the preferential benefit of the two.  The Long-Term Disability Program coverage costs the Debtors approximately $6,564.92 per month.

## Business Travel Accident Insurance

178.    The Debtors provide eligible Union Employees and Non-Union Employees with business travel accident insurance through Zurich at no cost to Employees (the "<u>BTA Program</u>"). BTA Program coverage is generally equal to six (6) times an Employee's eligible base pay, up to a maximum of $2 million, if an Employee dies or suffers certain physical losses due to an accident while traveling on company business.  The BTA Program coverage costs the Debtors approximately $175 per month (paid annually in January).

## Employee Assistance Program

179.    The Debtors provide eligible Union Employees and Non-Union Employees and their eligible family members, at no cost to Employees, with an Employee Assistance Program through ENI (the "<u>EAP</u>").  The EAP is a confidential counseling and referral service that can assist eligible Employees and their eligible dependents with a range of problems, such as grief or bereavement, family/parenting issues, anger management and similar issues.  The EAP costs the Debtors approximately $315 per month.

## Flexible Spending Accounts

180.    Certain of the Debtors are participating employers under the DI Section 125 Flexible Benefits Plan and the DI Section 125 Flexible Benefits Plan for Employees Covered Under a Collective Bargaining Agreement.  Under these plans, a Flexible Spending Accounts Program is available for eligible Union Employees and Non-Union Employees.  The Flexible

Spending Accounts (the "FSAs") allow Employees to pay for eligible health care and dependent care expenses with pre-tax dollars, which are deducted from an Employee's paycheck based on the amount such Employee has elected to contribute to the FSA for a year. There are three types of FSAs offered under the program, including a Health Care FSA from which eligible health care expenses can be reimbursed, a Limited Purpose FSA from which eligible dental and vision expenses can be reimbursed and a Dependent Care FSA from which eligible expenses for the care of eligible dependents may be reimbursed. Additionally, per the CBA, the Debtors make an annual employer contribution to the Health Care and Limited Purposes FSAs for participating Union Employees; assuming current enrollment in the Health Care and Limited Purpose FSAs remains the same for 2012, the Debtors will owe about $50,400 for this contribution ($400 for about 126 participants), which will be funded at the beginning of 2012.

### Supplemental Life and AD&D Insurance and Long-Term Care Insurance

181. Employees may also elect to purchase certain additional coverage/benefits at their own expense, with such premiums withheld from their paychecks and remitted to the insurance carrier by DNE on behalf of the Employees. For example, at their own cost, Employees may purchase supplemental life and accidental death and dismemberment insurance coverage provided through Prudential. Non-Union Employee contributions for supplemental life and accidental death and dismemberment insurance are, on average, approximately $103.26 per month and $88.14 per month, respectively. Non-Union Employees may also purchase long-term care insurance at their own cost, which is also provided through Prudential. There is one (1) Non-Union Employee currently enrolled in long-term care insurance, with approximately $30.40 deducted from such individual's paycheck per month for the coverage.

## Severance

182.     Prior to the Petition Date and in the ordinary course of business, DNE was a participating employer under certain severance plans, including the DI Severance Pay Plan (the "Severance Plan"),[21] which provides certain severance benefits for DNE's eligible Non-Union Employees.  The Non-Union Employees covered under this Severance Plan are "plant-level" employees and are not considered "insiders" of the Debtors.  Pursuant to the Severance Plan, eligible Non-Union Employees generally become eligible for severance payments and benefits if their employment is terminated due to a reduction in force, position elimination or office closing.  Benefits under the Severance Plan generally include:  (i) a lump sum amount (which is determined based on factors, e.g., compensation, years of service, that vary under the different plans); (ii) in certain circumstances, a lump sum amount that is equivalent to or based on the STI Plan (described below) (but which is payable under the Severance Plan and not the STI Plan) and (iii) continued health coverage and outplacement benefits.  Receipt of benefits under the Severance Plan is conditioned on an eligible Employee's timely execution of a claims release agreement.  Additionally, under the CBA, Union Employees with one (1) or more completed years of continuous service and who are laid off are entitled to one (1) week of base pay for each full year of continuous service (including service accrued with Central Hudson Gas & Electric).  DNE is not obligated to rehire any Union Employee who accepts this payment.

183.     As of the Petition Date, there are no former employees receiving Severance payments under the Severance Plans.

---

[21] The Employees of DNE are also eligible to participate in the Dynegy Inc. Change in Control Severance Pay Plan (the "CIC Severance Plan") sponsored by Dynegy Inc.  Pursuant to the CIC Severance Plan, eligible Non-Union Employees are entitled to receive severance payments and benefits if their employment is terminated as a result of an involuntary termination occurring as a result of a change in control of Dynegy Inc.  At this time the Debtors are not seeking authority to make any payments under the CIC Severance Plan; however, the Debtors reserve their right to seek authority to honor obligations that may come due under the CIC Severance Plan at a later date should circumstances dictate.

**Short-Term Incentives**

184.     The Debtors offer certain bonus programs (collectively, the "<u>Employee Incentive</u> <u>Programs</u>") as an additional component of the Debtors' compensation structure.  The Employee Incentive Programs are designed to compensate the Employees for achieving certain performance goals in the prior calendar year.

185.     Eligible Non-Union Employees of certain of the Debtors (each such Employee, a "<u>Participant</u>") participate in the Dynegy Inc. Incentive Compensation Plan (the "<u>STI Plan</u>").  Participants who are employed on the last day of a calendar year (a "<u>Performance Period</u>") have an opportunity to receive an award ("<u>STI</u>"), generally payable as a lump sum cash payment, for the Performance Period if certain performance goals and objectives are achieved during the Performance Period.  A Participant is generally eligible to receive an STI award based on his or her established STI target, eligible base pay, performance and the level of funding of the total "<u>Bonus Pool</u>" for the Performance Period.

186.     Funding of the Bonus Pool is generally determined based on financial and/or non-financial performance objectives.  The Compensation and Human Resources Committee of the Board of Directors of Dynegy Inc. (the "<u>Compensation Committee</u>") has the sole discretion to determine at what level a Bonus Pool will be funded for a Performance Period and the payment amount, if any, to be paid to Participants under this plan.  For the 2010 Performance Period, the aggregate STI payment for eligible Non-Union Employees of the Debtors was $529,650.

187.     The Debtors believe there are no amounts outstanding with respect to Employees of the Debtors on account of any Employee Incentive Programs as of the Petition Date, that the Employee Incentive Programs are maintained and paid in the ordinary course of business and that no payment under the Employee Incentive Programs is made to insiders of the Debtors.

