**Hearing Date and Time:** December 2, 2011 at 10:00 a.m. (prevailing Eastern Time)
**Objection Deadline:** November 28, 2011 at 12:00 p.m. (prevailing Eastern Time)

John J. Rapisardi, Esq.
George A. Davis, Esq.
Josh Brant, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

-and-

Peter Friedman, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for U.S. Bank National Association, as Indenture Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **DYNEGY HOLDINGS, LLC, <u>et al.</u>,**[1] | : | **Case No. 11-38111 (CGM)** |
|  | : |  |
| **Debtors.** | : | **Jointly Administered** |
|  | : |  |

---------------------------------------------------------------x

**NOTICE OF MOTION OF U.S. BANK NATIONAL ASSOCIATION,**
**AS INDENTURE TRUSTEE, FOR APPOINTMENT OF AN**
<u>**EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE**</u>

       **PLEASE TAKE NOTICE** that a hearing to consider the relief requested in the

Motion of U.S. Bank National Association, as Indenture Trustee, for Appointment of an

Examiner Pursuant to Section 1104(c) of the Bankruptcy Code dated November 11, 2011 (the

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are Dynegy Holdings, LLC (8415); Dynegy Northeast Generation, Inc. (6760); Hudson Power, L.L.C. (NONE); Dynegy Danskammer, L.L.C. (9301); and Dynegy Roseton, L.L.C. (9299).

"*Examiner Motion*"), filed by U.S. Bank National Association, as successor indenture trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Roseton Units 1 and 2 and successor indenture trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Danskammer Units 3 and 4, shall be held before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 355 Main Street, Poughkeepsie, New York 12601-3315 (the "***Bankruptcy Court***") on **December 2, 2011 at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Examiner Motion and the relief requested therein shall be made in writing, shall state with particularity the legal and factual bases for such objection, shall comply with the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the case management procedures (the "***Case Management Procedures***") established in these cases pursuant to the Administrative Order Establishing Case Management Procedures [ECF No. 35], and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest on a 3.5 inch disk or CD-ROM, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-399 and the Case Management Procedures so as to be actually received no later than **November 28, 2011 at 12:00 p.m. (prevailing Eastern Time)** by: (i) Cadwalader, Wickersham & Taft LLP, attorneys for U.S. Bank National

Association, One World Financial Center, New York, NY 10281 (Attn: George A. Davis, Esq. and Josh Brant, Esq.); (ii) Sidley Austin LLP, proposed counsel to the Debtors, 787 Seventh Avenue, New York, NY 10019 (Attn: James F. Conlan, Esq. and Matthew A. Clemente, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; and (iv) the parties listed on the Special Service List and the General Service/2002 List maintained in these cases pursuant to the Case Management Procedures.

Dated: New York, New York
        November 11, 2011

**CADWALADER, WICKERSHAM & TAFT LLP**

_/s/  George A. Davis_
John J. Rapisardi
George A. Davis
Josh Brant
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
john.rapisardi@cwt.com
george.davis@cwt.com
josh.brant@cwt.com

-and-

Peter Friedman
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
peter.friedman@cwt.com

_Attorneys for U.S. Bank National Association, as Indenture Trustee_

John J. Rapisardi, Esq.
George A. Davis, Esq.
Josh Brant, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

-and-

Peter Friedman, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for U.S. Bank National Association, as Indenture Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **DYNEGY HOLDINGS, LLC, <u>et al.</u>,**[1] | : | **Case No. 11-38111 (CGM)** |
| | : | |
| Debtors. | : | **Jointly Administered** |
| | : | |

------------------------------------------------------------x

## MOTION OF U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, FOR APPOINTMENT OF AN <u>EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE</u>

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are Dynegy Holdings, LLC (8415); Dynegy Northeast Generation, Inc. (6760); Hudson Power, L.L.C. (NONE); Dynegy Danskammer, L.L.C. (9301); and Dynegy Roseton, L.L.C. (9299).

U.S. Bank National Association, as successor indenture trustee (the "***Roseton Indenture Trustee***") under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Roseton Units 1 and 2 (the "***Roseton Indenture***") and successor indenture trustee (the "***Danskammer Indenture Trustee***" and, together with the Roseton Indenture Trustee, the "***Indenture Trustee***") under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Danskammer Units 3 and 4 (the "***Danskammer Indenture***"), at the direction of holders of notes issued under those indentures, submits this motion for appointment of an examiner to investigate and report on the conduct of Dynegy Holdings, LLC ("***Dynegy Holdings***"), certain affiliates of Dynegy Holdings, the directors of each of the foregoing, and certain significant equity holders of Dynegy Inc. (the directors of each of the foregoing and significant equity holders of Dynegy Inc. together are referred to as the "***Control Group***"),[2] with a particular focus on those entities' roles in prepetition actions that resulted in hundreds of millions of dollars in assets being transferred away from Dynegy Holdings' creditors for the benefit of their ultimate equity holders just two months prior to the commencement of these chapter 11 cases. The appointment of an examiner is mandatory pursuant to section 1104(c) of the bankruptcy code, and cause exists for the appointment of an examiner based on the conduct of Dynegy Holdings, its affiliates and the Control Group. In support of this motion, the Indenture Trustee respectfully represents as follows:

---

[2] Icahn Capital L.P., Franklin Resources, Inc., and Seneca Capital Advisors, LLC, the three largest shareholders of Dynegy Inc., nominated or have direct ties to four of the seven members of Dynegy Inc.'s board of directors, collectively hold in excess of 30% of Dynegy Inc.'s shares, and are members of the Control Group. See Dynegy Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2011); Carl Icahn, Quarterly Report (Form 13F-HR) (Aug. 15, 2011); Dynegy Inc., Form 4 (Oct. 4, 2011); Dynegy, Inc., Schedule 13G (Oct. 11, 2011); Dynegy Inc., Schedule 13D (Aug. 25, 2011); Dynegy Inc., Current Report (Form 8-K) (Mar. 10, 2011); Dynegy Inc., Current Report (Form 8-K) (May 5, 2011).

## PRELIMINARY STATEMENT

These cases are not about preserving an operating business. Only two of the five debtors in these cases have operating businesses, and those debtors have made clear that they intend to get rid of those businesses as soon as possible. The only issues in these cases are:

- what assets are or should be available to satisfy the debtors' obligations? and

- who is entitled to those assets?

Given the conduct described in this motion, appointment of an examiner is warranted to address both of these questions.

Prior to September 2011, Dynegy Holdings indirectly owned all of the debtors' and their non-debtor affiliates' operating assets. As such, all of Dynegy Holdings' assets were available to satisfy Dynegy Holdings' creditors, and all of the value of those assets had to pass through Dynegy Holdings before reaching its parent company, Dynegy Inc. (a non-debtor). On September 2, 2011, Dynegy Inc. announced that it was now the owner of over half (by revenues) of the operating assets that used to belong to Dynegy Holdings. In other words, half of Dynegy Holdings' revenue-generating assets no longer are available to satisfy Dynegy Holdings' creditors. They are exclusively available to Dynegy Inc. and its equity holders. This insider transfer was undertaken with no notice to creditors and, based on Dynegy Inc.'s public filings, no third party marketing process, no fairness opinion and no review by independent directors. The restructuring support agreement that Dynegy Holdings, Dynegy Inc. and a *de minimis* minority of non-insider creditors agreed to immediately prior to the filing of these cases is a direct outgrowth of this improper transfer and requires the debtors to implement a plan that maintains equity's hold on assets that should properly be used to repay creditors.

## Transfer of Dynegy Holdings Assets to Dynegy Inc.



Note:  Abbreviated chart.

The fact that Dynegy Holdings transferred a significant portion of its assets to an insider through a closed and secretive process just two months prior to filing a chapter 11 case is in and of itself sufficient to warrant scrutiny. The actions of Dynegy Holdings' board went beyond that, however. The transaction described below clearly was unfair to Dynegy Holdings and its creditors. It also is replete with evidence that Dynegy Holdings' board knew its actions were improper. Rather than honoring its fiduciary duties to Dynegy Holdings' creditors, the board sought to erect legal barriers to inevitable creditor challenges by (i) laundering the transfer through a shell subsidiary formed less than a month earlier, in an attempt to manufacture standing obstacles to any challenges, and (ii) converting Dynegy Holdings from a corporation to a limited liability company *the same day* its board approved the transfer in an attempt to minimize fiduciary obligations to creditors. Dynegy Holdings' board's abdication of its responsibilities to creditors raises serious questions about its fitness to manage Dynegy Holdings and the other debtors in these chapter 11 cases. The actions of Dynegy Inc. and the Control

Group are equally troubling, and are clear violations of laws protecting creditors against self-dealing, fraudulent transfers and abuse of the corporate form.

The harm to creditors caused by these actions prompted three different groups of Dynegy Holdings' creditors to file lawsuits seeking to reverse the asset transfer to Dynegy Inc. In response to these suits, Dynegy Holdings, its affiliates and the Control Group have argued, among other things, that their actions do not violate any contractual obligations to Dynegy Holdings' creditors.[3] This argument misses the salient point: unlawful activity is unlawful regardless of whether it also violates contract. And Dynegy Holdings' transfer of significant assets to its parent company in exchange for an unsecured "undertaking" worth less than two-thirds of the value Dynegy Holdings ascribed to those assets, just two months prior to filing these cases, was unlawful.

The Indenture Trustee seeks appointment of an examiner in these cases to investigate this transfer and the related actions of Dynegy Holdings, its affiliates and the Control Group. This case presents the archetypical scenario where it is necessary to appoint an examiner to "conduct such an investigation . . . of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor . . . ." 11 U.S.C. 1104(c). Appointment of an examiner is mandated in Dynegy Holdings' case as all of the statutory predicates have been met: (i) a trustee has not yet been appointed; (ii) Dynegy Holdings has not filed a chapter 11 plan; and (iii) Dynegy Holdings' unsecured debts exceed the $5 million threshold established in section 1104(c)(2) of the bankruptcy code. Appointment of an examiner is also warranted here "in the

---

[3] The Indenture Trustee maintains that these actions do violate its guaranty agreements with Dynegy Holdings, and fully reserves its rights with respect to that issue.

interest of creditors" given the prepetition conduct of Dynegy Holdings, its affiliates and the Control Group. See 11 U.S.C. § 1104(c)(1). Once appointed, the examiner should look closely into the conduct described in this motion and carefully monitor whether the Control Group is continuing to improperly direct Dynegy Holdings' and the other debtors' actions for the benefit of Dynegy Inc. and its equity holders. The examiner should be given a sufficient budget and appropriate resources to report to the Court and the public on the issues described below.

The past several months have been tumultuous for Dynegy Holdings' creditors, to say the least.[4] These chapter 11 cases finally afford creditors the protections and oversight of Dynegy Holdings' activities necessary to right the harms suffered. Given the events leading to these cases, that oversight must be robust. As the Second Circuit has advised, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right." In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966). A full and thorough investigation by a court-appointed examiner is an important step in that regard, and will benefit Dynegy Holdings' creditors and further the bankruptcy code's goals of transparency and disclosure to parties in interest.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction and venue over this motion under 28 U.S.C. §§ 157, 1334, 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[4] See, e.g., Matt Wirz, Carl Icahn Drinks Your Dynegy Milkshake, Wall St. J. (Sept. 2, 2011), http://blogs.wsj.com/deals/2011/09/02/34615/; Matt Wirz, Carl Icahn to Dynegy Bond Holders: I Dare You, Wall St. J. (Nov. 1, 2011), http://blogs.wsj.com/marketbeat/2011/11/01/carl-icahn-to-dynegy-bond-holders-i-dare-you/; Stephen J. Lubben, What's Behind Dynegy's Unusual Bankruptcy, N.Y. Times (Nov. 8, 2011), http://dealbook.nytimes.com/2011/11/08/whats-behind-dynegys-unusual-bankruptcy/.

## BACKGROUND

**A.      The Chapter 11 Cases**

2.      On November 7, 2011, the Debtors commenced voluntary cases under chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the Southern District of New York.

3.      Dynegy Holdings and its non-debtor parent Dynegy Inc., through their direct and indirect subsidiaries (collectively with Dynegy Holdings and Dynegy Inc., "***Dynegy***"), sell electric energy, capacity and ancillary services on a wholesale basis to utilities, cooperatives, municipalities, power marketers and other industry customers in six U.S. states. The consolidated company owns and/or operates 17 power plants fueled by a mix of coal, fuel oil and natural gas, and is the nation's third largest independent power producer.

**B.      The Interest of the Indenture Trustee in these Cases**

4.      The Indenture Trustee is the successor indenture trustee under the Roseton Indenture and the Danskammer Indenture. These indentures are part of an integrated "sale-leaseback" financing arrangement the debtors used to acquire two electric power generating facilities located in Newburgh, New York, known as the Roseton and Danskammer facilities, respectively, for an aggregate purchase price of $954 million.

5.      In order to obtain long term financing for the acquisitions, in May 2001, debtors Dynegy Holdings, Dynegy Roseton, L.L.C. ("***Dynegy Roseton***"), and Dynegy Danskammer, L.L.C. ("***Dynegy Danskammer***") entered into participation and related agreements (collectively, the "***Operative Documents***") with the predecessors in interest to the Indenture Trustee, certain subsidiaries of PSEG Resources Inc. ("***PSEG***") and certain other parties, which resulted in PSEG, through its indirect subsidiaries Roseton OL LLC and Danskammer OL LLC (together, the "***PSEG Entities***"), providing approximately $920 million in financing. Of that

amount, the PSEG Entities contributed $120 million directly (plus $18 million towards transaction costs) and financed the remaining $800 million by issuing an aggregate of $250 million in 7.27% Series A Notes and $550,400,000 in 7.67% Series B Notes under the Roseton Indenture and Danskammer Indenture.

6.    The notes issued by Roseton OL LLC are secured by both power generation units at the Roseton facility, and the notes issued by Danskammer OL LLC are secured by two of the six power generation units at the Danskammer facility, in each case along with related personal property. Each PSEG Entity has assigned all of its rights in those facilities (other than certain specified rights related to tax indemnities and other matters) to the Indenture Trustee. Dynegy Roseton and Dynegy Danskammer make semi-annual payments directly to the Indenture Trustee, which uses the funds to pay principal and interest on the Series A and Series B Notes, and transfers the remainder to the PSEG Entities.

7.    As credit support for the Roseton and Danskammer financing transactions, Dynegy Holdings fully, unconditionally, and irrevocably guaranteed to the Indenture Trustee Dynegy Roseton's and Dynegy Danskammer's obligations under the Operative Documents. Dynegy Holdings' obligations under these guaranties are *pari passu* with its other senior unsecured obligations, including its outstanding senior notes and debentures.

8.    Accordingly, the Indenture Trustee holds direct claims against Dynegy Roseton, Dynegy Danskammer, and Dynegy Holdings.

## THE PREPETITION TRANSACTIONS

9.     In February  2011, Dynegy Inc.'s chief executive officer and chairman of its
board, and Dynegy Inc.'s chief financial officer each resigned, and all five independent members
of Dynegy Inc.'s board of directors announced that they would not stand for re-election in June
2011. Dynegy Inc., Current Report (Form 8-K) (Feb. 23, 2011). Accordingly, in March 2011,
Dynegy Inc.'s board elected Vincent J. Intrieri, Samuel Merksamer, and E. Hunter Harrison to
the board. Dynegy Inc., Current Report (Form 8-K) (Mar. 10, 2011). Messrs. Intrieri and
Merksamer both are employees of, and were nominated by, Icahn Capital L.P. Id. Mr. Harrison
was nominated by Seneca Capital Advisors, LLC. Id. Icahn Capital and Seneca Capital both are
significant shareholders of Dynegy Inc. and are members of the Control Group.

10.     On May 4, 2011, the Dynegy Inc. board elected Michael J. Embler to the
board. Mr. Embler was the chief investment officer of Franklin Mutual Advisors LLC, a
subsidiary of Franklin Resources, Inc., from 2005 to 2009. Dynegy Inc., Current Report (Form 8-
K) (May 5, 2011). Franklin Resources also is a significant shareholder of Dynegy Inc. and a
member of the Control Group. Accordingly, four of the seven members of Dynegy Inc.'s board
have direct ties to Dynegy Inc.'s largest shareholders.

11.     Dynegy Holdings' board also is not independent. That board consists of
three members, all of which are executive officers of Dynegy Inc. and one of which is a member
of Dynegy Inc.'s board. Dynegy Inc., Current Report (Form 8-K) at Ex. 3.2, p. C-1 (Sept. 8,
2011). Further, upon information and belief and based on public filings, all three members of
Dynegy Holdings' board are shareholders of Dynegy Inc. Dynegy Inc., Quarterly Report (Form
10-Q) at Ex. 10.7-10.10 (Aug. 8, 2011).

A.    **Dynegy's August Financing and Reorganization**

12.    On August 8, 2011, Dynegy announced that it had obtained a total of $1.7 billion in new financing secured by the assets of all operating subsidiaries other than Dynegy Roseton and Dynegy Danskammer. Dynegy also reorganized the operating subsidiaries of Dynegy Holdings into two "portfolios", with the Roseton and Danskammer facilities left to the side: a portfolio consisting of Dynegy's gas power generation facilities (the "gas portfolio") and a portfolio consisting of Dynegy's coal power generation facilities (the "coal portfolio"). Each portfolio was "ring fenced" from the rest of the company; i.e., Dynegy amended the existing organizational documents of certain subsidiaries and formed new subsidiaries, and took certain related actions, in an attempt to shield the coal and gas portfolio from the impact of a Dynegy Holdings bankruptcy. The new financing came in two parts: a $1.1 billion facility secured by the gas portfolio, and a $600 million facility secured by the coal portfolio.



