**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                          :
In re:                                    :        **Chapter 11**
                                          :
**DYNEGY HOLDINGS, LLC, <u>et al.</u>,**[1]        :        **Case No. 11-38111 (CGM)**
                                          :
                                          :        **Jointly Administered**
          **Debtors.**                    :
                                          :
                                          :
--------------------------------------------------------------x
                                          :
**THE SUCCESSOR LEASE INDENTURE**         :
**TRUSTEE under the Indenture of Trust,** :        **Adversary Case No. 11-_____**
**Mortgage, Assignment of Leases and Rents and** :
**Security Agreement related to Roseton Units 1 and** :
**2 and THE SUCCESSOR LEASE INDENTURE**   :
**TRUSTEE under the Indenture of Trust,** :
**Mortgage, Assignment of Leases and Rents and** :
**Security Agreement related to Danskammer Units** :
**3 and 4, U.S. BANK NATIONAL ASSOCIATION,** :
                                          :
          **Plaintiff,**                  :
                                          :
     **v.**                               :
                                          :
**DYNEGY HOLDINGS, LLC, DYNEGY**          :
**ROSETON, L.L.C., and DYNEGY**           :
**DANSKAMMER, L.L.C.,**                   :
                                          :
          **Defendants.**                 :
--------------------------------------------------------------x

### COMPLAINT FOR DECLARATORY JUDGMENTS THAT 11 U.S.C. § 502(B)(6) IS NOT APPLICABLE TO CLAIMS ARISING FROM OR RELATED TO THE ROSETON <u>AND DANSKAMMER PERSONAL PROPERTY LEASES AND GUARANTIES</u>

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are Dynegy Holdings, LLC (8415); Dynegy Northeast Generation, Inc. (6760); Hudson Power, L.L.C. (NONE); Dynegy Danskammer, L.L.C. (9301); and Dynegy Roseton, L.L.C. (9299).

Plaintiff U.S. Bank National Association, as successor indenture trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Roseton Units 1 and 2 (the "**Roseton Indenture**") and successor indenture trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Danskammer Units 3 and 4 (the "**Danskammer Indenture**"), by and through its undersigned counsel, pursuant to direction from the Certificateholders (defined below), alleges the following upon information and belief, except as to the allegations pertaining to Plaintiff, which it alleges upon personal knowledge.

## OVERVIEW OF THIS CASE

1.      On the first day of these cases Defendants Dynegy Holdings, LLC, Dynegy Roseton, L.L.C. and Dynegy Danskammer, L.L.C. filed a motion to reject certain agreements, including the Personal Property Leases described below.[2] ECF No. 5. The motion stated that the Debtors will seek to determine Plaintiff's claims arising from this rejection under section 502(b)(6) of the bankruptcy code. Id. at ¶ 25. However, section 502(b)(6) does not apply to the Personal Property Leases. Section 502(b)(6) covers only "claim[s] of a lessor for damages resulting from the termination of a lease of real property . . . ." 11 U.S.C. § 502(b)(6). The Personal Property Leases are leases of property that "**constitutes personal property for all**

---

[2] Plaintiff intends to respond separately to that motion, and reserves all rights with respect thereto. That motion refers to the Personal Property Leases as the "Facility Leases".

*purposes* . . . ." Personal Property Leases § 2.2 (emphasis added).[3] Simply put, the Personal Property Leases are expressly leases of personal property only. The leases clearly say it, the parties clearly meant it, and New York State law clearly respects it. So does the bankruptcy code.

2.      Further, the treatment of these agreements as personal property leases is consistent (a) across all of Defendants' other leases and agreements with Plaintiff and other parties, (b) with applicable federal and state law, and (c) upon information and belief, with Defendants' and the PSEG Entities' (defined below) tax filings. Sophisticated parties, including Defendants, deliberately severed this personal property from the underlying real property and expressly limited the scope of the Personal Property Leases to that severed personal property. Defendants represented and warranted that the Personal Property Leases only cover personal property, and the PSEG Entities (defined below) negotiated the terms of and entered into these leases on that basis. The parties' agreements covering real property are separate leases that are distinct from the Personal Property Leases.

3.      Moreover, the Personal Property Leases are part of an integrated "sale-leaseback" financing structure set up to transfer certain tax benefits associated with personal property ownership to different lender parties (not the Certificateholders). In exchange, Defendants received tax benefits associated with paying rent, and a favorable rate and other terms for the financing. At the time this structure was created, it was a financing vehicle. This is obvious from Defendants' own public statements (some of which are set forth in the "Factual Background" below), including to their regulators, that the sale-leaseback transactions were "intended simply

---

[3] A copy of the Facility Lease Agreement dated as of May 8, 2001, between PSEG Roseton and Dynegy Roseton (the "***Roseton Personal Property Lease***") is attached as <u>Exhibit A</u>. A copy of the Facility Lease Agreement dated as of May 8, 2001, between PSEG Danskammer and Dynegy Danskammer (the "***Danskammer Personal Property Lease***" and, together with the Roseton Personal Property Lease, the "***Personal Property Leases***") is attached as <u>Exhibit B</u>.

to effectuate long-term financing" for the Roseton and Danskammer facilities. It is also reflected in the fact that:

- the structure of the sale-leaseback, as opposed to a "true" or "bona fide" lease, is tax-driven and its provisions differ substantially from the provisions customarily found in a bona fide lease;

- Defendants purchased the leased personal property for their own use, then sought out a financial company to "sell" the property to and immediately "lease" it back from, in exchange for a long-term loan;

- the rent schedule under the Personal Property Leases requires 85% of the rent to be paid in the first half of the lease term, and is designed expressly to repay borrowed money plus a stated yield, not a market-derived rent for use of the personal property;

- Defendants – the nominal lessees of the personal property – have assumed the burdens, risks and costs of ownership of the property, even with respect to events that are outside their control; and

- the leased personal property's useful life will be used up by the expiration of the initial lease term, making Defendants the bona fide economic owners of the leased personal property.

4.      Regardless of the nomenclature used to describe the Personal Property Leases, Plaintiff's relationship with Defendants plainly is one of lender-borrower, and therefore section 502(b)(6) does not apply. In fact, Defendants' regulators authorized Defendants to enter into the sale-leaseback transactions expressly because they are financings and because they created a lender-borrower relationship. Defendants should not be permitted to avoid their obligations to repay the hundreds of millions of dollars Certificateholders loaned to them based on a recharacterization that is completely divorced from the economic realities of the Personal Property Leases. The Personal Property Leases either are the leases of personal property they claim to be or they are financing vehicles; they simply are not bona fide leases of real property subject to section 502(b)(6).

5.      Apart from the treatment of the Personal Property Leases, section 502(b)(6) does not apply to Plaintiff's claims arising from Dynegy Holdings, LLC's ("**Dynegy Holdings**") guaranties of those leases. These guaranties are not leases, and Plaintiff is not a "lessor" under the guaranties. Accordingly, the guaranties clearly are outside the scope of section 502(b)(6). Further, Dynegy Holdings is not a party to the Personal Property Leases and is not entitled to section 502(b)(6) benefits intended for debtor-lessees under bona fide leases.

