# **EXHIBIT J**

*Execution Copy*

# TAX INDEMNITY AGREEMENT

Dated as of May 8, 2001

among

## DYNEGY DANSKAMMER, L.L.C.

## RESOURCES CAPITAL MANAGEMENT CORPORATION

## PSEGR NEWBURGH HOLDINGS LLC

## DANSKAMMER OP LLC

and

## DANSKAMMER OL LLC

### DANSKAMMER UNITS 3 AND 4

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| SECTION 1. | Tax Assumptions. | 1 |
| SECTION 2. | Intention of Parties | 4 |
| SECTION 3. | Records and Statements. | 4 |
| SECTION 4. | Representations, Warranties and Covenants of Facility Lessee | 4 |
| SECTION 5. | Indemnified Losses | 5 |
| SECTION 6. | Tax Savings. | 13 |
| SECTION 7. | Contests. | 15 |
| SECTION 8. | Certain Adjustments. | 17 |
| SECTION 9. | Definitions. | 18 |
| SECTION 10. | Survival of Agreement. | 18 |
| SECTION 11. | Payments. | 18 |
| SECTION 12. | Late Payments. | 19 |
| SECTION 13. | Miscellaneous. | 19 |
| Exhibit A | Source Information Provided by the Facility Lessee in Connection with the Closing Appraisal | A-1 |
| Exhibit B | Source Information Provided by the Facility Lessee in Connection with the Engineering Report | B-1 |

# TAX INDEMNITY AGREEMENT

This **TAX INDEMNITY AGREEMENT** dated as of May 8, 2001, is entered into by and among **DYNEGY DANSKAMMER, L.L.C.** (together with its successors and permitted assigns, "Facility Lessee"), **RESOURCES CAPITAL MANAGEMENT CORPORATION** (together with its successors and permitted assigns), **PSEGR NEWBURGH HOLDINGS LLC** (together with its successors and permitted assigns), **DANSKAMMER OP LLC** (together with its successors and permitted assigns) and **DANSKAMMER OL LLC** (together with its successors and permitted assigns). Capitalized terms used but not defined in this Agreement shall have the defined meanings set forth in Appendix A to the Participation Agreement dated as of May 1, 2001 (the "Participation Agreement"), among the Facility Lessee, Wilmington Trust Company, as Lessor Manager, The Chase Manhattan Bank, as Lease Indenture Trustee, The Chase Manhattan Bank, as Pass-Through Trustee, Danskammer OL LLC, as Owner Lessor, and Danskammer OP LLC, as Owner Participant or (if not defined in the Participation Agreement) in the Facility Lease.

## WITNESSETH

**WHEREAS**, the Periodic Lease Rent, Allocated Rent and Termination Values payable by Facility Lessee under the Facility Lease have been determined in part on the basis of the assumption that as a result of entering into the transactions contemplated by the Operative Documents Equity Investor will be entitled to certain U.S. Federal, state and local income tax benefits identified in Section 1 of this Agreement, and Facility Lessee has agreed to indemnify Equity Investor under certain circumstances for the loss of such benefits;

**NOW, THEREFORE**, as an inducement to Equity Investor to enter into the transactions contemplated by the Operative Documents and in consideration of the mutual covenants contained in this agreement and in the other Operative Documents, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

SECTION 1. <u>Tax Assumptions.</u>  The Periodic Lease Rent, Allocated Rent and Termination Values have been calculated by Equity Investor, and Owner Participant's Net Economic Return has been computed, in part, on the basis of the assumptions (it being understood and agreed that, except to the extent provided herein, Facility Lessee has made no representation or warranty with respect to the accuracy of any of such assumptions) that for U.S. Federal, state and local income tax purposes (the "Tax Assumptions"):

(a) On the Closing Date, 100% of the Purchase Price will be allocable to property that constitutes 20-year property under section 168(e) of the Code and the Owner Lessor will be entitled to 20-year, 150% declining balance (switching to the straight line method when most favorable) depreciation deductions with

respect to such property, utilizing the half-year convention and a zero salvage value, under MACRS ("Depreciation Deductions").

