imposed due to any failure to properly and timely register the transaction contemplated by the Operative Documents as a confidential tax shelter under and pursuant to Section 6111 of the Code;

(xxiii) a Tax Loss with respect to any period occurring after (and not simultaneously with) (1) the expiration or earlier termination of the Lease Term or (2) the return of the Facility to the Owner Lessor; or

(xxiv) any inaccuracy or the incorrectness of any conclusion reached in the Closing Appraisal, unless as a result of the breach or inaccuracy of a Tax Representation or any of the representations or warranties made by the Facility Lessee in Sections 3.1(a)-(d), (f)(ii), (g), (m), (n), (p), (r), (t), (v), (w) or (y) of the Participation Agreement.

SECTION 6. Tax Savings.

(a) Generally. If (i) Facility Lessee shall have elected and paid the indemnity with respect to any Tax Loss pursuant to section 5(a), (ii) the Equity Investor, as the result of the event giving rise to such Tax Loss, shall realize (or, in accordance with paragraph (b) shall be deemed to have realized) with respect to any year U.S. Federal income tax savings that would not have been realized but for such Tax Loss or the event giving rise thereto, and (iii) such savings have not previously been taken into account under this Agreement, then, provided no Significant Lease Default or Lease Event of Default shall have occurred and is continuing, the Equity Investor shall pay to Facility Lessee an amount equal to the sum of (x) such U.S. Federal income tax savings (and, to the extent provided in paragraph (b), state and local income tax savings), and (y) the amount of any U.S. Federal, state or local income tax savings realized as the result of any payment made pursuant to this sentence; provided, however, that such sum shall not exceed the excess of the amounts previously paid by Facility Lessee to the Equity Investor pursuant to Section 5(a)(2) hereof over the amounts previously paid by the Equity Investor to Facility Lessee pursuant to this Section 6 with respect to such Tax Loss with the remainder of such sum to be carried forward and applied pro tanto as an offset against future indemnity payments owed by the Facility Lessee pursuant to Section 5(a)(2).

(b) Assumptions in Calculating Tax Savings. For purposes of calculating in clause (x) of Section 6(a) the income tax savings realized by the Equity Investor, the Equity Investor shall be deemed to have fully utilized any tax benefits resulting from a Tax Loss or the event giving rise thereto against U.S. Federal, state and local income taxes payable at the Assumed Tax Rate, except that, with respect to any tax savings arising as a result of an Inclusion Loss and for purposes of calculating in clause (y) of Section 6(a) the income tax savings realized by the Equity Investor, the Equity Investor will be assumed to be taxable at the Effective Rate.

(c) <u>Timing of Payment and Verification</u>. Any payments due to Facility Lessee pursuant to Section 6(a) shall be paid, provided no Significant Lease Default or Lease Event of Default has occurred and is continuing, within 30 days after the Equity Investor shall realize (or be deemed to have realized) the tax savings. If Facility Lessee shall disagree with the amounts calculated to be paid to it, such amount shall be reviewed and determined in accordance with Section 5(c) above.

(d) <u>Rent Accruals</u>. If as the result of the inclusion of any provision referenced in Section 5(a)(B)(xiii), (1) the Equity Investor or a Related Party shall be entitled or required pursuant to a Final Determination or an opinion of counsel selected by the Owner Participant and reasonably satisfactory to the Facility Lessee to accrue Rent as taxable income under the Facility Lease at a rate less accelerated than that assumed in the Tax Assumptions, and (2) the Lessee is also accruing its rental expense at a rate less accelerated and, as a result, suffers an adverse U.S. Federal income tax consequence on an actual basis, the Lessee shall be permitted, so long as no Significant Lease Default or Lease Event of Default shall have occurred and be continuing, to defer the Equity Portion of Periodic Lease Rent to such dates (not extending beyond the end of the Basic Lease Term or properly elected Renewal Term) as shall (taking into account the tax benefits arising from such revised accrual of Rent and any tax consequences of such deferral of the Equity Portion of Periodic Lease Rent) preserve the Owner Participant's Net Economic Return (computed in accordance with the Tax Assumptions, other than the assumptions set forth in Sections 1(d), 1(e)(i), 1(e)(iv) and 1(j), *provided*, however, that no such deferral of the Equity Portion of Periodic Lease Rent shall require the Owner Participant to record a book loss as of the date such adjustment of Rent is first made and, *provided further*, that the Facility Lessee will attempt to structure any such deferral of the Equity Portion of Periodic Lease Rent (but only if the same can be accomplished at no cost to the Facility Lessee) in such manner so as to cause the Owner Participant's book earnings for the year in which the adjustment is first made and the succeeding four years to be neither increased nor decreased by more than five percent (5%). Corresponding adjustments to the schedule of Termination Value to reflect such deferral shall be made. Each Lessor Group Member agrees to use reasonable good faith efforts to file (and reasonably pursue) a protective claim for refund (at the sole cost and expense of Facility Lessee, such costs and expenses to be reimbursed on demand and on an After-Tax Basis by the Facility Lessee) with respect to any open year as to which the Internal Revenue Service has challenged, pursuant to Section 467 of the Code, the rental deductions claimed by the Facility Lessee, if the Facility Lessee shall so request in writing.

