JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484
Anton R. Valukas (admitted *pro hac vice*)
David J. Bradford (admitted *pro hac vice*)
Daniel R. Murray (admitted *pro hac vice*)

919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699
Heather D. McArn

*Counsel to the PSEG Entities*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case** |
| **DYNEGY HOLDINGS, LLC, et al.,**[1] | : | |
| | : | |
| | : | **Case No. 11-38111 (CGM)** |
| **Debtors.** | : | **Jointly Administered** |
| | : | |

----------------------------------------------------------------- x

**RESOURCES CAPITAL MANAGEMENT CORPORATION;**
**DANSKAMMER OL, LLC; ROSETON OL, LLC; AND RESOURCES**
**CAPITAL ASSET RECOVERY, L.L.C.'S JOINDER TO THE MOTION OF**
**U.S. BANK NATIONAL ASSOCIATION FOR APPOINTMENT OF AN EXAMINER**
**PURSUANT TO SECTION 1104(C) OF THE BANKRUPTCY CODE**

---

[1] The Debtors are: Dynegy Holdings, LLC; Dynegy Danskammer, L.L.C.; Dynegy Roseton, L.L.C.; Dynegy
Northeast Generation, Inc.; and Hudson Power, L.L.C.

Resources Capital Management Corporation; Danskammer OL, LLC; Roseton OL, LLC; and Resources Capital Asset Recovery, L.L.C., Series DD and Series DR (collectively referred to as the "PSEG Entities") hereby join (the "Joinder") in the relief sought in the Motion of U.S. Bank National Association For Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code [Dkt. No. 48] (the "Indenture Trustee's Examiner Motion" filed by the "Indenture Trustee").  In further support of this Joinder, the PSEG Entities state as follows:

### Preliminary Statement

1.      As the Indenture Trustee states in its motion, this case is the "archetypical scenario where it is necessary to appoint an examiner to 'conduct such an investigation . . . of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor . . ..' 11 U.S.C. 1104(c)."  (Indenture Trustee's Examiner Motion, p. 5.)

2.      The Debtors' commencement of these chapter 11 cases is the most recent step in a scheme orchestrated by non-debtor Dynegy Inc. and its other non-debtor affiliates (collectively with the Debtors, "Dynegy"), along with the directors of each of the foregoing, and certain significant equity holders of Dynegy Inc. (the directors and the significant equity holders of Dynegy Inc., along with their respective affiliates and persons who directly or indirectly control them, are collectively referred to herein as the "Control Group")[2] to strip value from the Debtors, and in particular Dynegy Holdings, LLC ("Dynegy Holdings"), for the benefit of Dynegy Inc.

---

[2] The Control Group includes Icahn Capital L.P. ("Icahn Capital"), Franklin Resources, Inc. ("Franklin Resources"), and Seneca Capital Advisors, LLC ("Seneca") (three of the largest shareholders of Dynegy Inc.), Carl Icahn, and the members of Dynegy Inc.'s board of directors they nominated. *See* Dynegy Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2011); Carl Icahn, Quarterly Report (Form 13F-HR) (Aug. 15, 2011); Dynegy Inc., Form 4 (Oct. 4, 2011); Dynegy, Inc., Schedule 13G (Oct. 11, 2011); Dynegy Inc., Schedule 13D (Aug. 25, 2011); Dynegy Inc., Current Report (Form 8-K) (Mar. 10, 2011); Dynegy Inc., Current Report (Form 8-K) (May 5, 2011) [Dkt. No. 53, at A-1 to A-7].

and its equity holders—and to create an artificial insolvency so as to seek to take unfair

advantage of section 502(b)(6)'s cap on rejection damages.  Dynegy Inc.'s scheme, if successful,

would turn the Bankruptcy Code on its head by allowing Dynegy Inc. not only to retain its equity

interest in the Debtors, but also to reap the benefits of the prepetition fraudulent transfers that

rendered the Debtors "insolvent" and caused them to file for bankruptcy relief in the first

instance.

4. In June 2011, after a series of failed efforts to gain leverage and control over

3. Dynegy Inc. caused the Debtors to file these bankruptcy cases in the wake of

three state court lawsuits, including one filed on November 4, 2011 by the PSEG Entities, all of

which allege that Dynegy and certain members of the Control Group engaged in actual or

constructive fraud when they rendered Dynegy Holdings artificially insolvent by engaging in a

restructuring scheme designed solely to benefit Dynegy Inc. and its shareholders, including Icahn

Capital and Seneca, at the expense of Dynegy Holdings and its creditors.  The Debtors—which

remain controlled by the non-Debtor insiders who masterminded the prepetition scheme—now

inappropriately seek to use the protections of the Bankruptcy Code to facilitate that scheme.

