**Hearing Date and Time:** December 2, 2011 at 10:00 a.m. (prevailing Eastern Time)
**Objection Deadline:** November 28, 2011 at 12:00 p.m. (prevailing Eastern Time)

JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484
Anton R. Valukas (admitted *pro hac vice*)
David J. Bradford (admitted *pro hac vice*)
Daniel R. Murray (admitted *pro hac vice*)

919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699
Heather D. McArn

*Counsel to the PSEG Entities*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
                                                                :
**In re**                                                       :
                                                                :      **Chapter 11 Case**
**DYNEGY HOLDINGS, LLC, et al.,**[1]                            :
                                                                :
                          **Debtors.**                          :      **Case No. 11-38111 (CGM)**
                                                                :      **Jointly Administered**
                                                                :
-------------------------------------------------------------- x

**NOTICE OF MOTION OF RESOURCES CAPITAL MANAGEMENT**
**CORPORATION; RESOURCES CAPITAL ASSET RECOVERY, L.L.C.,**
**SERIES DD AND SERIES DR; DANSKAMMER OL LLC; AND**
**ROSETON OL LLC FOR ENTRY OF AN ORDER DISMISSING**
**DEBTORS' CHAPTER 11 CASES PURSUANT TO 11 U.S.C. § 1112(b)**

---

[1]The Debtors are: Dynegy Holdings, LLC; Dynegy Danskammer, L.L.C.; Dynegy Roseton, L.L.C.; Dynegy Northeast Generation, Inc.; and Hudson Power, L.L.C.

**PLEASE TAKE NOTICE** that a hearing to consider the *Motion of Resources Capital Management Corporation; Resources Capital Asset Recovery, L.L.C., Series DD and Series DR; Danskammer OL LLC; and Roseton OL LLC for Entry of an Order Dismissing Debtors' Chapter 11 Cases Pursuant to 11 U.S.C. § 1112(b)* (the "Motion to Dismiss") shall be held before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 355 Main Street, Poughkeepsie, New York 12601-3315 (the "Bankruptcy Court") on **December 2, 2011 at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion to Dismiss and the relief requested therein shall be made in writing, shall state with particularity the legal and factual bases for such objection, shall comply with the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the case management procedures (the "Case Management Procedures") established in these cases pursuant to the Administrative Order Establishing Case Management Procedures [Dkt. No. 35], and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest on a 3.5 inch disk or CD-ROM, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-399 and the Case Management Procedures so as to be actually received no later than **November 28, 2011 at 12:00 p.m. (prevailing Eastern Time)** by: (i) Jenner & Block LLP, attorneys for Resources Capital Management Corporation;

Resources Capital Asset Recovery, L.L.C., Series DD and Series DR; Danskammer OL LLC;

and Roseton OL LLC, 353 North Clark Street, Chicago, Illinois, 60654 (Attn: David J. Bradford

and Daniel R. Murray); (ii) Sidley Austin LLP, proposed counsel to the Debtors, 787 Seventh

Avenue, New York, NY 10019 (Attn: James F. Conlan, Esq. and Matthew A. Clemente, Esq.);

(iii) White & Case LLP, proposed special counsel to Dynegy Holdings and the other debtors,

1155 Avenue of the Americas, New York, NY 10036 (Attn: Thomas E. Lauria, Esq. and Gerard

Uzzi, Esq.); (iv) the Office of the United States Trustee for the Southern District of New York,

33 Whitehall Street, 21st Floor, New York, New York 10004; and (v) the parties listed on the

Special Service List and the General Service/2002 List maintained in these cases pursuant to the

Case Management Procedures.

Dated: November 18, 2011    Respectfully Submitted,

           Resources Capital Management Corporation;
           Resources Capital Asset Recovery, L.L.C.,
           Series DD and Series DR;
           Roseton OL LLC; and
           Danskammer OL LLC


           By: /s/ *Heather D. McArn*
           One of Their Attorneys

           JENNER & BLOCK LLP
           Anton R. Valukas
           David J. Bradford
           Daniel R. Murray
           353 N. Clark Street
           Chicago, IL 60654-3456
           Phone: (312) 222-9350
           Fax: (312) 527-0484

           Heather D. McArn
           919 Third Avenue, 37th Floor
           New York, New York 10022-3908
           Telephone:  (212) 891-1600
           Facsimile:  (212) 891-1699

JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484
Anton R. Valukas (admitted *pro hac vice*)
David J. Bradford (admitted *pro hac vice*)
Daniel R. Murray (admitted *pro hac vice*)

919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699
Heather D. McArn

*Counsel to the PSEG Entities*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                         :
**In re**                     :
                         :           **Chapter 11 Case**
**DYNEGY HOLDINGS, LLC, et al.,**[1]   :
                         :
                         :           **Case No. 11-38111 (CGM)**
             **Debtors.**      :           **Jointly Administered**
                         :
---------------------------------------------------------------x

**MOTION OF RESOURCES CAPITAL MANAGEMENT
CORPORATION; RESOURCES CAPITAL ASSET RECOVERY, L.L.C.,
SERIES DD AND SERIES DR; DANSKAMMER OL LLC; AND
ROSETON OL LLC FOR ENTRY OF AN ORDER DISMISSING
DEBTORS' CHAPTER 11 CASES PURSUANT TO 11 U.S.C. § 1112(B)**

Resources Capital Management Corporation; Resources Capital Asset Recovery, L.L.C.,

Series DD and Series DR; Roseton OL LLC; and Danskammer OL LLC (collectively referred to

as the "PSEG Entities") respectfully move for entry of an Order dismissing the chapter 11 cases

of Dynegy Holdings, LLC ("Dynegy Holdings"); Dynegy Danskammer, L.L.C. ("Dynegy

---
[1] The Debtors are: Dynegy Holdings, LLC; Dynegy Danskammer, L.L.C.; Dynegy Roseton, L.L.C.; Dynegy
Northeast Generation, Inc.; and Hudson Power, L.L.C.

Danskammer"); Dynegy Roseton, L.L.C. ("Dynegy Roseton"); Dynegy Northeast Generation,

Inc. ("Dynegy Northeast"); and Hudson Power, L.L.C. ("Hudson") (collectively, the "Debtors").

## INTRODUCTION

This Court should dismiss the Debtors' bankruptcy cases because the Debtors have

fraudulently and without good faith manufactured an artificial insolvency in an effort to impose

the limitations of section 502(b)(6) of the Bankruptcy Code upon a handful of the Debtors'

creditors.  In *In re Integrated Telecom Express Inc.*, 384 F.3d 108, 115 (3rd Cir. 2004), the Third

Circuit ordered the dismissal of a bankruptcy petition in strikingly similar circumstances.  The

Third Circuit's reasoning is directly applicable to these cases, and this Court should follow

*Integrated Telecom* and dismiss the Debtors' bankruptcy cases.

The Debtors' commencement of these chapter 11 cases is the most recent step in a

scheme orchestrated by non-debtor Dynegy Inc. and its other non-debtor affiliates (collectively

with the Debtors, "Dynegy"), along with certain members of the "Control Group."[2]  Dynegy Inc.

and certain members of the Control Group have fraudulently stripped value from the Debtors,

and in particular Dynegy Holdings, for the benefit of Dynegy Inc. and its equity holders—and

thereby created an artificial insolvency.  They seek to exploit that artificial insolvency to take

unfair advantage of section 502(b)(6)'s cap on certain lease rejection damages.  Dynegy Inc.'s

scheme, if successful, would turn the Bankruptcy Code on its head by allowing Dynegy Inc. to

extract and retain much of the value of the Debtors and reap the benefits of the prepetition

---

[2] The directors of Dynegy Holdings and the directors and the significant equity holders of Dynegy Inc., along with their respective affiliates and persons who directly or indirectly control them, are collectively referred to herein as the "Control Group."  The Control Group includes Icahn Capital L.P. ("Icahn Capital"), Franklin Resources, Inc. ("Franklin Resources"), and Seneca Capital Advisors, LLC ("Seneca") (three of the largest shareholders of Dynegy Inc.), Carl Icahn, and the members of Dynegy Inc.'s board of directors they nominated.  *See* Dynegy Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2011); Carl Icahn, Quarterly Report (Form 13F-HR) (Aug. 15, 2011); Dynegy Inc., Form 4 (Oct. 4, 2011); Dynegy, Inc., Schedule 13G (Oct. 11, 2011); Dynegy Inc., Schedule 13D (Aug. 25, 2011); Dynegy Inc., Current Report (Form 8-K) (Mar. 10, 2011); Dynegy Inc., Current Report (Form 8-K) (May 5, 2011) [Dkt. No. 53, at A-1 to A-7].

fraudulent transfers that rendered the Debtors artificially insolvent and caused them to file for bankruptcy relief in the first instance.

