# EXHIBIT 1

IN THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| Resources Capital Management Corp., | ) | |
| Roseton OL, LLC, and | ) | |
| Danskammer OL, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. _____ |
| v. | ) | |
| | ) | |
| Dynegy Inc., Dynegy Holdings, Inc., | ) | |
| Dynegy Holdings, LLC, | ) | |
| Dynegy Gas Investments, LLC, | ) | |
| Thomas W. Elward, Michael J. Embler, | ) | |
| Robert C. Flexon, E. Hunter Harrison, | ) | |
| Vincent J. Intrieri, Samuel Merksamer, | ) | |
| Felix Pardo, Clint C. Freeland, | ) | |
| Kevin T. Howell, Icahn Capital LP, | ) | |
| Seneca Capital Advisors, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **COMPLAINT**

Resources Capital Management Corporation, Roseton OL, LLC ("Roseton OL"), and

Danskammer OL, LLC ("Danskammer OL") (together "Plaintiffs"), by their attorneys, for their

Complaint against Defendants Dynegy Inc., Dynegy Holdings, Inc., Dynegy Holdings, LLC,

Dynegy Gas Investments, LLC, Thomas W. Elward, Michael J. Embler, Robert C. Flexon, E.

Hunter Harrison, Vincent J. Intrieri, Samuel Merksamer, Felix Pardo, Clint C. Freeland, Kevin

T. Howell, Icahn Capital LP and Seneca Capital Advisors, LLC (together "Defendants"), allege

as follows.

### **Nature of the Action**

1.       This is an action to remedy Defendants' scheme of self-dealing and financial

manipulation, designed to avoid over $500 million in corporate guaranties made to Plaintiffs by

Defendant Dynegy Holdings, Inc. ("DHI") and divert over one billion dollars or more of value

from DHI to Dynegy Inc. ("Dynegy") for the benefit of its shareholders, including New York based Icahn Capital ("Icahn Capital") and Seneca Capital Advisors, LLC ("Seneca"). Defendants' scheme has been characterized as "unprecedented in the annals of corporate finance." It has drawn national attention for manipulating corporate form and transferring assets and value, all to give preference to equity holders at the expense of creditors who specifically bargained for guaranties. Defendants' scheme openly challenges whether the rule of law protects against fraudulent transfers and self-dealing. Unless remedied, Defendants' scheme will cause Plaintiffs and other creditors hundreds of millions of dollars of loss and will result in increased uncertainty in the financial markets about whether contracts, rules of priority, and prohibitions on fraudulent transfers protect corporate creditors.

2.      The self-dealing and fraudulent transfers are part of a larger scheme to transfer assets and value out of the reach of DHI's creditors. The scheme directly violates prohibitions in guaranties, given by DHI to Plaintiffs, which prohibit DHI from transferring substantially all of its assets, including the value and/or ownership of the subsidiaries that directly own those assets.

3.      Flouting their contractual promises and basic rules of law, and ignoring the corporate form of DHI and its subsidiaries, Defendants, who control DHI (a wholly owned subsidiary of Dynegy), have stripped DHI of substantially all of its assets and value, rendering it artificially insolvent. They have transferred much of that value to Dynegy and thereby to its shareholders, without pretense of independent judgment, arm's length bargaining, or independent valuation of consideration.

4.      Defendants have purposely attempted to render DHI insolvent in order to facilitate a bankruptcy proceeding for DHI, in which all of DHI's valuable assets are kept out of the bankruptcy proceeding. Defendants threaten to use those bankruptcy proceedings to contend

2

that, among other things, their over $500 million in lease and guaranty obligations are limited under Section 502(b)(6) of the Bankruptcy Code, which in certain circumstances limits real estate lease claims in a bankruptcy proceeding. If such a cap were indeed applicable, that cap would not even arguably be available to DHI if DHI was not artificially insolvent.

5.      Defendants have manufactured this artificial insolvency at DHI by transferring away from DHI its right to avail itself of distributions from all of its profitable subsidiaries, its direct ownership of a valuable subsidiary, and its indirect ownership of coal fueled plants. At the same time, Defendants have saddled DHI with substantial liabilities, including direct ownership of the Dynegy entities responsible for the over $500 million in unpaid lease payments and a $1.25 billion note that was incurred without adequate consideration.

6.      In July 2011, Roseton OL and Danskammer OL filed a lawsuit in the Delaware Court of Chancery seeking emergency injunctive relief to prevent DHI, in the very first step of this fraudulent scheme, from transferring assets to certain bankruptcy-remote "ring fenced" subsidiaries. Other DHI creditors filed a similar action in this Court, and then agreed to wait for the Delaware Court's ruling.

7.      To avoid the emergency injunction sought from the Delaware Court, Samuel Merksamer, a Dynegy director and executive at Icahn Capital, represented to that court that there would be no "transfer" because DHI's subsidiaries would continue to own all the same assets, including, importantly, all of DHI's coal fueled plants which represented over 50% of Dynegy's revenues. Merksamer, who was nominated to Dynegy's Board of Directors by Icahn Capital, submitted a sworn affidavit to the Delaware Court as a representative of Dynegy and DHI in which he represented:

> DHI will continue to hold direct equity interests *at all times* in entities that own indirectly all of the power generating assets, just

3

as, and to the same extent that, the direct subsidiaries of DHI today indirectly own such assets. Thus, DHI will continue to own indirectly the same revenue generating assets that it indirectly owns today.

8.    The Delaware Chancery Court's preliminary injunction ruling—which Dynegy and DHI prevented the Delaware Supreme Court from reviewing on the merits by closing the transactions then at issue only hours before the Supreme Court could rule on a stay—were based on two premises that are no longer true. First, DHI asserts that the transfers at issue were made only by DHI's subsidiaries and not by DHI itself. To the contrary, as set forth more fully in this Complaint, DHI directly transferred its most valuable assets, including its right to access distributions from subsidiaries, and subsequent to the Delaware Court ruling, DHI engaged in egregious conduct that demonstrates that it is the alter ego of and responsible for the conduct of the shell subsidiaries that supposedly made the transfers. Second, DHI and Dynegy represented to the Delaware Court that the same subsidiaries, under the DHI corporate umbrella, that owned all the Dynegy plants before the transactions would continue to own all of the Dynegy plants at issue in the future. Shortly after the Delaware Court ruled, however, DHI made a mockery of their representations to the Court and transferred all of its coal-fueled plants, representing over 50% of its revenue, completely outside of DHI's umbrella.

9.    After the Delaware Court accepted DHI's and Dynegy's sworn representations and denied emergency injunctive relief, Defendants transferred ownership of Dynegy Coal HoldCo, LLC ("Coal HoldCo")—an indirect DHI subsidiary that owned all of DHI's coal fueled plants—out of DHI's reach. That transaction is riddled with self-dealing and at the core of a larger fraudulent transfer of value from DHI and its creditors to Dynegy and its shareholders. This course of conduct reflects that Dynegy has disregarded any corporate distinctions between DHI and all of its direct and indirect subsidiaries. Accordingly, Dynegy and DHI controlled and

4

are responsible for the various transfers purportedly made by DHI's direct and indirect subsidiaries.

10.    Defendants' scheme continued.    Without any apparent valuation by an independent party, Dynegy arbitrarily agreed that it would only pay $1.25 billion for Coal HoldCo, which some have asserted is less than Coal HoldCo's actual value.    But even that arbitrary $1.25 billion price tag was illusory and part of Defendants' further scheme to defraud DHI's creditors, including Plaintiffs.

11.    In consideration for Coal HoldCo, Dynegy provided to Dynegy Gas Investments, LLC ("DGI"), the DHI subsidiary that owned Coal HoldCo, an "undertaking," which DHI valued at $1.25 billion, even though it had a value substantially less than $1.25 billion.    Dynegy and DGI, then acting as one entity with DHI and its subsidiaries, gave new meaning to the term "shell game."    Again without arm's length bargaining, Defendants agreed with themselves to transfer to DHI the right to receive what it called an "undertaking" (which was worth substantially less than $1.25 billion), in exchange for DHI giving DGI a promissory note in the principal amount of $1.25 billion, so as to saddle DHI with further arbitrary, but substantial liabilities for inadequate consideration offset only by an "undertaking."

12.    Defendants were far from done.    As part of transferring to DHI the right to receive this undertaking, Defendants agreed with themselves to make the undertaking less valuable. They added to it a provision that permitted Dynegy to extinguish this purported $1.25 billion undertaking altogether merely by arranging to retire DHI bonds at a significant discount to par value—giving Dynegy a full $1 credit for a $1 bond that could be retired by paying only approximately 60 or 70 cents on the dollar, as Dynegy sought to accomplish through the exchange offers it launched in September 2011. The corporate opportunity to retire that debt at a

discount belonged to DHI, but Dynegy disregarded DHI's corporate form and attempted to misappropriate it.

13.    The effect of Defendants' self-dealing scheme was to transfer Coal HoldCo to Dynegy for a fraction of its actual value, while subjecting DHI to a $1.25 billion obligation, without adequate consideration.  There has not been any showing that any of these transactions were approved by independent directors or based upon independent valuations.  The clear purpose of the self-dealing was to enrich Dynegy and thereby its shareholders at the expense of DHI's legitimate creditors, including particularly Plaintiffs.

14.    As a further badge of fraud, recognizing that these transfers constituted breaches of fiduciary duties to DHI's creditors, including Plaintiffs, Defendants attempted to extinguish the fiduciary obligations of DHI's directors by purporting to convert DHI into a limited liability company and eliminating its directors.

15.    Thus, in breach of the guaranties and directly contrary to their representations to the Delaware Court, and similar representations made to this Court, Defendants went on to completely disregard and reorganize DHI's corporate structure so as to cut off DHI's access to any valuable assets.  In doing so, they transferred completely out of DHI's reach ownership and financial access to any of the coal powered plants that generate over 50% of DHI's and Dynegy's total revenue, and saddled DHI with substantial liabilities, so as to render or further render it artificially insolvent—all while transferring over $1 billion of value to Dynegy and its shareholders, including Icahn Capital and Seneca, even though they had no entitlement to it.

16.    The fraudulent scheme, including the transfers and reorganization and conversion of DHI's corporate form, makes a mockery of the rule of law, Defendants' representations to the Delaware Court and this Court, and DHI's corporate structure.  It violates, among other things,

6

the terms of the guaranties, for which both DHI and now Dynegy are responsible, both New York and Delaware laws that prohibit transfers intentionally designed to defeat or hinder the rights of creditors, and laws that prohibit intentional and/or constructive fraudulent conveyances by an insolvent entity. The fraudulent transfers also constitute an illegal dividend from a subsidiary to a parent company, for which the directors of the transferor company are liable. The fraudulent transfers unjustly enrich Dynegy and its directors and shareholders at Plaintiffs' expense.

17. Defendants' financial manipulations for the benefit of Dynegy and its shareholders were designed and effectuated by Dynegy's and DHI's directors, including representatives of two of Dynegy's largest shareholders, Icahn Capital and Seneca. These directors were given significant financial incentives to transfer value to Dynegy—for the benefit of Icahn Capital and Seneca and other Dynegy shareholders—at the expense of DHI's creditors. They have completely disregarded their fiduciary obligations by knowingly causing DHI to breach its contractual obligations, and openly engaged in self-dealing. They are liable to Plaintiffs for breaches of fiduciary duty, fraudulent transfers, tortious interference with contract, illegal dividends, and unjust enrichment. Icahn Capital and Seneca, who have incented and/or encouraged those breaches of duty, and thereby caused the fraudulent transfers, illegal dividends and breaches of contract, are liable for aiding and abetting the same, as well as for tortious interference and unjust enrichment.

