# EXHIBIT 5

*Execution Copy*

# TAX INDEMNITY AGREEMENT

Dated as of May 8, 2001

among

## DYNEGY ROSETON, L.L.C.

## RESOURCES CAPITAL MANAGEMENT CORPORATION

## PSEGR NEWBURGH HOLDINGS LLC

## ROSETON OP LLC

and

## ROSETON OL LLC

## ROSETON UNITS 1 AND 2

# TABLE OF CONTENTS

Page

SECTION 1.    Tax Assumptions. ................................................................ 1

SECTION 2.    Intention of Parties ............................................................ 4

SECTION 3.    Records and Statements. ...................................................... 4

SECTION 4.    Representations, Warranties and Covenants of Facility Lessee ...................... 4

SECTION 5.    Indemnified Losses ............................................................ 5

SECTION 6.    Tax Savings.................................................................... 13

SECTION 7.    Contests...................................................................... 15

SECTION 8.    Certain Adjustments........................................................... 17

SECTION 9.    Definitions................................................................... 18

SECTION 10.   Survival of Agreement. ........................................................ 18

SECTION 11.   Payments. .................................................................... 18

SECTION 12.   Late Payments................................................................ 19

SECTION 13.   Miscellaneous. ............................................................... 19

Exhibit A     Source Information Provided by the Facility Lessee in Connection
              with the Closing Appraisal................................................. A-1

Exhibit B     Source Information Provided by the Facility Lessee in Connection
              with the Engineering Report ............................................... B-1

# TAX INDEMNITY AGREEMENT

This **TAX INDEMNITY AGREEMENT** dated as of May 8, 2001, is entered into by and among **DYNEGY ROSETON, L.L.C.** (together with its successors and permitted assigns, "Facility Lessee"), **RESOURCES CAPITAL MANAGEMENT CORPORATION** (together with its successors and permitted assigns), **PSEGR NEWBURGH HOLDINGS LLC** (together with its successors and permitted assigns), **ROSETON OP LLC** (together with its successors and permitted assigns) and **ROSETON OL LLC** (together with its successors and permitted assigns). Capitalized terms used but not defined in this Agreement shall have the defined meanings set forth in Appendix A to the Participation Agreement dated as of May 1, 2001 (the "Participation Agreement"), among the Facility Lessee, Wilmington Trust Company, as Lessor Manager, The Chase Manhattan Bank, as Lease Indenture Trustee, The Chase Manhattan Bank, as Pass-Through Trustee, Roseton OL LLC, as Owner Lessor, and Roseton OP LLC, as Owner Participant or (if not defined in the Participation Agreement) in the Facility Lease.

## WITNESSETH

**WHEREAS**, the Periodic Lease Rent, Allocated Rent and Termination Values payable by Facility Lessee under the Facility Lease have been determined in part on the basis of the assumption that as a result of entering into the transactions contemplated by the Operative Documents Equity Investor will be entitled to certain U.S. Federal, state and local income tax benefits identified in Section 1 of this Agreement, and Facility Lessee has agreed to indemnify Equity Investor under certain circumstances for the loss of such benefits;

**NOW, THEREFORE**, as an inducement to Equity Investor to enter into the transactions contemplated by the Operative Documents and in consideration of the mutual covenants contained in this agreement and in the other Operative Documents, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

SECTION 1. Tax Assumptions. The Periodic Lease Rent, Allocated Rent and Termination Values have been calculated by Equity Investor, and Owner Participant's Net Economic Return has been computed, in part, on the basis of the assumptions (it being understood and agreed that, except to the extent provided herein, Facility Lessee has made no representation or warranty with respect to the accuracy of any of such assumptions) that for U.S. Federal, state and local income tax purposes (the "Tax Assumptions"):

(a) On the Closing Date, 100% of the Purchase Price will be allocable to property that constitutes 20-year property under section 168(e) of the Code and the Owner Lessor will be entitled to 20-year, 150% declining balance (switching to the straight line method when most favorable) depreciation deductions with

respect to such property, utilizing the half-year convention and a zero salvage value, under MACRS ("Depreciation Deductions").

(b) Transaction Costs paid pursuant to Section 2.4 of the Participation Agreement will be amortizable under Section 162 of the Code on a straight-line basis over the Basic Lease Term (the "Transaction Costs Deductions").

(c) The Loans will constitute loans made to the Owner Lessor, and all interest accrued with respect to advances thereunder will be deductible, as accrued, pursuant to Section 163 of the Code (the "Interest Deductions").

(d) The Owner Lessor will be entitled to current deductions of amounts accrued as Lessor Section 467 Interest (the "Section 467 Interest Deductions").

(e) As a result of entering into the transactions contemplated by the Operative Documents, the Equity Investor will not be required to include any amount in gross income prior to the termination of the Facility Lease other than: (i) Proportional Rent (and, if the Lease is renewed, Renewal Lease Rent) in the amounts and at the times that such Rent is allocated pursuant to the terms of the Facility Lease; (ii) gain upon the receipt of Termination Value (or other amounts based on Termination Value) in an amount equal to the sum of Termination Value and the balance of any loan arising under and then outstanding under Treas. Reg. § 1.467-4 and at the time that Termination Value is made; (iii) gain upon the sale (direct or indirect) of all or any portion of the Facility or of all or any portion of the Equity Investor's interest in the Owner Lessor if such sale shall not occur during the continuance of an Event of Default or, if the sale shall occur during the continuance of an Event of Default, (A) in the case of a sale of the Facility, the sales price for the Facility shall be equal to or in excess of Termination Value (or a pro rata portion thereof in the case of a partial sale) or (B) in the case of a sale (direct or indirect) of the Owner Lessor, the sales price shall be equal to or in excess (or a pro rata portion thereof in the case of a partial sale) of the excess of Termination Value over the then outstanding amount of the Loans; (iv) interest income in the amounts accrued as Lessee Section 467 Interest and income upon any cancellation or forgiveness of the balance of any loan arising under Treas. Reg. § 1.467-4; (v) income attributable to any improvement realized upon or after termination of the Facility Lease; (vi) payments being made to the Equity Investor, Owner Participant or Owner Lessor on an After-Tax Basis; (vii) amounts paid to the Equity Investor, Owner Participant or Owner Lessor and identified as interest under the Operative Documents; and (viii) any other amount to the extent such items of income result in an equal and offsetting deduction of the same character in the same taxable year as the inclusion other than the Depreciation Deductions, Interest Deductions, Section 467 Interest Deductions and Transaction Cost Deductions.

(f) Throughout the Basic Lease Term, the marginal U.S. Federal, state and local income tax rate applicable to the Equity Investor will be as set forth in the Pricing Assumptions (the "Assumed Tax Rate") and the Equity Investor will

always have sufficient taxable income for U.S. Federal, state and local income tax purposes to utilize fully the Assumed Deductions (as defined below);

(g) The Facility Lease will be a "true lease" for U.S. Federal, state and local income tax purposes, and the Owner Lessor shall be treated as owner and lessor, and the Facility Lessee shall be treated as lessee, of the Facility for such purposes;

(h) The Equity Investor will compute its U.S. Federal, state and local taxable income on a calendar-year basis using the accrual method of accounting.

(i) The Facility will be treated as placed in service by the Equity Investor on the Closing Date.

(j) The Facility Lease will not be a "disqualified leaseback or long-term agreement" within the meaning of Section 467(b)(4) of the Code and the Equity Investor will not be subject to application of Section 467(b)(2) of the Code with respect to the Periodic Lease Rent provided under the Facility Lease.

(k) The Owner Lessor, Owner Participant and any entity(ies) interposed between the Owner Participant and the Equity Investor (the "Intermediary Entities") will each be a disregarded entity for U.S. Federal, state and local income tax purposes, and the Equity Investor will be entitled and required to take into account, in computing its U.S. Federal, state and local taxable income, all items of income, gain, loss, deduction and credit with respect to the Owner Lessor's interest in the Facility.

