# EXHIBIT 8

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ROSETON OL, LLC, a Delaware          )
limited liability company, and        )
DANSKAMMER OL, LLC, a               )
Delaware limited liability company,    )
                                      )
                    Plaintiffs,        )          C.A. No.
                                      )
            v.                        )
                                      )
DYNEGY HOLDINGS, INC.,              )
a Delaware corporation,              )
                                      )
                    Defendant.        )

## VERIFIED COMPLAINT

COMES NOW Plaintiffs Roseton OL, LLC, and Danskammer OL, LLC (collectively referred to as "PSEG"), by and through their undersigned counsel, and alleges upon personal knowledge as to their own acts and as to all other matters upon information and belief, as follows:

## NATURE OF ACTION

1.      This is an action for permanent injunctive relief, declaratory judgment and damages.  PSEG seeks to prevent Defendant Dynegy Holdings, Inc. ("DHI") from entering into a series of related company transactions that would turn into a hollow shell DHI's guaranty of $920 million in financing provided by PSEG.  These transactions are designed to deprive DHI of the ability to exercise control over its valuable coal and gas assets and the cash flow provided by those assets, so that PSEG has no practical way to enforce the guaranties that were backed by these valuable DHI assets.  DHI seeks to complete these related company transactions in breach of the guaranties issued in favor of PSEG and in violation of statutory and common-law prohibitions on fraudulent transfers.

2.      On or about May 1, 2001, PSEG and DHI entered into a series of transactions whereby PSEG purchased two power facilities, Roseton Units 1 and 2, and Danskammer Units 3 and 4, for $920 million, and immediately leased those facilities back pursuant to long-term leases to single-purpose entities wholly owned by DHI.  About $790 million in lease payments remain outstanding under the leases.  DHI, which held, and holds, substantial coal and gas assets and enjoys substantial cash flow resulting therefrom, issued guaranties (the "Guaranties") to PSEG to guarantee the obligations of DHI's single-purpose subsidiaries under the long-term leases executed as part of the overall sale and leaseback arrangement.

3.      Section 4.2 of the Guaranties expressly prohibits DHI from "transfer[ring] or leas[ing] its properties and assets substantially as an entirety to any Person in one or a series of transactions" except under specific conditions, one of which is that any such transfers must be accompanied by an agreement to have the entities receiving the assets also assume the Guaranties in a form reasonably acceptable to the guaranteed parties.

4.      On July 11, 2011, Dynegy, Inc., DHI's parent company, filed an SEC Form 8-K disclosure in which it stated an intention to reorganize DHI.  Under the proposed reorganization, DHI would create two wholly-owned "bankruptcy remote" limited liability companies, one that would hold all of DHI's valuable coal assets, and one that would hold all of DHI's valuable gas assets.  These bankruptcy remote limited liability companies would be structured so that while DHI is technically the sole member of the companies, the member(s) of such bankruptcy-remote companies would be deprived of the power to cause the companies unilaterally to make distributions to its members, as any distribution would require the approval of an independent manager appointed by DHI, and the companies would have caps on the amount of distributions they can make per year.

5.      DHI's transfer of its gas and coal assets into bankruptcy remote entities, if permitted, would deprive PSEG of the bargained-for benefit of the Guaranties.  If, as is anticipated, the single-purpose entities holding the Roseton and Danskammer power facility leases default on their lease obligations, PSEG can enforce the Guaranties by obtaining a judgment against DHI and executing, if necessary, on DHI's member interests in its gas and coal subsidiaries.  However, if DHI succeeds in transferring its gas and coal assets into bankruptcy remote entities, in breach of the Guaranties, execution on DHI's member interests in its gas and coal subsidiaries does not provide the guaranteed cash flow that the Guaranties were designed to protect, as PSEG could not access the cash flow derived from DHI's valuable gas and coal assets without approval of an "independent" manager appointed by DHI.

6.      Thus, the transactions contemplated by DHI are designed to, and would have the effect of, depriving PSEG of the very benefit the Guaranties were designed to protect, the continued payment of lease obligations in the event DHI's single-purpose subsidiaries defaulted on their lease obligations.  Indeed, upon information and belief, these transactions are a precursor to DHI's subsidiaries' intended default on their obligations under the long-term leases, and are designed to deprive PSEG of the benefit of the Guaranties.

7.      Upon learning of DHI's proposed transactions, PSEG sent a letter to DHI dated July 14, 2011 advising DHI of PSEG's rights under the Guaranties and seeking DHI's confirmation that it will not go forward with its proposed transactions without complying with the provisions in the Guaranties that prohibit the transfer of DHI's assets without, among other things, requiring the transferees to assume the obligations under the Guaranties.  In the alternative, PSEG asked DHI to agree to a standstill whereby DHI would agree not to go forward with the contemplated transactions for at last fourteen days while the parties sought to resolve

their differences.  DHI rejected PSEG's position on the proper construction of the Guaranties and is going forward with its planned transactions, requiring PSEG to file this action to protect its interests in light of DHI's planned transactions.

## THE PARTIES

8.     Roseton OL, LLC, is a Delaware limited liability company with its principal place of business in New Jersey.  Roseton OL, LLC, is an indirect subsidiary of Public Service Enterprise Group Incorporated, a company engaged in different aspects of the electric power business, including generation, transmission, and distribution.

9.     Danskammer OL, LLC, is a Delaware limited liability company with its principal place of business in New Jersey.  Danskammer OL, LLC, is an indirect subsidiary of Public Service Enterprise Group Incorporated.

10.     Roseton OL, LLC, and Danskammer OL, LLC, are the lessors in long-term power generation facility lease agreements with DHI subsidiaries, and are the guaranteed parties in Guaranties issued by DHI to ensure satisfaction of the obligations under the long-term leases. Roseton OL, LLC, and Danskammer OL, LLC, collectively will be referred to as "PSEG."

11.     DHI is a Delaware corporation with its principal place of business in Houston, Texas.

## JURISDICTION

12.     This Court has subject-matter jurisdiction over this action pursuant to 10 Del. C. § 341 and common-law principles of equity.  Specifically, the Court has jurisdiction because PSEG seeks equitable relief, including permanent injunctive and declaratory relief, in connection with its claims.

13.     This Court has personal jurisdiction over DHI because it is an entity formed under Delaware law.

**FACTUAL BACKGROUND**

**THE ORIGINAL SALE AND LEASEBACK TRANSACTIONS**

14.     On or about May 1, 2001, DHI and certain of its subsidiaries entered into a series of transactions with PSEG whereby DHI subsidiaries sold the Roseton and Danskammer power generation facilities to PSEG for substantial sums and then leased the facilities back from PSEG pursuant to long-term leases.

15.     As part of the transaction, DHI caused Dynegy Roseton, LLC, a single-purpose entity wholly owned by DHI, to sell Roseton Units 1 and 2 to PSEG for a purchase price of $620,000,000.  Simultaneous with that sale, PSEG leased Roseton Units 1 and 2 back to Dynegy Roseton, LLC, for a period through February 8, 2035.  Plaintiff Roseton OL, LLC, was the specific PSEG company that purchased Roseton Units 1 and 2 and leased them back to Dynegy Roseton, LLC.

16.     Also as part of the May 1, 2001 transactions, DHI caused Dynegy Danskammer, LLC, a single-purpose entity wholly owned by DHI, to sell Danskammer Units 3 and 4 to PSEG for a purchase price of $300,000,000.  Simultaneous with that sale, PSEG leased Danskammer Units 3 and 4 back to Dynegy Danskammer, LLC,  for a period through May 8, 2031.  Plaintiff Danskammer OL, LLC, was the specific PSEG company that purchased Roseton Units 1 and 2 and leased them back to Dynegy Danskammer, LLC.

17.     In order to protect PSEG in the event that the Roseton and Danskammer facilities did not create sufficient cash flow to satisfy the lessees' lease obligations, DHI executed as part of the May 1, 2001 transactions identical Guaranties with respect to each lease.  The effect of

5

these Guaranties was to protect PSEG by making the cash flow from DHI's valuable gas and

coal assets available to satisfy the lease obligations of the DHI subsidiaries that leased the

Roseton and Danskammer facilities.  Copies of the Guaranties are attached hereto as <u>Exhibit A</u>

and <u>Exhibit B</u>.

18.    Section 4.2 of the Guaranties provides in pertinent part:

> The Guarantor shall not consolidate with or merge into any other
> Person, or convey, transfer or lease its properties and assets
> substantially as an entirety to any Person in one or a series of
> transactions unless each of the following conditions are satisfied:
>
>         . . . .
>
> (b)  such resulting, surviving or succeeding Person, if other than
> the Guarantor, shall execute and deliver to the [Lessor] . . . an
> assignment and assumption agreement in form and substance
> satisfactory to the [Lessor] . . . .

19.    In essence, Section 4.2 of the Guaranties protects PSEG by prohibiting DHI from

transferring its assets without ensuring that the Guaranties follow the assets and that DHI's assets

continue to protect PSEG from the effect of any default by the DHI subsidiaries leasing the

Roseton and Danskammer facilities.

20.    PSEG was willing to enter into the long-term leases and the accompanying

Guaranties because DHI's valuable gas and coal assets provided considerable cash flow to

ensure performance of the obligations of the single-purpose entities that would be lessees under

the long-term leases.  Section 4.2 of the Guaranties protected PSEG by ensuring that DHI's

stable, profitable gas and coal assets would not be dissipated and thereby degrade the security

provided by the Guaranties.

21.    Pursuant to Section 1 of the Guaranties, each of the Guaranties incorporates the

definitions appendix of, respectively, the Roseton Participation Agreement by which the Roseton

sale/leaseback transaction occurred, and the Danskammer Participation Agreement by which the

Danskammer sale/leaseback transaction took place.  The definitions appendix to each of the

Participation Agreements provides that "Person" includes both corporations and limited liability

companies, and each definition appendix provides that "words importing the singular include the

plural and vice versa."

### DHI'S PLAN TO SHIELD ITS GAS AND COAL ASSETS FROM THE GUARANTY

22.    The Roseton and Danskammer power generation facilities leased by DHI's

subsidiaries have been troubled financially and have a substantially negative financial value and

do not themselves provide sufficient cash flow for the lessees to continue to meet their

obligations under the long-term leases into which they entered.  Nevertheless, PSEG remains

protected by DHI's Guaranties.

23.    DHI has very valuable gas and coal assets that provide considerable cash flow and

would allow DHI to satisfy the obligations under the Roseton and Danskammer leases in the

event that the lessees themselves are unable to meet those obligations.

24.    On July 11, 2011, however, DHI's parent company, Dynegy, Inc., filed an SEC

Form 8-K in which it advised that it intended to cause a series of related company transactions

that, in effect, would deprive DHI of the power to unilaterally access the cash flow of its gas and

coal assets and would prevent an entity, such as PSEG, that might obtain a judgment against DHI

and execute on DHI's interest in its gas and coal subsidiaries from accessing the cash flow

provided by those assets.  A copy of Dynegy, Inc.'s SEC Form 8-K filing is attached as Exhibit

C.

25.    In particular, according to the Dynegy, Inc., Form 8-K filing, DHI intends to

transfer all of its valuable gas assets into a new Delaware limited liability company called

Dynegy Gas Investments Holdings, LLC. In addition, the planned transactions would cause DHI to transfer all of its valuable coal assets into a new Delaware limited liability company called Dynegy Coal Investments Holdings, LLC. Both of these new limited liability companies would be wholly owned, through a series of other entities, by DHI, and both of the new limited liability companies would be structured as "bankruptcy remote" limited liability companies.

26.     The "bankruptcy remote" aspect of the limited liability companies that would own DHI's gas and coal assets, if the transaction is permitted, would deprive PSEG of the value of its Guaranties. The "bankruptcy remote" limited liability companies contemplated by DHI would have an independent manager and would require unanimous manager consent for many company actions, and would have specific limits on the amount of profits that may be distributed to its members. Indeed, bankruptcy remote entities are designed to have independence from their owners and to avoid intercompany transactions such as asset pledges. Thus, even though DHI technically would be the sole owner of these "bankruptcy remote" entities, it would have a severely limited, and perhaps non-existent, ability to control the affairs of these subsidiaries, such as the ability to compel cash flow distributions to satisfy DHI's obligations under the Guaranties.

27.     Thus, the intended effect of DHI's planned corporate transactions is to take all of the DHI operations with any value and shift those assets into bankruptcy remote entities in order to frustrate execution on any judgment against DHI under the Guaranties, while leaving Roseton and Danskammer leases, which have a negative value, in a direct, non-bankruptcy remote subsidiary of DHI.

28.     DHI's actions are directly contrary to the intended purpose of the Guaranties, which was to make cash flow from DHI's gas and coal assets available to guarantee payment under the Roseton and Danskammer long-term leases.

29.     In the likely event that DHI's subsidiary defaults on its lease obligations to PSEG, DHI's planned corporate reorganization, if consummated, would deprive PSEG of much of the value of its right to execute on a judgment against DHI pursuant to the Guaranties.

30.     Ordinarily, if DHI cannot provide cash flow to satisfy its obligation under the Guaranties, PSEG could obtain a judgment against DHI and execute on DHI's member interests in its subsidiaries.  By making the two subsidiaries that own its valuable gas and coal assets "bankruptcy remote" entities, DHI would leave PSEG with the hollow remedy of executing on member interests in subsidiaries where the owner of such subsidiaries has no unilateral power to control the affairs of the company it owns.

31.     On June 14, 2011, PSEG sent a letter to DHI asking it to confirm that if the contemplated transactions went forward that DHI, pursuant to the terms of the Guaranties, would ensure that the entities receiving DHI's gas and coal assets would assume the obligations under the Guaranties.  DHI rejected PSEG's construction of the Guaranties and is moving forward with the planned transactions.


**COUNT I**
**BREACH OF CONTRACT**

32.     PSEG realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 31 above.

33.     Section 4.2 of the Guaranties prohibits DHI from transferring, in one or a series of transactions, substantially all of its assets without first satisfying conditions set forth in the

Guaranties, including a requirement that the transferee(s) assume the obligations under the Guaranties.

