# EXHIBIT 9

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE


ROSETON OL, LLC and          :
DANSKAMMER OL, LLC,          :
                             :
            Plaintiffs,      :
                             :
        vs.                  :   Civil Action
                             :   No. 6689-VCP
DYNEGY HOLDINGS, INC.,       :
                             :
            Defendant.       :


                    −  −  −


                    Chancery Courtroom No. 12B
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Monday, July 25, 2011
                    4:05 p.m.


                    −  −  −

BEFORE:  HON. DONALD F. PARSONS, JR., Vice Chancellor.

                    −  −  −



                    ORAL ARGUMENT
        MOTION FOR TEMPORARY RESTRAINING ORDER

2

```
 1    APPEARANCES:

 2

 3            KEVIN F. BRADY, ESQ.
              JEREMY ANDERSON, ESQ.
              Connolly, Bove, Lodge & Hutz LLP
 4              -and-
              FILIBERTO AGUSTI, ESQ.
 5            JOHN F. O'CONNOR, ESQ.
              of the District of Columbia Bar
 6            Steptoe & Johnson LLP
                for Plaintiffs

 7

 8            SAMUEL A. NOLEN, ESQ.
              MARGOT F. ALICKS, ESQ.
 9            Richards, Layton & Finger, P.A.
                -and-
10            GLENN M. KURTZ, ESQ.
              DOUGLAS P. BAUMSTEIN, ESQ.
11            of the New York Bar
              THOMAS E. LAURIA, ESQ.
12            of the Florida Bar
              White & Case LLP
13              for Defendants

14

15                            -  -  -

16

17

18

19

20

21

22

23

24
```

3

1          THE COURT:  All right.  Good

2    afternoon.

3          MR. AGUSTI:  Good afternoon,

4    Your Honor.

5          MR. NOLAN:  If I could just begin with

6    introductions of counsel who are at the table with me;

7    Glenn Kurtz, Thomas Lauria and Doug Baumstein from

8    White & Case.  With Your Honor's permission, Mr. Kurtz

9    will make today's argument.

10          THE COURT:  All right.  Okay.

11    Mr. Brady, before we get started?

12          MR. BRADY:  Good afternoon,

13    Your Honor.  Kevin Brady from Connolly, Bove, Lodge &

14    Hutz for Roseton OL, LLC and Danskammer OL, LLC.  With

15    me at counsel table is Mr. Filiberto Agusti and

16    Mr. John O'Connor from the Steptoe firm and, at the

17    end, my colleague Jeremy Anderson.  Mr. Agusti and

18    Mr. O'Connor have been admitted pro hac; and with

19    Court's permission, Mr. Agusti will make the argument

20    for the plaintiffs.

21          THE COURT:  Okay.

22          MR. AGUSTI:  Good afternoon,

23    Your Honor.

24          THE COURT:  Good afternoon.

4

1        MR. AGUSTI:  There's been a lot of

2   paper generated in a very few days in this case and I

3   apologize.  We are partially responsible for some of

4   that.  But one thing that I want to be sure I started

5   off with is by making sure that with all this paper,

6   we don't lose the forest for the trees.

7        In essence, what we're bringing before

8   Your Honor is a motion for a temporary restraining

9   order in a situation where as a result of some

10   transactions that Dynegy Holdings, Inc. proposes to

11   do, they are going to essentially eviscerate

12   $1 billion of guaranties that our clients hold.

13        We believe that these transfers will

14   both violate the terms of the guaranties and also

15   violate -- even if it didn't violate the terms of the

16   guaranties, violate the Delaware Fraudulent Transfer

17   Act.

18        Your Honor, I'll just begin with a --

19   and the reason why we need a temporary restraining

20   order, Your Honor, is because that will cause

21   immediate and irreparable harm to my clients.  And as

22   I'll point out, there is really no balancing harm to

23   the defendant for the short period of time that it

24   will take for the Court to allow the parties to brief

5

1   and to hear preliminary injunction --

2                   THE COURT:  They say it jeopardizes

3   their financing.

4                   MR. AGUSTI:  Your Honor, actually,

5   what they say is that the entire proceeding

6   jeopardizes their financing.  But if you look

7   carefully through all the paper that's been filed,

8   there is actually no allegation that a temporary

9   restraining order for this short a period of time

10  would actually eliminate their possibility for

11  financing.

12                  Essentially, remember what we're

13  asking for at the TRO stage instead of a preliminary

14  injunction.  What we're asking for here is a temporary

15  restraining order to give us sufficient time to brief

16  and have a hearing on the merits of our preliminary

17  injunction hearing.

18                  Your Honor, I'll get to some of the

19  things they say about what might happen to them.  I

20  might also add that their allegation about harm to

21  financing is not supported by any -- and there's been

22  a lot of paper here, but there's absolutely no

23  specific allegations as to what specifically is going

24  to happen in this short period of time that's going to

6

1   make the financing go away.  There is really nothing

2   alleged in documents that say that the financing is

3   not going to be possible if they should prevail at a

4   preliminary injunction hearing.

5              So, Your Honor, what I would say to

6   the harm that they're caused is that there is a

7   general statement that there's a possibility of harm

8   to them, Your Honor, but actually there are no facts

9   that are actually narrowly alleged as to what will

10  happen to them, and there is certainly not even an

11  allegation that they have to file for bankruptcy if

12  Your Honor takes the short period of time required for

13  preliminary injunction, or that they'll lose their

14  financing.

15             What they're saying right now to the

16  Court is that perhaps at a preliminary injunction

17  stage, if a preliminary injunction were entered, they

18  might not be able to do those things, but I'll get to

19  that in a moment.

20             THE COURT:  All right.

21             MR. AGUSTI:  Your Honor, just to go

22  through the facts -- and Your Honor has probably read

23  the briefs.

24             THE COURT:  I have read the briefs.

7

1              MR. AGUSTI:  Terrific.  Then I will

2    just point out what I think are the forest; but if

3    Your Honor has any other questions, I'm here actually

4    to answer Your Honor's questions, not to go on

5    incessantly.

6              Your Honor, as Your Honor knows, our

7    clients entered into a sale/leaseback transaction for

8    close to a billion dollars in 2001.  Essentially, the

9    sale/leaseback documents amply give my clients access

10   to those assets, which are essentially the Danskammer

11   Plant Units 3 and 4 and the Roseton facility; and so,

12   Your Honor, we don't need any further access to those

13   assets.

14              What the guaranty was clearly

15   calculated to do was to get DHI on the hook for this

16   as well because our clients did not simply want to

17   rely on the credit of these two facilities.  And in

18   connection with that, we had anti-transfer provisions

19   that, as both parties have noted, basically call for

20   bid a transfer of the assets sold as an entirety to

21   any person in one or more transactions.

22              And it is notable, Your Honor, that

23   that is talking about all the assets of the guarantor.

24   It doesn't say just the equipment.  It doesn't say

8

1   just the coal plants.  It doesn't say the coal plants

2   but not the stock.  It says "all assets."  Stock is

3   just one more category of assets.

4                   And so when our clients were looking

5   for a guaranty, they were looking for everything that

6   DHI held.  And, indeed, DHI now, Your Honor, has

7   asserted in its papers that we knew that they held

8   everything indirectly through stock, and so almost

9   necessarily, the assets must have included stock.

10                  It's also relevant to note,

11  Your Honor, that it doesn't say "only assets held

12  directly by DHI."  It just says "assets," "all

13  assets," not "just assets held directly by DHI."  And,

14  indeed, if any such express provision would have been

15  suggested, our clients would have presumably fought it

16  because, as they say, all of our assets, all of the

17  assets of the guarantor, were held indirectly.

18                  So, Your Honor, which brings me

19  actually to the discussion of the first sort of

20  factual position that they've taken in their

21  opposition, which is that, essentially, although PSEG,

22  these two indirect subsidiaries of PSEG, knew that the

23  assets were held indirectly, they agreed to a

24  billion-dollar guarantee that did not cover them.

9

1          That, Your Honor, is inconceivable.

2   You would not get a guaranty -- the only purpose of

3   the guaranty was to get collateral out -- or to get, I

4   should say, credit support outside of the two

5   facilities that were being leased.

6          And PSEG would not have agreed to have

7   an anti-transfer provision that basically allowed

8   them, the day after that guaranty was signed, to

9   transfer everything out from under the guaranty.

10   That's not -- it's -- to us, it's an implausible

11   interpretation of the statute; and under New York law,

12   it would be a very disfavored interpretation of the

13   statute.