However, out of an abundance of caution, the Debtors seek, after notice and the final hearing, Court approval of the Employee Incentive Programs and related payments made to the Employees in the ordinary course of the Debtors' business.

**Other Bonuses and Awards**

188.    Other types of bonuses and awards are also periodically granted to certain Employees to recognize special achievements, including "Spot On Awards", "Extra Mile Awards", and "Guiding Principles Awards."  Spot On Awards allow managers and supervisors to provide "on the spot" recognition to Employees for performance that goes above and beyond day-to-day expectations (e.g., completing a particularly arduous or difficult task/project under budget and/or ahead of a deadline). A manager or supervisor, with appropriate approval, can designate awards in $25 denominations, up to a maximum of $100. The awards are made in the form of Visa gift cards.  The Extra Mile Award program is designed to recognize those active, full-time Non-Union Employees who have displayed extraordinary performance in line with the company's Guiding Principles and is intended to supplement the STI Plan for those who are key contributors to the organization.  Maintaining these rewards will serve to motivate Employees during the transition period pending operational control by the Owner Lessors.  There are two tiers of reward level, and depending on the level of achievement, the awards range from a minimum of $250 to a maximum of $5,000.  Finally, the Guiding Principles Award recognizes Employees who exhibit the company's Guiding Principles as part of their daily activities at work and in their personal lives.  All regular full-time Union and Non-Union Employees are eligible for consideration for a Guiding Principle Award.  Any Employee or group of Employees may nominate a colleague for consideration, and recipients of the Guiding Principle Award receive an award check for $7,500 (gross).

**Long-Term Incentives/Equity and Equity-Based Awards**

189.    Dynegy Inc. maintains (or has maintained) certain long-term incentive plans ("LTIPs") and the Dynegy Inc. 2009 Phantom Stock Plan (the "Phantom Plan"), under which DNE is a participating employer and under which prior equity awards have been granted, and may be granted going forward, to certain Non-Union Employees.  Specifically, four (4) Non-Union Employees have been granted and have outstanding awards of phantom stock units, with a total of about 35,864 outstanding units that are generally anticipated to vest and be paid no sooner than March 2012 (based on the awards' vesting schedules).  However, one (1) of these four (4) Non-Union Employees has given notice of his intent to retire by year-end 2011 and meets certain age and service requirements that would result in certain of the Employee's outstanding phantom stock unit amounts vesting and being paid at that time in accordance with the applicable award agreements.  If such Non-Union Employee retires on December 31, 2011, approximately 4,991 of his outstanding unvested phantom stock units would vest and be paid at such time.  Vesting and other terms and conditions of these phantom stock unit awards are governed by the award agreements and the Phantom Plan.

**Retiree Health and Life Insurance**

190.    Approximately 32 former employees[22] of the Debtors continue to receive healthcare (e.g., medical, prescription drug, dental and vision coverage) and life insurance benefits (the "Retiree Health and Life Insurance Program") upon their retirement (the "Retired Employees").  Providing the Continued Healthcare Benefits during the post-petition period before entry of the Order, or if necessary through the balance of the Notice Period, will provide the Debtors with sufficient time to identify Retired Employees and will prevent interruption of

---

[22] This includes 27 Non-Union Retired Employees and 5 Union Retired Employees, all of whom are currently under the age of 65.

healthcare benefits to Retired Employees. As of the Petition Date, the outstanding Continued Healthcare Benefits to be provided by the Debtors total approximately $35,000 per month to the current Retired Employees. By plan amendment adopted prior to the Petition Date, effective January 1, 2012, all retiree benefits under the Retiree Health and Life Insurance Program available to those Employees retiring prior to attaining the age of 65 are being frozen for Non-Union Employees; i.e., Non-Union Employees who retire on or after January 1, 2012, and have not yet attained the age of 65 will no longer be eligible for Continued Healthcare Benefits. For a Non-Union Employee who otherwise meets eligibility criteria to be eligible to receive retiree health and life insurance benefits prior to attaining the age of 65, such Employee must retire on or before December 31, 2011 in order to receive such benefits. Additionally, effective January 1, 2012, all retiree benefits under the Retiree Health and Life Insurance Program for Non-Union Employees and Non-Union Retired Employees who are age 65 or older are being eliminated; these benefits will no longer be offered (subject to any requirements under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA")).

### Reimbursable Expenses

191. Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors directly or indirectly reimbursed certain Employees for Reimbursable Expenses they incurred on behalf of the Debtors in the scope of their employment. The Reimbursable Expenses typically included expenses for air travel, lodging, ground transportation, meals and other business-related expenses. Generally, the Debtors, through J.P. Morgan Chase & Co. ("Chase"), provide approximately 30 Employees who frequently incur Reimbursable Expenses with corporate credit cards (the "Chase Cards") to be used solely in connection with expenses

incurred within the scope of their employment by the Debtors. The Debtors remit payment for these Reimbursable Expenses either directly to Chase, or to Chase via a non-debtor affiliate.

192. In addition, some Reimbursable Expenses are incurred by Employees through the use of personal funds or personal credit cards. Employees are reimbursed for such Reimbursable Expenses through the accounts payable process.

193. The aggregate amount of Reimbursable Expenses incurred by the Employees per month during 2011, either through the use of the Chase Cards or through the use of personal funds or personal credit cards, is, on average, approximately $1,500. The Debtors estimate that, as of the Petition Date, there are no Reimbursable Expenses that have been incurred but remain unpaid. However, because the Employees do not always promptly submit their expense reports, it is possible that certain other Reimbursable Expenses incurred by Employees prior to the Petition Date may not have yet been reimbursed by the Debtors.

*Deductions and Withholdings*

194. During each applicable pay period, the Debtors routinely deduct certain amounts from their Employees' paychecks, including: (a) union dues; (b) garnishments, child support and similar deductions; and (c) other pre-tax and after-tax deductions payable pursuant to various Employee Benefits (as described more fully herein and in the Wages/Benefits Motion, and including, among other things, medical, dental and vision benefits, insurance premiums for supplemental life and accidental death and dismemberment insurance and long-term care insurance, 401(k) contributions and loans, and FSA (health and dependent care) contributions) (collectively, the "Deductions"). The Debtors then forward the Deductions to various third party recipients. On average, the Debtors deduct approximately $9,722 from the Employees' paychecks on a bi-weekly basis on account of Deductions. However, due to the Debtors'

commencement of these Chapter 11 Cases, the Deductions were deducted from Employees'

earnings, but may not have been subsequently forwarded to the appropriate third party recipients

prior to the Petition Date. The Debtors estimate that there are no amounts in Deductions that

were taken prior to the Petition Date that have not yet been forwarded to the appropriate third

parties.