Note: Abbreviated chart.

13.    Importantly, the new financing restricts aggregate annual dividends to Dynegy Holdings from the gas and coal portfolios to $225 million per year – $135 million from the gas portfolio and $90 million from the coal portfolio. This restriction on distributions was concerning in light of Dynegy Holdings' debt obligations. Dynegy Inc. and Dynegy Holdings spent $515 million on debt service and general and administrative expenses alone in 2010, $584 million in 2009, and $550 million in 2008. Dynegy Inc., Annual Report (Form 10-K), at 50-51 (Mar. 8, 2011). The amount of these obligations only increase for several years to come.

14.    The effect of the distribution restrictions was obvious: as Standard and Poor's noted "[b]ecause distributions to [Dynegy Holdings] from [the coal and gas portfolios] are capped at a total of $225 million, we believe that [Dynegy Holdings] will run out of cash and default . . . . [The] default path for Dynegy is simply a bankruptcy filing because distributions

from [the coal and gas portfolios] will not be enough to meet its obligations in 2012." *Research Update: Dynegy Inc. 'CC' Rating Remains on CreditWatch as it Restructures*, S&P RATINGSXPRESS Credit Research, Standard & Poor's, July 19, 2011, at 2.

**B.    Dynegy Misrepresents the Facts and its Intentions to the Delaware Chancery Court**

15.    On July 21, 2011, certain creditors (but not the Indenture Trustee) sued Dynegy Holdings in the New York State Supreme Court seeking to temporarily enjoin Dynegy Holdings from proceeding with its proposed financing and reorganization. The next day, the PSEG Entities brought a similar action in the Delaware Chancery Court. The New York case was consensually stayed to allow the Delaware case to be resolved first.

16.    In seeking a temporary restraining order, the PSEG Entities asserted that Dynegy's proposed reorganization constituted fraudulent transfers (among other things). Denying this charge, Dynegy Holdings repeatedly stated that there was not and would not be in the future any transfer of any assets out from under Dynegy Holdings. Specifically, Samuel Merksamer, a member of the board of directors of Dynegy Inc. stated in an affidavit that:

> [Dynegy Holdings] is undertaking a reorganization, so there will be some movements of subsidiaries and of equity interests among subsidiaries. Although there will be some changes in [Dynegy Holdings'] direct ownership holdings, [Dynegy Holdings'] direct subsidiaries will own directly or indirectly all of the same revenue generating assets that [Dynegy Holdings'] direct subsidiaries indirectly own today. In effect, there will be some shifting of subsidiaries from one pocket to the other, but *[Dynegy Holdings] will continue to hold direct equity interests <u>at all times</u> in entities that own indirectly all of the power generating assets, just as, and to the same extent that, the direct subsidiaries of [Dynegy Holdings] today indirectly own such assets.* Thus, [Dynegy Holdings] will continue to own indirectly the same revenue generating assets that it indirectly owns today.

Second Supplemental Affidavit of Samuel Merksamer ¶ 4, <u>Roseton OL, LLC and Danskammer</u>

<u>OL, LLC v. Dynegy Holdings Inc.</u>, CA No. 6689-VCP (Del. Ch. July 28, 2011) (emphasis

added).

      17.    Dynegy Holdings, through White & Case LLP – the counsel that

represented and advised both Dynegy Inc. and Dynegy Holdings in the prepetition actions

described in this motion and which now represents Dynegy Inc.[5] – represented to the Delaware

court that:

> Following the Reorganization, [Dynegy Holdings] will continue
> indirectly to own the same power plants, through a series of
> subsidiaries, that it owns today. *[Dynegy Holdings] is not
> transferring farther out of reach any power plants. Indeed, no
> assets are being transferred outside of [Dynegy Holdings']
> ultimate ownership.*

Defendant's Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining

Order at 2-3, <u>Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc.</u>, CA No.

6689-VCP (Del. Ch. July 25, 2011) (emphasis added).

      18.    At the hearing, that same counsel affirmed on the record that:

> [Dynegy Holdings] today, indirectly, through a series of
> subsidiaries, owns 17 power plants, many of which are profitable.
> *And following the reorganization, [Dynegy Holdings] will own 17
> power plants, the very same power plants*; and they will be equal
> in value to what they're equal to today except to the extent that the
> value is enhanced by reason of its new liquidity and its new
> structure. So it's important to understand that not only is there
> technically not a transfer but, economically, *[Dynegy Holdings]
> has the same value after the reorganization that it has today. It is
> still the indirect owner of all the assets.*

---

[5] White & Case LLP has proposed to act as special counsel to the debtors in these cases with respect to
certain lease issues. <u>See</u> ECF Nos. 5 & 7. The Indenture Trustee reserves all rights with respect to
whether that role is appropriate or consistent with the bankruptcy code given White & Case's prepetition
representation of Dynegy Holdings and Dynegy Inc. and its ongoing representation of Dynegy Inc in
these cases.

Transcript of Oral Argument at 36:13-37:1, <u>Roseton OL, LLC and Danskammer OL, LLC v.</u> <u>Dynegy Holdings Inc.</u>, CA No. 6689-VCP (Del. Ch. July 25, 2011) (emphasis added).[6]

19.    Mr. Merksamer also sought to assure the court that Dynegy Holdings would have sufficient funds to meet its obligations. He represented to the court that, after the new financing was in place, "the new [coal portfolio] and [gas portfolio] are permitted to collectively provide $225 million in dividends to [Dynegy Holdings] on an annual basis." Affidavit of Samuel Merksamer ¶13, <u>Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc.</u>, CA No. 6689-VCP (Del. Ch. July 25, 2011).

20.    Counsel confirmed on the record that "[T]here is an ability to provide dividends unrestricted in use up to [Dynegy Holdings] in the amount of $225 million per year." Transcript of Oral Argument at 56:7-9, <u>Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc.</u>, CA No. 6689-VCP (Del. Ch. July 25, 2011). Mr. Merksamer and counsel told the court that Dynegy Holdings would receive up to $225 million per year from its ownership of the coal and gas portfolios. The only way those statements were true is if Dynegy Holdings continued to own both the coal and gas portfolios.

21.    Based in significant part on these representations, the Delaware Chancery Court denied the PSEG Entities' application for a temporary restraining order, finding that "[Dynegy Holdings] did not transfer any valuable assets away from its corporate structure. The Transaction contemplates only transferring such assets from one subsidiary of [Dynegy Holdings] to another . . . ." Memorandum Opinion at 43, <u>Roseton OL, LLC and Danskammer</u>

---

[6] Dynegy Holdings made similar statements in the New York case before it was consensually stayed. For example, Dynegy Holdings represented to the court that "before any restructuring is happening, [Dynegy Holdings] has under it . . . revenue generating assets. When restructuring closes [Dynegy Holdings] will have . . . the very same assets. So there is no change in credit risk whatsoever." July 21, 2011 Hr'g Tr. at 12:15-22, <u>LibertyView Credit v. Dynegy Holdings Inc.</u>, Case No. 651998/2011 (N.Y. Sup. Ct. July 2011).

OL, LLC v. Dynegy Holdings Inc., CA No. 6689-VCP (Del. Ch. July 29, 2011). Just weeks later, Dynegy Holdings transferred the coal portfolio – constituting assets that generate more than half of Dynegy Holdings' revenues – to Dynegy Inc., in contradiction of the representations made to the Delaware Chancery Court.

22.    These misrepresentations are particularly concerning given that, at the time they were made, Dynegy Holdings' board knew it would transfer the coal portfolio to Dynegy Inc. Upon information and belief, and based on the fact that the coal portfolio financing originally was scheduled to close on or about July 25, 2011, it seems clear that the provisions of the coal portfolio financing were substantially finalized before Dynegy Holdings appeared before the Delaware Chancery Court. Those provisions include a non-market term providing that the transfer of the coal portfolio from Dynegy Holdings to Dynegy Inc. would not cause a default. Dynegy Inc., Current Report (Form 8-K) at Ex. 10.1, p. 7 (Aug. 8, 2011).[7] The new financing for the gas portfolio, the provisions of which are otherwise substantially identical to the coal portfolio financing, does not include this special term. Dynegy Inc., Current Report (Form 8-K) at Ex. 10.2, p. 7 (Aug. 8, 2011).

### C.    Dynegy Inc. Takes the Coal Portfolio From Dynegy Holdings' Creditors for Insufficient Value

23.    As noted, on September 1, 2011, just weeks after telling the Delaware Chancery Court that Dynegy Holdings would remain the owner of all of its operating assets, Dynegy Inc.

---

[7] Specifically, under both the coal portfolio facility and the gas portfolio facility, a "Change in Control" constitutes an event of default. The definition of "Change in Control" in the coal portfolio facility includes that "direct or indirect ownership of the [coal portfolio] shall have been transferred directly or indirectly from [Dynegy Holdings] and its Wholly Owned Subsidiaries to any direct or indirect subsidiary of [Dynegy Inc.] other than [Dynegy Holdings] and its Wholly Owned Subsidiaries; *provided, that such transfer shall not be deemed to be a "Change of Control" to the extent it is duly authorized as lawful by the board of directors of [Dynegy Inc.]*." Id. (emphasis added). The definition of "Change in Control" in the gas portfolio facility does not include a similar provision.

announced that it had taken ownership of Dynegy Coal Holdco, LLC – the entity that owns the coal portfolio – from Dynegy Holdings.



Note: Abbreviated chart.

24.    Dynegy artificially constructed the transfer as a two-step transaction in an attempt to concoct standing issues for Dynegy Holdings' creditors seeking to challenge the transfer. First, Dynegy Gas Investments, LLC ("**Dynegy Gas Investments**"), a wholly owned subsidiary of Dynegy Holdings formed just a few weeks prior to the transaction, transferred ownership of Dynegy Coal Holdco, LLC to Dynegy Inc. In exchange, Dynegy Inc. issued to Dynegy Gas Investments an undertaking under which it promised to make a stream of payments through 2026. Dynegy asserted that both the coal portfolio equity and the undertaking are worth $1.25 billion.

-16-

25.    Second (and simultaneously), Dynegy Gas Investments assigned the Dynegy Inc. undertaking to Dynegy Holdings in exchange for a note. Dynegy Inc. and Dynegy Holdings then amended and restated the undertaking to make it a direct obligation from Dynegy Inc. to Dynegy Holdings (i.e., removing Dynegy Gas Investments as a party to the undertaking) – reflecting the true parties to the transaction: Dynegy Holdings and Dynegy Inc.

## Dynegy "Two-Step" Transaction



26.    The coal portfolio constituted a significant portion of Dynegy Holdings' total assets and generated more than half of its revenues. Notwithstanding, Dynegy Holdings' board appears to have effectuated the transfer with no independent oversight regarding the true value of the coal portfolio, the sufficiency of the consideration, or the fairness of the transaction to Dynegy Holdings. The transfer was not reviewed by independent directors: each of the members of Dynegy Holdings' board is either a senior officer or a director of Dynegy Inc., or both. Upon information and belief each Dynegy Holdings' board member holds shares in Dynegy Inc. It also does not appear, based on Dynegy Inc.'s public filings, that the transaction was subject to any fairness opinion from outside advisors. Dynegy Holdings never offered third parties the opportunity to bid on the coal portfolio or undertook any other strategic alternatives or marketing

process to determine whether more beneficial uses of the assets were available to it. Without even a nod to corporate governance formalities, Dynegy Holdings' board slapped a $1.25 billion valuation on the coal portfolio equity and approved its transfer to Dynegy Inc. for consideration that no rational board could in good faith deem to constitute reasonably equivalent value.

> **D.    The Consideration for the Coal Portfolio was Clearly Insufficient**

27.    The consideration for the coal portfolio was clearly worth far less than the $1.25 billion Dynegy asserts. This is not a circumstance where reasonable parties can disagree on valuation. Here we have a concrete marker against which we can compare the undertaking to determine its value: the new financing for the coal portfolio.

28.    Specifically, as described above, in August 2011 Dynegy closed on a new $600 million senior secured financing facility that is secured by a first priority lien on substantially all of the assets in the coal portfolio. Less than a month later, Dynegy Inc. issued the undertaking. Dynegy Inc.'s only sources of revenues are (a) Dynegy Holdings, and (b) the coal portfolio. Because Dynegy Holdings is insolvent, the only revenues available to pay the undertaking come from the coal portfolio – the very same revenues available to pay the coal portfolio financing. As such, the undertaking and the coal portfolio financing are directly comparable, as the undertaking is effectively an unsecured obligation of the coal portfolio and the coal portfolio financing is a secured obligation of the coal portfolio. And one need only compare the terms of the undertaking and the coal portfolio financing to see that the undertaking is not worth $1.25 billion:

|  | **Coal Portfolio Financing** | **Undertaking** |
|---|---|---|
| Issued | August 5, 2011 | September 1, 2011 |
| Principal | $600 million | $1.25 billion |
| Interest Rate | 9.25%[8] | 7.75% (implied)[9] |
| Maturity | 2016 | 2026 |
| Security | First priority lien on substantially all coal portfolio assets | None |
| Restrictions on Cash Flow Available to Satisfy Debt | None. | No more than $90 million per year from coal portfolio |
| Loan-to-Value | 32% | 100% |
| Priority | First priority | Structurally subordinated to Coal Portfolio Facility |

29.    The undertaking has a longer maturity, no collateral, a far less attractive loan-to-value ratio, sits behind the dividend restrictions at the coal portfolio and is structurally subordinated to the coal portfolio financing, and yet has a *lower* interest rate. Clearly the interest rate on the undertaking should be much higher than 7.75% in order to yield a fair value of $1.25 billion. In fact, based on market data on similarly structured loans, the interest rate needed to make the value of the undertaking equal to $1.25 billion is at least double that interest rate. Furthermore, at its existing interest rate the fair value of the undertaking is no more than two-thirds of the $1.25 billion asserted by Dynegy Inc. Accordingly, Dynegy Holdings and its creditors were made more than $400 million poorer as a result of this transfer.

30.    Further, just 15 days after announcing that Dynegy Holdings had transferred away the coal portfolio, Dynegy Holdings announced that it "may become the subject of a voluntary or involuntary bankruptcy case" if it was unable to restructure a significant portion of its debt obligations. Dynegy Inc., Current Report (Form 8-K) at Ex. 99.2 (Sept. 16, 2011). By transferring away over half of its revenue-generating assets, Dynegy Holdings' board

---

[8] Based on current trading prices, the implied interest rate is 10%.

[9] Assuming a $1.25 billion principal amount.

undermined any chance of successfully restructuring its own debt, either outside of bankruptcy or in. Rather, as described below, it ceded control of any restructuring to Dynegy Inc., whose participation in and consent to any proposed restructuring was now required in order to make the value of the coal portfolio available to Dynegy Holdings' creditors. This shifting control of Dynegy Holdings' restructuring to Dynegy Inc. was in and of itself a breach of Dynegy Holdings' board's fiduciary duties.

### E.    Dynegy Attempted to Hide Behind the Corporate Form

31.    No reasonable board observing the bare minimum of fiduciary duties would have determined the coal portfolio transfer to be appropriate for Dynegy Holdings. Yet Dynegy Inc. so dominates and controls Dynegy Holdings and its board of managers that Dynegy Holdings' board gave away that company's assets without hesitation and apparently without observing the fair and open process required where an insolvent company moves significant assets to a controlling insider. Knowing that the coal portfolio transfer was patently unfair to Dynegy Holdings and would be challenged by aggrieved creditors, Dynegy Inc. and Dynegy Holdings erected barriers to those challenges through the very corporate separateness they disregarded in constructing and approving the transfer.

32.    Specifically, Dynegy Inc. and Dynegy Holdings:

- ran the transaction through a straw man – in the form of Dynegy Gas Investments, a new subsidiary of Dynegy Holdings formed less than a month prior to the transfer, to manufacture standing issues for Dynegy Holdings' creditors; and

- converted Dynegy Holdings from a Delaware corporation to a Delaware limited liability company *the same day* the coal portfolio was transferred to Dynegy Inc. This was a transparent attempt to minimize Dynegy Holdings' and its board's fiduciary duties to creditors (even as they prepared to violate those duties) by attempting to take advantage of the lower standards of duty and barriers to derivative standing that arguably apply to Delaware limited liability companies.

33.     Dynegy Holdings' board knew its actions were antithetical to the best interests of the creditors to whom it owed fiduciary duties, and sought to hide from those duties behind corporate formalities rather than honor them.

**F.     Pending State Court Litigation**

34.     On September 21, 2011, certain holders of Dynegy Holdings' senior notes commenced an action against Dynegy Inc., Dynegy Holdings, Dynegy Gas Investments, and Dynegy Holdings' board in the Supreme Court of the State of New York, County of New York, captioned <u>Avenue Investments, L.P. v. Dynegy Inc.</u>, Case No. 652599/2011. On September 27, 2011, the Indenture Trustee commenced an action against Dynegy Inc., Dynegy Holdings, Dynegy Gas Investments, and their directors and managers in the same court, captioned <u>U.S. Bank National Ass'n v. Dynegy Inc.</u>, Case No. 652642/2011 (the "<u>Indenture Trustee Complaint</u>", attached as <u>Exhibit A</u>). On November 4, 2011, the PSEG Entities commenced an action against Dynegy Inc., Dynegy Holdings, Dynegy Gas Investments, and their directors, managers and significant shareholders in the same court, captioned <u>Resources Capital Management Corp. v. Dynegy Inc.</u>, Case No. 653067/2011. Each complaint seeks, among other things, declarations that the transfer of the coal portfolio to Dynegy Inc. constituted actual and constructive fraudulent transfers, and an unwinding of that transfer.