6.      Finally, the financing that the Certificateholders provided to Defendants pursuant to the Personal Property Leases and the guaranties was on terms substantially similar to those provided by other parties that loaned funds to Dynegy Holdings under more traditional financing structures (i.e., notes and debentures issued by Dynegy Holdings). Plaintiff's claims under the guaranties rank *pari passu* with the claims of these other lenders. In the Registration Statement it filed for the Certificates, Dynegy Holdings advised Certificateholders to evaluate the decision to purchase the Certificates (and accordingly provide financing under the Personal Property Leases) as if they were making loans directly to Dynegy Holdings. Artificially reducing Plaintiff's claims against Dynegy Holdings under section 502(b)(6) would provide an inappropriate windfall to Dynegy Holdings' other creditors (and its equity), and would violate a central tenant of the bankruptcy code that similarly situated creditors should be treated substantially similarly.

7.      The Court should reject any attempt to twist section 502(b)(6) to deprive Certificateholders of their right to a fair recovery on the full amount of their claims. Plaintiff requests that the Court enter an order pursuant to sections 1334(b), 1334(e) and 2201 of title 28, United States Code, sections 105 and 502 of the bankruptcy code and rules 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure granting the relief requested herein.

**JURISDICTION AND VENUE**

8.      The Court has jurisdiction over this adversary proceeding pursuant to sections 157 and 1334 of title 28, United States Code. Venue is proper pursuant to sections 1408 and 1409 of title 28, United States Code.

9.      This adversary proceeding is a core proceeding pursuant to sections 157(b)(2)(A), (B) and (O) of title 28, United States Code, and the Court may enter a final judgment as to the merits of this case.

**PARTIES**

A.      **Plaintiff**

10.     Plaintiff U.S. Bank National Association, solely in its capacities as successor indenture trustee under both the Roseton Indenture and Danskammer Indenture, is a national banking association organized under the laws of the United States. Its main office is in Cincinnati, Ohio.

B.      **Defendants**

11.     Defendant Dynegy Holdings, upon information and belief, is a Delaware limited liability company and is a debtor in these chapter 11 cases. Prior to September 1, 2011, Dynegy Holdings Inc. was a Delaware corporation.

12.     Defendant Dynegy Roseton, L.L.C. ("***Dynegy Roseton***"), upon information and belief, is a Delaware limited liability company and is a debtor in these chapter 11 cases. Dynegy Roseton is a wholly-owned indirect subsidiary of Dynegy Holdings.

13.     Defendant Dynegy Danskammer, L.L.C. ("***Dynegy Danskammer***" and, together with Dynegy Roseton, the "***Dynegy Borrowers***"), upon information and belief, is a Delaware limited liability company and is a debtor in these chapter 11 cases. Dynegy Danskammer is a wholly-owned indirect subsidiary of Dynegy Holdings.

6

C.    **Other Relevant Entities**

14.    Roseton OL LLC ("**PSEG Roseton**"), upon information and belief, is a Delaware limited liability company. PSEG Roseton is a wholly-owned, indirect subsidiary of PSEG Resources Inc.

15.    Danskammer OL LLC ("**PSEG Danskammer**" and, together with PSEG Roseton, the "**PSEG Lenders**"), upon information and belief, is a Delaware limited liability company. PSEG Danskammer is a wholly-owned, indirect subsidiary of PSEG Resources Inc.

16.    Roseton OP LLC ("**PSEG Roseton HoldCo**"), upon information and belief, is a Delaware limited liability company. PSEG Roseton HoldCo is a wholly-owned, indirect subsidiary of PSEG Resources Inc., and is the direct parent of PSEG Roseton.

17.    Danskammer OP LLC ("**PSEG Danskammer HoldCo**" and, together with PSEG Roseton HoldCo, the "**PSEG HoldCos**"), upon information and belief, is a Delaware limited liability company. PSEG Danskammer HoldCo is a wholly-owned, indirect subsidiary of PSEG Resources Inc., and is the direct parent of PSEG Danskammer.

18.    PSEG Resources Inc., upon information and belief, is a New Jersey corporation.

## FACTUAL BACKGROUND

19.    Dynegy Holdings and its parent company, Dynegy Inc., sell electric energy, capacity and ancillary services on a wholesale basis to utilities, cooperatives, municipalities, power marketers and other industry customers in six U.S. states. According to public disclosures, through their direct and indirect subsidiaries the consolidated company owns and/or operates 17 power plants fueled by a mix of coal, fuel oil and natural gas, and is the nation's third largest independent power producer.

20.     Defendants acquired the Roseton and Danskammer facilities as a result of a June 1998 order of the State of New York Public Service Commission requiring Central Hudson Gas & Electric Corporation to sell its fossil-fueled electric generation facilities. Case 96-E-0909, Central Hudson Gas and Electric Corporation – Plans for Electric Rates and Restructuring, Opinion and Order Adopting Terms of Settlement Subject to Modifications and Conditions, Opinion No. 98-14 (June 30, 1998). To comply with this order, Central Hudson commenced a sale process for, among other facilities, the Danskammer power generation facility and Central Hudson's interest in the Roseton power generation facility. The other owners of the Roseton facility joined the sales process. Central Hudson conducted a two-phase auction for the Roseton and Danskammer facilities between May and August 2000. Cases 96-E-0909, et al., Order Approving Transfer of the Danskammer and Roseton Generating Stations and Making Other Findings, at 7 (Dec. 20, 2000).

21.     On August 8, 2000, Defendants announced that Dynegy Roseton and Dynegy Danskammer had executed definitive agreements to purchase the Roseton and Danskammer facilities. The purchased facilities included:

- Roseton Facility. The Roseton facility consists of two primary generating units with a net generating capacity of 1,200 MW. Roseton Units 1 and 2 are capable of burning fuel oil and natural gas simultaneously. The facility also has substantial fuel oil storage capacity. The Roseton Units were placed into operation in 1974, and were 27 years old at the time they were purchased by Defendants.

- Danskammer Facility. The Danskammer facility consists of four primary generating units with a net generating capacity of 500 MW. Danskammer Units 1 and 2 use natural gas or fuel oil and have a combined net generating capacity of 130 MW. Danskammer Units 3 and 4 use coal or natural gas and have a combined net generating capacity of 370 MW. There are two additional small Units at the facility. The Danskammer Units 3 and 4 were placed into operation in 1959 and 1967, respectively, and were 42 and 34 years old at the time they were purchased by Defendants.

8

Defendants also purchased 380 acres of land surrounding the two facilities, as well as related rail, shipping and other fuel delivery facilities and related equipment. Dynegy Inc., Current Report (Form 8-K) (Aug. 22, 2000).

22.     Defendants intended to close their purchase of the Roseton and Danskammer facilities "with a combination of project and corporate debt." Id. When the transactions closed on January 30, 2001, however, neither Dynegy Roseton nor Dynegy Danskammer had secured third-party financing to pay the approximately $954 million needed to purchase the two facilities. Defendants instead financed the acquisitions through a $954 million intercompany loan from Dynegy Holdings, evidenced by subordinated demand notes issued by Dynegy Roseton and Dynegy Danskammer to Dynegy Holdings. Dynegy Holdings Inc., Registration Statement Under the Securities Act of 1933 (Form S-4), at F-9, F-19, 41 & 44 (July 10, 2001).

23.     This intercompany financing was a stop-gap measure while Defendants obtained long-term third party financing to replace the intercompany demand notes. In the interim, Dynegy Holdings entered into interest rate swaps and other hedges "as protection against the impact fluctuating interest rates have on an anticipated financing transaction" that would refinance those notes. Dynegy Holdings Inc., Registration Statement Under the Securities Act of 1933 (Form S-4), at F-9 & F-19 (July 10, 2001).