(b) Transaction Costs paid pursuant to Section 2.4 of the Participation Agreement will be amortizable under Section 162 of the Code on a straight-line basis over the Basic Lease Term (the "Transaction Costs Deductions").

(c) The Loans will constitute loans made to the Owner Lessor, and all interest accrued with respect to advances thereunder will be deductible, as accrued, pursuant to Section 163 of the Code (the "Interest Deductions").

(d) The Owner Lessor will be entitled to current deductions of amounts accrued as Lessor Section 467 Interest (the "Section 467 Interest Deductions").

(e) As a result of entering into the transactions contemplated by the Operative Documents, the Equity Investor will not be required to include any amount in gross income prior to the termination of the Facility Lease other than: (i) Proportional Rent (and, if the Lease is renewed, Renewal Lease Rent) in the amounts and at the times that such Rent is allocated pursuant to the terms of the Facility Lease; (ii) gain upon the receipt of Termination Value (or other amounts based on Termination Value) in an amount equal to the sum of Termination Value and the balance of any loan arising under and then outstanding under Treas. Reg. § 1.467-4 and at the time that Termination Value is made; (iii) gain upon the sale (direct or indirect) of all or any portion of the Facility or of all or any portion of the Equity Investor's interest in the Owner Lessor if such sale shall not occur during the continuance of an Event of Default or, if the sale shall occur during the continuance of an Event of Default, (A) in the case of a sale of the Facility, the sales price for the Facility shall be equal to or in excess of Termination Value (or a pro rata portion thereof in the case of a partial sale) or (B) in the case of a sale (direct or indirect) of the Owner Lessor, the sales price shall be equal to or in excess (or a pro rata portion thereof in the case of a partial sale) of the excess of Termination Value over the then outstanding amount of the Loans; (iv) interest income in the amounts accrued as Lessee Section 467 Interest and income upon any cancellation or forgiveness of the balance of any loan arising under Treas. Reg. § 1.467-4; (v) income attributable to any improvement realized upon or after termination of the Facility Lease; (vi) payments being made to the Equity Investor, Owner Participant or Owner Lessor on an After-Tax Basis; (vii) amounts paid to the Equity Investor, Owner Participant or Owner Lessor and identified as interest under the Operative Documents; and (viii) any other amount to the extent such items of income result in an equal and offsetting deduction of the same character in the same taxable year as the inclusion other than the Depreciation Deductions, Interest Deductions, Section 467 Interest Deductions and Transaction Costs Deductions.

(f) Throughout the Basic Lease Term, the marginal U.S. Federal, state and local income tax rate applicable to the Equity Investor will be as set forth in the Pricing Assumptions (the "Assumed Tax Rate") and the Equity Investor will

always have sufficient taxable income for U.S. Federal, state and local income tax purposes to utilize fully the Assumed Deductions (as defined below);

(g) The Facility Lease will be a "true lease" for U.S. Federal, state and local income tax purposes, and the Owner Lessor shall be treated as owner and lessor, and the Facility Lessee shall be treated as lessee, of the Facility for such purposes;

(h) The Equity Investor will compute its U.S. Federal, state and local taxable income on a calendar-year basis using the accrual method of accounting.

(i) The Facility will be treated as placed in service by the Equity Investor on the Closing Date.

(j) The Facility Lease will not be a "disqualified leaseback or long-term agreement" within the meaning of Section 467(b)(4) of the Code and the Equity Investor will not be subject to application of Section 467(b)(2) of the Code with respect to the Periodic Lease Rent provided under the Facility Lease.

(k) The Owner Lessor, Owner Participant and any entity(ies) interposed between the Owner Participant and the Equity Investor (the "Intermediary Entities") will each be a disregarded entity for U.S. Federal, state and local income tax purposes, and the Equity Investor will be entitled and required to take into account, in computing its U.S. Federal, state and local taxable income, all items of income, gain, loss, deduction and credit with respect to the Owner Lessor's interest in the Facility.

(l) Periodic Lease Rent, Allocated Rent and all other gains, losses, income, deductions and credits under the Facility Lease or the transactions contemplated by the Operative Documents will be treated as U.S. source pursuant to Sections 861 et seq. of the Code.