(e) <u>Subsequent Loss of Tax Savings</u>. The loss, disallowance or recapture of any tax savings described in this Section 6 subsequent to the year of realization by the Equity Investor shall be treated as a Tax Loss that is indemnifiable pursuant to the provisions of this Agreement without regard to Section 5(d) hereof (other than clause (xi) thereof).

SECTION 7. Contests.

(a) If a written adjustment shall be proposed by the Internal Revenue Service that, if sustained, could result in a Tax Loss for which Facility Lessee and the lessee under the Other Facility Lease might be required to make indemnity payments in an aggregate amount in excess of $100,000 (taking into account similar and logically related claims), Equity Investor agrees (i) to notify Facility Lessee promptly in writing of such proposed adjustment within 15 days of the receipt of such adjustment (including in reasonable detail, the nature, extent and purported basis of such adjustment, to the extent of the Equity Investor's knowledge thereof) and, in the event that there are less than 30 days to respond to such claim, the Equity Investor agrees to request an extension of time to contest such claim so that the period remaining to initiate such contest is not less than 30 days from the date of the Equity Investor's notice to the Lessee of such claim, (ii) not to make payment of such proposed adjustment for at least 30 days (or such shorter period as may be required by law) after the giving of such written notice of the proposed adjustment to Facility Lessee and (iii) provided that Equity Investor shall not have received prior to the time before which a response to such claim is due a written opinion, setting forth in reasonable detail the facts and analysis upon which such opinion is based (a copy of such opinion which shall be delivered to the Facility Lessee as soon as practicable after receipt), of independent tax counsel selected by the Equity Investor and reasonably satisfactory to the Facility Lessee, to the effect that, (A) with respect to any initial contest, there is not a Reasonable Basis for such contest and (B) with respect to the appeal of a judicial decision, that it is "more likely than not" that the Equity Investor will not prevail in such appeal, to take such action in contesting such adjustment as Facility Lessee shall request in writing from time to time (it being understood that Equity Investor, in its sole discretion, shall be entitled to pursue or forego any administrative appeals, proceedings, hearings and conferences, provided, that Equity Investor may not forego any administrative process if any other item of the Equity Investor's tax return for the same taxable year is subject to such administrative process or such process is necessary in order to preserve any judicial remedy) and not to settle any such proposed adjustment without the prior written consent of Facility Lessee (provided, however, that Equity Investor will not be required to pursue an appeal to the United State Supreme Court); subject, however, to the satisfaction of the following conditions: (A) within 30 days after notice by Equity Investor to Facility Lessee of such proposed adjustment (or such shorter period as may be required by law) Facility Lessee shall request that such proposed adjustment be contested; (B) although Equity Investor will keep Facility Lessee reasonably informed as to the progress of such contest (including, subject to the execution of confidentiality agreements reasonably satisfactory to the Equity Investor), will use good faith efforts to provide the Facility Lessee and its counsel with copies of any correspondence (or excerpts thereof relating to the adjustment or the contest of such adjustment) or excerpts of other written materials received by the Equity Investor in connection with the contest and with the opportunity to review and make suggestions on all submissions to the Internal Revenue Service and any court to the extent such