4. In June 2011, after a series of failed efforts to gain leverage and control over

Dynegy Inc. and its subsidiaries' assets, Icahn Capital, along with Seneca, seized majority

control of Dynegy Inc.'s board of directors.  Shortly thereafter, Dynegy carried out a refinancing

transaction that transferred Dynegy Holdings' valuable assets to certain bankruptcy-remote

"ring-fenced" affiliates.  In doing so, Dynegy and certain members of the Control Group created

an artificial liquidity crisis at Dynegy Holdings by restricting the ring-fenced entities' dividends

to Dynegy Holdings to approximately half of what it would need to meet its debt service

obligations. Then—in direct contravention of representations Dynegy made to the Delaware

Chancery Court—Dynegy Inc. took from Dynegy Holdings its valuable portfolio of coal-fueled

-3-

plants for clearly inadequate consideration via another corporate restructuring.

5.      In the penultimate step before commencing these bankruptcy cases, Dynegy Inc.,

Dynegy Holdings, and certain consenting noteholders entered into a coercive restructuring

support agreement, which not only provides for Dynegy Inc. to retain its artificially enhanced

equity value, but also purports to extinguish the Debtors' fraudulent transfer claims against

Dynegy Inc. by providing a full release to "Dynegy and its subsidiaries and all of their respective

directors, officers, employees, agents, attorneys and representatives." (Restructuring Support

Agreement Term Sheet, at p. 5 [Dkt. No. 18, Ex. 2].) The restructuring support agreement does

not stop there. In stark contrast to its favorable treatment of the parties responsible for the

Debtors' artificial insolvency, the restructuring support agreement attempts to punish the PSEG

Entities and the Indenture Trustee. It is conditioned upon this Court limiting the PSEG Entities'

claims to a fraction of the amount to which they are entitled under the leases and guaranties by

applying section 502(b)(6)'s cap, which the PSEG Entities contend does not apply.

6.      By rendering Dynegy Holdings artificially insolvent, Dynegy Inc. has attempted

to manufacture a bankruptcy case where applying section 502(b)(6)'s cap on rejection damages

potentially could be appropriate. Dynegy Inc.'s desire to misuse the Bankruptcy Code is the

primary reason it stripped Dynegy Holdings of its assets and then caused it to file this petition in

an attempt to take advantage of insolvency that resulted from the fraudulent transfers.

7.      This Court should not permit Dynegy Inc. to be both the cause and the beneficiary

of Dynegy Holdings' artificial insolvency. The PSEG Entities join in the Indenture Trustee's

Examiner Motion.

**Joinder**

8.      Appointment of an examiner is mandated in these cases because all of the

statutory predicates have been met: (i) a trustee has not yet been appointed; (ii) the Debtors have

not filed a chapter 11 plan; and (iii) the Debtors' unsecured debts exceed the $5 million threshold

established in section 1104(c)(2) of the Bankruptcy Code.  Further, the prepetition conduct of

Dynegy and certain members of the Control Group warrants appointment of an examiner "in the

interests of creditors." *See* 11 U.S.C. § 1104(c)(1).  Accordingly, the PSEG Entities join in the

Indenture Trustee's Examiner Motion and incorporate its arguments into this Joinder.[3]

9.      Pursuant to section 1106(b) of the Bankruptcy Code, a court-appointed examiner

shall perform the duties set forth in sections 1106(a)(3) and (4), which provide that an examiner

shall:

> (3) except to the extent that the court orders otherwise, investigate
> the acts, conduct, assets, liabilities, and financial condition of the
> debtor, the operations of the debtor's business and the desirability
> of the continuance of such business, and any other matter relevant
> to the case or to the formulation of a plan;
>
> (4) as soon as practicable -
>
> (A) file a statement of any investigation conducted under
> paragraph (3) of this subsection, including any fact ascertained
> pertaining to fraud, dishonesty, incompetence, misconduct,
> mismanagement, or irregularity in the management of the affairs of
> the debtor, or to a cause of action available to the estate; and
>
> (B) transmit a copy or a summary of any such statement to any
> creditors' committee or equity security holders' committee, to any
> indenture trustee, and to such other entity as the court designates.

11 U.S.C. § 1106(a).

---

[3] The PSEG Entities contend that the Debtors were rendered artificially insolvent as a result of the prepetition
fraudulent transfers.  To the extent the Indenture Trustee's Examiner Motion suggests that the Debtors were
insolvent *prior* to the fraudulent transfers, the PSEG Entities disagree with, and do not join in, that allegation.

10.     The Indenture Trustee's proposed scope of the examiner's investigation—which

relates generally to the fraud and misconduct of the Debtors and certain members of the Control

Group—is consistent with the role of the examiner set forth by the plain language of section

1106 of the Bankruptcy Code.  11 U.S.C. § 1106; *see also In re Gilman Servs., Inc.*, 46 B.R. 322,

327 (Bankr. D. Mass. 1985) (the primary function of an examiner is to "investigate the debtor's

actions, financial condition, as is appropriate under the particular circumstances of the case

including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current

or former management").