Dynegy Inc. caused the Debtors to file these bankruptcy cases in the wake of three state court lawsuits, including one filed on November 4, 2011, by the PSEG Entities, all of which allege that Dynegy and certain members of the Control Group engaged in actual or constructive fraud when they rendered Dynegy Holdings artificially insolvent by engaging in a restructuring scheme designed solely to benefit Dynegy Inc. and its shareholders, including Icahn Capital and Seneca, at the expense of Dynegy Holdings and its creditors.[3]

In June 2011, after a series of failed efforts to gain leverage and control over Dynegy Inc. and its subsidiaries' assets, Icahn Capital, along with Seneca, seized majority control of Dynegy Inc.'s board of directors. Shortly thereafter, Dynegy carried out a refinancing transaction that transferred Dynegy Holdings' valuable assets to certain bankruptcy-remote "ring-fenced" affiliates. In doing so, Dynegy and certain members of the Control Group created an artificial liquidity crisis at Dynegy Holdings by restricting the ring-fenced entities' dividends to Dynegy Holdings to approximately half of what it would need to meet its debt service obligations. Then—in direct contravention of representations Dynegy made to the Delaware Chancery Court—Dynegy Inc. took from Dynegy Holdings its valuable portfolio of coal-fueled plants for clearly inadequate consideration via another corporate restructuring.

By rendering Dynegy Holdings artificially insolvent, Dynegy Inc. has attempted to manufacture a bankruptcy case where a damages-capped lease rejection would potentially be an

---

[3] A copy of the Complaint filed in the PSEG Entities Lawsuit (the "PSEG Complaint") is attached hereto as Exhibit 1 and incorporated herein.

appropriate remedy.[4]  Dynegy Inc.'s desire to misuse the Bankruptcy Code is the primary reason

it stripped Dynegy Holdings of its assets and then caused the Debtors to file their bankruptcy

petitions seeking to take advantage of the artificial insolvency that resulted from the fraudulent

transfers.  Dynegy Inc. cannot be both the cause and the beneficiary of Dynegy Holdings'

artificial insolvency.  This Court should dismiss the Debtors' bankruptcy cases because they

were filed in bad faith.

        In addition, because the Debtors are hopelessly conflicted to the point where they have

preemptively refused to pursue fraudulent transfer claims against Dynegy Inc. and its affiliates,

the bankruptcy cases should be dismissed pursuant to section 1112(b)(4)(B) of the Bankruptcy

Code.[5]

## JURISDICTION AND VENUE

        1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(2) and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The subject matter of the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  The statutory

predicates for the relief sought are sections 105(a) and 1112(b) of title 11 of the United States

Code (the "Bankruptcy Code").

## BACKGROUND FACTS

I.      **The Chapter 11 Cases.**

        2.      Dynegy Holdings and its non-debtor parent Dynegy Inc., through their direct and

indirect subsidiaries, sell electric energy, capacity, and ancillary services on a wholesale basis to

---

[4] The PSEG Entities dispute that section 502(b)(6)'s cap on damages arising out of the rejection of real property leases applies to the personal property leases and related agreements at issue in these cases.

[5] Although the dismissal of the Debtors' bankruptcy cases would best serve the parties in interest, if this Court is disinclined to dismiss the cases at this time, it should defer ruling on this Motion until after an examiner is appointed and conducts its investigation.  Accordingly, the PSEG Entities have joined in the motion of the Indenture Trustee for the appointment of an examiner.  [Dkt. Nos. 48, 90.]

utilities, cooperatives, municipalities, power marketers, and other industry customers in six U.S. states.  Dynegy owns or operates 17 power plants fueled by a mix of coal, fuel oil, and natural gas, and is the nation's third largest independent power producer.

3.      On November 7, 2011, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.   On November 9, 2011, this Court entered an Order jointly administering the Debtors' cases for administrative purposes.  [Dkt. No. 39.]

4.      On November 7, 2011, the Debtors filed the Motion of the Debtors Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 for Entry of an Order Authorizing The Debtors to Reject the Lease Documents (the "Lease Rejection Motion").  [Dkt. No. 5.]  The Lease Rejection Motion seeks entry of an Order rejecting certain personal property leases with the PSEG Entities, as well as the contemporaneously-executed guaranties, tax indemnity agreements, participation agreements, and the pass-through trust agreement.  It also provides that the Debtors will seek to cap any damages arising from rejection pursuant to section 502(b)(6).

5.      On November 11, 2011, U.S. Bank National Association (the "Indenture Trustee") as successor indenture trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Roseton Units 1 and 2 and successor indenture trustee under the Indenture of Trust, Mortgage, Assignment of Leases and Rents and Security Agreement related to Danskammer Units 3 and 4, filed a motion for the appointment of an examiner to investigate and report on the conduct of the Debtors (the "Examiner Motion").  [Dkt.

No. 48.]  On November 18, 2011, the PSEG Entities joined in the Examiner Motion.  [Dkt. No. 90.][6]

6.      On November 16, the United States Trustee filed the Notice of Appointment of Committee of Unsecured Creditors.  [Dkt. No. 85.]  The Committee is presently comprised of four voting members, including Roseton OL, one of the PSEG Entities.

## II.    The PSEG Entities' 2001 Transaction With Dynegy Holdings, Dynegy Danskammer, And Dynegy Roseton.

7.      On or about May 1, 2001, Dynegy Holdings and certain of its subsidiaries entered into a series of transactions with Danskammer OL, Roseton OL, and other affiliates by which Dynegy Danskammer and Dynegy Roseton sold the Roseton and Danskammer power generation facilities to and then leased the generating units back from them pursuant to long-term leases. Dynegy Holdings caused: (a) Dynegy Danskammer to sell Danskammer Units 3 and 4 to Danskammer OL for a purchase price of $300,000,000, and simultaneously to lease-back those units for a period through May 8, 2031 ("Danskammer Lease"); and (b) Dynegy Roseton to sell Roseton Units 1 and 2 to Roseton OL for a purchase price of $620,000,000, and simultaneously to lease-back those units for a period through February 8, 2035 ("Roseton Lease").  The Danskammer Lease and the Roseton Lease are attached hereto as Exhibits 2 and 3.

8.      As part of the May 1, 2001 transactions, Dynegy Holdings executed identical guaranties with respect to each lease (the "Guaranties") and other related agreements, including the tax indemnity agreements described below.  The Guaranties are attached hereto as Exhibit 4.

---

[6] Danskammer OL LLC ("Danskammer OL") and Roseton OL LLC ("Roseton OL") are respectively the owner-lessors of certain generating units within the Danskammer power facility and the Roseton power facility, which are subject to the lease-back agreements with certain Debtors.  Resources Capital Management Corporation ("RCMC") is an indirect parent of Danskammer OL and Roseton OL and a party to the Guaranties and the Tax Indemnity Agreements discussed herein.  Resources Capital Asset Recovery, L.L.C., Series DD and Series DR are Series limited liability companies that are also the indirect parents of Danskammer OL and Roseton OL, respectively, and is the assignee of certain interests of RCMC.  PSEG Resources, Inc. is a New Jersey corporation and the ultimate parent of the PSEG Entities.

The effect of the Guaranties was to protect the PSEG Entities by making the cash flow and equity value of all Dynegy Holdings' valuable assets available to guarantee obligations incurred by Dynegy Holdings' affiliates and to protect against the transfer of Dynegy Holdings' assets and value that backstopped those obligations.  But for the Guaranties, the PSEG Entities would not have participated in the sale lease-back transactions.

9.      The PSEG Entities also bargained for certain valuable tax benefits in connection with the sale and lease-back transactions.  To assure they received the after-tax rate of return for which they bargained, the PSEG Entities insisted and Dynegy Holdings' subsidiaries agreed to execute tax indemnity agreements (collectively, the "Tax Indemnity Agreements").  Copies of the Tax Indemnity Agreements are attached hereto as Exhibits 5 and 6.

10.     The Tax Indemnity Agreements and Guaranties provide that Dynegy Holdings and certain affiliates will indemnify the PSEG Entities for the loss of certain federal, state, and local income tax benefits and related rates of return that the PSEG Entities bargained for in connection with the sale and lease-back transactions.  The Tax Indemnity Agreements and Guaranties also prohibit Dynegy Holdings and certain affiliates from taking any action that would impair those tax benefits.  The Tax Indemnity Agreements provide the PSEG Entities the "right to receive payments pursuant to this Agreement" in the event of a breach.  (Tax Indemnity Agreements at 5.)

## III.    Dynegy's Transfers and Restructuring Scheme.

11.     In June 2011, Icahn Capital, along with Seneca, prevailed in overhauling Dynegy Inc.'s board.  Dynegy Inc. announced on June 15, 2011, a new slate of directors, at least four of which had professional relationships with Icahn Capital.  Seneca, whose interests aligned with Icahn Capital, appointed a fifth new director.