18. Defendants' fraudulent conduct is the subject of two other pending lawsuits filed in this Court, captioned *Avenue Investments, L.P., et al. v. Dynegy, et al.*, Index No. 652599/2011 (N.Y. S. Ct., N.Y. Cty., filed 9/21/11) and *Successor Lease Indenture Trustee et al. v. Dynegy Inc., et al.*, Index No. 652642/2011 (N.Y. S. Ct., N.Y. Cty., filed 9/27/11). It also relates to the action filed in this Court, since discontinued with leave to restore, captioned *Libertyview Credit*

*Opportunities Fund, LP et al. v. Dynegy Holdings, Inc.*, Index No. 651998/2011 (N.Y. S. Ct., N.Y. Cty., filed 07/21/11).  Plaintiffs file this lawsuit in this Court because it is related to those other lawsuits.  Plaintiffs commence this action after entering into multiple standstill agreements with Defendants that allowed the parties the opportunity to try to resolve Plaintiffs' claims against Defendants without additional litigation.  Those efforts were unsuccessful.

## Parties

*Plaintiffs*

19.    Plaintiff Roseton OL, LLC ("Roseton OL") is a Delaware limited liability company with its principal place of business in New Jersey.  It is the owner-lessor of the Roseton power facility that is located in New York and subject to the lease-back agreements with Dynegy subsidiaries.

20.    Plaintiff Danskammer OL, LLC ("Danskammer OL") is a Delaware limited liability company with its principal place of business in New Jersey.  It is the owner-lessor of the Danskammer power facility that is located in New York and subject to the lease-back agreements with Dynegy subsidiaries.

21.    Plaintiff Resources Capital Management Corporation ("RCMC") is a New Jersey corporation with its principal place of business in New Jersey.  It is an indirect parent of the other Plaintiffs and is a party to the Guaranties and the Tax Indemnity Agreement discussed herein.

*Defendants*

22.    Defendant Dynegy, Inc. ("Dynegy") is a Delaware corporation with its principal place of business in Houston, Texas.  Dynegy and its subsidiaries produce and sell energy and related services.  Their power plants are fueled by a mix of natural gas, coal and fuel oil.

8

Dynegy's subsidiaries lease and/or operate the Roseton, Danskammer and Independence power plants, which are located in New York.

23.     Defendant Dynegy Holdings, Inc. ("DHI"), until at least September 1, 2011, was a Delaware corporation with its principal place of business in Houston, Texas.  It is a wholly owned and controlled subsidiary of Dynegy.  On September 1, 2011, DHI filed documents with the state of Delaware purporting to convert itself to a Delaware limited liability company, Dynegy Holdings, LLC.  Dynegy is the only member of Dynegy Holdings, LLC.  Dynegy Holdings, Inc. and/or Dynegy Holdings LLC will be referred to herein as "DHI."  DHI's subsidiaries lease and/or operate the Roseton and Danskammer power plants, which are located in New York.

24.     Defendant Dynegy Gas Investments, LLC ("DGI") is a newly created Delaware limited liability company with its principal place of business in Houston, Texas.  DGI is a direct, wholly owned subsidiary of DHI, and was created for the purpose of furthering Defendants' fraudulent scheme.  Before the fraudulent transfer of Coal HoldCo, DGI owned 100% of the equity interests of Coal HoldCo.  Coal HoldCo owned 100% of the equity interests in Dynegy Coal Investments Holdings, LLC, which owned 100% of the equity interests in Dynegy Midwest Generation LLC ("CoalCo").

25.     Defendant Icahn Capital LP ("Icahn Capital") is a Delaware company registered to do business in New York, with its principal place of business in New York, New York.  Icahn Capital is represented on Dynegy's Board of Directors by some of the Dynegy Board's newly appointed directors.  Icahn Capital is a substantial stockholder in Dynegy, reportedly owning or controlling approximately 15% of Dynegy's outstanding shares.

26.     Defendant Vincent J. Intrieri ("Intrieri") is a member of Dynegy's Board of Directors, to which he was appointed in 2011 upon his nomination by Icahn Capital and/or other Icahn entities.  He is the chair of Dynegy's newly formed Special Committee for Finance & Restructuring, which has designed and driven the fraudulent scheme at issue.  Intrieri has been the Senior Managing Director of Icahn Capital since 2004.  He also is the Senior Managing Director of Icahn Associates LP and a director of Icahn Enterprises G.P. Inc.  The Dynegy website reports that he formerly served on several boards and currently serves on the boards of at least four separate companies where "Carl C. Icahn, directly or indirectly, either (i) controls such company or (ii) has an interest in such company through the ownership of securities."  On information and belief, Intrieri owns or controls at least thousands of shares of Dynegy stock.  On information and belief, Intrieri resides in New York and owns property in New York.  Intrieri also has submitted to the jurisdiction of the New York courts because he transacts, regularly does, and derives substantial revenue from business in New York.

27.     Defendant Samuel Merksamer ("Merksamer") is a member of Dynegy's Board of Directors and was nominated to the Board by Icahn Capital and/or other Icahn entities in 2011, at the age of 30.  He, like Intrieri, is a member of Dynegy's Special Committee for Finance & Restructuring.  Merksamer is an Investment Analyst at Icahn Capital, where he is "responsible for identifying, analyzing and monitoring investment opportunities and portfolio companies for Icahn Capital."  The Dynegy website reports that Merksamer has and continues to serve as a director for several companies that "are each, directly or indirectly, controlled by Carl C. Icahn."  On information and belief, Merksamer owns or controls at least thousands of shares of Dynegy stock.  On information and belief, Merksamer resides in New York and owns property in New

York. Merksamer also has submitted to the jurisdiction of the New York courts because he transacts, regularly does, and derives substantial revenue from business in New York.

28. Defendant Felix Pardo ("Pardo") is a member of Dynegy's Board of Directors. Like all of the other current members of the Board, Pardo was appointed to the Dynegy Board in 2011. Pardo and Icahn Capital have a long-running business relationship, as Pardo was appointed by Icahn Capital to RJR Nabisco's Board of Directors when it reportedly took control of that company in and around 1999. On information and belief, Pardo transacts, regularly does, and derives substantial revenue from business in New York, including traveling to and conducting business in New York in connection with his role as a board member for Dynegy, including meeting to carry out the transactions at issue in this Complaint.

29. Defendant Robert C. Flexon ("Flexon") is a member of Dynegy's Board of Directors and serves as its President and Chief Executive Officer. He was appointed to the Dynegy Board of Directors in 2011. From 2004 until 2009, Flexon was a senior officer of NRG Energy, Inc. ("NRG Energy"). On information and belief, Icahn Capital and/or other Icahn entities have invested nearly $50 million in NRG Energy. One or more of the new directors and/or managers brought over to Dynegy and DHI in 2011 formerly worked under Flexon at NRG Energy. On September 1, 2011, Flexon was made a member of the Board of Managers for DHI. On information and belief, he had been a director of DHI at times relevant to this Complaint. On information and belief, Flexon owns or controls at least thousands of shares of Dynegy stock. On information and belief, Flexon transacts, regularly does, and derives substantial revenue from business in New York, including traveling to and conducting business in New York many times in connection with his role as a CEO and a board member for Dynegy, including meeting to carry out the transactions at issue in this Complaint.

30.     Defendant Ewing Hunter Harrison ("Harrison") is the Chairman of the Board of Directors of Dynegy.  He was nominated by Seneca to serve on Dynegy's Board in March 2011 and was named the Chairman of the Board in June 2011.  On information and belief, Harrison owns or controls at least thousands of shares of Dynegy stock.  On information and belief, Harrison transacts, regularly does, and derives substantial revenue from business in New York, including traveling to and conducting business in New York many times in connection with his role as a the Chairman of the Board of Directors for Dynegy, including meeting to carry out the transactions at issue in this Complaint.

31.     Defendant Michael J. Embler ("Embler") is a member of Dynegy's Board of Directors.  He was appointed to the Board in 2011.  On information and belief, Embler owns or controls at least thousands of shares of Dynegy stock.  Embler resides in New York.  On information and belief, Embler transacts, regularly does, and derives substantial revenue from business in New York.

32.     Defendant Thomas W. Elward ("Elward") is a member of Dynegy's Board of Directors.  He was appointed to Dynegy's Board in 2011.  On information and belief, Elward owns or controls at least thousands of shares of Dynegy stock.  On information and belief, Elward transacts, regularly does, and derives substantial revenue from business in New York, including traveling to and conducting business in New York many times in connection with his role as a board member for Dynegy, including meeting to carry out the transactions at issue in this Complaint.

33.     Together, Defendants Intrieri, Merksamer, Pardo, Flexon, Harrison, Elward and Embler are herein referred to as the "Dynegy Directors."

12

34.     Defendant Client C. Freeland ("Freeland") is the Executive Vice President and Chief Financial Officer of Dynegy and the Executive Vice President and Chief Financial Officer of DHI, as well as an active Manager of DHI. On information and belief, Freeland was a Director or Manager of DHI at times relevant to this Complaint. On information and belief, Freeland owns or controls at least thousands of shares of Dynegy stock. On information and belief, Freeland transacts, regularly does, and derives substantial revenue from business in New York, including traveling to and conducting business in New York many times in connection with his role as an officer for Dynegy, including meeting to carry out the transactions at issue in this Complaint.

35.     Defendant Kevin T. Howell ("Howell") is the Executive Vice President and Chief Operating Officer of DHI, as well as an active Manager of DHI. On information and belief, Howell was a Director or Manager of DHI at times relevant to this Complaint. On information and belief, Howell owns or controls at least thousands of shares of Dynegy stock. On information and belief, Howell transacts, regularly does, and derives substantial revenue from business in New York, including traveling to and conducting business in New York in connection with his role as an officer for Dynegy, including to meet with Dynegy directors during the past two years.

36.     Upon information and belief, Defendant Howell, together with Defendants Flexon and Freeland, constituted the entirety of DHI's Board of Directors, and now constitute the entirety of DHI's Board of Managers. Flexon, Freeland and Howell together are referred to as the "DHI Directors" in their capacity as directors of Dynegy Holdings, Inc. and as "DHI Managers" in their capacity as managers of Dynegy Holdings LLC.

37.    Defendant Seneca Capital Advisors, LLC ("Seneca") is a Delaware limited liability company.  It is a privately held hedge fund manager registered in New York with its principal place of business in New York.  On information and belief, Seneca, like Icahn Capital, is a substantial investor in Dynegy.  It reportedly owns or controls approximately 10% of Dynegy's outstanding shares.

### Jurisdiction and Venue

38.    This Court has subject matter jurisdiction over this action pursuant to N.Y. C.P.L.R.  §3001 and common law principles of equity.

39.    This Court also has personal and subject matter jurisdiction because DHI and Dynegy irrevocably submitted to the nonexclusive jurisdiction of this Court pursuant to Section 8.6 of the Guaranties.  Section 8.6 of the Guaranties provides (emphasis added):

> *Consent to Jurisdiction; Waiver of Trial by Jury*.  **(a) The Guarantor (i) hereby irrevocably submits to the nonexclusive jurisdiction of the Supreme Court of the State of New York, New York County** (without prejudice to the right of any party to remove to the United States District Court for the Southern District of New York) and to the nonexclusive jurisdiction of the United States District Court for the Southern District of New York **for the purposes of any suit, action or other proceeding arising out of this Guaranty, or the subject matter hereof or any of the transactions contemplated hereby brought by any of the Guaranteed Parties or their successors or assigns**; (ii) hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court, or in such federal court; and (iii) to the extent permitted by Applicable Law, **hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding any claim that it is not personally subject to the jurisdiction of the above-named courts**, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty, or the subject matter hereof may not be enforced in or by such court.