(l) Periodic Lease Rent, Allocated Rent and all other gains, losses, income, deductions and credits under the Facility Lease or the transactions contemplated by the Operative Documents will be treated as U.S. source pursuant to Sections 861 et seq. of the Code.

(m) For state and local income tax purposes, the Equity Investor will be entitled to depreciation, interest and amortization deductions at the same times and in the same amounts as the Equity Investor is allowed the Depreciation Deductions, the Interest Deductions, the Section 467 Interest Deductions and the Transaction Costs Deductions.

(n) The Equity Investor will be required to include in its gross income for state and local income tax purposes for any taxable year during the Basic Lease Term, with respect to its interest in the Facility, amounts equal to such amounts as are required to be included in its gross income for U.S. Federal income tax purposes.

The Depreciation Deductions, Transaction Costs Deductions, Section 467 Interest Deductions and Interest Deductions are referred to collectively as the "Assumed Deductions."

In the event that (i) Equity Investor shall suffer a Tax Loss (as such term is hereinafter defined) with respect to which Facility Lessee has paid the required indemnity hereunder or (ii) the percentages for Periodic Lease Rent, Allocated Rent, Proportional Rent, Section 467 Loan Balance, Section 467 Interest or Termination Values shall be adjusted pursuant to Section 3.5 of the Facility Lease, then the foregoing assumptions shall be amended, if and to the extent appropriate, to reflect such Tax Loss or the events giving rise to such payment or adjustment, respectively.

SECTION 2.  Intention of Parties.  Equity Investor and Facility Lessee acknowledge that it is intended that Equity Investor will be the owner and lessor of the Facility for all U.S. Federal, state and local income tax purposes, that Facility Lessee will be the lessee of the Facility for such purposes, and that the Facility Lease will be characterized as a true lease for such purposes.  Equity Investor and Facility Lessee agree that neither they nor any of their respective Affiliates will file any income tax return or other document for U.S. Federal, state or local income tax purposes that is inconsistent with this intention or inconsistent with the foregoing Tax Assumptions unless and to the extent required by a Final Determination binding on the parties hereto or as contemplated by Section 5 or 6 below.

SECTION 3.  Records and Statements.  Within 30 days after written request therefor, Facility Lessee shall provide such information (to the extent that such information is regularly maintained by Facility Lessee or any Affiliate in the ordinary course of its business and is reasonably available to any such Person or is required by Applicable Law to be maintained by Facility Lessee or any Affiliate) as Equity Investor may reasonably require to enable Equity Investor to fulfill its tax return filing, audit and litigation requirements (at Facility Lessee's cost and expense).

SECTION 4.  Representations, Warranties and Covenants of Facility LesseeFacility Lessee represents, warrants and covenants that:

(a) During the Basic Lease Term, no portion of the Facility is or will become tax-exempt use property within the meaning of section 168(h)(1) of the Code, tax-exempt bond financed property within the meaning of section 168(g)(5) or "public utility property" within the meaning of Section 168(i)(10) of the Code (it being understood that this is not a representation as to the "true lease" status of the Lease or the passthrough nature of the Owner Lessor, the Owner Participant or the Intermediary Entities);

(b) All written factual information supplied by or on behalf of the Facility Lessee to the Appraiser or Engineering Consultant and identified in Exhibits A and B hereof as information relied upon by the Appraiser or Engineering Consultant, respectively, was accurate at the time given and on the Closing Date, and the Facility Lessee did not omit information available to it which, in light of the circumstances in which the supplied information was provided, rendered the supplied information materially misleading (except that, in the case of information in the nature of forecasts, projections or estimations of the future life, performance, costs, revenues or other future items relating to the Facility, this

representation shall instead be that any such information as was supplied by or on behalf of the Facility Lessee was prepared in good faith and on a reasonable basis, determined both at the time given and on the Closing Date);

(c) On the Closing Date, no improvements will be required in order to render the Facility complete for its intended use by the Facility Lessee, other than ancillary items of removable equipment of a kind customarily selected and furnished by lessees of property substantially similar to the Facility;

(d) No Lessee Person (defined for purposes of this Agreement as the Facility Lessee, any sublessee or other user or person in possession of the Facility or any portion thereof or any Affiliate of any of the foregoing, but excluding in all events the Owner Lessor, the Owner Participant, the Equity Investor and each of their respective Affiliates) has taken or will take any position in any filing by it for U.S. Federal, state or local income tax purposes that it is the owner of the Facility or that is otherwise inconsistent with the Tax Assumptions or the allocation of Periodic Lease Rent set forth in Schedule 2-A to the Facility Lease (unless consistent with a contrary Final Determination binding on the Equity Investor or the Facility Lessee with respect to such position);

(e) The Facility was placed in service for U.S. Federal income tax purposes no later than the Closing Date;

(f) The Facility Lessee will not acquire or guarantee (directly or indirectly) any interest in the Lease Debt, the Loans, the Lessor Notes or the Certificates (it being understood that the transactions contemplated by the Operative Documents shall not be considered to constitute such a guarantee and that the Facility Lessee's exercise of rights or performance of obligations in accordance with or as contemplated under the Operative Documents shall not be deemed to violate this provision); and

(g) On the Closing Date, 100% of the Equity Investor's basis in the Facility will be allocable to 20-year property described in Section 168(c)(1) of the Code.

The sole remedy for the inaccuracy or breach of any of the foregoing representations, warranties and covenants shall be the Equity Investor's right to receive payments pursuant to this Agreement.

SECTION 5.   Indemnified Losses

(a) If (A) as a result of (i) any act or failure to act by any Lessee Person (other than (w) the execution or the delivery of the Operative Documents, (x) any act or failure to act expressly required by the Operative Documents, (y) any act or failure to act expressly permitted by the Operative Documents, other than any substitution or replacement of all or any portion of the Facility not required by the Operative Documents and the assignment or subleasing of the Facility Lessee's interest in the Facility  or (z) any act or failure to act taken at the express written

request of the Owner Participant or the Owner Lessor acting at the direction of the Owner Participant (other than during the continuance of a Lease Event of Default)), (ii) the breach, inaccuracy or incorrectness of any of the Tax Representations or any of the representations or warranties made by the Facility Lessee in Sections 3.1(a)-(d), (f)(ii), (g), (m), (n), (p), (r), (t), (v), (w) or (y) of the Participation Agreement, (iii) any loss, damage, destruction, casualty, non-use, retirement, removal, replacement, substitution, alteration, modification, addition, improvement, repair, rebuild, theft, taking, confiscation, requisition, seizure or condemnation of all or any portion of the Facility, (iv) the actual receipt of any warranty, damage, refund, insurance, requisition, indemnity or similar payment that is not retained by the Owner Participant or any Related Party, (v) the bankruptcy, insolvency or other proceeding for the relief of debtors involving, or any foreclosure on or against, the Facility Lessee or any Lessee Person, (vi) any foreclosure or pursuit of remedies (whether by the Owner Participant or otherwise) resulting from a Lease Event of Default, (vii) the financing of the Exempt Facilities or the existence of or actions in connection with the Revenue Bonds or the Exempt Facilities Agreement, or (viii) any amendment, modification, supplement or waiver to or in respect of any Operative Document initiated or requested by the Facility Lessee or made during the continuance of a Lease Event of Default, in each case that is made without the written consent of the Owner Participant or the Owner Lessor acting at the direction of the Owner Participant (with (i) through (viii) being hereafter referred to as a "Lessee Action"), the Equity Investor shall suffer a delay in claiming, shall not have the right to claim or shall not claim (in each case, only after receiving a written opinion, delivered to the Facility Lessee as soon as practicable and prior to the date on which the tax return is to be filed on which such claim will not be made, of independent tax counsel selected by the Equity Investor and reasonably acceptable to the Facility Lessee (setting forth in reasonable detail the facts and analysis upon which such opinion is based) to the effect that as a result of a Tax Law Change or change in or discovery of facts subsequent to the Closing Date, other than a Tax Law Change described in Section 5(d)(v) below, there is no Reasonable Basis to make such claim), or shall lose, shall suffer a disallowance of or shall be required to recapture all or any portion of the Assumed Deductions (a "Deduction Loss"); or