34.　　The transactions described in the Dynegy, Inc., SEC Form 8-K filing would breach Section 4.2 of the Guaranties because the transactions would transfer all of the DHI assets with any positive financial value—DHI's gas and coal assets—to new bankruptcy remote limited liability companies that DHI technically would own but would have little power to control.

35.　　By refusing to confirm its intention to comply with Section 4.2 of the Guaranties and ensure that any such transfers were accompanied by assumptions of the Guaranties in a form reasonably acceptable to PSEG, DHI has repudiated the Guaranties and breached its obligations to PSEG.

36.　　As a result of DHI's breach of contract, PSEG has been irreparably damaged.

## COUNT II
## FRAUDULENT TRANSFER

37.　　PSEG realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 36 above.

38.　　DHI's plan to transfer its valuable gas and coal assets to bankruptcy remote limited liability companies will render DHI unable to pay its debts as they generally come due, including DHI's obligations under the Guaranties.

39.　　Upon information and belief, DHI also is insolvent in that the value of its obligations outweighs the value of its assets.

40.　　The contemplated transactions, by which DHI will transfer its valuable gas and coal assets to bankruptcy remote limited liability companies, will not provide DHI with fair

value for the loss of DHI's power to control the affairs of the subsidiaries being given direct ownership over these assets.

41.     The contemplated transactions will leave DHI severely undercapitalized.

42.     The contemplated transfers will have the effect of reducing DHI's ability to access the assets that it indirectly owns, and will thereby hinder PSEG's ability to recover under the Guaranties.

43.     The contemplated transfers are being performed with an intent to hinder, delay, or defraud creditors in that they were made with the specific purpose of segregating DHI's valuable assets from its troubled Roseton and Danskammer operations, and thereby denying PSEG the protections contemplated by having DHI guarantee the performance of the DHI subsidiaries that leased the Roseton and Danskammer facilities.

44.     DHI will be insolvent at the time the contemplated transfers are made, and/or will be rendered insolvent by virtue of the contemplated transfers.

45.     Under the Uniform Fraudulent Transfers Act—which has been codified in 12 Del. C. §§ 4301 to 4311—this Court has the power to issue injunctive relief to bar fraudulent conveyances and to avoid fraudulent conveyances that have already taken place.

46.     PSEG is entitled to injunctive relief that prohibits DHI from going forward with the proposed transactions unless the transactions are structured in a way that protects PSEG's interests, that is, an injunction that prohibits the transactions to the extent that they frustrate PSEG's ability to have the terms of the Guaranties satisfied out of the cash flow from DHI's gas and coal assets.

47.     In the event that the contemplated transfers occur before the Court issues an injunction prohibiting them, PSEG is entitled to have the Court avoid the fraudulent transfers.

11

## COUNT III
## DECLARATORY JUDGMENT

48.     PSEG realleges and incorporates by reference the allegations set forth in

Paragraphs 1 through 47 above.

49.     The transactions described in Dynegy, Inc.'s SEC Form 8-K filing are prohibited

by the Guaranties because the transactions would transfer DHI's assets to new bankruptcy

remote limited liability companies without satisfying the requirements in Section 4.2 of the

Guaranties with respect to such transfers of assets.

50.     In addition, the transactions described in Dynegy, Inc.'s SEC Form 8-K filing

would constitute fraudulent transfers because (1) the transfers would not provide DHI with

reasonably equivalent value for its loss of control over the transferred assets, (2) the transfers are

designed with an intent to hinder, delay, or defraud creditors in that they were made with the

specific purpose of segregating DHI's valuable assets from its troubled power generation facility

operations at Roseton and Danskammer, and thereby denying PSEG the protections

contemplated by having DHI guarantee the performance of its subsidiaries, (3) DHI will be

insolvent at the time of the contemplated transfers and/or will be rendered insolvent by the

transfers, and (4) the transfers will leave DHI undercapitalized.

51.     Therefore, pursuant to 6 Del. C. §§ 18-110, 18-111 and 10 Del. C. §§ 6501-6502,

the Court should enter a declaratory judgment that the transactions described in Dynegy, Inc.'s

SEC Form 8-K filing would breach Section 4.2 of the Guaranties and would constitute fraudulent

conveyances unless the transactions also involve assignment and assumption of the Guaranties,

in a form reasonably acceptable to PSEG, by the entities that would directly own DHI's gas and

coal assets.

52.     PSEG lacks an adequate remedy at law because the very purpose of DHI's planned transactions is to make execution on a judgment against DHI a hollow exercise. If the contemplated transactions are completed, with PSEG limited to pursuing an after-the-fact claim for damages, DHI will have profited from its breach of the Guaranties and fraudulent transfers because the very purpose of DHI's actions is to make an after-the-fact damages award an inadequate remedy. Moreover, while this Court has the power to unwind fraudulent transfers, if the contemplated transfers go forward and PSEG is limited to a damages remedy, there is no guarantee that the bankrupt remote entities that would receive DHI's gas and coal assets would continue to hold those assets through the completion of this action. Where a defendant's planned actions are designed to make a damages remedy inadequate, limiting the plaintiff to that same damages remedy in necessarily inadequate, and equitable relief is therefore appropriate.

## PRAYER FOR RELIEF

WHEREFORE, PSEG respectfully requests that the Court enter judgment in its favor against DHI as follows:

A.     An order permanently enjoining DHI from transferring its gas and coal assets unless the transfers comply with Section 4.2 of the Guaranties, including a requirement that the transferees are assigned and assume DHI's obligations under the Guaranties;

B.     To the extent any of the transactions contemplated by the Dynegy, Inc. SEC Form 8-K filing are consummated prior to being enjoined by this Court, an order avoiding such transfers;

C.     A judicial declaration that the transactions described in Dynegy, Inc.'s SEC Form 8-K filing would breach Section 4.2 of the Guaranties and would constitute fraudulent conveyances unless the transactions also involve assignment and assumption of the Guaranties,

in a form reasonably acceptable to PSEG, by the entities that would directly own DHI's gas and coal assets;

D.     To the extent any of the transactions contemplated by the Dynegy, Inc. SEC Form 8-K filing are consummated prior to being enjoined by this Court, damages in an amount to be proven at trial;

E.     Attorneys' fees and costs, including fees and costs to which PSEG is entitled pursuant to contract, by statute, and at common law; and

F.     Such other and further relief as this Court deems just and proper.

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Kevin F. Brady*
Kevin F. Brady (No. 2248)
Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
*Attorneys for Plaintiffs*

Of counsel:
Filiberto Agusti
John F. O'Connor
Shannen W. Coffin
Andrew J. Sloniewsky
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

Dated: July 22, 2011

4403386_1.DOC

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ROSETON OL, LLC and DANSKAMMER OL, LLC, | ) )  ) | |
| Plaintiffs, | ) ) | |
| | ) | C.A. No. 6689-VCP |
| v. | ) ) | |
| DYNEGY HOLDINGS INC., | ) ) | |
| Defendant. | ) | |

<u>**AFFIDAVIT OF SAMUEL MERKSAMER**</u>

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss. |
| COUNTY OF NEW YORK | ) |

**SAMUEL MERKSAMER**, being duly sworn, deposes and says:

1.     I am currently an outside member of the Board of Directors (the "Board") of Dynegy, Inc. "Dynegy") and a member of the Board's Special Committee for Finance and Restructuring.  I submit this Declaration based on my personal knowledge and in support of Dynegy Holdings Inc.'s ("DHI" or the "Company") Opposition To Plaintiffs' Motion For A Temporary Restraining Order, which is being filed concurrently.

**I.     <u>Dynegy Holdings Inc.</u>**

2.     Dynegy's primary business is the production and sale of electric energy, capacity and ancillary services from Dynegy's fleet of seventeen operating power plants in six states totaling approximately 11,800 MW of generating capacity.

3.     DHI is a wholly owned subsidiary of Dynegy.  DHI does not own the Roseton and Danskammer power generation facilities, nor does it own any other power plant.  Rather, DHI is

a holding company that has indirect equity interests in various operating subsidiaries that run the seventeen operating power plants.

4.      I understand that Plaintiffs in this action are challenging DHI's Reorganization (described below) based on certain guaranties under which DHI provided unsecured guaranties of certain payment and performance obligations of the facility lessees of the Roseton and Danskammer power plants.   DHI is the only guarantor under the guaranties at issue; none of DHI's subsidiaries provided any guaranty to Plaintiffs.   The Plaintiffs also did not obtain a security interest in any of DHI's assets.

## II.    DHI's Proposed Reorganization

### A.    Creation of Bankruptcy Remote Entities

5.      On July 10, 2011, Dynegy issued a press release stating its intention to pursue a reorganization (the "Reorganization") of DHI and its subsidiaries whereby, *inter alia*, substantially all of the Company's coal-fired power generation facilities would continue to be held by Dynegy Midwest Generation, Inc. ("CoalCo") and substantially all of the Company's gas-fired power generation facilities would be held by Dynegy Power Corp. ("GasCo").   DHI would also continue indirectly to own Dynegy Northeast Generation, the entity that indirectly holds the equity interest in the subsidiaries that operate the Roseton and Danskammer power generation facilities.  The Reorganization was undertaken to facilitate certain new credit facilities, align the Company's asset base and maximize its flexibility to address additional potential debt restructuring activities.  After the Reorganization, the same power generating assets that DHI currently owns indirectly through operating subsidiaries will continue to be owned by DHI indirectly through operating subsidiaries.

6.    Under the Reorganization, GasCo and CoalCo will become "bankruptcy remote"
entities.  A bankruptcy remote entity is a subsidiary that has an independent director (or
manager, in the case of a limited liability company) appointed and has restrictions that certain
additional debt can only be incurred with the approval of the independent third party director.
Under the Reorganization, the unanimous consent of board of managers of GasCo and CoalCo,
including the independent manager, will be required for filing any bankruptcy proceeding,
seeking or consenting to the appointment of any receiver, making or consenting to any
assignment for the benefit of creditors, admitting in writing the inability to pay the applicable
bankruptcy remote entity's debts, consenting to substantive consolidation, dissolving or
liquidating, engaging in any business beyond those set forth in applicable bankruptcy remote
entity's organizational documents, amending the bankruptcy remoteness provisions in such
entity's organizational documents and, at any time following execution of the applicable credit
agreement, amending, terminating or entering material intercompany relationships with Dynegy
entities outside the ring-fenced group.

7.    GasCo and CoalCo will also implement customary rating agency "separateness"
criteria and will have separately appointed boards of directors or managers (as applicable),
separate books and records, separately appointed officers or separate members (as applicable)
and separate bank accounts.  GasCo and CoalCo will also hold themselves out as separate legal
entities and not as divisions of the Company, pay liabilities from their own funds, conduct
business in their own name (other than any business relating to the trading activities of the
Company and its subsidiaries), observe entity level formalities, not pledge assets for the benefit
of other persons and implement any other provisions reasonably required to effect the

bankruptcy remoteness of such entities.  Moreover, the Company will undertake to sell a 20%
ownership interest in GasCo.

8.      By insulating the bankruptcy remote entities from the credit risk of the rest of the
enterprise, the bankruptcy remote entities can avoid bankruptcy even if other entities, such as
DHI, need to file for bankruptcy protection.  This protects the bankruptcy remote entities from
the considerable burdens and expenses of operating under Chapter 11.  Moreover, the bankruptcy
remote structure permits the entities to borrow at a lower cost and will provide additional
liquidity.  The bankruptcy remote structure also eliminates cross-defaults based on the troubled
power generating assets, which would otherwise trigger a higher interest rate in the event of a
default.

9.      The power plants transferred to GasCo and CoalCo as part of the Reorganization
are not directly owned by DHI.  DHI does not own any power plants or other revenue generating
assets.  In addition, the Roseton and Danskammer power plants are not direct subsidiaries of DHI
now, nor will they be after the Reorganization.  Rather, DHI only indirectly owns, through a
series of subsidiaries, the power generating assets.  Following the Reorganization, DHI will
continue to own, indirectly through a series of subsidiaries, each of those same power generating
assets.  On a consolidated basis, DHI will have all of the same assets it currently has on a
consolidated basis.

B.      **New Credit Facilities**

10.     On July 11, 2011, the Company launched the process of seeking lenders for the
newly contemplated senior secured credit facilities, which it intends to close at the end of July
2011.  The new credit facilities would consist of a $1.3 billion, 6 year senior secured term loan
facility available to GasCo (the "GasCo Term Loan Facility") and a $400 million, 6 year senior

secured term loan facility available to CoalCo (the "CoalCo Term Loan Facility" and, together

with the GasCo Term Loan Facility, the "New Credit Facilities"). The New Credit Facilities do

not increase the net debt held by DHI's direct and indirect subsidiaries.

11.    Proceeds from the GasCo Term Loan Facility are expected to be used to (i) repay

the outstanding indebtedness under the existing senior secured credit facility at DHI, (ii) at the

option of GasCo, repay up to approximately $192 million of existing debt relating to Sithe (the

intermediate project holding company that indirectly holds the Independence facility in New

York), (iii) make a $400 million restricted payment to a parent holding company of GasCo an

indirect subsidiary of DHI, (iv) fund cash collateralized letters of credit and cash collateral for

existing collateral requirements, (v) pay related transaction fees and expenses and (vi) fund

additional cash to the balance sheet for general working capital and liquidity purposes.

12.    Proceeds from the CoalCo Term Loan Facility are expected to be used to (i) fund

cash collateralized letters of credit and cash collateral for existing collateral requirements,

(ii) pay related transaction fees and expenses and (iii) fund additional cash to the balance sheet to

provide the CoalCo portfolio with liquidity for general working capital and general corporate

purposes.