14          And, indeed, Your Honor, we're faulted

15   in their briefs for not including 37 different kinds

16   of preventative provisions that we could have this

17   thought of.  But, Your Honor, I would turn the

18   question back to them.  If they intended for us to

19   agree to their not -- to basically be able to

20   transfer -- for the indirect subsidiaries to be able

21   to transfer whatever they wanted, those assets that

22   basically were owned indirectly by DHI, why didn't

23   they include such provision in the anti-transfer

24   provisions?  The fact is, Your Honor, that it's not

1  there.

2              And so, Your's Honor --

3              THE COURT:  You mentioned a moment ago

4  that something was not authorized by the Act or some

5  reference to the Act.  What Act are you referring to?

6              THE WITNESS:  The Fraudulent Transfer

7  Act, Your Honor.

8              THE COURT:  All right.

9              MR. AGUSTI:  And so, basically -- and

10 actually, wholly aside from this conversation that

11 we're having about the guaranty provision, the

12 Fraudulent Transfer Act, we believe, would prevent

13 this from happening because, clearly, we believe

14 that --

15             THE COURT:  That's sort of an

16 independent argument from --

17             MR. AGUSTI:  Independent.  Actually,

18 right now, I'm just setting out, walking through the

19 facts as I see them, because at this TRO stage, we

20 have conducted no discovery, of course, so we have to

21 try to respond to factual allegations as they are

22 flung at us.

23             Let me just proceed, if I may, then to

24 where we are today.  Essentially, we believe that we

1   have a guaranty that should be backed by all of the

2   assets of DHI.  What's happened, of course, is that

3   the Roseton and Danskammer plants are not doing so

4   well.  They have basically insufficient revenue to

5   service the leases, which are basically the payments

6   that they owe to our clients.

7                    For example, although outside of the

8   lease payments, Roseton is scheduled to clear about

9   $1 million, it has a $78 million lease payment due on

10  November 11th -- or November of 2011.  And so,

11  Your Honor, it's perfectly clear now that Roseton

12  can't meet its service.

13                   And it's perfectly clear, I might say,

14  from Dynegy's own 8-K that this new company that

15  they're basically creating by stripping all of the

16  valuable assets away from DHI is going to have a

17  negative cash flow in the hundreds of millions of

18  dollars.

19                   They say that they intend to have the

20  affiliates make contributions in the future, but the

21  fact is, Your Honor, there is absolutely no obligation

22  for any affiliate to make any contribution to DHI in

23  the future, at least on the basis of the documents

24  that have been presented to us so far.

12

1        And so, Your Honor, at the point in

2   time when the guaranties have become most important

3   and most relevant to us, at that point in time, we

4   have this so-called corporate reorganization.  And

5   what the corporate reorganization, Your Honor,

6   basically amounts to is a transfer of every asset,

7   really, that they have in the company, every piece of

8   stock, everything that they have with the notable

9   exceptions of Roseton and Danskammer, essentially,

10  into bankruptcy-remote entities.

11        And there's been a lot of discussion

12  about what bankruptcy-remote entities mean; and what

13  it means has varied.  What Dynegy says it means has

14  varied in the last several days.

15        I don't know if Your Honor had an

16  opportunity to see our reply brief.

17        THE COURT:  I did.

18        MR. AGUSTI:  But, you know, quite

19  recently, Dynegy took the position in open court that,

20  actually, an independent director did have the power

21  to be able to prevent distributions up to the parent.

22  So that was Thursday.  Apparently, in reaction to our

23  suit, there's now been a -- well, at least the LLC

24  documents that we see now say that the independent

13

1    director is no longer required in order to have a

2    distribution.

3              But it -- a couple of things to bear

4    in mind is that there can be no distributions -- that

5    the board is supposed to only be thinking about the

6    interests of the bankruptcy-remote entity.  That is to

7    say that this isn't going to be like every other DHI

8    wholly owned subsidiary.

9              DHI wholly owned subsidiaries, as the

10   Court knows, basically can be run for the interests of

11   its shareholder.  This entity is going to have an

12   independent board that is going to make independent

13   decisions.  And those independent decisions are surely

14   not going to include the payment of our $790 million

15   that is still outstanding to PSEG.

16             THE COURT:  So you're referring to the

17   fact that DHI is designated as a restricted affiliate;

18   is that right?

19             MR. AGUSTI:  I'm sorry?

20             THE COURT:  Does this work into this

21   language about a restricted affiliate?

22             MR. AGUSTI:  Yes.  It's referred to as

23   a restricted affiliate by -- in its own papers.  And

24   so, basically, it's an affiliate, but it's not like

14

1  every other affiliate.  It's an affiliate that has

2  special qualities.  It is run independently, and it is

3  supposed to be run on its own for its own behalf.

4               And as we pointed out in the reply,

5  Your Honor, distributions can't be made if they are in

6  violation of the credit agreements, according to this

7  new LLC document that we saw at 10:00 a.m. this

8  morning.

9               Now, we don't have a copy of the

10  credit agreements so we don't know what the credit

11  agreements provide, but there is, it would seem to us,

12  a strong likelihood that the creditors of this new

13  bankruptcy-remote entity are going to have some say as

14  to whether money from their borrower gets dividended

15  up to pay an overdue debt of a creditor of DHI.

16               So, Your Honor, there are many ways --

17  and I think a lot of what I keep talking about with

18  trees and forests, there are a lot of little points

19  that have been made throughout the opposition which

20  make you think that, you know, nothing has changed;

21  but, Your Honor, surely and absolutely, something is

22  going to change.  Because if nothing was going to

23  change to us, Your Honor, they would not be here

24  resisting us so much.

1    And what's going to change, surely as

2  it can be, the whole reason for a bankruptcy-remote

3  entity, is in order to create a ring-fence around

4  these assets, in their own language, a ring-fence

5  around these assets that are being transferred over to

6  these new subs.  And we, PSEG's subsidiaries, are

7  decidedly outside the ring-fence.

8    That is the substantive qualitative

9  difference of what's going on here.  It is, for us, it

10  is something that's irremediable.  Basically, at the

11  end of the day, when they transfer those assets over,

12  they will find -- what they hope to do is to keep us

13  outside of the ring-fence and, therefore, no longer

14  have access to the stock.

15    THE COURT:  So what would happen if

16  this all went through as you envision it, by the end

17  of this year, they, DHI, would have defaulted on the

18  two -- or its subsidiaries for those two plants, they

19  would have defaulted on the monies that they owed.

20  You'd make demand of DHI for payment under the

21  guaranties.  DHI wouldn't do it.  You'd get a judgment

22  against them.  And then, as they say, you'd have

23  control of their stock.  That's their main entity.

24  But you wouldn't be able to use that control of the

16

1   stock to cause the coal company and the gas company to

2   make dividends and so on to you because you have run

3   up against this bankruptcy-remote structure.

4                    MR. AGUSTI:  That's absolutely right,

5   Your Honor.  That makes this kind of a transfer --

6   that's the whole reason why they're doing it.  That's

7   the whole reason why we're here.

8                    THE COURT:  Now, let's suppose we're

9   in the pre-transaction world.  Let's assume they're

10  already in default; that you've already gone through

11  the stages of making a demand against the guaranty.

12  They don't perform on the guaranty.  You get the

13  judgment against them.  You get the stock as it sits

14  today.

15                   MR. AGUSTI:  Yes, sir.

16                   THE COURT:  Do they have a controlling

17  interest in these -- I mean in the individual --

18                   MR. AGUSTI:  Absolutely, Your Honor.

19                   THE COURT:  -- plants and so on?

20                   I realize it might be ten layers of

21  subsidiaries, but somewhere down there is a plant.

22                   MR. AGUSTI:  Absolutely.  As far as we

23  know, Your Honor, they have a 100 percent interest all

24  the way down.

17

1           And so, basically, if a stock is as it

2  sits today, once we execute that judgment, what would

3  happen is we would have the power to go all the way

4  down to the bottom and do what any 100 percent

5  shareholder of a corporation could do.  It could

6  liquidate assets.  It could allow the assets to run

7  and use -- and dividend up the cash flow.  It could do

8  all of those things that anybody who is a holder of

9  stock of an unrestricted affiliate, if you will, can

10  do.  And what's --

11           THE COURT:  All right.  Let's assume,

12  then, that there's no injunctive relief.  The

13  transaction goes through the way they're talking

14  about.  And then we get down the road.  All these

15  defaults have occurred.  You've tried to exercise all

16  your rights under a judgment against DHI, but you get

17  nowhere.

18           And so as part of your enforcement

19  strategy, you're pursuing this case not in an

20  injunctive mode, but to have a final judgment on the

21  merits that this was -- this transaction was

22  fraudulent or some sort of thing like that.