195. Further, the Debtors are required by law to withhold from each Employee's wages

amounts related to, among other things, federal, state and local income taxes, as well as Social

Security and Medicare taxes (collectively, the "Withholdings"), for later remittance to the

appropriate federal, state or local taxing authorities. The Debtors must then match with their

own funds amounts for Social Security and Medicare taxes and pay, based upon a percentage of

gross payroll, additional amounts for state and federal unemployment insurance (together with

the Withholdings, the Debtors' "Payroll Taxes"). The Debtors' Payroll Taxes, including both the

Debtors' and the Employees' portions, for the calendar year 2010, were approximately

$1,458,194 and $5,469,410, respectively.

196. The Debtors' Payroll Taxes are generally processed and forwarded to the

appropriate federal, state or local taxing authority at the same time the Employees' payroll

checks are disbursed. As of the Petition Date, the Debtors estimate the amount of accrued and

outstanding prepetition obligations with respect to the Payroll Taxes to be approximately

$162,920.

### *Third Party Compensation*

197. The Debtors estimate that the aggregate amount of Prepetition Administration

Costs accrued but unpaid as of the Petition Date is $2,150. The Debtors believe, and I agree, that

payment of the Prepetition Administration Costs is justified because the failure to pay any such

amounts might disrupt third party providers' services with respect to the Employee

Compensation, Employee Benefits, Reimbursable Expenses and Deduction and Withholdings

discussed herein and in the Wages/Benefits Motion.

<u>Basis for Relief</u>

198.     The Debtors believe, and I agree, that the relief requested in the Wages/Benefits

Motion is necessary for the Debtors' to operate the Facilities in compliance with all applicable

federal and state regulatory requirements until the Owner Lessors are able to accept operational

responsibility for the Leased Facilities.  In addition, the Debtors believe, and I agree, that it is

necessary to continue payment of administrative fees to the various vendors that administer the

Debtors' Employee Obligations and Employee Benefit Plans.  Without the continued services of

these administrators, including, but not limited to, BCBS, Medco, Prime Therapeutics, Delta

Dental, Vanguard (the 401(k) Plan administrator) and Buck (the Pension Plan administrator), the

Debtors will be unable to continue to honor their Employee Obligations and related Employee

Benefits in an efficient and cost-effective manner.

199.     Payment of Employee Obligations as requested in the Wages/Benefits Motion and

in accordance with the Debtors' prepetition business practices is in the best interests of the

Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue

to operate their businesses in an economic and efficient manner, without disruption until

regulatory approval is obtained for the Owner Lessors to take over operations.  Moreover, the

total amount sought to be paid in the Wages/Benefits Motion is relatively modest compared with

the importance of the Employees in obtaining the requisite regulatory approval to transition the

Leased Facilities to the Owner Lessors.

200.    For the foregoing reasons, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors that all relief requested in the Wages/Benefits Motion be granted.

**vi.    Debtors' Motion for an Interim and Final Order Authorizing (I) Continuation of Prepetition Insurance Policies in the Ordinary Course of Business, (II) Payment of all Prepetition Obligations in Respect Thereof, and (III) Payment of Post-Petition Installment Payments (the "<u>Insurance Motion</u>")**

201.    In connection with their business operations, the Debtors maintain, both directly and through Dynegy Inc., multiple insurance policies.  The Debtors maintain these insurance policies in amounts and types of coverage that comport with prudent business practices, the state and local laws governing the multiple jurisdictions in which the Debtors operate, and various contractual obligations.  For the 2010-2011 policy period, the total annual premiums paid by the Debtors were approximately $2,450,000.  The insurance policies are listed in Exhibit A to the Insurance Motion, along with the corresponding insurance carriers (the "<u>Insurance Carriers</u>").[23]

202.    Certain types of insurance policies, including those for workers compensation liability, automobile liability, excess liability and property liability, are procured and maintained by Dynegy Inc., the ultimate parent of the Debtors and their non-debtor affiliates (the "<u>DI Insurance Policies</u>").  In such cases, Dynegy Inc. is the named insured party, with the Debtors and other non-debtor affiliates endorsed as additional insured parties (the "<u>Additional Insured Parties</u>") under the DI Insurance Policies.  As the named insured party, Dynegy Inc. is responsible for the payment of premiums to the Insurance Carriers, and the cost of such

---

[23] In addition to the Insurance Policies listed on Exhibit A to the Insurance Motion, the Debtors maintain numerous insurance policies with respect to, among other things, employee health, dental, disability and life insurance benefits.  These policies are separately addressed in the Wages/Benefits Motion.

premiums is then allocated to each of the Additional Insured Parties, including the Debtors, according to methods consistent with industry practice.[24]

203. Certain other types of insurance policies, including marine open ocean cargo insurance and charterer's legal liability insurance, are specific to certain of the Debtors' operating plants and are therefore procured and maintained by the Debtors directly (the "Facilities Insurance Policies", together with the DI Insurance Policies, the "Insurance Policies"). In the case of the Facilities Insurance Policies, the applicable Debtor is the named insured party and is directly responsible for premium payments to the Insurance Carriers.

204. Certain of the Insurance Policies require the Debtors to pay (either directly or through DI) the annual insurance premium (the "Insurance Premiums") in advance. For these types of Insurance Policies, the Debtors believe that all such Insurance Premiums have been paid in full as of the Petition Date. Under some circumstances, Insurance Premiums that are pre-paid are adjusted at the end of the relevant policy period, resulting in either a credit to the Debtors or additional amounts owed by the Debtors (depending on the adjustment). Therefore, notwithstanding the fact that the Debtors have paid outstanding Insurance Premiums in full prior to the Petition Date, the Debtors could nonetheless be obligated to pay an adjusted premium amount under certain of these Insurance Policies after the Petition Date.

205. For certain other of the Insurance Policies, the Debtors pay (either directly or through Dynegy Inc.) Insurance Premiums in two (2) or more installment payments ("Installment Premiums"). As of the Petition Date, the Debtors believe that they are current on all Installment Premiums.

---

[24] As described in the Cash Management Motion, certain administrative services, including the placement and maintenance of insurance policies, are performed on the Debtors' behalf by one or more non-debtor affiliates pursuant to the GSA (as defined in the Cash Management Motion) and the Debtors pay a fee for the benefit of these services. In addition to the fees under the GSA, the Debtors are required to pay their allocated portion of the actual cost of the Insurance Policies (i.e., the Insurance Premiums).

206.     As set forth herein and in the Insurance Motion, the Debtors and I do not believe that there are any outstanding prepetition obligations under the Insurance Policies.