35.     Specifically, the Indenture Trustee Complaint alleges, among other things, that:

- The transfer of the coal portfolio to Dynegy Inc. constituted actual and constructive fraudulent transfers;

- Dynegy Gas Investments, Dynegy Holdings, Dynegy Inc., and the respective board of directors and managers of each of the foregoing participated in the transfer of the coal portfolio to Dynegy Inc. with actual intent to hinder, delay and defraud Dynegy Holdings' creditors;

- Dynegy Holdings' managers breached their fiduciary duties to creditors by distributing value to Dynegy Inc., to the detriment of creditors, at a time when Dynegy Holdings was insolvent;

- Dynegy Holdings' managers engaged in self-dealing and breached their fiduciary duties to creditors by approving Dynegy Holdings' participation in the transfer of the coal portfolio to Dynegy Inc. for less than fair value; and

- Dynegy Inc. has abused the corporate form and disregarded the separateness of Dynegy Inc., Dynegy Holdings, Dynegy Gas Investments and their subsidiaries. Further, Dynegy Inc. so thoroughly dominated Dynegy Holdings and its other subsidiaries as to make each the alter ego of the other.

Complaint at 33-45. Each of the other state court complaints allege substantially similar harms.

G.    **The Debtors' Restructuring Support Agreement**

36.    The Debtors entered these cases on the back of an announcement that they had entered into an agreement with holders of approximately $1.4 billion of Dynegy Holdings' senior notes regarding the provisions of a proposed chapter 11 plan. Dynegy Inc., Current Report (Form 8-K) (Nov. 8, 2011). Based on public reports, it appears that 81% or more of this amount is controlled by Franklin Advisors Inc., a subsidiary of Franklin Resources Inc. (a member of the Control Group).[10] Accordingly, total non-insider support for the agreement constitutes, at most, 8% of Dynegy Holdings' senior obligations, before taking into account the Indenture Trustee's claims against Dynegy Holdings. The agreement is also contingent on the Indenture Trustee's and other creditors' claims being capped under section 502(b)(6), which the Indenture Trustee contends is not supported by fact or law.

---

[10]  Richard Bravo, <u>Dynegy Extends Distressed-Debt Swap Again as Bondholders Withdraw Offers</u>, Bloomberg News (Oct. 21, 2011), http://mobile.bloomberg.com/news/2011-10-21/dynegy-extends-debt-swap-again-as-bondholders-withdraw-offers ("Franklin Advisers Inc. of San Mateo, California, is the largest Dynegy bondholder, owning notes with a face value of at least $1.13 billion, and second-largest shareholder, according to data compiled by Bloomberg. Its parent, Franklin Resources Inc., announced a 10.5 percent equity stake in the company in an Oct. 11 regulatory filing.").

37.    More importantly, the proposal proposes to pay creditors less than 100% of their claims, and yet to allow the Debtors' equity holders to keep their interests in Dynegy Holdings. To induce creditors to accept this deal, Dynegy Holdings and Dynegy Inc. are offering creditors, among other things, new notes secured by the coal portfolio equity – the very asset that Dynegy Inc. and the Control Group took away from creditors just two months before these cases were filed. This puts equity, not Dynegy Holdings, firmly in the driver's seat regarding any chapter 11 plan because equity now controls the coal portfolio, which must be part of any consensual restructuring of Dynegy Holdings' debts. The fact that this agreement proposes to leave equity unimpaired but fails to pay creditors in full is a direct consequence of the prepetition actions described above, and reflects the leverage equity now has over creditors as a result of its prepetition actions, including taking the coal portfolio from Dynegy Holdings.

38.    Two months ago all of the coal portfolio's value and all of the gas portfolio's value were available to satisfy Dynegy Holdings' creditors, and Dynegy's structure ensured that Dynegy Inc. could not receive one dollar of value until Dynegy Holdings' creditors were paid in full. On the eve of bankruptcy, the Debtors transferred assets to Dynegy Inc. to create a scenario where equity will retain substantial value notwithstanding that creditors are not fully repaid. This directly contravenes the absolute priority principles of the bankruptcy code. Dynegy Holdings' board's approval of the restructuring support agreement and stated intent to pursue that agreement's distortion of the absolute priority rule is in and of itself a separate breach of its fiduciary duties to Dynegy Holdings' creditors. Oversight is necessary here to ensure that the priority scheme Congress intended is not being subverted and those fiduciary duties are honored, and that equity does not use its prepetition bad acts to control Dynegy Holdings' restructuring.

**RELIEF REQUESTED**

39.    The Indenture Trustee respectfully requests the appointment of an independent examiner pursuant to section 1104(c) of the bankruptcy code to investigate and report on:

- the structuring, negotiation, and closing of the August 2011 new financing and reorganization, including, without limitation, the impetus for the dividend restrictions and internal reorganization, the reasons for the inclusion of a change of control provision that allowed the coal portfolio equity to be transferred to Dynegy Inc., and the participation of members of the Control Group in, and the benefits they derived from, the new financing, dividend restrictions and internal reorganization;

- the structuring, negotiation, and closing of the transfer of the coal portfolio equity to Dynegy Inc., including, without limitation, the reasons for the formation of Dynegy Gas Investments and the inclusion of that entity in the transfer, the reasons for the amendment and restatement of the undertaking upon its assignment to Dynegy Holdings, whether the two steps of the transaction should be disregarded, and the value of the coal portfolio equity and the consideration paid to Dynegy Holdings;

- the structuring, negotiation, and execution of the November 7, 2011 restructuring support agreement, including, without limitation, the determination to leave equity unimpaired, the timing of milestones set out in the agreement, the agreement's adherence to the Debtors' fiduciary obligations to creditors, and whether continued pursuit of a plan based on the agreement is an appropriate use of Dynegy Holdings' resources in advance of (i) pursuit of any estate claims the examiner recommends be pursued in order to restore assets to Dynegy Holdings' estate and (ii) a determination on the allowed amount of claims that the agreement seeks to cap under section 502(b)(6);

- the entire fairness of each of the above transactions to Dynegy Holdings and its creditors, including, without limitation, the Control Group's compliance with its fiduciary duties to creditors;

- any potential causes of action that Dynegy Holdings' estate may have arising out of any of the foregoing or any related actions, including any prepetition dividends or distributions made while Dynegy Holdings was insolvent, including causes of action against Dynegy Inc., Dynegy Holdings' other affiliates, Dynegy Holdings' prepetition advisors, or the Control Group;

- whether equitable subordination or the designation of votes of any claims against or interests in Dynegy Holdings, including, without limitation, claims or interests held by the Control Group, is warranted;

- whether the mismanagement of Dynegy Holdings or breaches of fiduciary duties by any members of the Control Group necessitate the appointment of a trustee to oversee Dynegy Holdings' estate; and

- whether substantive consolidation of Dynegy Holdings and some or all of its non-debtor affiliates is warranted based on Dynegy Inc.'s domination and control of Dynegy Holdings and its subsidiaries.

## BASIS FOR RELIEF REQUESTED

40.     Dynegy Holdings' board has shown a disregard for its fiduciary duties to creditors, and has conspired with Dynegy Inc. and the Control Group to take assets from creditors and coerce creditors to accept less than they are entitled to. These prepetition actions have caused significant harm to creditors, and were undertaken with the intent to frustrate, delay, and defraud creditors' recoveries on the billions of dollars they loaned to Dynegy Holdings. Further, these actions subvert the absolute priority provisions of the bankruptcy code by transferring value to equity before creditors have been paid in full. These actions clearly justify appointment of an examiner to ensure that creditors' rights and claims are fully protected in Dynegy Holdings' chapter 11 case.

**A.      Appointment of an Examiner is Mandatory Under Section 1104(c)(2) of the Bankruptcy Code**

41.     Appointment of an examiner is mandatory in Dynegy Holdings' case under the plain language of section 1104(c) of the bankruptcy code, which states that:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if -
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interest of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts
for goods, services, or taxes, or owing to an insider, exceed
$5,000,000.

11 U.S.C. § 1104(c).

42.    Almost without exception, courts recognize the mandatory nature of the
appointment of an examiner under section 1104(c)(2) (and its predecessor, section 1104(b)(2)) of
the bankruptcy code).[11] As the U.S. Court of Appeals for the Sixth Circuit stated in Morgenstern
v. Revco D.S., Inc. (In re Revco D.S., Inc.), section 1104(c)(2) of the bankruptcy code "plainly
means that the bankruptcy court 'shall' order the appointment of an examiner when the total
fixed, liquidated, unsecured debt exceeds $5 million, if [a party in interest] requests one." 898
F.2d 498, 500-01 (6th Cir. 1990). Relying on the imperative nature of the word "shall" and the
contrast between the subsections of section 1104(c), the Court of Appeals in Revco held that the
appointment of an examiner is mandatory under section 1104(c)(2). Id.

43.    Similarly, in Loral Stockholders Protective Committee v. Loral Space &
Communications, Ltd. (In re Loral Space & Communications, Ltd.), the District Court for the
Southern District of New York found that, in light of the straightforward language and legislative
history of section 1104(c)(2), "the Bankruptcy Court had no discretion to deny appointment of an
examiner where . . . the $5,000,000 debt threshold is met and shareholders of a public company
have moved for appointment of an examiner." No. 04 Civ. 8645RPP, 2004 WL 2979785, at *5
(S.D.N.Y. Dec. 23, 2004); see also Walton v. Cornerstone Ministries Invs., Inc., 398 B.R. 77, 82
(N.D. Ga. 2008) (stating that the mandatory nature of section 1104(c)(2) is evidenced by "the

---

[11] The Bankruptcy Reform Act of 1994 added a new section 1104(b) to the bankruptcy code and re-
designated the old section 1104(b) as section 1104(c), which is identical to the original provision.
Accordingly, cases before October 22, 1994, refer to the examiner appointment provision as section
1104(b), while subsequent cases refer to section 1104(c).

plain meaning of the provision, including Congress's use of the generally mandatory term 'shall'"); In re UAL Corp., 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) (finding that (i) the mandatory nature of section 1104(c)(2) "is apparent from the language" of the statute and (ii) the "legislative history forcefully indicates that appointment of an examiner was intended to be mandatory in cases exceeding the debt threshold" because the statute rejects mandatory appointment of a trustee but provides for mandatory appointment of an examiner as protection against corporate mismanagement); In re Big Rivers Elec. Corp., 213 B.R. 962, 965-66 (Bankr. W.D. Ky. 1997) (finding that appointment of an examiner was "required as a matter of law" because the debtor's fixed, liquidated, unsecured debts exceeded $5 million); In re Vision Dev. Group of Broward County, LLC, No. 07–17778, 2008 WL 2676827, at *3 (Bankr. S.D. Fla. June 30, 2008) (appointing an examiner where the unsecured debts exceeded the "$5 million threshold for mandatory appointment of an examiner under section 1104(c)(2)").

44.    The leading bankruptcy treatise confirms this view. "Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a motion for appointment of an examiner is made by a party in interest." 7 COLLIER ON BANKRUPTCY ¶ 1104.03(2)(b) at 1104-38 (15th ed. rev. 2004).

45.    The requisite elements of section 1104(c)(2) are satisfied in Dynegy Holdings' case. The Court has not appointed a trustee, no plan has been filed, and Dynegy Holdings' fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, are well in excess of $5 million. See Petition of Dynegy Holdings, LLC, Exhibit A [ECF No. 1]; Declaration of Kent R. Stephenson Pursuant to Local Bankruptcy Rule

1007-2 in Support of First Day Motions ¶¶ 25-27 [ECF No. 18]. Accordingly, appointment of an

examiner is mandatory in Dynegy Holdings' case under section 1104(c)(2).

### B.      Appointment of an Examiner is in the Interests of Creditors

46.      Not only is appointment of an examiner mandatory under section 1104(c)(2)

of the bankruptcy code, the conduct of Dynegy Holdings', its affiliates, and the Control Group

makes it clear that appointment of an examiner is in the "interests of the debtors' creditors" as

defined in section 1104(c)(1). The purpose of section 1104(c) is to address allegations of "fraud,

dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the

affairs of the debtor of or by current or former management of the debtor." 11 U.S.C. § 1104(c).

The appointment of an examiner is in the interests of creditors where "such appointment allows

for a thorough, independent, and expeditious examination to be made into serious allegations." In

re JNL Funding Corp., No. 10-73724, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26,

2010) (appointing examiner under section 1104(c)(1) to investigate allegations of debtor's

prepetition misconduct). "One of the functions of an examiner is to investigate potential causes

of action to the estate." In re Gilman Servs., Inc., 46 B.R. 322, 328 (Bankr. D. Mass. 1985).

47.      To establish that an examiner is in the "interests of creditors", a party

seeking appointment of an examiner under section 1104(c)(1) must put forth "credible evidence"

to substantiate its allegations of the debtor's fraud or misconduct. Keene Corp. v. Coleman (In re

Keene Corp.), 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994). The moving party does not need to

establish the merits of its case upon a motion to appoint an examiner, however. See In re 1243

20th St. Inc., 6 B.R. 683, 686 (Bankr. D.D.C. 1980). That, of course, is the purpose of the

examiner's investigation.

48.      Appointment of an examiner is particularly appropriate and in the "interests

of creditors" where related parties engaged in a prepetition transfer of assets, which was tainted

by fraud or impropriety. See In re 1243 20th St. Inc., 6 B.R. at 683. In 1243 20th St., the

bankruptcy court found that the debtor's prepetition transfers of over $60,000, while insolvent, to

an entity that had the same president and director as the debtor, formed "the factual basis for the

appointment of an examiner" under section 1104(c)(1). Id. at 685. "A debtor's sale of assets to a

related corporation before the commencement of the bankruptcy case warrants an investigation

by an examiner where there are unanswered questions concerning the transaction and

interrelationships of the parties involved." In re Gilman Servs., Inc., 46 B.R. at 327. In Gilman,

the bankruptcy court appointed an examiner under section 1104(c)(1) to investigate, among other

things, whether the debtors' prepetition transfer of their major real estate assets to a partnership

owned by certain shareholders of the debtors was a fraudulent conveyance. Id. at 328. The court

found that the "need for further investigation outweigh[ed] the attendant costs of an examiner . . .

and the need for further inquiry for the protection of creditors and shareholders of [a] public

company outweigh[ed] any delay." Id. at 329. This is precisely what is alleged to have occurred

here as detailed above and in the Indenture Trustee Complaint.

49.    The allegations at issue in Dynegy Holdings' case are very similar to what

was alleged in In re Keene Corp., a case that the Bankruptcy Court for the Southern District of

New York described as "a textbook case calling for the appointment of an examiner in the

interest of creditors." 164 B.R. at 856. There (as here) certain of the debtor's creditors had

commenced prepetition state court proceedings against the debtor, its affiliates, and certain of

their officers and directors, alleging that the debtor's corporate restructuring transferred over

$200 million of the debtor's assets to newly formed affiliates (which were subsequently spun

off). Id. at 846-47. The creditors alleged that the prepetition conduct was fraudulent and aimed at

diverting value away from creditors. Id. The court held that appointment of an examiner was

warranted under the circumstances, particularly in light of the fact that the debtor's chairman and president were defendants in a related state court action. Id. at 856. Relevant to the court's reasoning was that: (i) the examiner would accelerate, rather than delay, the continuation of the prepetition lawsuits and (ii) the examiner's report would evaluate the value of prosecuting the claims. Id. at 857.

50.     The appointment of examiners in the recent cases of In re Extended Stay Inc. and In re Tribune Co. demonstrate the appropriateness of appointing an examiner where there are allegations of prepetition fraud and misconduct by a debtor and its management. In In re Extended Stay Inc., the Bankruptcy Court for the Southern District of New York appointed an independent examiner to investigate: (i) the financial circumstances leading to the filing of the debtors' bankruptcy cases; (ii) the circumstances surrounding the debtors' highly leveraged prepetition buyout and the subsequent restructuring of debt that sought to indemnify the debtors' insiders against their guaranty obligations; and (iii) whether the debtors' estates had any claims against the debtors' insiders or the lenders under the prepetition loan agreement in connection with the buyout. See Order Pursuant to 11 U.S.C. § 1104(c) Directing the Appointment of an Examiner at 2, In re Extended Stay Inc., Case No. 09-13764 (JMP) (Bankr. S.D.N.Y. Sept. 24, 2009) [ECF No. 311].

51.     Similarly, in In re Tribune Co. the Bankruptcy Court for the District of Delaware appointed an independent examiner, over the objections of the debtors and the creditors' committee, to investigate whether there were potential claims and causes of action held by the debtors' estates in connection with the 2007 leveraged buyout of Tribune, including claims of fraudulent conveyance and breach of fiduciary duties. See Agreed Order Appointing an

Examiner at 2, In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. April 20, 2010) [ECF No. 4120].

52.     The prepetition acts of Dynegy Holdings, its affiliates and the Control Group, as set forth above and described in further detail in the Indenture Trustee Complaint, give rise to unanswered questions that warrant a thorough investigation by an independent examiner. There are a myriad of credible allegations of fraud and misconduct by Dynegy Holdings, its affiliates and the Control Group prior to the commencement of these cases. Dynegy Holdings transferred valuable assets to its parent, Dynegy Inc., when that value should have been used to repay Dynegy Holdings' creditors. The fraudulent transfer of the coal portfolio away from Dynegy Holdings' creditors for the benefit of Dynegy Inc.'s shareholders is indicative of an overall scheme by Dynegy Holdings, Dynegy Inc. and the Control Group to delay and defraud their creditors.