24.     Next, on April 23, 2001, Defendants filed a petition with the State of New York Public Service Commission seeking approval to "enter into a sale and lease-back financing transaction . . . [to] replace the short-term financing it used to close the purchase of the Danskammer and Roseton facilities." Case 01-E-0587, Dynegy Danskammer, LLC and Dynegy Roseton, LLC – Petition for Expedited Approval Under Lightened Regulation of the Issuance of Securities, Order Authorizing Issuance of Lease Obligation Notes, at 2 (Apr. 27, 2001).

25.    In order to permanently finance the Roseton and Danskammer acquisitions, Defendants sought permission to:

> enter into a sale leaseback arrangement, for financing purposes, with passive [PSEG Lenders] that will take title to and leaseback the Danskammer and Roseton facilities to the [Dynegy Borrowers]. The lease transactions will raise $920 million of the funds needed for [Dynegy's] acquisition of Danskammer and Roseton and for certain transaction expenses related to the lease transaction. . . . [The PSEG Lenders and PSEG HoldCos] are indirect, wholly owned subsidiaries of PSEG Resources. PSEG Resources is an institutional investor that provides financing to participants in various industries. Specifically, PSEG Resources manages a portfolio of over 60 separate investments across a wide spectrum of industry segments and asset types, including leveraged and direct financing leases . . . .

Case 01-E-0587, Dynegy Danskammer, LLC and Dynegy Roseton, LLC – Petition for Expedited Approval Under Lightened Regulation of the Issuance of Securities, Petition of Dynegy Danskammer, L.L.C. and Dynegy Roseton, L.L.C. for Expedited Approval under Lightened Regulation of the Issuance of Securities, at 3-5 (Apr. 23, 2001). Defendants made clear that "[t]his sale and leaseback transaction is intended to effectuate the long-term financing of the Danskammer and Roseton facilities and is similar, in concept, to a financing mechanism already approved by the Commission . . . ." Id. at 5-6. The sale-leaseback transaction "is intended simply to effectuate long-term financing," and nothing more. Case EL01-28-000, Dynegy Danskammer, L.L.C., Dynegy Roseton, L.L.C., Application for Authorization of Transaction Under Section 203 of the Federal Power Act and Request for Findings Regarding Public Utility Status, at 7 n. 10 (Jan. 10, 2001).

26.    In approving Defendants' request, the New York Public Service Commission explicitly recognized that Dynegy was seeking approval of a "financing transaction," noting:

> [W]e need not make an in-depth analysis of the proposed financing transactions. Instead, by relying on the representations made in the petition [submitted by Dynegy] . . . swift action may be taken,

avoiding constraints to financing flexibility that might hinder the development of the competitive electric market.

Case 01-E-0587, <u>Dynegy Danskammer, LLC and Dynegy Roseton, LLC – Petition for Expedited Approval Under Lightened Regulation of the Issuance of Securities</u>, Order Authorizing Issuance of Lease Obligation Notes, at 4 (Apr. 27, 2001). The Commission further determined that "the lender whose funds underlie the transaction is PSEG Resources, an institutional investor that provides financing in a variety of capital-intensive industries," and which, due to its "acting solely as financier[] in a sale and lease-back transaction," would not be subject to regulation as an electric corporation notwithstanding its nominal ownership of specified power generation equipment at the Roseton and Danskammer facilities. <u>Id.</u> at 3-4. Accordingly, the Commission authorized Defendants to enter into the Roseton and Danskammer financing transactions on or about April 27, 2001.[4]

27.    On or about May 9, 2001, Defendants "refinanced on a long-term basis" the intercompany demand notes by "complet[ing] a sale-leaseback transaction to provide the term financing for the acquisition of" the Roseton and Danskammer facilities. Dynegy Holdings Inc., Registration Statement Under the Securities Act of 1933 (Form S-4), at F-9, F-11, F-19 & F-21 (July 10, 2001). Specifically, Dynegy Roseton obtained approximately $620 million in financing under the Roseton Personal Property Lease and related guaranty and other financing agreements (collectively, the "**Roseton Financing Agreements**") and Dynegy Danskammer obtained approximately $300 million in financing under the Danskammer Personal Property Lease and related guaranty and other financing agreements (collectively, the "**Danskammer Financing**

---

[4] Third party insiders of the Defendants also consider the Roseton and Danskammer sale-leasebacks to be financing transactions. For example, in a November 2010 presentation, Seneca Capital, an approximately 10% equity holder of Dynegy Inc. (the direct parent of Dynegy Holdings), characterized rent payments under the Personal Property Leases as "fundamentally a repayment of debt." Dynegy Inc., Information Required In Proxy Statement (Schedule 14-A), at 34 (Nov. 5, 2010).

*Agreements*" and, together with the Roseton Financing Agreements, the "***Financing Agreements***"). Dynegy Roseton and Dynegy Danskammer used the $920 million in proceeds from these financing transactions to pay off substantially all of the intercompany notes they had issued to Dynegy Holdings. Id. at 35.

## STRUCTURE OF THE ROSETON AND DANSKAMMER SALE-LEASEBACK FINANCING TRANSACTIONS

28.    As described below, the Roseton Financing Agreements and Danskammer Financing Agreements each were structured as "sale-leasebacks" to take advantage of certain federal tax provisions relating to depreciation of personal property and treatment of rent, among others, which allowed Defendants to obtain financing at lower rates than they could obtain under traditional financing structures. Similar financing structures often are employed in the power generation industry.

29.    The tax-driven nature of these transactions dictated that the personal property at each facility be treated entirely separately from the real property. Accordingly, these transactions employed three separate leases:

- the Personal Property Leases, which address the personal property at the facilities;

- the Real Property Leases, which address the real property at the facilities; and

- the Real Property Subleases, which also address the real property at the facilities.

30.    The Personal Property Leases are leases of personal property. The Real Property Leases and Real Property Subleases are leases of real property.

12

A.    **The Roseton Financing Transaction**

31.    Under the Roseton Financing Agreements, Dynegy Roseton "sold" the Roseton facility's Units 1 and 2, along with related personal property (collectively, the "***Transferred Roseton Personal Property***"), to PSEG Roseton, in exchange for approximately $620 million in long-term financing. The relevant documents are explicit that Dynegy Roseton did ***not*** transfer ownership of any of the Roseton facility's real property to PSEG Roseton. PSEG Roseton immediately leased back to Dynegy Roseton all of the Transferred Roseton Personal Property pursuant to the Roseton Personal Property Lease, and Dynegy Holdings fully and unconditionally guarantied Dynegy Roseton's performance under the Roseton Personal Property Lease.[5]

32.    Separately, Dynegy Roseton leased to PSEG Roseton the real property on which the Transferred Roseton Personal Property sits and PSEG Roseton immediately subleased that real property back to Dynegy Roseton.[6] Accordingly, PSEG Roseton is the owner and lessor of the Transferred Roseton Personal Property under the Roseton Personal Property Lease. Dynegy Roseton is the owner and lessor of the Roseton facility's real property under the Roseton Real Property Lease.