(m) For state and local income tax purposes, the Equity Investor will be entitled to depreciation, interest and amortization deductions at the same times and in the same amounts as the Equity Investor is allowed the Depreciation Deductions, the Interest Deductions, the Section 467 Interest Deductions and the Transaction Costs Deductions.

(n) The Equity Investor will be required to include in its gross income for state and local income tax purposes for any taxable year during the Basic Lease Term, with respect to its interest in the Facility, amounts equal to such amounts as are required to be included in its gross income for U.S. Federal income tax purposes.

The Depreciation Deductions, Transaction Costs Deductions, Section 467 Interest Deductions and Interest Deductions are referred to collectively as the "Assumed Deductions."

In the event that (i) Equity Investor shall suffer a Tax Loss (as such term is hereinafter defined) with respect to which Facility Lessee has paid the required indemnity hereunder or (ii) the percentages for Periodic Lease Rent, Allocated Rent, Proportional Rent, Section 467 Loan Balance, Section 467 Interest or Termination Values shall be adjusted pursuant to Section 3.5 of the Facility Lease, then the foregoing assumptions shall be amended, if and to the extent appropriate, to reflect such Tax Loss or the events giving rise to such payment or adjustment, respectively.

SECTION 2. <u>Intention of Parties</u>. Equity Investor and Facility Lessee acknowledge that it is intended that Equity Investor will be the owner and lessor of the Facility for all U.S. Federal, state and local income tax purposes, that Facility Lessee will be the lessee of the Facility for such purposes, and that the Facility Lease will be characterized as a true lease for such purposes. Equity Investor and Facility Lessee agree that neither they nor any of their respective Affiliates will file any income tax return or other document for U.S. Federal, state or local income tax purposes that is inconsistent with this intention or inconsistent with the foregoing Tax Assumptions unless and to the extent required by a Final Determination binding on the parties hereto or as contemplated by Section 5 or 6 below.

SECTION 3. <u>Records and Statements</u>. Within 30 days after written request therefor, Facility Lessee shall provide such information (to the extent that such information is regularly maintained by Facility Lessee or any Affiliate in the ordinary course of its business and is reasonably available to any such Person or is required by Applicable Law to be maintained by Facility Lessee or any Affiliate) as Equity Investor may reasonably require to enable Equity Investor to fulfill its tax return filing, audit and litigation requirements (at Facility Lessee's cost and expense).

SECTION 4. <u>Representations, Warranties and Covenants of Facility Lessee</u>Facility Lessee represents, warrants and covenants that:

(a) During the Basic Lease Term, no portion of the Facility is or will become tax-exempt use property within the meaning of section 168(h)(1) of the Code, tax-exempt bond financed property within the meaning of section 168(g)(5) or "public utility property" within the meaning of Section 168(i)(10) of the Code (it being understood that this is not a representation as to the "true lease" status of the Lease or the passthrough nature of the Owner Lessor, the Owner Participant or the Intermediary Entities);

(b) All written factual information supplied by or on behalf of the Facility Lessee to the Appraiser or Engineering Consultant and identified in Exhibits A and B hereof as information relied upon by the Appraiser or Engineering Consultant, respectively, was accurate at the time given and on the Closing Date, and the Facility Lessee did not omit information available to it which, in light of the circumstances in which the supplied information was provided, rendered the supplied information materially misleading (except that, in the case of information in the nature of forecasts, projections or estimations of the future life, performance, costs, revenues or other future items relating to the Facility, this

representation shall instead be that any such information as was supplied by or on behalf of the Facility Lessee was prepared in good faith and on a reasonable basis, determined both at the time given and on the Closing Date);

(c) On the Closing Date, no improvements will be required in order to render the Facility complete for its intended use by the Facility Lessee, other than ancillary items of removable equipment of a kind customarily selected and furnished by lessees of property substantially similar to the Facility;