documents and submissions relate to the Tax Loss (it being understood that the Facility Lessee shall not be permitted to review any portions of such documents or submissions that relate to issues unrelated to the transactions contemplated by the Operative Documents) and will, if timely requested, consult in good faith with Facility Lessee's tax counsel and consider in good faith suggestions by such counsel as to the conduct, including the most appropriate forum, of such contest, nevertheless the conduct of such contest (subject to the requirement that Facility Lessee's written consent to any settlement of the contest be obtained) shall remain within the sole discretion and control of Equity Investor and its tax counsel, who shall determine the nature of all actions to be taken to contest such proposed adjustment, including, without limitation, (x) whether the contest shall be initially by way of judicial or administrative proceedings, or both, (y) whether the proposed adjustment shall be contested by resisting payment or by paying the tax and seeking a refund thereof and (z) if Equity Investor shall undertake judicial action, the court of competent jurisdiction in which to contest such proposed adjustment; (C) Facility Lessee shall have agreed to pay Equity Investor promptly on an After-Tax Basis all reasonable costs and expenses that Equity Investor shall incur in connection with contesting such proposed adjustment, including, without limitation, reasonable attorneys', accountants', experts' and investigatory fees and disbursements and shall have provided Equity Investor with adequate assurances of the timely payment thereof; (D) such contest involves no material risk of the sale, forfeiture or loss of any portion of the Facility; (E) if Equity Investor shall determine to pay the tax proposed and sue for a refund or shall elect to make a deposit in the nature of a cash bond with respect to any proposed adjustment pursuant to Revenue Procedure 84-58, 1984-2 C.B. 501 (or any similar successor procedure), Facility Lessee shall advance to Equity Investor, on an interest-free basis and with no additional net after-tax cost to Equity Investor, sufficient funds to pay the tax and interest, penalties and additions to tax payable with respect thereto; (F) no Lease Event of Default or Significant Lease Default shall have occurred and be continuing; and (G) the Facility Lessee shall have acknowledged in writing its liability to indemnify the Equity Investor in respect of the claim if the contest is unsuccessful, provided, however, that such acknowledgment of liability will not be binding if the contest is resolved on a basis from which it can be clearly established that the Facility Lessee would not be liable to the Equity Investor in the absence of such acknowledgment.

(b) Nothing contained in this Section 7 shall require Equity Investor to contest a proposed adjustment that it would otherwise be required to contest pursuant to this Section 7 if (A) Equity Investor (i) waives (by written notice to Facility Lessee) the payment by Facility Lessee of any amount that might otherwise be payable by Facility Lessee under this Agreement in respect of such proposed adjustment and any related proposed adjustment with respect to any taxable year, the contest of which is effectively foreclosed by the settlement of such proposed adjustment, and (ii) promptly pays to Facility Lessee any amount previously paid or advanced by Facility Lessee pursuant to clause (E) of Section 7(a) hereof with respect to such proposed adjustment, or (B) the subject of such contest has previously been resolved in a Final Determination for a prior taxable

year adversely to the Equity Investor, unless the Facility Lessee shall have provided the Equity Investor with an opinion of counsel selected by the Equity Investor and reasonably satisfactory to the Facility Lessee that as a result of a Tax Law Change, or change in fact, the prior Final Determination is no longer determinative of the issue.

(c) If Facility Lessee shall have requested Equity Investor to contest such proposed adjustment as above provided and shall have duly complied with all the terms of this Section 7, Facility Lessee's liability for indemnification under this Agreement with respect to such proposed adjustment shall, unless Facility Lessee and Equity Investor shall otherwise agree, be deferred until a Final Determination of the liability of Equity Investor. At such time, Facility Lessee shall become obligated in accordance with the provisions of this Agreement for the payment of any indemnification under this Agreement resulting from the outcome of such contest, and Equity Investor shall become obligated to repay to Facility Lessee the amount advanced hereunder with respect to such proposed adjustment. Within 30 days following such Final Determination, any amounts then due hereunder shall be paid first by set-off against each other and either (a) Facility Lessee shall pay to Equity Investor any excess of the full amount then due hereunder over the amount of any advances previously made by Facility Lessee and applied against Facility Lessee's indemnity obligation as aforesaid or (b) Equity Investor shall repay to Facility Lessee any excess of such advances over such full amount then due hereunder, together with any interest (net of taxes payable on the receipt or accrual of such interest) received by Equity Investor that is properly attributable to such excess amount of such advances during the period such advances were outstanding, and, if Facility Lessee shall have paid an indemnity to Equity Investor with respect to the adverse tax consequences of any advances or payments hereunder, the amount of any tax saving resulting from any payment to Facility Lessee pursuant to this sentence.