11.     In particular, the Indenture Trustee requests the appointment of an independent

examiner to investigate and report on:

- the structuring, negotiation, and closing of the August 2011 new financing and reorganization, including, without limitation, the impetus for the dividend restrictions and internal reorganization, the reasons for the inclusion of a change of control provision that allowed the coal portfolio equity to be transferred to Dynegy Inc., and the participation of members of the Control Group in, and the benefits they derived from, the new financing, dividend restrictions and internal reorganization;

- the structuring, negotiation, and closing of the transfer of the coal portfolio equity to Dynegy Inc., including, without limitation, the reasons for the formation of Dynegy Gas Investments and the inclusion of that entity in the transfer, the reasons for the amendment and restatement of the undertaking upon its assignment to Dynegy Holdings, whether the two steps of the transaction should be disregarded, and the value of the coal portfolio equity and the consideration paid to Dynegy Holdings;

- the structuring, negotiation, and execution of the November 7, 2011 restructuring support agreement, including, without limitation, the determination to leave equity unimpaired, the timing of milestones set out in the agreement, the agreement's adherence to the Debtors' fiduciary obligations to creditors, and whether continued pursuit of a plan based on the agreement is an appropriate use of Dynegy Holdings' resources in advance of (i) pursuit of any estate claims the examiner recommends be pursued in order to restore assets to Dynegy Holdings' estate and (ii) a determination on the allowed amount of claims that the agreement seeks to cap under section 502(b)(6);

- the entire fairness of each of the above transactions to Dynegy Holdings and its creditors, including, without limitation, the Control Group's compliance with its fiduciary duties to creditors;

- any potential causes of action that Dynegy Holdings' estate may have arising out of any of the foregoing or any related actions, including any prepetition dividends or distributions made while Dynegy Holdings was insolvent, including causes of action against Dynegy Inc., Dynegy Holdings' other affiliates, Dynegy Holdings' prepetition advisors, or the Control Group;

- whether equitable subordination or the designation of votes of any claims against or interests in Dynegy Holdings, including, without limitation, claims or interests held by the Control Group, is warranted;

- whether the mismanagement of Dynegy Holdings or breaches of fiduciary duties by any members of the Control Group necessitate the appointment of a trustee to oversee Dynegy Holdings' estate; and

- whether substantive consolidation of Dynegy Holdings and some or all of its non-debtor affiliates is warranted based on Dynegy Inc.'s domination and control of Dynegy Holdings and its subsidiaries.

(Indenture Trustee's Examiner Motion, pp. 24-25.)

12.     In addition to the topics of investigation outlined by the Indenture Trustee, the

PSEG Entities request that the Court direct the examiner to:

- report on whether, at the time Dynegy Holdings, Dynegy, or members of the Control Group represented to the Delaware Chancery Court or the Supreme Court of the State of New York that, following the restructuring contemplated in Dynegy's July 11, 2011 8-K, Dynegy Holdings would continue to own the same assets that it owned prior to the restructuring, any of Dynegy Holdings, Dynegy, or the Control Group knew that statement to be false; and

- perform the duties specified in sections 1106(a)(3) and (4) of the Bankruptcy Code.

13.     To ensure that the examiner's investigation is thorough, the order directing the

appointment of an examiner should direct the Debtors, their affiliates, and members of the

Control Group (and their professionals, as well as all other parties) to cooperate fully with the

examiner.  The Court also should permit the examiner to retain counsel and any other advisors

necessary to conduct a thorough examination.  Because timeliness is important in these cases, the

PSEG Entities join in the Indenture Trustee's request that the Court direct the examiner to provide an initial report 90 days after appointment and, if necessary, submit a final report in 180 days.

### Conclusion

For all of the foregoing reasons, the PSEG Entities join in the Indenture Trustee's Examiner Motion and respectfully request entry of an order: (a) approving and directing the appointment of an independent examiner in these cases for the purposes of investigating and reporting to the Court and parties in interest in these cases with respect to the matters described in the Indenture Trustee's Examiner Motion and in this Joinder; and (b) granting such other relief as the Court deems just and proper.

Dated: November 18, 2011

Respectfully Submitted,

Resources Capital Management Corporation, Danskammer OL, LLC, Roseton OL, LLC, and Resources Capital Asset Recovery, L.L.C., Series DD and DR

By: */s/ Heather D. McArn*
      One of Their Attorneys

JENNER & BLOCK LLP
Anton R. Valukas
David J. Bradford
Daniel R. Murray
353 N. Clark Street
Chicago, IL 60654-3456
Phone: (312) 222-9350
Fax: (312) 527-0484

Heather D. McArn
919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699