12.     Following the Icahn/Seneca takeover, Dynegy Inc. and certain members of the Control Group orchestrated a series of fraudulent transfers, including changes to Dynegy's corporate structure (collectively referred to herein as the "Transfers"), designed to render Dynegy Holdings artificially insolvent.  The overall scheme carried out by the Transfers is further described in the paragraphs below and is referred to as the "Restructuring Scheme."

**A.     The First Step—"Ring-Fencing."**

13.     In the first step of the Restructuring Scheme, Dynegy Holdings fraudulently transferred virtually all of its value and assets to two newly-created bankruptcy-remote "ring-fenced" entities, one ("CoalCo") to hold all of its valuable coal assets, and another ("GasCo") to hold all of its valuable gas assets.  These bankruptcy-remote entities were structured so that although Dynegy Holdings technically was the sole member of each, it could not compel distributions from either of them because any distribution required the approval of an independent manager, and because of artificial caps on the amount of distributions the entities can make per year.  According to a Standard & Poor's report from July 19, 2011, "the caps will make it impossible for Dynegy Holdings to cover its obligations."

14.     Also, in the first step of the Restructuring Scheme, Dynegy Inc. caused the fraudulent transfers of the two Dynegy subsidiaries that owe the direct lease obligations (Dynegy Roseton and Dynegy Danskammer) and the Dynegy entity that directly owns them (Dynegy Northeast) to Dynegy Holdings' direct ownership and did not "ring-fence" Dynegy Northeast or Dynegy Holdings.  Dynegy Inc. did this in an attempt to obfuscate Dynegy Holdings' assets so that it could—as it has indeed attempted to do in these bankruptcy cases—dump a stripped-down Dynegy Holdings into bankruptcy in an effort to discharge or limit the Roseton Lease, Danskammer Lease, Guaranties, and Tax Indemnity Agreements.  Dynegy Inc. also intended its

scheme to remove from the reach of the PSEG Entities and other creditors the other businesses that Dynegy Holdings previously owned.

15.    The following diagrams show Dynegy Holdings' corporate structure before and after the first step of the Restructuring Scheme:

### DYNEGY CORPORATE STRUCTURE
### BEFORE THE RESTRUCTURING SCHEME



## DYNEGY CORPORATE STRUCTURE IMMEDIATELY AFTER
## THE FIRST STEP IN THE RESTRUCTURING SCHEME



16.     On July 11, 2011, Dynegy Inc. and Dynegy Holdings filed an SEC Form 8-K that acknowledged their intention to reorganize Dynegy Holdings.  (Exhibit 7, July 11, 2011 SEC Form 8-K at 2.)  But they disclosed only part of their plan.

17.     Dynegy Inc. and Dynegy Holdings, in the 8-K, acknowledged the possibility that a court could find that some of the transfers involved in the first step of the Restructuring Scheme were fraudulent conveyances:

> *While we have no reason to believe that DPC (GasCo) or any of the entities involved in the pre-Loan transfers that embody the formation of DPC (GasCo) are, or upon closing of the applicable transfers or the Loans, will be, rendered*

> *insolvent, if that is not the case, DPC (GasCo), as a debtor in possession, or its creditors (on behalf of DPC (GasCo)'s bankruptcy estate or individually if DPC (GasCo) is not in bankruptcy) may claim that (A) the transfers of assets in the creation of DPC (GasCo) constituted transfers and seek remedies (either within or outside of a bankruptcy filing), which could include the unwinding of those transfers, and/ or (B) DPC (GasCo)'s distribution of a portion of the proceeds from the GasCo Term Loan to DHI constituted a fraudulent transfer and seek remedies (either within or outside of a bankruptcy filing), which could include the unwinding of those distributions.*

(*Id.* at 7.)

18.     Dynegy Inc. also reported in the 8-K that following the closing of the loans contemplated by the first step of the Restructuring Scheme, it may undertake steps that would increase the likelihood that creditors like the PSEG Entities would challenge the prior transactions:

> *Following the closing of the Loans, Dynegy may engage in transactions that increase the likelihood of its estate or creditors challenging the pre-Loan transactions.*

(*Id.* at 6-7.)

**B.     Dynegy Holdings' False Representations to the Delaware Court of Chancery.**

19.     On July 22, 2011, Roseton OL and Danskammer OL filed a verified complaint against Dynegy Holdings in the Delaware Court of Chancery seeking to prevent Dynegy Holdings from making certain proposed Transfers because of their concern that those Transfers "would turn into a hollow shell DHI's guaranty of $920 million in financing provided by PSEG." (Group Exhibit 8, Del. Ch. Ct. Compl. ¶1.)  Contemporaneous with the filing of their complaint, Roseton OL and Danskammer OL filed a Motion for Temporary Restraining Order, seeking to enjoin Dynegy Holdings from proceeding with its proposed Transfers until after a preliminary injunction hearing.

20.     In its opposition to the Motion for Temporary Restraining Order, Dynegy Holdings repeatedly represented to the Delaware Chancery Court, as a basis for denying the

motion, that following the Transfers and related restructuring, Dynegy Holdings would continue to own the same assets that it owned prior to the restructuring. Dynegy Holdings' and Dynegy Inc.'s Board of Directors member Samuel Merksamer represented in briefs and supporting affidavits, for example:

- "Following the Reorganization, DHI will continue to own, indirectly through a series of subsidiaries, each of those same power generating assets. On a consolidated basis, **DHI will have all of the same assets it currently has** on a consolidated basis." (Ex. 8, July 25, 2011 Aff. of Samuel Merksamer ¶9.)

- **"DHI will continue to hold direct equity interests *at all times*** in entities that own indirectly all of the power generating assets, just as, and to the same extent that, the direct subsidiaries of DHI today indirectly own such assets. Thus, DHI will continue to own indirectly the same revenue generating assets that it indirectly owns today." (Ex. 8, July 25, 2011 2d Supp. Aff. of Samuel Merksamer ¶4, emphasis added.)

- "After the Reorganization, DHI will have rights in the same assets that it had before the Reorganization. . . ." (Ex. 8, DH Opp. to Mot. for TRO at 1.)

- "DHI is not transferring farther out of reach any power plants. Indeed**, no assets are being transferred outside of DHI's ultimate ownership."** (*Id.* at 2-3.)

- "The **Reorganization will in no way diminish the value of DHI's assets**. Rather, DHI will continue to own the equity of DHI's direct subsidiaries—and that equity will continue to include the same value of the same power plants." (*Id.* at 3.)

- "On a consolidated basis, **nothing will change**." (*Id.* at 18.)

- "Following the Reorganization, DHI will continue indirectly to own the same revenue generating assets, through a series of subsidiaries, and that equity will still be subject to execution in the event of a judgment. In short, **DHI will continue to own indirectly, just as it does now, 100% of those assets**." (*Id.* at 10.)

- "DHI does not currently directly own any power plants; it owns stock in subsidiaries that own stock in subsidiaries that own power plants. This was so when the Guaranties were executed. It is true now. And it will be the case after the Reorganization is completed." (*Id.* at 1.)

21.    Relying on the affidavit from Mr. Merksamer, Dynegy Holdings made the same representations at the hearing on the Motion for Temporary Restraining Order:

- "DHI today, indirectly, through a series of subsidiaries, owns 17 power plants, many of which are profitable. **And following the reorganization, DHI will own 17 power plants**, the very same power plants; and they will be equal in value to what they're equal to today except to the extent that the value is enhanced by reason of its new liquidity and its new structure. So it's important to understand that not only is there technically not a transfer but, economically, DHI has the same value after the reorganization that it has today." (Exhibit 9, 7/25/11 Del. Ch. Ct. Hr'g Tr. at 36:13-24.)

- "But what's interesting about it is usually, when you get in these situations, it's because the guarantor is being left with substantially fewer assets than they had; and that's actually not the case here." (*Id*. at 37:5-9.)

- **"It does not mean, of course, that the value of those bankruptcy-remote entities is removed from the bankruptcy estate.** To the contrary, the estate, if it was DHI, would continue to own what it always owned, which is equity in entities that were holding companies that ultimately owned the power assets; and they would still have that." (*Id*. at 38:8-14.)

- "We have put in an affidavit [from Mr. Merksamer] that says all of this, Your Honor, that says that we will—that DHI indirectly owns through a series of subsidiaries all of the power plants at issue; and following the reorganization, **DHI will continue to own through a series of subsidiaries the very same power plants**." (*Id*. at 44:23-45:5.)

- "The enterprise under DHI will look the same after the reorganization, just as it looks today." (*Id*. at 49:22-24.)

- "As to the parent, as I've already said, the parent now owns the indirect interest in all these power assets through subsidiaries, and it continues to do so. So the fair value, it's starting the day with the same value it's ending the day. Before the reorganization, it has the full enterprise value of all of its subsidiaries. At the end of the day, it has the full value of all of its subsidiaries. It goes from the left pocket to the right pocket. You can go find it on an org chart, but that doesn't mean it's a transfer." (*Id*. at 55:6-16.)