DHI and Dynegy also availed themselves of the benefits of New York law by the choice of law

provision in the Guaranties.   Section 8.5 of the Guaranties provides:

> *Governing Law*.  This Guaranty shall be in all respects governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance (without giving effect to the conflicts of laws provisions, other than New York General Obligations Law Section 5-1401).

Additionally, the Guaranties and other lease-back agreement related documents concern two power facilities, the Roseton and Danskammer power plants, located in Newburgh, New York.

40.    This Court has personal jurisdiction over each Defendant because each is present in this State by reason of transacting business here and/or residing here and derives substantial revenue from commerce here, and/or because each Defendant has committed the acts complained of herein within this State, and/or because each Defendant committed the acts complained of herein outside the State which caused injury within the State and expected or reasonably should have expected their acts to have consequences in the State and/or because each Defendant expressly consented to jurisdiction in the State, and/or because personal jurisdiction exists over an alter ego or agent of each Defendant.  Defendants committed their acts for the benefit of, at the behest and direction of New York-based shareholders, Icahn Capital and Seneca.  Additionally, Dynegy and its subsidiaries are leasing and operating the Roseton and Danskammer power plants in this State.  On information and belief, in connection with each of these activities, the Dynegy and DHI Directors and Managers traveled to New York and/or engaged in business here.

41.    Indeed, Dynegy has admitted in other filings with this Court that it held board or board committee meetings on several occasions in New York in 2011, during which the fraudulent restructuring and transfers were discussed and/or agreed to by Dynegy board members.

15

42.    Venue is proper in New York County because, among other things, one or more of the named parties resides in the county as of the commencement of this action.

## Factual Background

### Icahn Capital's Influence and Control Over Dynegy

43.    Icahn Capital repeatedly has attempted to gain leverage and control over Dynegy and its subsidiaries' assets, but has been thwarted.  After those attempts failed, in 2011, Icahn Capital gained effective control of Dynegy and its subsidiaries by replacing a majority of those directors and managers with directors and managers who have ties to Icahn Capital.

44.    On March 9, 2011, Dynegy announced that four new directors had been elected to its Board of Directors, including Intrieri and Merksamer, who were nominated by, and work for, Icahn Capital.

45.    In June 2011, Icahn Capital, along with Seneca, completed their overhaul of Dynegy and its subsidiaries' directors and managers.  On June 15, Dynegy announced that it had elected a new Board of Directors, who were Intrieri, Merksamer, Pardo, Flexon, Elward, Embler and Harrison.  At least Intrieri, Merksamer, Pardo and Flexon have professional relationships with Icahn Capital.  Harrison was appointed by Seneca, whose interests are now aligned with Icahn Capital.  On June 23, Dynegy announced Flexon as its new President and Chief Executive Officer.  A material component of the newly placed Dynegy and/or DHI Directors' and/or Managers' compensation is based on the creation of equity value for Dynegy.

46.    After the installation of the new directors and managers, Defendants worked together to fraudulently avoid DHI's corporate obligations and to transfer assets to unjustly enrich Dynegy and its shareholders, including in particular the driver of the scheme, Icahn Capital, and its eager passenger, Seneca.

*DHI's Guaranties*

47.     Long before the installation of the current directors and managers, on or about May 1, 2001, DHI and certain of its subsidiaries entered into a series of transactions with Roseton OL, Danskammer OL and other affiliates by which DHI subsidiaries sold the Roseton and Danskammer power generation facilities and then leased the facilities back from them pursuant to long-term leases. DHI caused subsidiary Dynegy Roseton, LLC ("Dynegy Roseton") to sell Roseton Units 1 and 2 to Roseton OL for a purchase price of $620,000,000. Simultaneous with that sale, Roseton OL leased Roseton Units 1 and 2 back to Dynegy Roseton for a period through February 8, 2035 ("Roseton Lease"). The Roseton Lease is attached as Exhibit A to this Complaint.

48.     In addition, DHI caused subsidiary Dynegy Danskammer, LLC ("Dynegy Danskammer") to sell Danskammer Units 3 and 4 to Danskammer OL for a purchase price of $300,000,000. Simultaneous with that sale, Danskammer OL leased Danskammer Units 3 and 4 back to Dynegy Danskammer for a period through May 8, 2031 ("Danskammer Lease"). The Danskammer Lease is attached as Exhibit B to this Complaint.

49.     As part of the May 1, 2001 transactions, DHI executed identical Guaranties with respect to each lease and other related agreements, including tax indemnity agreements described below (the "Guaranties"). The purposes of the Guaranties included protecting Plaintiffs by making the cash flow and equity value of all DHI's valuable assets available to guarantee obligations incurred by DHI affiliates and to protect against the transfer of DHI assets and value that backstopped those obligations. The Guaranties are attached as Exhibit C to this Complaint.

17

50.    Section 2.1 of each Guaranty provides in relevant part:

The Guarantor hereby fully, unconditionally and irrevocably guarantees, . . . (a) the due and punctual performance and observance by the Facility Lessee of each term, provision and condition binding upon or applicable to the Facility Lessee under or pursuant to any of the Operative Documents . . ., and (b) the due, punctual and full payment . . . of each amount that the Facility Lessee is or may become obligated to pay under or pursuant to any of the Operative Documents.

51.    Under Section 4.1 of the Guaranties, DHI covenants and agrees that it will at all times do or cause to be done all things necessary to preserve and keep in full force and effect its legal existence unless certain inapplicable exceptions exist.

52.    Section 4.2 of each Guaranty provides in relevant part (emphasis added):

The Guarantor shall not consolidate with or merge into any other Person, or convey, transfer or lease its properties and assets substantially as an entirety to any Person *in one or a series of transactions* unless each of the following conditions are satisfied:

* * *

(b) such resulting, surviving or succeeding Person, if other than the Guarantor, shall execute and deliver to the [Lessor] . . . an assignment and assumption agreement in form and substance satisfactory to the [Lessor] . . . .

53.    In essence, Section 4.2 of the Guaranties protects Plaintiffs by prohibiting DHI from transferring its assets without ensuring that the Guaranties follow the assets, because any recipient of substantially all of the assets must assume responsibility for the Guaranties.

54.    Section 8.11 of each Guaranty provides that, "This Guaranty shall be binding upon the Guarantor and its successors and permitted assigns and shall inure to the benefit of and shall be enforceable by, each of the Guaranteed Parties."

*DHI-PSEG Tax Indemnity Agreements*

55.    Plaintiffs also bargained for certain valuable tax benefits in connection with the sale and lease-back transactions described above.  To assure they received the after-tax rate of return they bargained for, Plaintiffs insisted that DHI's subsidiaries execute tax indemnity agreements and that those agreements were covered by DHI's Guaranties.

56.    On or about May 8, 2001, Dynegy Roseton entered into a tax indemnity agreement with Roseton OL, RCMC, PSEGR Newburgh Holdings LLC, and Roseton OP LLC. A true and correct copy of that tax indemnity agreement is attached as Exhibit D.

57.    On or about May 8, 2001, Dynegy Danskammer entered into a nearly identical tax indemnity agreement with Danskammer OL, RCMC, PSEGR Newburgh Holdings LLC, and Danskammer OP LLC.  A true and correct copy of that tax indemnity agreement is attached as Exhibit E.  (Together with Exhibit D, the "Tax Indemnity Agreements.")

58.    The Tax Indemnity Agreements and Guaranties provide, among other things, that under certain circumstances described in the agreements, DHI and certain affiliates will indemnify Plaintiffs for the loss of certain federal, state, and local income tax benefits and related rates of return that Plaintiffs bargained for in connection with the sale and lease-back transactions described above.  The Tax Indemnity Agreements and Guaranties also prohibit DHI and certain affiliates from taking any action that would cause the loss of those tax benefits.  The Tax Indemnity Agreements provide that as a remedy for a breach of their terms, Plaintiffs have the "right to receive payments pursuant to this Agreement."  (Tax Indemnity Agreements at 5.) Among the illicit purposes of Defendants' fraudulent conduct described herein is to cause defaults of the Roseton and Danskammer Leases—which may have adverse tax consequences for which DHI bears responsibility under the Tax Indemnity Agreements and Guaranties—and avoid that responsibility by stripping DHI of assets with which to meet its obligations.

19

*Defendants' Transfers and Restructuring Scheme*

59.     Defendants have orchestrated a series of fraudulent transfers and changes to Dynegy's corporate structure—which constitute a single, integrated transaction—designed to defraud DHI's creditors and frustrate their ability to bring claims against the Dynegy and DHI Directors responsible for perpetrating that fraud.    Those events, including the fraudulent transfers, are further described in the paragraphs below and are collectively referred to as the "Restructuring Scheme."    Defendants' fraudulent transfers, which are part of the Restructuring Scheme, alone are referred to as the "Transfers."

• **The First Step—"Ring Fencing."**

60.     In the first step of the Restructuring Scheme, Defendants fraudulently transferred virtually all of DHI's value and assets, including Sithe Energies Inc. ("Sithe") (over which DHI had direct ownership), to two newly-created bankruptcy-remote "ring-fenced" entities, one (CoalCo) to hold all of its valuable coal assets, and another (GasCo) to hold all of its valuable gas assets.  These bankruptcy-remote entities were structured so that, although DHI technically is the sole member of each, DHI cannot compel distributions from them both because any distribution requires the approval of an independent manager appointed by DHI, and because of artificial caps on the amount of distributions the entities can make per year.  According to a Standard & Poor's report from July 19, 2011, "the caps will make it impossible for DHI to cover its obligations."

61.     Also in the first step of the Restructuring Scheme, Defendants fraudulently transferred the two Dynegy subsidiaries that owe the direct lease obligations (Dynegy Roseton and Dynegy Danskammer) and the Dynegy entity that directly owns them (Dynegy Northeast Generation, Inc., or "DNE") to DHI's direct ownership and did not "ring fence" DNE or DHI. They did this in an attempt to obfuscate DHI's assets and to put it into a bankruptcy in an effort

20

to discharge or limit the Roseton Lease, Danskammer Lease and Guaranty obligations, and remove from the reach of Plaintiffs and other creditors the other businesses that DHI previously owned.

62.    The following diagrams show DHI's corporate structure before and after the first step of the Restructuring Scheme:



DYNEGY CORPORATE STRUCTURE
BEFORE THE RESTRUCTURING SCHEME



63.    On July 11, 2011, Dynegy and DHI filed an SEC Form 8-K in which they acknowledged their intention to reorganize DHI. (Ex. F, July 11, 2011 SEC Form 8-K at 2.) But they disclosed only part of their plan.

64.    In that 8-K, Dynegy and DHI recognized the risk of substantive consolidation in the event of a bankruptcy:

> ***In the event of a bankruptcy of DHI or any of its subsidiaries, DHI or its debtor subsidiaries (or their creditors) may seek to substantitively consolidate DPC (GasCo), DGI Holdings, DMG (CoalCo) and/or DCI Holdings with the debtors' estates.***
>
> \*   \*   \*
>
> The Loans will restrict the ability of GasCo and CoalCo to pay dividends or make other restricted payments. If, as a result of such leverage or otherwise, DHI or any of its subsidiaries becomes the

22

subject of a voluntary or involuntary bankruptcy case, DHI or any debtor subsidiary (or any trustee of the bankruptcy estate of DHI or any debtor subsidiary or any creditor thereof or other party in interest thereof) could ask the bankruptcy court with jurisdiction over any bankruptcy case to substantively consolidate one or more of DHI's non-debtor subsidiaries (i.e., those that are not the subject of such cases) with the estate(s) of DHI and/or its debtor subsidiaries.