(B)  as a result of (i) any repair, maintenance, replacement, rebuild or substitution of or any alteration, modification, addition or improvement to, the Facility or any portion thereof, (ii) the actual receipt of any warranty, damage, refund, insurance, requisition, indemnity or similar payment that is not retained by the Owner Participant or a Related Party, (iii) any loss, damage, destruction, casualty, non-use, replacement, removal, rebuild, substitution, theft, taking, confiscation, requisition, seizure or condemnation of all or any portion of the Facility, (iv) a change, adjustment or modification of the schedule of Periodic Lease Rent or Allocated Rent in connection with a Lease Event of Default, (v) the payment by the Facility Lessee of Periodic Lease Rent or Termination Value at times or in amounts inconsistent with the terms of the Facility Lease other than at the express written request of the Owner Participant or the Owner Lessor acting at

the direction of the Owner Participant (other than a request made during the continuance of a Lease Event of Default) or, unless required by a Final Determination, the deduction by the Facility Lessee of rental or interest amounts with respect to the Facility Lease that are inconsistent (either as to timing or amount) with the assumptions set forth in Section 3.2(c) of the Facility Lease, as modified by Section 3.4 of the Facility Lease, (vi) any foreclosure or pursuit of remedies against the Facility Lessee (whether by the Owner Participant or otherwise) during the continuance of an Lease Event of Default, (vii) any refinancing of the Lease Debt or the Loan or financing of improvements, (viii) the bankruptcy, insolvency or other proceeding for the relief of debtors involving, or any foreclosure on or against, the Facility Lessee or any Lessee Person, (ix) any amendment, modification, supplement or waiver ("Amendment") effected after the Closing Date to any Operative Document (A) that is made, initiated or requested by the Facility Lessee unless the Owner Participant or Owner Lessor has consented in writing to such Amendment or (B) that is in connection with a Lease Event of Default, (x) any act or omission of the Facility Lessee that is prohibited by the Operative Documents, (xi) any payment by or on behalf of the Facility Lessee (including, without limitation, indemnities, expenses, fees and compensation) to the Pass Through Trustee or pursuant to the Pass Through Trust Agreement, (xii) the breach, inaccuracy or incorrectness of any of the Tax Representations or any of the representations or warranties made by the Facility Lessee in Sections 3.1(a)-(d), (f)(ii), (g), (m), (n), (p), (r), (t), (v), (w) or (y) of the Participation Agreement (or the inaccuracy of any of such listed Participation Agreement representations as incorporated in the Officer's Certificate delivered by the Facility Lessee on the Closing Date) or (xiii) the existence or operation of any provision in the Operative Documents relating to the payment of damages or other amounts to Certificateholders in the event that the Certificates are not registered under the Securities Act of 1933 or otherwise within 240 days of the Closing Date (or in the event that, thereafter, they cease to be so registered), the Equity Investor shall be required for U.S. Federal income tax purposes to include in its gross income an amount not described under the Tax Assumption set forth in Section 1(e) above (an "Inclusion Loss" and, together with the Deduction Loss, a "Tax Loss"),

then, subject in each instance to the exclusions set forth below, Facility Lessee will pay to Equity Investor, at Facility Lessee's election given pursuant to its irrevocable written notice delivered to Equity Investor 10-days before the date on which a payment with respect to such Tax Loss is due and payable to Equity Investor hereunder, either (1) a lump sum amount that on an After-Tax Basis shall be sufficient to preserve Owner Participant's Net Economic Return, after taking into account the amount of all increases and reductions in Equity Investor's U.S. Federal, state and local income taxes in all taxable years that are predicated upon such Tax Loss plus all interest, penalties, fines and additions to tax payable by the Equity Investor as a result of such Tax Loss, (2) unless a Significant Lease Default or a Lease Event of Default shall have occurred and be continuing and so long as the Guarantor's senior unsecured debt obligations are then rated at least

investment grade by two nationally recognized rating agencies (or if the Guarantor's obligations are then rated by only one such agency, by such agency), an amount sufficient to reimburse the Equity Investor, on an After-Tax Basis, for the additional U.S. Federal, state and local income taxes payable by (or not refundable to) the Equity Investor from time to time as a result of such Tax Loss plus all interest, penalties, fines and additions to tax payable by the Equity Investor as a result of such Tax Loss, provided, however, if a Significant Lease Default or a Lease Event of Default shall occur and be continuing or if Facility Lessee no longer meets the rating standard described above, a lump sum amount shall become immediately due under clause (2) to preserve Owner Participant's Net Economic Return in accordance with the method described in clause (1) above (taking into account, however, any payments previously made by the Facility Lessee pursuant to clause (2)). Amounts payable under this Section 5(a) shall be computed based on the Tax Assumptions set forth in Section 1 hereof (as such Tax Assumptions have been modified in accordance with such Section 1), but assuming in the case of amounts payable due to a Deduction Loss that Equity Investor is subject to U.S. Federal, state and local tax at the Assumed Tax Rate and, with respect to payments due to an Inclusion Loss and with respect to calculating any amounts on an "After-Tax Basis" assuming that Equity Investor is subject to U.S. Federal, state and local income taxes at the highest marginal statutory rates then in effect for corporations for U.S. Federal, state and local income tax purposes (taking into account any deductibility of state and local taxes for U.S. Federal income tax purposes) (the "Effective Rate") and in either case that Equity Investor can concurrently fully utilize any tax benefits resulting from such Tax Loss against income subject to taxes payable at the Assumed Tax Rate or Effective Rate, whichever is applicable.

(b) Any amount payable by Facility Lessee to Equity Investor pursuant to this Section 5 with respect to a Tax Loss shall be paid upon the occurrence of the latest of the following times as shall be applicable to the circumstances: (i) a determination of independent tax counsel forming the basis for a failure to claim as set forth in Section 5(a), (ii) 30 days after the date of Equity Investor's notice to Facility Lessee pursuant to Section 7 with respect to such Loss, (iii) if any such indemnity payment relates to a Tax Loss that is being contested pursuant to Section 7, 15 days after the date of a Final Determination with respect to such Loss, and (iv) subject to Section 7(a)(E) hereof, the date Equity Investor shall be required to pay the additional taxes giving rise to such amount payable by Facility Lessee (or would be required to pay such tax pursuant to the assumptions set forth in Section 5(a)); provided, however, that the date required for payment shall be delayed until 15 days after completion of any verification required pursuant to Section 5(c) (with interest accruing from the date such payment would otherwise be due until the date of actual payment at the Overdue Rate).