13.    The Reorganization enhances DHI's liquidity. DHI is at risk of violating a

covenant in Q3 or Q4, which would bar its access to funds under its existing facility. That

covenant is being eliminated in the refinancing, and an additional $800 million in liquidity will

be available, with no restriction on use by DHI. Additionally, a parent holding company of

GasCo will receive $400 million at the closing of the refinancing, which will have no restrictions

on use. GasCo also has the right to sell a 20% ownership interest in GasCo (which has an

estimated value of at least of $2.5 billion), and there are no restrictions on the use of those

proceeds. In addition, the new CoalCo and GasCo are permitted to collectively provide $225 million in dividends to DHI on an annual basis. The $225 million limitation on dividends to DHI can be eliminated after the New Credit Facilities are repaid.

14.    Following the Reorganization, DHI will continue to own, indirectly through a series of subsidiaries, the same power generating assets it indirectly owned prior to the Reorganization.

_____
**SAMUEL MERKSAMER**

SWORN TO AND SUBSCRIBED
Before me this _24_ day of July 2011.

_____
Notary Public

**BERNADETTE KAREN GALIANO**
**NOTARY PUBLIC, State of New York**
**No. 02GA6174163**
**Qualified in New York County**
**Commission Expires Sept. 10, 20_11_**

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2011, a copy of the foregoing was served by efile upon the following attorney of record:

> Kevin F. Brady (#2248)
> Jeremy D. Anderson (#4515)
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, Delaware 19899

> /s/ Margot F. Alicks
> Margot F. Alicks (#5127)

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ROSETON OL, LLC and DANSKAMMER )
OL, LLC, )
            )
            )
            Plaintiffs, )
            )       C.A. No. 6689-VCP
       v. )
            )
DYNEGY HOLDINGS INC., )
            )
            Defendant. )

## SECOND SUPPLEMENTAL AFFIDAVIT OF SAMUEL MERKSAMER

STATE OF NEW YORK       )
                        ) ss.
COUNTY OF NEW YORK   )

      **SAMUEL MERKSAMER**, being duly sworn, deposes and says:

      1.     I submit this Supplemental Affidavit in response to Plaintiffs' Response To DHI's

Motion To Strike Or In The Alternative To Permit The Filing Of A Sur-Reply (the "Response")

to clarify the record concerning the planned reorganization (the "Reorganization") of the

subsidiary holdings of Dynegy Holding Inc. ("DHI").

      2.     In my Supplemental Affidavit I corrected Plaintiffs' misstatement that DHI

currently owns, and as a result of its Reorganization would be transferring, its direct equity

interests in Dynegy Power Corp. ("DPC") and Ontelaunee Power Operating Company, LLC

("OPOC").

      3.     Now, Plaintiffs assert that "DHI does not deny that its proposed transactions

would result in DHI transferring away to new subsidiaries all of the specific stock and member

interests it currently owns directly." Response ¶ 5. Plaintiffs again are incorrect. DHI will not be transferring away all of its stock and equity interests as a result of the Reorganization.

4.    DHI is undertaking a reorganization, so there will be some movements of subsidiaries and of equity interests among subsidiaries. Although there will be some changes in DHI's direct ownership holdings, DHI's direct subsidiaries will own directly or indirectly all of the same revenue generating assets that DHI's direct subsidiaries indirectly own today. In effect, there will be some shifting of subsidiaries from one pocket to another, but DHI will continue to hold direct equity interests at all times in entities that own indirectly all of the power generating assets, just as, and to the same extent that, the direct subsidiaries of DHI today indirectly own such assets. Thus, DHI will continue to own indirectly the same revenue generating assets that it indirectly owns today.

SAMUEL MERKSAMER

SWORN TO AND SUBSCRIBED
Before me this 28 day of July 2011.

Notary Public

```
YOLANDA GEE
Notary Public - State of New York
NO. 01GE6135220
Qualified in Kings County
My Commission Expires 10-17-13
```

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ROSETON OL, LLC and DANSKAMMER OL, LLC, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 6689-VCP |
| | ) | |
| DYNEGY HOLDINGS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

OF COUNSEL:

Glenn M. Kurtz
Douglas P. Baumstein
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

Samuel A. Nolen (#971)
Margot F. Alicks (#5127)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Attorneys for Defendant*

Dated: July 25, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT .........................................................................1

STATEMENT OF FACTS ...............................................................................4

    A.    The Sale-Leaseback Transaction And Guaranties ...................................4

    B.    DHI's Proposed Reorganization..........................................................6

    C.    DHI Is Not Transferring Away Any Of The Revenue Generating
        Power Plants.........................................................................8

    D.    The Bankruptcy Remote Structure Will Not Diminish DHI's Value,
        Or Shield Such Value From Creditors ................................................10

ARGUMENT ...............................................................................................12

I.    PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER SHOULD
    BE DENIED..........................................................................................12

    A.    Plaintiffs Cannot Demonstrate Colorable Claims Or A Likelihood
        Of Success On The Merits ..............................................................15

        1.    DHI's Assets Are Not Being Transferred Substantially In
            Their Entirety .....................................................................15

            a.    Only DHI, Not Its Subsidiaries, Is Restricted From
                Transferring Assets Substantially In Their Entirety ......................15

            b.    Regardless Of The Fact That DHI Is Not
                Transferring The Assets At Issue, The Transfers
                Would Not Constitute A Transfer Of Assets
                Substantially As An Entirety ......................................17

            c.    Successor Obligation Clauses Do Not Apply To
                Corporate Reorganizations...........................................19

        2.    "Ring-Fencing" Certain Assets Does Not Place Them
            Beyond Execution; The Reorganization Places Assets No
            Farther From DHI Than They Are Now ....................................21

RLF1 4989879v. 1

3.      The Guaranties' Restrictions And Covenants Do Not
        Prohibit The Reorganization ......................................................................24

4.      Plaintiffs Cannot Show A Reasonable Probability Of
        Success On The Merits Of Their Fraudulent Transfer Claim....................27

B.  Plaintiffs Cannot Demonstrate Irreparable Harm ..................................................29

C.  The Balancing Of The Equities Weighs Overwhelmingly In Favor
    Of Denying A Temporary Restraining Order ........................................................33

    1.      Plaintiffs Will Sustain No Harm If A TRO Is Not Issued ........................33

    2.      DHI Would Be Irreparably Harmed If Its Reorganization
            Was Enjoined ............................................................................................34

D.  A Bond Would Have To Be An Amount Equal To The Threatened
    Financing................................................................................................................36

CONCLUSION ......................................................................................................................37

RLF1 4989879v. 1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anaconda Building Materials Co. v. Newland*,
  336 F.2d 625 (9th Cir. 1964) .................................................22

*Angelo, Gordon & Co., L.P. v. Allied Riser Communications Corp.*,
  805 A.2d 221 (Del. Ch. 2002).............................................31, 32

*B.S.F. Co. v. Philadelphia Nat'l Bank*,
  204 A.2d 746 (Del. 1964) .................................................18, 20

*Bank of N.Y. v. First Millennium, Inc.*,
  598 F. Supp. 2d 550 (S.D.N.Y. 2009), *aff'd*, 607 F.3d 905 (2d Cir. 2008) .................16, 28, 30

*Bank of N.Y. v. Tyco Int'l Group, S.A.*,
  545 F. Supp. 2d 312 (S.D.N.Y. 2008).......................................19, 20, 25

*Benitec Australia Ltd. v. Promega Corp.*,
  2005 WL 549552 (D. Del. Mar. 8, 2005) ...............................................32

*In re Bernard Tech., Inc.*,
  398 B.R. 526 (Bankr. D. Del. 2008) ...............................................28

*Bird v. Wilmington Soc'y of Fine Arts*,
  43 A.2d 476 (Del. Ch. 1945)...............................................21, 23

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
  154 A.2d 684 (Del. 1959) ...............................................23

*Capricorn Investors III, L.P. v. Coolbrands Int'l, Inc.*,
  2009 WL 2208339 (N.Y. Sup. Ct. July 14, 2009) .........................................16, 17

*Caspian Alpha Long Credit Fund, L.P. v. Marisco Parent Superholdco*,
  Civ. A. No. 5941-VCL (Del. Ch. Nov. 3, 2010).......................................14

*City of Philadelphia v. One Reading Center Assoc.*,
  143 F. Supp. 2d 508 (E.D. Pa. 2001) ...............................................37

*CNL-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*,
  2011 WL 353529 (Del. Ch. Jan. 28, 2011)...............................................14

*Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*,
  996 A.2d 324 (Del. Ch. 2010), *aff'd*, 15 A.3d 216 (Del. 2011) ...............................................16

*Cook v. David Rozenholc & Assocs.*,
    642 N.Y.S.2d 230 (N.Y. App. Div. 1996) ...........................................................24

*Cottle v. Carr*,
    1988 WL 10415 (Del. Ch. Feb. 9, 1988) .............................................................30

*Dewolf v. Datapoint Corp.*,
    1985 WL 21153 (Del. Ch. Oct. 28, 1985) ...........................................................27

*Dukas v. Davis Aircraft Prods. Co.*,
    516 N.Y.S.2d 781 (N.Y. App. Div. 1987) ...........................................................19

*Emerald Partners v. Berlin*,
    712 A.2d 1006 (Del. Ch. 1997), *aff'd*, 726 A.2d 1215 (Del. 1999) ......................36

*Geren v. Quantum Chem. Corp.*,
    832 F. Supp. 728 (S.D.N.Y. 1993).......................................................................25

*Gimbel v. Signal Cos., Inc.*,
    316 A.2d 599 (Del. Ch. 1974).................................................................17, 18, 20

*Guzzetta v. Service Corp. of Westover Hills*,
    C.A. No. 2922-VCP (Del. Ch. July 21, 2011) (Mem. Op.) ................................36

*Hall v. Kalinowski*,
    1992 WL 296861 (Del. Ch. Oct. 9, 1992) ..........................................................12

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
    723 F. Supp. 976 (S.D.N.Y. 1989).......................................................................25

*Hecco Ventures v. Sea-Land Corp.*,
    1986 WL 5840 (Del. Ch. May 19, 1986)..............................................................13

*Herd v. Major Realty Corp.*,
    1989 WL 997170 (Del. Ch. Nov. 8, 1989) ..........................................................31

*Hollinger Inc. v. Hollinger Int'l, Inc.*,
    858 A.2d 342 (Del. Ch. 2004)........................................................................17, 18

*Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*,
    2009 WL 3245205 (S.D. Ind. 2009) ....................................................................37

*In re HRP Myrtle Beach Holdings, LLC*,
    2008 WL 4442606 (Bankr. D. Del. Sept. 29, 2008) ............................................26

*John Hancock Mut. Life Ins. Co. v. Barnes*,
    1992 WL 101610 (Del. Ch. May 11, 1992)..........................................................13

*Joseph v. Shell Oil Co.*,
  482 A.2d 335 (Del. Ch. 1984)........................................................................27

*In re Loral Space & Commc'ns, Inc.*,
  2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ...............................................16, 27

*Lui v. Park Ridge at Terryville Assn.*,
  196 A.D.2d 579 (N.Y. App. Div. 1993) .......................................................24

*Mercier v. Inter-tel (Del.), Inc.*,
  929 A.2d 786 (Del. Ch. 2007)......................................................................36

*Moor Disposal Serv., Inc. v. Kent County Levy Court*,
  2007 WL 2351070 (Del. Ch. Aug. 10, 2007) ...............................................14

*Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*,
  570 F. Supp. 1529 (S.D.N.Y. 1983)..............................................................16

*In re Netsmart Techs., Inc. S'holders Litig.*,
  924 A.2d 171 (Del. Ch. 2007)......................................................................36

*New Castle Cnty. Vocational Tech. Educ. Ass'n. v. Bd. of Educ.*,
  451 A.2d 1156 (Del. Ch. 1982)....................................................................30

*Newman v. Warren*,
  684 A.2d 1239 (Del. Ch. 1996)....................................................................13

*Nomad Acquisition Corp. v. Damon Corp.*,
  1988 WL 383667 (Del. Ch. Sept. 20, 1988) ................................................30

*Oliver Press Partners, LLC v. Decker*,
  2005 WL 3441364 (Del. Ch. Dec. 6, 2005)..................................................14

*In re Pac. Lumber Co.*,
  584 F.3d 229 (5th Cir. 2009) .......................................................................21

*Portfolio Fin. Servicing Co. v. Sharemax.com, Inc.*,
  334 F. Supp. 2d 620 (D.N.J. 2004) ..............................................................23

*In re Regency Holdings (Cayman), Inc.*,
  216 B.R. 371 (Bankr. S.D.N.Y. 1998)...................................................22, 23, 28

*Reserves Mgmt. Corp. v. 30 Lots, LLC*,
  2009 WL 4652991 (Del. Nov. 30, 2009) ......................................................28

*Resnick v. Karmax Camp Corp.*,
  540 N.Y.S.2d 503 (N.Y. App. Div. 1989) ...................................................19

*Sanofi-Synthelabo v. Apotex Inc.*,
488 F. Supp. 2d 317 (S.D.N.Y. 2006), *aff'd*, 470 F.3d 1368 (Fed. Cir. 2006) ........................36

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982) ...........................................................................................16, 25

*Sinclair Oil Corp. v. Levien*,
280 A.2d 717 (Del. Ch. 1971) ...................................................................................................22

*Solash v. Telex Corp.*,
1988 WL 3587 (Del. Ch. Jan. 19, 1988) ............................................................................13, 33

*Story v. Kennecott Copper Corp.*,
394 N.Y.S.2d 353 (N.Y. Sup. Ct. 1977) ...........................................................................18, 19

*Tate & Lyle PLC v. Staley Cont'l, Inc.*,
1988 WL 46064 (Del. Ch. May 9, 1988) ..................................................................................36

*In re Touch Am. Holdings, Inc.*,
401 B.R. 107 (Bankr. D. Del. 2009) .........................................................................................22

*Trenwick Am. Litig. Trust v. Ernst & Young, LLP*,
906 A.2d 168 (Del. Ch. 2006) ...................................................................................................22

*U.S. Bank Nat'l Ass'n v. Angeion Corp.*,
615 N.W.2d 425 (Minn. Ct. App. 2000) ...................................................................................17

*USX Corp. v. Adriatic Ins. Co.*,
345 F.3d 190 (3d Cir. 2003) ......................................................................................................21

*Wand Equity Portfolio II L.P. v. AM/FM Internet Holding Inc.*,
2001 WL 167720 (Del. Ch. Feb. 7, 2001) ................................................................................31

*Wilmington Trust Co. v. Tropicana Entm't, LLC*,
2008 WL 555914 (Del. Ch. Feb. 29, 2008) ..............................................................................24

## STATUTES & RULES

6 *Del. C.* § 1301 ...........................................................................................................................28

8 *Del. C.* § 271 .............................................................................................................................20

Ct. Ch. R. 65(c) ......................................................................................................................35, 36

## OTHER AUTHORITIES

ABA Section of Business Law, *Model Negotiated Covenants and Related Definitions*, 61
Bus. Law. 1439, 1533-35 (2006) .......................................................................................... 26

RLF1 4989879v. 1

Dynegy Holdings Inc. ("DHI") respectfully submits this Opposition to Plaintiffs'[1] Motion

For A Temporary Restraining Order (the "Motion").