23           MR. AGUSTI:  Mm-hmm.

24           THE COURT:  Then why isn't it

18

1    sufficient to just wait until that occurs and get

2    whatever remedy comes out of that?

3                    MR. AGUSTI:  There are a couple of

4    reasons, Your Honor.

5                    The first reason, of course, is that

6    our contract claim would be largely frustrated at that

7    point.  We don't have an agreement with those newly

8    created bankruptcy-remote entities.

9                    And so, basically, to the extent

10   that -- so the breach of contract claim that we

11   believe we have, because there would have been a

12   breach of Section 4.2 of the guaranty, that claim

13   would be, as a practical matter, gone, because we

14   would no longer -- because the entity against which we

15   could enforce our rights would at that point be

16   completely insolvent.  Hundreds of millions of dollars

17   in negative cash flow.  So that cause of action would

18   go away.

19                    As to the fraudulent transfer action,

20   Your Honor, what we would try to do is we would seek

21   to essentially transfer -- to pull back, to void the

22   transaction, and pull the asset back into DHI.

23                    But if this were allowed to go

24   forward, Your Honor, we would face some complicating

1    factors.  At that point, presumably, if this

2    transaction were to go through, the third-party

3    lenders to the bankruptcy-remote entity would take the

4    position, I suppose, that they had detrimentally

5    relied upon the fact that this entity had the asset at

6    the time.  And we would then be faced with a bunch of

7    complicating third-party claims on our fraudulent

8    transfer action that would make it more difficult than

9    it would be if we didn't have those transactions

10   before.

11               So that's, Your Honor, the reason why

12   for us, largely, what is now a very straightforward

13   $790 million claim, because there would have been a

14   breach of the guaranty -- and at that point, to be

15   sure, the current senior creditors may well be senior

16   to us, Your Honor, but there is excess value in there

17   that's being transferred over to these other entities;

18   and we would like to have a shot at that excess value.

19               We would not like for that excess

20   value to essentially be encumbered or be in contest

21   with other people for it.  What we would like to do,

22   Your Honor, is to have an active, effective,

23   fraudulent transfer action that prevents our cause of

24   action from being frustrated.

20

1              THE COURT:  But for fraudulent

2    transfer, you'd have to show that conveyances were

3    made for virtually no consideration; that there was

4    nothing in it for DHI and so on.

5              MR. AGUSTI:  Yes, sir.  Yes, sir.  And

6    we're prepared to do that.

7              Your Honor, there's actually two ways

8    of having a fraudulent transfer.  First of all, as we

9    stated in our papers, you have to show reasonably

10   equivalent value -- irrespective of intent, you have

11   to show reasonably equivalent value.  And the

12   reasonably equivalent value in this case would be --

13   there is no reasonable equivalent value.  They

14   essentially concede, Your Honor -- let me back up.

15             Reasonably equivalent value is to be

16   viewed from the perspective of the creditor.  We've

17   cited case law for that proposition.  And that's

18   understandable, Your Honor, because the fraudulent

19   transfer statute is to protect the creditor.  So what

20   the value that's going back to DHI would have to be

21   would be value that is valuable to the creditor, us.

22             Now, what value is going -- there is

23   an excess of value going to the bankruptcy-remote

24   entities.  There is a payment being made to secured

1    lenders, Your Honor, with that.  And that part of the

2    transaction, we don't want to focus on, at least not

3    for the moment, based on the facts that we know.  But

4    there is an excess value going over to the

5    bankruptcy-remote entities.

6                    And on that value, for that value,

7    Your Honor, what they say in their papers is that what

8    they're getting is this stock that, as Your Honor has

9    quite properly analyzed, essentially, is stock that

10    does not give you the normal rights that you would

11    have against an entity.  Essentially --

12                    THE COURT:  But they're getting -- I

13    think they say, We're getting that stock, but we're

14    also getting the benefits that this structure gives us

15    in terms of our own dealings with substitute lenders

16    for our current lenders with whom we've got problems.

17    So we're about to go into default with our current

18    lenders.  If we do this transaction, we may get

19    something back that's a little less than what we had

20    before, but we'll be enabled to make a new loan that

21    gives us all kinds of upside potential.

22                    Maybe they're right, maybe they're

23    wrong, but for a fraudulent conveyance, we don't

24    usually slice it too finely.

22

1              MR. AGUSTI:  Your Honor, I mean, I

2    would love an opportunity to have a preliminary

3    injunction hearing at which we can address these

4    issues in greater length; first of all, let me say

5    that.

6              Second of all, Your Honor, let me say

7    this about what you just said:  Certainly, there is

8    money that's being generated by this transaction to

9    pay off secured lenders.  And there's no showing that

10   this is the only such transaction that could be

11   entered into to pay off those secured lenders.

12             But there is an excess of value over

13   and above what's being -- which is not very fine.

14   It's hundreds of millions of dollars, Your Honor.  And

15   it's going over to these new bankruptcy-remote

16   entities; and these new bankruptcy-remote entities are

17   only paying back this stock for it.

18             And so, Your Honor, you do have to, in

19   looking at the reasonably equivalent value, you have

20   to look at the reasonably equivalent value for what?

21   Basically, they are receiving a payment on the secured

22   loans for the transfer from the new lenders.  But,

23   basically, that's not -- that is not reasonably

24   equivalent.  And I think that anyone, looking at their

23

1   papers, would have to conclude that.  Because they're

2   getting a loan that's in excess of the loan necessary

3   to pay their current secured lenders.

4                    And so, basically, Your Honor, to the

5   extent that there is additional assets, assets over

6   and above what it took to pay their current secured

7   lenders, Your Honor, that excess -- the only thing

8   that they're getting, and they say time and again,

9   their rationale for why there is reasonably equivalent

10  value, is just because they're getting the stock,

11  which, as Your Honor has analyzed, is actually not --

12  it's this stock in this restricted affiliate that can

13  sort of go on its own.

14                   So to creditors like -- perhaps to

15  them, in ten years, that might be of some value.  But

16  to a creditor like us, somebody who is a hostile third

17  party, that stock potentially never will have any

18  value because, essentially, the bankruptcy-remote

19  subsidiaries can simply thumb their nose at their

20  technical owner.

21                   THE COURT:  I appreciate that; and I

22  know that we've got a limited amount of time, so --

23  but, you know, you're in the position of a creditor.

24  You can't make the kinds of arguments of fiduciary

CHANCERY COURT REPORTERS

24

1   duties and all those kinds of things which might get

2   into interesting issues of the sort that you were

3   talking about that creditors, as your client, would

4   look at, Well, what are their rights under the

5   contract?

6                   And, unfortunately, it sounds like you

7   don't have all that strong a contract in the sense

8   that you don't have the kinds of things that people,

9   according to the defendants, anyway, who engage in

10   these kinds of transactions routinely get for

11   themselves.

12                   And one possibility is to think, Oh,

13   maybe nobody remembered to think about it.  Another

14   way is that it's sophisticated parties on both sides;

15   presumably, it was negotiated; and they got whatever

16   they could get.  And your guys got something that

17   protects you at the level of DHI, but it doesn't

18   protect you against things that the subsidiaries do,

19   other kinds of transactions, other kinds of

20   refinancing.

21                   So give me your argument on that.

22                   MR. AGUSTI:  If I may, Your Honor,

23   first of all, Your Honor, this is a factual issue.

24   This is totally a factual issue.

25

1              I just want to make this point again:

2    They note in their papers, which they had the weekend

3    to write, they note 37 provisions that might have

4    avoided this.  In our three hours that we had to put

5    together our paper, we point to one provision that

6    they could have put in the document that would have

7    avoided this dispute.

8              And that is for them to say in the

9    document that notwithstanding the foregoing,

10   notwithstanding the foregoing, this anti-transfer

11   provision shall not limit the ability of indirect

12   subsidiaries of DHI to transfer assets.  Your Honor,

13   very simple.  Why didn't they write that down?

14             Your Honor, what they're asking you to

15   do is to read an anti-transfer provision in such a way

16   so that it means nothing.  You can't read -- New York

17   law tells us -- heck, the law in virtually every state

18   tells us that you can't read all of the meaning out of

19   a contract lightly.

20             So if it was their intent at the time

21   that they entered into that contract to read all the

22   meaning out of the anti-transfer provision, it was

23   incumbent upon them, not us, to write that expressly

24   in the contract.

1              All of those provisions to which they

2    referred, if they had suggested any of those 17

3    provisions to which they referred, maybe it would have

4    raised this issue that they wanted a restriction on

5    the ability of indirect subsidiaries; but, simply,

6    they simply did not.