207.     The Debtors have compelling business reasons for seeking to keep their Insurance Policies in effect.  The insurance coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many cases, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations.  Indeed, I believe that any interruption in the Debtors' insurance coverage would cause immediate and irreparable harm.

208.     If the Debtors did not continue to perform their obligations under the Insurance Policies, their coverage under the Insurance Policies could be voided.  Disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including:  (a) incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (b) incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (c) loss of good standing certification in states that require the Debtors to maintain certain levels of insurance coverage; (d) inability to obtain similar types of insurance coverage; and (e) incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.  Any or all of these consequences could be seriously harmful to the Debtors' continuing business efforts during the transition of operations to the Owner Lessors and during the pendency of these Chapter 11 Cases in general, as they would expose the Debtors to higher costs and an increased risk of loss.

209. For the foregoing reasons, and for the reasons discussed in the Insurance Motion, the Debtors believe, and I agree, that it is in the best interests of the Debtors, their estates and their creditors that all relief requested in the Insurance Motion be granted.

**vii. Debtors' Motion for an Interim Order and Final Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "<u>Utilities Motion</u>")**

210. In connection with the operation of their businesses and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, telephone service, data service and other similar services (the "<u>Utility Services</u>"). On a monthly basis, the Debtors spend approximately $275,000 for various Utility Services. These Utility Services are provided by approximately five (5) Utility Providers located throughout the United States, with certain of these Utility Providers having multiple accounts with the Debtors. A non-exhaustive list of these Utility Providers is attached as Exhibit A to the Utilities Motion.

211. The Debtors submit that the Proposed Adequate Assurance constitutes sufficient adequate assurance to the Utility Providers. The Debtors and I believe that these protections ensure that all Utility Providers will have adequate assurance of payment throughout these Chapter 11 Cases, and the Debtors believe, and I agree, that no other or further assurance is necessary.

212. The Debtors believe, and I agree, that the adjustments to the Adequate Assurance Account, as proposed in the Utilities Motion, will permit the Debtors to maintain the Adequate Assurance Account with an amount that consistently provides the Utility Providers that do not

otherwise hold deposits or security for their Utility Services with a half-monthly deposit on account of such services.

213.     Uninterrupted Utility Services are essential to the Debtors' operation of the Facilities, including the Leased Facilities, until the operation of such Leased Facilities is transitioned to the Owner Lessors.  A disruption of the Utility Services at the Leased Facilities would likely be costly to the Debtors and harmful to their businesses, as the Debtors would be forced from the outset of these Chapter 11 Cases to focus on finding replacement Utility Providers and services to avoid disruption to the Leased Facilities during the transition period. Moreover, the business disruption that would likely result from interruption of the Utility Services would almost certainly adversely affect the Debtors' business efforts, to the detriment of their estates, creditors, and employees.  It is therefore critical that Utility Services to the Debtors continue uninterrupted after the Petition Date and during the transition period.

214.     For the foregoing reasons, and for the reasons discussed in the Utilities Motion, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors that all relief requested in the Utilities Motion be granted.

**viii.     Debtors' Motion for an Order Authorizing the Debtors to Continue the Marketing, Sale and Trading of Energy Through Dynegy Power Marketing, LLC (the "Trading Motion")**

215.     Because Dynegy Danskammer and Dynegy Roseton are not currently authorized NYISO market participants/customers, they cannot sell electric energy into the markets facilitated by the NYISO.  In order to sell the energy they produce directly into the NYISO Markets, Dynegy Danskammer and Dynegy Roseton each have entered into an EMA with a non-debtor affiliate, DPM, dated August 4, 2011 (collectively, the "EMAs").  DPM is an energy marketer that is a registered NYISO customer and market participant and is authorized to sell

energy, capacity and certain ancillary services (collectively, the "Energy Products") related to energy sales in the New York region at market-based rates. Pursuant to the EMAs, DPM provides energy management and marketing services to Dynegy Danskammer and Dynegy Roseton by, among other things, selling the energy generated by the Facilities and scheduling such sales. In addition to sales and marketing, DPM has also historically performed certain trading and hedging activities (the "Trading Activities") on behalf of Danskammer and Roseton.

216.    After DMP completes a sale, it collects the revenues generated by such sale and remits such amounts to DNE's gross margin account. DPM receives a fee of $100,000 per month from each of Dynegy Danskammer and Dynegy Roseton for the services provided by DPM under the EMAs. The Debtors and I believe that, as of the Petition Date, there are no amounts owing to DPM under the EMAs.

217.    If demand were to spike and capacity at the Facilities was not available, end users may lose power – a result the NYISO is specifically charged with avoiding. Therefore, in order for Dynegy Danskammer and Dynegy Roseton to be able to fulfill their regulatory obligations, they depend upon DPM.

218.    Although the Debtors and I believe that continuing to operate under the EMAs is in the ordinary course of their businesses, given the critical importance of the EMAs and the need to comply with NYISO rules and requirements, the Debtors are filing the Trading Motion out of an abundance of caution to ensure continuity in their business practices and continued compliance with applicable regulatory requirements. In addition, the Debtors believe, and I agree, that the relief requested in the Trading Motion may help avoid any misunderstanding between DPM and NYISO based on DPM's non-debtor status and its role marketing and selling the Energy Products. The relief sought in the Trading Motion is thus critical and will help enable

the Debtors to stabilize their business operations and reassure market participants transacting with DPM that DPM has the requisite authority to transact on behalf of the Debtors, and continues to comply with applicable regulatory requirements.

219.     The Debtors will transact with DPM in exactly the same manner as they did prior to the Petition Date, and DPM will transact with NYISO in exactly the same manner as it did prior to the Petition Date.  Further, EMAs are typical in the power industry.

220.     Regulatory requirements require the Facilities to continue their power generation operations during this the contemplated transition period.  While the Facilities are required to continue to generate energy, pending the approval of their NYISO registration, the Debtors cannot directly market and sell the energy they produce into those markets facilitated by NYISO at market-based rates – to do so, they depend upon DPM.  Absent the ability to continue their current relationship with DPM pursuant to the EMA, the Debtors have no readily available alternative which would allow them to market and sell the Energy Products into the NYISO market.  Therefore, the Debtors believe, and I agree, that maintaining the status quo with respect to the sale of energy produced at the Facilities is in the best interests of all parties in interest in these cases, because it will allow the Debtors to fulfill their regulatory obligations without disruption or uncertainty.

221.     For the foregoing reasons, and for the reasons discussed in the Trading Motion, the Debtors have determined, and I agree, that it is in the best interest of the Debtors, their estates and their creditors that all relief requested in the Trading Motion be granted.