53.     Under the facts and circumstances of these cases, it is in the interests of Dynegy Holdings' creditors to appoint an independent examiner to investigate the credible claims of fraud and misconduct by Dynegy Holdings, its affiliates and the Control Group set forth herein and in the Indenture Trustee Complaint. The appointment of an independent examiner in these cases will allow for the timely and cost-effective investigation of these claims as well as any other misconduct by Dynegy Holdings, its affiliates, and the Control Group during and before the commencement of these cases. Accordingly, for all the reasons stated above and in the Indenture Trustee Complaint, appointment of an independent examiner to investigate the fraud and misconduct of Dynegy Holdings, its affiliates and the Control Group is warranted pursuant to section 1104(c)(1) of the bankruptcy code.

C.    **The Proposed Scope of the Examiner's Investigation is Appropriate**

54.    Under section 1106(b) of the bankruptcy code, a court-appointed examiner

shall perform the duties set forth in sections 1106(a)(3) and 1106(a)(4), which provide that an

examiner shall:

> (3) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operations of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
>
> (4) as soon as practicable -
>
> (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and
>
> (B) transmit a copy or a summary of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates.

11 U.S.C. § 1106(a).

55.    The proposed scope of the examiner's investigation of the fraud and

misconduct of Dynegy Holdings, its affiliates and the Control Group is well within the purview

of an examiner's role, as set forth in the plain language of section 1106 of the bankruptcy code.

See Gilman Servs., 46 B.R. at 327 (the primary function of an examiner is to "investigate the

debtor's actions, financial condition, as is appropriate under the particular circumstances of the

case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by

current or former management").

56.    To ensure that the examiner's investigation is thorough and fulsome, the

order directing the appointment of an examiner should direct Dynegy Holdings, its affiliates and

members of the Control Group (and their professionals, as well as all other parties in interest) to

cooperate fully with the examiner. The examiner should also be permitted to retain counsel and any other advisors necessary to conduct a complete examination. Because timeliness is important in these cases, the Indenture Trustee respectfully requests that the Court direct the examiner to provide an initial report 90 days after appointment and, if necessary, a final report in 180 days.

## NOTICE

57.     Notice of this Motion has been provided to (i) Sidley Austin LLP, proposed counsel to Dynegy Holdings and the other debtors, 787 Seventh Avenue, New York, NY 10019 (Attn: James F. Conlan, Esq. and Matthew A. Clemente, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; and (iv) the parties listed on the Special Service List and the General Service/2002 List maintained in these cases. The Indenture Trustee submits that under the circumstances no other notice need be provided.

## NO PRIOR REQUEST FOR RELIEF

58.     No previous motion for the relief sought herein has been made to this or any other Court.

## CONCLUSION

For the reasons stated above, the Indenture Trustee respectfully requests entry of an order, substantially in the form attached as <u>Exhibit B</u> (a) approving and directing the appointment of an independent examiner in Dynegy Holdings' case for the purposes of investigating and reporting to the Court and parties in interest with respect to the matters described above and (b) granting such other relief as the Court deems just and proper.

Dated: New York, New York
        November 11, 2011

                                **CADWALADER, WICKERSHAM & TAFT LLP**


                                /s/  George A. Davis
                                John J. Rapisardi
                                George A. Davis
                                Josh Brant
                                One World Financial Center
                                New York, New York 10281
                                Telephone: (212) 504-6000
                                Facsimile: (212) 504-6666
                                john.rapisardi@cwt.com
                                george.davis@cwt.com
                                josh.brant@cwt.com

                                -and-

                                Peter Friedman
                                700 Sixth Street, N.W.
                                Washington, DC 20001
                                Telephone: (202) 862-2200
                                Facsimile: (202) 862-2400
                                peter.friedman@cwt.com

                                *Attorneys for U.S. Bank National Association, as*
                                *Indenture Trustee*

-34-

**<u>EXHIBIT A</u>**

FILED: NEW YORK COUNTY CLERK 09/27/2011
INDEX NO. 652642/2011
NYSCEF DOC. NO. 1
11-38111-cgm    Doc 48    Filed 11/11/11    Entered 11/11/11 12:15:46    Main Document
RECEIVED NYSCEF: 09/27/2011
Pg 39 of 96

**SUPREME COURT FOR THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------x
                                                               :
**THE SUCCESSOR LEASE INDENTURE**                              :
**TRUSTEE under the Indenture of Trust,**                      :
**Mortgage, Assignment of Leases and Rents and**              :    Index No. _____
**Security Agreement related to Roseton Units 1 and**         :
**2 and THE SUCCESSOR LEASE INDENTURE**                        :
**TRUSTEE under the Indenture of Trust,**                      :
**Mortgage, Assignment of Leases and Rents and**              :
**Security Agreement related to Danskammer Units**            :    **SUMMONS**
**3 and 4, U.S. BANK NATIONAL ASSOCIATION,**                  :
                                                               :
              **Plaintiff,**                                   :    Date Index No.
                                                               :    Purchased: _____
                                                               :
          **v.**                                               :
                                                               :
                                                               :
**DYNEGY INC., DYNEGY HOLDINGS, LLC,**                         :
**DYNEGY GAS INVESTMENTS, LLC, E.**                           :
**HUNTER HARRISON, THOMAS W. ELWARD,**                        :
**MICHAEL J. EMBLER, ROBERT C. FLEXON,**                      :
**VINCENT J. INTRIERI, SAMUEL**                               :
**MERKSAMER, FELIX PARDO, CLINT C.**                          :
**FREELAND, KEVIN T. HOWELL, JOHN DOE**                       :
**1, JOHN DOE 2, JOHN DOE 3, Etc.**                           :
                                                               :
              **Defendants.**                                  :
                                                               :
---------------------------------------------------------------x

To the above named Defendants:

            YOU ARE HEREBY SUMMONED to answer the complaint in this action

and to serve a copy of your answer on Plaintiff's attorneys within twenty (20) days after the

service of this summons, exclusive of the day of service, or within thirty (30) days after the

service is complete if this summons is not personally delivered to you within the State of New

York. In case of your failure to appear or answer, judgment will be taken against you by default

for the relief demanded in the complaint.

As set forth in the complaint, Plaintiff designates New York County as the place

of venue pursuant to Section 503 of the Civil Practice Law and Rules.

Dated: New York, NY
September 27, 2011

**CADWALADER, WICKERSHAM & TAFT LLP**

By:     /s/ Louis M. Solomon                                   
George A. Davis
Louis M. Solomon
Hal S. Shaftel

Office and Post Office Address

One World Financial Center
New York, NY 10128
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

*Attorneys for U.S. Bank National Association*

To:     Dynegy Inc.
1000 Louisiana, Suite 5800
Houston, TX 77002

Dynegy Holdings, LLC
1000 Louisiana, Suite 5800
Houston, TX 77002

Dynegy Gas Investments, LLC
1000 Louisiana, Suite 5800
Houston, TX 77002

E. Hunter Harrison
2708 Sheltingham Drive
Wellington, FL 33414-7053

Thomas W. Elward
5531 Swan Lake Drive
West Bloomfield, MI 48322-1765

Michael J. Embler
652 Hudson Street, Apartment 2S
New York, NY 10014-1619

Robert C. Flexon
3 Dunham Street
Newtown, PA 18940-1989

Vincent J. Intrieri
1365 York Avenue, Apartment 21B
New York, NY 10021-4045

Samuel Merksamer
Icahn Capital L.P.
767 Fifth Avenue, 47th Floor
New York, NY 10153-0023

Felix Pardo
1000 Louisiana, Suite 5800
Houston, TX 77002

Clint C. Freeland
127 W. 96th Street, Apartment 2D-W
New York, NY 10025-6428

Kevin T. Howell
2100 Tanglewilde Street, Apartment 45
Houston, TX 77063-1291

**SUPREME COURT FOR THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------------------------------------x
|  |  |  |
|---|---|---|
| **THE SUCCESSOR LEASE INDENTURE** | : | |
| **TRUSTEE under the Indenture of Trust,** | : | **Index No._____** |
| **Mortgage, Assignment of Leases and Rents and** | : | |
| **Security Agreement related to Roseton Units 1 and** | : | |
| **2 and THE SUCCESSOR LEASE INDENTURE** | : | |
| **TRUSTEE under the Indenture of Trust,** | : | |
| **Mortgage, Assignment of Leases and Rents and** | : | **COMPLAINT** |
| **Security Agreement related to Danskammer Units** | : | |
| **3 and 4, U.S. BANK NATIONAL ASSOCIATION,** | : | |
| | : | **JURY TRIAL** |
| **Plaintiff,** | : | **DEMANDED** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **DYNEGY INC., DYNEGY HOLDINGS, LLC,** | : | |
| **DYNEGY GAS INVESTMENTS, LLC, E.** | : | |
| **HUNTER HARRISON, THOMAS W. ELWARD,** | : | |
| **MICHAEL J. EMBLER, ROBERT C. FLEXON,** | : | |
| **VINCENT J. INTRIERI, SAMUEL** | : | |
| **MERKSAMER, FELIX PARDO, CLINT C.** | : | |
| **FREELAND, KEVIN T. HOWELL, JOHN DOE** | : | |
| **1, JOHN DOE 2, JOHN DOE 3, Etc.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

-----------------------------------------------------------------x

Plaintiff U.S. Bank National Association, in its capacities as Successor Indenture Trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Roseton Units 1 and 2 (the "Roseton Indenture") and Successor Indenture Trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Danskammer Units 3 and 4 (the "Danskammer Indenture"), as directed by holders of the outstanding notes under those indentures, by and through its undersigned counsel, for its Complaint, alleges the following upon information and belief, except as to the allegations pertaining to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.      On August 31, 2011, Defendant Dynegy Inc.'s shareholders held equity in an insolvent company. On September 2, 2011, those same shareholders were hundreds of millions of dollars richer, and had the opportunity to get richer still. Every penny of that new value was taken out of the pockets of Plaintiff and other creditors, who under law are entitled to it. The short-changed creditors are now likely to be repaid far less than the amounts they loaned to Defendants. This action seeks to return that value to creditors, restore the status quo ante and stop Defendants from improperly diverting additional value from creditors to shareholders.

2.      Defendants Dynegy Inc., its wholly owned subsidiary Dynegy Holdings, LLC ("Dynegy Holdings"), their relevant subsidiaries (collectively, "Dynegy") and each of their directors and managers have disguised this misappropriation as several purportedly-independent transfers. Looking at these transfers as a whole, however, their true nature is plain: Dynegy Inc. used its complete domination and control of its subsidiaries to take enormous value out of the already insolvent Dynegy Holdings when that value should have been used to repay Dynegy Holdings' creditors – first, by transferring Dynegy Holdings' ownership interests in valuable

operating subsidiaries to Dynegy Inc. for inadequate consideration, and second, by causing Dynegy Holdings' board of managers to agree to a mechanism that allows Dynegy Inc., **not** Dynegy Holdings, to realize the value of the market discount of Dynegy Holdings' outstanding senior notes and debentures, which discount alone is worth hundreds of millions of dollars. Entirely absent from these transfers is any semblance of an arm's-length exchange. What instead permeates these transactions is a series of insider dealings initiated by a dominant parent holding company that extracted significant value from lower-tiered entities at the expense of their creditors. Whether characterized as a dividend, an exchange for less than fair value, a misappropriation of corporate opportunities or otherwise, that reallocation of value was improper and deprived Plaintiff and other creditors of assets that should be available to satisfy their claims.

3.    It appears from Dynegy's public disclosures that Defendants did not bother to subject the transfer to *any* independent scrutiny – approval by disinterested directors, a fairness opinion, market-testing of the value being transferred, or any of the other corporate governance processes that should accompany a transfer of significant assets to an insider. Rather, Defendants disregarded their fiduciary duties and the separateness of Dynegy Inc., Dynegy Holdings and its subsidiaries, and sought to erect legal barriers to inevitable creditor challenges by running the transfer through a shell subsidiary formed less than a month earlier and converting Dynegy Holdings from a corporation to a limited liability company *the day before* its board approved the transfer. As described below, the agreements documenting the transfer further reflect Defendants' knowledge that they invariably would be called to task for their misdeeds.

4.    Defendants' actions come at a time when Dynegy Holdings is insolvent and should be acting in the best interest of creditors, not shareholders. Incredibly, Defendants' actions also occurred less than six weeks after they told the Delaware Chancery Court, on

multiple occasions, that Dynegy Holdings' operating subsidiaries would not be transferred. In response to allegations from creditors (not including Plaintiff) in July 2011 that Defendants were embarking on a scheme to move assets away from Dynegy Holdings, Defendants assured the Chancery Court that "[Dynegy Holdings] will continue to hold direct equity interests *at all times* in entities that own indirectly all of [Dynegy's operating assets], just as, and to the same extent that, the direct subsidiaries of [Dynegy Holdings] today indirectly own such assets." Second Supplemental Affidavit of Samuel Merksamer at ¶ 4, Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc., CA No. 6689-VCP (Del. Ch. Jul. 28, 2011) (emphasis added).



**Dynegy moves assets after representing it wouldn't do so**

[Dynegy Holdings] will continue to hold direct equity interests at all times in entities that own indirectly all of the power generating assets, just as, and to the same extent that, the direct subsidiaries of [Dynegy Holdings] today indirectly own such assets. Thus, [Dynegy Holdings] will continue to own indirectly the same revenue generating assets that it indirectly owns today.

- Samuel Merksamer, member of the board of directors of Dynegy Inc., to the Delaware Chancery Court on July 28, 2011

Defendants knew when they made these representations that just weeks later they would deprive Dynegy Holdings of six of its 17 power plants, which generate more than half its revenues, by moving ownership of these plants to Dynegy Inc. where only shareholders will benefit from their value.

5.    For a company, insolvent and with limited projected cash flow, to transfer a significant portion of its assets to an insider through a closed and secretive process is itself sufficient to warrant heightened judicial scrutiny. Defendants' actions have gone far beyond that, however. The transaction described below is devoid of any arm's-length basis and is structured solely to upstream hundreds of millions of dollars in value away from Dynegy Holdings and its creditors and into the pockets of the Dynegy Inc. shareholders. Plaintiff hereby seeks full and adequate relief arising from, among other things,

(a)    Dynegy Inc.'s and Dynegy Holdings' actual and constructive fraudulent transfers and breaches of contractual duties, including the covenant of good faith and fair dealing implied in Plaintiff's contracts with Dynegy Holdings;

(b)    The managers of Dynegy Holdings' independent breaches of fiduciary duties, including the duties of good faith, care, and loyalty, by engaging in self-dealing, by aiding and abetting the above fraudulent transfers and other improper conduct, by converting Dynegy Holdings' corporate opportunities, and by impermissibly distributing value to Dynegy Inc. while they knew Dynegy Holdings was insolvent;

(c)    The board of managers of Dynegy Gas Investments, LLC's ("Dynegy Gas Investments", a subsidiary of Dynegy Holdings) breaches of fiduciary duties to Dynegy Holdings, including by consenting to act as intermediary in the fraudulent transfers and by actively participating and aiding and abetting the wrongdoing described below;

(d)    Dynegy Inc.'s tortious interference with and inducement to breach Plaintiff's contracts and economic relations with Dynegy Holdings, as well as unjust enrichment; and

(e)    Defendants' misuse of the corporate form with respect to transactions with and through Dynegy Inc.'s subsidiaries and domination and control over those subsidiaries, each of which should be treated as alter ego single enterprises responsible for Defendants' debts and misconduct.

6.    Defendants' actions have caused substantial harm to Plaintiff that must be remedied, including by imposition of a constructive trust for the benefit of Plaintiff and Dynegy Holdings' other creditors and containing the assets that have been taken from Dynegy Holdings, and an order that Defendants and their affiliates may not dissipate assets of or used by Dynegy Holdings, together with appropriate injunctive and other equitable relief, including unwinding the improper transfers and transactions complained of herein.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over Dynegy Holdings with respect to claims arising under the Guaranty dated May 1, 2001, by and among Dynegy Holdings, as guarantor, Plaintiff, as successor trustee under the Danskammer Indenture, and certain other parties thereto (the "Danskammer Guaranty") and with respect to the Guaranty dated May 1, 2001, by and among Dynegy Holdings, as guarantor, Plaintiff, as successor trustee under the Roseton Indenture, and certain other parties thereto (the "Roseton Guaranty" and, together with the Danskammer Guaranty, the "Guaranties"), as each Guaranty provides in pertinent part that:

> [Dynegy Holdings] (i) hereby irrevocably submits to the nonexclusive jurisdiction of the Supreme Court of the State of New York, New York County . . . for the purposes of any suit, action or other proceeding arising out of this Guaranty, or the subject matter hereof or any of the transactions contemplated hereby . . . .

Guaranties § 8.6.

8.     Under Article 3 of the C.P.L.R., this Court has jurisdiction over each Defendant named herein because, among other things, the Defendant is a resident of or transacts business in the State of New York and/or has committed the acts complained of herein within the state and/or has committed the acts complained of herein outside the state which caused injury within the state (in each case, directly or by aiding and abetting the wrongdoing with a conscious intent to harm creditors, including Plaintiff), thus providing sufficient contacts with New York so as to render the exercise of jurisdiction by the courts of this state permissible.

9.     Venue is proper in New York County pursuant to Article 5 of the C.P.L.R. because, among other things, one or more of the named parties resides in the county as of the commencement of the action.