33.    PSEG Roseton obtained the $620 million it loaned to Dynegy Roseton under the Roseton Financing Agreements from two sources. First, PSEG Roseton HoldCo, the direct

---

[5] A copy of the Guaranty dated as of May 1, 2001, by and among Dynegy Holdings, as guarantor, Plaintiff's predecessor-in-interest, PSEG Roseton, PSEG Roseton HoldCo and certain other parties, related to the Roseton Personal Property Lease (the "***Roseton Guaranty***"), is attached as Exhibit C.

[6] A copy of the Site Lease Agreement dated as of May 8, 2001, between Dynegy Roseton and PSEG Roseton (the "***Roseton Real Property Lease***") is attached as Exhibit D. A copy of the Site Sublease Agreement dated as of May 8, 2001, between PSEG Roseton and Dynegy Roseton (the "***Roseton Real Property Sublease***") is attached as Exhibit E.

parent of PSEG Roseton, made a contribution to PSEG Roseton of $80.6 million (plus additional amounts to fund costs related to closing the financing transaction).

34.    Second, PSEG Roseton issued an aggregate of $64,325,000 in 7.27% Series A Notes and $475,075,000 in 7.67% Series B Notes (together, the "***Roseton Lessor Notes***") under the Roseton Indenture to pass through trusts. In turn, the pass through trusts sold certificates ("***Certificates***") evidencing factional undivided interests in the trusts (and accordingly, in the Roseton Lessor Notes) to third parties (the "***Certificateholders***"). Accordingly, the Certificateholders are the economic and beneficial owners of the Roseton Lessor Notes.

35.    The Roseton Lessor Notes are non-recourse to PSEG Roseton and are secured by a first priority security interest in and assignment of substantially all of PSEG Roseton's rights under the Roseton Personal Property Lease and related agreements (other than certain specified rights related to tax indemnities and other matters). Furthermore, Dynegy Roseton makes rent payments under the Roseton Personal Property Lease directly to Plaintiff (as trustee for the Roseton Lessor Notes), which uses the funds to pay principal and interest due on the Roseton Lessor Notes and remits any remaining amounts to PSEG Roseton. The "rent" due under the Roseton Personal Property Lease matches to the day the timing and amounts of principal and interest due on the Roseton Lessor Notes, plus additional amounts to repay PSEG Roseton's contribution with a predetermined yield.

36.    Accordingly, PSEG Roseton is the issuer of the notes in name only; the true obligors are Dynegy Roseton, by virtue of its commitment to make payments directly to Plaintiff to pay principal and interest on the Roseton Lessor Notes, and Dynegy Holdings, by virtue of its guaranty of those payments. PSEG Roseton merely is the junior participant in the financing, and its right to be repaid for the amounts it loaned and to take actions against the Transferred

Roseton Personal Property if Dynegy Roseton defaults are subordinate to the Certificateholders'
rights to repayment and remedies.

37.    A chart illustrating the transactions effected by the Roseton Financing
Agreements is below:



## B.    The Danskammer Financing Transaction

38.    The Danskammer Financing Agreements effectuated substantially the same series
of transactions with respect to Dynegy Danskammer's interest in the Danskammer facility's
Units 3 and 4 (but not any of the other four Units), along with related personal property
(collectively, the "*Transferred Danskammer Personal Property*" and, together with the
Transferred Roseton Personal Property, the "*Transferred Personal Property*"). Namely, Dynegy
Danskammer "sold" the Transferred Danskammer Personal Property to PSEG Danskammer, in
exchange for approximately $300 million in long-term financing. The relevant documents are
explicit that Dynegy Danskammer did ***not*** transfer ownership of any of the Danskammer

facility's real property to PSEG Danskammer. PSEG Danskammer immediately leased back to Dynegy Danskammer all of the Transferred Danskammer Personal Property pursuant to the Danskammer Personal Property Lease, and Dynegy Holdings fully and unconditionally guarantied Dynegy Danskammer's performance under the Danskammer Personal Property Lease.[7]

39.    Separately, Dynegy Danskammer leased to PSEG Danskammer the real property on which the Transferred Danskammer Personal Property sits and PSEG Danskammer immediately subleased that real property back to Dynegy Danskammer.[8] Accordingly, PSEG Danskammer is the owner and lessor of the Transferred Danskammer Personal Property under the Danskammer Personal Property Lease. Dynegy Danskammer is the owner and lessor of the Danskammer facility's real property under the Danskammer Real Property Lease.

40.    PSEG Danskammer obtained the $300 million it loaned to Dynegy Danskammer under the Danskammer Financing Agreements through a $39 million (plus additional amounts to fund costs related to closing the financing transaction) contribution from PSEG Danskammer HoldCo, the direct parent of PSEG Danskammer, and by issuing an aggregate of $185,675,000 in 7.27% Series A Notes and $75,325,000 in 7.67% Series B Notes (together, the "**Danskammer Lessor Notes**" and, together with the Roseton Lessor Notes, the "**Lessor Notes**") under the

---

[7] A copy of the Guaranty dated as of May 1, 2001, by and among Dynegy Holdings, as guarantor, Plaintiff's predecessor-in-interest, PSEG Danskammer, PSEG Danskammer HoldCo and certain other parties, related to the Danskammer Personal Property Lease (the "**Danskammer Guaranty**" and, together with the Roseton Guaranty, the "**Guaranties**"), is attached as Exhibit F.

[8] A copy of the Site Lease Agreement dated as of May 8, 2001, between Dynegy Danskammer and PSEG Danskammer (the "**Danskammer Real Property Lease**" and, together with the Roseton Real Property Lease, the "**Real Property Leases**") is attached as Exhibit G. A copy of the Site Sublease Agreement dated as of May 8, 2001, between PSEG Danskammer and Dynegy Danskammer (the "**Danskammer Real Property Sublease**" and, together with the Roseton Real Property Sublease, the "**Real Property Subleases**") is attached as Exhibit H.

Danskammer Indenture to the same pass through trusts that hold the Roseton Notes. Accordingly, the Certificateholders also are the economic and beneficial owners of the Danskammer Lessor Notes.

41.    Similar to the Roseton Lessor Notes, the Danskammer Lessor Notes are non-recourse to PSEG Danskammer and are secured by a first priority security interest in and assignment of substantially all of PSEG Danskammer's rights under the Danskammer Personal Property Lease and related agreements (other than certain specified rights related to tax indemnities and other matters). Furthermore, Dynegy Danskammer makes rent payments under the Danskammer Personal Property Lease directly to Plaintiff (as trustee for the Danskammer Lessor Notes), which uses the funds to pay principal and interest due on the Danskammer Lessor Notes and remits any remaining amounts to PSEG Danskammer. The "rent" due under the Danskammer Personal Property Lease matches to the day the timing and amounts of principal and interest due on the Danskammer Lessor Notes, plus additional amounts to repay PSEG Danskammer's contribution with a predetermined interest rate.

42.    Accordingly, PSEG Danskammer is the issuer of the notes in name only; the true obligors are Dynegy Danskammer, by virtue of its commitment to make payments directly to Plaintiff to pay principal and interest on the Danskammer Lessor Notes, and Dynegy Holdings, by virtue of its guaranty of those payments. PSEG Danskammer merely is the junior participant in the financing, and its right to be repaid for the amounts it loaned and to take actions against the Transferred Danskammer Personal Property if Dynegy Danskammer defaults are subordinate to the Certificateholders' rights to repayment and remedies.