(d) No Lessee Person (defined for purposes of this Agreement as the Facility Lessee, any sublessee or other user or person in possession of the Facility or any portion thereof or any Affiliate of any of the foregoing, but excluding in all events the Owner Lessor, the Owner Participant, the Equity Investor and each of their respective Affiliates) has taken or will take any position in any filing by it for U.S. Federal, state or local income tax purposes that it is the owner of the Facility or that is otherwise inconsistent with the Tax Assumptions or the allocation of Periodic Lease Rent set forth in Schedule 2-A to the Facility Lease (unless consistent with a contrary Final Determination binding on the Equity Investor or the Facility Lessee with respect to such position);

(e) The Facility was placed in service for U.S. Federal income tax purposes no later than the Closing Date;

(f) The Facility Lessee will not acquire or guarantee (directly or indirectly) any interest in the Lease Debt, the Loans, the Lessor Notes or the Certificates (it being understood that the transactions contemplated by the Operative Documents shall not be considered to constitute such a guarantee and that the Facility Lessee's exercise of rights or performance of obligations in accordance with or as contemplated under the Operative Documents shall not be deemed to violate this provision); and

(g) On the Closing Date, 100% of the Equity Investor's basis in the Facility will be allocable to 20-year property described in Section 168(c)(1) of the Code.

The sole remedy for the inaccuracy or breach of any of the foregoing representations, warranties and covenants shall be the Equity Investor's right to receive payments pursuant to this Agreement.

SECTION 5. Indemnified Losses

(a) If (A) as a result of (i) any act or failure to act by any Lessee Person (other than (w) the execution or the delivery of the Operative Documents, (x) any act or failure to act expressly required by the Operative Documents, (y) any act or failure to act expressly permitted by the Operative Documents, other than any substitution or replacement of all or any portion of the Facility not required by the Operative Documents and the assignment or subleasing of the Facility Lessee's interest in the Facility or (z) any act or failure to act taken at the express written

request of the Owner Participant or the Owner Lessor acting at the direction of the Owner Participant (other than during the continuance of a Lease Event of Default)), (ii) the breach, inaccuracy or incorrectness of any of the Tax Representations or any of the representations or warranties made by the Facility Lessee in Sections 3.1(a)-(d), (f)(ii), (g), (m), (n), (p), (r), (t), (v), (w) or (y) of the Participation Agreement, (iii) any loss, damage, destruction, casualty, non-use, retirement, removal, replacement, substitution, alteration, modification, addition, improvement, repair, rebuild, theft, taking, confiscation, requisition, seizure or condemnation of all or any portion of the Facility, (iv) the actual receipt of any warranty, damage, refund, insurance, requisition, indemnity or similar payment that is not retained by the Owner Participant or any Related Party, (v) the bankruptcy, insolvency or other proceeding for the relief of debtors involving, or any foreclosure on or against, the Facility Lessee or any Lessee Person, (vi) any foreclosure or pursuit of remedies (whether by the Owner Participant or otherwise) resulting from a Lease Event of Default, (vii) the financing of the Exempt Facilities or the existence of or actions in connection with the Revenue Bonds or the Exempt Facilities Agreement, or (viii) any amendment, modification, supplement or waiver to or in respect of any Operative Document initiated or requested by the Facility Lessee or made during the continuance of a Lease Event of Default, in each case that is made without the written consent of the Owner Participant or the Owner Lessor acting at the direction of the Owner Participant (with (i) through (viii) being hereafter referred to as a "Lessee Action"), the Equity Investor shall suffer a delay in claiming, shall not have the right to claim or shall not claim (in each case, only after receiving a written opinion, delivered to the Facility Lessee as soon as practicable and prior to the date on which the tax return is to be filed on which such claim will not be made, of independent tax counsel selected by the Equity Investor and reasonably acceptable to the Facility Lessee (setting forth in reasonable detail the facts and analysis upon which such opinion is based) to the effect that as a result of a Tax Law Change or change in or discovery of facts subsequent to the Closing Date, other than a Tax Law Change described in Section 5(d)(v) below, there is no Reasonable Basis to make such claim), or shall lose, shall suffer a disallowance of or shall be required to recapture all or any portion of the Assumed Deductions (a "Deduction Loss"); or