SECTION 8. Certain Adjustments. Upon the occurrence of a Tax Loss for which Equity Investor has received indemnification hereunder, Equity Investor shall recompute the Termination Values in accordance with the manner in which such Termination Values were originally computed to reflect such Tax Loss. If an event giving rise to the payment of an amount determined by reference to the schedules of Termination Values shall occur and the date as of which Equity Investor shall be affected shall be earlier or later than the date taken into account in computing such schedule, Equity Investor shall increase or decrease appropriately such Termination Values based otherwise on the same assumptions previously used by the Equity Investor in calculating such schedules. A Responsible Officer of Equity Investor shall certify to Facility Lessee in writing either that such Termination Values as set forth in the Facility Lease do not require change or the new Termination Values necessary to reflect the Tax Loss. Such certification shall describe in reasonable detail the basis for computing any such new Termination Values. Upon such certification (and verification in accordance with the procedures set forth in Section 5(c) hereof, if requested by Facility Lessee), any such new Termination Values shall be substituted for the Termination Values in the Facility Lease.

SECTION 9. Definitions. For the purposes of this Agreement:

"Equity Investor." Any reference to Equity Investor shall mean that corporation(s) which is required to include in its taxable income, for Federal income tax purposes, all or any portion of the Owner Lessor's income, gain, loss and deduction, as well as any affiliated group of corporations, within the meaning of Section 1504 of the Code, of which such corporation is or becomes a member (or, if the Owner Lessor shall not be or shall cease to be a disregarded or pass-through entity for Federal income tax purposes, shall mean the Owner Lessor as well as any affiliated group of corporations, within the meaning of Section 1504 of the Code, of which the Owner Lessor is or becomes a member).

"Final Determination" shall mean (i) a decision, judgment, decree or other order by any court of competent jurisdiction, which decision, judgment, decree or other order has become final after all allowable appeals by either party to the action have been exhausted or the time for filing such appeals has expired, (ii) a closing agreement entered into (x) under Section 7121 of the Code or any other settlement agreement entered into in connection with an administrative or judicial proceeding and (y) with the consent of Facility Lessee when required, (iii) the expiration of the time for instituting suit with respect to the claimed deficiency, or (iv) the expiration of the time for instituting a claim for refund, or if such a claim was filed, the expiration of the time for instituting suit with respect thereto.

SECTION 10. Survival of Agreement. The obligations and liabilities of the parties arising under this Agreement shall, to the extent arising out of acts or events occurring on or prior to the termination of the Facility Lease, continue in full force and effect, notwithstanding the assignment, expiration, or other termination of the Facility Lease, until all such obligations have been met and such liabilities have been paid in full, whether by expiration of time, by operation of law, or otherwise. The obligations and liabilities of each party arising under this Agreement are expressly made for the benefit of, and shall be enforceable by, the other party and its successors and permitted assigns.

SECTION 11. Payments.

(a) Any payments made pursuant to this Agreement to Equity Investor shall be made directly to Equity Investor, and no such payments shall constitute part of the corpus of the Trust Estate, and any payments made pursuant to this Agreement to Facility Lessee shall be made directly to Facility Lessee. Such payments shall be made by wire transfer of immediately available funds to a bank account of the payee in the continental United States as specified by the payee in written directions to the payor, or if no such direction shall have been given, by check of the payor payable to the order of the payee and mailed to the payee by certified mail, postage prepaid at its address as set forth in the Participation Agreement.

(b) Any amount which is payable to Facility Lessee by Equity Investor pursuant to this Agreement and is not paid because a Significant Lease Default or

a Lease Event of Default shall have occurred and be continuing shall be held by Equity Investor as security for Facility Lessee's obligations to Equity Investor hereunder and, if the Owner Lessor declares the Facility Lease to be in default pursuant to Section 16 thereof, shall be applied against Facility Lessee's obligations hereunder as and when due (and, to the extent Facility Lessee then owes no amounts hereunder to Equity Investor, shall be paid to Facility Lessee). At such time as there shall not be continuing any such Significant Lease Default or Lease Event of Default, such amount shall be paid to Facility Lessee to the extent not previously applied in accordance with the preceding sentence.