22.    Dynegy Holdings later took actions contrary to every one of those representations.

Most critically, before Dynegy Holdings made the representations, Dynegy Inc. had negotiated

(but did not publicly disclose until later) in a new financing agreement secured by CoalCo's

assets an express carve-out providing that a transfer of the CoalCo assets from Dynegy Holdings

to Dynegy Inc. would not constitute a default. (Exhibit 10, August 8, 2011 SEC Form 8-K at Ex.

10.1, p. 7.) This carve-out was non-market. Indeed, the financing agreement secured by

GasCo's assets included no such carve-out but was otherwise substantively identical to the CoalCo agreement. The inclusion of this unusual provision in the coal portfolio financing agreement suggests that Dynegy Holdings had intended to transfer beneficial ownership of CoalCo to Dynegy Inc. *before* it represented to the Delaware Court that it would continue to maintain ownership of those very assets.

23.    Parallel litigation concerning the same issues was commenced in New York state court in July 2011 by certain of Dynegy Holdings' creditors, who also sought a temporary restraining order. During an initial hearing in the New York state case, Dynegy Holdings made the following false representations:

- "At the end of today, before any restructuring is happening DHI has under it a series of companies and under those series of companies are other companies and ultimately revenue generating assets. *When restructuring closes DHI will have a series of companies under it, and they will have a series of companies under them that will hold the very same assets. So there is no change in credit risk whatsoever.*" (Exhibit 11, July 21, 2011 Hr'g Tr. at 12: 15-22 (emphasis added).)

- "[Dynegy Holdings] will have more than sufficient assets to pay these debts when they become due. *More significantly, it will have the same assets as today, and more significantly, there is nothing about the value of the assets at DHI today that will change its only equity.*" (*Id*. at 14: 21-26 (emphasis added).)

24.    On July 29, 2011, the Delaware Court issued a Memorandum Opinion denying the Motion for Temporary Restraining Order, relying in part on Dynegy Holdings' misrepresentations that Dynegy Holdings would continue to enjoy beneficial ownership of the valuable coal and gas assets. In fact, the Delaware Court specifically cited Dynegy Holdings' purported continued ownership of the coal assets as a basis for denying the Motion:

From a quantitative perspective, Plaintiffs arguably have shown that substantially all of its valuable power plant assets would be transferred into GasCo and CoalCo, leaving the allegedly negative-cash-flow-generating Roseton and Danskammer plants outside of the ring-fencing contemplated by the Transaction. ***But, GasCo and CoalCo still will be subsidiaries of DHI; thus, any assets transferred to them are not being transferred away from DHI's ultimate ownership. This fact distinguishes the B.S.F. Co. case*** . . . . Subject to

restrictions discussed below**, DHI** retains the value of the plants embedded in its ownership of the entities that directly own those plants today and **will own them after the Transaction is consummated.** Thus, Plaintiffs are not likely to succeed in showing quantitatively that DHI transferred away its valuable assets "substantially as an entirety."

(Exhibit 12, Mem. Op. at 36-37, emphasis added.)

25.     The Delaware Court was explicit in basing its ruling on the false premise that

Dynegy Holdings would continue to indirectly own the valuable CoalCo assets:

Plaintiffs are not likely to succeed in showing that DHI transferred the profitable power plants to GasCo and CoalCo without receiving a reasonably equivalent value.  This is because DHI did not transfer any valuable assets away from its corporate structure . . . . ***DHI will have the same indirect ownership interests in the physical assets after the Transaction as it did before it.***  Concededly, the bankruptcy remote nature of GasCo and CoalCo will deprive DHI of the same level of potential control over their assets as it had before the Transaction, but DHI also will enjoy, at least indirectly, the benefits of those entities' statuses.

(*Id.* at 43-44, emphasis added.)

26.     Based on Dynegy Holdings' representations, the Delaware Court made the

following findings, which Dynegy Inc.'s and Dynegy Holdings' subsequent acts rendered

unsupportable:

- Dynegy Holdings would continue to enjoy, at least indirectly, the benefits of CoalCo's assets.  (*Id.* at 44.)

- ***Dynegy Holdings is not insolvent.*** (*Id.* (emphasis added).)

- The Transfers and Restructuring Scheme would provide "actual and substantial financial benefits to DHI, which potentially could rebound to plaintiffs' benefit over time."  (*Id.* at 47.)

27.     Dynegy and Dynegy Holdings, within weeks, would make a mockery of their in-

court representations and the Delaware Court's findings by fraudulently transferring all of

CoalCo to Dynegy Inc. and out of Dynegy Holdings' ownership umbrella.

28.     On August 4, 2011, Roseton OL and Danskammer OL sought to appeal the

Delaware Chancery Court's decision to the Delaware Supreme Court.  But before the Supreme

Court could rule on a stay or request to certify an appeal, on August 5, 2011, Dynegy Holdings informed the Supreme Court that the restructuring transaction had closed and that these claims were moot.

29.     Shortly thereafter, on August 5, 2011, the Delaware Supreme Court exercised its discretion and refused Roseton OL and Danskammer OL's Application to Certify an Interlocutory Appeal from the Delaware Chancery Court's July 29, 2011 Memorandum Opinion because the matter was moot.  Roseton OL and Danskammer OL thereafter dismissed the case without prejudice.

**C.     September 1, 2011: Dynegy Inc. Acquires Direct Ownership Of Coal HoldCo.**

30.     On September 1, 2011, Dynegy Holdings did exactly what it represented to the Delaware Court it would not do: it transferred 100% of the outstanding membership interests of Coal HoldCo, which represents approximately 40% of the revenue of all of Dynegy Holdings' subsidiaries, to Dynegy Inc. without receiving adequate consideration.

31.     To achieve direct ownership of Coal HoldCo without paying fair consideration for it, and to further saddle Dynegy Holdings with excessive obligations, Dynegy Inc. devised a convoluted financing structure.  Dynegy Inc. did not purport to conduct a good faith or independent valuation before entering into that structure.  Rather, Dynegy Inc.'s Board of Directors and Dynegy Gas Investments' Board of Managers concluded (without obtaining an independent opinion) that the fair market value of Dynegy Inc.'s acquired equity stake in Coal HoldCo was approximately $1.25 billion.  (Exhibit 13, Sept. 8, 2011 SEC Form 8-K at 2.)

32.     Dynegy Inc. then agreed, pursuant to an undertaking agreement, to provide a stream of payments that Dynegy Inc. valued at $1.25 billion to Dynegy Gas Investments— Dynegy Holdings' subsidiary—in consideration for Dynegy Inc.'s acquisition of Coal HoldCo. (Exhibit 14, September 8, 2011 SEC Form 8-K at Ex. 2.2, the "Undertaking").  The

Undertaking's payment stream was equal in timing and amount to the payments of principal and interest that Dynegy Holdings was obligated to make under a portion of its $1.1 billion of 7.75% senior unsecured notes due 2019 and its $175 million of 7.625% senior debentures due 2026. Like the value assigned to Coal HoldCo, the value assigned to the Undertaking was self-serving and apparently not the subject of any independent or good faith valuation.

33.    On the same day it entered into the Undertaking, Dynegy Gas Investments assigned the Undertaking to Dynegy Holdings.  In exchange, Dynegy Holdings issued a note to Dynegy Gas Investments for $1.25 billion, with a payment stream equal in timing and amount to the payment stream from the Undertaking.  As Dynegy Holdings received rights to payments from Dynegy Inc. equal in value and amount to its obligation to make payments to Dynegy Gas Investments, the paired transactions provided no economic benefit to Dynegy Holdings.

34.    Simultaneous with the assignment of the Undertaking to it, Dynegy Holdings and Dynegy Inc. entered into an amended undertaking agreement (Exhibit 15, September 8, 2011 SEC Form 8-K at Ex. 2.3, the "Amended Undertaking") that made matters substantially worse for Dynegy Holdings.  The original Undertaking provided that Dynegy Inc.'s consent was requisite to any assignment of the Undertaking.  As consideration for Dynegy Inc.'s consent, the Amended Undertaking introduced a "Payment Reduction" clause that allowed Dynegy Inc. to extinguish its payment obligation to Dynegy Holdings altogether if Dynegy Inc. or its subsidiaries achieved a $1.25 billion reduction in the face value of Dynegy Holdings' outstanding bonds, which were trading substantially below par.  Consequently, Dynegy Inc. could exercise its option to cancel its $1.25 billion payment obligation to Dynegy Holdings for substantially less than $1.25 billion.  Therefore, the present value of the Amended Undertaking to Dynegy Holdings was worth substantially less than $1.25 billion.  Critically, Dynegy Inc.'s

cancellation of its obligation to pay Dynegy Holdings would have no effect on Dynegy Holdings'

obligation to pay $1.25 billion to Dynegy Gas Investment.