(Ex. F at 6.)

65.  Dynegy and DHI also recognized in the 8-K that a court may find some of the transfers involved in the first step of the Restructuring Scheme, including the transfer of Sithe from DHI to GasCo and the transfer of DNE (and its negative value assets) from GasCo to DHI, were fraudulent conveyances:

> *While we have no reason to believe that DPC (GasCo) or any of the entities involved in the pre-Loan transfers that embody the formation of DPC (GasCo) are, or upon closing of the applicable transfers or the Loans, will be, rendered insolvent, if that is not the case, DPC (GasCo), as a debtor in possession, or its creditors (on behalf of DPC (GasCo)'s bankruptcy estate or individually if DPC (GasCo) is not in bankruptcy) may claim that (A) the transfers of assets in the creation of DPC (GasCo) constituted transfers and seek remedies (either within or outside of a bankruptcy filing), which could include the unwinding of those transfers, and/ or (B) DPC (GasCo)'s distribution of a portion of the proceeds from the GasCo Term Loan to DHI constituted a fraudulent transfer and seek remedies (either within or outside of a bankruptcy filing), which could include the unwinding of those distributions.*

(*Id.* at 7.)

66.  Dynegy also reported in the 8-K that following the closing of the loans contemplated by the first step of the Restructuring Scheme, it may undertake steps that increased the likelihood that creditors like Plaintiffs would challenge the prior transactions:

> *Following the closing of the Loans, Dynegy may engage in transactions that increase the likelihood of its estate or creditors challenging the pre-Loan transactions.*

Following the closing of the Loans, the Finance and Restructuring Committee of Dynegy's Board of Directors will continue to work with its advisors in connection with additional potential debt restructuring activities, which may include direct or indirect transfers of equity interests of DCI Holdings and/or DGI Holdings on terms which would be duly authorized by Dynegy's Board of Directors as lawful, and/or further reorganizations of Dynegy and/or various of its subsidiaries (collectively, "Post-Closing Restructuring Transactions"). . . . To the extent that (a) one or more of such Post-Closing Restructuring Transactions is determined to be an actual or constructive fraudulent transfer because, among other things, a court determines that such Post-Closing Restructuring Transaction(s) is not supported by reasonably equivalent value, and (b) the components and structure of the entire transaction (i.e., the furnishing of the Loans and the effectuation of the applicable Post-Closing Restructuring Transactions) are determined to be part of a single integrated scheme, a court could "collapse" the transaction and, could impose one of the Fraudulent Conveyance Remedies (defined in Section 4 of Certain Investment Considerations below) upon the lenders in respect of the applicable Loans (the "Lenders"). The consequences of such a collapse could include (x) the "unwinding" of all of the steps in the entire transaction including the portion of the transaction related to the furnishing of the Loans in an effort to return the various transferred property to its original estate, and (y) the imposition of a remedy requiring the Lenders (as alleged beneficiaries of the overall transaction) to pay an amount equal to the value of the challenged transfers (plus potentially any post-transfer depreciation in the value of the transferred property, which may include the litigation expense incurred or reimbursed by the transferor).

(*Id.* at 6-7.)

67.    On July 14, 2011, upon learning of the proposed Transfers involved in the first step of the Restructuring Scheme, certain Plaintiffs sent a letter to DHI notifying DHI of Plaintiffs' rights under the Guaranties and seeking DHI's confirmation that it would not go forward with the proposed Transfers without complying with the provisions in the Guaranties that prohibit the transfer of DHI's assets without, among other things, requiring the transferee to assume DHI's obligations under the Guaranties. In the alternative, these Plaintiffs asked DHI to agree to a standstill whereby DHI would agree not to go forward with the contemplated

24

Transfers for at least fourteen days while the parties sought to resolve their differences. DHI rejected that request and indicated its intent to go forward with its planned Transfers.

***DHI's False Representations to the Delaware Court of Chancery and to this Court***

68.    On July 22, 2011, Roseton OL and Danskammer OL filed a verified complaint against DHI in the Delaware Court of Chancery seeking to prevent DHI from making the Transfers described above, because of their concern that those Transfers "would turn into a hollow shell DHI's guaranty of $920 million in financing provided by PSEG." (Group Ex. G, Del. Ch. Ct. Compl. ¶1.) Contemporaneous with the filing of their complaint, Roseton OL and Danskammer OL filed a Motion for Temporary Restraining Order, seeking to enjoin DHI from proceeding with its proposed Transfers until the court had an opportunity to hold a preliminary injunction hearing.

69.    In its opposition to the Motion for Temporary Restraining Order, DHI repeatedly represented to the Delaware Chancery Court, as a basis for denying the motion, that following the Transfers and related restructuring DHI would continue to own the same assets that it owned prior to the restructuring. DHI and Merksamer represented in briefs and supporting affidavits, for example:

- "Following the Reorganization, DHI will continue to own, indirectly through a series of subsidiaries, each of those same power generating assets. On a consolidated basis, DHI will have all of the same assets it currently has on a consolidated basis." (Ex. G, July 25, 2011 Aff. of Samuel Merksamer ¶9.)

- "DHI will continue to hold direct equity interests ***at all times*** in entities that own indirectly all of the power generating assets, just as, and to the same extent that, the direct subsidiaries of DHI today indirectly own such assets. Thus, DHI will continue to own indirectly the same revenue generating assets that it indirectly owns today." (Ex. G, July 28, 2011 2d Supp. Aff. of Samuel Merksamer ¶4 (emphasis added).)

- "After the Reorganization, DHI will have rights in the same assets that it had before the Reorganization. . . ." (Ex. G, DHI Opp. to Mot. for TRO at 1.)

25

- "DHI is not transferring farther out of reach any power plants. Indeed, no assets are being transferred outside of DHI's ultimate ownership." (*Id.* at 2-3.)

- "The Reorganization will in no way diminish the value of DHI's assets. Rather, DHI will continue to own the equity of DHI's direct subsidiaries—and that equity will continue to include the same value of the same power plants." (*Id.* at 3.)

- "On a consolidated basis, nothing will change." (*Id.* at 18.)

- "Following the Reorganization, DHI will continue indirectly to own the same revenue generating assets, through a series of subsidiaries, and that equity will still be subject to execution in the event of a judgment. In short, DHI will continue to own indirectly, just as it does now, 100% of those assets." (*Id.* at 10.)

- "DHI does not currently directly own any power plants; it owns stock in subsidiaries that own stock in subsidiaries that own power plants. This was so when the Guaranties were executed. It is true now. And it will be the case after the Reorganization is completed." (*Id.* at 1.)

70.   DHI made the same representations at the hearing on the Motion for Temporary

Restraining Order:

- "DHI today, indirectly, through a series of subsidiaries, owns 17 power plants, many of which are profitable. And following the reorganization, DHI will own 17 power plants, the very same power plants; and they will be equal in value to what they're equal to today except to the extent that the value is enhanced by reason of its new liquidity and its new structure. So it's important to understand that not only is there technically not a transfer but, economically, DHI has the same value after the reorganization that it has today." (Ex. H, 7/25/11 Del. Ch. Ct. Hr'g Tr. at 36:13-24.)

- "But what's interesting about it is usually, when you get in these situations, it's because the guarantor is being left with substantially fewer assets than they had; and that's actually not the case here." (*Id.* at 37:5-9.)

- "It does not mean, of course, that the value of those bankruptcy-remote entities is removed from the bankruptcy estate. To the contrary, the estate, if it was DHI, would continue to own what it always owned, which is equity in entities that were holding companies that ultimately owned the power assets; and they would still have that." (*Id.* at 38:8-14.)

- "We have put in an affidavit [from Mr. Merksamer] that says all of this, Your Honor, that says that we will—that DHI indirectly owns through a series of subsidiaries all of the power plants at issue; and following the reorganization, DHI will continue to own through a series of subsidiaries the very same power plants." (*Id.* at 44:23-45:5.)

26

- "The enterprise under DHI will look the same after the reorganization, just as it looks today." (*Id.* at 49:22-24.)

- "As to the parent, as I've already said, the parent now owns the indirect interest in all these power assets through subsidiaries, and it continues to do so. So the fair value, it's starting the day with the same value it's ending the day. Before the reorganization, it has the full enterprise value of all of its subsidiaries. At the end of the day, it has the full value of all of its subsidiaries. It goes from the left pocket to the right pocket. You can go find it on an org chart, but that doesn't mean it's a transfer." (*Id.* at 55:6-16.)

71.    Those representations were the basis for DHI's argument to the Delaware Court that the first step of its Restructuring Scheme did not involve a transfer of DHI's assets. But shortly after the Delaware Court ruled, Defendants took actions that rendered false every one of those representations. It is now apparent that at the time DHI made those false representations, it knew them to be false. Upon information and belief, before DHI made those false representations, Dynegy had negotiated in its new financing secured by its coal portfolio (but did not publicly disclose until later) for an express and non-market carve out providing that a transfer of the coal assets from DHI to Dynegy—which is exactly what it did several weeks later, *see infra* ¶¶85-94—would not constitute a default under the financing agreement.

72.    Parallel litigation concerning the same issues was commenced in July 2011 in this court by certain DHI creditors, who also sought a temporary restraining order. During an initial hearing before this Court, DHI made the following false representations:

- "At the end of today, before any restructuring is happening DHI has under it a series of companies and under those series of companies are other companies and ultimately revenue generating assets. *When* restructuring *closes DHI will have a series of companies under it, and they will have a series of companies under them that will hold the very same assets. So there is no change in credit risk whatsoever.*" (Ex. I, July 21, 2011 Hr'g Tr. at 12:15-22 (emphasis added).)

- [DHI] will have more than sufficient assets to pay these debts when they become due. *More significantly, it will have the same assets as of today, and more significantly, there is nothing about the value of the assets at DHI today that will change its only equity.*" (*Id.* at 14:21-26 (emphasis added).)

27

The case before this Court was stayed pending the Delaware Court's decision of Roseton OL and Danskammer OL's Motion for Temporary Restraining Order.

73.    On July 29, 2011, the Delaware Court issued a Memorandum Opinion denying the Motion for Temporary Restraining Order, relying in part on DHI's misrepresentations that DHI would continue to own the entities that directly owned the valuable coal and gas assets.  In fact, in ruling that Roseton OL and Danskammer OL did not show that they were likely to succeed in proving that DHI transferred its assets substantially as an entirety under Section 4.2 of the Guaranties, the Delaware Court specifically cited DHI's purported continued ownership of the coal assets, which unbeknownst to the Delaware Court or Plaintiffs, but apparently known by DHI and Dynegy, DHI would fraudulently transfer to Dynegy just weeks later:

> At the present time, DHI is a holding company that generally holds indirect interests in companies that own power plants.  After the Transaction is consummated, DHI will be a holding company that owns interests in different companies under the same corporate umbrella that own the same power plants.  Thus, from a qualitative standpoint, Plaintiffs have not shown they are likely to succeed in proving that DHI transferred its assets substantially as an entirety under § 4.2.
>
> From a quantitative perspective, Plaintiffs arguably have shown that substantially all of its valuable power plant assets would be transferred into GasCo and CoalCo, leaving the allegedly negative-cash-flow-generating Roseton and Danskammer plants outside of the ring-fencing contemplated by the Transaction.  ***But, GasCo and CoalCo still will be subsidiaries of DHI; thus, any assets transferred to them are not being transferred away from DHI's ultimate ownership.***  This fact distinguishes the *B.S.F. Co.* case . . . .  Subject to restrictions discussed below, DHI retains the value of the plants embedded in its ownership of the entities that directly own those plants today and will own them after the Transaction is consummated.  Thus, Plaintiffs are not likely to succeed in showing quantitatively that DHI transferred away its valuable assets "substantially as an entirety."