(c) When requesting payment by Facility Lessee pursuant to this Section 5, Equity Investor shall provide Facility Lessee with a certificate of a Responsible Officer setting forth in reasonable detail the amount payable by Facility Lessee and the computation of such amount, including the amount of any lump sum

payment that may be required pursuant to clause (1) of Section 5(a) or the
schedule of anticipated payments pursuant to clause (2) of Section 5(a) and
Section 6. If Facility Lessee shall disagree with such amount or with an amount
payable by Equity Investor pursuant to Section 6, such amount shall be reviewed
and determined on a confidential basis, based on the assumptions and methods
required herein, by an independent nationally recognized public accounting or
lease advisory firm jointly selected by Equity Investor and the Facility Lessee.
The costs of such verification shall be borne by Facility Lessee unless such
verification shall result in an adjustment in Facility Lessee's favor exceeding 5%
or more of the net present value (calculated using a discount rate of 6% per
annum) of the payment or payments computed by Equity Investor, in which case
such costs shall be borne by Equity Investor. Neither the Facility Lessee nor the
public accounting or lease advisory firm performing the verification will have any
right to examine the tax returns or books of Equity Investor in connection with the
verification procedure described in this Section 5(c). Equity Investor agrees to
cooperate with the independent firm referred to above and to supply it with all
information reasonably necessary to permit it to accomplish such review and
determination, provided that such accounting or lease advisory firm shall agree in
writing in a manner reasonably satisfactory to the Equity Investor that the
information supplied to such firm by Equity Investor shall be solely for its
confidential use and solely in connection with such verification. In the event such
accounting or lease advisory firm determines that such computations are
incorrect, then such firm shall determine what it believes to be the correct
computations. Absent manifest error, the computations of the accounting or lease
advisory firm shall be final, binding and conclusive upon the Facility Lessee and
the Equity Investor. The parties hereto agree that the independent accounting or
lease advisory firm's sole responsibility shall be to verify the computation of any
payment hereunder and that matters of interpretation of this Agreement or any
other Operative Document are not within the scope of the independent accountant
or lease advisory firm's responsibility. Such accounting or lease advisory firm
shall be requested to make its determination within 30 days.

(d) Notwithstanding the foregoing provisions of this Section 5, Facility
Lessee shall not have any liability to Equity Investor for indemnification under
this Section 5 for any Tax Loss if such Tax Loss results from:

(i)     any voluntary sale, transfer or other disposition
(direct or indirect) by the Equity Investor, Owner Participant or any Affiliate
thereof (each a "Lessor Group Member"), or any involuntary sale, transfer or
other disposition (direct or indirect) resulting from any bankruptcy of a Lessor
Group Member or the foreclosure by a creditor of a Lessor Group Member, of any
interest in or arising under the Operative Documents or of the Facility or of any
interest therein or of any interest in Owner Participant or in any Affiliate thereof,
unless, in each case, such sale, transfer or other disposition is in connection with a
Lease Event of Default that shall theretofore have occurred, an Event of Loss or
from the Facility Lessee's exercise of its rights under the Operative Documents;

(ii)    the occurrence of an Event of Loss or an event described in Section 13.1 or 14.1 of the Facility Lease so long as the Facility Lessee has otherwise fulfilled its payment obligations with respect to such event (and, if such obligation requires the Facility Lessee to make a payment of Termination Value or an amount computed by reference thereto, limited to the extent the amount of such payment accurately reflects the timing of tax consequences arising from the event or occurrence giving rise to such payment) or the occurrence of any other event that requires the Facility Lessee to pay Termination Value or an amount computed by reference thereto to the extent such payment is made and to the extent the amount of such payment accurately reflects the timing of tax consequences arising from the event or occurrence giving rise to such payment;

(iii)    failure by a Lessor Group Member timely or properly to claim any Assumed Deduction or to exclude income on its tax return unless the Equity Investor has received a written opinion (that was delivered to the Facility Lessee as soon as practicable and prior to the date on which the tax return was filed on which such failure was reflected) of independent tax counsel selected by the Equity Investor and reasonably acceptable to the Facility Lessee, setting forth in reasonable detail the facts and analysis upon which such opinion is based, to the effect that as a result of a Tax Law Change or change in facts subsequent to the Closing Date, other than a Tax Law Change described in Section 5(d)(v) below, there is no Reasonable Basis to claim such Assumed Deduction or exclusion from income;

(iv)    other than as a result of a Lessee Action or the inaccuracy of a Tax Representation, failure of the Owner Lessor's unadjusted basis in the Facility to equal the Purchase Price;

(v)    any enactment, promulgation, release, adoption, amendment or change to the Code or Treasury Regulations (final or temporary), Revenue Rulings, Revenue Procedures or a Treasury Department or IRS notice or announcement  that occurs subsequent to the Closing Date (a "Tax Law Change"); provided that this exclusion shall not apply to (a) any change in tax rates applicable to any gross up or Inclusion Loss or (b) any repair, maintenance, replacement, rebuild or substitution of, or any alteration, modification, addition or improvement to, the Facility or any portion thereof;

(vi)    the application of Section 59A, 168(d)(3), 168(d)(4)(C), 291 or 467 of the Code except, in the case of Section 467, as a result of (1) the inaccuracy or breach of a Tax Representation, (2) any act of the Facility Lessee that is expressly prohibited by the Operative Documents or any failure by the Facility Lessee to take an act expressly required by the Operative Documents, or (3) any event described in Section 5(a)(B)(i) through (xiii);

(vii)    the application of any rules relating to short taxable years, a change in the location, business, tax or other status or tax year of the

Equity Investor if and to the extent such application would otherwise result in an increase in Facility Lessee's indemnity obligations hereunder;

(viii)    the failure of the Equity Investor to have sufficient income or tax liability to benefit from the Assumed Deductions, provided that this exclusion shall not affect any indemnification calculated on a hypothetical basis as provided in Section 5(a);

(ix)    the failure of the Facility Lease to be treated as a "true lease" for U.S. Federal income tax purposes other than as a result (1) the breach or inaccuracy of a Tax Representation, (2) any act of the Facility Lessee that is expressly prohibited by the Operative Documents or any failure by the Facility Lessee to take an act expressly required by the Operative Documents, or (3) any event described in Section 5(a)(A)(ii) through (viii);

(x)    the failure of any of the Owner Participant, Owner Lessor or the Intermediary Entities to be treated as a disregarded entity for U.S. Federal, state or local income tax purposes to the extent of a resulting increase in Facility Lessee's indemnity obligations hereunder;

(xi)    the fraud, gross negligence or willful misconduct of a Lessor Group Member, or the breach or inaccuracy of any representation, warranty or covenant of a Lessor Group Member in any of the Operative Documents to the extent of a resulting increase in Facility Lessee's indemnity obligations hereunder;

(xii)    any Lessor Group Member being or becoming for U.S. Federal income tax purposes a charitable organization, a tax-exempt entity within the meaning of Section 168(h) of the Code, an agency or instrumentality of the United States, a state or political subdivision thereof or an international organization or the special status of a Lessor Group Member which status causes such member to be subject to the provisions of Section 55, 56, 57, 58, 59, 168(f)(2), 465, 469, 501, 542, 552, 851, 856 or 1361 of the Code in each case to the extent of a resulting increase in Facility Lessee's indemnity obligation hereunder;

(xiii)    the failure by the appropriate Lessor Group Member to contest a tax claim in accordance with, and to the extent required by, the applicable contest provisions in Section 7 hereof, if the Facility Lessee's ability to contest the claim is materially adversely affected as a result of such failure, unless such failure is the result of a Lessee Action;

(xiv)    the inclusion in income by the Equity Investor upon termination of the Facility Lease and return of the Facility in compliance with the Facility Lease of amounts attributable to improvements, modifications or additions to the Facility not financed by a Lessor Group Member and as to which title vests in a Lessor Group Member;

(xv)    an Amendment to any Operative Document to which any Lessor Group Member is a party and to which the Facility Lessee is not a party and which Amendment is not requested by the Facility Lessee in writing, other than any Amendment (A) that may be necessary as a result of, and is in conformity with, any Amendment to any Operative Document requested by the Facility Lessee in writing or (B) that is required by the terms of the Operative Documents or by applicable law or made during the continuation of a Lease Event of Default;

(xvi)    penalties or additions to Tax under Section 6662 or Section 6663 of the Code or relating to estimated Tax, in either case to the extent attributable to matters unrelated to the present transaction;