## PRELIMINARY STATEMENT

DHI is not transferring its assets "substantially as an entirety to any Person …."

(Guaranty § 4.2)  Plaintiffs misunderstand or misstate what DHI currently owns, what is

happening in connection with the reorganization at issue (the "Reorganization") and the impact

that it will have on the Guaranties.  DHI does not currently directly own any power plants; it

owns stock in subsidiaries that own stock in subsidiaries that own power plants.  This was so

when the Guaranties were executed.  It is true now.  And it will be the case after the

Reorganization is completed.

Contrary to Plaintiffs' argument, the Reorganization will not "strip DHI of all valuable

assets and render it incapable of honoring Guaranties." (Pl. Br. 1)  After the Reorganization, DHI

will have rights in the same assets that it had before the Reorganization, and its direct and

indirect subsidiaries will have more liquidity available to meet DHI's ongoing obligations

(including the Plaintiffs' leveraged leases) than is currently available for such matters.

Importantly, all of the proceeds generated by the Reorganization  – $1.7 billion – will be used to

retire existing first lien debt that may otherwise go into default or remain available for general

working capital purposes of DHI and/or its subsidiaries.  As such, from DHI's perspective, there

is no increase in net senior debt.

Indeed, the Reorganization is necessary for DHI and its subsidiaries to refinance their

existing $1.8 billion first lien credit facility, under which borrowing availability is currently

constrained (and likely to become more restricted over time) and which may otherwise be in

---

[1] Plaintiffs define themselves as "PSEG," but the Plaintiffs are not Public Service Enterprise Group, Inc., but rather Roseton OL, LLC and Danskammer OL, LLC.

covenant default before the end of the year.    In addition, by reconfiguring DHI's indirect subsidiaries into separately financeable gas-fueled and coal-fueled power generating businesses, not only is material potential value unlocked, but the terms of the replacement financing have been materially improved.    In seeking to block the Reorganization (and the refinancing it accommodates), Plaintiffs put at risk the ongoing viability of DHI's subsidiaries, and threaten the loss of hundreds of millions of dollars of value.    Plaintiffs seek to hold all these benefits hostage to protect rights they did not negotiate for and do not have in Guaranties of lease obligations that are not currently in default.

Plaintiffs misunderstand or misstate the existing organizational structure and the proposed changes to that structure.    Plaintiffs' argument presupposes and is dependent upon the misconception that DHI directly owns the revenue generating power plants.    According to Plaintiffs, DHI's Reorganization will essentially spin off the profitable plants, while maintaining the unprofitable plants.    That is not right.    Plaintiffs, however, must rely upon that fiction because they failed to obtain restrictions in the Guaranties to prevent DHI's subsidiaries from transferring its assets or other covenants that would prevent the Reorganization.    Plaintiffs should not be permitted to obtain by litigation restrictions and covenants they did not obtain by negotiation.

DHI does not directly own any power plants.    Rather, DHI only owns equity in five subsidiaries, none of which own any power plants.    DHI indirectly owns the power plants through a series of subsidiaries.    Following the Reorganization, DHI will continue indirectly to own the same power plants, through a series of subsidiaries, that it owns today.    DHI is not transferring farther out of reach any power plants.    Indeed, no assets are being transferred outside

of DHI's ultimate ownership.  Thus, DHI is not transferring its assets "substantially as an entirety to any Person."

Plaintiffs seem to misunderstand or misstate that by creating certain "bankruptcy remote" entities that will own, directly or indirectly, power plants, DHI will render the power plants immune from execution on a judgment against DHI (assuming first that there is a default by the borrower, and there is none at this time, then a default by DHI, and finally a judgment). Plaintiffs' contention suffers from two defects.  *One*, the Reorganization is irrelevant to their concern because the power plants are not today subject to execution in support of a judgment against DHI.  Rather, DHI's only assets are ownership interests in securities (shares or LLC interests) in certain subsidiaries, so it is only those securities that now or could ever be subject to execution.  The value of the power plants is, of course, embedded in the equity those securities represent, but a judgment creditor is not entitled to reach down and through separate corporations to take money out of their bank accounts.

*Two*, a "bankruptcy remote" structure does not mean that the value of the entities is somehow removed from the ultimate parent.  The Reorganization will in no way diminish the value of DHI's assets.  Rather, DHI will continue to own the equity of DHI's direct subsidiaries – and that equity will continue to include the same value of the same power plants.

A bankruptcy remote structure enhances the collateral position of potential lenders by minimizing the impact of an affiliate's bankruptcy or default on the potential lenders' collateral. Consequently, the bankruptcy remote structure increases the value of the "ring-fenced" assets by (i) permitting them to operate outside of bankruptcy, which saves substantial monies, and (ii) protecting the entities from an increased default interest rate.  Moreover, the bankruptcy remote structure permits the entities to borrow at a lower cost and provides additional liquidity.  Thus,

the executable assets at DHI, the equity of subsidiaries that indirectly own power plants, will be enhanced, not decreased, by reason of the Reorganization.

The Motion for a TRO is based on a misunderstanding or a misstatement of the facts, and has absolutely no merit. Enjoining DHI from reorganizing so as to obtain necessary capital will irreparably harm DHI and all of its subsidiaries and stakeholders. Indeed, DHI is at risk of defaulting under its existing credit facility, which would precipitate a liquidity crisis that, ironically, would harm Plaintiffs. Plaintiffs cannot alter their Guaranties to obtain covenants that were never included. Respectfully, the Motion should be denied.

## STATEMENT OF FACTS

### A.    The Sale-Leaseback Transaction And Guaranties

DHI is a wholly owned subsidiary of Dynegy Inc. ("Dynegy"). (*See* Affidavit of Margot F. Alicks, dated July 25, 2011 ("Alicks Aff."), Ex. 1 at 4)  Dynegy's primary business is the production and sale of electric energy, capacity and ancillary services from Dynegy's fleet of seventeen operating power plants in six states totaling approximately 11,800 MW of generating capacity. (*Id.*)  DHI is a holding company that has indirect equity interests in various operating subsidiaries that own the power plants. (*Id.*)

In May 2001, in connection with the acquisition of certain power-generating facilities located in Newburgh, New York, DHI and two of its subsidiaries (Dynegy Roseton, L.L.C. and Dynegy Danskammer, L.L.C.) entered into two sale-leaseback transactions pertaining to power-generating units. (*See* Alicks Aff. Ex. 2 at 9-10)  Pursuant to these sale-leaseback transactions, these units were sold to owner lessor entities, the Plaintiffs here, which were newly formed by an unrelated third party investor, and then the units were leased back to the Dynegy subsidiaries. (*Id.*)

4

In connection with the sale-leaseback transaction, DHI entered into two substantially identical guaranties (each, a "Guaranty" and collectively, the "Guaranties"), dated as of May 1, 2001, pursuant to which DHI, *inter alia*, provided unsecured guaranties of certain payment and performance obligations of facility lessees Dynegy Roseton, L.L.C. and Dynegy Danskammer, L.L.C., respectively.  (*See* O'Connor Aff. Exs. A and B)  The Guaranties are governed by New York law.  (O'Connor Aff. Exs A and B at § 8.5)  The Guaranties are by DHI alone and do not include its subsidiaries.  The Guaranties are unsecured.  Section 4.2 of the Guaranties provides that "[t]he Guarantor shall not consolidate with or merge into any other Person,[2] or convey, transfer or lease its properties and assets substantially as an entirety to any Person in one or a series of transactions unless [certain conditions are met]."  (*Id.*)  Although Plaintiffs argue (without citation) that they "negotiated additional protections" to their right to recover beyond the lessees' obligations (Pl. Br. 5), they did not do so.  Notably absent from the Guaranties are certain standard covenants that typical credit agreements often contain, such as:

- Prohibitions on contractually restricting dividends from subsidiaries;

- Restrictions on entering into other financing transactions by DHI or its subsidiaries;

- Restrictions on incurring obligations that restrict cash flow to DHI;

- Covenants requiring the maintenance of minimum levels of EBITDA, net worth, and credit rating;

- Restrictions on payment of dividends by DHI or its subsidiaries;

- Restrictions on internal restructuring or transferring assets between subsidiaries; or

- Restrictions on changes to the organizational documents of DHI or its subsidiaries to prevent, *e.g.*, bankruptcy filings.

---

[2] As defined in a certain Participation Agreement, which provides the definition of defined terms in the Guaranties, "Person" shall mean any individual, corporation, cooperative, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Fundamentally, Plaintiffs agreed to purchase two power plants in exchange for the lease revenues paid out of revenues generated by such plants and an unsecured guaranty claim against a holding company that had very few restrictions concerning the activities that it or its subsidiaries could undertake with respect to its indirectly owned operating assets, even if such activities resulted in reduced cash flow to the parent. Indeed, DHI is permitted to incur unlimited debt and DHI's subsidiaries themselves are not restricted from incurring debt that is structurally senior to Plaintiffs' unsecured guaranties.

### B.    DHI's Proposed Reorganization

On July 10, 2011, Dynegy issued a press release ("Press Release") stating its intention to pursue the Reorganization of DHI and its subsidiaries whereby, *inter alia*, substantially all of DHI's coal-fired power generation facilities would continue to be held by Dynegy Midwest Generation, Inc. ("CoalCo") and substantially all of DHI's gas-fired power generation facilities would be held by Dynegy Power Corp. ("GasCo"). DHI would continue to own indirectly all these assets, just as it owns them indirectly today. DHI would also continue to own indirectly Dynegy Northeast Generation, Inc., the entity that indirectly holds the equity interest in the subsidiaries that operate the Roseton and Danskammer power generation facilities. (*See* Alicks Aff. Ex. 3 at 1) The Reorganization would be undertaken to facilitate certain new credit facilities, which would replace the existing facility in order to avoid present near term default risks and obtain additional liquidity, as well as align DHI's asset base and maximize its flexibility to address additional potential debt restructuring activities. (*See* Alicks Aff. Ex. 4 at 2) After the Reorganization, the same power generating assets that DHI currently owns indirectly through operating subsidiaries will continue to be owned by DHI indirectly through operating subsidiaries. (Affidavit of Samuel Merksmar dated July 24, 2011 ("Merksmar Aff.") at ¶ 5)

6

On July 11, 2011, Dynegy launched the process of seeking lenders for the newly contemplated senior secured credit facilities, which it intends to close at the end of July 2011. (*See id.* at ¶ 10)  The new credit facilities would consist of a $1.3 billion, 6 year senior secured term loan facility available to GasCo (the "GasCo Term Loan Facility") and a $400 million, 6 year senior secured term loan facility available to CoalCo (the "CoalCo Term Loan Facility") and, together with the GasCo Term Loan Facility, the "New Credit Facilities").  (*Id.* at ¶ 10)

Proceeds from the GasCo Term Loan Facility are expected to be distributed and used to (i) repay the outstanding indebtedness under the existing senior secured credit facility at DHI, (ii) at the option of GasCo, repay up to approximately $192 million of existing debt relating to Sithe Energies Inc. (a subsidiary of DHI that indirectly holds the Independence facility in New York), (iii) make an additional $400 million restricted payment to a parent holding company of GasCo (an indirect subsidiary of DHI), (iv) fund cash collateralized letters of credit and cash collateral for existing collateral requirements, (v) pay related transaction fees and expenses and (vi) fund additional cash to the balance sheet for general working capital and liquidity purposes. (*Id.* at ¶ 11)

Proceeds from the CoalCo Term Loan Facility are expected to be used to (i) fund cash collateralized letters of credit and cash collateral for existing collateral requirements, (ii) pay related transaction fees and expenses, and (iii) fund additional cash to the balance sheet to provide the CoalCo portfolio with liquidity for general working capital and general corporate purposes.  (*Id.* at ¶ 12)

Plaintiffs complain that the new financing, which notably is not prohibited by the terms of the Guaranties, "would pay off the DHI secured line of credit and leave DHI with no liquidity of its own."  (Pl. Br. 6)  In fact, however, the Reorganization will increase, not decrease,

7

liquidity. Significantly, the financing does not increase the net debt held by DHI's direct and indirect subsidiaries. (Merksmar Aff. at ¶ 10) Moreover, DHI is at risk of violating a covenant in Q3 or Q4, which would bar its access to funds under its existing facility. (*Id.* at ¶ 13) That covenant is being eliminated in the refinancing, and an additional $800 million in liquidity will be available, with a subsidiary of DHI, which is outside the ring fence, receiving $400 million at the consummation of the Reorganization. There are no restrictions on the use of the latter amount. (*See id.*) And, the new CoalCo and GasCo can provide to DHI up to $225 million each year. (*See id.*) Furthermore, a DHI subsidiary will also have the right to sell 20% of the equity in GasCo, which has an estimated value of at least of $2.5 billion, thereby providing additional potential liquidity. (*See id.*) Thus, DHI's liquidity is substantially improved under the Reorganization.