7              In the absence of an express

8    provision -- in their absence, because we're actually

9    asking you to interpret the contract in a way that

10   makes sense.  We're saying, Hey, we've got a guaranty.

11   We've already had control of the two assets in which

12   we invested.  The only possible purpose of this

13   guaranty would be to control other assets.  And so the

14   anti-transfer -- according to them, they knew we all

15   held all our assets indirectly.

16              So there's no way -- given the

17   opportunity to show this at a preliminary injunction,

18   Your Honor, there is no way that PSEG would have

19   agreed to a guaranty with an anti-transfer provision

20   that allowed DHI to transfer away all of their assets

21   on the day after signing the guaranty.  There is just

22   simply -- it simply is not plausible.

23              So if they want --

24              THE COURT:  You have probably 6

27

1  minutes.

2              MR. AGUSTI:  Yes, sir.

3              THE COURT:  6 minutes.

4              MR. AGUSTI:  You would like me to

5  finish in 6 minutes?

6              THE COURT:  Right.

7              MR. AGUSTI:  Yes, sir.

8              Well, Your Honor --

9              THE COURT:  Let me -- just so you

10 know, I'm thinking that given the way this turned out

11 where the transaction was announced on July 11th and

12 this case didn't get filed until July 22nd, and the

13 emergency date is this Friday, July 29th, I'm not

14 going to treat this as a TRO in the sense of our usual

15 "all you need to show is a colorable claim on the

16 merits."

17             I think this is not the typical TRO

18 situation where you don't know anything about the

19 facts and things of that nature.

20             I'll treat it as a TRO in terms of the

21 decision point is, Do we need a put a stay of some

22 sort in place, a status quo order in place, so that we

23 can have a prompt preliminary injunction hearing?  But

24 I will require your side to show that it's likely to

1  succeed on the merits.  And that's the way I'll write

2  it.

3          I'll justify the reason I'm doing that

4  is because you took your time getting here.  And it

5  might have been a good idea, it might have been a bad

6  idea as to the way you did it.  I don't see it as

7  laches, but I'm not going to give you the benefit of

8  the doubt.

9          The other thing is I do want your

10  point of view as to what would the bond be if I

11  entered a temporary restraining order.

12          MR. AGUSTI:  Your Honor, I'll answer

13  the last question first.

14          Your Honor, our view is -- and I just

15  want to go back to this point, if I may, on the harm.

16  Right now, Your Honor, we do not have even a statement

17  that they're going to lose financing if the TRO is

18  entered for the limited period of time that it takes

19  to consider a preliminary injunction.

20          So even if you are treating this for

21  purposes of proof as a preliminary injunction, it will

22  still be of limited duration.

23          And so, Your Honor, since they have

24  not --

1           THE COURT:  How much time do you think

2   you would need to put on a preliminary injunction?

3           MR. AGUSTI:  Your Honor, we will do it

4   as quickly as you think we have to do it.  We want an

5   opportunity -- Your Honor, we've had three hours to

6   respond to their opposition.  We would like an

7   opportunity to have a proper hearing.  So as fast as

8   you think you need for it to be done, we'll have it

9   done that fast.

10          THE COURT:  So it could be a matter of

11  weeks.

12          MR. AGUSTI:  We could do it in ten

13  days.  We can do it easily in ten days.

14          So, Your Honor, if Your Honor has

15  hesitations about that, we will do it as fast as you

16  need it to be done.  We would like for you to have the

17  benefit of our full thoughts on what's been done here.

18          And I might say, Your Honor -- and I

19  accept what you said -- I will say that we filed our

20  action, what we thought was our TRO request, what we

21  thought was eight days before the scheduled closing

22  date.  There's been no representations that pricing

23  has happened.  I didn't see that in any of the papers.

24  So I don't know that they're prepared to close on

30

1    July 29th.

2              There is really almost no proof that

3    they are actually going to suffer irreparable harm.

4    There are general statements, extremely general

5    statements, about what harm might come to them.  There

6    is no specific proof as to harm, Your Honor.  And I'm

7    only asking for a very short period of time.

8              So, Your Honor, on the merits, we

9    believe that the anti-transfer provision is violated

10   here.  And we think their interpretation of the

11   anti-transfer provision is implausible.

12             And we would point to the cases that

13   we noted in our brief about both the quantitative and

14   qualitative.  There can be no question that this is a

15   qualitatively very important transfer.  And there is

16   no question that it's quantitatively a very important

17   transfer.  It's a transfer of billions of dollars in

18   assets.

19             And so we think, Your Honor, that

20   under any interpretation of these anti-transfer

21   provisions, that they would be violated.

22             Going to the fraudulent conveyance,

23   Your Honor, let me just very quickly blow through

24   insolvency.  There's no dispute, really, about

CHANCERY COURT REPORTERS

31

1   insolvency.  Once this transfer occurs, DHI will be

2   insolvent.

3                    As Vice Chancellor Lamb laid out in

4   the Mitsubishi versus Babcock case, the fact that they

5   have got affiliates that have the capacity to send

6   money to them does not save them from insolvency.

7   That's a holding of this Court.  And so it's clear

8   that when this transfer -- and it's in our papers.

9   It's clear --

10                   THE COURT:  Before the transfer, all

11  these properties were owned indirectly by DHI; and

12  after, they're going to be owned indirectly by DHI.

13                   MR. AGUSTI:  Yes, sir.  But the

14  difference, of course, is that before, those

15  properties were -- DHI had the power to call up cash

16  flows from those properties.  In fact, we feel that

17  they must have been doing it up to now or else they

18  wouldn't have been able to service --

19                   THE COURT:  Didn't you just tell me a

20  second ago that it doesn't matter if they could do

21  that for purposes of insolvency?

22                   MR. AGUSTI:  It doesn't matter for

23  purposes of insolvency if an affiliate has the right

24  to this entity or not.  If they still had the

1    100 percent control of the subsidiary, Your Honor, so

2    that it could actually command that those affiliates

3    send money up to them, then, no, they would not be

4    insolvent, Your Honor.

5                    THE COURT:  So the way you're looking

6    at it, let's say in November, they've got these large

7    bills coming due, 78 million for one of the plants and

8    another number for the other --

9                    MR. AGUSTI:  Right.

10                   THE COURT:  -- they could have gotten

11   that money under the old structure from any one of a

12   number, perhaps, of their subsidiaries.

13                   MR. AGUSTI:  Yes.

14                   THE COURT:  But with this new setup,

15   they're going to have no -- they have no control of

16   whether they get any money from anybody except the two

17   failing plants.

18                   MR. AGUSTI:  Exactly, Your Honor.  It

19   would be like a parent, for example.  A subsidiary

20   that's insolvent can't save itself by its parent

21   having a lot of assets because the parent has no

22   obligation and the subsidiary has no power to cause

23   the parent to bring assets down to it.

24                   We're in a similar situation here.

33

1   The parent in this case, because of the bankruptcy-

2   remote scheme, has no power to pull the assets up.

3   And so, therefore, it's going to find itself in a

4   situation where it is cash-flow insolvent.

5                   But for whatever -- you know, charity,

6   the affiliate which has no obligation to do it might

7   give it.  And so that, Your Honor, is not sufficient.

8   It's insolvent.  And so, basically, that factor is

9   clearly satisfied.

10                  The other factor, Your Honor, which we

11  discussed a second ago about reasonably equivalent

12  value, this same stock which is to be evaluated for

13  the purposes of reasonably equivalent value in our

14  hands, in our hands, this stock, which is what they're

15  receiving for the excess value, if you will, of the

16  transfer, is worthless to us.  And so there is no

17  reasonably equivalent value that's being transferred

18  to our clients for it.  And, therefore, we believe

19  that, on the facts, we have a fairly straightforward

20  fraudulent transfer.

21                  The other factor doesn't require even

22  those showings.  Even if you have reasonably

23  equivalent value, Your Honor, there is a second way of

24  getting a fraudulent transfer.  And that way is if you

34

1   have a transaction whose purpose it is -- one of whose

2   purposes it is to hinder creditors.

3                    We're being plainly hindered by this

4   transaction, plainly, under the analysis that

5   Your Honor made.  Whether or not they receive

6   reasonably equivalent value, this transaction will

7   hinder us.  And so if it -- indeed, it is structured

8   to hinder us.  It is structured to put us outside of a

9   ring-fence.  And that ring-fence, we think, and they

10  must think as well, is --

11                   THE COURT:  Okay.  And just remind me.

12  I saw mention of a $225 million cap, maybe an annual

13  cap in distributions, and a $270 million amount that

14  was coming due.