# VI.

## INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

222.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which information is set forth below.  All information and statements provided in Schedules 1 through 12 attached hereto are incorporated into this Declaration.

223.     In accordance with Local Bankruptcy Rule 1007-2(a)(3), Schedule 1 hereto is a list of the members of, and attorneys for, the Ad Hoc Bondholder Committee and also briefly describes the circumstances surrounding the formation of the Ad Hoc Bondholder Committee and the date of their formation.

224.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the thirty (30) largest unsecured claims (excluding insiders) against the Debtors, on a consolidated basis. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 2 regarding, among other things, the actual validity of any such claims.

225.     In accordance with Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 hereto is a list of the name and address of each of the holders of the five largest secured claims, with the amount of each claim, a brief description, an estimate of the value of the collateral securing each claim, and whether each claim or lien is disputed.

226.     In accordance with Local Bankruptcy Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the Debtors' assets and liabilities.

227.    In accordance with Local Bankruptcy Rule 1007-2(a)(7), Schedule 5 hereto provides a list of the number of debentures or other securities of the debtor that are publicly held, and, where known, the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.  No shares of stock of any of the Debtors are publicly held.

228.    In accordance with Local Bankruptcy Rule 1007-2(a)(8), Schedule 6 is a list of the Debtors' property not in the Debtors' possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

229.    In accordance with Local Bankruptcy Rule 1007-2(a)(9), Schedule 7 hereto is a list of the premises owned, leased, or held under other arrangement from which the Debtors conduct their business operations.

230.    In accordance with Local Bankruptcy Rule 1007-2(a)(10), Schedule 8 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the value of any assets held by the Debtors outside the territorial limits of the United States.

231.    In accordance with Local Bankruptcy Rule 1007-2(a)(11), Schedule 9 hereto is a list of litigation commenced against the Debtors where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

232.    In accordance with Local Bankruptcy Rule 1007-2(a)(12), Schedule 10 hereto contains the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

233.    The Debtors intend to continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

234.    In accordance with Local Bankruptcy Rule 1007-2(b)(1)-(2), Schedule 11 hereto is the estimated amount of  (i) the payroll to employees of DNE, (ii) payments to officers, directors, and stockholders, and (iii) payments to financial and business consultants for the 30-day period following the commencement of these Chapter 11 Cases.

235.    In accordance with Local Bankruptcy Rule 1007-2(b)(3), Schedule 12 hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of these Chapter 11 Cases.

### *Signature Page Follows*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of November, 2011 at New York, New York.

_____
Name: Kent R. Stephenson
Title:   Executive Vice President of Each of the
            Debtors

<u>**Schedule 1**</u>
<u>**Committees Organized Prior to the Petition Date**</u>

Prior to the filing of these chapter 11 cases, the Debtors engaged in discussions with various holders of Debtor Dynegy Holdings, LLC's public debt securities, represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP.

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), the following is a list of the noteholders:

| **Noteholders and Addresses** |
| --- |
| AEGON USA Investment Management, LLC<br>230 West Monroe, Suite 1450<br>Chicago, IL 60606 |
| Avenue Capital Group<br>399 Park Avenue, 6th Floor<br>New York, NY 10022 |
| Caspian Capital L.P.<br>767 Fifth Avenue, 45th Floor<br>New York, NY 10153 |
| Venor Capital Management LP<br>Times Square Tower<br>7 Times Square, Suite 3505<br>New York, NY 10036 |
| Oaktree Capital Management, L.P.<br>333 South Grande Avenue, 28th Floor<br>Los Angeles, CA 90071 |

These noteholders began discussions with the Debtors on or about October 7, 2011.