## PARTIES

### A.     Plaintiff

10.     Plaintiff, U.S. Bank National Association, solely in its capacities as Successor Indenture Trustee under the Roseton Indenture and Successor Indenture Trustee under the Danskammer Indenture, is a national banking association organized under the laws of the United States. Its main office as set forth in its Articles of Association is Cincinnati, Ohio. Plaintiff maintains offices and regularly transacts substantial business in New York, and the effects of Defendants' improper conduct have been and will be felt by Plaintiff (including its constituent noteholders) in New York.

### B.     Defendants

#### i.     *Dynegy Entities*

11.     Defendant Dynegy Inc., upon information and belief, is a Delaware corporation. Dynegy Inc.'s subsidiaries include power plants located in New York.

12.     Defendant Dynegy Holdings, upon information and belief, is a Delaware limited liability company. Prior to September 1, 2011, Dynegy Holdings Inc. was a Delaware corporation. Because Dynegy Holdings was converted to a limited liability company for the purpose of harming creditors, the change to its corporate status should be disregarded. Dynegy Holdings' subsidiaries include power plants located in New York.

13.     Defendant Dynegy Gas Investments, upon information and belief, is a Delaware limited liability company. Dynegy Gas Investments was formed on or about August 4, 2011 in connection with Dynegy's internal reorganization described below.

*ii.     Fiduciary Defendants*

14.     Defendant E. Hunter Harrison, upon information and belief, is Chairman of the board of directors of Dynegy Inc. and has served on that board since March 2011 and at all times relevant to the matters described in this Complaint. He served as interim President and Chief Executive Officer of Dynegy Inc. from April 2011 until June 2011.

15.     Defendant Thomas W. Elward, upon information and belief, has been a member of the Dynegy Inc. board of directors since 2011 and at all times relevant to the matters described in this Complaint.

16.     Defendant Michael J. Embler, upon information and belief, has been a member of the Dynegy Inc. board of directors since 2011 and at all times relevant to the matters described in this Complaint. Mr. Embler is a resident of New York.

17.     Defendant Robert C. Flexon, upon information and belief, is the President and Chief Executive Officer of Dynegy Inc. He has been a member of the Dynegy Inc. board of directors since 2011 and at all times relevant to the matters described in this Complaint. Upon information and belief, Mr. Flexon is also a member of the board of managers of Dynegy Holdings at all times relevant to the matters described in this Complaint.

-7-

18.     Defendant Vincent J. Intrieri, upon information and belief, has been a member of the Dynegy Inc. board of directors since 2011 and at all times relevant to the matters described in this Complaint. Mr. Intrieri is a resident of New York. Mr. Intrieri is a Senior Managing Director of Icahn Capital, L.P., a significant shareholder of Dynegy Inc.

19.     Defendant Samuel Merksamer, upon information and belief, has been a member of the Dynegy Inc. board of directors since 2011 and at all times relevant to the matters described in this Complaint. Mr. Merksamer is a resident of New York. Mr. Merksamer is an investment analyst at Icahn Capital, L.P.

20.     Defendant Felix Pardo, upon information and belief, has been a member of the Dynegy Inc. board of directors since 2011 and at all times relevant to the matters described in this Complaint.

21.     Defendant Clint C. Freeland, upon information and belief, is the chief financial officer of Dynegy Inc. and of Dynegy Holdings, and has been a member of the Dynegy Holdings board of managers at all times relevant to the matters described in this Complaint. Mr. Freeland is a resident of New York.

22.     Defendant Kevin T. Howell, upon information and belief, has been a member of the Dynegy Holdings board of managers at all times relevant to the matters described in this complaint.

23.     John Doe 1, upon information and belief, has been a member of the Dynegy Gas Investments board of managers since its formation in August 2011.

24.     John Doe 2, upon information and belief, has been a member of the Dynegy Gas Investments board of managers since its formation in August 2011.

25.     John Doe 3, upon information and belief, has been a member of the Dynegy Gas Investments board of managers since its formation in August 2011.

26.     All defendants herein have acted and are continuing to act in furtherance of their collective improper ends as alleged herein and as active and knowing agents of each other in carrying out the improper conduct alleged herein. Defendant Dynegy Holdings and its affiliates and subsidiaries are completely dominated and controlled by Defendant Dynegy Inc., which has abused the corporate form of Dynegy Holdings and Dynegy Gas Investments to intentionally harm Plaintiff. Dynegy Inc. has alter ego liability for the breaches of contract and torts by Dynegy Holdings and Dynegy Gas Investments, and vice versa.

## FACTUAL BACKGROUND

27.     Dynegy Inc., through its direct and indirect subsidiaries, sells electric energy, capacity and ancillary services on a wholesale basis to utilities, cooperatives, municipalities, power marketers and other industry customers in six US states. The consolidated company owns and/or operates 17 power plants fueled by a mix of coal, fuel oil and natural gas, and is the nation's third largest independent power producer.

28.     An abbreviated chart reflecting the organizational and capital structure of Dynegy as of July 2011 is below:



## Dynegy organization/capital structure as of July 2011

Note: Abbreviated chart.

A.    **Plaintiff's Relationship To Dynegy**

   i.    *The Roseton And Danskammer Financings*

29.    In January 2001, Dynegy Roseton L.L.C. ("Dynegy Roseton") and Dynegy Danskammer L.L.C. ("Dynegy Danskammer"), each a wholly owned indirect subsidiary of Dynegy Holdings, acquired certain power generating facilities located in Newburgh, New York, known as the Roseton and Danskammer facilities, respectively, for an aggregate purchase price of $950 million.

30.    In order to obtain long term financing for the acquisitions, in May 2001 Dynegy Holdings, Dynegy Roseton and Dynegy Danskammer entered into participation and related agreements (collectively, the "Operative Documents") with the predecessors-in-interest to Plaintiff, certain subsidiaries of Public Service Enterprise Group Inc. ("PSEG") and certain other

parties, which resulted in PSEG, through its indirect subsidiaries Roseton OL LLC and
Danskammer OL LLC (together, the "PSEG Entities"), providing approximately $920 million in
secured financing to Dynegy. Of that amount, the PSEG Entities contributed $120 million
directly (plus $18 million towards transaction costs), and financed the remaining $800 million by
issuing an aggregate of $250 million in 7.27% Series A Notes and $550,400,000 in 7.67% Series
B Notes, as follows:

| | **7.27% Series A Notes** | | **7.67% Series B Notes** | |
|---|---|---|---|---|
| | Principal Amount | Maturity | Principal Amount | Maturity |
| Roseton | $64,325,000 | November 2008 | $475,075,000 | November 2016 |
| Danskammer | $185,675,000 | November 2010 | $75,325,000 | November 2012 |

31.    The notes issued by Roseton OL LLC are secured by both power generation units
at the Roseton facility, and the notes issued by Danskammer OL LLC are secured by two of the
four power generation units at the Danskammer facility. Each PSEG Entity has assigned all of its
rights in those facilities (other than certain specified rights) to Plaintiff, as successor indenture
trustee for the Series A and Series B Notes with respect to each facility. Dynegy Roseton and
Dynegy Danskammer make semi-annual payments to Plaintiff, which uses the funds to pay
principal and interest on the Series A and Series B Notes, and transfers the remainder to the
PSEG Entities.

32.    The Series A Notes were satisfied in full on or around November 2010 and are no
longer outstanding. The Danskammer Series B Notes mature in November 2012, and the
Roseton Series B Notes mature in November 2016. The next scheduled payment for the Roseton
and Danskammer facilities in the amount of $82,482,840, of which $60,375,000 constitutes
payment of principal on the Roseton Series B Notes, is due November 8, 2011.

ii.    *The Guaranties*

33.    As credit support for the Roseton and Danskammer financing transactions, Dynegy Holdings fully, unconditionally and irrevocably guaranteed Dynegy Roseton's and Dynegy Danskammer's obligations under the Operative Documents. Because the Roseton and Danskammer facilities currently produce minimal net operating revenues, Dynegy Holdings directly or indirectly satisfies virtually all of Dynegy Roseton's and Dynegy Danskammer's obligations to Plaintiff, and has been doing so for some time.

34.    The credit support offered by the Guaranties is critical to repayment of the Series B Notes, a fact Defendants acknowledge. The Registration Statement Dynegy Holdings filed with the Securities and Exchange Commission on July 10, 2001 prominently advertised, on its first page, that "[Dynegy Holdings] has agreed to guarantee [the obligations of Dynegy Roseton and Dynegy Danskammer, which] are indirect wholly owned subsidiaries of [Dynegy Holdings]. Accordingly, when making the credit decision of whether to [purchase interests in the Series A and Series B Notes], *you should focus on the information about [Dynegy Holdings] provided in this prospectus.*" Dynegy Holdings Inc., Registration Statement Under the Securities Act of 1933 (Form S-4), at 1 (July 10, 2001) (emphasis added). The Registration Statement provided a consolidated balance sheet and income statement for Dynegy Holdings reflecting cash flows from all of its operating subsidiaries. Dynegy Holdings' financial status was similarly presented on a consolidated basis, including all of its subsidiaries, in its subsequent SEC filings.

35.    Moreover, the Guaranties include provisions designed to ensure that the credit support provided by Dynegy Holdings will survive any consolidation, merger, or other transaction involving a transfer or lease of substantially all of Dynegy Holdings' properties and assets. Specifically, Section 4.2 of each Guaranty provides in relevant part that Dynegy Holdings "shall not . . . convey [or] transfer . . . its properties and assets substantially as an entirety to any

Person in one or a series of transactions" unless each of six express conditions is satisfied, including that the succeeding Person "shall expressly assume all of the Guarantor's obligations under this Guaranty." Guaranties § 4.2(b).

36.    Dynegy Holdings' obligations under the Guaranties are *pari passu* with its other senior unsecured obligations, including its outstanding senior notes and debentures described below.

**B.    Dynegy's Other Material Indebtedness**

37.    Prior to the refinancing Dynegy undertook in August 2011, Dynegy Holdings was the borrower under a Fifth Amended and Restated Credit Agreement, under which it had outstanding approximately $850 million under a term facility, $68 million under a term B facility, and $439 million in issued letters of credit. All of these amounts were repaid, and the credit agreement terminated, in August 2011.

38.    Dynegy Holdings also is the issuer of approximately $3.3 billion in senior unsecured notes and debentures that mature between 2012 and 2026, and $200 million in subordinated debentures payable to affiliates of Dynegy Holdings that are due in 2027. Specifically, as of June 30, 2011, Dynegy Holdings had the following notes and debentures outstanding:

|  | Carrying Amount Outstanding |
|---|---|
| Senior notes and debentures: | |
| 8.75 percent due 2012 | $89 million |
| 7.5 percent due 2015 (1) | $770 million |
| 8.375 percent due 2016 (2) | $1.043 billion |
| 7.125 percent due 2018 | $173 million |
| 7.75 percent due 2019 | $1.1 billion |
| 7.625 percent due 2026 | $171 million |
| Subordinated debentures payable to affiliates, 8.316 percent due 2027 | $200 million |

(1) Includes unamortized discounts of $15 million
(2) includes unamortized discounts of $3 million

39.    Accordingly, Dynegy Holdings acts as the primary financing entity for the entire Dynegy enterprise. Prior to the improper transfer described in this Complaint, all of Dynegy's cash-generating subsidiaries sat under Dynegy Holdings in the Dynegy corporate structure and provided Dynegy Holdings with the funds to repay its debts. Dynegy Holdings, in turn, sat underneath Dynegy Inc., and could not properly distribute cash up to Dynegy Inc. if doing so endangered Dynegy Holdings' ability to service its debt obligations.

## DYNEGY HOLDINGS IS CLEARLY INSOLVENT

**A.    Operational Difficulties and Capital Expenditures Render Dynegy Holdings Insolvent**

40.    Dynegy's financial condition has substantially deteriorated in recent years to the point where, even prior to improperly transferring substantial assets to Dynegy Inc., it clearly had become insolvent due to over-leveraging, high capital expenditures, changes in energy costs and weak demand. As a result of these and other factors, Dynegy's operating revenues have fallen every year since 2007, and it suffered substantial net losses of $1.262 billion in 2009 and $234 million in 2010. Dynegy's independent registered public accounting firm has expressed doubts as to Dynegy's ability to continue as a going concern every year since 2008. Dynegy Inc., Annual Report (Form 10-K), at 26 (Mar. 8, 2011).

41.    Dynegy has long publicly acknowledged its financial weakness and its likely inability to repay creditors. In light of the decline in the market prices of natural gas and wholesale electricity and the Dynegy Inc. board of directors' inability to identify "any economic or industry factors that create a reasonable basis for believing that the market price declines will reverse in the next several years," the board determined in 2009 that the "declining cash flow generation capacity of [Dynegy], combined with its high level of indebtedness and the need to

incur additional indebtedness to fund operations and required environmental capital expenditures

. . . [make] the risks of pursuing a standalone business strategy [] considerable." "Given current

forward commodity price curves, ***our future operating cash flows are likely to be insufficient to***

***fund our planned capital expenditure program and our debt service requirements.***" Dynegy

Inc., Quarterly Report (Form 10-Q), at 40 (May 9, 2011) (emphasis added). Dynegy Inc.'s

management forecasts negative operating cash flow, after capital expenditures, at least through

2015:

|  | **2011E** | **2012E** | **2013E** | **2014E** | **2015E** |
|---|---|---|---|---|---|
| Operating cash flow less total capital expenditures | ($279) | ($348) | ($99) | ($201) | $(122) |
| Operating cash flow less total capital expenditures and debt amortization | ($497) | ($514) | ($184) | ($204) | ($125) |

Dynegy Inc., Preliminary Proxy Statements (Schedule 14A), at 59 (Jan. 10, 2011).

42.    In October 2010, Dynegy Inc. warned investors that "[u]nder no scenario as a

public company would [Dynegy Inc.'s] Board be able to issue a dividend to stockholders"

because, among other reasons, "[d]ividends would not be permitted as a public company under

Delaware law" as "Dynegy does not believe it presently has sufficient statutory surplus to

support a dividend." Dynegy Inc., Investor Presentation, at 3 (Oct. 2010). "No public company in

Dynegy's condition should issue a dividend." Id. at 4.

43.    Dynegy's financial advisors also declared Dynegy Holdings insolvent. In

connection with advising Dynegy Inc.'s board of directors regarding a third party tender offer for

outstanding Dynegy Inc. shares, Dynegy's financial advisors estimated the value of Dynegy

Inc.'s equity using three different methodologies, which produced an estimated value of between

($4.00) and $4.83 per share based on a comparable companies analysis, ($10.57) and ($1.07) per

share based on a discounted cash flow analysis, and ($15.80) and ($0.80) per share on a sum-of-

the-parts analysis. Dynegy Inc., Preliminary Proxy Statements (Schedule 14A), at 46-57 (Jan. 10,

2011). At the time, Dynegy Inc. had no liabilities. Accordingly, these negative equity values reflect a negative equity value for Dynegy Holdings. Earnings prospects for Dynegy's operating subsidiaries have only deteriorated since these values were calculated.

**B.** **Dynegy's Recent Refinancing Guarantees Dynegy Holdings Will Be Unable To Pay Its Debts When Due**

44.    On July 11, 2011, Dynegy announced that it would refinance its existing credit facility through a total of $1.7 billion in new financing secured by the assets of all operating subsidiaries other than Dynegy Roseton and Dynegy Danskammer. Dynegy also reorganized the operating subsidiaries of Dynegy Holdings into two "portfolios", with the Roseton and Danskammer facilities left to the side: a portfolio consisting of Dynegy's gas power generation facilities (the "gas portfolio") and a portfolio consisting of Dynegy's coal power generation facilities (the "coal portfolio"). Each portfolio was "ring fenced" from the rest of Dynegy; i.e., Dynegy amended the existing organizational documents of certain subsidiaries and formed new subsidiaries, and took certain related actions, in an attempt to shield the coal and gas portfolio from the impact of a Dynegy Holdings bankruptcy. A portion of the proceeds of the new financing was allocated to refinance Dynegy's existing credit facility and certain other Dynegy obligations. An abbreviated chart reflecting the organizational and capital structure of Dynegy after its refinancing is below:



Note: Abbreviated chart.

45.    Importantly, the refinancing restricts aggregate annual dividends to Dynegy Holdings from the gas and coal portfolios to $225 million per year – $135 million from the gas portfolio and $90 million from the coal portfolio. This restriction on distributions is concerning in light of Dynegy Holdings' debt obligations. Dynegy Inc. and Dynegy Holdings spent $515 million on debt service and general and administrative expenses alone in 2010, $584 million in 2009 and $550 million in 2008. Dynegy Inc., Annual Report (Form 10-K), at 50-51 (Mar. 8, 2011). Dynegy Holdings' projected debt service payments for 2011 with respect to its outstanding notes and debentures *alone* total approximately $269 million, in addition to approximately $126 million in other payment support Dynegy Holdings is obligated to provide to, among other subsidiaries, Dynegy Roseton and Dynegy Danskammer. The effect of the distribution restrictions is obvious: as Standard and Poor's noted "[b]ecause distributions to

[Dynegy Holdings] from [the coal and gas portfolios] are capped at a total of $225 million, we believe that [Dynegy Holdings] will run out of cash and default . . . . [The] default path for Dynegy is simply a bankruptcy filing because distributions from [the coal and gas portfolios] will not be enough to meet its obligations in 2012." *Research Update: Dynegy Inc.*, S&P CREDIT RESEARCH, STANDARD & POOR'S, Jul. 28, 2011, at 3.

46.     Not surprisingly, on July 11, 2011, the day Dynegy announced its proposed refinancing and reorganization, Moody's downgraded the Dynegy Holdings senior notes and debentures and the Series B Notes from Caa3 to Ca (highly speculative), and the market price of the Series B Notes plummeted from 87% of par value on Friday, July 7, 2011, to 76% on Monday, July 11, 2011, and further to 71% by Friday, July 15, 2011.