**C.     Additional Obligations Undertaken By Defendants In Connection
        With The Financing Transactions**

43.     The financing and securities markets also recognize that the "sale-leasebacks"
represent loans made to the Dynegy Borrowers by the Certificateholders and the PSEG Lenders,
and that the Dynegy Borrowers and Dynegy Holdings are the true obligors for these loans. As a
result, Dynegy Holdings and its parent, Dynegy Inc., treat the Certificates (which represent
interests in the Lessor Notes) as securities issued by Dynegy, including:

- preparing and filing with the Securities and Exchange Commission the
  required registration statement permitting the Certificates to be publicly
  traded;

- preparing and filing with the Securities and Exchange Commission
  company, financial and other information with respect to Dynegy; and

- paying the administrative and other costs of the pass through trusts that
  issued the Certificates.

**THE PERSONAL PROPERTY LEASES
ARE LEASES OF PERSONAL PROPERTY**

44.     The Personal Property Leases expressly are leases *only* of personal property; they
expressly are *not* leases of real property. Section 2.2 of each Personal Property Lease provides
that:

> Title to the [Transferred Personal Property], and every portion
> thereof is severed, and shall be and remain severed, from title to
> the real estate . . ., and shall not, except as specifically
> contemplated by the [Financing Agreements], be affected in any
> way by any instrument dealing with the [underlying real estate] or
> any part thereof. ***The [Transferred Personal Property] constitutes
> personal property for all purposes,*** other than possibly for the
> purposes of laws relating to ad valorem or property taxes.

Personal Property Leases § 2.2 (emphasis added).

45.    The Real Property Leases and Real Property Subleases also make clear that the

Transferred Personal Property is personal property and **only** personal property. Specifically, each

Real Property Lease provides that:

> The [Transferred Personal Property and related property], all
> equipment at any time acquired by the [PSEG Lenders] and located
> on the [real property covered by the Real Property Lease] and each
> part thereof have been severed by agreement and intention of the
> parties hereto from the [real property] and from title thereto and ***(i)
> shall be considered as personal property of the [PSEG Lenders],
> (ii) even though attached or affixed to or installed upon the [real
> property], as the case may be, shall not be considered to be
> fixtures or a part of the [real property]*** . . . . [T]he [PSEG
> Lenders] shall have the right to remove, from time to time, the
> [Transferred Personal Property and related property] or any part
> thereof or any such other equipment and property relating solely to
> the [Transferred Personal Property] at any time acquired by the
> [PSEG Lenders], from the [real property] . . . .

Real Property Leases § 9 (emphasis added).

46.    The Real Property Subleases similarly provide that:

> The [Transferred Personal Property and related property], all
> equipment at any time acquired by the [PSEG Lenders] and located
> on the [real property covered by the Real Property Sublease] and
> each part thereof have been severed from the [real property] and
> from title thereto, ***shall be considered as personal property, and
> even though attached or affixed to or installed upon the [real
> property], as the case may be, shall not be considered to become
> fixtures or a part of the [real property]***.

Real Property Subleases § 8 (emphasis added).

47.    The explicit categorization of the Transferred Personal Property as personal

property carries through to other Financing Agreements. Specifically, the Tax Indemnity

Agreements (defined and described below) provide that:

> 100% of the Purchase Price [for the Transferred Personal Property]
> will be allocable to property that constitutes 20-year property
> under section 168(e) of the [Internal Revenue] Code and the
> [PSEG Lenders] will be entitled to 20-year, 150% declining
> balance (switching to the straight line method when most

19

favorable) depreciation deductions with respect to such property . . . ."

Tax Indemnity Agreements § 1(a).[9] Moreover, each Dynegy Borrower represents and warrants in the Tax Indemnity Agreements that "100% of the [PSEG Lenders' and their affiliates'] basis in the [Transferred Personal Property] will be allocable to 20-year property described in section 168(c)(1) of the [Internal Revenue] Code." Tax Indemnity Agreements § 4(g). This is important because nonresidential real property is not eligible for 150% declining balance depreciation deductions and 20-year depreciation schedules. Even where that real property is depreciable, it must be depreciated on a straight line basis, and must be depreciated over 39 years, not 20. 26 U.S.C. § 168(b)(3). By definition, then, 100% of the Transferred Personal Property must be personal property – and cannot be real property – to obtain the tax treatment the parties intended and which the Dynegy Borrowers represented and warranted (and guarantied through the Tax Indemnity Agreements as described below) it would have. Upon information and belief, the Dynegy Borrowers, Dynegy Holdings and the PSEG Lenders each consistently have treated 100% of the Transferred Personal Property as personal property for, among others, federal income tax purposes.

48.    The Financing Agreements contain other provisions that expressly treat the Transferred Personal Property as personal property. First, upon expiration or earlier termination of certain of the Financing Agreements, the Dynegy Borrowers are obligated, at their sole risk and expense, to "dismantle the [Transferred Personal Property] . . . and cause it to be delivered to a railhead or other suitable common carrier" for shipment to the PSEG Lenders. Real Property

---

[9] Copies of the Tax Indemnity Agreement with respect to the Roseton Financing Agreements and Danskammer Financing Agreements, as filed by the PSEG Entities with the New York State Supreme Court in the action Resources Capital Management Corp. v. Dynegy Inc., Case No. 653067/2011 (N.Y. Sup. 2011), are attached as Exhibit I and Exhibit J, respectively (collectively, the "*Tax Indemnity Agreements*").

Leases § 2.7(a). As noted above, the PSEG Lenders also are entitled to remove the Transferred Personal Property from the underlying real estate (subject to the Dynegy Borrowers' rights to use the Transferred Personal Property under the Personal Property Leases). This is consistent with the Transferred Personal Property being personal property and not affixed to or a part of the underlying real property.

49.     Second, the Dynegy Borrowers are required to obtain an appraisal from an "Independent Appraiser" regarding useful life and fair market value of the Transferred Personal Property under certain circumstances. That Independent Appraiser must "meet[] the ***personal property*** qualifications criteria established by the Appraisal Foundation." Personal Property Leases § 15 & Appendix A (emphasis added). There is no requirement that the Independent Appraiser be qualified to assess real property.

50.     Clearly the parties to the Personal Property Leases intended them to be leases of personal property. Their intent is expressly and unambiguously stated multiple times in the Personal Property Leases and other Financing Agreements. They consistently treat the Transferred Personal Property as personal property, and expressly ***not*** as real property, across all of the Financing Agreements and, upon information and belief, in the parties' federal income and other tax filings. The parties to the Personal Property Leases are sophisticated and were represented by counsel when they negotiated and drafted the leases. New York State law clearly respects parties' express statements that property covered by an agreement is personal in nature. Therefore, Plaintiff seeks a declaration that section 502(b)(6) does not apply to the Personal Property Leases.

## THE PERSONAL PROPERTY LEASES
## AND RELATED AGREEMENTS ARE FINANCING VEHICLES

51.     Not only are the Personal Property Leases clear on their face that they are not

leases of real property, but the economic realities of the Financing Agreements also underscores

that they are not leases of real property. As described above, Defendants expressly entered into

these agreements to obtain long-term financing for their purchase of the Roseton and

Danskammer facilities. The terms of the agreements also reflect that these are financing vehicles,

and not bona fide leases.