(B) as a result of (i) any repair, maintenance, replacement, rebuild or substitution of or any alteration, modification, addition or improvement to, the Facility or any portion thereof, (ii) the actual receipt of any warranty, damage, refund, insurance, requisition, indemnity or similar payment that is not retained by the Owner Participant or a Related Party, (iii) any loss, damage, destruction, casualty, non-use, replacement, removal, rebuild, substitution, theft, taking, confiscation, requisition, seizure or condemnation of all or any portion of the Facility, (iv) a change, adjustment or modification of the schedule of Periodic Lease Rent or Allocated Rent in connection with a Lease Event of Default, (v) the payment by the Facility Lessee of Periodic Lease Rent or Termination Value at times or in amounts inconsistent with the terms of the Facility Lease other than at the express written request of the Owner Participant or the Owner Lessor acting at

the direction of the Owner Participant (other than a request made during the continuance of a Lease Event of Default) or, unless required by a Final Determination, the deduction by the Facility Lessee of rental or interest amounts with respect to the Facility Lease that are inconsistent (either as to timing or amount) with the assumptions set forth in Section 3.2(c) of the Facility Lease, as modified by Section 3.4 of the Facility Lease, (vi) any foreclosure or pursuit of remedies against the Facility Lessee (whether by the Owner Participant or otherwise) during the continuance of an Lease Event of Default, (vii) any refinancing of the Lease Debt or the Loan or financing of improvements, (viii) the bankruptcy, insolvency or other proceeding for the relief of debtors involving, or any foreclosure on or against, the Facility Lessee or any Lessee Person, (ix) any amendment, modification, supplement or waiver ("Amendment") effected after the Closing Date to any Operative Document (A) that is made, initiated or requested by the Facility Lessee unless the Owner Participant or Owner Lessor has consented in writing to such Amendment or (B) that is in connection with a Lease Event of Default, (x) any act or omission of the Facility Lessee that is prohibited by the Operative Documents, (xi) any payment by or on behalf of the Facility Lessee (including, without limitation, indemnities, expenses, fees and compensation) to the Pass Through Trustee or pursuant to the Pass Through Trust Agreement, (xii) the breach, inaccuracy or incorrectness of any of the Tax Representations or any of the representations or warranties made by the Facility Lessee in Sections 3.1(a)-(d), (f)(ii), (g), (m), (n), (p), (r), (t), (v), (w) or (y) of the Participation Agreement (or the inaccuracy of any of such listed Participation Agreement representations as incorporated in the Officer's Certificate delivered by the Facility Lessee on the Closing Date) or (xiii) the existence or operation of any provision in the Operative Documents relating to the payment of damages or other amounts to Certificateholders in the event that the Certificates are not registered under the Securities Act of 1933 or otherwise within 240 days of the Closing Date (or in the event that, thereafter, they cease to be so registered), the Equity Investor shall be required for U.S. Federal income tax purposes to include in its gross income an amount not described under the Tax Assumption set forth in Section 1(e) above (an "Inclusion Loss" and, together with the Deduction Loss, a "Tax Loss"),

then, subject in each instance to the exclusions set forth below, Facility Lessee will pay to Equity Investor, at Facility Lessee's election given pursuant to its irrevocable written notice delivered to Equity Investor 10-days before the date on which a payment with respect to such Tax Loss is due and payable to Equity Investor hereunder, either (1) a lump sum amount that on an After-Tax Basis shall be sufficient to preserve Owner Participant's Net Economic Return, after taking into account the amount of all increases and reductions in Equity Investor's U.S. Federal, state and local income taxes in all taxable years that are predicated upon such Tax Loss plus all interest, penalties, fines and additions to tax payable by the Equity Investor as a result of such Tax Loss, (2) unless a Significant Lease Default or a Lease Event of Default shall have occurred and be continuing and so long as the Guarantor's senior unsecured debt obligations are then rated at least