SECTION 12. <u>Late Payments.</u> To the extent permitted by applicable law, any late payment by either party of any of its obligations under this Agreement shall result in the obligation on the part of such party promptly to pay an amount equal to interest at the Overdue Rate.

SECTION 13. <u>Miscellaneous.</u>

(a) <u>Amendments and Waivers</u>. No term, covenant, agreement or condition of this Agreement may be terminated, amended or compliance therewith waived (either generally or in a particular instance, retroactively or prospectively) except by an instrument or instruments in writing executed by each party hereto.

(b) <u>Notices</u>. Unless otherwise expressly specified or permitted by the terms hereof, all communications and notices provided for herein shall be in writing or by a telecommunications device capable of creating a written record, and any such notice shall become effective (a) upon personal delivery thereof, including by overnight mail or courier service, (b) in the case of notice by United States mail, certified or registered, postage prepaid, return receipt requested, upon receipt thereof, or (c) in the case of notice by such a telecommunications device, upon transmission thereof, provided such transmission is promptly confirmed by either of the methods set forth in clauses (a) or (b) above, in each case addressed to each party hereto at its address set forth below or, in the case of any such party hereto, at such other address as such party may from time to time designate by written notice to the other parties hereto:

If to the Facility Lessee:

    Dynegy Danskammer, L.L.C.
    c/o Dynegy Northeast Generation, Inc.
    994 River Road
    Newburgh, New York 12550
    Telephone No.: (845) 563-4961
    Facsimile No.: (845) 563-4992
    Attention: Daniel P. Thompson, Vice President, Operations

with a copy to:

> Dynegy Power Corp.
> 1000 Louisiana Street, Suite 5800
> Houston, Texas 77002
> Telephone No.: (713) 507-6823
> Facsimile No.: (713) 767-8510
> Attention: Timothy A. Beverick, Esq.

If to Resources Capital Management Corporation:

> Resources Capital Management Corporation
> 1300 North Market Street, Suite 405
> Wilmington, DE 19801
> Telephone No.: (302) 576-2895
> Facsimile No.: (302) 576-2897
> Attention: William R. Barbour, Esq.

If to PSEGR Newburgh Holdings LLC

> PSEGR Newburgh Holdings LLC
> c/o Resources Capital Management Corporation
> 1300 North Market Street, Suite 405
> Wilmington, DE 19801
> Telephone No.: (302) 576-2895
> Facsimile No.: (302) 576-2897
> Attention: William R. Barbour, Esq.

If to Danskammer OP LLC:

> Danskammer OP LLC,
> c/o Resources Capital Management Corporation
> 1300 North Market Street, Suite 405
> Wilmington, DE 19801
> Telephone No.: (302) 576-2895
> Facsimile No.: (302) 576-2897
> Attention: William R. Barbour, Esq.

If to Danskammer OL LLC:

> Danskammer OL LLC,
> c/o Wilmington Trust Company
> Rodney Square North
> 1100 North Market Street
> Wilmington, Delaware 19890-0001
> Telephone No.: (302) 651-1000
> Facsimile No.: (302) 651-8882
> Attention: Corporate Trust Administration

A copy of all notices provided for herein shall be sent by the party giving such notice to each of the other parties hereto.

(c) <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of, and shall be enforceable by, the parties hereto and their respective successors and permitted assigns as permitted by and in accordance with the terms hereof.

(d) <u>Governing Law</u>. This Agreement shall be in all respects governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance (without giving effect to the conflicts of laws provision thereof, other than New York General Obligations Law Section 5-1401).

(e) <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(f) <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which, when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

(g) <u>Headings and Table of Contents</u>. The headings of the sections and the table of contents of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

(h) <u>Further Assurances</u>. Each party hereto will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by the other party, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

DYNEGY DANSKAMMER, L.L.C.

By: _____
   Name: Gregory D. Kingsley
   Title: Assistant Treasurer

RESOURCES CAPITAL
MANAGEMENT CORPORATION

By: _____
   Name:
   Title:

PSEGR NEWBURGH HOLDINGS LLC

By: _____
   Name:
   Title:

DANSKAMMER OP LLC

By: _____
   Name:
   Title:

DANSKAMMER OL LLC

By: Wilmington Trust Company, not in its individual capacity but solely as Lessor Manager

   By: _____
      Name:
      Title:

Tax Indemnity Agreement (Danskammer)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

DYNEGY DANSKAMMER, L.L.C.