35.     The September 1, 2011 step of the Restructuring Scheme transferred beneficial

ownership of Coal HoldCo away from Dynegy Holdings to Dynegy Inc.  In exchange, Dynegy

Holdings received the promise of a stream of payments, which Dynegy Inc. valued at $1.25

billion.  In addition, the transaction contemplated that Dynegy Holdings would simultaneously

incur $1.25 billion in obligations to Dynegy Gas Investments.  Further, Dynegy Inc. could cancel

its obligation to pay Dynegy Holdings at any time by cancelling Dynegy Holdings' existing

$1.25 billion bond obligations, which would require an expenditure of far less than $1.25 billion

due to prevailing market conditions.  Viewed as a whole, the transactions took away Dynegy

Holdings' interest in Coal HoldCo in exchange for a set of new rights and obligations that

provided *negative* economic value to Dynegy Holdings.

36.     Thus, the September 1, 2011 transactions were a loss on two fronts for Dynegy

Holdings.  *First*, by allowing Dynegy Inc. to reduce dollar-for-dollar the principal amount of the

Amended Undertaking for any Dynegy Holdings senior notes or debentures that Dynegy Inc. or

its subsidiaries (other than Dynegy Holdings and its subsidiaries) acquires and retires, cancels, or

forgives, Dynegy Inc. took away Dynegy Holdings' opportunity to capture the market discount

on Dynegy Holdings' notes and debentures.  *Second*, Dynegy Inc. took the CoalCo asset from

Dynegy Holdings for substantially less value than it was worth.

37.     Likely cognizant that Dynegy Holdings' creditors would challenge these transfers,

Dynegy Inc. sought to shield them from meaningful review in a public forum.  The Coal HoldCo

Purchase Agreement provides that if there is a challenge to the self-serving $1.25 billion

valuation of Coal HoldCo, that Dynegy Inc. and Dynegy Holdings agree that any dispute must be

resolved in binding arbitration.  (Exhibit 16, September 8, 2011 SEC Form 8-K at Ex. 2.1, §2.3.)

The Purchase Agreement goes on to state:

> [a]ny third party that is determined by a court of competent jurisdiction to have standing to bring any claim relating to this agreement or the transactions contemplated hereunder (including, without limitation, fraudulent conveyance and transfer claims) may intervene and participate as a party to the arbitration, provided that such third party agrees in writing with each of the parties to this agreement to be bound by this arbitration agreement.

(*Id.* at §5.6(c).)  Those provisions attempt to short-circuit the very relief that the PSEG Entities

sought by the PSEG Entities Lawsuit.

38.    Further, these transactions were not approved by independent and disinterested

parties.  For example, the Amended Undertaking was executed on behalf of both Dynegy Inc.

and Dynegy Holdings by Clint C. Freeland, who simultaneously served as the Chief Financial

Officer of Dynegy Inc. and the Chief Financial Officer and Director or Manager of Dynegy

Holdings.

39.    As shown below, the effect of the sale of Coal HoldCo from Dynegy Gas

Investments to Dynegy Inc. was to divest Dynegy Holdings of any interest in Coal HoldCo and

the valuable coal assets:

## DYNEGY CORPORATE STRUCTURE
## AFTER THE FRAUDULENT TRANSFER OF COAL HOLDCO



40.    But for the Transfers, Dynegy Holdings would have otherwise been entitled to *all* of Coal HoldCo's $1.25 billion or more in value.  Now, unless the Transfers are avoided as fraudulent, Dynegy Holdings has no beneficial interest in Coal HoldCo.  The Transfers were intended to create an artificial insolvency at Dynegy Holdings.

41.    As part of their overall effort to erect barriers to future challenges to the Transfers, Dynegy Inc. and the Dynegy Holdings directors filed, on September 1, 2011, documents purporting to change Dynegy Holdings from a corporation to a Delaware limited liability

company, Dynegy Holdings, LLC, under section 266 of Delaware's General Corporation Law. The PSEG Entities believe that Dynegy Holdings and Dynegy Inc. changed Dynegy Holdings from a corporation to an LLC in an attempt to take advantage of recent Delaware Supreme Court precedent that an LLC's members have no fiduciary duties to the LLC's creditors. The PSEG Entities, however, dispute that that this part of Dynegy's scheme will successfully shield Dynegy Holdings from its creditors' fraudulent transfer claims.

42.     The purportedly-converted Dynegy Holdings' only member is Dynegy Inc. Its new Board of Managers, as appointed by Dynegy Inc., consists of many former directors and officers of Dynegy Holdings, Inc. Because the corporate structure of Dynegy and Dynegy Holdings was used for fraudulent, unfair, and unjust purposes, there is ground to pierce their corporate veils such that Dynegy Inc. should be deemed the alter-ego of Dynegy Holdings.

43.     Following the numerous September 1 transactions, on September 15, 2011, Dynegy Inc. and Dynegy Holdings offered an exchange of up to $1.25 billion of Dynegy Holdings' debt ("Exchange Offer") in an effort to eliminate the $1.25 billion obligation it incurred under the Amended Undertaking in connection with acquiring CoalCo. Ultimately, the Debtors failed to obtain sufficient support and withdrew the Exchange Offer.

44.     The Debtors' commencement of these bankruptcy cases is the latest chapter in Dynegy Inc.'s multi-step self-dealing scheme. *First*, through a series of premeditated fraudulent transfers, Dynegy Inc. systematically stripped value from the Debtors to render them artificially insolvent. *Second*, having rendered the Debtors artificially insolvent, Dynegy Inc. placed the Debtors into bankruptcy with the intent to use the Bankruptcy Code to limit claims of specific creditors—the PSEG Entities and the Indenture Trustee. *Third*, Dynegy Inc. together with the Debtors seek to exploit their artificial insolvency to attempt to take advantage of section

502(b)(6).  Dynegy Inc. is playing a corporate shell game, which this Court should not endorse. Rather, it should dismiss the Debtors' bankruptcy cases.

## ARGUMENT

The Debtors filed these cases to advance their and Dynegy Inc.'s scheme to create an artificial insolvency at Dynegy Holdings in an effort to invoke the protections of section 502(b)(6) to limit claims of the parties to the Roseton Lease and the Danskammer Lease while enriching the  Debtors' equity holders.  The Debtors did not file these cases for the purpose of engaging in a legitimate reorganization or maximizing the value of the estates, and the Debtors have indicated that they have no intention of pursuing valuable avoidance actions against Dynegy Inc.  Therefore, this Court should dismiss these cases.

## I.        Lack Of Good Faith Is Cause For Dismissal.

Section 1112(b) provides that a court must dismiss a chapter 11 bankruptcy case upon a showing of cause by a party in interest.  11 U.S.C. § 1112(b)(1).  In addition to the illustrative list of circumstances set forth in section 1112(b) that constitute cause, courts recognize that "absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under § 1112(b)." *Official Comm. Of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 160-61 (3rd Cir. 1999) (collecting cases from various courts of appeals); *see C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2nd. Cir. 1997).  Once a debtor's bad faith is at issue, the debtor bears the burden of rebutting that contention and establishing that it filed its petition in good faith.  *In re SGL Carbon*, 200 F.3d at 160-61; *In re Integrated Telecom*, 384 F.3d at 118.  Courts apply a factually-intensive inquiry to determine whether a debtor filed its petition in good faith.  *In re SGL Carbon*, 200 F.3d at 118.

In conducting the analysis, courts consider both the subjective intent of the debtor and what objective purposes the bankruptcy filing could serve to advance.  *Santa Fe Minerals, Inc. v.*

*Bepco, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605, 618 (3rd Cir. 2009).   A bankruptcy filing serves a valid bankruptcy purpose if it will either preserve the value of a going concern or maximize the value of the debtor's estate.   *Id.* at 619; *In re Integrated Telecom*, 384 F.3d at 120. Courts should focus "on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose . . . and (2) whether the petition is filed merely to obtain a tactical litigation advantage," but should not exclude other factors.   *In re Integrated Telecom*, 384 F.3d at 120.  (internal citations and punctuation omitted).

Considering the purposes underlying chapter 11 illuminates whether a bankruptcy filing fulfills a "valid bankruptcy purpose."   Chapter 11's purposes include (i) preserving going concerns, and (ii) maximizing value available to satisfy the debtor's creditors.   *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434, 453 (1999).   Where, as here, the debtor intends to liquidate, the inquiry focuses on the latter purpose.[8]   *See In re 15375 Memorial*, 589 F.3d at 619.   A bankruptcy petition maximizes value where it preserves value that would be lost outside of bankruptcy.   *In re Integrated Telecom*, 384 F.3d at 120.   Filing a petition to obtain a litigation advantage or to delay creditors does not serve any valid bankruptcy purpose and can justify dismissal.   *Id.* at 119-20; *In re SGL Carbon*, 200 F.3d at 161-62 (good faith requirement "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way").   In addition, dismissal is warranted where an otherwise solvent debtor abuses the bankruptcy process to inflict section 502(b)(6)'s cap on its leasehold creditors.   *See In re Integrated Telecom*, 384 F.3d at 122-24.