(Ex. J, Mem. Op. at 36-37 (emphasis added).)

2b31c5ac8e8aaae2

74.   The Delaware Court's determination that Roseton OL and Danskammer OL were not likely to prevail on their fraudulent transfer claim also was based on DHI's false representations that it would continue to indirectly own the valuable CoalCo assets:

> Plaintiffs are not likely to succeed in showing that DHI transferred the profitable power plants to GasCo and CoalCo without receiving a reasonably equivalent value. This is because DHI did not transfer any valuable assets away from its corporate structure. . . . ***DHI will have the same indirect ownership interests in the physical assets after the Transaction as it did before it.*** Concededly, the bankruptcy remote nature of GasCo and CoalCo will deprive DHI of the same level of potential control over their assets as it had before the Transaction, but DHI also will enjoy, at least indirectly, the benefits of those entities' statuses.

(*Id.* at 43-44 (emphasis added).)

75.   Based on DHI's representations, the Delaware Court made the following findings, which if not then, are now unsupportable due to Defendants' subsequent acts, including:

- DHI would continue to enjoy, at least indirectly, the benefits of CoalCo's assets. (*Id.* at 44.)

- DHI is not insolvent. (*Id.*)

- The Transfers and Restructuring Scheme would provide "actual and substantial financial benefits to DHI, which potentially could rebound to plaintiffs' benefit over time." (*Id.* at 47.)

76.   Within a matter of weeks, as discussed below, Defendants made a mockery of their representations to the courts and key passages in the Delaware Court's opinion by promptly and fraudulently transferring all of CoalCo and its physical plants to Dynegy and out of DHI's ownership umbrella.

77.   On August 4, 2011, Roseton OL and Danskammer OL sought to appeal the Delaware Chancery Court's decision to the Delaware Supreme Court. While the Delaware Supreme Court considered granting a stay, including asking the parties to recommend appropriate amounts for a bond to secure a stay pending appeal, but before it could rule on a stay

or request to certify an appeal, on August 5, 2011, DHI informed the Delaware Supreme Court that the restructuring transaction that those Plaintiffs sought to enjoin had closed and that their claims were moot and also that the final step in the transactions that Roseton OL and Danskammer OL sought to enjoin—the formal funding of the loans thereunder—had been consummated.

78.    Shortly thereafter, on August 5, 2011, the Delaware Supreme Court, in the exercise of discretion, refused Roseton OL and Danskammer OL's Application to Certify an Interlocutory Appeal from the Delaware Chancery Court's July 29, 2011 Memorandum Opinion on the basis that the matter was moot.  Roseton OL and Danskammer OL thereafter dismissed the case without prejudice.

***Defendants' Restructuring Scheme Continues***

- **August 5, 2011: Dynegy Closes $1.7 Billion Refinancing With Icahn Capital Participating.**

79.    On information and belief, Icahn Capital or a related Icahn entity sought to participate in and/or participated in the financing of CoalCo and GasCo, despite its affiliation with members of Dynegy's Board of Directors.  An analyst at Moody's commented that it was unusual for a non-bank and shareholder, represented on the board of directors, to participate in such a financing.  Icahn Capital benefited in its lender capacity from the artificial increase in the value of the assets owned by the ring-fenced entities resulting from the arbitrary limits on the distributions they could make to DHI.  Those entities and their operations had been available to meet DHI's obligations to Plaintiffs; now, Dynegy shareholders, including Icahn Capital and Seneca, can seek to extract the value of those entities without first honoring the Lease and Guaranty obligations to Plaintiffs.

80.    On August 8, 2011, Dynegy and DHI filed an SEC Form 8-K announcing the consummation of the ring-fencing, initial transfers, and refinancing.    Dynegy and DHI announced two new credit facilities:   (i) a $1,100,000,000 five-year senior secured term loan financing facility among GasCo, Credit Suisse AG, and others ("GasCo Term Loan Facility"), and (ii) a $600,000,000 senior secured term loan facility among CoalCo, Credit Suisse, and others ("CoalCo Term Loan Facility").  (Ex. K, Aug. 8, 2011 SEC Form 8-K at 2.)

81.    According to the Form 8-K, proceeds of borrowings under the CoalCo Term Loan Facility:

> were or will be used by CoalCo, to (i) fund cash collateralized letters of credit and provide cash collateral for existing and future collateral requirements, (ii) make a $200 million restricted payment to a parent holding company of CoalCo, (iii) pay related transaction fees and expenses and (iv) fund additional cash to the balance sheet to provide the CoalCo portfolio with cash to be used for general working capital and general corporate purposes.

(*Id.* at 4.)

82.    According to the Form 8-K, proceeds of borrowings under the GasCo Term Loan Facility:

> were or will be used by GasCo to (i) repay an intercompany obligation of a GasCo subsidiary to DHI and ultimately to repay certain outstanding indebtedness under DHI's Fifth Amended and Restated Credit Agreement, (ii) fund cash collateralized letters of credit and provide cash collateral for existing and future collateral requirements, (iii) at the option of GasCo, repay up to approximately $192 million of debt relating to Sithe Energies, Inc. (the intermediate project holding company that indirectly holds the Independence facility in New York), (iv) make a $200 million restricted payment to a parent holding company of GasCo, (v) pay related transaction fees and expenses and (vi) fund additional cash to the balance sheet to provide the GasCo portfolio with liquidity for general working capital and liquidity purposes.

(*Id.* at 2.)

83.    As shown in the above diagrams, as part of the first step in DHI's Restructuring Scheme, Sithe was transferred from DHI to a different Dynegy subsidiary.  With the proceeds of the refinancing, Dynegy then announced a cash tender offer to purchase $191,687,012.47 in outstanding debt from Sithe.

84.    Therefore, the $1.7 billion of asset value that was previously available to backstop DHI's Guaranties to Plaintiffs now was pledged for the benefit of Icahn Capital and other new lenders, creating liquidity and value, much of which would soon be transferred to Dynegy's direct ownership and completely out of the ownership and reach of DHI.

- **September 1, 2011: Dynegy Acquires Direct Ownership of Coal HoldCo.**

85.    On September 1, 2011, Defendants did exactly what DHI represented to the Delaware Court they would not do:  they transferred 100% of the outstanding membership interests of Coal HoldCo, which represents over 50% of the revenue of all DHI subsidiaries, to Dynegy without paying adequate consideration to either DHI or Coal HoldCo.  That transfer, and transferring the right to receive distributions, which itself is a critical asset, further effected a transfer of substantially all of the assets of DHI to Dynegy, contrary to DHI's representations to the Delaware Court and this Court, and caused DHI to lose ownership of all of the valuable coal assets.

86.    In order to achieve direct ownership of Coal HoldCo without paying fair consideration for it, and to further saddle DHI with excessive obligations, Defendants devised a convoluted financing structure.  As set forth in Dynegy's Form 8-K filed on September 8, 2011, Dynegy's Board of Directors and DGI's Board of Managers purportedly concluded in an act of self-dealing that the fair market value of Dynegy's acquired equity stake in Coal HoldCo was approximately $1.25 billion.  (Ex. L, Sept. 8, 2011 SEC Form 8-K at 2.)  Dynegy did not purport to conduct a good faith or independent valuation.

32

87.     Dynegy then purported to provide $1.25 billion in consideration to DGI for Coal HoldCo pursuant to a vague "undertaking," which DGI quickly agreed would be assigned to DHI in exchange for a note from DHI to DGI for $1.25 billion.  The undertaking Dynegy gave coincided in timing and amount to the payments of principal and interest that DHI was obligated to make under a portion of its $1.1 billion of 7.75% senior unsecured notes due 2019 and its $175 million of 7.625% senior debentures due 2026 ("Undertaking Agreement").  A copy of the Undertaking Agreement is attached as Exhibit M.  The present value of the undertaking to DHI is worth substantially less than $1.25 billion.  Like the value assigned to Coal HoldCo, the value assigned to the undertaking was self-serving and apparently not the subject of any independent or good faith valuation.

88.     In conjunction with assigning the right to receive monies under the undertaking to DHI in exchange for DHI agreeing to pay the $1.25 billion note to DGI, Defendants amended the undertaking to render it even less valuable by allowing Dynegy to extinguish it altogether if Dynegy or its subsidiaries achieved a $1.25 billion reduction in the face value of DHI's outstanding bonds.  Dynegy knew this could be done for substantially less than $1.25 billion, because the bonds were trading at a substantial discount.  (A copy of the Amended and Restated Undertaking Agreement is attached as Exhibit N.)

89.     The net effect of this scheme was to transfer Coal HoldCo to Dynegy and away from DHI without Dynegy paying fair consideration to DHI or DGI, while leaving DHI fully liable for the $1.25 billion note it provided to DGI in purported consideration for the illusory undertaking from Dynegy.

90.     Further illustrating the unlawful and self-dealing nature of the Restructuring Scheme, including the Transfers, is Defendants' own recognition and admission that DHI's

33

creditors would challenge them as fraudulent. The Coal HoldCo Purchase Agreement provides that if there is a challenge to the self-serving $1.25 billion valuation, that Defendants agree that any dispute must be resolved in binding arbitration. (Purchase Agreement §2.3.) The Purchase Agreement goes on to state:

> [a]ny third party that is determined by a court of competent jurisdiction to have standing to bring any claim relating to this agreement or the transactions contemplated hereunder (including, without limitation, fraudulent conveyance and transfer claims) may intervene and participate as a party to the arbitration, provided that such third party agrees in writing with each of the parties to this agreement to be bound by this arbitration agreement.

(*Id*. at §5.6(c).) That provision is an implicit acknowledgement by Defendants that the coal portfolio transfer was fraudulent and is susceptible to challenge.

91.    Defendants could not completely conceal their self-dealing and disregard of corporate formality. As an example, the Amended and Restated Undertaking Agreement was executed on behalf of both Dynegy and DHI by Freeland, who simultaneously was serving as the Chief Financial Officer of Dynegy and the Chief Financial Officer and Director or Manager of DHI.

92.    As shown below, the effect of the sale of Coal HoldCo from DGI to Dynegy was to divest DHI of any interest in Coal HoldCo and the valuable coal assets:



93.    But for the Transfers, DHI would have otherwise been entitled to *all* of Coal HoldCo's $1.25 billion or more in value.  Now DHI is entitled to *nothing* from Coal HoldCo.

94.    The Transfers violate the Guaranties and have caused Plaintiffs hundreds of millions of dollars in damages.

- **September 1, 2011: Conversion of Dynegy Holdings, Inc. to Dynegy Holdings, LLC.**

95.    Recognizing that the DHI Directors had breached their fiduciary duties and that other Defendants had aided and abetted those breaches by allowing the Transfers, the Dynegy and DHI Directors concurrently sought to erect artificial defenses to claims against them by

filing, on September 1, 2011, documents purporting to change DHI from a corporation to a Delaware limited liability company, Dynegy Holdings, LLC (also "DHI"), under Section 266 of Delaware's General Corporation Law. Because that conversion was carried out for improper purposes, it should be deemed void and of no legal effect.