(xvii)    a determination that the transactions contemplated by the Operative Documents are a sham, lack a valid business purpose or have a substance that is different from their form, or a determination that that the Equity Investor, Owner Participant or any Related Party is not holding its interest in the Facility in the ordinary course of a trade or business or that the Equity Investor, Owner Participant or any Related Party did not enter into said transactions for profit in each case unless such determination results from (1) the inaccuracy of a Tax Representation, (2) any act of the Facility Lessee that is expressly prohibited by the Operative Documents or any the Facility Lessee's failure to take any act expressly required by the Operative Documents or (3) any event described in Section 5(a)(A)(ii) through (viii);

(xviii) the failure of the Loan or any loan arising under Section 467 of the Code to constitute qualified nonrecourse financing within the meaning of Treasury Regulation Section 1.861-10T other than as a result of a Lessee Action;

(xix) the existence of, or any consequence of, a deferred equity structure or a deferred or prepaid rent structure, provided that the Facility Lessee makes all payments when due and accrues all rental expense and Section 467 Loan Interest in accordance with the terms of the Facility Lease;

(xx)    any tax election made by a Lessor Group Member that is inconsistent with the Tax Assumptions to the extent of an increase in the Facility Lessee's indemnity obligations hereunder;

(xxi)    the term of the Facility Lease (for purposes of Section 467 of the Code) being treated as extending beyond the end of the originally scheduled Basic Lease Term;

(xxii) penalties, additions to tax or interest attributable to a failure to comply with Section 6011, 6111 or 6112 of the Code or the Regulations promulgated thereunder, *provided, however;* that this exclusion shall not apply to the extent of any penalties, additions to tax or interest that are

imposed due to any failure to properly and timely register the transaction contemplated by the Operative Documents as a confidential tax shelter under and pursuant to Section 6111 of the Code;

(xxiii) a Tax Loss with respect to any period occurring after (and not simultaneously with) (1) the expiration or earlier termination of the Lease Term or (2) the return of the Facility to the Owner Lessor; or

(xxiv) any inaccuracy or the incorrectness of any conclusion reached in the Closing Appraisal, unless as a result of the breach or inaccuracy of a Tax Representation or any of the representations or warranties made by the Facility Lessee in Sections 3.1(a)-(d), (f)(ii), (g), (m), (n), (p), (r), (t), (v), (w) or (y) of the Participation Agreement.

SECTION 6.  Tax Savings.

(a) Generally.  If (i) Facility Lessee shall have elected and paid the indemnity with respect to any Tax Loss pursuant to section 5(a), (ii) the Equity Investor, as the result of the event giving rise to such Tax Loss, shall realize (or, in accordance with paragraph (b) shall be deemed to have realized) with respect to any year U.S. Federal income tax savings that would not have been realized but for such Tax Loss or the event giving rise thereto, and (iii) such savings have not previously been taken into account under this Agreement, then, provided no Significant Lease Default or Lease Event of Default shall have occurred and is continuing, the Equity Investor shall pay to Facility Lessee an amount equal to the sum of (x) such U.S. Federal income tax savings (and, to the extent provided in paragraph (b), state and local income tax savings), and (y) the amount of any U.S. Federal, state or local income tax savings realized as the result of any payment made pursuant to this sentence; provided, however, that such sum shall not exceed the excess of the amounts previously paid by Facility Lessee to the Equity Investor pursuant to Section 5(a)(2) hereof over the amounts previously paid by the Equity Investor to Facility Lessee pursuant to this Section 6 with respect to such Tax Loss with the remainder of such sum to be carried forward and applied pro tanto as an offset against future indemnity payments owed by the Facility Lessee pursuant to Section 5(a)(2).

(b) Assumptions in Calculating Tax Savings.  For purposes of calculating in clause (x) of Section 6(a) the income tax savings realized by the Equity Investor, the Equity Investor shall be deemed to have fully utilized any tax benefits resulting from a Tax Loss or the event giving rise thereto against U.S. Federal, state and local income taxes payable at the Assumed Tax Rate, except that, with respect to any tax savings arising as a result of an Inclusion Loss and for purposes of calculating in clause (y) of Section 6(a) the income tax savings realized by the Equity Investor, the Equity Investor will be assumed to be taxable at the Effective Rate.

(c) <u>Timing of Payment and Verification</u>. Any payments due to Facility Lessee pursuant to Section 6(a) shall be paid, provided no Significant Lease Default or Lease Event of Default has occurred and is continuing, within 30 days after the Equity Investor shall realize (or be deemed to have realized) the tax savings. If Facility Lessee shall disagree with the amounts calculated to be paid to it, such amount shall be reviewed and determined in accordance with Section 5(c) above.

(d) <u>Rent Accruals</u>. If as the result of the inclusion of any provision referenced in Section 5(a)(B)(xiii), (1) the Equity Investor or a Related Party shall be entitled or required pursuant to a Final Determination or an opinion of counsel selected by the Owner Participant and reasonably satisfactory to the Facility Lessee to accrue Rent as taxable income under the Facility Lease at a rate less accelerated than that assumed in the Tax Assumptions, and (2) the Lessee is also accruing its rental expense at a rate less accelerated and, as a result, suffers an adverse U.S. Federal income tax consequence on an actual basis, the Lessee shall be permitted, so long as no Significant Lease Default or Lease Event of Default shall have occurred and be continuing, to defer the Equity Portion of Periodic Lease Rent to such dates (not extending beyond the end of the Basic Lease Term or properly elected Renewal Term) as shall (taking into account the tax benefits arising from such revised accrual of Rent and any tax consequences of such deferral of the Equity Portion of Periodic Lease Rent) preserve the Owner Participant's Net Economic Return (computed in accordance with the Tax Assumptions, other than the assumptions set forth in Sections 1(d), 1(e)(i), 1(e)(iv) and 1(j), *provided*, however, that no such deferral of the Equity Portion of Periodic Lease Rent shall require the Owner Participant to record a book loss as of the date such adjustment of Rent is first made and, *provided further*, that the Facility Lessee will attempt to structure any such deferral of the Equity Portion of Periodic Lease Rent (but only if the same can be accomplished at no cost to the Facility Lessee) in such manner so as to cause the Owner Participant's book earnings for the year in which the adjustment is first made and the succeeding four years to be neither increased nor decreased by more than five percent (5%). Corresponding adjustments to the schedule of Termination Value to reflect such deferral shall be made. Each Lessor Group Member agrees to use reasonable good faith efforts to file (and reasonably pursue) a protective claim for refund (at the sole cost and expense of Facility Lessee, such costs and expenses to be reimbursed on demand and on an After-Tax Basis by the Facility Lessee) with respect to any open year as to which the Internal Revenue Service has challenged, pursuant to Section 467 of the Code, the rental deductions claimed by the Facility Lessee, if the Facility Lessee shall so request in writing.

(e) <u>Subsequent Loss of Tax Savings</u>. The loss, disallowance or recapture of any tax savings described in this Section 6 subsequent to the year of realization by the Equity Investor shall be treated as a Tax Loss that is indemnifiable pursuant to the provisions of this Agreement without regard to Section 5(d) hereof (other than clause (xi) thereof).

SECTION 7.   Contests.