> ### C. DHI Is Not Transferring Away Any Of The Revenue Generating Power Plants.

The Motion contains numerous incorrect statements about the Reorganization. Perhaps most fundamentally, Plaintiffs incorrectly state that:

- "DHI's planned transaction would keep worthless Roseton and Danskammer as direct subsidiaries of DHI while transferring all of DHI's valuable assets to 'bankruptcy remote' limited liability companies, essentially out of reach of DHI's general creditors, most prominently [Plaintiffs]." (Pl. Br. 3)

- "Under this proposed reorganization, DHI's Roseton and Danskammer operations, with their chronically negative net fair value, would remain as a direct subsidiary of DHI, but DHI's valuable gas and coal subsidiaries would be transferred to indirect subsidiaries that would be created as 'bankruptcy remote' limited liability companies." (Pl. Br. 5)

- "DHI now proposes to eviscerate the Guaranties by placing DHI's cash-generating power plants – valued at between $3.4 and $5.6 billion – beyond the reach of [Plaintiffs], leaving behind only the very two failing power plants which [Plaintiffs] originally deemed insufficient to ensure performance under the leases." (Pl. Br. 1)

- The Reorganization would "send billions of dollars of assets out of DHI to 'bankruptcy remote' limited liability companies." (Pl. Br. 10)

DHI does not directly own any power plants or other revenue generating assets. (Merksmar Aff. at ¶ 9) Roseton and Danskammer are not direct subsidiaries of DHI now, nor will they be after the Reorganization. These "valuable assets" also are not directly owned by DHI, so they are already "out-of-reach of DHI's general creditors." (Pl. Br. 3) Rather, DHI only indirectly owns, through a series of subsidiaries, the power plants. Following the Reorganization, DHI will continue to own, indirectly through a series of subsidiaries, each of those same power plants. On a consolidated basis, DHI will continue to have all of the same assets it currently has. (Merksmar Aff. at ¶ 9)

Plaintiffs also misstate that:

- Under the Guaranties "the proceeds from other DHI coal and gas assets would be available to satisfy DHI's lease payments for the Roseton and Danskammer facilities." (Pl. Br. 2)

- "*In essence*, DHI promised to use the cash flow from all of its assets, including its other gas and coal plants, in order to induce [Plaintiffs] to invest nearly one billon dollars in these facilities." (Pl. Br. 5) (emphasis added)

There is no citation to the Guaranties, and there is no such provision. DHI's assets are merely equity holdings in entities that do not themselves directly own any revenue generating assets. DHI did not promise to use cash flow from its assets to make lease payments. To the contrary, the Guaranties simply provide that, in the event of default, DHI, and only DHI, would guarantee "*on a senior unsecured basis* ... (a) the due and punctual performance and observance by the Facility Lessee of each term, provision and condition binding upon or applicable to the Facility Lessee under or pursuant to any of the Operative Documents ... and (b) the due, punctual and full payment ... of each amount that the Facility Lessee is or may become obligated to pay under or pursuant to any of the Operative Documents." (O'Connor Aff., Ex. A at § 2.1.)

9

(emphasis added).  None of the entities that own the revenue generating assets provided any guaranty to Plaintiffs.  (*See* Merksmar Aff. at ¶ 4)  Nor did Plaintiffs obtain a security interest in those assets.  (*Id.*)

### D.    The Bankruptcy Remote Structure Will Not Diminish DHI's Value, Or Shield Such Value From Creditors.

Under the Reorganization, GasCo and CoalCo will become "bankruptcy remote" entities. (Merksmar Aff. at ¶ 6)  A bankruptcy remote entity is a subsidiary that has an independent director (or manager, in the case of a limited liability company) and, among other things, has restrictions such that certain additional debt can only be incurred with the approval of the independent director.  (*Id.*)  By being insulated from the credit risk of the rest of the enterprise, such entities can avoid bankruptcy even if other entities, such as DHI, need to file for bankruptcy protection.  (*Id.* at ¶ 8)  This protects the ring-fenced entity from the considerable burdens and expenses of operating under Chapter 11, thus enhancing its value, a value indirectly owned by DHI here.

Plaintiffs misunderstand or misstate the consequences of what it means to be "bankruptcy remote."  Plaintiffs argue that the bankruptcy remote structure will somehow prevent them from executing on the value of those subsidiaries if they ever obtain a judgment against DHI.  (Pl. Br. 11-12, 16)  The value of a bankruptcy remote entity is not shielded from execution on judgment. Today, DHI indirectly owns the revenue generating assets at issue, through a series of subsidiaries, and that equity would be subject to execution in the event of a judgment.  Following the Reorganization, DHI will continue indirectly to own the same revenue generating assets, through a series of subsidiaries, and that equity will still be subject to execution in the event of a judgment.  In short, DHI will continue to own indirectly, just as it does now, 100% of those assets.

Indeed, the bankruptcy remote structure can only increase the value of DHI.  *One*, the bankruptcy remote structure is being implemented in order to obtain better pricing on debt.  (*See* Merksmar Aff. at  ¶ 8)  *Two*, the structure preserves the equity value of DHI's subsidiaries by making it more likely that those companies can avoid bankruptcy if DHI has to file, which will save substantial costs attendant to the operation of a business in bankruptcy, where numerous professionals are involved in analyzing and oftentimes disputing operational decisions.  (*Id.*) *Three*, the bankruptcy remote structure eliminates cross-defaults based on the troubled power generating assets, which would otherwise trigger a higher interest rate in the event of a default. (*Id.*)  Plaintiffs do not, and cannot, identify any diminution in value to DHI based on the use of the bankruptcy remote structure.

Plaintiffs further complain that DHI would not be able to compel a dividend from the bankruptcy remote entities.  (Pl. Br. 11)  ("[e]ven if [Plaintiffs] obtained a judgment against DHI and enforced it against DHI's ownership interest in the bankruptcy remote LLC, [Plaintiffs] could not, as holder of those ownership interests, compel distributions.")[3]  But DHI does not have that right now, so the Reorganization is not changing anything.  And certainly Plaintiffs have no right to require DHI to compel dividends from its subsidiaries now or under the Reorganization.  In any case, a DHI subsidiary will receive $400 million at the consummation of the transaction, with no limitations on use, the new CoalCo and GasCo can provide a combined $225 million annually to DHI, and a DHI subsidiary will have the right to sell 20% of GasCo equity, which entity has an estimated value of at least of $2.5 billion.  (Merksmar Aff. at ¶ 13) Moreover, contrary to Plaintiffs' allegation that "any distributions would require the approval of an independent manager" (Compl. ¶ 4; Pl. Br. 4), the bankruptcy remote structure *does not* vest

---

[3]  The $225 million annual limit on dividends from CoalCo and GasCo can be eliminated after the senior secured debt is repaid. (Merksmar Aff. at ¶ 13)  That debt is structurally senior to Plaintiffs' interests, so they cannot complain about protections to ensure that it is repaid first.

the independent manager with the right to disallow dividends.  Rather, the relevant limited liability company agreements do not require such approval and even state explicitly "[f]or the avoidance of doubt, the vote of the Independent Manager is not required for the distribution of earnings or capital."  (Alicks Aff. Exs. 5 and 6, Section 8(c))

Plaintiffs' rights today are to assert claims against the lessees and against DHI under the Guaranties.  If the lessees default and if DHI defaults, Plaintiffs can sue DHI.  If Plaintiffs obtain a judgment against DHI, and DHI fails to satisfy the judgment, then Plaintiffs can execute against DHI's assets.  DHI's assets consist solely of equity in entities that indirectly own, through a series of subsidiaries, revenue producing assets.  Thus, execution would be limited to foreclosing on the equity.  A judgment against DHI would not provide Plaintiffs with a right to dip into the accounts of separate entities or compel them to upstream cash.  Plaintiffs simply cannot set aside corporate form and reach down through and into numerous entities to take money from their bank accounts.  The value of the assets against which Plaintiffs would be able to execute, the equity owned by DHI, will not change by reason of the Reorganization, except to the extent that the value increases.

## ARGUMENT

## I.   PLAINTIFFS' MOTION FOR A TEMPORARY   RESTRAINING ORDER SHOULD BE DENIED.

Delaware courts recognize that a TRO is an "extraordinary" remedy granted only "to prevent truly irreparable injury."  *Hall v. Kalinowski*, 1992 WL 296861, at *1 (Del. Ch. Oct. 9, 1992).  Courts consider three factors when determining whether to issue a temporary restraining order: "the imminence and significance of plaintiff[']s claim of irreparable injury; the probable merits of plaintiff[']s claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued."

*Newman v. Warren*, 684 A.2d 1239, 1244 (Del. Ch. 1996); *Solash v. Telex Corp.*, 1988 WL 3587, at *1 (Del. Ch. Jan. 19, 1988) (when considering preliminary relief, the Court must balance the alleged irreparable injury claimed by plaintiff with the "prospect that the defendant or third parties may be wrongfully injured if the relief is improvidently granted"). If the Court determines that the plaintiffs have failed to demonstrate a sufficient possibility of irreparable harm, a TRO will not issue, even if the plaintiff presents a colorable claim. *See*, *e.g.*, *John Hancock Mut. Life Ins. Co. v. Barnes*, 1992 WL 101610, at *4 (Del. Ch. May 11, 1992).

Where a record exists from which the Court may "responsibly make a more informed judgment concerning the merits, ... the elements of the equitable test [are] something akin to the traditional preliminary injunction formulation." *CNL-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*, 2011 WL 353529, at *7 (Del. Ch. Jan. 28, 2011) (internal quotation marks and citations omitted); *Newman*, 684 A.2d at 1244 ("Affidavits of both sides may sometimes be submitted even though the application is for a TRO and held on a day or two notice. In such cases the court has stated the elements of the equitable test are something akin to the traditional preliminary injunction formulation.") Here, the Court has sufficient information to make an "informed judgment" concerning the merits.[4] Accordingly, the appropriate standard to use in assessing the merits is the requirement, applicable to preliminary injunctions, that plaintiff must demonstrate a "reasonable probability of success" on the merits. *Hecco Ventures v. Sea-Land Corp.*, 1986 WL 5840, at *3 (Del. Ch. May 19, 1986).

In addition, where, as here, a TRO movant is guilty of laches, the Court may deny the TRO application on such basis or may apply the more stringent preliminary injunction test. DHI publicly announced the proposed Reorganization in its Form 8K filed on July 11, 2011. (*See*

---

[4]  Specifically, the Court can consider the Guaranties, which are unambiguous, and the information describing the Reorganization, which is uncontested, to determine whether DHI proposes to transfer its "properties and assets substantially as an entirety."

Alicks Aff. Ex. 4)  Plaintiffs waited three days until July 14 before writing a letter to DHI and setting July 15 as a response deadline after which they would "take appropriate action to enforce [their] rights and remedies." (O'Connor Aff. Ex. D)  DHI's counsel responded by July 15, advising Plaintiffs that DHI would proceed with the Reorganization.  (*See* Alicks Aff. Ex. 7)  Nonetheless, Plaintiffs waited six more days before filing their "emergency" request for TRO relief on the night of July 21.  As a result of Plaintiffs' laches, DHI was forced to prepare its opposition papers over the weekend for filing on Monday (July 25) at 10 a.m., with argument to be held the same afternoon.

This Court has declined TRO applications on the grounds of laches in similar circumstances.  *See*, *e.g.*, *CNL-AB LLC*, 2011 WL 353529, at * 7 (denying motion for TRO on ground of laches where movant's fourteen day delay prejudiced opposing parties and the Court by requiring a defense and decision on a limited record and only six days to prepare for hearing); *Moor Disposal Serv., Inc. v. Kent County Levy Court*, 2007 WL 2351070, at *1 (Del. Ch. Aug. 10, 2007) (denying TRO application where "[t]he emergency nature of plaintiff's complaint [was] a self-inflicted wound that [did] not justify the commencement of the heavy machinery of expedited injunctive proceedings."); *Oliver Press P'rs, LLC v. Decker*, 2005 WL 3441364, at *1 (Del. Ch. Dec. 6, 2005) (denying motion for expedited injunction proceedings where plaintiffs' eleven day delay "wasted nearly half the time potentially available to prepare, hear and decide this case").

Alternatively, in similar cases of laches, this Court has held that the proper standard for a TRO application is the traditional preliminary injunction test.  *See* Argument and Ruling on Motion to Expedite, at pp. 4-6, 49, 51, *Caspian Alpha Long Credit Fund, L.P. v. Marisco Parent Superholdco*, Civ. A. No. 5941-VCL (Del. Ch. Nov. 3, 2010) ("And it certainly should not take

14

sophisticated investors over a week to hire counsel or sophisticated counsel over a week to get

his act in gear.") ("I'm not giving you the benefit of any lesser standard. You could have moved

faster. So this will be treated on a preliminary injunction standard.").

A.    **Plaintiffs Cannot Demonstrate Colorable Claims Or A Likelihood Of Success On The Merits.**

1.    **DHI's Assets Are Not Being Transferred Substantially In Their Entirety.**

Plaintiffs assert a breach of Section 4.2. of the Guaranties, which states, in relevant part,

that "[t]he Guarantor shall not ... convey, transfer or lease its properties and assets substantially

as an entirety to any Person in one or a series of transactions unless" certain conditions are met,

including that such transferee "expressly assume all of the Guarantor's obligations under this

Guaranty." Plaintiffs' claim fails as the transfers at issue are not to be made by DHI, the only

party subject to the restriction. Moreover, DHI will retain indirect ownership over the same

power generating facilities it indirectly owns now.

a.    **Only DHI, Not Its Subsidiaries, Is Restricted From Transferring Assets Substantially In Their Entirety.**

The Guaranties restrict only transfers by the "Guarantor," which is defined as DHI only.

There is no such restriction on DHI's subsidiaries. Plaintiffs simply ignore the unambiguous

terms of the Guaranties.

Significantly, there is a form "all or substantially all" ("ASA") provision (a formulation

synonymous with "substantially in their entirety") that covers subsidiaries. (*See* Alicks Aff. Ex.