15                   MR. AGUSTI:  Yes, sir.

16                   THE COURT:  Is the 270 million what

17  would be owed to your company, you, or to all

18  creditors?

19                   MR. AGUSTI:  No.  To all creditors,

20  Your Honor.  So, basically, even if they decided to go

21  ahead, assuming that version of the facts, if they

22  decided to go ahead and contribute up to the

23  225 million, clearly, they wouldn't have enough.

24                   THE COURT:  All creditors would have

35

1   to take a haircut.

2                   MR. AGUSTI:  That's right.  So,

3   basically, they would be clearly insolvent then.

4                   So, Your Honor, we think we have,

5   either under theory number one, which requires no

6   reasonably equivalent value and insolvency; or, reason

7   number two, which is basically a construct to obstruct

8   and hinder creditors, that we satisfy the Delaware

9   Fraudulent Transfer Act statute.

10                  THE COURT:  Why don't we hear from the

11  other side.

12                  MR. AGUSTI:  Yes, Your Honor.

13                  MR. KURTZ:  Good afternoon,

14  Your Honor.  I'd like to start with what we stressed

15  in our papers, which, namely, is that the plaintiffs'

16  entire case, including this motion, is based on a

17  misunderstanding or a misstatement of the underlying

18  facts, agreements, and transactions.

19                  And we heard a lot about not losing

20  the forest for the trees.  So what I'd like to do is

21  start off with two very important points which pervade

22  the entire analysis and answer, really, all of the

23  questions and address the reasons, fundamentally, why

24  there is no technical claim here and, perhaps less

36

1  importantly but certainly notably, that there is

2  absolutely no economic prejudice or harm to them,

3  notwithstanding this notion that there is some scheme

4  out here.

5             And the first faulty premise is their

6  position in the papers that DHI owns power plant

7  assets and is going to effectively transfer those

8  assets and leave behind the unprofitable Danskammer

9  and Roseton.  And of course, that's not true.  As

10 we've put in with evidence, there is no direct

11 holdings whatsoever; nor is there going to be a

12 separation under DHI of either of those facilities.

13            DHI today, indirectly, through a

14 series of subsidiaries, owns 17 power plants, many of

15 which are profitable.  And following the

16 reorganization, DHI will own 17 power plants, the very

17 same power plants; and they will be equal in value to

18 what they're equal to today except to the extent that

19 the value is enhanced by reason of its new liquidity

20 and its new structure.

21            So it's important to understand that

22 not only is there technically not a transfer but,

23 economically, DHI has the same value after the

24 reorganization that it has today.  It is still the

37

1   indirect owner of all the assets.

2                   So we have an interesting case, and

3   I'll walk through it.  The plaintiffs could not

4   establish a technical breach of the successor obligor

5   or the "all or substantially all" provision.  But

6   what's interesting about it is usually, when you get

7   in these situations, it's because the guarantor is

8   being left with substantially fewer assets than they

9   had; and that's actually not the case here.

10                  There was a notion that it must be a

11  change because why are we resisting?  But as I'm going

12  to get into, we're resisting because it's the

13  plaintiffs that are trying to effect the change.  It's

14  the plaintiffs that are trying to substitute the

15  guarantor as being DHI with a guarantor of DHI plus a

16  bunch of subsidiaries that are not guarantors today;

17  that haven't pledged any assets; that there's no

18  security interest in; and otherwise.

19                  The second basic faulty premise here

20  is this notion that this bankruptcy-remote structure

21  somehow shields value from creditors.  And that,

22  likewise, Your Honor, is simply not true.  As I've

23  just mentioned, all of the same assets are within

24  DHI's indirect ownership.

1          The way this will work is you will

2    have bankruptcy-remote subsidiaries that will directly

3    or indirectly own the power plants.  What that

4    accomplishes is permitting those profitable

5    subsidiaries to continue to operate outside bankruptcy

6    even if DHI or another troubled affiliate is forced to

7    file.

8          It does not mean, of course, that the

9    value of those bankruptcy-remote entities is removed

10   from the bankruptcy estate.  To the contrary, the

11   estate, if it was DHI, would continue to own what it

12   always owned, which is equity in entities that were

13   holding companies that ultimately owned the power

14   assets; and they would still have that.

15          And the way one would liquidate that

16   claim, of course, is that you would have a default by

17   a borrower, then a default by the guarantor, then a

18   lawsuit against the guarantor, then a judgment, and

19   then execution.  And the execution would be against

20   the equity.

21          And that equity would not, of course,

22   permit you to reach down and through corporate

23   entities and raid their bank accounts; but it would

24   permit you to effectively satisfy your judgment

39

1  because you would be able to sell the stock, which

2  includes, of course, the value of the assets.

3                So at the outset, there is not even

4  harm here.  There is just an interest in I guess

5  creating better paper and better security that doesn't

6  exist today.

7                And with that, what I'd like to do is

8  move through the technical elements, of course,

9  starting with the likelihood of success on the merits

10  because this is so clear that I think it really sheds

11  light on the rest of what we're going to do today.

12                And the first point, and this is

13  dispositive, is what I'll call the ASA -- "all or

14  substantially all" provision; it could be called the

15  successor obliquer clause as well -- applies only to

16  DHI and not any subsidiaries.

17                Notably, there are standard ASA

18  provisions that are all set forth in the model

19  indenture which everybody uses to draft indentures,

20  and which they've been recognized by the Courts in

21  numerous decisions.  And they provide for two forms.

22  One form is where you lock up just the guaranty, DHI;

23  and in the other form, you include the subsidiaries as

24  well.

40

1              The parties here agreed only to the

2     form that applied to DHI and not to the subsidiaries.

3     Interestingly enough, that's not the more common form.

4     So what the parties were able to negotiate here for

5     was the more restrictive form.  And that's how --

6              THE COURT:  Now, I don't have anything

7     in the record.  Maybe I do.  I've read the briefs.  I

8     haven't read all the affidavits and everything.  So I

9     don't know if there is anything in the record that

10    indicates that that was an explicitly negotiated-for

11    provision.

12             MR. KURTZ:  Your Honor, we certainly

13    did not go back and include the drafting history.  And

14    the reason we didn't do that is because the provision

15    is unambiguous on its face; and so, of course,

16    extrinsic evidence is inadmissible.

17             What we did include in the record were

18    other forms of indentures that included the language,

19    including the model form of indenture --

20             THE COURT:  I've seen those.

21             MR. KURTZ:  -- which includes the

22    expansion to the subsidiaries.

23             THE COURT:  All right.

24             MR. KURTZ:  And I would note, just

1  because there is another rule of construction which is

2  relevant here, and that is when parties deliberately

3  include a subsidiary in one provision and not in

4  another, they are, of course, deemed to have done that

5  deliberately.

6           And Section 4.3 of the very same

7  guaranty, which is the very next section after the ASA

8  provision, which is 4.2, specifically includes not

9  only the guarantor but also the guarantor's

10  subsidiary.  So the parties, when they intended to

11  include within a restriction both the guarantor and a

12  particular subsidiary, have, in fact, done so.

13           Now, the only response that we have

14  gotten to any of this, Your Honor, and it was stated a

15  couple of times today, was, That sounds like a bad

16  deal.  Now, put aside, as I'm going to get to, because

17  there is actually no diminution in the value of DHI

18  and no transfer away of any DHI asset -- it's not even

19  true -- but, of course, that's just not how the law

20  works.  Making a bad deal doesn't make it an ambiguous

21  deal or subject to reformation.

22           And even though I wouldn't normally

23  feel like I needed to cite a case for that

24  proposition, I thought it was interesting that Vice

42

1    Chancellor Noble in the Great-West case just this year

2    on January 14th addressed this precise argument with

3    almost the precise terms.  You'll note that the

4    plaintiffs in theirs papers called it an absurd

5    construction because they didn't get enough.

6                    And with Your Honor's permission, I'll

7    read a brief passage:

8                    "Great-West also attempts to encourage

9    a conclusion that the language of the default Expense

10   Assumption escalator is ambiguous by insisting that

11   the Defendants' interpretation produces an

12   unconscionable and absurd result.  That Great-West

13   does not like the result, however, does not render it

14   ambiguous if the result is required by the plain

15   language of the contract."

16                   And it goes on to say that lawyers and

17   parties have to give meaning to the words that they've

18   selected.

19                   So, initially, Your Honor, we know

20   there is more than one version of this.