## Schedule 2
## Consolidated List of Holders of 30 Largest Unsecured Claims

Following is the consolidated list of the Debtors' creditors holding the thirty largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) and Local Bankruptcy Rule 1007-2(a)(4) for filing in these chapter 11 cases. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the thirty largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | 7.75% SENIOR NOTES | | $1,100,000,000.00 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM<br><br>*(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM<br><br>*(if secured, also state value of security)* |
|---|---|---|---|---|
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | 8.375% SENIOR NOTES | | $1,046,800,000.00 |
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | 7.5% SENIOR NOTES | | $785,000,000.00 |
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | SERIES B 8.316% SUBORDINATED CAPITAL INCOME SECURITIES | | $200,000,000.00 |
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | 7.125% SENIOR DEBENTURES | | $175,000,000.00 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | 7.625% SENIOR DEBENTURES | | $175,000,000.00 |
| WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 | MICHAEL G. OLLER, JR. WILMINGTON TRUST CO. CORPORATE CAPITAL MARKETS RODNEY SQUARE NORTH 1100 N MARKET STREET WILMINGTON, DE 19890 FAX: 302-636-4145 MIKEOLLER@WILMINGTONTRUST.COM | 8.75% SENIOR NOTES | | $88,500,000.00 |
| POZAMENT CORPORATION 56 CENTRAL AVENUE RAVENA, NY 12143 | POZAMENT CORPORATION 56 CENTRAL AVENUE RAVENA, NY 12143 PHONE: 203-878-2395 FAX: 203-878-3721 | TRADE DEBT | | $ 57,438.00 |
| TARA PLANT CONSTRUCTION INC 650 BEAULIEU STREET HOLYOKE, MA 01040 | TARA PLANT CONSTRUCTION INC 650 BEAULIEU STREET HOLYOKE, MA 01040 PHONE: 413-534-8193 FAX: 413-534-8195 TARAPLANT.CONST@VERIZON.NET | TRADE DEBT | | $45,790.00 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| ALLSTATE SECURITY INC<br>71-73 CLINTON STREET<br>PO BOX 37<br>MONTGOMERY,  NY 12549 | ALLSTATE SECURITY INC<br>71-73 CLINTON STREET<br>PO BOX 37<br>MONTGOMERY,  NY 12549<br>PHONE: 845-778-0546<br>FAX: 845-457-4235<br>SCSSTM@AOL.COM | TRADE DEBT | | $37,277.73 |
| WAREX TERMINALS CORPORATION<br>1 SOUTH WATER STREET<br>PO BOX 488<br>NEWBURGH, NY 12551 | ED CUCCURULLO<br>COSMO SCIANNA<br>WAREX TERMINALS CORPORATION<br>1 SOUTH WATER STREET<br>PO BOX 488<br>NEWBURGH, NY 12551<br>PHONE: 845-561-4000<br>FAX: 845-569-8552 | TRADE DEBT | | $ 32,023.29 |
| ALL MECHANICAL SERVICES INC<br>PO BOX 110<br>430 HIGH STREET<br>PERTH AMBOY, NJ 08862 | ALL MECHANICAL SERVICES INC<br>PO BOX 110<br>430 HIGH STREET<br>PERTH AMBOY, NJ 08862<br>PHONE: 732-442-8292<br>FAX: 732-442-0736 | TRADE DEBT | | $29,940.00 |
| CENTRAL HUDSON GAS AND ELECTRIC CORP<br>284 SOUTH AVE<br>POUGHKEEPSIE, NY 12602 | CENTRAL HUDSON GAS AND ELECTRIC CORP<br>284 SOUTH AVE<br>POUGHKEEPSIE, NY 12602<br>PHONE: 845-486-5466<br>FAX: | UTILITY | | $29,616.00 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| PSC INDUSTRIAL OUTSOURCING LP<br>115 MAIN STREET<br>UNIT 4B<br>MONROE, CT 06468 | PSC INDUSTRIAL OUTSOURCING LP<br>115 MAIN STREET<br>UNIT 4B<br>MONROE, CT 06468<br>PHONE: 203-220-8890<br>FAX: 203-220-8891 | TRADE DEBT | | $27,603.45 |
| PERRECA ELECTRIC CO INC<br>520 BROADWAY<br>PO BOX 2530<br>NEWBURGH, NY 12550 | PHIL HUGGINS<br>PERRECA ELECTRIC CO INC<br>520 BROADWAY<br>PO BOX 2530<br>NEWBURGH, NY 12550<br>PHONE: 845-562-4080<br>FAX: 845-562-2523<br>PHIL@PERRECA.COM | TRADE DEBT | | $19,064.22 |
| ASHLEY MECHANICAL INC<br>27 EMERICK STREET<br>KINGSTON, NY 12401 | KENNETH FINKE<br>ASHLEY MECHANICAL INC<br>27 EMERICK STREET<br>KINGSTON, NY 12401<br>PHONE: 845-331-1652<br>FAX: 845-331-2463<br>KEN_FINKE@ASHLEYMECHANICAL.COM | TRADE DEBT | | $17,526.64 |
| PHASE II DIESEL INC<br>186 S ROBINSON AVE<br>NEWBURGH, NY 12550 | PHASE II DIESEL INC<br>186 S ROBINSON AVE<br>NEWBURGH, NY 12550<br>PHONE: 845-569-8771<br>FAX: 845-569-8248 | TRADE DEBT | | $16,196.53 |
| ALSTOM POWER INC<br>2000 DAY HILL ROAD<br>WINDSOR, CT 06095 | ALSTOM POWER INC<br>2000 DAY HILL ROAD<br>WINDSOR, CT 06095<br>PHONE: 630-245-8486<br>FAX: 860-285-3567 | TRADE DEBT | | $15,388.68 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM<br><br>*(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM<br><br>*(if secured, also state value of security)* |
|---|---|---|---|---|
| ZINTER HANDLING INC<br>4313 ROUTE 50<br>SARATOGA SPRINGS, NY 12866 | ZINTER HANDLING INC<br>4313 ROUTE 50<br>SARATOGA SPRINGS, NY 12866<br>PHONE: 800-462-1101<br>FAX: 518-583-1063 | TRADE DEBT | | $12,637.19 |
| FACILITIES MAINTENANCE CORP OF FLORIDA<br>84 PATRICK LANE, SUITE 1<br>POUGHKEEPSIE, NY 12603 | FACILITIES MAINTENANCE CORP OF FLORIDA<br>84 PATRICK LANE, SUITE 1<br>POUGHKEEPSIE, NY 12603<br>PHONE: 845-454-8427<br>FAX: 845-454-5920 | TRADE DEBT | | $11,200.00 |
| WATER QUALITY MANAGEMENT INC<br>PO BOX 733<br>MARLBORO, NY 12542 | WATER QUALITY MANAGEMENT INC<br>PO BOX 733<br>MARLBORO, NY 12542<br>PHONE: 845-236-7543<br>FAX: 845-236-3911 | TRADE DEBT | | $9,725.00 |
| NEWBURGH WINDUSTRIAL<br>65 JEANNE DRIVE<br>NEWBURGH, NY 12550 | NEWBURGH WINDUSTRIAL<br>65 JEANNE DRIVE<br>NEWBURGH, NY 12550<br>PHONE: 845-566-5300<br>FAX: 845-566-5340<br>JOEBARRA2002@YAHOO.COM | TRADE DEBT | | $9,523.88 |
| DUTCHESS TEKCON INDUSTRIES INC<br>44 NOXON RD, SUITE 1<br>POUGHKEEPSIE, NY 12603 | DUTCHESS TEKCON INDUSTRIES INC<br>44 NOXON RD, SUITE 1<br>POUGHKEEPSIE, NY 12603<br>PHONE: 845-452-4594<br>FAX: 845-452-4797 | TRADE DEBT | | $8,518.71 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| MID ISLAND ELECTRICAL SUPPLY 59 MALL DRIVE COMMACK, NY 11725 | MID ISLAND ELECTRICAL SUPPLY 59 MALL DRIVE COMMACK, NY 11725 PHONE: 877-324-4242 FAX: 877-324-2636 | TRADE DEBT | | $8,338.05 |
| BUCK CONSULTANTS LLC DEPT CH 104061 PALATINE, IL 6055-4061 | BUCK CONSULTANTS LLC DEPT CH 104061 PALATINE, IL 6055-4061 PHONE: FAX: | TRADE DEBT | | $6,940.79 |
| VERIZON 140 WEST STREET NEW YORK, NY 10007 | VERIZON 140 WEST STREET NEW YORK, NY 10007 PHONE: FAX: 212-571-1897 | TRADE DEBT | | $5,766.23 |
| WELCH INDUSTRIAL SUPPLY CO INC 76 PRINCE ST CPO BOX 1567 KINGSTON, NY 12402 | BILL WELCH FRANK WELCH WELCH INDUSTRIAL SUPPLY CO INC 76 PRINCE ST CPO BOX 1567 KINGSTON, NY 12402 PHONE: 845-338-0393 FAX: 845-338-0569 WELCHINDUSTRIAL@AOL.COM | TRADE DEBT | | $5,586.23 |
| OTIS ELEVATOR CO 229 B MANCHESTER RD POUGHKEEPSIE, NY 12603 | OTIS ELEVATOR CO 229 B MANCHESTER RD POUGHKEEPSIE, NY 12603 PHONE: 309-693-8131 FAX: 845-452-9219 | TRADE DEBT | | $5,448.21 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER, E-MAIL ADDRESS AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM WHO MAY BE CONTACTED | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| SYNAPSE RISK MANAGEMENT LLC<br>360 ERIE BLVD<br>SYRACUSE, NY 13202 | SYNAPSE RISK MANAGEMENT LLC<br>360 ERIE BLVD<br>SYRACUSE, NY 13202<br>PHONE: 315-475-3700<br>FAX: 315-475-3780 | TRADE DEBT | | $5,000.00 |
| BENSHAW INC<br>615 ALPHA DRIVE<br>PITTSBURGH, PA 15238-2819 | BENSHAW INC<br>615 ALPHA DRIVE<br>PITTSBURGH, PA 15238-2819<br>PHONE: 412-487-8235<br>FAX: 412-487-4201 | TRADE DEBT | | $4,898.19 |