## DYNEGY HOLDINGS TRANSFERS HUNDREDS OF MILLIONS OF DOLLARS IN VALUE FROM ITS CREDITORS TO DYNEGY INC.'S SHAREHOLDERS

47.     In the first half of 2011 Icahn Enterprises L.P., the largest shareholder of Dynegy Inc., and other significant shareholders of Dynegy Inc. placed an entirely new slate of directors on Dynegy Inc.'s board, including several of their own representatives. The new board had an immediate impact on the perceived risk of Dynegy Holdings defaulting on its debts. In a March 28, 2011 announcement, Moody's Investor Service downgraded, among other Dynegy debt, the Series B Notes and Dynegy Holdings senior notes and debentures, stating that "[w]hile information remains limited about the long-term intentions of the [new Dynegy Inc.] board, we believe that default risk, through some form of distressed debt exchange, has increased with this change in corporate governance." *Moody's Lowers Dynegy's CFR to Caa3*, MOODY'S GLOBAL CREDIT RESEARCH, MOODY'S INVESTORS SERVICE, Mar. 28, 2011, at 1. This apprehension turned out to be well-founded.

A.    **Dynegy Holdings Improperly Transfers The Coal Portfolio To Dynegy
Inc.**

48.    On September 2, 2011, Dynegy Inc. took ownership of Dynegy Coal Holdco,
LLC, the entity that owns all the equity interests in the coal portfolio, from Dynegy Holdings. A
chart summarizing the transfer is below.



Note:  Abbreviated chart.

49.    Nominally, the transfer was conducted in two steps: Dynegy Gas Investments, a
wholly owned subsidiary of Dynegy Holdings formed several weeks prior to the transaction,
transferred ownership of Dynegy Coal Holdco, LLC, which Dynegy Inc. determined to be worth
$1.25 billion, to Dynegy Inc. In exchange, Dynegy Inc. issued to Dynegy Gas Investments an
undertaking under which it promised to make a stream of payments, allegedly also worth $1.25
billion, that matches the payments Dynegy Holdings is obligated to make under its $1.1 billion

of 7.75% senior unsecured notes due 2019 and its $175 million of 7.625% senior unsecured notes due 2026.

50.    Simultaneously, Dynegy Gas Investments assigned the Dynegy Inc. undertaking to Dynegy Holdings in exchange for a $1.25 billion note issued by Dynegy Holdings that accrues interest at 4.24% per annum and pays all interest and principal at maturity in 2027. Dynegy Inc. and Dynegy Holdings then amended and restated the undertaking to make it a direct obligation from Dynegy Inc. to Dynegy Holdings (i.e., removing Dynegy Gas Investments as a party to the undertaking) and to provide that, for every $1 face amount of Dynegy Holdings' $3.3 billion in outstanding senior notes or debentures that Dynegy Inc. or its subsidiaries, other than Dynegy Holdings and its subsidiaries, acquires and retires, cancels or forgives, payments due under the undertaking will be reduced by a total of $1.678 (effectively a dollar-for-dollar reduction in the undertaking's principal amount, assuming that principal amount is the $1.25 billion alleged by Defendants). Dynegy Inc., Current Report (Form 8-K) (Sept. 8, 2011). On September 15, 2011, Dynegy Inc. announced an offer to acquire $1.25 billion in Dynegy Holdings notes and debentures – exactly the amount required to entirely eliminate the undertaking – for consideration totaling approximately $850 million.

51.    The coal portfolio constitutes a significant portion of Dynegy Holdings' total assets and generates more than half of its revenues. Notwithstanding, Defendants appear to have effectuated the transfer with no independent oversight regarding the true value of the coal portfolio, the sufficiency of the consideration or the fairness of the transaction to Dynegy Holdings. The transfer was not reviewed by independent directors – each of the members of Dynegy Holdings' board of managers is either a senior officer or a director of Dynegy Inc., and upon information and belief each holds shares in Dynegy Inc. – nor, upon information and belief,

was it subject to a fairness opinion by outside counsel, and Dynegy Holdings never offered third parties the opportunity to bid on the coal portfolio or undertook any other process to determine whether more beneficial uses of the assets were available to it. Without even a nod to corporate governance formalities, Dynegy Holdings' board of managers, fully interested in maximizing value to Dynegy Inc. at the expense of Dynegy Holdings, slapped a $1.25 billion valuation on the coal portfolio equity and approved its transfer to Dynegy Inc. for consideration that no rational board could deem to constitute reasonably equivalent value.

**B.      The Consideration For The Coal Portfolio Was Clearly Insufficient**

52.      In exchange for its ownership interest in the coal portfolio, Dynegy Holdings received an unsecured undertaking from Dynegy Inc. to make a stream of payments with a supposed principal amount of $1.25 billion, a weighted-average maturity at 2020 and an implied interest rate of 7¾%. An unsecured loan by Dynegy Inc. on those terms simply is not worth the $1.25 billion valuation Defendants attach to the coal portfolio equity. Notably, Dynegy's new coal portfolio credit facility (which closed less than a month prior to issuance of the undertaking), which is structurally senior to the undertaking and has a first priority lien on all of the coal portfolio's assets (which, based on Defendants' valuation of the assets net of this credit facility (i.e., the coal portfolio equity), are worth $1.85 billion) to secure $600 million in principal, has a minimum interest rate of 9.25% and an implied rate based on current prices of approximately 10%. Clearly the interest rate on the undertaking, which is unsecured, structurally subordinated to that credit facility and carries a far less attractive loan-to-value ratio (100% loan-to-value based on Defendants' valuation of the coal portfolio), should be meaningfully higher. In fact, upon information and belief and based on market data on similarly structured loans, the interest rate needed to make the value of the undertaking equal to $1.25 billion is at least double its implied interest rate. Furthermore, at its existing implied interest rate, and *before*

incorporating the dollar-for-dollar reduction provision described below, the fair value of the undertaking is no more than two-thirds the $1.25 billion asserted by Defendants.

**C.    The Undertaking Is Structured To Deprive Dynegy Holdings Of Its
Corporate Opportunity To Retire Its Debts At A Discount**

53.    Not only was the undertaking, as issued, clearly worth less than the value Defendants themselves assign to the coal portfolio equity, it has been amended and restated after its issuance to, among other things, insert a provision allowing Dynegy Inc. to reduce dollar-for-dollar the principal amount of the undertaking for any Dynegy Holdings senior notes or debentures that Dynegy Inc. or its subsidiaries (other than Dynegy Holdings and its subsidiaries) acquires and retires, cancels or forgives. Accordingly, Dynegy Inc. benefits twice from transferring the coal portfolio from Dynegy Holdings – first, by taking assets of far greater value than the consideration paid, and second, by taking away Dynegy Holdings' corporate opportunity to capture the market discount on its notes and debentures. This opportunity was an asset of Dynegy Holdings, worth hundreds of millions of dollars, for which Dynegy Inc. paid *zero* consideration.

54.    As noted, on September 15, 2011, Dynegy Inc. announced an offer to exchange up to $1.25 billion of Dynegy Holdings notes and debentures (i.e., the exact amount required to eliminate the undertaking) for approximately $850 million in cash and notes secured by Dynegy Inc.'s ownership interest in the coal portfolio. Accordingly, by spending $850 million to acquire and retire, cancel or forgive $1.25 billion in Dynegy Holdings notes and debentures, Dynegy Inc. can cancel the undertaking in its entirety – thereby purchasing $1.25 billion in coal portfolio equity (at Defendants' own valuation) for approximately $850 million (again, at Defendants' own valuation). Whatever the value of the undertaking without this dollar-for-dollar reduction provision, with this provision it is clearly not reasonably equivalent value for the coal portfolio

equity. The announced exchange offer will expire, and tendered Dynegy Holdings notes and debentures will be exchanged for cash and new notes secured by the coal portfolio equity, on or about October 13, 2011.

55.     Further, by causing Dynegy Holdings to agree to add this dollar-for-dollar reduction provision to the undertaking (with *no* consideration from Dynegy Inc. for doing so), Dynegy Inc. and Dynegy Holdings' board of managers misappropriated a valuable asset of Dynegy Holdings: the opportunity to use the value of the coal portfolio equity to retire Dynegy Holdings' debt at its current market discount. Specifically, until it was taken away by Dynegy Inc., the coal portfolio equity was an asset of Dynegy Holdings and its value was available to Dynegy Holdings to satisfy its obligations. To the extent holders of those obligations are willing to declare them satisfied in full for a payment or exchange at less than par, Dynegy Holdings had the opportunity to use the coal portfolio equity's value (whether by selling the coal portfolio or issuing new debt secured by the coal portfolio's equity as Dynegy Inc. now proposes to do) to take advantage of that discount for the benefit of itself, Plaintiff and Dynegy Holdings' other creditors.

56.     There is simply no reason why Dynegy Inc., and not Dynegy Holdings, should benefit from this opportunity. Dynegy Inc.'s pending exchange offer is based on the value of the coal portfolio equity, an asset that should belong to Dynegy Holdings. Other than the fact that Dynegy Inc. has taken that asset from Dynegy Holdings for less than fair value, there is nothing to stop Dynegy Holdings from conducting the exact same exchange offer, thereby capturing the approximately $400 million in value (i.e., retire $1.25 billion in debt for $850 million in new notes and cash) that Dynegy Inc. expects to receive if the exchange is successful. By allowing the coal portfolio equity to be transferred to Dynegy Inc. and then amending and restating the

undertaking to include the dollar-for-dollar reduction provision, Dynegy Holdings' managers misappropriated for the benefit of Dynegy Inc. and its shareholders, including themselves, a corporate opportunity worth hundreds of millions of dollars to the insolvent Dynegy Holdings.

### D.    Defendants' Knowledge That The Coal Portfolio Transfer Is Fraudulent Is Evident

57.    No independent board, or even an interested board observing the bare minimum of fiduciary duties, would have determined the coal portfolio transfer to be appropriate for Dynegy Holdings. Yet Dynegy Inc. so dominates and controls Dynegy Holdings and its board of managers that the board gave away Dynegy Holdings' assets without hesitation and apparently without observing any fair and open process of the type required where an insolvent company moves significant assets to a controlling insider. Knowing that the coal portfolio transfer was patently unfair to Dynegy Holdings and was certain to be challenged by creditors whose assets were being taken, Defendants sought to manufacture barriers to those challenges through the very corporate separateness they so readily disregarded in constructing and approving the transfer. Defendants also misrepresented their intentions, including to the Delaware Chancery Court, to minimize creditor scrutiny until the transfer had been completed. In spite of these attempts, and in fact because of them, Defendants' intent to defraud Plaintiff and Dynegy Holdings' other creditors in wanton disregard of their fiduciary duties is readily apparent.

*i.    Dynegy Misrepresents Its Intentions To The Delaware Chancery Court*

58.    On July 21, 2011, certain individual holders of interests in the Series B Notes (not including Plaintiff) brought suit against Dynegy Holdings in the New York Supreme Court seeking to temporarily enjoin Dynegy Holdings from proceeding with its proposed refinancing. The next day, on July 22, 2011, the PSEG Entities brought a similar action in the Delaware

Chancery Court. The New York case was consensually stayed to allow the Delaware case to be resolved in the first instance.

59.     In their request for a temporary restraining order, the PSEG Entities asserted that Dynegy's proposed refinancing constituted, among other things, fraudulent transfers. To refute this claim, Defendants repeatedly stated that they were not seeking to transfer any assets out from under Dynegy Holdings. Specifically, Samuel Merksamer, a newly-elected member of the board of directors of Dynegy Inc., a member of the board's Special Committee for Finance and Restructuring, and an employee of Icahn Capital L.P., Dynegy Inc.'s largest shareholder, stated in an affidavit that

> [Dynegy Holdings] is undertaking a reorganization, so there will be some movements of subsidiaries and of equity interests among subsidiaries. Although there will be some changes in [Dynegy Holdings'] direct ownership holdings, [Dynegy Holdings'] direct subsidiaries will own directly or indirectly all of the same revenue generating assets that [Dynegy Holdings'] direct subsidiaries indirectly own today. In effect, there will be some shifting of subsidiaries from one pocket to the other, but *[Dynegy Holdings] will continue to hold direct equity interests <u>at all times</u> in entities that own indirectly all of the power generating assets, just as, and to the same extent that, the direct subsidiaries of [Dynegy Holdings] today indirectly own such assets*. Thus, [Dynegy Holdings] will continue to own indirectly the same revenue generating assets that it indirectly owns today.

Second Supplemental Affidavit of Samuel Merksamer at ¶ 4, Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc., CA No. 6689-VCP (Del. Ch. Jul. 28, 2011) (emphasis added).

60.     Dynegy Holdings represented in its response papers that

> Following the Reorganization, [Dynegy Holdings] will continue indirectly to own the same power plants, through a series of subsidiaries, that it owns today. *[Dynegy Holdings] is not transferring farther out of reach any power plants. Indeed, no assets are being transferred outside of [Dynegy Holdings'] ultimate ownership.*

Defendant's Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining Order at 2-3, Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc., CA No. 6689-VCP (Del. Ch. Jul. 25, 2011) (emphasis added).

61.     Similarly, Dynegy Holdings' counsel affirmed on the record that

> [Dynegy Holdings] today, indirectly, through a series of subsidiaries, owns 17 power plants, many of which are profitable. ***And following the reorganization, [Dynegy Holdings] will own 17 power plants, the very same power plants***; and they will be equal in value to what they're equal to today except to the extent that the value is enhanced by reason of its new liquidity and its new structure. So it's important to understand that not only is there technically not a transfer but, economically, [Dynegy Holdings] has the same value after the reorganization that it has today. It is still the indirect owner of all the assets.

Transcript of Oral Argument at 36-37, Roseton OL, LLC and Danskammer OL, LLC v. Dynegy Holdings Inc., CA No. 6689-VCP (Del. Ch. Jul. 25, 2011) (emphasis added).

62.     Based in significant part on these representations, the Delaware Chancery Court denied the PSEG Entities' application for a temporary restraining order. Upon information and belief, the Series B Note holders also determined not to participate in the PSEG Entities' action in reasonable reliance on these and other statements. That reliance proved to be misplaced.

63.     Dynegy's representations regarding not moving assets out from under Dynegy Holdings were false when made. Dynegy's new financing secured by the coal portfolio, which upon information and belief Dynegy had negotiated ***before*** it appeared before the Delaware Chancery Court (but which was not made public until nearly two weeks later), included an express and non-market carve out providing that a transfer of the coal portfolio out from under Dynegy Holdings to Dynegy Inc. would not constitute a default under the financing agreement. Barely a month after Mr. Merksamer and Defendants' counsel represented to the Delaware Chancery Court that Defendants would not deprive Dynegy Holdings of its indirect ownership in

any operating subsidiaries, it did exactly that: on September 2, 2011, Dynegy announced that it had moved the coal portfolio out from under Dynegy Holdings and place it directly under Dynegy Inc.

64.    Dynegy knew as far back as July that its planned taking of the coal portfolio from Dynegy Holdings could not withstand scrutiny, and it was willing to misrepresent its intentions to the Delaware Chancery Court to avoid having those plans derailed.

ii.    *Dynegy Attempts To Disguise Its Domination and Control And Shield Itself From Liability For Its Actions By Abusing The Corporate Form*

65.    Recognizing that the coal portfolio transfer was patently unfair to Dynegy Holdings, Defendants inserted a straw man – in the form of Dynegy Gas Investments, a new subsidiary of Dynegy Holdings formed less than a month prior to the transfer – to (a) artificially characterize a single transaction as two separate transfers, and (b) mask the violations of fiduciary duties committed by Dynegy Holdings' board of managers in approving the transaction by making a shell subsidiary the nominal bad actor. The economic realities of the transaction, made clear by, among other things, the contemporaneous execution of the two transfers (i.e., transfer of ownership of the coal portfolio from Dynegy Gas Investments to Dynegy Inc. in exchange for the undertaking, and transfer of the undertaking from Dynegy Gas Investments to Dynegy Holdings in exchange for the note) and the restatement of the undertaking to be a direct obligation between Dynegy Holdings and Dynegy Inc.), are that the transfer of the coal portfolio was conducted between Dynegy Holdings and Dynegy Inc., and the dual-transfer structure and use of a shell intermediary should be disregarded.

66.    In fact, the timing of the amendment and restatement of the undertaking speaks volumes to Defendants' true intent, as well as to the illusory nature of Dynegy Gas Investments' participation in the coal portfolio transfer. The undertaking as issued to Dynegy Gas Investments

11-38111-cgm    Doc 48    Filed 11/11/11    Entered 11/11/11 12:15:46    Main Document
Pg 70 of 96

did not include the dollar-for-dollar reduction provision – the provision providing that the principal amount of the undertaking would be reduced by one dollar for every dollar in principal amount of Dynegy Holdings senior notes and debentures that Dynegy Inc. cancels, forgives or retires. Rather that provision was inserted only in connection with the undertaking being transferred to Dynegy Holdings by Dynegy Gas Investments. Inserting the dollar-for-dollar reduction provision only after the undertaking had been transferred to Dynegy Holdings was necessary to prop up the façade that this transaction was anything other than a transaction directly between Dynegy Holdings and Dynegy Inc. Dynegy Gas Investments receives no benefit from defeasance of Dynegy Holdings senior notes and debentures, as it is a subsidiary of Dynegy Holdings and is not liable for any of Dynegy Holdings' debt obligations. As such, the inclusion in the undertaking of the dollar-for-dollar reduction provision from the outset would render the undertaking *per se* insufficient value (as noted, it was insufficient value even without the dollar-for-dollar reduction provision) because Dynegy Inc. could eliminate its payment obligations to Dynegy Gas Investments by instead satisfying the debt of Dynegy Holdings, and thereby not paying a **single dollar** to Dynegy Gas Investments in exchange for the coal portfolio equity. Accordingly Defendants had to insert the provision as part of the second "step" of the transfer to continue the myth that Dynegy Gas Investments was truly a party to the transaction.