**A.     The Personal Property Leases Are Not Bona Fide Leases**

52.     The Personal Property Leases include a number of provisions that demonstrate

that they are financing arrangements. These and other provisions are inconsistent with the leases

being bona fide leases that would create a landlord-tenant relationship. For example:

- The semi-annual rent payments due under the Personal Property Leases vary wildly during the lease term. More than 85% of the total rent due under the leases is due in the first half of the initial lease term, and no rent is due for the final five years. Additionally, the amount due for each six-month period varies from $0 to over $137 million. Such variation is inconsistent with bona fide leases.

- Rent payments may be adjusted under certain circumstances unrelated to the leased personal property, so long as the after-tax return to the PSEG Lenders is maintained. This is inconsistent with bona fide leases, where rent adjustments are tied to the use or usefulness of the leased property.

- Rent payments on any given date are required to be at least sufficient to pay amounts due on debt nominally issued by the PSEG Lenders, who are the *lessors*. This is inconsistent with bona fide leases, where rent amounts and due dates are tied to the value of using the leased property, not the lessor's financing. Clearly, "rent" due under the leases is entirely a function of the cost to service the senior debt portion of the financing and to provide a set rate of return on the junior portion of the financing.

- The Dynegy Borrowers, the lessees, are responsible for making modifications to the leased property as required by law. This is inconsistent with bona fide leases, where such responsibilities are placed on the lessor as owner of the property.

- The Dynegy Borrowers must continue to pay rent under the Personal Property Leases even if the leased property is destroyed, condemned, taken by government action or made unusable, whether by force majeure or otherwise. This is inconsistent with bona fide leases, where the risks of ownership remain with the lessor.

- If the leased property is destroyed, damaged beyond use, condemned, confiscated, or otherwise rendered unusable (even if through no fault of the Dynegy Borrowers), the Dynegy Borrowers, as lessees, must repair or replace the property, or pay the PSEG Lenders, as lessors, a payment calculated to give the PSEG Lenders and the Certificateholders the entire anticipated economic return on their loans, including compensating the PSEG Lenders for adverse tax consequences. This is inconsistent with bona fide leases, where the risks of ownership remain with the lessor.

53.    Each of these provisions is consistent with a borrower-lender relationship between the Dynegy Borrowers and the PSEG Lenders, where payments due are intended to repay debt obligations and the borrower maintains the burdens of ownership of collateral for the loans. They are not consistent with a landlord-tenant relationship. They reflect categorically that the Personal Property Leases are part of an integrated set of agreements that provided financing to the Dynegy Borrowers to acquire assets. It follows that they are not the bona fide leases that are covered by section 502(b)(6).

**B.    The Structure Of The Financing Agreements Is Tax-Driven**

54.    The Financing Agreements are designed to transfer certain tax benefits associated with owning personal property to a lender (in this case, the PSEG Lenders) in exchange for favorable financing terms. These tax considerations are the primary reason Defendants and the PSEG Lenders structured the Financing Agreements as leases, and why they employed separate leases to cover the personal property and the real property, rather than utilizing another financing structure. Defendants' claims that the Personal Property Leases are not leases of personal property only runs contrary to Defendants' own representations and warranties to the PSEG

Entities, which upon information and belief the PSEG Entities relied when determining how to treat the Personal Property Leases for tax purposes.

55.    The principal benefit the PSEG Lenders derive from providing financing under the "sale-leaseback" structure, rather than a more traditional financing structure, is the right to depreciate, for income tax purposes, the Transferred Personal Property. This allows the PSEG Lenders to reduce their (and their affiliates') taxable income; a benefit only provided to the "owner" of the depreciable property. To maximize this benefit, the PSEG Lenders only took title to personal property, as (1) real estate (i.e., land) is not depreciable for federal income tax purposes and (2) nonresidential real property provides less tax benefit than personal property, as the former must be depreciated over a longer period and using a less favorable depreciation schedule. By carefully selecting (and "purchasing") only portions of the Roseton and Danskammer facilities that constitute personal property, the PSEG Lenders ensured that the entire $920 million they loaned to Defendants would be attributed to personal property, which maximizes their tax benefits under the structure.[10]

56.    This tax consideration also explains why, just four months after Dynegy paid $954 million for the Roseton and Danskammer facilities in their entirety – including all six primary power generating units at those facilities, two secondary units at Danskammer and all associated personal property, fixtures, real property and surrounding real estate – the PSEG Lenders would pay 98% of that amount (the $920 million loaned plus $18 million in closing costs) to "purchase" only one half of the power generating units and a subset of the personal

---

[10] Had the PSEG Lenders taken title both to personal property and real property, they would have been required to allocate the "purchase price" between those assets, and would only be entitled to the most favorable depreciation deductions based on the value attributed to the personal property. The portion attributed to the depreciable real property would receive less favorable depreciation treatment, and the portion attributed to real estate would not be eligible for depreciation deductions.

property at the facilities, and none of the permanent fixtures, real property or real estate. Clearly tax considerations drove the structure of these transactions.

57.     To ensure that the PSEG Lenders and their affiliates would receive their bargained-for tax benefits under the Financing Agreements, Defendants indemnified those parties against any Federal, state or local taxes above and beyond those anticipated by the parties based on the assumptions set forth in the Tax Indemnity Agreements. The Tax Indemnity Agreements indemnify the PSEG Lenders against unexpected taxes even where (with certain exceptions set out in the Tax Indemnity Agreements) those taxes arise as a result of events or circumstances that are not within the Dynegy Borrowers' control.

**C.      Rental Payments Under The Personal Property Leases Are Expressly Determined To Repay Principal And Interest On The Financing**

58.     Pursuant to the Personal Property Leases, the Dynegy Borrowers are obligated to make semi-annual periodic lease payments in scheduled amounts and on scheduled dates that match the principal and interest due on the Lessor Notes on such dates, plus additional amounts to repay and provide a specified economic return on the PSEG HoldCos' contribution. The Dynegy Borrowers stated as much in their application to the Federal Energy Regulatory Commission regarding the sale-leaseback transactions: "Each of the [Dynegy Borrowers] will pay semiannual installments of rent to each of the [PSEG Lenders] during the term of the [Personal Property Lease] sufficient to service the [Lessor Notes] and provide an adequate yield on each [PSEG Holdco's] investment." Case EL01-28-000, Dynegy Danskammer, L.L.C., Dynegy Roseton, L.L.C., Application for Authorization of Transaction Under Section 203 of the Federal Power Act and Request for Findings Regarding Public Utility Status, at 5 (Jan. 10, 2001).

59.    The Personal Property Leases are also explicit on this point. Section 3 of each Personal Property Lease provides that the periodic rent due under the lease may be adjusted under certain circumstances, so long as such adjustment "preserve[s] the [PSEG HoldCo's] [anticipated (a) net after-tax yield, . . . and (b) aggregate GAAP income and after-tax cash flow] through the end of the [Personal Property Lease's initial term]." Personal Property Leases § 3.4(c). Furthermore, the Personal Property Leases provide that:

> Anything herein or in any other [Financing Agreement] to the contrary notwithstanding, [periodic rent] payable on any [date specified in the Personal Property Lease] . . . shall, in the aggregate, be in an amount at least sufficient to pay in full principal and interest payable on the Lessor Notes on such [date].

Personal Property Leases § 3.4(d). Thus, the "rental payments" were not, and have never been, tied to real market conditions for leasing power generation equipment, but rather were tied to a rate of return and scheduled interest and principal payments investors believed appropriate for the amounts they loaned to the Dynegy Borrowers.