investment grade by two nationally recognized rating agencies (or if the Guarantor's obligations are then rated by only one such agency, by such agency), an amount sufficient to reimburse the Equity Investor, on an After-Tax Basis, for the additional U.S. Federal, state and local income taxes payable by (or not refundable to) the Equity Investor from time to time as a result of such Tax Loss plus all interest, penalties, fines and additions to tax payable by the Equity Investor as a result of such Tax Loss, provided, however, if a Significant Lease Default or a Lease Event of Default shall occur and be continuing or if Facility Lessee no longer meets the rating standard described above, a lump sum amount shall become immediately due under clause (2) to preserve Owner Participant's Net Economic Return in accordance with the method described in clause (1) above (taking into account, however, any payments previously made by the Facility Lessee pursuant to clause (2)). Amounts payable under this Section 5(a) shall be computed based on the Tax Assumptions set forth in Section 1 hereof (as such Tax Assumptions have been modified in accordance with such Section 1), but assuming in the case of amounts payable due to a Deduction Loss that Equity Investor is subject to U.S. Federal, state and local tax at the Assumed Tax Rate and, with respect to payments due to an Inclusion Loss and with respect to calculating any amounts on an "After-Tax Basis" assuming that Equity Investor is subject to U.S. Federal, state and local income taxes at the highest marginal statutory rates then in effect for corporations for U.S. Federal, state and local income tax purposes (taking into account any deductibility of state and local taxes for U.S. Federal income tax purposes) (the "Effective Rate") and in either case that Equity Investor can concurrently fully utilize any tax benefits resulting from such Tax Loss against income subject to taxes payable at the Assumed Tax Rate or Effective Rate, whichever is applicable.

(b) Any amount payable by Facility Lessee to Equity Investor pursuant to this Section 5 with respect to a Tax Loss shall be paid upon the occurrence of the latest of the following times as shall be applicable to the circumstances: (i) a determination of independent tax counsel forming the basis for a failure to claim as set forth in Section 5(a), (ii) 30 days after the date of Equity Investor's notice to Facility Lessee pursuant to Section 7 with respect to such Loss, (iii) if any such indemnity payment relates to a Tax Loss that is being contested pursuant to Section 7, 15 days after the date of a Final Determination with respect to such Loss, and (iv) subject to Section 7(a)(E) hereof, the date Equity Investor shall be required to pay the additional taxes giving rise to such amount payable by Facility Lessee (or would be required to pay such tax pursuant to the assumptions set forth in Section 5(a)); provided, however, that the date required for payment shall be delayed until 15 days after completion of any verification required pursuant to Section 5(c) (with interest accruing from the date such payment would otherwise be due until the date of actual payment at the Overdue Rate).

(c) When requesting payment by Facility Lessee pursuant to this Section 5, Equity Investor shall provide Facility Lessee with a certificate of a Responsible Officer setting forth in reasonable detail the amount payable by Facility Lessee and the computation of such amount, including the amount of any lump sum

payment that may be required pursuant to clause (1) of Section 5(a) or the schedule of anticipated payments pursuant to clause (2) of Section 5(a) and Section 6. If Facility Lessee shall disagree with such amount or with an amount payable by Equity Investor pursuant to Section 6, such amount shall be reviewed and determined on a confidential basis, based on the assumptions and methods required herein, by an independent nationally recognized public accounting or lease advisory firm jointly selected by Equity Investor and the Facility Lessee. The costs of such verification shall be borne by Facility Lessee unless such verification shall result in an adjustment in Facility Lessee's favor exceeding 5% or more of the net present value (calculated using a discount rate of 6% per annum) of the payment or payments computed by Equity Investor, in which case such costs shall be borne by Equity Investor. Neither the Facility Lessee nor the public accounting or lease advisory firm performing the verification will have any right to examine the tax returns or books of Equity Investor in connection with the verification procedure described in this Section 5(c). Equity Investor agrees to cooperate with the independent firm referred to above and to supply it with all information reasonably necessary to permit it to accomplish such review and determination, provided that such accounting or lease advisory firm shall agree in writing in a manner reasonably satisfactory to the Equity Investor that the information supplied to such firm by Equity Investor shall be solely for its confidential use and solely in connection with such verification. In the event such accounting or lease advisory firm determines that such computations are incorrect, then such firm shall determine what it believes to be the correct computations. Absent manifest error, the computations of the accounting or lease advisory firm shall be final, binding and conclusive upon the Facility Lessee and the Equity Investor. The parties hereto agree that the independent accounting or lease advisory firm's sole responsibility shall be to verify the computation of any payment hereunder and that matters of interpretation of this Agreement or any other Operative Document are not within the scope of the independent accountant or lease advisory firm's responsibility. Such accounting or lease advisory firm shall be requested to make its determination within 30 days.