By: _____
    Name: Gregory D. Kingsley
    Title: Assistant Treasurer

RESOURCES CAPITAL
MANAGEMENT CORPORATION

By: _____
    Name: Christopher P. Lelleher
    Title: Vice President

PSEGR NEWBURGH HOLDINGS LLC

By: _____
    Name: Christopher P. Lelleher
    Title: Vice President

DANSKAMMER OP LLC

By: _____
    Name: Christopher P. Lelleher
    Title: Vice President

DANSKAMMER OL LLC

By: Wilmington Trust Company, not in its individual capacity but solely as Lessor Manager

    By: _____
        Name:
        Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

DYNEGY DANSKAMMER, L.L.C.

By: _____
    Name: Gregory D. Kingsley
    Title: Assistant Treasurer

RESOURCES CAPITAL
MANAGEMENT CORPORATION

By: _____
    Name:
    Title:

PSEGR NEWBURGH HOLDINGS LLC

By: _____
    Name:
    Title:

DANSKAMMER OP LLC

By: _____
    Name:
    Title:

DANSKAMMER OL LLC

By: Wilmington Trust Company, not in its individual capacity but solely as Lessor Manager

By: _____
    Name: James P Lawler
    Title: Vice President

Tax Indemnity Agreement (Danskammer)

Exhibit A

<u>Source Information Provided by the Facility Lessee in Connection with the Closing Appraisal</u>

1. Confidential Offering Memorandum – "Roseton & Danskammer Fossil Generation Assets" dated March 22, 2000, containing two CDs, and received by Deloitte & Touche from Dynegy during the site inspections of the Facilities on November 28, 2000. The information used by Deloitte & Touche is contained in Section 4, Fossil Generation Assets, and Section 7, Environmental Overview, as well as appendices in the Offering Memorandum and portions of the included compact discs, in each case, relevant to such sections.

2. Roseton/Danskammer Fuel Costs, Operations and Maintenance Expense, Capacity Factors and Generation broken out by unit from January 2000 through October 2000 from Central Hudson, provided on behalf of Dynegy, and received by Deloitte & Touche during the site inspections of the Facilities.

3. Fax dated December 3, 2000 from Dynegy to Deloitte & Touche containing the Production and Fuel Usage Report for 1998 and 1999.

4. Site plans and architectural plans received by Deloitte & Touche from Central Hudson, provided on behalf of Dynegy, via Fed Ex on December 4, 2000.

5. Fax dated December 5, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche with the overall summary of fixed assets for Roseton/Danskammer. Report run from January 2000 to August 2000.

6. Electronic mail dated December 6, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the Danskammer detailed Fixed Asset Register.

7. Electronic mail dated December 6, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the system code descriptions.

8. Electronic mail dated December 7, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the unit code descriptions.

9. Fax dated December 8, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the building code descriptions.

10. Fax dated December 11, 2000 from Central Hudson provided on behalf of Dynegy to Deloitte & Touche containing the additional building code descriptions.

11. Electronic mail dated December 13, 2000 from Dynegy to Deloitte & Touche with Excel file containing historical 1997 to March 2000 Capacity Factors by unit.

12. Fax dated December 14, 2000 from Central Hudson provided on behalf of Dynegy to Deloitte & Touche with the assets, at both Danskammer and Roseton, in the gas regulator station as well as the substations that will be retained by Central Hudson.

13. Electronic mail dated December 14, 2000 from Dynegy to Deloitte & Touche with Excel file containing projected emission rates for Roseton and Danskammer.

14. Electronic mail dated January 22, 2001 from Dynegy to Deloitte & Touche containing 2000 Operation and Maintenance Expenses (excluding fuel and depreciation) for Roseton and Danskammer, as well as 2000 Actual Capacity Factors for all the Units.

15. Electronic mail dated January 29, 2001 from Dynegy to Deloitte & Touche containing the Net Generation Actual 2000 for all Danskammer and Roseton Units.

16. Electronic mail dated January 30, 2001 from Dynegy to Deloitte & Touche containing the emissions and fuel actuals for 2000.

17. Electronic mail dated February 20, 2001 from Dynegy to Deloitte & Touche containing fuel by type and by facility information.