---

[8] The *Declaration of Kent R. Stephenson Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Petitions* (the "Stephenson Declaration") [Dkt. No. 18] states that "the Debtors' only operations … consist of those at the Roseton and Danskammer facilities which are the subject of facility leases which the Debtors are seeking to reject" and that "the Debtors intend to operate the facilities … until the Debtors receive approval to transition operational control of leased facilities to the owners." (Stephenson Declaration ¶ 7.)

## II.     A Solvent Debtor May Not File A Bankruptcy Petition For The Sole Purpose Of Capping A Lessor's Claim To Benefit Its Equity Holder.

Dynegy Inc.'s machinations severely restricted Dynegy Holdings' access to support from its most valuable assets and, most recently, took from  Dynegy Holdings' one of its two most valuable assets, CoalCo, and placed it directly in Dynegy Inc.'s hands.   Dynegy Inc.'s implementation of this scheme has rendered Dynegy Holdings artificially insolvent as indicated in the Debtors' first-day filings.   The Debtors' first-day filings however, fail to tell the whole story because they do not account for a highly valuable asset of Dynegy Holdings: its fraudulent transfer claims against Dynegy Inc. and others.   Instead, the Debtors propose through the Restructuring Support Agreement they filed with the Court as part of their first-day pleadings to release: "Dynegy and its subsidiaries and all of their respective directors, officers, employees, agents, attorneys and representatives" from all claims, including Dynegy Holdings' valuable fraudulent transfer cause of action.  (Restructuring Support Agreement Term Sheet, at p. 5 [Dkt. No. 18, Ex. 2].)  Dynegy Holdings' purported release of Dynegy is devastating to the PSEG Entities and the Indenture Trustee.  If Dynegy Holdings pursued its fraudulent transfer claims, it would recover assets more than sufficient to pay all claims against it, including the entirety of the PSEG Entities' and Indenture Trustee's claims.   Where a solvent entity files a bankruptcy to cap lessor claims to enrich equity holders, good faith is lacking and dismissal is appropriate.

### A.     Courts Will Dismiss A Bankruptcy Case Filed By A Solvent Debtor To Take Advantage Of Section 502(b)(6)'s Cap To Benefit Equity Holders.

Courts will dismiss a bankruptcy case where the filing fails to serve a bankruptcy purpose.  Where a debtor is solvent and files a bankruptcy petition simply to cap the claim of a lessor-creditor pursuant to section 502(b)(6), the filing serves no bankruptcy purpose and should be dismissed.

In *Integrated Telecom*, the Third Circuit reviewed a lessor-creditor's motion to dismiss a liquidating chapter 11 bankruptcy case.   384 F.3d at 115.   The bankruptcy court denied the lessor-creditor's motion, relying on *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197 (3rd Cir. 2003), which held that a financially-distressed, liquidating debtor filed its petition in good faith even though it filed primarily to take advantage of section 502(b)(6)'s cap.   On appeal, the *Integrated Telecom* court found that the debtor lacked good faith, reversed the bankruptcy court's denial of the dismissal motion, and distinguished the *PPI* case.   *In re Integrated Telecom*, 384 F.3d at 118-30.

The *Integrated Telecom* court concluded that in considering whether a liquidating chapter 11 is in good faith, the court must determine whether the filing will "maximize[e] the value of the bankruptcy estate."   384 F.3d at 120.   The court observed that "[a]t its most basic level, the Bankruptcy Code maximizes value by alleviating the problem of financial distress" and therefore, "good faith necessarily requires some degree of financial distress on the part of the debtor."   *Id*. at 121.   Moreover, "if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."   *In re SGL Carbon*, 200 F.3d at 166.

Having observed that insolvency or financial distress is a prerequisite to good faith, the *Integrated Telecom* court concluded that the debtor was solvent and had sufficient capital to pay the uncapped claim of the lessor-creditor.   *Id*. at 122.   Relying primarily on this ground, the court distinguished *PPI*, the case on which the court below had based its decision to deny the motion for dismissal.   *Id*. at 123-24.   The *Integrated Telecom* court characterized *PPI* as standing "for the proposition that an *insolvent* debtor can file under Chapter 11 in order to maximize the value of its sole asset to satisfy its creditors, while at the same time availing itself of the landlord cap

under § 502(b)(6)." *Id*. at 124 (emphasis added).  As the *Integrated Telecom* case involved a solvent, non-distressed debtor, the *PPI* case was inapplicable.

The *Integrated Telecom* court further concluded that mere desire to take advantage of a particular provision of the Bankruptcy Code cannot, by itself, support a finding of good faith.  *Id*. at 127; *see also In re HBA East, Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988) ("A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one.").  Rather, where a debtor is solvent such that "*the petition seeks to distribute value directly from a creditor to a company's shareholders*", the threshold question of whether the bankruptcy filing will create or preserve value for the estate is "particularly sensitive."  *Integrated Telecom*, 384 F.3d at 129 (emphasis added).  In the *Integrated Telecom* case, the debtor failed to satisfy that threshold because it was not financially distressed, but merely wished to cap a lessor's claim to benefit the debtor's equity holders.  As this set of facts could not support a finding of good faith, the *Integrated Telecom* court reversed the lower decisions and ordered the bankruptcy dismissed.  *Id*. at 129-30.

### B. The Debtors' Litigation Claim Against Dynegy Inc. Renders The Debtors Solvent, And This Court Should Dismiss These Cases.

Here, while the Debtors have been rendered *artificially* insolvent by the fraudulent transfers that precipitated their filing, the Debtors' contingent asset (its recovery of Transfers from Dynegy Inc. and others) would make the Debtors solvent.[9]  The sole reason that the transferred assets are not accessible by the Debtors is that the Debtors, together with Dynegy Inc. and certain members of the Control Group, engineered a complex series of transactions that first restricted the Debtors' access to assets by ring-fencing, and then shifted the CoalCo assets out of

---

[9] Courts in this Circuit have long recognized that contingent assets should be counted in evaluating a debtor's solvency.  *See In re Ollag Constr. Equip. Corp.*, 578 F.2d 904, 908 (2d Cir. 1978).

Dynegy Holdings' hands altogether and into those of Dynegy Inc. with the ultimate goal of then imposing section 502(b)(6)'s cap against the PSEG Entities' and Indenture Trustee's claims.[10] To be clear, this is not a close case for avoidance; the Transfers are, on their face, fraudulent because, when viewed of a whole they deprived Dynegy Holdings of support from its two most valuable assets (GasCo and CoalCo) and transferred one of those assets (CoalCo) to Dynegy Inc. for negative value.

### 1.    The Transfers Were Actually And Constructively Fraudulent.

"It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction" for purposes of fraudulent transfer analysis. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2nd. Cir. 1995). While courts apply collapsing analysis most frequently in the context of leveraged buy outs, collapsing analysis is a flexible tool that allows a court to collapse "various transactions into one integral transaction" where those transactions carry out a fraud. *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212-13 (3rd Cir. 1999) (applying collapsing analysis to a series of "sham" transactions intended to place a debtor's assets in a new company outside the reach of creditors). Therefore, when deciding whether collapsing analysis applies, courts should focus on "whether there was an overall scheme to defraud the estate" rather than on the technical particulars of the transaction. *In re OODC, LLC*, 321 B.R. 128, 138 (Bankr. D. Del. 2005).

---

[10] Further, these transactions violated Section 4.2 of the Guaranties by transferring substantially all of Dynegy Holdings' assets to another entity, Dynegy Inc., through a series of transactions. (*See* Ex. C.) Courts have held that where a debtor has engaged in a prepetition reorganization that violated the terms of an agreement with creditors, that fact counsels against finding that the debtor filed its bankruptcy petition in good faith. *See In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 132 (6th Cir. 1995).

The Second Circuit applies a two-part analysis when considering whether to collapse a series of transactions. First, consider whether, if collapsed, the transaction involved a transfer of the debtor's property for less than reasonably equivalent value or with actual intent to delay, hinder, or defraud creditors. *HBE Leasing*, 48 F.3d at 635. Second, consider whether "the transferee in the leg of the transaction sought to be avoided … [has] actual or constructive knowledge of the entire scheme" that renders the exchange fraudulent. *Id*. If the answer to both questions is "yes," the court should collapse the transactions.