96.     The purportedly converted DHI's only member is Dynegy. Its new Board of Managers, as appointed by Dynegy, consists of Defendants Freeland, Howell and Flexon; many other of DHI's former directors and officers continue to be officers of the purportedly converted DHI.

97.     Because the corporate structure of Dynegy and DHI was used for fraudulent, unfair and unjust purposes, as more fully set forth below in paragraphs 111 to 124, their corporate veils should be pierced and/or Dynegy should be deemed to be the alter-ego of DHI. Additionally, because DHI has transferred substantially all of its assets to Dynegy, pursuant to the terms of the Guaranties, Dynegy has assumed the obligations of the Guaranties pursuant to the terms of the Guaranties that make a transferee liable for the Guaranties.

- **September 15, 2011: Dynegy Announces Coercive Exchange Offers for up to $1.25 billion of DHI's debt.**

98.     On September 15, 2011, Defendants revealed the next intended step in the Restructuring Scheme, and the transfer of substantially all of its assets to Dynegy and its shareholders, by offering an exchange of up to $1.25 billion of DHI debt ("Exchange Offer"). After extending the deadline several times, Dynegy finally terminated the Exchange Offer on November 3, 2011, likely when it became clear to Dynegy that coercive nature and unfair terms of the Exchange Offer had rendered it unsuccessful. Because Dynegy simply uses and controls DHI as a shell to effectuate its Restructuring Scheme, Dynegy retains the ability to at anytime launch another offer to exchange DHI debt.

99.    The Exchange Offer was calculated to provide Dynegy with up to $1.25 billion of benefit while costing it much less, by eliminating the $1.25 billion undertaking Dynegy gave to DHI in conjunction with the transfer of Coal HoldCo to Dynegy. The intent of the Exchange Offer, which Standard & Poor's described as "coercive and tantamount to default," would be to relieve Dynegy of its undertaking payment obligations to DHI, while leaving DHI on the hook to DGI for $1.25 billion.

100.    The Exchange Offer was the attempt to culminate, though perhaps not the final act in, Defendants' ploy to defraud DHI's creditors including Plaintiffs. Dynegy's obligations pursuant to the Amended Undertaking would have been reduced by $1.678 for every $1.00 of notes it had retired in connection with the Exchange Offer. That would be true even though Dynegy was purchasing DHI's notes for *substantially less than par*. Thus if the Exchange Offer had been successful and sufficient noteholders had tendered, Dynegy's payment obligations under the Amended Undertaking *would have been reduced to zero*. DHI's only remaining asset of any value then would have been its indirect equity interest in Gas HoldCo, which DHI has already ring-fenced to ensure the Gas HoldCo assets do not provide DHI with sufficient cash flow to service DHI's debts and obligations. DHI will be left without the ability to satisfy its obligations when they come due. Dynegy intends to put DHI into bankruptcy or coerce DHI's creditors to take significant haircuts to avoid bankruptcy. At the same time, Dynegy will acquire Coal HoldCo, worth $1.25 billion or more, for far less through an insider transaction.

101.    On September 19, 2011, an analyst from Standard & Poor's wrote: "Upon completion of the [Exchange Offer], DHI will have no assets other than the Roseton-Danskammer lease, which is hugely unprofitable for Dynegy as it involves payments of more than $500 million in the next few years with very little economic value for Dynegy. Further,

while DHI retains about $2.1 billion in unsecured debt and a cap on distributions from ring-fenced subsidiary GasCo, a successful exchange for $1.25 billion would eliminate the undertaking from Dynegy to DHI that was put in place as consideration for the transfer of Dynegy Coal Holdings LLC (CoalCo), a wholly owned, indirect subsidiary of DHI, to Dynegy."

102.    Dynegy wrote in its September 15, 2011 SEC Form 8-K: "Upon consummation of the Exchange Offers, in the absence of further successful debt restructuring and/or refinancing, there can be no assurance that DH or its subsidiaries responsible for the Roseton and Danskammer lease obligations will have sufficient resources to pay existing indebtedness and, as a result, may become the subject of a voluntary or involuntary bankruptcy case." (Ex. O, Sept. 15, 2011 SEC Form 8-K at Ex. 99.2, 1.)

103.    The Restructuring Scheme, including the Transfers, involved deliberate strategy by Defendants of stripping DHI of assets, making those assets available only to equity holders, and purposely preventing DHI from meeting its obligations to its creditors including particularly Plaintiffs.  The Restructuring Scheme, including the Transfers, is prohibited by Guaranties and the law.

104.    Indeed, Dynegy was forced to recognize in its September 15, 2011 8-K the substantial risk that a creditor may file a lawsuit to challenge the legality of the Exchange Offer:

> It is possible that our creditors and/or other parties may seek to assert a variety of claims against Dynegy, its subsidiaries, the members of Dynegy's Board of Directors, and others, challenging some or all of the transactions, including, claims under state or federal law for, among other things, breach of contract, fraudulent transfer or preference, or otherwise alleging that various aspects of the transactions were improper.

(*Id.* at Ex. 99.2, 3.)

105.    On both October 20 and 27, Dynegy announced that it planned to further extend the deadline for the Exchange Offer, which was initially set to expire on October 13.

106.    On November 1, Dynegy again announced that "extending the withdrawal deadline for the offers to exchange (the "Exchange Offers") up to $1,250,000,000 principal amount of the outstanding notes, debentures and capital income securities of DH, for Dynegy's new 10% Senior Secured Notes due 2018 and cash to midnight, New York City time, on November 3, 2011 (the Withdrawal Deadline), which as previously announced is also the expiration date for the Exchange Offers, unless further extended or earlier terminated by Dynegy." (Ex. P, Nov. 1, 2011 SEC Form 8-K at 2.)  On November 4, Dynegy announced that it has terminated the Exchange Offer.

*DHI's Artificial Insolvency*

107.    Through its asset transfers, Dynegy improperly has rendered DHI insolvent, and unable to raise capital to pay its debts through traditional financing in any commercially sensible manner.

108.    Although DHI had access to $1.25 billion of equity value or more at Coal HoldCo before the Restructuring Scheme, Defendants have transferred Coal HoldCo's valuable assets to Dynegy out of reach of DHI and created and/or furthered an artificial insolvency at DHI.

109.    Defendants are forcing DHI into bankruptcy so they can contend, once it is subject to the bankruptcy laws, that Section 502(b)(6) of the Bankruptcy Code applies to its lease obligations.

110.    Defendants have threatened Plaintiffs with the possibility that DHI will invoke Bankruptcy Code Section 502(b)(6) in an attempt to cap Plaintiffs' and their assignees' right to over $500 million in future lease and/or guaranty payments.  Defendants recognize that a default on the lease obligations may result in substantial tax liabilities to Plaintiffs for which DHI would be responsible to indemnify Plaintiffs.  Defendants have stripped DHI of assets and value in part to leave insufficient funds available for DHI to satisfy that responsibility.

***Dynegy's, DHI's and DGI's Veils Should Be Pierced and/or Dynegy's Corporate Structure
Should Be Collapsed***

111.    Dynegy has extracted value from DHI and its subsidiaries without paying DHI's
creditors, including Plaintiffs.

112.    Dynegy has no assets, other than DHI and the assets of DHI and its subsidiaries
that were wrongfully transferred to Dynegy as part of the Restructuring Scheme.

113.    Dynegy has improperly and without regard to corporate structure used subsidiary
companies, including DHI subsidiaries, to unfairly shift assets out of the reach of certain
creditors in order to enrich Dynegy's shareholders, including some of its largest shareholders,
Icahn Capital and Seneca.

114.    Although it has completely ignored the corporate form of its subsidiaries and
DHI's subsidiaries when it suits its purpose, Dynegy is now trying to use the corporate form of
those subsidiaries and newly-minted subsidiaries as instruments by which it can inflict injury on
Plaintiffs.

115.    DHI and the other DHI subsidiaries were controlled and run by Dynegy directors
and officers who were not independent and who engaged in self-dealing transactions for the
benefit of Dynegy, its shareholders, and themselves.

116.    Dynegy has failed to treat DHI and its subsidiaries and DGI and its subsidiaries as
separate corporate entities except to the extent necessary to perpetuate its fraud against creditors.

117.    In failing to treat DHI and its subsidiaries as separate corporate entities, Dynegy
has shifted assets and value between entities without arm's length bargaining or adequate
consideration, undercapitalized DHI to render it insolvent, and treated DHI's subsidiaries as
mere façades.

118.    DGI is a shell holding company with no operations that was formed pursuant to the Restructuring Scheme for the purpose of facilitating the Defendants' fraudulent scheme, wrongs and injustice. DGI does not serve any legitimate business purpose, but rather was only created by DHI to frustrate the ability of DHI's creditors to unwind the Transfers as a fraudulent conveyance.

119.    At all relevant times Dynegy controlled and dominated DGI and DHI and their subsidiaries such that Dynegy, DHI and its subsidiaries, and DGI and its subsidiaries, are all alter egos of each other. Both DHI and DGI and their subsidiaries have been used as an artifice and a sham designed to achieve illegitimate purposes. Dynegy abused its dominion and control over DHI and DGI and their subsidiaries to perpetrate the fraudulent acts described herein.

120.    Dynegy obscured the financial impact of its asset shifts at DHI, and further evidenced its treatment of DHI as its alter ego, by electing to file SEC filings on a consolidated basis with DHI. For example, in the past six months, Dynegy and DHI filed three consolidated 8-K statements and a consolidated 10-Q.

121.    Indeed, Dynegy has admitted in other filings with this Court that the Dynegy board of directors held board or board committee meetings on several occasions in New York in 2011, during which the Restructuring Scheme and Transfers were discussed and decided by the Dynegy board members, as opposed to directors or managers of DHI or DGI.

122.    Dynegy should be deemed the alter ego of DHI and held liable for DHI's obligations based on the specific facts set forth in this Complaint.

123.    Each of DHI's former and current subsidiaries should be deemed alter egos of DHI and transfers of assets, including ownership of entities, by these subsidiaries and/or by Dynegy should be attributed to DHI based on the specific facts set forth in this Complaint.

41

124.    DGI and its subsidiaries are alter egos of Dynegy and/or DHI and their subsidiaries as shown by the specific facts set forth in this Complaint. All of the transfers of assets, including ownership of entities, by DGI and its subsidiaries should be attributed to Dynegy and DHI.

***Demand is Excused***

125.    Plaintiffs' claims and causes of action alleged herein are direct claims. In the alternative, if any claims or causes of action are deemed to be derivative in nature, Plaintiffs' obligation to make a demand on DHI's Directors/Managers is excused because, based on the specific conduct described in this Complaint, those Directors/Managers: (a) are Defendants in this proceeding and face a substantial likelihood of liability for their role in the improper conduct described above; (b) are engaged in conduct that is not a legitimate exercise of judgment and do not enjoy the protections of the business judgment rule; and/or (c) are otherwise conflicted from and unable to fairly consider a demand.

126.    Under Delaware Code Section 266(h), Plaintiffs' claims as a creditor of DHI should be unimpaired by the purported conversion of DHI from a corporation to a limited liability company.

## Count I: Breach of Guaranties, Including Covenant of Good Faith and Fair Dealing (Dynegy and DHI)

127.    Plaintiffs repeat and reallege Paragraphs 1-126 as though fully set forth here.

128.    The Guaranties are valid, enforceable agreements.

129.    Section 8.11 of each Guaranty provides that "This Guaranty shall be binding upon the Guarantor and its successors and permitted assigns and shall inure to the benefit of and shall be enforceable by the Guaranteed parties." For the reasons set forth herein, Dynegy is a

successor and assignee under the Guaranties and liable for DHI's obligations under the Guaranties.