(a) If a written adjustment shall be proposed by the Internal Revenue Service that, if sustained, could result in a Tax Loss for which Facility Lessee and the lessee under the Other Facility Lease might be required to make indemnity payments in an aggregate amount in excess of $100,000 (taking into account similar and logically related claims), Equity Investor agrees (i) to notify Facility Lessee promptly in writing of such proposed adjustment within 15 days of the receipt of such adjustment (including in reasonable detail, the nature, extent and purported basis of such adjustment, to the extent of the Equity Investor's knowledge thereof) and, in the event that there are less than 30 days to respond to such claim, the Equity Investor agrees to request an extension of time to contest such claim so that the period remaining to initiate such contest is not less than 30 days from the date of the Equity Investor's notice to the Lessee of such claim, (ii) not to make payment of such proposed adjustment for at least 30 days (or such shorter period as may be required by law) after the giving of such written notice of the proposed adjustment to Facility Lessee and (iii) provided that Equity Investor shall not have received prior to the time before which a response to such claim is due a written opinion, setting forth in reasonable detail the facts and analysis upon which such opinion is based (a copy of such opinion which shall be delivered to the Facility Lessee as soon as practicable after receipt), of independent tax counsel selected by the Equity Investor and reasonably satisfactory to the Facility Lessee, to the effect that, (A) with respect to any initial contest, there is not a Reasonable Basis for such contest and (B) with respect to the appeal of a judicial decision, that it is "more likely than not" that the Equity Investor will not prevail in such appeal, to take such action in contesting such adjustment as Facility Lessee shall request in writing from time to time (it being understood that Equity Investor, in its sole discretion, shall be entitled to pursue or forego any administrative appeals, proceedings, hearings and conferences, provided, that Equity Investor may not forego any administrative process if any other item of the Equity Investor's tax return for the same taxable year is subject to such administrative process or such process is necessary in order to preserve any judicial remedy) and not to settle any such proposed adjustment without the prior written consent of Facility Lessee (provided, however, that Equity Investor will not be required to pursue an appeal to the United State Supreme Court); subject, however, to the satisfaction of the following conditions: (A) within 30 days after notice by Equity Investor to Facility Lessee of such proposed adjustment (or such shorter period as may be required by law) Facility Lessee shall request that such proposed adjustment be contested; (B) although Equity Investor will keep Facility Lessee reasonably informed as to the progress of such contest (including, subject to the execution of confidentiality agreements reasonably satisfactory to the Equity Investor), will use good faith efforts to provide the Facility Lessee and its counsel with copies of any correspondence (or excerpts thereof relating to the adjustment or the contest of such adjustment) or excerpts of other written materials received by the Equity Investor in connection with the contest and with the opportunity to review and make suggestions on all submissions to the Internal Revenue Service and any court to the extent such

documents and submissions relate to the Tax Loss (it being understood that the Facility Lessee shall not be permitted to review any portions of such documents or submissions that relate to issues unrelated to the transactions contemplated by the Operative Documents) and will, if timely requested, consult in good faith with Facility Lessee's tax counsel and consider in good faith suggestions by such counsel as to the conduct, including the most appropriate forum, of such contest, nevertheless the conduct of such contest (subject to the requirement that Facility Lessee's written consent to any settlement of the contest be obtained) shall remain within the sole discretion and control of Equity Investor and its tax counsel, who shall determine the nature of all actions to be taken to contest such proposed adjustment, including, without limitation, (x) whether the contest shall be initially by way of judicial or administrative proceedings, or both, (y) whether the proposed adjustment shall be contested by resisting payment or by paying the tax and seeking a refund thereof and (z) if Equity Investor shall undertake judicial action, the court of competent jurisdiction in which to contest such proposed adjustment; (C) Facility Lessee shall have agreed to pay Equity Investor promptly on an After-Tax Basis all reasonable costs and expenses that Equity Investor shall incur in connection with contesting such proposed adjustment, including, without limitation, reasonable attorneys', accountants', experts' and investigatory fees and disbursements and shall have provided Equity Investor with adequate assurances of the timely payment thereof; (D) such contest involves no material risk of the sale, forfeiture or loss of any portion of the Facility; (E) if Equity Investor shall determine to pay the tax proposed and sue for a refund or shall elect to make a deposit in the nature of a cash bond with respect to any proposed adjustment pursuant to Revenue Procedure 84-58, 1984-2 C.B. 501 (or any similar successor procedure), Facility Lessee shall advance to Equity Investor, on an interest-free basis and with no additional net after-tax cost to Equity Investor, sufficient funds to pay the tax and interest, penalties and additions to tax payable with respect thereto; (F) no Lease Event of Default or Significant Lease Default shall have occurred and be continuing; and (G) the Facility Lessee shall have acknowledged in writing its liability to indemnify the Equity Investor in respect of the claim if the contest is unsuccessful, provided, however, that such acknowledgment of liability will not be binding if the contest is resolved on a basis from which it can be clearly established that the Facility Lessee would not be liable to the Equity Investor in the absence of such acknowledgment.

(b) Nothing contained in this Section 7 shall require Equity Investor to contest a proposed adjustment that it would otherwise be required to contest pursuant to this Section 7 if (A) Equity Investor (i) waives (by written notice to Facility Lessee) the payment by Facility Lessee of any amount that might otherwise be payable by Facility Lessee under this Agreement in respect of such proposed adjustment and any related proposed adjustment with respect to any taxable year, the contest of which is effectively foreclosed by the settlement of such proposed adjustment, and (ii) promptly pays to Facility Lessee any amount previously paid or advanced by Facility Lessee pursuant to clause (E) of Section 7(a) hereof with respect to such proposed adjustment, or (B) the subject of such contest has previously been resolved in a Final Determination for a prior taxable

year adversely to the Equity Investor, unless the Facility Lessee shall have provided the Equity Investor with an opinion of counsel selected by the Equity Investor and reasonably satisfactory to the Facility Lessee that as a result of a Tax Law Change, or change in fact, the prior Final Determination is no longer determinative of the issue.

(c) If Facility Lessee shall have requested Equity Investor to contest such proposed adjustment as above provided and shall have duly complied with all the terms of this Section 7, Facility Lessee's liability for indemnification under this Agreement with respect to such proposed adjustment shall, unless Facility Lessee and Equity Investor shall otherwise agree, be deferred until a Final Determination of the liability of Equity Investor. At such time, Facility Lessee shall become obligated in accordance with the provisions of this Agreement for the payment of any indemnification under this Agreement resulting from the outcome of such contest, and Equity Investor shall become obligated to repay to Facility Lessee the amount advanced hereunder with respect to such proposed adjustment. Within 30 days following such Final Determination, any amounts then due hereunder shall be paid first by set-off against each other and either (a) Facility Lessee shall pay to Equity Investor any excess of the full amount then due hereunder over the amount of any advances previously made by Facility Lessee and applied against Facility Lessee's indemnity obligation as aforesaid or (b) Equity Investor shall repay to Facility Lessee any excess of such advances over such full amount then due hereunder, together with any interest (net of taxes payable on the receipt or accrual of such interest) received by Equity Investor that is properly attributable to such excess amount of such advances during the period such advances were outstanding, and, if Facility Lessee shall have paid an indemnity to Equity Investor with respect to the adverse tax consequences of any advances or payments hereunder, the amount of any tax saving resulting from any payment to Facility Lessee pursuant to this sentence.

SECTION 8. Certain Adjustments. Upon the occurrence of a Tax Loss for which Equity Investor has received indemnification hereunder, Equity Investor shall recompute the Termination Values in accordance with the manner in which such Termination Values were originally computed to reflect such Tax Loss. If an event giving rise to the payment of an amount determined by reference to the schedules of Termination Values shall occur and the date as of which Equity Investor shall be affected shall be earlier or later than the date taken into account in computing such schedule, Equity Investor shall increase or decrease appropriately such Termination Values based otherwise on the same assumptions previously used by the Equity Investor in calculating such schedules. A Responsible Officer of Equity Investor shall certify to Facility Lessee in writing either that such Termination Values as set forth in the Facility Lease do not require change or the new Termination Values necessary to reflect the Tax Loss. Such certification shall describe in reasonable detail the basis for computing any such new Termination Values. Upon such certification (and verification in accordance with the procedures set forth in Section 5(c) hereof, if requested by Facility Lessee), any such new Termination Values shall be substituted for the Termination Values in the Facility Lease.