8 (Commentaries on the American Bar Foundation's Model Debenture Provisions (the

"Commentaries")) at 430 (providing a sample covenant regarding the "Limitation on

Consolidation, Merger, or Disposition of Property by Subsidiaries")).[5]  Indeed, that form is the more commonly used form.  (*Id.* at 426) ("Indenture provisions which are made applicable to the consolidated activities of the Company and certain of its subsidiaries *would usually include* provisions which *restrict the consolidation or merger of such subsidiaries* and the disposition of their assets as an entirety or substantially as an entirety."). (emphasis added)  Here, however, the parties instead agreed to limit only DHI.  The fact that the parties did not adopt the broader ASA provision contained in the model indentures is dispositive.  *See In re Loral Space & Commc'ns, Inc.*, 2008 WL 4293781, at *36 (Del. Ch. Sept. 19, 2008)  (analyzing indenture under New York law and refusing to find that Indenture implicitly restricted consent payment for early redemption "when explicit model covenants on the same issue are clearly in existence and in use in market transactions.") (internal citations omitted).

*Capricorn Investors III, L.P. v. Coolbrands Int'l, Inc.*, 2009 WL 2208339 (N.Y. Sup. Ct. July 14, 2009) is on point.  In that case, the plaintiffs argued that the change of control provision in a partnership agreement that applied to the disposition of the defendant's assets also applied to the assets of defendant's subsidiaries.  The court disagreed, finding that the partnership agreement was carefully crafted and that the change of control provision expressly did not include a sale of assets by defendant's subsidiaries.  (*Id*. at *9)  In so holding, the court acknowledged that it "may not by construction add or excise terms, nor distort the meaning of

---

[5]  Courts regularly rely upon the Commentaries to construe indenture provisions.  *See*, *e.g.*, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982) (relying upon Commentaries to interpret indenture provision); *Bank of N.Y. v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 564-65 (S.D.N.Y. 2009), *aff'd*, 607 F.3d 905 (2d Cir. 2008) (same); *Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1535-36 (S.D.N.Y. 1983) (same); *Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 331 (Del. Ch. 2010), *aff'd*, 15 A.3d 216 (Del. 2011) (TABLE) ("Courts enhance stability and uniformity of interpretation by looking to the multi-decade efforts of leading practitioners to develop model indenture provisions. ... [For instance, t]he commentaries contain both model sets of provisions and offer section-by-section analysis. ... While these materials obviously are no substitute for construing the agreement, they provide powerful evidence of the established commercial expectations of practitioners and market participants.").

those used and thereby make a new contract for the parties under the guise of interpreting the writing…." *Id.* (quotation omitted).

DHI is not transferring the power plants at issue. Indeed, DHI does not directly own such assets, but rather owns only equity interests in direct subsidiaries that ultimately and indirectly own those assets through a series of subsidiaries. The transfers are being made by subsidiaries of DHI, and the ASA provision does not apply to the subsidiaries. Consequently, Plaintiffs do not state a claim.

> **b.** **Regardless Of The Fact That DHI Is Not Transferring The Assets At Issue, The Transfers Would Not Constitute A Transfer Of Assets Substantially As An Entirety.**

Because DHI is not making the challenged transfers, there is no need to address the scope of an ASA provision. Nonetheless, the transfers here at issue are not substantially the entirety of the assets.

Courts evaluating whether an asset disposition involves "substantially all" of a company's assets for purposes of successor obligor provisions look at both qualitative and quantitative metrics. *U.S. Bank Nat'l Ass'n v. Angeion Corp.*, 615 N.W.2d 425, 433 (Minn. Ct. App. 2000) (stating that, under New York law, whether disposition involved "all or substantially all of [corporation's] assets depends upon both the quantitative and the qualitative nature of the asset transfer" referring to operating revenue, operating profit, and book value). The focus of the qualitative analysis requires viewing the transaction "in terms of its overall effect on the corporation" and whether the transaction "'strike[s] at the heart of the corporate existence.'" *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 377, 384 (Del. Ch. 2004) (quotation omitted); *see also Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 606 (Del. Ch. 1974) ("Every transaction out of normal routine does not necessarily require shareholder approval. The unusual nature of the transaction must strike at the heart of the corporate existence and purpose."). Here,

in contrast, DHI's corporate purpose and existence remain unchanged.  Right now, DHI is a holding company that owns the equity of subsidiaries that, in turn, own the equity of other subsidiaries, and so on, until one reaches distant subsidiaries that own seventeen operating power plants in six states totaling approximately 11,800 MW of generating capacity.  After the Reorganization, DHI will remain a holding company that owns the equity of subsidiaries that, in turn, own the equity of other subsidiaries, and so on, until one reaches distant subsidiaries that own the same seventeen operating power plants in six states totaling approximately 11,800 MW of generating capacity.  On a consolidated basis, nothing will change.

The "quantitative" analysis dictates the same result.  When assessing the quantitative effect of an asset disposition, courts focus on the "quantitative vitality" of the assets in question and whether value measures and operating metrics indicate that the company will "retain economic vitality" after the disposition by "retaining other significant assets." *Hollinger*, 858 A.2d at 379-80; *see also Gimbel*, 316 A.2d at 606 (assessing whether assets are "quantitatively vital to the operation of the corporation").

Thus, numerous decisions in both the successor obligor and stockholder vote contexts have turned upon whether the disposition has deprived a company of its primary income producing assets or assets otherwise necessary to carry on viable operations.  *B.S.F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964) (Pennsylvania law) (disposition of "only substantial income[] producing asset" constituted disposition of "substantially all" assets under successor obligor provision); *Hollinger, Inc.*, 858 A.2d at 380 (holding that corporation could continue as a viable entity without the transferred assets because the remaining assets were "quantitatively vital economic asset[s]").  Other decisions have framed the test as involving an assessment of whether the disposition has effectively mandated liquidation.  *See Story v.*

*Kennecott Copper Corp.*, 394 N.Y.S.2d 353, 354 (N.Y. Sup. Ct. 1977); *Resnick v. Karmax Camp Corp.*, 540 N.Y.S.2d 503, 504 (N.Y. App. Div. 1989) (holding that internal restructuring did not amount to "substantially all" assets because "quite simply, ... these transactions did not result in a liquidation, in whole or in part, of the camp business operated by the respondent which retained ownership of the corporate land and buildings"); *Dukas v. Davis Aircraft Prods. Co.*, 516 N.Y.S.2d 781, 782 (N.Y. App. Div. 1987) ("the transaction did not result in a liquidation, in whole or in part ....").

Here, the valuable power plants are not being transferred out of DHI, as alleged by Plaintiffs. To the contrary, all of the power plants are staying within DHI. Thus, any transfers of DHI's direct equity interests will not have any quantitative impact on the value of DHI and will be immaterial to DHI's "economic vitality," which remains unchanged, if not enhanced, by the Reorganization.

        **c.**        **Successor Obligation Clauses Do Not Apply To Corporate Reorganizations.**

"Successor obligor provisions have two purposes: 'to leave the borrower free to merge, liquidate or to sell its assets in order to enter a wholly new business free of public debt' and to assure the lender 'a degree of continuity of assets.'" *Bank of N.Y. v. Tyco Int'l Group, S.A.*, 545 F. Supp. 2d 312, 322 (S.D.N.Y. 2008) (citing *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1050 (2d Cir. 1982)). Because a lender's interest is in continued operations, corporate restructurings of the type contemplated here are routinely found not to trigger a successor obligation. *Id.* at 321 ("Tyco was restructured, not liquidated ... [and] [t]here is no indication that successor obligor clauses were intended to require consent from the noteholders for such internal restructuring, even when coupled with a spin-off of some of the obligor's assets."); *see also Resnick*, 149 A.D.2d at 709 (transfer of assets to newly formed subsidiaries did

not constitute disposition of all or substantially all the assets of a corporation); *Gimbel*, 316 A.2d at 605 ("[I]t is not our law that shareholder approval is required upon every 'major' restructuring of the corporation.  Again, it is not necessary to go beyond the statute [8 *Del. C.* § 271].  The statute requires shareholder approval upon the sale of 'all or substantially all' of the corporation's assets.  That is the sole test to be applied.").[6]

*Tyco* is instructive.  In *Tyco* an indenture trustee claimed a corporate spin off would violate an indenture covenant stating that Tyco "will not ... sell or convey all or substantially all of its assets to any Person, unless ... the successor entity ... shall expressly assume the due and punctual payment of the principal of and interest on all the [Notes] or the obligations under the Guarantees, as the case may be ...." 545 F. Supp. 2d at 314.  The Court looked at the substance of the transaction and noted that:

> Before the Transaction, Tyco was a public corporation that maintained four lines of business through a single holding company, TIGSA. TIGSA was the only obligor on the Notes, and Tyco was a guarantor. After the Transaction, Tyco is a public corporation that maintains two lines of business through a single holding company, TIFSA. Tyco and TIFSA are co-obligors on the Notes. The noteholders remain lenders to Tyco, but Tyco divested itself of two lines of business. In essence, Tyco spun off two of its businesses.

(*Id.* at 320).  Mindful of the purpose of successor obligor clauses, the Court concluded that the fact of a restructuring did not implicate the successor obligor clause:

> Tyco was restructured, not liquidated ...There is no indication that successor obligor clauses were intended to require consent from the noteholders for such internal restructuring, even when coupled with a spin-off of some of the obligor's assets.

(*Id.* at 320-21).

---

[6] Plaintiffs' assertion that *B.S.F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746 (Del. 1964) "controls here" (Pl. Br. 20) is wrong for precisely this reason as it involves the transfer of assets to an entity outside the structure of the parent corporation and not an internal restructuring.  *See B.S.F.*, 204 A.2d at 748-49.

20

Here, it is even clearer that the Reorganization does not violate the ASA provision. There is not merely some continuity of assets for the Plaintiffs here; rather the identical material assets will continue to be held on a consolidated basis by DHI.

> **2.    "Ring-Fencing" Certain Assets Does Not Place Them Beyond Execution; The Reorganization Places Assets No Farther From DHI Than They Are Now.**

In describing the effect of creating "bankruptcy remote" entities under the DHI corporate umbrella, Plaintiffs repeatedly misstate the facts, misconstrue their (and DHI's) rights, and ignore the corporate form. Plaintiffs thus repeatedly describe that (i) the power plants as DHI's assets (when they are not), (ii) assert that DHI, as a parent company, can compel the payment of dividends from subsidiaries (which it cannot do), (iii) imply that Plaintiffs can cause DHI to require subsidiaries to pay dividends (which they cannot do), and (iv) claim that they now can execute on a hypothetical judgment directly against the revenue generating assets owned by DHI's subsidiaries, but would not be able to after a Reorganization (which also is not true).[7]

Plaintiffs are wrong in asserting entitlement to access the assets of DHI's subsidiaries. Plaintiffs do not have a guaranty from DHI's subsidiaries, or a security interest in their assets. It is a fundamental tenet of corporate law that a parent does not have title to the assets of its subsidiaries. *See Bird v. Wilmington Soc'y of Fine Arts*, 43 A.2d 476, 483 (Del. Ch. 1945) ("The owner of the shares of stock in a company is not the owner of the corporation's property.") (internal citation omitted); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 211 (3d Cir. 2003)

---

[7] Bankruptcy remote entities, which essentially involve heightened observance of the corporate distinctness of affiliated entities than might otherwise be the case in a consolidated enterprise, are well recognized and serve important functions, especially to the creditors of such entities. *See In re Pac. Lumber Co.*, 584 F.3d 229, 250 (5th Cir. 2009) (rejecting substantive consolidation of parent and its wholly-owned "bankruptcy-remote" subsidiary where there was no evidence of improper commingling of claims and noting that "[i]f courts are not wary about substantive consolidation of special purpose entities, investors will grow less confident in the value of the collateral securing their loans; the practice of securitization, a powerful engine for generating capital, will become less useful; and the cost of capital will increase.").

("Because, under basic tenets of corporate law, a parent corporation does not 'own,' *i.e.,* have legal title to, the assets of its subsidiary, a parent company does not own shares of a company held by its subsidiary."); *In re Touch Am. Holdings, Inc.*, 401 B.R. 107, 126 (Bankr. D. Del. 2009) ("It is well recognized that 'a corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary.'"); *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) ("as a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities. The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's. Hence, the parent's creditors have no claim to the subsidiary's assets, and *vice versa.*") (citations omitted); *Anaconda Building Materials Co. v. Newland*, 336 F.2d 625, 628 (9th Cir. 1964) (finding that assets of subsidiary corporations could not be used to satisfy creditors' claims against parent corporation where "the subsidiaries were operated as separate entities" and "the objecting creditors did not rely upon the credit of the subsidiaries").

Similarly, Plaintiffs complain that DHI would not be able to "compel distributions" or that the revenue generating subsidiaries could "refuse distribution demands" necessary to satisfy a potential claim. (Pl. Br. 11, 19) Plaintiffs again seek to disregard the corporate form. It is well-established that a subsidiary's directors authorize the payment of dividends to its parent, not the parent itself. *See Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 174 (Del. Ch. 2006) (finding decision to declare dividend is subject to a subsidiary board's business judgment and the board may refuse if "pursuit of [the parent's] strategy will cause the subsidiary to violate its legal obligations"); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 722 (Del. Ch. 1971) (payment of dividends by subsidiary was a matter of its directors' business judgment). A

judgment against a parent does not compel its direct and indirect subsidiaries to pay dividends to satisfy the judgment.

Plaintiffs' implication that they can cause DHI to cause subsidiaries to pay dividends to DHI to pay Plaintiffs is also incorrect. Plaintiffs do not, and cannot, cite any such term or right, and nothing in the ASA provision protects asserted rights to compel distributions. Indeed, that could never be the case because there is no restriction in the Guaranties on the subsidiaries incurring debt or other obligations that are structurally senior to the Guaranties.