21                   THE COURT:  Let me -- they seem to be

22   making the argument that -- I guess it's one of the

23   principles of contract construction that if there are

24   two ways to interpret the contract and one way leads

CHANCERY COURT REPORTERS

43

1   to an absurd result -- which, normally, it doesn't,

2   but our Supreme Court once in a while has found

3   that -- then you don't go in the direction of the

4   absurd result.

5              They seem to be saying that, you know,

6   for them to insist on DHI being a guarantor, and

7   without having in mind that that was going to include

8   the hard assets and not just ownership in this stock,

9   would be considered absurd.

10             But it sounds like what you're saying

11  is that there are these two different forms so that

12  even if it's a minority form, it's a recognized

13  position that some people come to.

14             MR. KURTZ:  It is, Your Honor.  And

15  nor is it absurd.  There is nothing absurd about --

16  some people loan, as did plaintiffs, on an unsecured

17  basis.  Some get a secured basis.  You can't come in

18  and say, Why would I have done that?  They can get rid

19  of all their assets and I won't have anything.  Well,

20  because you did do that.

21             Some people get transfer restrictions

22  on guarantors at the issuer itself and some get them

23  with respect to their affiliates as well.  It doesn't

24  make it absurd.  It just makes it a commercial

44

1   transaction.

2              Separately, what I find interesting is

3   it doesn't happen to have any effect.  I'm not quite

4   sure why it would be absurd to say, You are left with

5   your remedies against DHI which, following the

6   reorganization, will hold each and every asset that it

7   held before the reorganization.  You'll just be moving

8   bubbles around in the corporate organizational chart.

9              And you will include bankruptcy-remote

10  protections which do not devalue the stock which is

11  subject to execution.  It would, in fact, enhance the

12  value of the stock.

13             Again, this is really a critical

14  implication that's wrong by them.  It's the idea that

15  if you make yourself bankruptcy-remote, that you pull

16  the assets out of the structure and it's not

17  available, the value of the assets are no longer

18  available to DHI.  That's not true.

19             THE COURT:  Do I have any evidence in

20  the record at this point -- I realize we're one day

21  into the case -- that I could rely on for that?  Are

22  there any affidavits to that effect?

23             MR. KURTZ:  Yes.  We have put in an

24  affidavit that says all of this, Your Honor, that says

45

1   that we will -- that DHI indirectly owns through a

2   series of subsidiaries all of the power plants at

3   issue; and following the reorganization, DHI will

4   continue to own through a series of subsidiaries the

5   very same power plants.

6                    THE COURT:  I'm with you on those two,

7   but I think you went a little further.  And I thought

8   I heard you say that there is no devaluation of stock

9   when that stock happens to be in a bankruptcy-remote

10  entity.  In fact, it might actually have higher value.

11  Is there any evidence of that?

12                   MR. KURTZ:  I'm not sure that we put

13  it in evidence, but let me explain it this way.  It's

14  not sort of magic capsule that you jump into.  All it

15  really is is certain restrictions which lenders

16  require in order to provide better terms and a loan,

17  in this case, that imposes into the structure an

18  independent director.

19                   Frankly, here in Delaware, in Chancery

20  Court, I'm not sure I ever heard anybody complain

21  about the following of corporate governance at the

22  subsidiary level and the concern with the use of an

23  independent director to ensure that the companies

24  operate the way they operate.

1          But under normal Delaware law, the

2  holding company owns the shares of its direct

3  subsidiaries and right down the line.  That doesn't

4  change because there is an independent director in the

5  corporate governance.

6          And then in terms of why is it worth

7  more, because you can't be pulled into bankruptcy.

8  Then you operate outside the bankruptcy, and you've

9  entered the bankruptcy filing, which means your

10  decisions aren't subject to review and billing by

11  courtrooms full of professionals and judicial

12  oversight.

13          THE COURT:  All right.  I understand.

14          MR. KURTZ:  So that's why you never

15  really get past their claim, at least under Section

16  4.2, because DHI isn't making the transfers.

17          Now, just for the sake of

18  completeness, they've moved on and talked about, Well,

19  let's just assume that somehow it applies to everyone.

20          And by the way, I pause on the notion

21  that a loan agreement is supposed to contain

22  provisions that don't restrict the borrower but,

23  rather, delineate all the things the borrower can do.

24  That is a novel position that has never been stated in

47

1   court, literature, or even in casual conversation that

2   I've ever heard about.

3            The way covenants work is they're

4   restrictions on the borrower.  And there is no

5   provision within the credit agreements that say -- or

6   the indentures, that say that DHI can continue to sell

7   power or DHI can get a loan, in fact, if they're

8   permitted to get a loan; that DHI can hire and fire

9   people.  I mean, you don't set forth in a borrowing

10  all the different things that an entity can do.

11           What you do is you negotiate

12  restrictions.  And this restriction was specific to

13  DHI and not the subsidiaries.  You don't need the

14  suspenders on the belt.  You already have the

15  prohibition only on DHI.  You can't extend it to the

16  alternative form by saying, Yeah, but you didn't say,

17  "By the way, when I said DHI, that means DHI and not

18  anyone else."  That goes without saying.

19           THE COURT:  Let me just -- and I

20  apologize to the staff in the sense that it's a bit of

21  an imposition that we're beyond 5:00 this evening.

22           Ms. White, you're free to go if you

23  have buses to catch or other transportation.  Thanks.

24           But that's fine.  But otherwise, what

48

1    I would like us to point to is maybe wrapping up in

2    the 5:30 range, something like that.

3                    MR. KURTZ:  Understood, Your Honor.

4                    THE COURT:  Go ahead.  I'm sorry.

5                    MR. KURTZ:  On sort of the purpose and

6    the idea that even if this was somehow to extend --

7    and it cannot -- to the entire enterprise, the

8    enterprise isn't transferring anything away.  The

9    enterprise is going to have the same assets and the

10   same power plants that it had before.

11                   And the decision that I think is most

12   instructive is Tyco.  And in Tyco, the issuer had four

13   lines of business.  And what they proposed to do in

14   their internal restructuring was to spin off two of

15   those lines of business.  And the Court went through

16   an analysis, and I think it's actually worth quoting

17   the Court on this.

18                   "The Transaction clearly resulted from

19   a decision to sell off some properties made in the

20   regular course of business.  The only liquidation

21   involved in the Transaction was that of TIGSA, a

22   holding company with minimal assets other than Tyco's

23   operating businesses" -- sounds familiar -- "and TIGSA

24   was replaced by TIFSA" -- so there was a change in the

49

1   holding company -- "also a holding company with

2   minimal assets other than Tyco's operating

3   businesses."

4                   "BNY" -- who was the party challenging

5   the indenture trustee in that case -- "argues that

6   Sharon Steel" -- which is the Second Circuit decision

7   everybody looks at -- "applies because of the

8   liquidation of TIGSA," the holding company.  Which

9   we're not getting a liquidation.

10                  "But the operative entity with respect

11  to the Notes is Tyco" -- here DHI -- "not TIGSA.

12  TIGSA was simply a holding company, and it has been

13  replaced by another holding company."

14                  "While UV's noteholders" -- and there,

15  it's the plaintiffs in the Sharon Steel case -- "found

16  themselves expecting repayment from an entirely new

17  entity, here the noteholders still look to Tyco for

18  repayment."

19                  That's on all fours except in one

20  respect.  In Tyco, two important businesses were, in

21  fact, spun off.  In this case, none of the power

22  plants are being spun off.  The enterprise under DHI

23  will look the same after the reorganization, just as

24  it looks today.

50

1          The other case, Your Honor, that I

2   think is worth reviewing is the Hollinger case, Vice

3   Chancellor Strine's case, where, in discussing these

4   issues, he talked about the fact that you would need

5   to have effectively a blow to the heart, to a vital

6   organ, leaving the business disabled, before it would

7   be an "all or substantially all."

8          And here, of course, the business is

9   going to be improved.  It's not going to get a blow to

10  the heart.  If anything, it's going to get a shot of

11  adrenaline to the heart.

12          And what Hollinger then goes on to

13  say, and as everybody, I think, really understands, is

14  that ASA provisions, successor obligor provisions, are

15  not there to prevent corporate internal

16  reorganizations.  They're there to insure that all the

17  assets aren't basically sold off to a third party

18  without having any guaranty on them.

19          And that's really the problem that you

20  have here, Your Honor, which is that the plaintiffs

21  are in the same position, albeit somewhat enhanced,

22  perhaps, but what they'd like to do is change their

23  position entirely.  They'd like to have new covenants,

24  ones that they feel maybe they should have had to

51

1  begin with.

2                And we identified probably not 37 or

3  17, as counsel said, but we identified standard

4  garden-variety customary types of covenants that are

5  used to protect against, you know, the erosion of

6  assets and the like that were not included here.