## Schedule 3
## Consolidated List of Holders of 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the creditors holding, as of October 31, 2011, the largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101. The books and records of the Debtors indicate that only two secured creditors may have claims of any material size; the list below therefore consists of only those two creditors rather than the five required by Local Bankruptcy Rule 1007-2(a)(5).

The information contained herein shall not constitute an admission of liability by, nor is it binding on the Debtors. Any amounts listed herein are estimated, on a preliminary basis, and are subject to verification. The Debtors reserve any and all rights to assert that any debt or claim listed herein is a disputed claim, debt or lien and to assert any remedies, defenses, counterclaims, and offsets with respect to leach of the foregoing. The description of the collateral securing the underlying obligation is intended only as a brief summary. In the event of any inconsistency between the summary set forth below and the respective corporate legal documents relating to such obligations, the descriptions in the corporate legal documents shall control.

| Creditor | Mailing Address and Phone Number | Amount of Claim against Debtors | Nature of Claim | Is Claim Disputed? | Type of Collateral | Value of Collateral |
|---|---|---|---|---|---|---|
| Credit Suisse AG, Cayman Islands Branch | Eleven Madison Avenue New York, NY 10010 Attention: Agency Group - Larcy Naval, Vice-President Telephone: (212) 325-9143 Fax: (212) 743-1783 | $26,217,318 | Letter of Credit Facility | | Cash in an account at Bank of New York | $27,003,838 |
| BG Energy Merchants, LLC | 811 Main Street Suite 3400 Houston, TX 77002 Telephone: (713) 599-3798 Fax: (713) 599-3924 | $0 | Natural Gas Contract | | Cash | $1,000,000 |

## Schedule 4
## Summary of Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following provides a summary of the Debtors' assets and liabilities.

Condensed Consolidated Balance Sheet
As of September 30, 2011

Unaudited

Total Assets: **$13.765 billion**


Total Liabilities: **$6.181 billion**

## Schedule 5
## Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held ("Securities") and the number of holders thereof. The Securities held by the Debtors' directors and officers are listed separately.

**Stock**
The Debtors have no classes of stock that are publicly held.

**Notes**

| Trustee | Issuance | Issue Amount | Outstanding Principal Amount | Maturity | Secured/ Unsecured | Approximate Number of Holders |
|---|---|---|---|---|---|---|
| Wilmington Trust Company | 8.75% senior notes | $88,500,000 | 88,491,000 | 2/15/2012 | Unsecured | > 675 |
| Wilmington Trust Company | 7.5% senior notes | $785,000,000 | $785,000,000 | 6/1/2015 | Unsecured | > 800 |
| Wilmington Trust Company | 8.375% senior notes | $1,046,800,000 | $1,046,800,000 | 5/1/2016 | Unsecured | > 4,200 |
| Wilmington Trust Company | 7.75% senior notes | $1,100,000,000 | $1,100,000,000 | 6/1/2019 | Unsecured | > 1,000 |
| Wilmington Trust Company | 7.125% senior debentures | $175,000,000 | $175,000,000 | 5/5/2018 | Unsecured | > 200 |
| Wilmington Trust Company | 7.625% senior debentures | $175,000,000 | $175,000,000 | 10/15/2026 | Unsecured | 275 |
| Wilmington Trust Company | Series B 8.316% Subordinated Capital Income Securities | $200,000,000 | $200,000,000 | 6/1/2027 | Unsecured | > 100 |

**Other Securities**
The Debtors have no other securities that are publicly held.

**Securities Held by the Debtors' Directors, Managers, and Officers**
None of the Debtors' Directors, Managers, and Officers hold any publicly-held securities of the Debtors.

## Schedule 6
## Debtors' Property Not in the Debtors' Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity. The Debtors' may also have paid advance payment retainers with various professionals. The Debtors' professionals will disclose their retainers (including any remaining balance) in their respective retention applications.

| Name | Mailing Address and Telephone Number | Purpose | Amount |
|---|---|---|---|
| First Columbia – 4 LA, LLC | 22 Century Hill Drive, Suite 301<br>Latham, NY 12110<br>Attention: Lease Administrator<br>(518) 213-1000 | Security Deposit for Office Lease | $27,917 |
| Inter-American Coal S.A. | Carrera 13 No. 93-19 Oficina 201<br>Atención: Fernando Medina<br>Bogotá, Colombia<br>(305) 704-0284 | Prepayment for coal not yet delivered | $4,000,000 |
| Bank of New York Mellon | 101 Barclay Street, 8 West<br>New York, NY 10286<br>Attention: Corporate Trust Administration<br>(212) 815-6907 | Collateral for Letter of Credit facility | $27,003,838 |
| BG Energy Merchants, LLC | 811 Main Street<br>Suite 3400<br>Houston, TX 77002<br>Telephone: (713) 599-3798<br>Fax: (713) 599-3924 | Cash Collateral for Natural Gas | $1,000,000 |

## <u>Schedule 7</u>
## <u>Premises Owned, Leased, or Held Under Other Arrangements</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their business.