67.    The restatement of the undertaking to include the dollar-for-dollar reduction provision also demonstrates Dynegy Inc.'s complete domination and control over Dynegy Holdings and Dynegy Holdings' managers' abdication of their fiduciary duties. Amending the undertaking to insert the dollar-for-dollar reduction provision as a part of transferring the undertaking from Dynegy Gas Investments to Dynegy Holdings would be nonsensical in a transaction among independent entities: there is no reason for Dynegy Inc. to receive any

consideration (let alone consideration worth hundreds of millions of dollars) from Dynegy Holdings when Dynegy Holdings is purportedly purchasing the undertaking from Dynegy Gas Investments, *not* Dynegy Inc. There also is no reason for Dynegy Holdings to purchase the undertaking in the first place, as Dynegy Gas Investments, a wholly owned subsidiary of Dynegy Holdings that, upon information and belief, has no operations and no creditors, would have distributed any payments it received under the undertaking to Dynegy Holdings. Dynegy Holdings' actions only make sense from one perspective: that of Dynegy Inc. Not surprisingly, the amended and restated undertaking was executed on behalf of *both* Dynegy Inc. and Dynegy Holdings by Defendant Clint C. Freeland, the chief financial officer (and, upon information and belief, a shareholder) of Dynegy Inc. and chief financial officer and board member of Dynegy Holdings – hardly an arm's-length transaction.

68.    Further, the fact that (a) the undertaking Dynegy Gas Investments nominally received in exchange for the coal portfolio is so clearly of inadequate value, (b) the consideration Dynegy Holdings gave to Dynegy Gas Investments in exchange for the undertaking – a 16-year note bearing 4.24% interest and which pays no principal or interest until maturity – is so unlike any other debt instrument issued by Dynegy Holdings, and (c) Dynegy Gas Investments' board of managers also appears to have failed to undertake even cursory corporate governance processes when approving the transfer of the coal portfolio equity to Dynegy Inc., all evidence the complete domination and control exerted by Dynegy Inc. over Dynegy Gas Investments. Accordingly, Dynegy Holdings and Dynegy Gas Investments should not be treated as separate corporate entities when considering the propriety of the coal portfolio transfer.

69.    Finally, Defendants converted Dynegy Holdings from a Delaware corporation to a Delaware limited liability company *the day before* the coal portfolio was transferred to Dynegy

Inc. in a transparent attempt to minimize Dynegy Holdings' and its board of managers' fiduciary duties to creditors, on the eve of violating those duties, by taking advantage of the lower standards of duty and barriers to derivative standing that arguably apply to Delaware limited liability companies. This change of corporate form serves no legitimate business purpose, is a tacit admission by Dynegy Holdings' board of managers that they do not believe the transfer of the coal portfolio and related steps are consistent with their fiduciary duties, and itself is a violation of Dynegy Holdings' board of managers' fiduciary duties (as an attempt to avoid managers' existing duties to Plaintiff and other creditors). Clearly these managers had cause for concern: the consideration Dynegy Holdings received for the coal portfolio was woefully insufficient and materially increased the probability that Dynegy Holdings will default on its obligations in the near term; and the consideration was structured to transfer additional value from Dynegy Holdings to Dynegy Inc. as creditor fears of a default increased (and the market price of Dynegy Holdings senior notes and debentures correspondingly fell). Dynegy Holdings' board of managers had direct interests in this transaction as senior managers, directors and, upon information and belief, shareholders of Dynegy Inc., and acted solely in the interest of that company.

70.    Each of the foregoing constitutes more than abuse of the corporate form; it reflects an intentional effort by Defendants to shield themselves from liability for a transaction they knew was improper.

iii.    *The Agreements Effectuating The Transfer Of The Coal Portfolio Anticipate That Creditors Will Oppose The Transaction As Unfair To Dynegy Holdings And Its Creditors*

71.    Defendants purport to have effectuated the coal portfolio transfer through, among other documents, a Membership Interest Purchase Agreement dated September 1, 2011 (the "Purchase Agreement"). This agreement expressly reflects Defendants' understanding that, given

the unfairness of the coal portfolio transfer to Dynegy Holdings, Dynegy Holdings' creditors would have no choice but to challenge that transfer.

72.     First, the Purchase Agreement reveals Defendants' concern that the transfer would be challenged as fraudulent. That agreement provides if, within two years of the transfer, "there shall arise any dispute" as to whether the coal portfolio is worth more (or less) than $1.25 billion, either party may submit the appropriate value to binding arbitration. Purchase Agreement § 2.3. Beyond having no practical value (as both parties that may trigger this provision are dominated by Defendants), this provision would be rendered unnecessary had Defendants established the value of the coal portfolio equity through proper means.

73.     More telling, the Purchase Agreement's arbitration provision provides that

> [a]ny third party that is determined by a court of competent jurisdiction to have standing to bring any claim relating to this agreement or the transactions contemplated hereunder (including, without limitation, fraudulent conveyance and transfer claims) may intervene and participate as a party to the arbitration, provided that such third party agrees in writing with each of the parties to this agreement to be bound by this arbitration agreement.

Purchase Agreement § 5.6(c). This highly unusual provision is an acknowledgment by Defendants that, given the terms of that transfer, Dynegy Holdings' creditors were certain to challenge the coal portfolio transfer as fraudulent.

## DEFENDANTS' EXCHANGE OFFER AND PREJUDICE TO PLAINTIFF

74.     As noted, on September 15, 2011, Dynegy Inc. announced an exchange offer whereby current holders of Dynegy Holdings notes and debentures may agree to tender those notes and debentures in exchange for new notes issued by Dynegy Inc. and secured by a lien on the coal portfolio equity, and, in certain circumstances, a cash payment. Based on publicly

available information, it is unclear to Plaintiff whether consummation of the exchange offer will materially impair its ability to obtain adequate relief for the harms described in this Complaint.

75.    Specifically, a significant portion of those harms resulted from ownership of the coal portfolio being transferred away from Dynegy Holdings to Dynegy Inc. for insufficient consideration. Dynegy Inc. has not made public the indenture pursuant to which it will issue its new notes. If that indenture includes provisions that undermine this Court's ability to unwind or otherwise reverse the coal portfolio transfer, such as provisions that would cause or likely lead to an event of default under the new notes if the Court granted such relief, consummation of the exchange would not only misappropriate Dynegy Holdings' corporate opportunity to effect this exchange for its own benefit, but also would materially impair the value to Plaintiff and Dynegy Holdings of that remedy. An event of default under the new notes indenture may result in acceleration of the new notes, exercise of remedies by the new notes trustee, and events of default under the coal portfolio credit facility (if new notes holders exercise remedies against the coal portfolio equity); each of which would materially decrease the value of the coal portfolio to Dynegy Holdings and deprive Plaintiff of an appropriate remedy for the improper taking by Dynegy Inc. of ownership of the coal portfolio.

76.    In its public announcement for the exchange offer, Dynegy Inc. states:

> [T]here is no guarantee that [claims by creditors] will not be asserted [] with respect to [Defendants' August 2011 refinancing and reorganization] or other transactions effected by Dynegy and/or its subsidiaries, including Dynegy's recent acquisition of the direct ownership of [the coal portfolio]. Similar actions or claims may also be asserted with respect to the Exchange Offers. . . . In the event such litigation is not decided in our favor, a court might grant relief that adversely affects us and/or the Holders of the New Notes, including, without limitation, (i) requiring such Holders to disgorge some or all of the cash payments received pursuant to the Exchange Offers, (ii) invalidating the pledge of the equity interest in [the coal portfolio] that was granted as security

for the New Notes or any future grants of collateral (e.g., stock splits and dividends), *(iii) transferring the [coal portfolio] equity interest to [Dynegy Gas Investments] (with the direct and indirect subsidiaries of [Dynegy Coal Holdco, LLC] becoming direct and indirect subsidiaries of [Dynegy Gas Investments], and/or (iv) restoring the Holders of the New Notes to their position as holders of the Old Notes by, among other things, cancelling their New Notes.*

Dynegy Inc., Current Report (Form 8-K), at 3 (Sept. 16, 2011) (emphasis added).

77.    In reliance on these public statements regarding the ability of the coal portfolio transfer to be unwound and the exchange offer to be reversed, Plaintiff is not seeking at this time preliminary or other relief affecting Dynegy Inc.'s ability to consummate its pending exchange offer. Plaintiff, however, reserves all rights to seek such relief at any time to the extent it becomes aware of facts or circumstances that are not consistent with those statements.

78.    Plaintiff has satisfied any and all conditions precedent to asserting each of the causes of action set forth herein, except only those that Defendants have waived or have no legal entitlement to assert.

## COUNT I

### FRAUDULENT TRANSFERS
### (AGAINST DEFENDANTS DYNEGY GAS INVESTMENTS, DYNEGY HOLDINGS AND DYNEGY INC., AND THE DIRECTORS AND MANAGERS OF EACH)

79.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

80.    The transfer of the coal portfolio to Dynegy Inc. constitutes an actual fraudulent transfer under section 276 of the New York Debtor & Creditor Law.

81.    Defendants Dynegy Gas Investments and its board of managers, Dynegy Holdings and its board of managers, and Dynegy Inc. and its board of directors participated in the transfer of the coal portfolio to Dynegy Inc. with actual intent to hinder, delay and defraud

Plaintiff and Dynegy Holdings' other creditors. Defendants' goal in approving the transfer of the coal portfolio equity to Dynegy Inc. was to frustrate Plaintiff's right to be paid from and recover against the value of that asset, and not for any legitimate business purpose.

82.    Further, the transfer of the coal portfolio equity has all of the badges of fraud indicating actual fraudulent intent: First, the transferee, Dynegy Inc., wholly owns Dynegy Holdings and Dynegy Holdings' board of managers are all senior executives of Dynegy Inc. Mr. Flexon also is a member both of the board of managers of Dynegy Holdings and of the board of directors of Dynegy Inc. Second, the coal portfolio transfer is highly unusual, and is outside the ordinary course of Dynegy's business. Third, the transfer was conducted in secret, and was completed quickly after the purportedly-unrelated internal reorganization that made it possible was concluded. Fourth, the consideration for the transfer was clearly inadequate. Fifth, Dynegy Holdings was insolvent at the time of the transfer, and was made more insolvent by the transfer. Sixth, the transfer is an integral part of a course of conduct designed to transfer value from creditors to shareholders.

83.    As a result of Defendants' actions, Plaintiff has suffered damages for which it is entitled to redress in the form of an injunction, damages, and such other relief as the Court deems just and proper.

## COUNT II

### FRAUDULENT TRANSFERS
### (AGAINST DEFENDANTS DYNEGY GAS INVESTMENTS, DYNEGY HOLDINGS AND DYNEGY INC.)

84.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

85.     The transfer of the coal portfolio to Dynegy Inc. constitutes a constructively fraudulent transfer under sections 273-275 of the New York Debtor & Creditor Law.

86.     Dynegy Holdings was insolvent at the time the coal portfolio was transferred to Dynegy Inc., and was rendered more insolvent by the transfer. The consideration Dynegy Holdings received for the coal portfolio – Dynegy Inc.'s undertaking – does not constitute fair consideration for the coal portfolio as the value of the undertaking is disproportionately small when compared to the value of the coal portfolio and the exchange was not made in good faith.

87.     As a result of Defendants' actions, Plaintiff has suffered damages for which it is entitled to redress in the form of an injunction, damages, and such other relief as the Court deems just and proper.

## COUNT III

## BREACH OF CONTRACT, INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST ALL DEFENDANTS)

88.     Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

89.     Transfer of the coal portfolio constitutes a transfer of substantially the entirety of Dynegy Holdings' assets, in that the coal portfolio represents approximately 65% of revenues generated by Dynegy Holdings' operating subsidiaries. Further, Dynegy Holdings' conversion from a corporation to a limited liability company also constitutes a transfer of substantially the entirety of Dynegy Holdings' assets. As Dynegy Holdings has not met the requirements of Section 4.2 of the Guaranties, it has breached its contracts with Plaintiff.

90.     Further, Dynegy Holdings, as agent for the Defendants, represented to Plaintiff and the Series A and Series B Note holders that their claims would be backstopped by the asset values of and cash flows generated by Dynegy Holdings' operating subsidiaries, including those

in the coal portfolio. Given these representations, a reasonable person in the position of Plaintiff would be justified in understanding that the Guaranties included an implied promise that Dynegy Holdings would not permit its material operating subsidiaries to be transferred out from under it, and up to Dynegy Inc., without fair consideration.

91.     Dynegy Holdings' active participation in taking the coal portfolio away from Plaintiff is a violation of the covenant of good faith and fair dealing implied in the Guaranties. The other Defendants have been and remain active co-conspirators and aiders and abetters of such breach.

92.     By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT IV

## BREACH OF FIDUCIARY DUTIES – CONVERSION OF CORPORATE OPPORTUNITY (MANAGERS OF DYNEGY HOLDINGS)

93.     Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

94.     Dynegy Holdings was insolvent at the time of the transfer of the coal portfolio to Dyengy Inc. Accordingly, the directors of Dynegy Holdings owed duties of good faith, loyalty and care to Dynegy Holdings' creditors, including Plaintiff.

95.     Defendants Robert C. Flexon, Clint C. Freeland, and Kevin T. Howell are members of the board of managers of Dynegy Holdings. Upon information and belief, each Defendant also owns shares in Dynegy Inc. and accordingly benefits personally from any transfer of value from Dynegy Holdings' creditors to Dynegy Inc. and its shareholders.

96.     Integral to the duty of loyalty is that Dynegy Holdings' board of managers will not, without consent, divert and exploit for their own benefit any opportunity that should be

deemed an asset of the corporation. Dynegy Holdings' board did just that, however, when it approved the amended and restated undertaking. Specifically, Dynegy Holdings agreed that Dynegy Inc., rather than Dynegy Holdings, would receive the benefit of any Dynegy Holdings senior notes and debentures that are retired, canceled or forgiven for less than par value. This ability to capture the discount on Dynegy Holdings' outstanding senior notes and debentures was a business opportunity in which Dynegy Holdings had a tangible expectancy, and therefore could not properly be taken by Dynegy Holdings' board of managers for their benefit as shareholders of Dynegy Inc.

97.     By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT V

## BREACH OF FIDUCIARY DUTIES – IMPERMISSIBLE DISTRIBUTION OF VALUE AND ILLEGAL DIVIDEND  (MANAGERS OF DYNEGY HOLDINGS AND DYNEGY INC.)

98.     Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

99.     By participating in the transfer of the coal portfolio to Dynegy Inc., and by agreeing to amend and restate the undertaking in a manner that permits Dynegy Inc. to capture the value of any discounted exchange or satisfaction of Dynegy Holdings' outstanding senior notes and debentures, in each case without receiving just compensation, Dynegy Holdings' board of managers distributed value to Dynegy Holdings' equity holder, to the detriment of Plaintiff and Dynegy Holdings' other creditors, at a time when their fiduciary duties ran to those creditors. As such, Dynegy Holdings' managers have breached their fiduciary duties to Plaintiff.

100.     Further, Dynegy Inc. and Dynegy Holdings' board of managers each knew that, at the time the distribution (i.e., the transfer of the coal portfolio to Dynegy Inc. and the amendment and restatement of the undertaking) was made and after giving effect to the distribution, Dynegy Holdings' recourse liabilities owed to third parties exceeded the fair value of its assets. Accordingly, the distribution constituted an improper dividend and distribution.

101.     By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT VI

## BREACH OF FIDUCIARY DUTIES
## (MANAGERS OF DYNEGY GAS INVESTMENTS)

102.     Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

103.     Defendants John Doe 1, John Doe 2, and John Doe 3, etc. are members of the board of managers of Dynegy Gas Investments. Upon information and belief, each Defendant also owns shares in Dynegy Inc. and accordingly benefits personally from any transfer of value from Dynegy Holdings' creditors to Dynegy Inc. and its shareholders.

104.     The managers of Dynegy Gas Investments owe duties of good faith, loyalty, and care to Dynegy Holdings, the direct or indirect equity holder of Dynegy Gas Investments. In participating in the transfer of the coal portfolio to Dynegy Inc., the Dynegy Gas Investments managers knew they were approving transactions that were not in the best interests of Dynegy Gas Investments or its equity holder, but rather had the effect of transferring away substantial value to Dynegy Inc. Accordingly, Dynegy Gas Investments' managers breached their fiduciary duties to Dynegy Holdings, including, without limitation, the duties of good faith, loyalty, and due care.

105.    By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT VII

## TORTIOUS INTERFERENCE WITH CONTRACT
## (DYNEGY INC. AND ALL OTHER DEFENDANTS EXCEPT DYNEGY HOLDINGS)

106.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

107.    Defendant Dynegy Inc. was aware of Plaintiff's contractual relationship with Dynegy Holdings under the Guaranties and other Operative Documents. Dynegy Inc. also was aware of the statements in the Registration Statement related to the Roseton and Danskammer financing transactions and other SEC filings that would cause Plaintiff to rely on Dynegy Holdings maintaining ownership of its operating subsidiaries when determining to enter into the Operative Documents with Dynegy Holdings and its affiliates. Dynegy Inc. induced Dynegy Holdings to breach the covenant of good faith and fair dealing implied in the Guaranties by, acting through the members of Dynegy Inc.'s management that are members of Dynegy Holdings' board of managers, causing Dynegy Holdings to approve the transfer of the coal portfolio to Dynegy Inc., including the provisions of the undertaking relating to retirement of Dynegy Holdings' outstanding senior notes and debentures, for less than fair value. Dynegy Inc. lacks any privilege that would allow it to induce Dynegy Holdings to breach its contracts with Plaintiff, and accordingly such actions constitute intentional interference with Plaintiff's contracts.