**D.    The PSEG Lenders Do Not Bear Any Risk Of Loss Or Burdens of Ownership For The Transferred Personal Property**

60.    Under the Personal Property Leases, the Dynegy Borrowers assumed the risk of loss associated with owning and operating the Transferred Personal Property. "[A]s would be the case if the [Dynegy Borrowers] owned the [Transferred Personal Property] outright, the [Dynegy Borrowers] will have the full responsibility for the operation, management, and maintenance of their respective [Transferred Personal Property . . . ." Case EL01-28-000, Dynegy Danskammer, L.L.C., Dynegy Roseton, L.L.C., Application for Authorization of Transaction Under Section 203 of the Federal Power Act and Request for Findings Regarding Public Utility Status, at 5 (Jan. 10, 2001).

61.     The Personal Property Leases provide that the Dynegy Borrowers' obligation to pay all rent and other payments under the Personal Property Leases is "absolute and unconditional under any and all circumstances and shall not be terminated, extinguished, diminished, lost or otherwise impaired by any circumstance of any character," including by:

- any setoff, counterclaim, recoupment, defense or other right of the Dynegy Borrowers, including any claim as a result of any breach by any person of any covenant or provision in the Personal Property Leases;

- any lack or invalidity of title or any unavailability of the Transferred Personal Property or any part thereof;

- any loss or destruction of, or damage to, the Transferred Personal Property, or any interruption or cessation in the use or possession thereof or any part thereof by the Dynegy Borrowers for any reason whatsoever and of whatever duration;

- the condemnation, requisitioning, expropriation, seizure or other taking of title to or use of the Transferred Personal Property;

- any event of "force majeure"; or

- any other cause.

Personal Property Leases § 9. To remove all doubt regarding the Dynegy Borrowers' unconditional repayment obligations, the Personal Property Leases further provide that "[i]f for any reason whatsoever this [Personal Property Lease] shall be terminated in whole or in part by operation of law or otherwise, except as specifically provided herein, the [Dynegy Borrower] nonetheless agrees, to the extent permitted by Applicable Law, to pay to the [PSEG Lender] [all rent and other payments] due and owing, at the time such payment would have become due and payable in accordance with the terms hereof had this [Personal Property Lease] not been so terminated." Id.

62.     Further, in virtually every circumstance under which the Roseton or Danskammer facility becomes useless or a burden, the Dynegy Borrowers must make Plaintiff and the PSEG

Lenders whole. For example, upon termination of the Personal Property Leases the PSEG Lenders may tender the Transferred Personal Property (or any affected portion thereof if the Personal Property Leases are only partially terminated) to the Dynegy Borrowers in exchange for the Dynegy Borrowers paying to Plaintiff the "Termination Value" (or a portion of the Termination Value if the Personal Property Leases are terminated with respect to only a portion of the Transferred Personal Property). The Termination Value is an amount calculated to repay the principal, premium and interest due on the Lessor Notes, repay the PSEG HoldCos' contribution and anticipated yield, and pay expected amounts due under the Dynegy Borrowers' tax indemnity obligations to the PSEG Lender and its affiliates.[11]

63.    This right of the PSEG Lenders to tender the Transferred Personal Property in exchange for the Termination Value payment effectively transfers all risks of ownership to the Dynegy Borrowers given the scope of the Personal Property Leases' termination provisions. Specifically, if the Transferred Personal Property or any power generating unit that is a part thereof is destroyed or damaged beyond economic repair or is rendered permanently unfit for normal use (even through no fault of the Dynegy Borrowers), the Dynegy Borrowers must either (a) rebuild or replace the destroyed property, or (b) terminate the Personal Property Lease and pay the Termination Value. If the Transferred Personal Property or any power generating unit that is a part thereof is seized, condemned, confiscated or otherwise taken, or its use is

---

[11] As of the petition date, Termination Value is not less than $1 billion. Under certain circumstances the Dynegy Borrowers may sell the affected property (or the PSEG Lenders' interests in the Personal Property Leases) and use the net proceeds of the sale to help pay the Termination Value. Alternatively, the PSEG Lenders may retain (and potentially sell) the affected property, but only if they provide the Dynegy Borrowers with adequate financial assurance that they will pay to Plaintiff a sufficient amount to prepay the Lessor Notes (or portion thereof to the extent the Personal Property Leases are terminated with respect to only a portion of the Transferred Personal Property) or, under certain circumstances, that they will assume responsibility for paying the principal and interest due on the Lessor Notes and have the financial wherewithal to do so.

requisitioned beyond the expiration of the Personal Property Leases term by a governmental or similar entity, the Dynegy Borrowers must terminate the Personal Property Leases and pay the Termination Value.

64.     Accordingly, all risk of damage or loss to the Transferred Personal Property remains with the Dynegy Borrowers, and the PSEG Lenders and Certificateholders have only assumed the credit risk of the Dynegy Borrowers and Dynegy Holdings (as guarantor); the same as any other lender to those entities.

**E.    The Transferred Personal Property Cannot Reasonably Be Expected To Have Economic Useful Life Or Significant Residual Value At The Expiration Of The Personal Property Leases**

65.     The initial lease term for the Roseton Personal Property Lease expires on February 8, 2035. At that time the Roseton power generation Units 1 and 2 will have been in operation for over 60 years. The initial lease term for the Danskammer Personal Property Lease expires on May 8, 2031. At that time the Danskammer power generation Units 3 and 4 will have been in operation for 71 and 63 years respectively. The parties to the Financing Agreements could not reasonably have expected, at the time they entered into those agreements, that any of those Units will be economically viable or have any significant residual value at the end of the Personal Property Leases' initial terms absent unplanned, extraordinary and expensive capital expenditures and investments in the Units.

66.     For example, in a 1994 submission to the New York State Public Service Commission, Consolidated Edison Company of New York, Inc., formerly a part owner of the Roseton facility, stated that the Roseton facility had a "17 year remaining life amortization effective April 1, 1992." Case 04-E-0334, <u>Consolidated Edison Company of New York, Inc.</u>, Summary of Annual Depreciation Rates and Computed Reserves for Depreciation at December 31, 1993, at Ex. 16, p. 3 n. B (Aug. 9, 1994). Central Hudson's submissions to the Commission

the previous year estimated that the useful life of their significant equipment, which included the Roseton and Danskammer facilities, was 40 to 45 years from commencing operations: indicating that Roseton's useful life would expire before 2020, and Danskammer's would expire before 2014. Case 92-E-0155, Central Hudson Gas & Electric Corporation, Statement of Depreciation and Amortization Accruals, at Ex. 25, Sch. B (Apr. 27, 1993). Other utilities in New York have indicated similar or shorter expected useful lives for power generation units similar to the Roseton and Danskammer facilities. See, e.g., Case 95-E-0491, Orange and Rockland Utilities, Inc., Depreciation Study Summary, at Ex. 12 (Aug. 29, 1995) (determining the useful life of power generation units at between 32 and 35 years).

67.    Accordingly, the Dynegy Borrowers are entitled under the Personal Property Leases to use the Transferred Personal Property for substantially the entirety of its useful life.