(d) Notwithstanding the foregoing provisions of this Section 5, Facility Lessee shall not have any liability to Equity Investor for indemnification under this Section 5 for any Tax Loss if such Tax Loss results from:

(i) any voluntary sale, transfer or other disposition (direct or indirect) by the Equity Investor, Owner Participant or any Affiliate thereof (each a "Lessor Group Member"), or any involuntary sale, transfer or other disposition (direct or indirect) resulting from any bankruptcy of a Lessor Group Member or the foreclosure by a creditor of a Lessor Group Member, of any interest in or arising under the Operative Documents or of the Facility or of any interest therein or of any interest in Owner Participant or in any Affiliate thereof, unless, in each case, such sale, transfer or other disposition is in connection with a Lease Event of Default that shall theretofore have occurred, an Event of Loss or from the Facility Lessee's exercise of its rights under the Operative Documents;

(ii) the occurrence of an Event of Loss or an event described in Section 13.1 or 14.1 of the Facility Lease so long as the Facility Lessee has otherwise fulfilled its payment obligations with respect to such event (and, if such obligation requires the Facility Lessee to make a payment of Termination Value or an amount computed by reference thereto, limited to the extent the amount of such payment accurately reflects the timing of tax consequences arising from the event or occurrence giving rise to such payment) or the occurrence of any other event that requires the Facility Lessee to pay Termination Value or an amount computed by reference thereto to the extent such payment is made and to the extent the amount of such payment accurately reflects the timing of tax consequences arising from the event or occurrence giving rise to such payment;

(iii) failure by a Lessor Group Member timely or properly to claim any Assumed Deduction or to exclude income on its tax return unless the Equity Investor has received a written opinion (that was delivered to the Facility Lessee as soon as practicable and prior to the date on which the tax return was filed on which such failure was reflected) of independent tax counsel selected by the Equity Investor and reasonably acceptable to the Facility Lessee, setting forth in reasonable detail the facts and analysis upon which such opinion is based, to the effect that as a result of a Tax Law Change or change in facts subsequent to the Closing Date, other than a Tax Law Change described in Section 5(d)(v) below, there is no Reasonable Basis to claim such Assumed Deduction or exclusion from income;

(iv) other than as a result of a Lessee Action or the inaccuracy of a Tax Representation, failure of the Owner Lessor's unadjusted basis in the Facility to equal the Purchase Price;

(v) any enactment, promulgation, release, adoption, amendment or change to the Code or Treasury Regulations (final or temporary), Revenue Rulings, Revenue Procedures or a Treasury Department or IRS notice or announcement that occurs subsequent to the Closing Date (a "Tax Law Change"); provided that this exclusion shall not apply to (a) any change in tax rates applicable to any gross up or Inclusion Loss or (b) any repair, maintenance, replacement, rebuild or substitution of, or any alteration, modification, addition or improvement to, the Facility or any portion thereof;

(vi) the application of Section 59A, 168(d)(3), 168(d)(4)(C), 291 or 467 of the Code except, in the case of Section 467, as a result of (1) the inaccuracy or breach of a Tax Representation, (2) any act of the Facility Lessee that is expressly prohibited by the Operative Documents or any failure by the Facility Lessee to take an act expressly required by the Operative Documents, or (3) any event described in Section 5(a)(B)(i) through (xiii);

(vii) the application of any rules relating to short taxable years, a change in the location, business, tax or other status or tax year of the

Equity Investor if and to the extent such application would otherwise result in an increase in Facility Lessee's indemnity obligations hereunder;

(viii)  the failure of the Equity Investor to have sufficient income or tax liability to benefit from the Assumed Deductions, <u>provided</u> that this exclusion shall not affect any indemnification calculated on a hypothetical basis as provided in Section 5(a);