18. Fax dated February 27, 2001 from Dynegy to Deloitte & Touche with the 2000 Net Heat Rates, generation and fuels for Roseton and Danskammer.

19. Electronic mail dated March 2, 2001 from Dynegy to Deloitte & Touche containing an excel file with the capacity factors for Roseton and Danskammer from 1997 to 2000.

20. Electronic mail dated April 3, 2001 from Dynegy to Deloitte & Touche containing a word file with the explanation of the Plant Maintenance Programs for Roseton and Danskammer.

21. Electronic mail dated May 8, 2001 from Orrick, Herrington & Sutcliffe provided on behalf of Dynegy to Deloitte & Touche containing the Facility Description and Retained Asset Description attached to Bill of Sale.

22. The "Facility Certification Letter," dated May 8, 2001 on Dynegy letterhead.

Exhibit B

<u>Source Information Provided by the Facility Lessee in Connection with the Engineering Report</u>

1. Confidential Offering Memorandum – "Roseton & Danskammer Fossil Generation Assets" received by Stone & Webster Consultants from Dynegy in November 2000 (used for general facility description)

2. Heat Rate Deviation Reports – Danskammer – December 1996 received by Stone & Webster Consultants from Dynegy in November 2000

3. Heat Rate Deviation Reports – Danskammer – December 1997 received by Stone & Webster Consultants from Dynegy in November 2000

4. Re: Danskammer Unit 3 Input Output Test – memorandum – April 1994 received by Stone & Webster Consultants from Dynegy in November 2000

5. Re: Danskammer Unit 4 Input Output Test – memorandum – May 1994 received by Stone & Webster Consultants from Dynegy in November 2000

6. Central Hudson – Operating Budget System – Comparison of Expenses – 1995 received by Stone & Webster Consultants from Dynegy in November 2000

7. Event Edit Report – (Printout of Individual NERCGads Events) – All Events for 2000 received by Stone & Webster Consultants from Dynegy in November 2000

8. CD ROMS, 'Fossil Generating Asset Divestiture' Disk 1 and 2 received by Stone & Webster Consultants from Dynegy in November 2000 (used for assessing the facility condition, performance review, and operation and maintenance review)

9. CD ROM, 'Fossil Generating Asset Divestiture' Stage 2 Disk 1 received by Stone & Webster Consultants from Dynegy in November 2000 (used for assessing the facility condition, performance review, and operation and maintenance review)

10. Danskammer Coal Shipments -- 2000 (South American Sources) received by Stone & Webster Consultants from Dynegy in November 2000

11. Oiltest Inc. (file #11323) Certificate of Fuel Oil Analysis - Monthly Composite 10/2000 Danskammer received by Stone & Webster Consultants from Dynegy in November 2000

12. Graph entitled 'Danskammer Unit 3 Waterwall Tube Leaks' received by Stone & Webster Consultants from Dynegy in November 2000

13. Thielsch Engineering, Inc. Evaluation of Select Boiler and Turbine Components of Danskammer Unit 3 and Unit 4 received by Stone & Webster Consultants from Dynegy in November 2000

14. Report 9273 'Evaluation Of Select Boiler And Turbine Components Unit No. 3 And Lower Waterwall Drum Evaluation Unit No. 4 April 2000 Danskammer Station Chg&E' Dated December 2000 received by Stone & Webster Consultants from Dynegy in April 2001

15. Unit 3 2000 General Electric turbine overhaul report (job summary, inspection summary and recommendations) received by Stone & Webster Consultants from Dynegy in November 2000

16. Unit 4 1999 MD&A turbine overhaul report (summary, steam path audit and inspection reports) received by Stone & Webster Consultants from Dynegy in November 2000

17. Unit 3 2000 MD&A turbine major inspection report (overview and summary) received by Stone & Webster Consultants from Dynegy in November 2000

18. Unit 4 General Electric Steam Turbine Generator instruction book (general description, nameplate data) received by Stone & Webster Consultants from Dynegy in November 2000

19. Unit 3 General Electric Turbine Section instruction book (general description, nameplate) received by Stone & Webster Consultants from Dynegy in November 2000

20. Unit 4 Northeast Inspection Services May 1999 Final NDE Report received by Stone & Webster Consultants from Dynegy in November 2000