Here, the facts of the Transfers make a strong case for applying collapsing analysis. *First*, the facts suggest that the Transfers are both actually and constructively fraudulent. The PSEG Entities will prove at a hearing that the subjective intent behind the Transfers was to render Dynegy Holdings artificially insolvent so that Dynegy Inc. could cause Dynegy Holdings to file bankruptcy in an attempt to cap the PSEG Entities' claims via section 502(b)(6). Absent the Transfers, Dynegy Holdings would be solvent today and lack any economic rationale for filing bankruptcy. Therefore, Dynegy Inc. and Dynegy Holdings carried out the Transfers with the actual intent to delay, hinder, and defraud Dynegy Holdings' creditors.

Further, Dynegy Holdings received less than reasonably equivalent value in exchange for the Transfers when viewed as a single, collapsed transaction. Before the Transfers, Dynegy Holdings had full access to cash at all of its direct and indirect subsidiaries, and an indirect ownership interest in CoalCo, an asset worth well in excess of $1.25 billion. After the Transfers, Dynegy Holdings had severely restricted access to its subsidiaries' assets and no interest in CoalCo. Instead, Dynegy Holdings had (i) a $1.25 billion *debt* to Dynegy Gas Investments pursuant to the Promissory Note; and (ii) a contingent right to receive payments that Dynegy Inc. valued at $1.25 billion and that would vanish should Dynegy Inc. extinguish $1.25 billion of face

value of Dynegy Holdings' bond debt. Critically, Dynegy Holdings' bond debt was at the time

of the Transfers and is now trading substantially below par. Therefore, the value Dynegy

Holdings would receive from the elimination of the bond debt would be far less than the value of

the $1.25 billion payment stream. Moreover, should Dynegy Inc. exercise its option by

eliminating the bond debt, Dynegy Holdings' obligation to pay Dynegy Gas Investments $1.25

billion would remain.

Therefore, in exchange for giving up its right to distributions and many of its valuable

assets, Dynegy Holdings can expect one of two outcomes:

- <u>Outcome one</u>: Dynegy Inc. does not exercise its option, such that Dynegy Holdings receives a stream of payments equal in time and value to the stream of payments it owes to Dynegy Gas Investments. Because Dynegy Holdings will use all payments received to pay Dynegy Gas Investments, this outcome provides no real economic value to Dynegy Holdings let alone value reasonably equivalent to its interest in CoalCo.

- <u>Outcome two</u>: Dynegy Inc. exercises its right to cancel its payment obligation by eradicating Dynegy Holdings' bond debt. Given the market conditions at the time of the Transfers, eradicating the bond debt at that time would have provided Dynegy Holdings with value substantially less than the Amended Undertaking's $1.25 billion payment stream. In this outcome, Dynegy Holdings receives value worth less than $1.25 billion but is left with a *debt* to Dynegy Gas Investments of $1.25 billion for a *negative* net economic value. Consideration of *negative* value cannot possibly serve as reasonably equivalent consideration for Dynegy Holdings giving up an asset worth more than $1.25 billion.

Under either outcome, Dynegy Holdings receives far less than reasonably equivalent value and

its creditors are badly prejudiced.

*Second*, there is little doubt that Dynegy Inc. had actual knowledge of the entire scheme.

As evidenced by its SEC filings, Dynegy Inc. conceived of and executed every step of the

Transfers. Further, Dynegy Inc.'s employees served as officers of Dynegy Holdings, Dynegy

Gas Investments, and other subsidiaries of Dynegy Inc. whose consent was necessary for the

Transfers to go forward. Dynegy Inc. caused the Transfers to occur, and the Transfers were

actually and constructively fraudulent. For these reasons, the Court should collapse the Transfers as part of its fraudulent transfer analysis.

> ### 2. The Transfers Rendered The Debtors Artificially Insolvent As Part Of A Scheme To Limit The PSEG Entities Claims Via Section 502(b)(6).

For the reasons set forth in Section II.B.1, the Transfers may be avoided as fraudulent transfers. Once the Transfers are avoided, Dynegy Holdings will have sufficient assets once more to pay all presently-due claims in full. It is a matter of when, not if, Dynegy Holdings will receive its rightful assets and resolve its temporary liquidity scarcity. In evaluating the Debtors' solvency for purposes of bad faith analysis, the Court should include the Debtors' future avoidance of the Transfers when evaluating the Debtors' solvency. *See In re Ollag Constr. Equip.*, 578 F.2d at 908. Rather than acknowledge that sufficient assets exist to pay all of the Debtors' creditors, Dynegy Inc. and the Debtors seek to capitalize upon their fraudulent transfer scheme during the window between the fraudulent transfers' consummation and their avoidance by filing a bankruptcy for the purpose of limiting the PSEG Entities' claims to enrich Dynegy Inc. This scheme, while lucrative to Dynegy Inc., will not maximize the value of the Debtors' estates in these liquidating chapter 11 cases. This scenario is closely analogous to that in *Integrated Telecom* and calls for the dismissal of these bankruptcy cases.

The Restructuring Support Agreement and its term sheet also counsel in favor of dismissal. The term sheet describes a plan that would allow creditors other than the PSEG Entities and the Indenture Trustee to receive replacement claims against Dynegy Inc. that are substantially equal to the creditors' prepetition claims. In contrast, the Debtors have indicated that they will argue that section 502(b)(6) substantially limits the PSEG Entities' claims (*e.g.*, Dkt. No. 5 ¶ 25), and the term sheet states that limiting the PSEG Entities' claims to less than $300 million in aggregate is a condition to plan consummation. (Stephenson Declaration Ex. 2.)

Meanwhile, Dynegy Inc.'s equity interest in Dynegy Holdings will remain in place, unchanged. (*Id.*)  In sum, the Debtors have proposed to allow all parties' rights to pass through these bankruptcy cases substantially unscathed, with the significant exception of the PSEG Entities and the Indenture Trustee.  As Dynegy Inc.'s equity position will remain undisturbed, any limitation on the PSEG Entities' claims will directly benefit Dynegy Inc.

Thus, these bankruptcy cases bear strong resemblance to the one dismissed in *Integrated Technologies*.  Like *Integrated Technologies*, the raison d'être behind these bankruptcy cases is to limit a single class of creditors' claims via an economically-unnecessary bankruptcy for the purposes of improving the positions of equity holders.  A debtor's parent's desire to take advantage of section 502(b)(6) cannot alone support a finding of good faith, and the Debtors' participation in the pre-petition scheme to siphon its assets to Dynegy Inc. amply demonstrates bad faith.  Indeed, the facts suggest strongly that Dynegy Inc. has engaged in bold gamesmanship to enhance its own interests at the expense of the Debtors' creditors and that the Debtors have been and remain complicit in these efforts.

The Debtors may seek to distinguish *Integrated Technologies* on grounds that they are experiencing a temporary liquidity scarcity as a result of the pre-petition corporate reshuffling and, therefore, are in genuine need of bankruptcy protection.  This assertion falls flat given that the Debtors' artificial insolvency is one of the their own making and appears intended to create precisely the conditions the Debtors and Dynegy Inc. now seek to exploit.  Moreover, courts are to engage in a "fact intensive inquiry" and examine "the totality of facts and circumstances" when determining whether good faith exists.  *In re Integrated Technologies*, 384 F.3d at 118. Here, the facts are that the Debtors' liquidity issues exist *only* because the Debtors and Dynegy Inc. colluded to carry out a fraudulent transfer for Dynegy Inc.'s benefit.  The results of the

Debtors' and Dynegy Inc.'s prepetition fraudulent conduct can hardly count *in favor* of finding that the Debtors commenced these cases in good faith. Rather, the prepetition fraudulent transfer further supports a finding that the Debtors lack good faith and that these cases should be dismissed.

### III.    This Bankruptcy Is Intended To Benefit Dynegy Inc. Rather Than To Maximize The Value Of The Debtors' Estates, Which Justifies Dismissal.

This Court should dismiss these cases for a second reason. Where a debtor files a bankruptcy for the purpose of giving a tactical or other advantage to its parent entity, at the expense of the debtor's estate, good faith is lacking and dismissal is appropriate. *In re 15375 Memorial*, 589 F.3d at 624-26. Here, the PSEG Entities anticipate that Dynegy Inc. will argue that the proposed plan's consummation will terminate Dynegy Inc.'s obligation to pay $1.25 billion to Dynegy Holdings under the Amended Undertaking. This result will benefit Dynegy Inc. at the expense of Dynegy Holdings' estate and further counsels in favor of dismissal.

### A.    Filing A Petition To Gain A Tactical Or Economic Advantage For A Debtor's Parent Entity Does Not Fulfill A Valid Bankruptcy Purpose.