130.    In Section 4.2 of the Guaranties, DHI promises that it "shall not consolidate with or merge into any other Person, or convey, transfer or lease its properties and assets substantially as an entirety to any Person in one or a series of transactions."

131.    DHI and thus Dynegy breached Section 4.2 of the Guaranties by reason of the Restructuring Scheme, including the Transfers.  DHI and Dynegy also breached Section 4.2 of the Guaranties when Dynegy failed to provide an assignment and assumption agreement that was satisfactory to Plaintiffs in connection with the Transfers, as Section 4.2 demands.

132.    Under Section 4.1 of the Guaranties, except as permitted by Section 4.2 (which permission does not apply here), DHI agrees that it will at all times do or cause to be to be done all things necessary to preserve and keep in full force and effect its legal existence.

133.    DHI and Dynegy breached Section 4.1 when DHI, at Dynegy's direction, went forward with the Restructuring Scheme including its attempts to convert from a Delaware corporation into a Delaware limited liability company in order to try to shield its directors from liability for their breaches of fiduciary duties.

134.    Even if the Court determines that Guaranties do not have express terms that prohibit the Restructuring Scheme, including the Transfers, DHI's contractual representations in the Guaranties included and are consistent with an implied covenant of good faith and fair dealing that DHI would not transfer its direct or indirect assets and equity to Dynegy without fair consideration.  By engaging in the Restructuring Scheme, DHI and Dynegy breached that covenant of good faith and fair dealing.

135.    Plaintiffs have been substantially damaged as a result of Dynegy's and DHI's breaches of the Guaranties.  Plaintiffs have suffered and will continue to suffer significant economic injury, including hundreds of millions of dollars in lease obligations, Guaranty obligations, and Tax Indemnity Agreement obligations.

**Count II: Declaratory Judgment - Obligations Under the Tax Indemnity Agreements (Dynegy and DHI)**

136.    Plaintiffs repeat and reallege Paragraphs 1-135 as though fully set forth here.

137.    The Tax Indemnity Agreements are valid, enforceable agreements.

138.    Plaintiffs have satisfied and continue to satisfy all of their obligations under the Tax Indemnity Agreements.

139.    Dynegy has assumed DHI's obligations under the Guaranties, which include the obligation to comply with the terms of the Tax Indemnity Agreements.  Dynegy has assumed those obligations for several, independent reasons, including, because it assumed those obligations as a successor to the Guaranties pursuant to their terms, it assumed substantially all of the rights and assets of DHI that were used as the basis for the Guaranties, and it has controlled DHI and its subsidiaries used them fraudulently as its alter ego to avoid corporate liabilities and unjustly transfer equity.

140.    The Tax Indemnity Agreements prohibit DHI and thus Dynegy from taking any actions that would cause Plaintiffs to lose the tax benefits at issue.  DHI and Dynegy have set into motion a scheme that breaches that obligation and that will cause Plaintiffs substantial injuries as a result.

141.    Plaintiffs are entitled to a declaration that pursuant to the terms of the Tax Indemnity Agreements and Guaranties (including their guaranties of the tax indemnity obligations), Dynegy has assumed all of DHI's obligations under the Tax Indemnity Agreements

44

and the Guaranties of the Tax Indemnity Agreements and/or that Dynegy is the successor, assignee and alter ego of DHI with respect to DHI's obligations under both the Tax Indemnity Agreements and the Guaranties of the Tax Indemnity Agreements.

142.    Plaintiffs are entitled to any equitable relief in connection with the violation of its rights under the Tax Indemnity Agreements, and DHI's and Dynegy's breaches of those obligations.

## Count III: Breach of Fiduciary Duties
## (DHI Directors)

143.    Plaintiffs repeat and reallege Paragraphs 1-142 as though fully set forth here.

144.    On or before September 1, 2011, the DHI Directors intentionally rendered DHI insolvent and/or agreed to do so. As a consequence of that insolvency, the DHI Directors owed DHI's creditors, including Plaintiffs, fiduciary duties of good faith, care and loyalty.

145.    The DHI Directors' approval of the Restructuring Scheme, including the Transfers, which were designed to defeat or hinder the interests and rights of Plaintiffs as one of DHI's creditors, breached the DHI Directors' duties of good faith, care and loyalty.

146.    The Restructuring Scheme, including the Transfers, was not the product of legitimate business judgment; instead it was based on intentional, conflicted and self-interested misconduct.

147.    Although DHI has purportedly converted from a corporation to a limited liability company and eliminated its directors, the DHI Directors may not thereby shed their fiduciary duties with respect to the Restructuring Scheme, including the Transfers, after implementing those transactions. The conversion of DHI itself is evidence of the DHI Directors' self-interest and misconduct and should be null and void. Under Delaware law such a conversion may not be used to defeat claims of creditors, including those asserted herein.

148.    As a result of the DHI Directors' breach of their fiduciary duties, Plaintiffs have suffered and will continue to suffer significant economic injury, including hundreds of millions of dollars in lease obligations and Guaranty obligations.

149.    Plaintiffs also have suffered and will continue to suffer other damages as a result of the DHI Directors' conduct, including:

- the loss of the benefit of its bargain in the leases, Guaranties, Tax Indemnity Agreements and related agreements; and

- substantial attorneys' and other professional fees incurred in redressing these Defendants' improper conduct, which are owed to Plaintiffs under the terms of the Guaranties.

150.    Plaintiffs, as a creditor of DHI and to the extent they may do so in their own right, seek on behalf of DHI and itself, monetary damages from the DHI Directors for the injuries caused by the DHI Directors' breaches of their fiduciary duties.

151.    The DHI Directors' conduct described above was wanton, willful and oppressive and/or was made in bad faith towards Plaintiffs.    That conduct warrants the imposition of substantial punitive damages.

152.    No justification or privilege excuses the DHI Directors' wrongful conduct.

153.    As set forth above, demand on the DHI Directors is excused in these circumstances as being futile.    DHI's Directors are defendants in this action and they were intimately involved in and received compensation to induce their implementation of the Restructuring Scheme, including the Transfers.    The DHI Directors are not, and cannot be presumed to be, capable of exercising independent and disinterested judgment about whether to pursue these actions on behalf of DHI's creditors, including Plaintiffs.    Further, Defendants have attempted to preclude demand upon the DHI Directors by purporting to convert to a limited liability company and eliminating its directors.

154.    Dynegy is liable for the obligations and liabilities of DHI, and thus Dynegy and its Directors are conflicted.  As a consequence, making a demand on Dynegy or its Directors would be futile.

### Count IV: Aiding & Abetting Breach of Fiduciary Duty
### (Dynegy Directors, Icahn Capital and Seneca)

155.    Plaintiffs repeat and reallege Paragraphs 1-154 as though fully set forth here.

156.    The Dynegy Directors, Icahn Capital and Seneca knew or should have known that at the time of the Restructuring Scheme, including the Transfers, DHI Directors owed fiduciary duties to DHI and its creditors.

157.    The Dynegy Directors, Icahn Capital and Seneca knew or should have known that in implementing the Restructuring Scheme, including the Transfers, the DHI Directors were breaching their fiduciary duties to creditors.

158.    The Dynegy Directors, Icahn Capital and Seneca aided and abetted those breaches of fiduciary duties by authorizing the Restructuring Scheme, including the Transfers, by:

- putting DHI Directors and Managers in place to implement the Restructuring Scheme, including the Transfers;

- authorizing, encouraging and/or directing the DHI Directors to implement the Restructuring Scheme, including the Transfers;

- incentivizing the DHI Directors and Managers to implement the Restructuring Scheme, including the Transfers; and

- attempting to cause the improper change to DHI's corporate status from a corporation into a limited liability company to try to shield the DHI directors from liability for their breaches of fiduciary duties.

159.    Additionally, on information and belief, the Reorganization Scheme was designed and driven by Icahn Capital.

160.    Plaintiffs have suffered and will continue to suffer significant economic injury, including hundreds of millions of dollars in lease obligations, Guaranty obligations, and Tax Indemnity Agreement obligations as a result of the DHI Directors' breaches of fiduciary duty.

161.    Plaintiffs also have suffered and will continue to suffer other damages as a result of these Defendants' conduct, including:

- the loss of the benefit in the leases, Guaranties, Tax Indemnity Agreements and related agreements;

- other consequential damages resulting from these Defendants' aiding and abetting breaches of fiduciary duty; and

- substantial attorneys' and other professional fees incurred in redressing Defendants' improper conduct, as provided for under the Guaranties.

162.    The Dynegy Directors', Icahn Capital's and Seneca's conduct described above was wanton, willful and oppressive and/or was made in bad faith towards Plaintiffs. That conduct warrants the imposition of substantial punitive damages.

163.    No justification or privilege excuses the Dynegy Directors', Icahn Capital's or Seneca's wrongful conduct.

### Count V: Tortious Interference With Contract
### (Dynegy, DGI, Icahn Capital and Seneca)

164.    Plaintiffs repeat and reallege Paragraphs 1-163 as though fully set forth here.

165.    The Guaranties, leases and Tax Indemnity Agreements provided to Plaintiffs by DHI are valid, enforceable guaranties.

166.    As described above, DHI has breached the terms of the Guaranties and other related agreements.

167.    Dynegy, DGI, Icahn Capital and Seneca intended that their conduct would cause DHI to breach its obligations under the Guaranties and other related agreements. Because these Defendants were familiar with the terms of the Guaranties and other related agreements, they

knew or should have known that DHI would be in breach of its obligations if it implemented the Restructuring Scheme, including the Transfers. Indeed, these Defendants intended to cause those breaches.

168.    As shown by the specific facts set forth in this Complaint, Dynegy, DGI, Icahn Capital and Seneca induced DHI's breaches of the Guaranties and other Operative Documents by the illegitimate conduct described above, including:

- nominating directors and managers to implement the Restructuring Scheme, including the Transfers;

- incentivizing those directors and managers to implement the Restructuring Scheme, including the Transfers;

- making misleading representations or causing them to be made to Plaintiffs and the Delaware Chancery Court;

- authorizing, encouraging and/or directing DHI to implement the Restructuring Scheme, including the Transfers; and

- attempting to cause the improper change to DHI's corporate status from a corporation into a limited liability company to try to shield the DHI Directors from liability for their breaches of fiduciary duties.

169.    Dynegy, DGI, Icahn Capital and Seneca all interfered with the Guaranties and other related agreements by wrongful means, in that their actions were carried out through breaches of contractual obligations, breaches of fiduciary duty, misrepresentations, and fraudulent transfers, as set forth herein.

170.    Plaintiffs have suffered and will continue to suffer significant economic injury, including hundreds of millions of dollars in lease obligations, Guaranty obligations, and Tax Indemnity Agreement obligations.

171.    No justification or privilege excuses Dynegy's, DGI's, Icahn Capital's or Seneca's wrongful conduct and tortious interference.

172.    Dynegy's, DGI's, Icahn Capital's and Seneca's conduct described above was wanton, willful and oppressive and/or was made in bad faith towards Plaintiffs. That conduct warrants the imposition of substantial punitive damages.

## Count VI: Unjust Enrichment
### (Dynegy, Dynegy Directors, DGI, Icahn Capital and Seneca)

173.    Plaintiffs repeat and reallege Paragraphs 1-172 as though fully set forth here.

174.    If, in the alternative, it is determined that Plaintiffs and these Defendants have no binding contractual relationships that expressly prohibited the Restructuring Scheme, including the Transfers, then these Defendants have been unjustly enriched by the Restructuring Scheme, including the Transfers.