SECTION 9.   Definitions.  For the purposes of this Agreement:

"Equity Investor."   Any reference to Equity Investor shall mean that corporation(s) which is required to include in its taxable income, for Federal income tax purposes, all or any portion of the Owner Lessor's income, gain, loss and deduction, as well as any affiliated group of corporations, within the meaning of Section 1504 of the Code, of which such corporation is or becomes a member (or, if the Owner Lessor shall not be or shall cease to be a disregarded or pass-through entity for Federal income tax purposes, shall mean the Owner Lessor as well as any affiliated group of corporations, within the meaning of Section 1504 of the Code, of which the Owner Lessor is or becomes a member).

"Final Determination" shall mean (i) a decision, judgment, decree or other order by any court of competent jurisdiction, which decision, judgment, decree or other order has become final after all allowable appeals by either party to the action have been exhausted or the time for filing such appeals has expired, (ii) a closing agreement entered into  (x) under Section 7121 of the Code or any other settlement agreement entered into in connection with an administrative or judicial proceeding and (y) with the  consent of Facility Lessee when required, (iii) the expiration of the time for instituting suit with respect to the claimed deficiency, or (iv) the expiration of the time for instituting a claim for refund, or if such a claim was filed, the expiration of the time for instituting suit with respect thereto.

SECTION 10. Survival of Agreement.  The obligations and liabilities of the parties arising under this Agreement shall, to the extent arising out of acts or events occurring on or prior to the termination of the Facility Lease, continue in full force and effect, notwithstanding the assignment, expiration, or other termination of the Facility Lease, until all such obligations have been met and such liabilities have been paid in full, whether by expiration of time, by operation of law, or otherwise.  The obligations and liabilities of each party arising under this Agreement are expressly made for the benefit of, and shall be enforceable by, the other party and its successors and permitted assigns.

.SECTION 11. Payments.

(a) Any payments made pursuant to this Agreement to Equity Investor shall be made directly to Equity Investor, and no such payments shall constitute part of the corpus of the Trust Estate, and any payments made pursuant to this Agreement to Facility Lessee shall be made directly to Facility Lessee.  Such payments shall be made by wire transfer of immediately available funds to a bank account of the payee in the continental United States as specified by the payee in written directions to the payor, or if no such direction shall have been given, by check of the payor payable to the order of the payee and mailed to the payee by certified mail, postage prepaid at its address as set forth in the Participation Agreement.

(b) Any amount which is payable to Facility Lessee by Equity Investor pursuant to this Agreement and is not paid because a Significant Lease Default or

a Lease Event of Default shall have occurred and be continuing shall be held by Equity Investor as security for Facility Lessee's obligations to Equity Investor hereunder and, if the Owner Lessor declares the Facility Lease to be in default pursuant to Section 16 thereof, shall be applied against Facility Lessee's obligations hereunder as and when due (and, to the extent Facility Lessee then owes no amounts hereunder to Equity Investor, shall be paid to Facility Lessee). At such time as there shall not be continuing any such Significant Lease Default or Lease Event of Default, such amount shall be paid to Facility Lessee to the extent not previously applied in accordance with the preceding sentence.

SECTION 12. Late Payments. To the extent permitted by applicable law, any late payment by either party of any of its obligations under this Agreement shall result in the obligation on the part of such party promptly to pay an amount equal to interest at the Overdue Rate.

SECTION 13. Miscellaneous.

(a) Amendments and Waivers. No term, covenant, agreement or condition of this Agreement may be terminated, amended or compliance therewith waived (either generally or in a particular instance, retroactively or prospectively) except by an instrument or instruments in writing executed by each party hereto.

(b) Notices. Unless otherwise expressly specified or permitted by the terms hereof, all communications and notices provided for herein shall be in writing or by a telecommunications device capable of creating a written record, and any such notice shall become effective (a) upon personal delivery thereof, including by overnight mail or courier service, (b) in the case of notice by United States mail, certified or registered, postage prepaid, return receipt requested, upon receipt thereof, or (c) in the case of notice by such a telecommunications device, upon transmission thereof, provided such transmission is promptly confirmed by either of the methods set forth in clauses (a) or (b) above, in each case addressed to each party hereto at its address set forth below or, in the case of any such party hereto, at such other address as such party may from time to time designate by written notice to the other parties hereto:

If to the Facility Lessee:

> Dynegy Roseton, L.L.C.
> c/o Dynegy Northeast Generation, Inc.
> 992 River Road
> Newburgh, New York  12550
> Telephone No.: (845) 563-4961
> Facsimile No. : (845) 563-4992
> Attention: Daniel P. Thompson, Vice President, Operations

with a copy to:

> Dynegy Power Corp.
> 1000 Louisiana Street, Suite 5800
> Houston, Texas 77002
> Telephone No.: (713) 507-6823
> Facsimile No.: (713) 767-8510
> Attention: Timothy A. Beverick, Esq.

If to Resources Capital Management Corporation:

> Resources Capital Management Corporation
> 1300 North Market Street, Suite 405
> Wilmington, DE 19801
> Telephone No.: (302) 576-2895
> Facsimile No.: (302) 576-2897
> Attention: William R. Barbour, Esq.

If to PSEGR Newburgh Holdings LLC

> PSEGR Newburgh Holdings LLC
> c/o Resources Capital Management Corporation
> 1300 North Market Street, Suite 405
> Wilmington, DE 19801
> Telephone No.: (302) 576-2895
> Facsimile No.: (302) 576-2897
> Attention: William R. Barbour, Esq.

If to Roseton OP LLC:

> Roseton OP LLC,
> c/o Resources Capital Management Corporation
> 1300 North Market Street, Suite 405
> Wilmington, DE 19801
> Telephone No.: (302) 576-2895
> Facsimile No.: (302) 576-2897
> Attention: William R. Barbour, Esq.

If to Roseton OL LLC:

> Roseton OL LLC,
> c/o Wilmington Trust Company
> Rodney Square North
> 1100 North Market Street
> Wilmington, Delaware 19890-0001
> Telephone No.: (302) 651-1000
> Facsimile No.: (302) 651-8882
> Attention: Corporate Trust Administration

A copy of all notices provided for herein shall be sent by the party giving such notice to each of the other parties hereto.

(c) Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of, and shall be enforceable by, the parties hereto and their respective successors and permitted assigns as permitted by and in accordance with the terms hereof.

(d) Governing Law. This Agreement shall be in all respects governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance (without giving effect to the conflicts of laws provision thereof, other than New York General Obligations Law Section 5-1401).

(e) Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(f) Counterparts. This Agreement may be executed in separate counterparts, each of which, when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

(g) Headings and Table of Contents. The headings of the sections and the table of contents of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

(h) Further Assurances. Each party hereto will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by the other party, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

DYNEGY ROSETON, L.L.C.

By: _____
    Name:  Gregory D. Kingsley
    Title:  Assistant Treasurer

RESOURCES CAPITAL
MANAGEMENT CORPORATION

By: _____
    Name:
    Title:

PSEGR NEWBURGH HOLDINGS LLC

By: _____
    Name:
    Title:

ROSETON OP LLC

By: _____
    Name:
    Title:

ROSETON OL LLC

By: Wilmington Trust Company, not in its
    individual capacity but solely as Lessor
    Manager

    By: _____
        Name:
        Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

DYNEGY ROSETON, L.L.C.

By: _____
      Name:  Gregory D. Kingsley
      Title:   Assistant Treasurer

RESOURCES CAPITAL
MANAGEMENT CORPORATION

By: _____
      Name:  Christopher P. Kelleher
      Title:  Vice President

PSEGR NEWBURGH HOLDINGS LLC

By: _____
      Name:  Christopher P. Kelleher
      Title:  Vice President

ROSETON OP LLC

By: _____
      Name:  Christopher P. Kelleher
      Title:  Vice President

ROSETON OL LLC

By:  Wilmington Trust Company, not in its
     individual capacity but solely as Lessor
     Manager

     By: _____
        Name:
        Title:

Tax Indemnity Agreement (Roseton)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

DYNEGY ROSETON, L.L.C.