Plaintiffs also incorrectly assert that the creation of bankruptcy remote entities makes it more difficult for Plaintiffs to execute on a hypothetical judgment they could get against DHI if, at some point, it were to default on its obligations to Plaintiffs. In fact, nothing will have changed, as now Plaintiffs (assuming they had a judgment) could only execute on DHI's equity interests and not on the valuable assets several steps below it in the corporate structure. *See, e.g.*, *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959) ("A creditor of the parent corporation may not, in the absence of fraud, disregard the separate existence of a subsidiary corporation and look directly to specific assets of a subsidiary for satisfaction of his claim against the parent."); *Regency Holdings*, 216 B.R. at 375 (A "parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's" and therefore that "parent's creditors have no claim to the subsidiary's assets, and vice versa."); *Portfolio Fin. Servicing Co. v. Sharemax.com, Inc.*, 334 F. Supp. 2d 620, 629 (D.N.J. 2004) (dismissing creditor's claim against subsidiary premised on debt owed by parent where subsidiary "continued to exist as a separate corporate entity"); *Bird*, 43 A.2d at 483.

### 3.    The Guaranties' Restrictions And Covenants Do Not   Prohibit The Reorganization.

Plaintiffs offer the conclusory assertion that the "Guaranties anticipated that they could not be circumvented by corporate reorganization or other DHI transfers of the assets in question," but fail to identify any provisions of the Guaranties that prohibit transfers by DHI's subsidiaries or restrictions on other activities that would prevent DHI from consummating the Reorganization.   (Pl. Br. 2)   Simply, Plaintiffs did not obtain in the Guaranties contractual protections that would prevent the Reorganization.   Under well-established law governing the interpretation of indentures, Plaintiffs cannot imply into the Guaranties obligations that the Plaintiffs failed to obtain by negotiation.

Under New York law, which governs the Guaranties, courts enforce agreements according to their plain and unambiguous terms and do not attempt "to add to or vary the writing" where the contract is unambiguous and complete. *Cook v. David Rozenholc & Assocs.*, 642 N.Y.S.2d 230, 231 (N.Y. App. Div. 1996) ("[w]hen an agreement is set forth in a clear, complete document, it should, as a rule, be enforced according to its terms"); *Lui v. Park Ridge at Terryville Assn.*, 196 A.D.2d 579, 580 (N.Y. App. Div. 1993) ("A court should not, under the guise of contract interpretation, 'imply a term which the parties themselves failed to insert' or otherwise rewrite the contract.").   Because of their restriction on economic freedom, courts are particularly unwilling to imply terms in the context of note indentures.   As this Court noted, indenture provisions that "restrict the commercial freedom that issuers otherwise enjoy under default law are traditionally interpreted strictly, precisely because they involve specifically extracted limitations on ordinary economic liberties." *Wilmington Trust Co. v. Tropicana Entm't, LLC*, 2008 WL 555914, at *6 (Del. Ch. Feb. 29, 2008) (analyzing indenture under New

York law and noting that "[w]hen the parties omit a provision that seems obvious and could easily have been included, courts are loathe to impose such a provision by implication.").

Consequently, courts routinely deny attempts to imply terms into negotiated covenants that are not set forth explicitly in the parties' agreement. *See Sharon Steel Corp.*, 691 F.2d at 1049 ("[t]he debt securityholder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he ... establishes his rights through contractual provisions set forth in the ... indenture); *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 733 (S.D.N.Y. 1993) ("'Defendants ... were under a duty to carry out the terms of the contract, but not to make sure that plaintiffs have made a good investment. The former they have done; the latter we have no jurisdiction over.' If the challenged transaction does not violate any express term of the indenture, or prevent the bondholder from obtaining the benefit of an express indenture term, a bondholder may not challenge an action by the corporation on the basis of breach of the indenture contract."); *Tyco*, 545 F. Supp. 2d at 322 ("The Indentures could provide for protection for the noteholders in the event that the obligor disposed of less than substantially all of its assets, but they do not. In the absence of such a provision, the Court will not impose one."); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 992 (S.D.N.Y. 1989) ("[T]he Indenture could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this Court to imply ... Because the risk of a takeover – and the indenture provisions available to limit that risk – were well-known, to imply such provisions could impose on the parties terms they affirmatively excluded from their contract.").

Plaintiffs did not obtain in the Guaranties restrictions on DHI's subsidiaries transferring any, let alone all, of their assets or other standard marketplace protections to protect the cash flow, capital structures and operations of DHI and its subsidiaries. Such restrictions are standard

provisions for credit agreements and common in the market. *See* Barry A. Graynor, Practicing

Law Institute, Senior Secured Credit Agreement, PLI Order No. 22488, at *347 (2010) (setting

forth model credit agreement covenant restricting "any agreement, arrangement, instrument or

other document which, directly or indirectly, prohibits or restricts in any manner… the ability of

any Subsidiary to [ ] pay dividends or make distributions in respect of its Capital Stock [or]

transfer any of its properties or assets to any Loan Party or any other Subsidiary."); ABA Section

of Business Law, *Model Negotiated Covenants and Related Definitions*, 61 Bus. Law. 1439,

1533-35 (2006) (setting forth model covenant "designed to prevent the Company and its

Restricted Subsidiaries from agreeing to any contractual limitation on the ability of the

Restricted Subsidiaries to send cash and other assets, whether in the form of dividends or loans

or other property transfers, to the Company"); *see also In re HRP Myrtle Beach Holdings, LLC*,

2008 WL 4442606, at *78 (Bankr. D. Del. Sept. 29, 2008) (authorizing senior secured financing

agreement limiting "any consensual encumbrance or restriction of any kind on the ability of any

Subsidiary of any Loan Party [ ] to pay dividends or to make any other distribution on any shares

of Capital Stock of such Subsidiary owned by any Loan Party or any of its Subsidiaries [or] to

transfer any of its property or assets to any Loan Party or any of its Subsidiaries").  If Plaintiffs

wanted to obtain those additional protections, Plaintiffs would have had to negotiate specific

language in the Guaranties expressly limiting the rights of DHI and its subsidiaries.

Similarly, multiple publicly available examples of financing documents confirm that the

market uses express language when it wants to extend restrictions to the subsidiaries of an

obligor.[8]

---

[8] *See*, *e.g.*, Alicks Aff. Ex. 9 (Owens Corning Indenture dated January 2, 2009) at Section 4.09
("If the Company *or any of its Subsidiaries*, directly or indirectly, creates, incurs, issues, assumes,
guarantees or otherwise become directly or indirectly liable, contingently or otherwise, with respect to ...
any Indebtedness secured by a Lien ... the Company will secure the Securities on an equal and ratable

Plaintiffs' failure to obtain standard marketplace protections in the Guaranties dispositively demonstrates that no such protections were intended. *See Loral Space*, 2008 WL 4293781, at *36 (analyzing indenture under New York law and finding unconvincing "Noteholder Plaintiff's unsupported argument that [] investors would blindly rely on an implied covenant ... when explicit model covenants on the same issue are clearly in existence and in use in market transactions.") (internal citations omitted).

### 4.    Plaintiffs Cannot Show A Reasonable Probability Of Success On The Merits Of Their Fraudulent Transfer Claim.

Plaintiffs cannot meet their burden of proving that the fraudulent transfer claim has a reasonable probability of success on the merits.[9]  Plaintiffs incorrectly assert a fraudulent transfer claim, arguing that (i) DHI did not receive reasonably equivalent value for the purported transfer of power plants, (ii) DHI was insolvent or became insolvent because of the purported transfer of

---

basis with the Indebtedness so secured[.]"), Section 5.01 ("The Company may not, directly or indirectly ... (2) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company *and its Restricted Subsidiaries taken as a whole*, in one or more related transactions, to another Person[.]") (emphasis added); Ex. 10 (Calpine Corporation Indenture, dated January 14, 2011) at Section 5.01 (same); Ex. 11 (CF Industries, Inc. (First Supplemental Indenture, dated as of April 23, 2010) at Section 4.09 ("[N]either CF Holdings *nor any of its Subsidiaries* shall create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable for, contingently or otherwise ... any Indebtedness ...."), Section 5.01(a) ("Neither CF Holdings nor the Company will, directly or indirectly ... (2) sell, assign, transfer, convey, lease or otherwise dispose of all or substantially all of the properties or assets of *CF Holdings and its Subsidiaries, taken as a whole*, in one or more related transactions, to another Person[.]" (emphasis added in all).

[9]  Contrary to Plaintiffs' assertion, DHI does not bear the burden of proving that the proposed transfer of assets to GasCo and CoalCo are not fraudulent. (Pl. Br. 24)  On a motion for a preliminary injunction, it is the Plaintiffs that bear "the burden of showing that there is a reasonable probability of his prevailing on the merits if a trial were held, regardless of where the burden of persuasion would fall at a trial." *See Dewolf v. Datapoint Corp.*, 1985 WL 21153, at *3 (Del. Ch. Oct. 28, 1985) (rejecting argument that because spin-off transaction was a transfer that was within the corporation, the defendant had the burden of proof on preliminary injunction motion); *Joseph v. Shell Oil Co.*, 482 A.2d 335, 340 (Del. Ch. 1984) (on motion for preliminary injunction, plaintiffs have burden of proving reasonable probability of prevailing on merits if a trial was held).  Plaintiffs' proffered authority is inapposite and does not address a movant's burden for injunctive relief. (Pl. Br. at 24, citing *Mitchell v. Wilmington Trust Co.*, 449 A.2d 1055, 1060 (Del. Ch. 1982) (analyzing burden of proof on merits of claim to extinguish mortgage lien); *Treated Timber Prods. v. S&A Assocs., Inc.*, 488 So. 2d 159, 160-61 (Fla. Dist. Ct. App. 1986) (analyzing burden of proof for claim under Florida statute to collect judgment).

27

power plants, and/or (iii) the transfers of the power plants are designed to delay and hinder Plaintiffs' ability to collect on the Guaranties once the lessees default.  (Pl. Br. 23-27)  All of these of these arguments fail.  Initially, Plaintiffs' claim that DHI "fraudulently transferred" valuable power plants to bankruptcy remote entities is just incorrect, as DHI does not directly own any of the power plants.  Delaware's fraudulent transfer laws prohibit "transfers" of an "asset," which is defined as "property of the debtor."  6 *Del. C.* § 1301.  Here, the transferred power plants are not assets of DHI.  So, there is no transfer by DHI, fraudulent or otherwise, to challenge, and Plaintiffs cannot, as a matter of law, establish a claim for fraudulent transfer. *Reserves Mgmt. Corp. v. 30 Lots, LLC*, 2009 WL 4652991, at *5 (Del. Nov. 30, 2009) ("A fraudulent transfer must be one made by the debtor… Therefore, in order to have a transfer, there must be an asset."); *Regency Holdings*, 216 B.R. at 375 (refusing to permit preference action relating to transfer of assets from debtor's subsidiary, noting that "[t]he parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's.  Hence, the parent's creditors have no claim to the subsidiary's assets, and vice versa); *In re Bernard Tech., Inc.*, 398 B.R. 526, 529 (Bankr. D. Del. 2008) (dismissing trustee's fraudulent conveyance action based on assets belonging to debtor's subsidiary, noting that the debtor and subsidiary were "separate and distinct entities.").

In addition to the lack of a predicate transfer (fraudulent or otherwise), Plaintiffs' fraudulent transfer claims fail to state a claim for three other reasons.

*First*, Plaintiffs' claim that there was a transfer for less than "reasonably equivalent value" is based on Plaintiffs' incorrect premise that DHI is transferring the plants.  (Pl. Br. 24)  After the Reorganization, DHI will have the same indirect ownership interest it has today, so there is no

28

transfer of value away from DHI.[10]  (*See supra* at Section I.C)  The transfer of DHI's indirect holdings of power plants from one wholly owned indirect subsidiary to another wholly-owned indirect subsidiary is nothing more than shifting assets from the left pocket to the right, with the amount received being identical to the amount transferred.

*Second*, Plaintiffs do not demonstrate any reasonable probability of success on their claim that DHI is insolvent or will become insolvent as a result of the proposed restructuring. Plaintiffs' third party opinion by Mark Sherman is patently insufficient because it is based on the erroneous assumption that as a result of the Reorganization, DHI will no longer have any interest in the bankruptcy remote entities.  (Pl. Br. 25; Sherman Aff ¶¶ 11-14)  The Reorganization, however, does not deprive DHI of its indirect equity interests in the assets of the bankruptcy remote entities.  (*See supra* at Section I.C)

*Third*, Plaintiffs' argument that the purported transfers of the power plants are "designed to delay and hinder" Plaintiffs' rights under the Guaranties (assuming a default ever occurs) is likewise based on the flawed premise that DHI is "trying to wall off its profitable assets ... to frustrate PSEG's efforts to collect on its Guaranty."  (Pl. Br. 27)  DHI did not promise to use cash flow from its subsidiaries to make lease payments, and none of the entities that own the revenue generating assets provided any guaranty to Plaintiffs. (*See supra* at Section II.A.2)  Nonetheless, as addressed above, those assets are no more walled off under the Reorganization than they are now.  (*See supra* at Section II.A.2)

### B.    Plaintiffs Cannot Demonstrate Irreparable Harm.

This Court has described a TRO as a remedy of an "emergency nature," issued only when the plaintiff is facing irreparable harm.  *Cottle v. Carr*, 1988 WL 10415, at *2 & n.3 (Del. Ch.

---

[10] Plaintiffs compound their fiction by creating a fictitious consideration – the receipt by DHI of certain loan proceeds from CoalCo and GasCo – which is entirely unrelated to the transfer of power plants between subsidiaries.  (Pl. Br. 24)

Feb. 9, 1988).  To be "irreparable," any alleged harm must be "imminent," "unspeculative," and "genuine." *Nomad Acquisition Corp. v. Damon Corp.*, 1988 WL 383667, at *7 (Del. Ch. Sept. 20, 1988).  Irreparable harm is of absolute necessity, and if a plaintiff's claims of irreparable harm fail, "a discussion of the probability of success on the merits is not useful and, in fact, [would likely] be an 'advisory opinion.'" *New Castle Cnty. Vocational Tech. Educ. Ass'n. v. Bd. of Educ.*, 451 A.2d 1156, 1164 (Del. Ch. 1982).