7                And I think there is one that is of

8  particular import; and that is the provision -- and

9  it's in the model indenture, and we've cited cases on

10  it as well on Page 26 of our brief -- but the

11  provision that limits the ability of the borrower to

12  restrict the payment of dividends from a subsidiary.

13                And that is -- when you get past this,

14  what they keep focusing on, Well, what about the

15  dividends from the subsidiaries?  Those were

16  effectively unrestricted before.  Now they're being

17  restricted.  So they didn't get one of those and they

18  can't get them now.  That's got nothing to do with the

19  transfer of assets, the provision at issue.  That's a

20  different kind of clause.

21                But just to give the Court the comfort

22  that you might want on it because, unlike some cases

23  where you have to make tough decisions on the basis of

24  a technical reading, here, actually, the equitable

1   decision follows the technical reading.

2                    And the issue here is what is the

3   reorganization doing, if anything, to change the

4   plaintiffs' standing?  And it's doing nothing.

5   Because as a matter of corporate law, first, as a

6   matter of corporate law, it's a subsidiary's decision,

7   not DHI's decision, as to when to dividend a payment

8   or distribute a payment up to the parent.  That's not

9   something DHI controls.  And that's corporate law.

10   People come here to Delaware and incorporate to insure

11   that that is the law.

12                    Secondly, Your Honor, this restriction

13   on subsidiaries in the bankruptcy-remote entities,

14   this is not in an LLC agreement.  This is not

15   corporate governance.  This is something that's

16   contained in a credit agreement.  And that credit

17   agreement is with respect to senior secured debt.  And

18   so the senior secured lenders are entitled to be

19   repaid before the unsecured lenders in any case.  And

20   once they are repaid, then all these restrictions go

21   away.  So once the credit agreement goes away, the

22   restrictions go away.

23                    So even though this could easily be

24   built into the LLC agreement, it's not.  So it's not a

53

1   corporate governance issue.  It's a loan.  And there

2   is no restriction whatsoever on the incurrence of

3   senior secured debt in any amounts that DHI chooses to

4   incur.

5                    Even if DHI could cause the

6   subsidiaries to otherwise pay a dividend, which is

7   sort of the notion here, it's certainly under no

8   obligation to do so.  Plaintiffs have no right to

9   cause the parent, to cause the subsidiary, to

10  dividend.  So they're not losing any right because

11  there is a restriction in a credit agreement.  That's

12  not a right that exists for them today.

13                    As a matter of law, a subsidiary is

14  not required to make dividends in order to pay a

15  judgment against a parent, which is obviously what the

16  plaintiffs are trying to do here.

17                    So in the normal case, no

18  reorganization, a judgment against DHI, DHI has no

19  obligation to dividend up money to pay the judgment;

20  and the law is that the subsidiary is not required to

21  do so.  So, again, no change based on the

22  reorganization in their ability to collect on their

23  debt.

24                    In any case, plaintiffs' argument that

CHANCERY COURT REPORTERS

1  the independent manager has some veto right on

2  declaring dividends is wrong.  And the only support

3  that the plaintiffs cite for this is a statement that

4  I made last Friday on two hours' notice before being

5  dragged into an order to show cause in New York

6  Supreme Court on the same subject which has now been

7  stayed.  I made the statement.  I was wrong.

8              In order to insure that this is clear,

9  Your Honor, if you simply look at the governing

10  document, it says, "for the avoidance of all doubt,

11  there is no veto right."

12              So you go through all of this, and

13  there is no change whatsoever.  There is no right to

14  the dividend.  There is no bar to the dividend based

15  on the bankruptcy-remote structure.  There is no harm.

16              And that brings me, Your Honor, and

17  I'll try to move a little faster on this stuff, to the

18  fraudulent transfer case.  There seems to be some

19  allegation that we weren't disputing this.  That's, of

20  course, wrong.  There is no transfer.  There is no

21  transfer by DHI, so DHI could not have committed a

22  fraudulent transfer.

23              If a subsidiary of DHI makes a

24  fraudulent transfer, then that subsidiary is subject

1    to a lawsuit.  You don't sue a parent company based on

2    the conduct of a subsidiary.  So to start with, you

3    have the wrong party.  They're not entitled to prevent

4    transfers.  They don't have standing on transfers with

5    respect to subsidiaries.

6                    As to the parent, as I've already

7    said, the parent now owns the indirect interest in all

8    these power assets through subsidiaries, and it

9    continues to do so.  So the fair value, it's starting

10   the day with the same value it's ending the day.

11   Before the reorganization, it has the full enterprise

12   value of all of its subsidiaries.  At the end of the

13   day, it has the full value of all of its subsidiaries.

14   It goes from the left pocket to the right pocket.  You

15   can go find it on an org chart, but that doesn't mean

16   it's a transfer.

17                    And then the last point on the

18   transfer, there was a lot of argument about the poor

19   position that the plaintiffs will find themselves in

20   following the reorganization because of the poor

21   performance of the direct borrower's assets as opposed

22   to those under DHI.  And I want to clear the record up

23   on this because, of course, it doesn't make a

24   difference.  It could be the case that DHI is unable

56

1    to pay a penny under the guaranty, but if it's not a

2    transfer of all or substantially all of the assets or

3    a fraudulent transfer, it's not before the Court.

4                    But, again, in the interest of at

5    least making sure the Court is aware of the actual

6    facts as opposed to the allegations, there is an

7    unrestricted -- there is an ability to provide

8    dividends unrestricted in use up to DHI in the amount

9    of $225 million per year.  So no change with respect

10   to that 225.

11                   There is, in addition to that, on the

12   closing of the refinancing, a transfer of $400 million

13   to a DHI direct subsidiary outside the

14   bankruptcy-remote entity subject to the same

15   non-restriction on use as the 225.  So to the extent

16   DHI has the ability to access dividends from beneath

17   it, it will still have that ability with respect to

18   400 million.

19                   In addition to that, there is a direct

20   or an indirect subsidiary of DHI that has the right to

21   sell 20 percent of GasCo.  GasCo is valued at

22   approximately no less than 2-1/2 billion dollars.

23   20 percent of 2-1/2 billion dollars is $500 million.

24   That's not within the bankruptcy-remote entity and

57

1    there is no restriction on that use.

2                         You add those numbers up over the four

3    years before the maturity on the indentures at issue,

4    the first maturity date, and you come up with

5    $1.8 billion of assets that are available to the

6    extent their dividended up without concerning

7    ourselves with bankruptcy-remote structures; and

8    that's as against a $1 billion obligation to the

9    plaintiffs.

10                        So we're not even talking about a

11   situation where there is insufficient assets of DHI,

12   necessarily, in order to pay all the debts as they

13   come due.

14                        Irreparable harm, obviously, that's

15   usually the price of entry.  They've not established

16   any.  What they're trying to do is cut a new deal.

17   But let's talk about the balancing of the equities

18   because the statement was made, We should just have a

19   temporary restraining order but wait ten days, have a

20   preliminary injunction.  They haven't satisfied the

21   standards, and there is going to be enormous problems.

22                        The capital markets in this country

23   have been up and down for years.  There are

24   prognostications -- excuse me -- people have predicted

1   that there may be a double-dip recession.  Our country

2   may go into default early next week.  Greece, Italy

3   and Ireland have gone into default.

4                   When financing is available in the

5   marketplace, you need to take it.  DHI is in a

6   difficult position.  It has very little access to

7   capital, which it needs at this juncture.  And it has

8   already publicly announced that it is at risk of

9   tripping a covenant default in Q3 or Q4 of this year,

10  which will bar all drawings under its existing

11  facility.

12                  In addition to that, that will

13  cross-default across the enterprise, including a

14  $3 billion indenture.  The company will be at material

15  risk of having to file for bankruptcy, which is going

16  to damage all of its shareholders, all of its

17  subsidiaries, and all of its stakeholders, including

18  the plaintiffs.

19                  And the cavalier notion that if they

20  get to nose around long enough, perhaps they'll find

21  something to support a TRO, is, frankly, misguided.  A

22  lot is riding on this.

23                  A decision by the Chancery Court in

24  Delaware that there is a likelihood of success on the

1   merits will reverberate through the capital markets.

2   I can all but guarantee we will not be able to close

3   the financing, and certainly not on the terms that

4   have been negotiated.

5                  And when you have to move your

6   interest rates, as you might have to do if you're not

7   bankruptcy-remote, by 4 points on a $1.7 billion

8   facility, you're talking about real dollars, even if

9   the financing remains available.