**Owned**

| Location Description | Location Address | City | State | Zip |
|---|---|---|---|---|
| Danskammer Units 1-2 | 994 River Road | Newburgh | NY | 12550 |

**Leased**

| Location Description | Location Address | City | State | Zip |
|---|---|---|---|---|
| Office space (Headquarters) | 1000 Louisiana Street | Houston | TX | 77002 |
| Roseton Units 1-2 | 992 River Road | Newburgh | NY | 12550 |
| Danskammer Units 3-4 | 994 River Road | Newburgh | NY | 12550 |
| Office space (Regional office) | 4 London Avenue | New Windsor | NY | 12553 |

**Lease/Sublease Arrangement with Third Party**

| Location Description | Location Address | City | State | Zip |
|---|---|---|---|---|
| Roseton site | 992 River Road | Newburgh | NY | 12550 |
| Danskammer site | 994 River Road | Newburgh | NY | 12550 |

# Schedule 8
## Location of Debtors' Assets, Books, and Records

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their consolidated books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

| Debtor Name | Location of Substantial Assets | Location of Books and Records |
|---|---|---|
| Dynegy Danskammer, L.L.C. | Newburgh, New York | Houston, Texas, and Newburgh, New York |
| Dynegy Holdings, LLC | Houston, Texas | Houston, Texas |
| Dynegy Roseton, L.L.C. | Newburgh, New York | Houston, Texas, and Newburgh, New York |
| Dynegy Northeast Generation, Inc. | Houston, Texas | Houston, Texas, and Newburgh, New York |
| Hudson Power, L.L.C. | Houston, Texas | Houston, Texas |

## Debtors' Assets Outside the United States

Debtor Dynegy Northeast Generation, Inc. has fully pre-paid for a shipment of coal from Inter-American Coal S.A. in South America and has pre-paid a marine carrier, CSL International Inc., for delivery of such shipment of coal. The coal has a value of approximately $4 million and was loaded on the *mv CSL Metis* on or about November 3, 2011, and is expected to set sail today, November 7, 2011, from South America. The Debtors expect that they will receive the coal on approximately November 13.

## **Schedule 9**
## **Litigation**

While the Debtors are party to certain actions and/or proceedings, to the best of the Debtors' knowledge, belief and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10
## Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Tenure | Prior Experience/Responsibilities |
|---|---|---|
| Robert C. Flexon<br><br>President & Chief Executive Officer | Since July 11, 2011 | Mr. Flexon served as the Chief Financial Officer of UGI Corporation, a distributor and marketer of energy products and related services from February to June 2011. He was the Chief Executive Officer of Foster Wheeler AG from June 2010 until October 2010 and the President and Chief Executive Officer of Foster Wheeler USA from November 2009 until May 2010. Prior to joining Foster Wheeler, Flexon was Executive Vice President and Chief Financial Officer of NRG Energy, Inc. from February 2009 until November 2009. He previously served as Executive Vice President and Chief Operating Officer of NRG Energy from March 2008 until February 2009 and as its Executive Vice President and Chief Financial Officer from 2004 to 2008. Prior to joining NRG Energy, Flexon held various key executive positions with Hercules, Inc. and Atlantic Richfield Company (now British Petroleum). |
| Carolyn J. Burke<br><br>Executive Vice President & Chief Administrative Officer | Since August 30, 2011 | Ms. Burke served as Global Controller for J.P. Morgan's Global Commodities business since March 2008. She was also NRG Energy's Vice President and Corporate Controller from September 2006 to March 2008 and Executive Director of Planning and Analysis from April 2004 to September 2006. Prior to joining NRG Energy, Burke held various key financial roles at Yale University, the University of Pennsylvania and at Atlantic Richfield Company (now British Petroleum). |
| Clint C. Freeland<br><br>Executive Vice President & Chief Financial Officer | Since July 5, 2011 | Mr. Freeland served as NRG Energy's Senior Vice President, Strategy & Financial Structure from February 2009 to June 2011, where he developed a venture capital partnership investment fund to invest in emerging energy company technologies. He was NRG Energy's Senior Vice President and Chief Financial Officer from February 2008 to February 2009 and its Vice President and Treasurer from April 2006 to February 2008. Prior to joining NRG Energy, Freeland held various key financial roles within the energy sector. |
| Kevin T. Howell<br><br>Executive Vice President & Chief Operating Officer | Since July 5, 2011 | Mr. Howell retired in August 2010 from NRG Energy, where he served as President of NRG Texas and Reliant Energy since August 2008. Prior to that he was NRG Energy's Executive Vice President and Chief Administrative Officer from January 2008 to August 2008 and Executive Vice President, Commercial Operations from August 2005 to January 2008. Before joining NRG Energy, Howell served in a variety of operating and commercial positions with several domestic and international energy companies. |
| Lynn A. Lednicky<br><br>Executive Vice President, Operations | Since 1991 | Mr. Lednicky joined Dynegy predecessor Destec Energy, Inc. in 1991. He has held positions of increasing responsibility at Dynegy, including Executive Vice President, Asset Management, Government and Regulatory Affairs, Executive Vice President, Commercial and Development and, prior to that, Executive Vice President, Strategic Planning and Corporate Business Development. |

| Name/Position | Tenure | Prior Experience/Responsibilities |
|---|---|---|
| Catherine B. Callaway<br><br>Executive Vice President & General Counsel | Since September 26, 2011 | Ms. Callaway served as General Counsel for NRG Gulf Coast and Reliant Energy since August 2011. She also served as General Counsel for NRG Texas and Reliant Energy from August 2010 to August 2011 and General Counsel for NRG Texas from November 2007 to August 2010. Prior to joining NRG, Ms. Callaway held various key legal roles at Calpine Corporation, Reliant Energy, The Coastal Corporation and Chevron. |
| Kent R. Stephenson<br><br>Executive Vice President | Since March 2011 | Mr. Stephenson served as Executive Vice President and General Counsel from March 2011 to September 2011 and as Senior Vice President and Deputy General Counsel from July 2006 to February 2011. Prior to joining Dynegy, he served as Vice President, General Counsel and Secretary of Pioneer Companies, Inc. from June 1995 to January 2006. From 1993 to 1995, he served as Vice President, General Counsel and Secretary of a predecessor of Pioneer Companies. Prior to 1993, he was Senior Vice President and General Counsel of Zapata Corporation, then an oil and gas services company. |

**<u>Schedule 11</u>**
**<u>Payroll</u>**

Pursuant to Local Rule 1007-2(b)(1)-(2), the following chart provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, members, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| Payments to Employees (not including officers, directors, and stockholders) | $250,000 |
| Payments to Officers, Stockholders, and Directors[1] | $15,699 |
| Payments to Financial and Business Consultants | $0 |

---

[1] The Debtors Officers and Directors/Members also provide services to non-Debtor affiliates and are paid by Dynegy Administrative Services, Inc. The monthly fee that the Debtors pay to DASI includes the Debtors' allocated share of the compensation paid to Officers and Directors/Manager. The amount listed above reflects the Debtors' approximate allocation of such compensation.

**Schedule 12**
**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the thirty 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| Cash Receipts | $30.76 million |
| Cash Disbursements | $7.00 million |
| Net Cash Gain or (Loss) | $23.76 million |
| Unpaid Obligations | Approx. $500,000 |
| Unpaid Receivables | Approx. $3.5 million |