108.    By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT VIII

### INDUCEMENT TO BREACH CONTRACT
### (DYNEGY INC. AND ALL OTHER DEFENDANTS EXCEPT DYNEGY HOLDINGS)

109.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

110.    Defendant Dynegy Inc. was aware of Plaintiff's contractual relationship with Dynegy Holdings under the Guaranties and other Operative Documents. Dynegy Inc. also was aware of the statements in the Registration Statement related to the Roseton and Danskammer financing transactions and other SEC filings that would cause Plaintiff to rely on Dynegy Holdings maintaining ownership of its operating subsidiaries when determining to enter into the Operative Documents with Dynegy Holdings and its affiliates. Dynegy Inc. induced Dynegy Holdings to breach the covenant of good faith and fair dealing implied in the Guaranties by, acting through the members of Dynegy Inc.'s management that are members of Dynegy's board of managers, causing Dynegy Holdings to approve the transfer of the coal portfolio to Dynegy Inc., including the provisions of the undertaking relating to retirement of Dynegy Holdings' outstanding senior notes and debentures, for less than fair value. Dynegy Inc. lacks any privilege that would allow it to induce Dynegy Holdings to breach its contracts with Plaintiff, and accordingly such actions constitute improper inducement to breach Plaintiff's contracts.

111.    By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT IX

## BREACH OF FIDUCIARY DUTIES – SELF DEALING
## (MANAGERS OF DYNEGY HOLDINGS)

112.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

113.    By approving Dynegy Holdings' participation in, and by not taking steps to oppose, the transfer of the coal portfolio to Dynegy Inc. for less than fair value, and by agreeing to amend the undertaking in a manner that misappropriated Dynegy Holdings' corporate opportunities to Dynegy Inc. for no value, Messrs. Flexon, Freeland and Howell engaged in self-dealing by approving and allowing transfers that benefitted them personally at the expense of Dynegy Holdings and its creditors. Such self-dealing violates the Defendants' fiduciary duties to Plaintiff.

114.    By reason of the breaches alleged herein, Defendants are liable for damages in amounts to be determined at trial.

## COUNT X

## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

115.    Plaintiff repeats and re-alleges each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

116.    Defendants have been unjustly enriched in that they have wrongfully and unjustly benefitted from the expropriation of value rightfully belonging to Dynegy Holdings for the benefit of its creditors, including Plaintiff.

117.    It is inequitable and unjust for Defendants to reap and retain gains that they received or might in the future receive. Defendants are obligated to disgorge those monies that

they have obtained and retained improperly. As a result, the Defendants are liable for damages in an amount to be determined at trial.

## COUNT XI

### COLLAPSING TRANSACTIONS; DISREGARD OF CHANGE IN CORPORATE FORM; PIERCING OF CORPORATE VEIL (AGAINST ALL DEFENDANTS)

118.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

119.    Dynegy's scheme to take the coal portfolio away from Dynegy Holdings' creditors for the benefit of shareholders constitutes an overarching plan, and the purported separate transactions involved should be viewed as one integrated transaction. At all relevant times, Dynegy Inc., Dynegy Holdings, Dynegy Gas Investments and the members of the boards of directors and managers of each of the foregoing knew or had constructive knowledge regarding the interrelatedness of Dynegy Gas Investments' transfer of the coal portfolio equity to Dynegy Inc. in exchange for the undertaking and Dynegy Gas Investments' assignment of the undertaking to Dynegy Holdings. Further, the transactions occurred at substantially the same time, and each transfer was dependent on all the other transfers occurring to effect Defendants' goal with respect to the transaction: to transfer the coal portfolio equity to Dynegy Inc. in exchange for an undertaking that allows Dynegy Inc. to capture the market discount of Dynegy Holdings' outstanding senior notes and debentures. Each transfer constituted only a step in Defendants' overall plan, and accordingly that plan must be viewed as a whole with all its implications; i.e., as a transfer of the coal portfolio from Dynegy Holdings to Dynegy Inc., and of the undertaking (as amended and restated) from Dynegy Inc. to Dynegy Holdings. Defendants should not be permitted to launder an otherwise improper transfer through a shell company to avoid liability for their actions.

120.    Further, Dynegy Holdings' conversion from a corporation to a limited liability company on the eve of the coal portfolio transfer should not be countenanced. The conversion is a brazen attempt to take advantage of the lower fiduciary standards arguably applicable to members and managers of a limited liability company than to the board of directors of a corporation, to shield Dynegy Holdings and its board of managers from the breaches they knew they would commit *the next day*. Dynegy Holdings' conversion to a limited liability company has no legitimate business purpose and serves only to support the bad acts of Dynegy Holdings' board of managers. All of Dynegy Holdings' creditors lent to a Delaware corporation, and Dynegy Holdings' insolvency means that it owes fiduciary duties to those creditors. Dynegy Holdings should not be allowed to hide from its obligations by flipping back and forth between legal forms for no reason other than to facilitate the defrauding of its creditors. Accordingly, Dynegy Holdings and its board of managers should be deemed to have the duties, fiduciary and otherwise, with respect to the transactions described herein, that they would have if Dynegy Holdings were a Delaware corporation.

121.    Defendants have used the corporate form of Dynegy Holdings to commit fraud and other serious wrongdoing. Further, as described above Dynegy Inc. so thoroughly dominated and controlled Dynegy Holdings and Dynegy Gas Investments so as to make one the alter ego of the other. Accordingly, and given the real and live controversy between the parties concerning the bona fides of the transactions alleged herein, Dynegy Inc., Dynegy Holdings and Dynegy Gas Investments should each be fully liable for the debts of, and breaches of contract and torts committed by, the other.

## COUNT XII

## DERIVATIVE STANDING FOR CERTAIN CAUSES OF ACTION
## (AGAINST ALL DEFENDANTS)

122.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

123.    Plaintiff asserts that none of the claims and causes of action alleged herein is derivative in nature but are direct claims against the active and liable wrongdoers. In the alternative, insofar as any claims or causes of action in this Complaint are deemed to be of a derivative nature, Plaintiff was not under an obligation to make a demand on the Dynegy Holdings board of managers. At the time this action was initiated, the board of managers was comprised of three managers, each of whom is named as a Defendant (the "DH Manager Defendants"). Plaintiff thus did not issue a demand upon the DH Manager Defendants prior to instituting this action because each of the DH Manager Defendants either (a) engaged in conduct that is not a legitimate exercise of judgment and/or is *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (b) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because he faces a substantial likelihood of liability for his role in the improper conduct described above.

124.    The DH Manager Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of the systematic stripping of assets and corporate opportunities to the detriment of Dynegy Holdings' creditors, including Plaintiff. In essence, as the "ultimate decision-making body" of Dynegy Holdings, the board of managers affirmatively adopted, implemented, and condoned a business strategy intended to breach Dynegy Holdings' lawful obligations to creditors. Breaking the law is not a legally protected business decision and such

conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Dynegy Holdings board of managers is excused.

125.    Even if knowingly directing and/or approving improper conduct could somehow fall within the ambit of the business judgment rule (which it does not), demand is also futile and excused because none of the members of the current Dynegy Holdings board of managers are disinterested or independent and they cannot, therefore, properly consider any demand.

126.    By reason of the foregoing, the Court should declare that the claims and causes of action herein alleged are direct and not derivative in nature and that, to the extent any such claims or causes of action are derivative in nature, demand has been excused.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court grant the following relief:

127.    Declarations as set forth above, including, and in addition and without limitation, that the transfer of the coal portfolio to Dynegy Inc. constituted actual and constructive fraudulent transfers, and declaring null, void, and of no further force and effect those transfers and (a) the Membership Interest Purchase Agreement by and between Dynegy Gas Investments and Dynegy Inc., dated September 1, 2011, (b) the Amended and Restated Undertaking Agreement by and between Dynegy Holdings and Dynegy Inc., dated September 1, 2011, and (c) the Promissory Note by and between Dynegy Holdings and Dynegy Gas Investments, dated September 1, 2011;

128.    Damages in amounts to be proved at trial;

129.    Permanent injunctive relief, including enjoining each of the Defendants from taking any steps adverse to Plaintiff's lawful interests and entitlements;

130.     Imposition of a constructive trust, including without limitation establishment of a constructive trust on the equity interests in Dynegy Coal Holdco, LLC and any distributions made by Dynegy Coal Holdco, LLC on or after September 1, 2011, and any and all proceeds of the foregoing, for the benefit of Plaintiff;

131.     A determination that each Defendant breached Plaintiff's contracts, including Section 4.2 and the implied covenant of good faith and fair dealing in each of the Guaranties, breached fiduciary duties as well as duties of care and loyalty, and engaged in improper self-dealing;

132.     A determination that Dynegy Inc. has tortiously interfered with and induced the breach of Plaintiff's contracts with Dynegy Holdings by intentionally inducing Dynegy Holdings to breach those contracts as well as the covenant of good faith and fair dealing implied in each of the Guaranties;

133.     Costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs and expenses;

134.     Interest on amounts recovered to the fullest extent permitted by law, including without limitation at the higher of the market or statutory rate; and

135.     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury with respect to each claim, cause of
action, and issue for which a trial by jury is legally available.

Dated: New York, NY
       September 27, 2011

**CADWALADER, WICKERSHAM & TAFT LLP**

By:____/s/ Louis M. Solomon_____
    George A. Davis
    Louis M. Solomon
    Hal S. Shaftel

Office and Post Office Address

    One World Financial Center
    New York, NY 10128
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666

*Attorneys for U.S. Bank National Association*

**<u>EXHIBIT B</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                               :

In re:                                 :              **Chapter 11**

                                      :

**DYNEGY HOLDINGS, LLC, et al.,**[1]       :              **Case No. 11-38111 (CGM)**

                                      :

                    **Debtors.**           :              **Jointly Administered**

                                        :

-----------------------------------------------------------------x

### ORDER GRANTING THE MOTION OF U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, FOR APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

Upon the *Motion of U.S. Bank National Association, as Indenture Trustee, for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* (the "***Motion***")[2] requesting entry of an order approving and directing the appointment of an independent examiner in Dynegy Holdings' case pursuant to section 1104(c) of the bankruptcy code; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the Court having heard the statements in support of the Motion at the hearing before the Court; and the Court having determined that there exists just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation; it is hereby

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are Dynegy Holdings, LLC (8415); Dynegy Northeast Generation, Inc. (6760); Hudson Power, L.L.C. (NONE); Dynegy Danskammer, L.L.C. (9301); and Dynegy Roseton, L.L.C. (9299).

[2]   Terms used but not defined herein shall have the meaning ascribed to them in the Motion.

**ORDERED** that the Motion is granted to the extent provided herein; and it is further

**ORDERED** that pursuant to section 1104(d) of the bankruptcy code, the United States Trustee shall, in consultation with Dynegy Holdings, the Official Committee of Unsecured Creditors (the "***Creditors Committee***"), the Indenture Trustee, and other parties in interest, promptly appoint an examiner (the "***Examiner***") in Dynegy Holdings' case; and it is further

**ORDERED** that pursuant to section 1106 of the bankruptcy code, the Examiner shall conduct an investigation and report to the Court and parties in interest in Dynegy Holdings' case, with respect to the following:

- the structuring, negotiation, and closing of the August 2011 new financing and reorganization, including, without limitation, the impetus for the dividend restrictions and internal reorganization, the reasons for the inclusion of a change of control provision that allowed the coal portfolio equity to be transferred to Dynegy Inc., and the participation of members of the Control Group in, and the benefits they derived from, the new financing, dividend restrictions and internal reorganization;

- the structuring, negotiation, and closing of the transfer of the coal portfolio equity to Dynegy Inc., including, without limitation, the reasons for the formation of Dynegy Gas Investments and the inclusion of that entity in the transfer, the reasons for the amendment and restatement of the undertaking upon its assignment to Dynegy Holdings, whether the two steps of the transaction should be disregarded, and the value of the coal portfolio equity and the consideration paid to Dynegy Holdings;

- the structuring, negotiation, and execution of the November 7, 2011 restructuring support agreement, including, without limitation, the determination to leave equity unimpaired, the timing of milestones set out in the agreement, the agreement's adherence to the Debtors' fiduciary obligations to creditors, and whether continued pursuit of a plan based on the agreement is an appropriate use of Dynegy Holdings' resources in advance of (i) pursuit of any estate claims the examiner recommends be pursued in order to restore assets to Dynegy Holdings' estate and (ii) a determination on the allowed amount of claims that the agreement seeks to cap under section 502(b)(6);

- the entire fairness of each of the above transactions to Dynegy Holdings and its creditors, including, without limitation, the Control Group's compliance with its fiduciary duties to creditors;

- any potential causes of action that Dynegy Holdings' estate may have arising out of any of the foregoing or any related actions, including any prepetition dividends or distributions made while Dynegy Holdings was insolvent, including causes of action against Dynegy Inc., Dynegy Holdings' other affiliates, Dynegy Holdings' prepetition advisors, or the Control Group;

- whether equitable subordination or the designation of votes of any claims against or interests in Dynegy Holdings, including, without limitation, claims or interests held by the Control Group, is warranted;

- whether the mismanagement of Dynegy Holdings or breaches of fiduciary duties by any members of the Control Group necessitate the appointment of a trustee to oversee Dynegy Holdings' estate; and

- whether substantive consolidation of Dynegy Holdings and some or all of its non-debtor affiliates is warranted based on Dynegy Inc.'s domination and control of Dynegy Holdings and its subsidiaries;

and it is further

**ORDERED** that the Examiner may retain counsel and any other professionals as may be necessary for the Examiner to perform its duties, which retention shall be subject to Court approval under standards equivalent to those set forth in section 327 of the bankruptcy code; and it is further

**ORDERED** that the Examiner and any professionals retained by the Examiner shall be compensated and reimbursed for their expenses by Dynegy Holdings' estate pursuant to any procedures for interim compensation and reimbursement of professionals that are established in Dynegy Holdings' case. Compensation and reimbursement of the Examiner shall be determined pursuant to section 330 of the bankruptcy code, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in section 330 of the bankruptcy code; and it is further

**ORDERED** that the Examiner shall have the standing of a party in interest with respect to matters that are within the scope of its investigation, and shall be entitled to appear and be heard at any hearings in Dynegy Holdings' case; and it is further

**ORDERED** that the Examiner is authorized, pursuant to Bankruptcy Rule 2004, to issue subpoenas as may be necessary to compel the production of documents and the testimony of witnesses in connection with its investigation; and it is further

**ORDERED** that the Examiner shall serve each subpoena and a copy of this Order on the target of the subpoena, with a copy to (i) Dynegy Holdings; (ii) the Creditors' Committee; (iii) the United States Trustee; and (iv) the Indenture Trustee (collectively, the "***Notice Parties***"), and shall file with the Court an affidavit of service for each subpoena that is served, and the Notice Parties shall be permitted to attend and observe any such depositions; and it is further

**ORDERED** that unless otherwise ordered by the Court, witnesses shall have at least ten (10) days from the service of a subpoena to either (i) produce to the Examiner all responsive documents requested in the Examiner's subpoena or (ii) file with the Court an objection or response to the subpoena, with a hearing promptly scheduled; and it is further

**ORDERED** that Dynegy Holdings, the other debtors, their affiliates, the members of the Control Group, and their respective professionals, and all other parties in interest are directed to cooperate fully with the Examiner in conjunction with the performance of any of the Examiner's duties and investigation; and it is further

**ORDERED** that Dynegy Holdings, the other debtors, the Creditors' Committee, and all other parties in interest shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, or duplication of, the Examiner's investigation; and it is further

**ORDERED** that within ten (10) business days after entry of this Order, the Examiner shall file with the Court a proposed work plan that shall include, but not be limited to, an estimated budget of the costs and expenses related to the Examiner's investigation, which shall be subject to the approval of the Court on ten (10) days' notice to Dynegy Holdings, the Creditors' Committee, the Indenture Trustee, and all other parties that have filed a notice of appearance in these cases; and it is further

**ORDERED** that pursuant to section 1106(a)(4), the Examiner shall provide an initial report of its investigation no later than ninety (90) days after the appointment of the Examiner, and if necessary, a final report no later than one hundred and eighty (180) days after appointment, in each case unless extended by order of the Court, and shall transmit a copy or a summary of any such report to the Creditors' Committee, any equity security holders' committee, any indenture trustee (including the Indenture Trustee) and any other entity that the Court may designate; and it is further

**ORDERED** that until the Examiner has filed its report, neither the Examiner nor the Examiner's professionals or agents shall make any public disclosures concerning the investigation or the performance of the Examiner's duties; and it is further

**ORDERED** that nothing in this Order shall impede the rights of the United States Trustee, the Creditors' Committee, Dynegy Holdings, the other debtors, the Examiner, the Indenture Trustee or any other party in interest to seek any other relief from this Court, including, but not limited to, a request to expand the scope of the Examiner's investigation or any other relief such party may otherwise deem appropriate in furtherance of the discharge of the Examiner's duties; and it is further

**ORDERED** that the Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:   Poughkeepsie, NY
_____, 2011

_____
UNITED STATES BANKRUPTCY JUDGE