## THE GUARANTIES

68.    As noted above, the Transferred Personal Property does not include significant Roseton and Danskammer facility assets, including two of the four primary power generating units at the Danskammer facility, substantial amounts of personal property at both the Roseton or Danskammer facilities or ownership of any of the real property at those facilities, including the 380 acres that surrounds those facilities. Defendants, however, required financing of an amount substantially equal to the price they paid for the entirety of the Roseton and Danskammer facilities. To solve for this problem, Dynegy Holdings fully, unconditionally and irrevocably guaranteed Dynegy Roseton's and Dynegy Danskammer's obligations under the Roseton Financing Agreements and Danskammer Financing Agreements, including under the Personal Property Leases, on a *pari passu* basis with its other senior unsecured obligations, including its outstanding senior notes and debentures.

69.    The credit support offered by the Guaranties was critical to the financing terms on which the Certificateholders lent to Defendants, a fact Defendants acknowledge. The Registration Statement Dynegy Holdings filed with the Securities and Exchange Commission on July 10, 2001 prominently advertised, on its first page, that "[Dynegy Holdings] has agreed to guarantee [the obligations of Dynegy Roseton and Dynegy Danskammer, which] are indirect wholly owned subsidiaries of [Dynegy Holdings]. Accordingly, when making the credit decision of whether to [purchase the  Certificates], *you should focus on the information about [Dynegy Holdings] provided in this prospectus*." Dynegy Holdings Inc., Registration Statement Under the Securities Act of 1933 (Form S-4), at 1 (July 10, 2001) (emphasis added).

70.    Moreover, the Guaranties include provisions designed to ensure that the credit support provided by Dynegy Holdings will survive any consolidation, merger, or other transaction involving a transfer or lease of substantially all of Dynegy Holdings' properties and assets. Specifically, section 4.2 of each Guaranty provides in relevant part that Dynegy Holdings "shall not . . . convey [or] transfer . . . its properties and assets substantially as an entirety to any Person in one or a series of transactions" unless each of six express conditions is satisfied, including that the succeeding Person "shall expressly assume all of the Guarantor's obligations under this Guaranty." Guaranties § 4.2(b).

71.    Not surprisingly, then, the terms of the Lessor Notes are similar to other notes issued by Dynegy Holdings. Specifically, the Lessor Notes included (a) the Series A Notes, which bore interest at 7.27% and fully matured 9 years after issuance, and (b) the Series B Notes, which bear interest at 7.67% and fully mature 14 years after issuance. Dynegy Holdings' other outstanding senior notes bear interest at between 7.5% and 8.75%, and mature between five and 12 years after issuance.

72.    The Lessor Notes effectively are, and were intended by Dynegy Holdings to be viewed as, an additional series of Dynegy Holdings notes, *pari passu* with and issued on substantially the same terms as Dynegy Holdings' other senior notes. Accordingly, Plaintiff's claims against Dynegy Holdings under the Guaranties should be treated the same as the claims of Dynegy Holdings' other senior lenders. They should not be subject to section 502(b)(6).

## CLAIMS FOR RELIEF

A.    **First Claim For Relief: Declaratory Judgment That The Leases Are Leases Of Personal Property Not Subject To Section 502(b)(6) Of The Bankruptcy Code**

73.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

74.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

75.    An actual and justiciable controversy exists among the Plaintiff and each of the Defendants with regard to the applicability of section 502(b)(6) of the bankruptcy code to the Personal Property Leases, the Guaranties and the other Financing Agreements. This issue is ripe for adjudication.

76.    Upon information and belief, Defendants contend that the Personal Property Leases are leases of real property within the scope of section 502(b)(6) of the bankruptcy code. The Personal Property Leases expressly state, however, that they are leases of personal property. New York State law, which governs the Personal Property Leases and their character under the bankruptcy code, upholds parties' right to contractually determine that property of the type that is the subject of the Personal Property Leases is personal property. Further, the property subject

to the Personal Property Leases has been severed from the underlying real property, and accordingly is not real property.

77.     The Court should enter a judgment declaring that the Personal Property Leases are leases of personal property outside the purview of section 502(b)(6), and accordingly any and all claims against any Defendant arising from or related to the Personal Property Leases are not subject to that section of the bankruptcy code. The Court also should enter a judgment declaring that the amount of such claims will be at least equal to the "Termination Value" provided in the Personal Property Leases, plus additional amounts provided for in the Financing Agreements.

**B.      Second Claim For Relief: Declaratory Judgment That The Leases Are Financing Vehicles And Are Not Subject To Section 502(b)(6) Of The Bankruptcy Code**

78.     Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

79.     This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

80.     Even if the Personal Property Leases are not considered leases of personal property, they are financing vehicles, which are not covered by section 502(b)(6) of the bankruptcy code. The Personal Property Leases are structured as leases to obtain certain tax advantages. The Financing Agreements do not transfer the burdens of ownership of the Transferred Personal Property to the PSEG Lenders, and their economic and other terms are structured to repay the financing provided to Defendants and not to compensate the PSEG Lenders for Defendants' use of the Transferred Personal Property.

81.     The Court should enter a judgment declaring that the Personal Property Leases and other Financing Agreements are not covered by section 502(b)(6), and accordingly any and

all claims against any Defendant arising from or related to the Financing Agreements are not subject to that section of the bankruptcy code.

**C.    Third Claim For Relief: Declaratory Judgment That The Guaranties Are Not Subject To Section 502(b)(6) Of The Bankruptcy Code**

82.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

83.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

84.    Even if the Personal Property Leases are subject to section 502(b)(6), the Guaranties are not. The Guaranties are independent contracts among the parties thereto, and are not leases of real property. Accordingly, section 502(b)(6) does not apply to claims against Dynegy Holdings under the Guaranties.

85.    The Court should enter a judgment declaring that the Guaranties are not within the purview of section 502(b)(6), and accordingly any and all claims against Dynegy Holdings arising from or related to the Guaranties are not subject to that section of the bankruptcy code.

**D.    Fourth Claim For Relief: Determination That The Guaranties Are Not Subject To Section 502(b)(6) Under Equitable Principles**

86.    Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

87.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

88.    Even if the Guaranties are within the purview of section 502(b)(6) of the bankruptcy code, equitable considerations dictate that Plaintiff's claims against Dynegy Holdings under the Guaranties not be limited by that section. The purchasers of the Certificates and the PSEG Lenders entered into the "sale-leasebacks" with the intent of lending funds to

34

Dynegy Holdings and its affiliates, and Dynegy Holdings' only other creditors are bondholders that lent funds to Dynegy Holdings on economic terms substantially similar to those provided under the Financing Agreements. Applying section 502(b)(6) to Plaintiff's claims under the Guaranties would result in an unfair windfall to Dynegy Holdings' other lenders.

89.    Additionally, to the extent equity interests in Dynegy Holdings will retain an interest in that debtor (including a right to purchase new equity in the reorganized debtor) under any chapter 11 plan proposed in these cases, application of section 502(b)(6) to Plaintiff's claims is inappropriate.

90.    The Court should exercise its equitable powers to exempt from the limits provided in section 502(b)(6) any and all of Plaintiff's claims against Dynegy Holdings under the Guaranties.

Dated:  New York, New York
        November 11, 2011

**CADWALADER, WICKERSHAM & TAFT LLP**

*/s/  George A. Davis*
John J. Rapisardi
George A. Davis
Josh Brant
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
john.rapisardi@cwt.com
george.davis@cwt.com
josh.brant@cwt.com

-and-

Peter Friedman
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
peter.friedman@cwt.com

*Attorneys for U.S. Bank National Association, as
Indenture Trustee*