(ix)  the failure of the Facility Lease to be treated as a "true lease" for U.S. Federal income tax purposes other than as a result (1) the breach or inaccuracy of a Tax Representation, (2) any act of the Facility Lessee that is expressly prohibited by the Operative Documents or any failure by the Facility Lessee to take an act expressly required by the Operative Documents, or (3) any event described in Section 5(a)(A)(ii) through (viii);

(x)  the failure of any of the Owner Participant, Owner Lessor or the Intermediary Entities to be treated as a disregarded entity for U.S. Federal, state or local income tax purposes to the extent of a resulting increase in Facility Lessee's indemnity obligations hereunder;

(xi)  the fraud, gross negligence or willful misconduct of a Lessor Group Member, or the breach or inaccuracy of any representation, warranty or covenant of a Lessor Group Member in any of the Operative Documents to the extent of a resulting increase in Facility Lessee's indemnity obligations hereunder;

(xii)  any Lessor Group Member being or becoming for U.S. Federal income tax purposes a charitable organization, a tax-exempt entity within the meaning of Section 168(h) of the Code, an agency or instrumentality of the United States, a state or political subdivision thereof or an international organization or the special status of a Lessor Group Member which status causes such member to be subject to the provisions of Section 55, 56, 57, 58, 59, 168(f)(2), 465, 469, 501, 542, 552, 851, 856 or 1361 of the Code in each case to the extent of a resulting increase in Facility Lessee's indemnity obligation hereunder;

(xiii)  the failure by the appropriate Lessor Group Member to contest a tax claim in accordance with, and to the extent required by, the applicable contest provisions in Section 7 hereof, if the Facility Lessee's ability to contest the claim is materially adversely affected as a result of such failure, unless such failure is the result of a Lessee Action;

(xiv)  the inclusion in income by the Equity Investor upon termination of the Facility Lease and return of the Facility in compliance with the Facility Lease of amounts attributable to improvements, modifications or additions to the Facility not financed by a Lessor Group Member and as to which title vests in a Lessor Group Member;

(xv) an Amendment to any Operative Document to which any Lessor Group Member is a party and to which the Facility Lessee is not a party and which Amendment is not requested by the Facility Lessee in writing, other than any Amendment (A) that may be necessary as a result of, and is in conformity with, any Amendment to any Operative Document requested by the Facility Lessee in writing or (B) that is required by the terms of the Operative Documents or by applicable law or made during the continuation of a Lease Event of Default;

(xvi) penalties or additions to Tax under Section 6662 or Section 6663 of the Code or relating to estimated Tax, in either case to the extent attributable to matters unrelated to the present transaction;

(xvii) a determination that the transactions contemplated by the Operative Documents are a sham, lack a valid business purpose or have a substance that is different from their form, or a determination that that the Equity Investor, Owner Participant or any Related Party is not holding its interest in the Facility in the ordinary course of a trade or business or that the Equity Investor, Owner Participant or any Related Party did not enter into said transactions for profit in each case unless such determination results from (1) the inaccuracy of a Tax Representation, (2) any act of the Facility Lessee that is expressly prohibited by the Operative Documents or any the Facility Lessee's failure to take any act expressly required by the Operative Documents or (3) any event described in Section 5(a)(A)(ii) through (viii);

(xviii) the failure of the Loan or any loan arising under Section 467 of the Code to constitute qualified nonrecourse financing within the meaning of Treasury Regulation Section 1.861-10T other than as a result of a Lessee Action;

(xix) the existence of, or any consequence of, a deferred equity structure or a deferred or prepaid rent structure, provided that the Facility Lessee makes all payments when due and accrues all rental expense and Section 467 Loan Interest in accordance with the terms of the Facility Lease;

(xx) any tax election made by a Lessor Group Member that is inconsistent with the Tax Assumptions to the extent of an increase in the Facility Lessee's indemnity obligations hereunder;

(xxi) the term of the Facility Lease (for purposes of Section 467 of the Code) being treated as extending beyond the end of the originally scheduled Basic Lease Term;

(xxii) penalties, additions to tax or interest attributable to a failure to comply with Section 6011, 6111 or 6112 of the Code or the Regulations promulgated thereunder, *provided, however*, that this exclusion shall not apply to the extent of any penalties, additions to tax or interest that are