Where a debtor files a bankruptcy primarily to protect or benefit a non-debtor parent entity, a finding of good faith cannot lie and dismissal is appropriate. *In re 15375 Memorial*, 589 F.3d at 624-26. The *Memorial* case concerned an eve-of-trial bankruptcy filing by two shell companies, Memorial and Santa Fe. *Id*. at 609. At the time of their petition filing, the debtors engaged in no business, had no employees, and shared addresses with their ultimate parent entity, GSF. *Id*. at 609-10. Memorial's and Santa Fe's officers were employees of GSF. *Id*. at 610-11. Santa Fe had previously engaged in oil and gas drilling, having "upstreamed" its profits to GSF through Memorial long before the petition filing. *Id*. Further, Santa Fe had once owned or leased a property, the Tebow Property, that was environmentally contaminated. *Id*. at 611.

Litigation regarding the Tebow Property lay at the heart of the *Memorial* bankruptcy. Before the bankruptcy, parties affected by the Tebow Property environmental contamination sued Santa Fe and others. *Id.* Trial preparation revealed that Santa Fe would likely bear the lion's share of the environmental liability, and the plaintiffs vowed to pursue BSF on an alter ego theory. *Id.* at 611-612. The plaintiffs also pledged to dismiss any party that filed for bankruptcy. *Id.*

Against this backdrop, GSF—acting through another subsidiary—entered into a transaction with Memorial and Santa Fe, by which it issued a line of credit to Memorial. *Id.* at 613. In exchange, Memorial purported to assume all Santa Fe's liabilities, pledged to indemnify GSF against Santa Fe-related claims, and agreed not to pursue any alter ego or single business enterprise claim against GSF. *Id.* Shortly thereafter, the debtors filed for bankruptcy. *Id.*

Following the bankruptcy filing, one of Santa Fe's co-defendants in the Tebow lawsuit, BEPCO, settled the lawsuit and received an assignment of all claims related to the Tebow Property. *Id.* 614. BEPCO moved to dismiss the bankruptcy case for lack of good faith, which motion the bankruptcy court denied. *Id.* at 616. The district court reversed the bankruptcy court, and an appeal to the Third Circuit followed. *Id.*

The appellate court observed that Memorial and Santa Fe were shell entities with no prospect of reorganizing and focused its good faith inquiry on whether the bankruptcy filing would maximize value for the debtor's estates. *Id.* at 619. After rejecting various of the Debtors' argument in favor of holding that the filing benefited the estates, the Third Circuit turned to what it saw as the outcome-dispositive issue: "*the Debtors' representative was primarily concerned with protecting the [parent entities], not the Debtors.*" *Id.* at 624 (emphasis original). In reaching this conclusion, the Third Circuit relied on facts including the following:

(i) the debtors' principal decision-maker was an employee of and principally loyal to the parent entity; (ii) the debtors' pre-bankruptcy transactions with the parent entity provided substantial benefits to the parent entity and minimal or illusory benefits to the debtors; (iii) the parent entity "was ultimately in control of whether the Debtors filed"; and (iv) the bankruptcy filing served the tactical purpose of avoiding or delaying liability to the parent entity for the Tebow Property environmental liability. *Id.* at 624-25. For all these reasons, the Third Circuit concluded that the bankruptcy filing did not maximize value to the debtors' estates, "failed to serve a valid bankruptcy purpose" and dismissed it for lack of good faith. *Id.* Thus, the essential teaching of *Memorial* is that where a liquidating debtor's bankruptcy filing benefits a corporate parent entity but fails to benefit or harms the debtor's creditors, dismissal is appropriate.

  **B.**  **The Debtors' Bankruptcy Primarily Benefits Dynegy Inc. At The Expense Of The Debtors' And Their Creditors.**

  The resemblances between the present cases and *Memorial* are striking. Like *Memorial*, these cases involve liquidating entities, whose chief decision-makers are employees of the parent entity,[11] and whose corporate parent entity had the ultimate say over whether a bankruptcy filing would go forward. More importantly, this bankruptcy filing—like *Memorial*—will grant substantial benefits, tactical and otherwise, to the Debtors' parent at the expense of the Debtors. Examining the effect of these bankruptcies on the Amended Undertaking brings this last point into sharp focus.

  The Amended Undertaking is among the Debtors' most valuable assets and would provide the Debtors with payments from Dynegy Inc. with a face value of $1.25 billion over the course of the agreement. Critically, the Amended Undertaking also provides Dynegy Inc. with

---

[11] For example, Kent R. Stephenson, who gave the Stephenson Declaration, is the Executive Vice President of each of the Debtors and is the Senior Vice President and Group General Counsel for Dynegy Inc.

an escape hatch from this obligation, which the Debtors' plan—as described in the Restructuring Term Sheet—seems designed to trigger.

The Amended Undertaking's "Reduction of Payment Amounts" clause provides that to the extent that Dynegy Inc. reduces certain of Dynegy Holdings' bond obligations through use of its property or through the issuance of debt instruments, Dynegy Inc.'s payment obligation to Dynegy Holdings will, in turn, reduce on a dollar-for-dollar basis. (Amended Undertaking §§ 1.1, 2.2.) The Restructuring Term Sheet provides that creditors of Dynegy Holdings will receive cash (presumably provided by Dynegy Inc.), secured notes issued by Dynegy Inc., and convertible PIK notes issued by Dynegy Inc. (Stephenson Declaration Ex. 2.) The PSEG Entities expect that Dynegy Inc. will argue that consummation of the plan constitutes a Payment Reduction, as that term is defined in the Amended Undertaking, which completely eliminates Dynegy Inc.'s obligation to make the payments Dynegy Inc. valued to be worth $1.25 billion to Dynegy Holdings over time.[12] Thus, these bankruptcy cases will have the effect of destroying one of Dynegy Holdings' major assets to benefit Dynegy Inc.[13] Pursuant to *Memorial*, this constitutes grounds for finding that these bankruptcy cases were not filed in good faith and ordering dismissal.

## IV.    The Chapter 11 Cases Should Also Be Dismissed Pursuant To Section 1112(b)(4)(B).

This Court should also dismiss the Debtors' bankruptcy cases on the basis that the Debtors' current management is grossly mismanaging the Debtors' estates. 11 U.S.C.

---

[12] The PSEG Entities reserve all rights to contest any later assertion that any plan consummation constitutes a Payment Reduction.

[13] The Debtors may argue that even if plan consummation eliminates Dynegy Holdings' right to receive payments pursuant to the Undertaking, the Debtors benefit because the plan will eliminate Dynegy Holdings' bond debt. This view ignores a critical fact: Dynegy Holdings' bond debt is now—and has been for quite some time—trading substantially below par. Dynegy Holdings could have taken advantage of this situation to undertake an exchange offer on its own account, which would have canceled the bond debt an amount less than the value of the payment stream from the Undertaking.

§ 1112(b)(4)(B).  The Debtors' first day filings evidence no intent of the Debtors to pursue valuable avoidance actions against Dynegy Inc.  Rather, the term sheet attached to the Restructuring Plan Agreement promises full releases for "Dynegy and its subsidiaries and all of their respective directors, officers, employees, agents, attorneys and representatives." (Restructuring Support Agreement Term Sheet, at p. 5.)  The Debtors' stated intention not to prosecute valuable avoidance actions against its insiders is a breach of the Debtors' fiduciary duties, and therefore constitutes gross mismanagement of the Debtors' estates.  *See In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) (failure to conduct "independent investigations of questionable transactions in which [the debtors] were involved" violates debtor's fiduciary duty).  In light of the Debtors' obvious gross mismanagement, dismissal is appropriate.

## NOTICE

Notice of this Motion has been provided to (i) Sidley Austin LLP, proposed counsel to Dynegy Holdings and the other debtors, 787 Seventh Avenue, New York, NY 10019 (Attn: James F. Conlan, Esq. and Matthew A. Clemente, Esq.); (ii) White & Case LLP, proposed special counsel to Dynegy Holdings and the other debtors, 1155 Avenue of the Americas, New York, NY 10036 (Attn: Thomas E. Lauria, Esq. and Gerard Uzzi, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; and (iv) the parties listed on the Special Service List and the General Service/2002 List maintained in these cases. The PSEG Entities submit that under the circumstances no other notice need be provided.

## NO PRIOR REQUEST FOR RELIEF

No previous motion for the relief sought herein has been made to this or any other court.

## CONCLUSION

For all of the foregoing reasons, the PSEG Entities respectfully requests that the Court enter an Order dismissing the Debtors' bankruptcy cases or granting such other relief as may be warranted.

Dated: November 18, 2011               Respectfully Submitted,

Resources Capital Management Corporation;
Resources Capital Asset Recovery, L.L.C.,
Series DD and Series DR;
Roseton OL LLC; and
Danskammer OL LLC


By: /s/ *Heather D. McArn*
One of Their Attorneys

JENNER & BLOCK LLP
Anton R. Valukas
David J. Bradford
Daniel R. Murray
353 N. Clark Street
Chicago, IL 60654-3456
Phone: (312) 222-9350
Fax: (312) 527-0484

Heather D. McArn
919 Third Avenue, 37th Floor
New York, New York 10022-3908
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699