175.    Dynegy, the Dynegy Directors, DGI, Icahn Capital and Seneca perpetrated a fraudulent scheme to enrich themselves to Plaintiffs' detriment and economic disadvantage.

176.    By their wrongful acts and omissions, and through the unlawful transfer of assets that had been promised as the backstop for the Guaranties, Dynegy, its Directors, DGI, Icahn Capital and Seneca have unjustly received and retained benefits that belong to Plaintiffs, including as follows:

(A)    Dynegy and its shareholders have wrongfully received direct ownership of $1.2 billion or more of equity value that was committed to backstop DHI's Guaranties to Plaintiffs;

(B)    On information and belief, Icahn Capital and/or related Icahn entities have received financial benefit from participating in the financing of the Restructuring Scheme;

(C)    The Dynegy Directors have received compensation and other benefits for implementing this scheme;

(D)    DGI received ownership of Sithe and received a $1.25 billion promissory note from DHI for inadequate consideration as part of the scheme; and

(E)    Dynegy intends to receive the benefit of a DHI corporate opportunity, shown by the amendment to the Undertaking, so as to allow Dynegy to receive the

exclusive benefit from any exchange of DHI bonds at discounted prices.

177.    The wrongful retention of those benefits violates fundamental principles of justice, equity and good conscience.

178.    Dynegy, the Dynegy Directors, DGI, Icahn Capital and Seneca have been unjustly enriched at the expense of Plaintiffs, and therefore are liable to Plaintiffs for unjust enrichment.

179.    This Court should disgorge and pay over to Plaintiffs to the extent of their injuries, the benefits obtained by these Defendants at the expense of Plaintiffs as a result of these Defendants' wrongful conduct.

## Count VII: Intentional Fraudulent Transfer
### (Dynegy, DHI, DHI Directors and DGI)

180.    Plaintiffs repeat and reallege Paragraphs 1-179 as though fully set forth here.

181.    The Transfers rendered or further rendered DHI insolvent.

182.    DHI's acceptance of the liabilities of other Dynegy subsidiaries, in exchange for inadequate consideration, contemporaneous with the Transfers, further rendered DHI insolvent.

183.    The Restructuring Scheme, including the Transfers, was agreed upon and set into motion at a time when DHI was a Delaware corporation with a board of directors who had fiduciary duties not to effect the Transfers.

184.    The Restructuring Scheme, including the Transfers, constitutes a conveyance as defined under N.Y. D.C.L. §270.

185.    The Restructuring Scheme, including the Transfers, was not consummated in the course of usual business.

186.    The Restructuring Scheme, including the Transfers, was undertaken in furtherance of a scheme to hinder, delay and defraud DHI's creditors.

187.    As shown by the specific facts set forth in this Complaint, Dynegy, DHI, the DHI Directors and DGI, acting individually and collectively, caused or made the Transfers with the actual intent to hinder, delay and defraud DHI's creditors.

188.    That actual intent is revealed by, among other things, the fact that:

- these Defendants knew the Transfers rendered or further rendered DHI insolvent;

- these Defendants knew the acceptance of liabilities further rendered DHI insolvent;

- some of these Defendants have made public statements recognizing that the Transfers would likely render DHI insolvent;

- DHI converted to a Delaware limited liability company in an attempt to shield the Dynegy and DHI Directors from liability for rendering DHI insolvent;

- Dynegy has threatened to place DHI into bankruptcy and invoke Bankruptcy Code Section 502(b)(6)'s cap on lease payments;

- Dynegy attempted to force DHI's creditors to exchange or sell their debt back to Dynegy or its subsidiaries pursuant to unfair terms, threatening bankruptcy or cram down as an alternative;

- as part of the coercive offering, Defendants tacitly admitted that they expect challenges to the fraudulent Transfers and Restructuring Scheme and attempted to force those challenges into binding arbitration;

- these Defendants sought to unjustly profit or receive other or financial benefit from the transaction that rendered DHI insolvent; and

- these Defendants have acted to avoid DHI and Dynegy's obligations under the Guaranties.

189.    Plaintiffs are creditors of DHI.    The Restructuring Scheme, including the Transfers, harmed Plaintiffs because it moved equity out of the reach of Plaintiffs and into the pockets of Dynegy, DGI, Icahn Capital and Seneca.

190.    The Restructuring Scheme, including the Transfers, was fraudulent pursuant to N.Y. D.C.L. §§275 and 276, and Plaintiffs are entitled to have it unwound, set aside, the assets transferred recovered, and any other obligations of DHI to Dynegy or DGI annulled.

## Count VIII: Constructive Fraudulent Transfer
## (Dynegy, DHI, DHI Directors and DGI)

191.    Plaintiffs repeat and reallege Paragraphs 1-190 as though fully set forth here.

192.    The Transfers rendered DHI insolvent.

193.    DHI received no or inadequate value in exchange for giving up the rights to its valuable gas and coal assets, the security for the Guaranties that DHI had provided to Plaintiffs.

194.    DHI's acceptance of the liabilities of other Dynegy subsidiaries, in exchange for inadequate consideration, contemporaneous with the transfer of assets, further plunged DHI into artificial insolvency.

195.    The Restructuring Scheme, including the Transfers, constitutes a conveyance pursuant to N.Y. D.C.L. §270.

196.    The Restructuring Scheme, including the Transfers, was not in good faith, not for legitimate business purposes and made without fair consideration.  It left DHI with unreasonably small and no real entitlement to future capital.

197.    The Restructuring Scheme, including the Transfers, was agreed upon and set into motion at a time when DHI was a Delaware corporation with a sitting board of directors who owed fiduciary duties to Plaintiffs.

198.    Dynegy, DHI, their Directors, and DGI, acting individually and collectively, caused or made the Transfers with the actual intent to hinder, delay and defraud DHI's creditors.

199.    Plaintiffs are creditors of DHI.  The Restructuring Scheme, including the Transfers, harmed Plaintiffs because it moved equity out of the reach of Plaintiffs and into the pockets of Dynegy, DGI, Icahn Capital and Seneca.

200.    The Restructuring Scheme, including the Transfers, was fraudulent pursuant to N.Y. D.C.L. §§273 and/or 274, and Plaintiffs are entitled pursuant to N.Y. D.C.L. §279(c) to

53

have it unwound, set aside, the assets transferred recovered, and any other obligations of DHI to Dynegy or DGI annulled.

## Count IX: Unlawful Distribution
### (DHI and Dynegy)

201.    Plaintiffs repeat and reallege Paragraphs 1-200 as though fully set forth here.

202.    The Transfers rendered DHI insolvent.

203.    The Transfers by DHI to Dynegy of DHI's indirect equity interest in Coal HoldCo were in essence a distribution by DHI to its sole member, Dynegy.

204.    Dynegy was on notice of the impropriety of the distribution it received in that it knew DHI did not have a surplus and/or was insolvent or would be rendered insolvent as a result of the Transfers.

205.    DHI, Dynegy and their Directors willfully or negligently approved the distribution despite their knowledge that DHI did not have a surplus and/or was insolvent or would be rendered insolvent as a result of the Restructuring Scheme, including the Transfers.

206.    If DHI was a limited liability company at the time of the Restructuring Scheme, including the Transfers, it violated Section 18-607(a) of the Delaware Limited Liability Company Act because it was an impermissible distribution made while DHI was insolvent. Accordingly, Plaintiffs would be entitled to repayment of the unlawful distribution pursuant to Section 18-607(b) of the Delaware Limited Liability Company Act.

## Count X: Unlawful Dividend
### (DHI, DHI Directors, Dynegy and Dynegy Directors)

207.    Plaintiffs repeat and reallege Paragraphs 1-206 as though fully set forth here.

208.    The Transfers rendered DHI insolvent.

209.    DHI's acceptance of the liabilities of other Dynegy subsidiaries, in exchange for inadequate value, contemporaneous with the transfer of assets, plunged DHI into insolvency or further into insolvency.

210.    The purported conversion of DHI from a corporation to a limited liability company was part of a single, integrated scheme to defraud DHI's creditors and to frustrate their ability to bring claims against DHI's directors who were responsible for perpetuating the Restructuring Scheme, including the Transfers. The conversion should therefore be deemed void and DHI should be treated for purposes of this Complaint as a Delaware corporation.

211.    In all events, DHI and its Directors remain liable for the Restructuring Scheme because, pursuant to Delaware Code Section 266(h), such a conversion does not extinguish Plaintiffs' claims as a DHI creditor under Delaware law.

212.    The Transfers by DHI to Dynegy were collectively in essence a dividend by DHI to its sole shareholder, Dynegy, made while DHI was insolvent or did not have a surplus.

213.    Dynegy was on notice of the impropriety of the dividend it received in that it knew DHI did not have a surplus and/or was insolvent or would be rendered insolvent as a result of the Restructuring Scheme, including the Transfers.

214.    DHI, Dynegy and their Directors willfully or negligently approved the distribution despite their knowledge that DHI did not have a surplus and/or was insolvent or would be rendered insolvent as a result of the Restructuring Scheme, including the Transfers.

215.    The Restructuring Scheme, including the Transfers, violated Del. C. §§160 and 173 and Plaintiffs are entitled to repayment of the unlawful dividend pursuant to Del. C. §174.

## Count XI: Alter Ego/Corporate Veil Piercing or Collapse of the Corporate Structure
## (DHI, DGI and Dynegy)

216.    Plaintiffs repeat and reallege Paragraphs 1-215 as though fully set forth here.

217.    As shown by the specific facts set forth in this Complaint, DGI and Dynegy are mere alter egos of DHI.  Dynegy and DGI should be deemed liable for DHI's obligations and liabilities to Plaintiffs.

218.    As also shown by the specific facts set forth in this Complaint, DHI's subsidiaries are mere alter egos of DHI.  The transfers of assets and value by DGI and/or DHI subsidiaries as set forth in this Complaint, should be attributed to DHI.

### Prayer For Relief

WHEREFORE, Plaintiffs request and demand:

1.    an order setting aside and annulling the Restructuring Scheme;

2.    an order awarding the declaratory relief as requested herein;

3.    an order declaring that Dynegy and its subsidiaries are enjoined from undertaking any transactions, including any further undertakings, debt offerings or any other steps adverse to Plaintiffs' lawful interests or entitlements, including the value of the Guaranties;

4.    an order and judgment awarding Plaintiffs damages in an amount to be proven at trial;

5.    an order and judgment awarding Plaintiffs punitive damages;

6.    all other relief to which Plaintiffs now are entitled or hereafter may be entitled;

7.    an order awarding Plaintiffs costs and expenses incurred in bringing this suit;

8.    a trial by jury on all issues so triable; and

9.    an order awarding such other and further relief as the Court may deem just and proper.

Dated: November 4, 2011

Respectfully Submitted,

Resources Capital Management Corporation,
Roseton OL, LLC, and
Danskammer OL, LLC,


By: /s/ Stephen L. Ascher
       One of Their Attorneys

JENNER & BLOCK LLP
Stephen L. Ascher (#2537538)
919 Third Avenue
New York, NY 10022-3908
Phone (212) 891-1600
Fax: (212) 891-1699
sascher@jenner.com

Anton R. Valukas
David J. Bradford
Bradley M. Yusim
Andrew W. Vail
353 N. Clark Street
Chicago, IL 60654-3456
Phone: (312) 222-9350
Fax: (312) 527-0484
avail@jenner.com