By: _____
     Name: Gregory D. Kingsley
     Title:   Assistant Treasurer

RESOURCES CAPITAL
MANAGEMENT CORPORATION

By: _____
     Name:
     Title:

PSEGR NEWBURGH HOLDINGS LLC

By: _____
     Name:
     Title:

ROSETON OP LLC

By: _____
     Name:
     Title:

ROSETON OL LLC

By:  Wilmington Trust Company, not in its individual capacity but solely as Lessor Manager

By: _____
     Name: *James P. Lawler*
     Title: *Vice President*

Tax Indemnity Agreement (Roseton)

Exhibit A

Source Information Provided by the Facility Lessee in Connection with the Closing Appraisal

1.    Confidential Offering Memorandum – "Roseton & Danskammer Fossil Generation Assets" dated March 22, 2000, containing two CDs, and received by Deloitte & Touche from Dynegy during the site inspections of the Facilities on November 28, 2000. The information used by Deloitte & Touche is contained in Section 4, Fossil Generation Assets, and Section 7, Environmental Overview, as well as appendices in the Offering Memorandum and portions of the included compact discs, in each case, relevant to such sections.

2.    Roseton/Danskammer Fuel Costs, Operations and Maintenance Expense, Capacity Factors and Generation broken out by unit from January 2000 through October 2000 from Central Hudson, provided on behalf of Dynegy, and received by Deloitte & Touche during the site inspections of the Facilities.

3.    Fax dated December 3, 2000 from Dynegy to Deloitte & Touche containing the Production and Fuel Usage Report for 1998 and 1999.

4.    Site plans and architectural plans received by Deloitte & Touche from Central Hudson, provided on behalf of Dynegy, via Fed Ex on December 4, 2000.

5.    Electronic mail dated December 6, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the Roseton detailed Fixed Asset Register.

6.    Electronic mail dated December 6, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the system code descriptions.

7.    Electronic mail dated December 7, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the unit code descriptions.

8.    Fax dated December 5, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche with the overall summary of fixed assets for Roseton/Danskammer. Report run from January 2000 to August 2000.

9.    Fax dated December 8, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the building code descriptions.

10.   Fax dated December 11, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche containing the additional building code descriptions.

11.   Electronic mail dated December 13, 2000 from Dynegy to Deloitte & Touche with Excel file containing historical 1997 to March 2000 Capacity Factors by unit.

12. Fax dated December 14, 2000 from Central Hudson, provided on behalf of Dynegy, to Deloitte & Touche with the assets, at both Danskammer and Roseton, in the gas regulator station as well as the substations that will be retained by Central Hudson.

13. Electronic mail dated December 14, 2000 from Dynegy to Deloitte & Touche with Excel file containing projected emission rates for Roseton and Danskammer.

14. Electronic mail dated January 22, 2001 from Dynegy to Deloitte & Touche containing 2000 Operation and Maintenance Expenses (excluding fuel and depreciation) for Roseton and Danskammer, as well as 2000 Actual Capacity Factors for all the Units.

15. Electronic mail dated January 29, 2001 from Dynegy to Deloitte & Touche containing the Net Generation Actual 2000 for all Danskammer and Roseton Units.

16. Electronic mail dated January 30, 2001 from Dynegy to Deloitte & Touche containing the emissions and fuel actuals for 2000.

17. Electronic mail dated February 20, 2001 from Dynegy to Deloitte & Touche containing fuel by type and by facility information.

18. Fax dated February 27, 2001 from Dynegy to Deloitte & Touche with the 2000 Net Heat Rates, generation and fuels for Roseton and Danskammer.

19. Electronic mail dated March 2, 2001 from Dynegy to Deloitte & Touche containing an excel file with the capacity factors for Roseton and Danskammer from 1997 to 2000.

20. Electronic mail dated April 3, 2001 from Dynegy to Deloitte & Touche containing a word file with the explanation of the Plant Maintenance Programs for Roseton and Danskammer.

21. Electronic mail dated May 8, 2001 from Orrick, Herrington & Sutcliffe provided on behalf of Dynegy to Deloitte & Touche containing the Facility Description and Retained Asset Description attached to Bill of Sale.

22. The "Facility Certification Letter," dated May 8, 2001 on Dynegy letterhead.

Exhibit B

Source Information Provided by the Facility Lessee in Connection with the Engineering Report

1. Confidential Offering Memorandum – "Roseton & Danskammer Fossil Generation Assets" received by Stone & Webster Consultants from Dynegy in November 2000 (used for general facility description)

2. Heat Rate Deviation Reports – Roseton – December 1996 received by Stone & Webster Consultants from Dynegy in November 2000

3. Heat Rate Deviation Reports – Roseton – December 1997 received by Stone & Webster Consultants from Dynegy in November 2000

4. Net Heat Rate –Roseton (2000rosnhr.xls) January 2000 – October 2000 received by Stone & Webster Consultants from Dynegy in November 2000

5. Monthly Availability Reports – Roseton - May 2000 to October 2000 received by Stone & Webster Consultants from Dynegy in November 2000

6. Re: Roseton Unit 2 Input/Output Test – March 1996 – memorandum received by Stone & Webster Conm,wsultants from Dynegy in November 2000

7. Re: Roseton Unit 2 Input/Output Curves for 100% Gas – memorandum received by Stone & Webster Consultants from Dynegy in November 2000

8. Re: Roseton Unit 1 Winter Curves for 100% Gas – memorandum received by Stone & Webster Consultants from Dynegy in November 2000

9. Re: Roseton Unit 1 Spring/Fall Curves for 100% Gas – memorandum – 9/22/95 received by Stone & Webster Consultants from Dynegy in November 2000

10. Central Hudson – Operating Budget System – Comparison of Expenses – 1995 received by Stone & Webster Consultants from Dynegy in November 2000

11. Event Edit Report – (Printout of Individual NERCGads Events) – All Events for 2000 received by Stone & Webster Consultants from Dynegy in November 2000

12. CD ROMS, 'Fossil Generating Asset Divestiture' Disk 1 and 2 received by Stone & Webster Consultants from Dynegy in November 2000 (used for assessing the facility condition, performance review, and operation and maintenance review)

13. CD ROM, 'Fossil Generating Asset Divestiture' Stage 2 Disk 1 received by Stone & Webster Consultants from Dynegy in November 2000 (used for assessing the facility condition, performance review, and operation and maintenance review)

14. MQS NDE Report on Various Unit 2 Components dated 3/7-10/1999 received by Stone & Webster Consultants from Dynegy in November 2000

15. Unit 1 1994 General Electric turbine overhaul report (job summary, inspection summary and recommendations) received by Stone & Webster Consultants from Dynegy in November 2000

16. Unit 2 1998 MD&A turbine overhaul report (overview, recommendations and summary) received by Stone & Webster from Dynegy in November 2000

17. Unit 1 and 2 General Electric Steam Turbine-Generator instruction book (nameplate data, unit description, turbine outline) received by Stone & Webster Consultants from Dynegy in November 2000

18. Unit 1 1994 GE Steam Path Inspection Report received by Stone & Webster Consultants from Dynegy in November 2000

19. Unit 1 General Electric Turbine Operation and Maintenance manual (general description, outline drawing, nameplate data and original heat balance) received by Stone & Webster Consultants from Dynegy in November 2000

20. Unit 2 General Electric Turbine Operation and Maintenance manual (general description, nameplate data) received by Stone & Webster Consultants from Dynegy in November 2000

21. Unit 1 and 2 GE turbine outline drawing received by Stone & Webster Consultants from Dynegy in November 2000

22. Unit 1 and 2 Burns & Roe main and reheat steam system drawing received by Stone & Webster Consultants from Dynegy in November 2000