Here, Plaintiffs' claim of irreparable harm fails completely and is premised entirely on a mischaracterization of the Reorganization at issue and its impact on the Guaranties.  *First*, Plaintiffs' central argument that the proposed Reorganization would render the Guaranties "permanently worthless" by placing DHI's current assets out of reach of creditors is incorrect and mischaracterizes entirely the Reorganization and its effect on the Guaranties.  As discussed at Section I.B *supra*, DHI's only assets which now or ever could be subject to execution are equity in certain subsidiaries, through which DHI indirectly owns the power plants, and following the Reorganization DHI will continue to indirectly own the same power plants through its equity interest its subsidiaries.  Plaintiffs' claim that the bankruptcy remote structure somehow removes the value of such entities from the ultimate parent is simply incorrect.  (*See supra* at Section II.A.2)[11]  Thus, Plaintiffs are in the same position under the Guaranties today as they will be after the Reorganization.

*Second*, Plaintiffs raise only a quintessential (albeit, speculative and unripe) claim for monetary damages under Guaranties.  As such, there is no threat of irreparable harm sufficient to justify the extraordinary relief requested here.  *See*, *e.g.*, *Wand Equity Portfolio II L.P. v. AM/FM Internet Holding Inc.*, 2001 WL 167720, at *3 (Del. Ch. Feb. 7, 2001) (denying plaintiffs' motion

---

[11]     Likewise, Plaintiffs' argument that the proposed reorganization constitutes a fraudulent transfer is without merit.  (*See supra* at Section II.A.4)

for expedited proceedings because "it appears from the complaint and the moving papers, to a reasonable certainty, that an award of money damages could fully and adequately compensate the plaintiffs for any injury they might suffer"); *Herd v. Major Realty Corp.*, 1989 WL 997170, at *2 (Del. Ch. Nov. 8, 1989) (refusing to schedule a hearing for injunctive relief because "complete relief" in the form of money damages was available).

*Third*, Plaintiffs allege only a hypothetical claim of future monetary injury, arguing (incorrectly) that – assuming one day there is a default by the lessees (and there is none at this time), then a default by DHI under the Guaranties (also now not the case), and then a judgment against DHI (again, not the case) – the Reorganization may "diminish[]" or make more "uncertain" Plaintiffs' likelihood of collecting on the Guaranties. (Pl. Br. 15-16)  Claims by creditors that future events may make judgment enforcement more difficult or burdensome have been held not to present the sort of "imminent," "unspeculative," and "genuine" harm that would constitute an "irreparable injury."  For example, in *Angelo, Gordon & Co., L.P. v. Allied Riser Communications Corp.*, 805 A.2d 221, 230-31 (Del. Ch. 2002), the Court of Chancery denied a motion for preliminary injunction brought by subordinated noteholders who objected to a proposed merger on the grounds, *inter alia*, that (i) the practical effect of the merger would be to subordinate the notes to senior debt "at levels never [previously] contemplated," (ii) the merger would "effectively alter[] the fundamental nature of the debtor-creditor relationship" originally envisioned by the noteholders, and (iii) underlying insolvency issues and anticipated levels of cash expenditures will prevent the noteholders from collecting on any future judgment. Declining to enjoin the merger, this Court held that the risk that the company's future economic performance and revised capital structure may make it more difficult for the noteholders to collect on a future judgment did not constitute immediate and "irreparable" harm.  *Id.* at 231

31

("Nevertheless, I cannot conclude that this possibility alone justifies the entry of an injunction against the Merger because the injury it contemplates is both speculative and will not result from the Merger itself but will only be felt, if at all, with the passage of time after the Merger."); *see also Benitec Australia Ltd. v. Promega Corp.*, 2005 WL 549552, at *6 (D. Del. Mar. 8, 2005) (no irreparable harm where movant failed to establish that the claimed injury was "non-speculative").

*Fourth*, rather than being harmed (much less irreparably), Plaintiffs' interests in DHI's equity are benefitted because the bankruptcy remote structure increases the value of the "ring-fenced" assets by (i) permitting them to operate outside of bankruptcy, which saves substantial monies, (ii) protecting the entities from the increased default interest rate, (iii) permitting the entities to borrow at a lower cost, and (iv) providing additional liquidity. (*See supra* at Section I.D)

*Fifth*, lacking any viable claim of irreparable harm, Plaintiffs raise a series of extraneous and meritless objections to the Reorganization. Plaintiffs argue (Pl. Br. 16) that GasCo and CoalCo may raise additional secured financing that would be in a superior credit position to Plaintiffs, but the Guaranties do not place any restriction on DHI's subsidiaries' ability to raise secured financing or provide Plaintiffs with any priority rights (nor do Plaintiffs argue otherwise). In addition, the new financing will not increase DHI's net debt. (*See infra* at Section I.B).

Plaintiffs also object (Pl. Br. 16) that "GasCo and CoalCo may sell assets in an effort to raise capital," but again no provision in the Guaranties prohibiting such an asset sale is or can be identified by Plaintiffs. In addition, even if Plaintiffs had negotiated such protection, an application for injunctive relief would only be ripe if and when such a sale was threatened.

Plaintiffs further complain (Pl. Br. 16) that a DHI subsidary will have a right to sell 20% of GasCo equity to third parties, but again the right of DHI's subsidiaries to sell equity holdings is not limited by the Guaranties, and such an equity sale (with an estimated value of at least $500 million) would only *increase* liquidity.

## C.    The Balancing Of The Equities Weighs Overwhelmingly In Favor Of Denying A Temporary Restraining Order.

In determining whether to grant Plaintiffs' requested TRO, this Court must satisfy itself that the potential injury avoided by granting the TRO outweighs the injury to Defendant and to third parties from a TRO that ultimately may be determined to have been improvidently granted. *Solash*, 1988 WL 3587, at *1.  A balancing of equities in this case weighs overwhelmingly in favor of denying Plaintiffs' TRO Motion.

### 1.    Plaintiffs Will Sustain No Harm If A TRO Is Not Issued.

Plaintiffs' argument (Pl. Br. 27-28) that the Reorganization would "frustrate[e] execution on the Guaranties and could require a lengthy and expensive process of unwinding the [proposed] transactions" is, as extensively discussed above, premised entirely on a mischaracterization of the existing and future corporate structure, non-existent "rights" under the Guaranties, and a fundamental misapprehension of the legal effect of the "bankruptcy remote" structure.  Plaintiffs' present rights under the Guaranties in fact remain *unchanged* by the Reorganization.  (*See supra* at Section II.A.3)

Moreover, contrary to Plaintiffs' incorrect and unsupported assertions, the Reorganization would materially *benefit* DHI and, by extension, the Plaintiffs.  The Reorganization will provide DHI and its subsidiaries with additional liquidity, and will not diminish in any way DHI's assets or value, nor increase the net debt held by DHI's direct and indirect subsidiaries.  The Reorganization will allow new credit facilities in the amount of $1.7 billion, on better terms than

existing debt, while eliminating a covenant that DHI is at risk of violating in the near future. Proceeds from the new credit facilities are expected to be used (i) repay existing debt, (ii) make certain payments to a parent holding company, (iii) fund collateralized letters of credit and cash collateral for existing collateral requirements, (iv) pay related transaction fees and expenses, and (v) fund additional cash to the balance sheet for general working capital and liquidity purposes. (*See supra* at Section I.B).

In addition, the bankruptcy remote structure employed in the Reorganization will (i) preserve the equity value of DHI's subsidiaries, the only asset that DHI directly owns, (ii) permit those companies to avoid bankruptcy if DHI has to file, which will save substantial costs attendant to the operation of a business in bankruptcy, where numerous professionals are involved in analyzing and oftentimes disputing operational decisions, and (iii) eliminate cross defaults by the troubled power generating assets, which would otherwise trigger a higher interest rate in the event of a default. (*See supra* at Section I.D).

## 2.    DHI Would Be Irreparably Harmed If Its Reorganization Was Enjoined.

By contrast, DHI will suffer irreparable harm if a TRO is issued. If the Reorganization is enjoined, DHI and its subsidiaries will not be able to close on the related $1.7 billion new credit facilities, on better terms than its existing debt, and DHI can have no realistic assurances that any comparable replacement financing would be available – particularly given the uncertain and troubled state of the capital markets in light of the continuing U.S. recession, the well publicized failure to date of the federal government to reach an agreement to extend the federal debt ceiling and the turmoil afflicting foreign capital markets given the well publicized fears of possible sovereign debt defaults ranging across Greece, Spain, Portugal, Ireland and Italy. And, as DHI has publicly disclosed, given DHI's liquidity problems, if it is "unable to amend or replace the

Credit Facility or otherwise obtain additional sources of liquidity, it may be necessary for [DHI] to seek protection from creditors under chapter 11 of the U.S. Bankruptcy Code, or an involuntary petition for bankruptcy may be filed against us."  (Alicks Aff., Ex. 1 at 30)

In addition, without the Reorganization, DHI will likely violate the interest coverage covenant under the existing credit facility by Q3 or Q4 of this year.  As DHI has publicly disclosed, a violation of that financial covenant could prevent DHI from drawing on the existing credit facility or accelerate DHI's repayment obligation thereunder (and any other indebtedness linked to it by cross-default or cross-acceleration provisions), and if DHI could not repay those amounts, the senior lenders "would be entitled to foreclose on, and acquire control of, substantially all of [DHI's] assets, which would have a material adverse impact on [DHI's] financial condition, results of operations and cash flows," including likely forcing DHI into bankruptcy.  (*Id.* at 7-8).

The balance of equities favors DHI even more strongly where, as here, Plaintiffs failed to offer to post a bond as required under Chancery Court Rule 65(c), and have not provided any evidence that they are able to provide adequate security.  The risk to DHI—and the failure of Plaintiffs to volunteer, or to provide evidence of the ability to post, an adequate bond—far outweighs any harm to Plaintiffs.  As discussed above, DHI would face severe risks were this Court to enter a restraining order, and an adequate bond by Plaintiffs would need to at least equal the value of the $1.7 billion credit facility threatened by Plaintiffs' request for injunctive relief. This Court recently noted that "[i]t would be hubristic for [the Court] to take a risk of that kind for the ... stockholders, [when] the plaintiffs have not volunteered to back up their demand with a full bond." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 209 (Del. Ch. 2007); *see also Mercier v. Inter-tel (Del.), Inc.*, 929 A.2d 786, 821 n.90 (Del. Ch. 2007) (finding that "it is

certainly relevant to a judge deciding whether to issue an injunction that plaintiff offers no protection to other investors if the powerful remedy he seeks was wrongly granted and caused them harm").

### D.    A Bond Would Have To Be An Amount Equal To The Threatened Financing.

Under Chancery Court Rule 65(c), no temporary restraining order "shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

The Delaware Court of Chancery held in *Emerald Partners v. Berlin* that, if a defendant has been wrongfully enjoined, its "recovery will be limited to the value of the ... security." 712 A.2d 1006, 1010 (Del. Ch. 1997), *aff'd*, 726 A.2d 1215 (Del. 1999). "Generally, courts should 'err on the high side' in setting the bond." *Guzzetta* v. *Service Corp. of Westover Hills*, C.A. No. 2922-VCP, mem. op. at 10 (Del. Ch. July 21, 2011). Thus, to obtain a TRO, and Plaintiffs have no grounds for one, the security that Plaintiffs must post should approximate the amount of damages the defendant would suffer if it is later determined that a TRO should not have issued. *See*, *e.g.*, *Tate & Lyle PLC v. Staley Cont'l, Inc.*, 1988 WL 46064, at *10 (Del. Ch. May 9, 1988) (ordering that an injunction "will be granted upon plaintiffs posting bond in the sum of $65 million"); *Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 349 (S.D.N.Y. 2006) (setting amount of bond at $400 million), *aff'd*, 470 F.3d 1368, 1384-85 (Fed. Cir. 2006); *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 2009 WL 3245205, at *2 (S.D. Ind. 2009) (increasing previously awarded bond to $140 million); *City of Philadelphia v. One Reading Center Assoc.*, 143 F. Supp. 2d 508, 528 (E.D. Pa. 2001) (setting amount of bond at $80 million).

The Reorganization will permit DHI to secure new credit facilities, on better terms, in the amount of $1.7 billion.  If Plaintiffs enjoin the Reorganization, DHI will face a substantial and real risk that it will not be able to secure replacement financing, particularly given the state of the international and domestic credit markets, and that, in turn, could force DHI into bankruptcy. (*See supra* at Section II.C.2)  Accordingly, Plaintiffs should post a bond that would provide that necessary $1.7 billion financing available to DHI today.  The financing, after paying outstanding indebtedness of $900 million, would result in $800 million of net liquidity.  At a minimum then, Plaintiffs should post an $800 million bond to make up for the potential loss of such liquidity.

## **CONCLUSION**

For reasons set forth above, DHI respectfully requests that the Court deny Plaintiffs' Motion For A Temporary Restraining Order.

|  |  |
|---|---|
|  | */s/ Samuel A. Nolen* |
|  | Samuel A. Nolen (#971) |
| OF COUNSEL: | Margot F. Alicks (#5127) |
|  | Richards, Layton & Finger, P.A. |
| Glenn M. Kurtz | One Rodney Square |
| Douglas P. Baumstein | 920 North King Street |
| White & Case LLP | Wilmington, Delaware 19801 |
| 1155 Avenue of the Americas | (302) 651-7700 |
| New York, New York 10036 |  |
| (212) 819-8200 | *Attorneys for Defendant* |

Dated:  July 25, 2011

RLF1 4989879v. 1

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2011, a copy of the foregoing was served by efile

upon the following attorney of record:

> Kevin F. Brady (#2248)
> Jeremy D. Anderson (#4515)
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, Delaware 19899

*/s/ Margot F. Alicks*
Margot F. Alicks (#5127)