10                 So a lot is riding on this.  This is

11  not an opportunity for somebody to try to improve

12  their covenants.  It is not a free look and a free

13  discovery ride until we can get ourselves into a

14  preliminary injunction hearing.  We have the record.

15                 Your Honor has recognized that by

16  reason of the timing here, you're going to apply the

17  preliminary injunction standards anyway.  Frankly, I

18  think it would apply because you have the guaranty in

19  front of you, the transaction as has been announced in

20  front of you, so I think you have the facts anyway.

21                 And there is no free look-see through

22  discovery without a material damage to all the

23  stakeholders.  We cannot walk out of here with a TRO

24  and have any expectation of being able to close the

60

1   refinancing.

2                   So the balancing of the equities

3   weighs overwhelmingly in our favor.  I can't think of

4   a way to protect against that with a bond for sure

5   because bankruptcy includes a lot of qualitative

6   matters that are far outside dollars and cents.  I can

7   tell you it involves a lot of dollars and cents.  But,

8   today, we think we will have financing available for

9   closing shortly of 1.7 billion; and I suppose a bond

10  at 1.7 billion will provide replacement financing if

11  we can't close.

12                  THE COURT:  All right.

13                  MR. KURTZ:  Thank you, Your Honor.

14                  MR. AGUSTI:  Your Honor, I recognize

15  staff has to leave and I will make my points very

16  briefly.

17                  Your Honor, I would implore you to

18  consider this as a TRO application.  Your Honor, we

19  filed our papers three business days, really, after we

20  were told that our asset -- that our guaranty would

21  not be assumed.  That was not until late July 15th, a

22  Friday.  Your Honor, we have done everything we can in

23  an extremely complicated case to try to put the case

24  together before you as soon as possible.

61

1        And, Your Honor, this oral argument

2  today emphasizes why it's going to be important to try

3  to give the parties a very limited amount of time to

4  do work they need to do to get the evidence before

5  you.  We've heard a tremendous amount of testimony by

6  counsel as to what the parties intended at the time.

7  We are trying to decipher from looking at model books

8  what the parties intended at the time.

9        Your Honor, we believe that it is

10  absurd, if you will, to enter into a guaranty, as a

11  logical matter, to enter into a guaranty knowing, as

12  they say that we knew, that all the assets were held

13  indirectly, that we intended for that guaranty not to

14  restrict the ability of the indirect subsidiaries to

15  transfer the assets.

16        That is, under any -- he's saying

17  that -- don't worry about it.  In this case, there is

18  no real transfer.  Of course, we've discussed ad

19  nauseam that there really is a change in the person

20  who holds these assets and, therefore, a change in

21  what that stock means to us.

22        But under their interpretation of this

23  provision, Your Honor, they don't have to just

24  transfer it to somebody in their corporate family.

62

1   They can transfer it to anybody, anywhere.  Because,

2   Your Honor, it's only indirect because they say that

3   this doesn't apply at all to assets held by indirect

4   subsidiaries.

5               And so, Your Honor, before you reach

6   the decision that they have a substantial likelihood

7   of success on the merits on that kind of an

8   interpretation, I implore you that we actually get

9   some evidence in front of you as to what the parties

10  actually negotiated in reaching this transaction.

11              Your Honor, counsel has indicated that

12  they faced some difficulties in the third quarter and

13  fourth quarter and that they may have defaults under

14  their credit facilities, but, Your Honor, not in the

15  next ten days.

16              Your Honor, in the next ten days,

17  which is all that we require -- we can even do it in

18  less if Your Honor thinks -- required for us to put

19  together the papers necessary for the preliminary

20  injunction hearing, all we're hearing is that Portugal

21  might default on its debt, that United States might

22  default on its debt, and that repercussions of this

23  are going to somehow affect them.  Your Honor, that is

24  not the kind of proof that has ever been found

63

1    sufficient to be irreparable harm.

2              Certainly, if you're balancing the

3    equities and you consider what I think is a somewhat

4    fanciful concept of what could possibly happen to

5    their financing in the next ten days as opposed to our

6    certain, our certain losing of our contract rights on

7    a $790 million guaranty, Your Honor, it strikes me

8    that, at least for the limited period of time that it

9    takes for us to advance the papers in a preliminary

10   injunction, that you should give us the opportunity to

11   do so.

12             Your Honor, I would just make just a

13   couple of other points because I know that time is

14   very short.  One thing about bankruptcy-remoteness

15   that has kind of been misunderstood or perhaps

16   misstated, I think, the fact that you are the

17   subsidiary of a company going into bankruptcy does not

18   mean that you have to go into bankruptcy.

19             They pretend that if you don't have a

20   bankruptcy-remote structure, necessarily, all of their

21   subsidiaries, if DHI files for bankruptcy, would have

22   to file for bankruptcy as well.  That's not true.

23             To give you a colorful example of how

24   that works, many airlines have filed for bankruptcies.

64

1    None of their frequent flyer programs have filed for

2    bankruptcy, which are subsidiaries of those entities.

3    The reason for that is because those programs are

4    profitable, and they didn't want to impose the cost of

5    bankruptcy upon those subsidiaries.

6                    So the issue is that that's not what

7    bankruptcy-remoteness is about.  It's that if you put

8    basically an independent board, and if DHI loses the

9    power to direct what goes on down below, then there is

10   no way that you can control that asset, control that

11   company.  That's why it's bankruptcy-remote.  It's

12   because the bankrupt can't get at it even if it wants

13   to.

14                   But if the proper thing to do is for

15   the companies -- for subsidiaries that are profitable

16   not to go into bankruptcy, they won't go into

17   bankruptcy.  And certainly, we have no desire that

18   anybody go into bankruptcy.

19                   So, Your Honor, what I would ask is

20   that you give us the opportunity to be able to

21   supplement the record and an opportunity to conduct

22   some level of discovery, Your Honor, so we can see

23   these negotiating histories that they're talking

24   about, so we can present ours, so that Your Honor can

65

1   decide for yourself whether the testimony that has

2   been given by counsel is true or whether there are

3   other facts that are true.

4                    Because, Your Honor, let me give some

5   testimony, as long as we're doing that.  It is

6   actually very normal -- I disagree with counsel.

7   Counsel says that covenants go only in favor of the

8   lender.  It's actually very normal for a borrower who

9   wants to make clear that covenants do not reach into

10  certain areas, it's extremely normal for that borrower

11  to make that clear through an express proviso to the

12  covenant.  And that's what we're saying is missing

13  here.

14                   They're claiming that, essentially, we

15  knew that all of their assets were being held in

16  indirect subsidiaries; that, essentially, we were

17  entering into an anti-transfer provision that allowed

18  them to, through their control of the indirect

19  subsidiaries, to move those assets anywhere they

20  wanted to; but that they didn't feel a need to put

21  that in a proviso in the documents.

22                   We believe when Your Honor receives

23  evidence on these issues, that Your Honor will be able

24  to conclude what the answer is and not try to have to

1   extrapolate it from an insufficient record.

2                   So, Your Honor, thank you very much

3   for hearing us on such short notice.  And if the Court

4   has no further questions, I will stop.

5                   THE COURT:  I appreciate very much the

6   efforts of counsel on both sides.

7                   This is -- do you have something also

8   you want to say?

9                   MR. KURTZ:  Your Honor, can I at least

10  make one point?  Because the idea that there would be

11  no bankruptcy and the like for the subsidiaries at

12  this point, there is cross-default provisions; so if

13  DHI files, everyone files.  There is a cross-default.

14  So factually, you should be aware of that.

15                  I think, Your Honor, I had answers,

16  but I know you want to complete; but I at least wanted

17  to make sure that you were aware of that.

18                  THE COURT:  All right.  Thank you.

19                  It's complicated enough that I'll take

20  the matter under advisement.  I do have in mind that

21  Friday is a deadline, at least a possible deadline,

22  and so I plan to make a decision before then.  But I

23  do have a very full week between now and then, also.

24  So exactly the form and when, I'm not positive, but

67

1   sometime between now and Friday, I'll get back to you.

2                     All right.   Thank you.

3                     (Court adjourned at 5:26 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

68

## CERTIFICATE

      I, JEANNE CAHILL, Official Court Reporter for the Court of Chancery of the State of Delaware, do hereby certify that the foregoing pages numbered 3 through 67 contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing in the above cause before the Vice Chancellor of the State of Delaware, on the date therein indicated.

      IN WITNESS WHEREOF I have hereunto set my hand this 25th day of July, 2011.


              /s/ Jeanne Cahill
              ------------------------
              Official Court Reporter
               of the Chancery Court
                State of Delaware


Certificate Number:  160-PS
Expiration:  Permanent