# EXHIBIT 12

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ROSETON OL, LLC and | ) | |
| DANSKAMMER OL, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 6689-VCP |
| | ) | |
| DYNEGY HOLDINGS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Submitted:  July 25, 2011
Decided:  July 29, 2011

Kevin F. Brady, Esq., Jeremy D. Anderson, Esq., CONNOLLY BOVE LODGE & HUTZ LLP, Wilmington, Delaware; Filiberto Agusti, Esq., John F. O'Connor, Esq., Shannen W. Coffin, Esq., Andrew J. Sloniewsky, Esq., STEPTOE & JOHNSON, Washington, D.C.; *Attorneys for Plaintiffs*.

Samuel A. Nolen, Esq., Margot F. Alicks, Esq., RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Glenn M. Kurtz, Esq., Douglas P. Baumstein, Esq., WHITE & CASE LLP, New York, New York; Thomas E. Lauria, Esq., WHITE & CASE LLP, Miami, Florida; *Attorneys for Defendant*.

**PARSONS, Vice Chancellor.**

This case arises out of a sale-leaseback transaction that occurred in 2001. In that transaction, the defendant, an indirect owner of various electric power generating facilities caused its subsidiaries to sell two power plants to plaintiffs, two buyers who simultaneously leased the plants back to two subsidiaries of the seller. Concurrently with the leases, the buyer-lessors entered into two substantially identical guaranties with the seller-lessees. Pursuant to those guaranties, if the seller-lessees default on their lease obligations, their corporate parent is obligated to make such payments. Importantly, the guaranties also contained successor obligor provisions, which restricted the parent's ability to transfer all or substantially all of its assets without first meeting several conditions, including a requirement that the entity succeeding in interest to its assets upon a transfer expressly assume its obligations under the guaranties.

Recently, the power plants involved in the sale-leaseback transaction have become financially imperiled, making it doubtful that the seller-lessees will be able to make their required lease payments going forward. Then, on July 10, 2011, the seller-lessees' parent company announced plans for a proposed transaction whereby it would seek a new credit facility and undergo an internal reorganization. As part of this reorganization, substantially all of its profitable power generating facilities will be transferred from existing subsidiaries to new "bankruptcy remote" subsidiaries, except for the two financially weakened power plants.

On July 22, 2011, the plaintiffs brought this action seeking to temporarily restrain the closing of the proposed transaction on the grounds that it violates the successor obligor provisions of the guaranties and would constitute a fraudulent transfer. For the

1

reasons stated below, I find it more appropriate to analyze the plaintiffs' motion for a temporary restraining order ("TRO") under the heightened standard for a preliminary injunction. Having considered the record before me, I hold that the Plaintiffs have failed to show either a probability of success on the merits of their breach of contract and fraudulent transfer claims or the existence of imminent irreparable harm if the transaction is not enjoined. Thus, I deny the plaintiffs' application for injunctive relief.

## I.    BACKGROUND

### A.    Parties[1]

Plaintiffs are Roseton OL LLC ("Roseton") and Danskammer OL, LLC ("Danskammer"), both Delaware limited liability companies with their principal places of business in New Jersey. Roseton and Danskammer are indirect subsidiaries of Public Service Enterprise Group Incorporated ("PSEG"), a company engaged in various aspects of the electric power business, including generation, transmission, and distribution. In certain contexts, consistent with the Complaint, I refer to Plaintiffs collectively as "PSEG."[2]

Defendant is Dynegy Holdings, Inc. ("DHI"), a Delaware corporation with its principal place of business in Houston, Texas. DHI is a wholly-owned subsidiary of Dynegy Inc. ("Dynegy"), whose primary business is the production and sale of electric

---

[1]    Many of the relevant facts are not disputed. Thus, I have provided citations to the record only where the referenced facts are controverted or to indicate the source of quoted material.

[2]    In the context of the Sale-Leaseback Transaction discussed *infra*, I also refer to Roseton and Danskammer as "Lessors."

energy, capacity, and ancillary services through seventeen operating power plants in six states.[3]   DHI is a holding company that has indirect equity interests in various subsidiaries that own one or more power generating facilities.

## B.    Facts

### 1.    The 2001 Sale-Leaseback Transaction

On or about May 1, 2001, DHI and certain of its subsidiaries entered into a series of transactions with PSEG in which its subsidiaries sold two power generation facilities located in Newburgh, NY, Roseton and Danskammer ("the Power Plants" or "Plants") to PSEG (the "Sale-Leaseback Transaction").[4]   DHI's subsidiaries contemporaneously leased the facilities back from PSEG pursuant to long-term leases and continued to operate them.   Specifically, DHI caused Dynegy Roseton, LLC ("DR LLC"), a wholly-owned DHI single-purpose entity, to sell Roseton Units 1 and 2 to Roseton in exchange for $620 million after which Roseton leased those units back to DR LLC through February 8, 2035.[5]   In unison, DHI also caused another of its single-purpose subsidiaries, Dynegy Danskammer, LLC ("DD LLC") (together with DR LLC, the "Lessees") to sell

---

[3]    Aff. of Margot F. Alicks ("Alicks Aff.") Ex. 1 at 4.

[4]    According to Plaintiffs, the Sale-Leaseback Transaction "allowed DHI to monetize the residual value of the plants and gave PSEG that residual value, and opportunity for future use, while permitting the parties to optimize the tax benefits associated with owning the plants."  Pls.' Op. Br. in Supp. of their Mot. for a TRO ("POB") 7.  Similarly, I refer to Defendant's answering brief as "DAB" and Plaintiffs' reply brief as "PRB."

[5]    Verified Compl. ("Compl.") ¶ 15; Aff. of Scott Jennings ("Jennings Aff.") ¶ 3.

Danskammer Units 3 and 4 to Danskammer for $300 million.  DD LLC then promptly leased those units back from Danskammer through May 8, 2031.[6]

## 2.    The Guaranties

The Sale-Leaseback Transaction contemplated, however, that DHI's subsidiaries' performance under the leases would be supported by something more than just the cash flows generated by the power plants they leased from PSEG.  Thus, simultaneous with the closing of that Transaction, DHI executed two identical guaranties in favor of PSEG (the "Guaranties").[7]  According to Plaintiffs, PSEG secured these Guaranties to avoid the risk of being "left high and dry" if the Plants did not create sufficient cash to permit DR LLC and DD LLC to pay the lease sums due to PSEG.  By doing so, PSEG sought, in effect, to make the proceeds from DHI's other gas and coal assets available to satisfy the lease obligations with respect to the Plants.  Thus, they contend that Guaranties § 2.1 obligates DHI to make the Lessees' lease payments in certain situations where they fail to make such payments.  In particular, § 2.1 states that DHI

> guarantees . . .  on a senior unsecured basis . . . (a) the due
> and punctual performance and observance by the [] Lessee of
> each term, provision and condition binding upon or applicable
> to the [] Lessee under or pursuant to any of the Operative
> Documents . . . and (b) the due, punctual and full payment . . .

---

[6]    Compl. ¶ 16; Jennings Aff. ¶ 3.

[7]    See Aff. of John F. O'Connor ("O'Connor Aff.") Ex. A, Guaranty Dated as of
May 1, 2001 made by Dynegy Holdings Inc. as Guarantor Danskammer Units 3
and 4; *id*. Ex. B, Guaranty Dated as of May 1, 2001 made by Dynegy Holdings
Inc. as Guarantor Roseton Units 1 and 2.  For brevity's sake, I refer to these two
agreements as the "Guaranties" in subsequent citations.

> of each amount that the [] Lessee is or may become obligated to pay under or pursuant to any of the Operative Documents[.]

This provision further states that:

> In the case of any failure by the [] Lessee[s] to perform or observe the Performance Obligations after notice thereof by any Guaranteed Party, [DHI] agrees to cause such performance or observance to be done, and in the case of any failure by the [] Lessee[s] to make Payment Obligations as and when the same shall become due and payable . . . [DHI] hereby agrees to make such payment . . . ; *provided*, that nothing herein shall expand the aforesaid obligations of [DHI] beyond those of the [] Lessee[s] under the Operative Documents."[8]

Another important covenant DHI entered into by virtue of the Guaranties is § 4.2, a so-called successor obligor clause, which limits DHI's ability to merge, consolidate, convey, transfer, or lease its assets without first meeting certain enumerated conditions. In particular, § 4.2(b) provides:

> The Guarantor shall not consolidate with or merge into any other Person, or convey, transfer or lease its properties and assets substantially as an entirety to any Person in one or a series of transactions unless . . . (b) such resulting, surviving or succeeding Person, if other than the Guarantor, shall execute and deliver to the Owner Participant . . . an assignment and assumption agreement in form and substance satisfactory to the Owner Participant . . . by which such resulting, surviving, or succeeding Person shall expressly assume all of the Guarantor's obligations under this Guaranty . . . .[9]

---

[8]     Guaranties § 2.1.

[9]     *Id.* § 4.2.  In addition, the Guaranties, through incorporation of definitions in the Participation Agreement, also define "Person" to include individuals, corporations, and limited liability companies, among others.  *See* O'Connor Aff. Ex. E at 26; *id.*

Plaintiffs contend that this provision prohibits DHI from transferring its assets without ensuring that the Guaranties follow them and that "DHI's $3.4 to $5.8 billion in other power plant assets continue to protect PSEG from the effect of any default" by the Lessees.[10]  DHI argues, however, that it does not directly own multiple power plants; rather, it owns stock in subsidiaries that own stock in subsidiaries that, directly or indirectly, own power plants.  In addition, DHI asserts that the Guaranties did not restrict the actions it may take with respect to its subsidiaries, and that its subsidiaries did not provide any guaranties to the Lessors.  Thus, it claims that PSEG obtained unsecured guaranties from a holding company that imposed few restrictions on the activities that it or its subsidiaries could undertake with respect to its indirectly owned operating assets, even if those activities reduced cash flow to the holding company.[11]

### 3.    The market for electric power and the Power Plants' financial trouble

According to Plaintiffs, the value of a power plant largely depends on the price of electricity relative to its costs, which may include fuel, operating expenses, and

---

Ex. F at 26.  The definitions applicable to the Guaranties also provide that "words importing the singular include the plural and vice versa."  *Id*. Ex. E at 1; *id*. Ex. F. at 1.

[10]    POB 9.  Plaintiffs argue that a principal reason that they agreed to enter into long-term leases with the DHI subsidiaries was that, as they understood it, the accompanying Guaranties provided considerable protection for the Lessors because the Lessors could count on DHI's other assets to ensure performance of the lease obligations.  *Id*.

[11]    DAB 6 (noting that DHI is permitted under the Guaranties to incur unlimited debt and its subsidiaries are not restricted from incurring debt that is structurally senior to the Lessors' Guaranties).

environmental compliance.[12]  Electrical power plants provide energy to the electric grid that transmits energy to electricity consumers; here, the New York Independent System Operator ("NYISO") administers the portion of the electrical grid where the Plants are located.  The NYISO sets prices through a "clearing price" auction whereby electricity generators place bids for a particular time period.  NYISO then dispatches the generators from lowest to highest bids until all power demand is met.  Thus, if a plant's cost of electric energy is too high, it is less likely to be selected by the NYISO for dispatch to its consumers.[13]

Recent discoveries of "massive natural gas reserves in North America" allegedly have caused the price of natural gas, a competitor of electric energy, to decline.[14]  This has caused a concomitant reduction in electricity prices below levels anticipated when the Lessees leased them from PSEG in 2001.  Hence, the revenues the Plants generate are insufficient to pay the financial obligations they previously assumed.[15]

---

[12]    Jennings Aff. ¶ 4.

[13]    *See id.* ¶ 4.  Plaintiffs point out that even if a generator does not sell its energy, it still incurs substantial fixed operating costs.  *Id.*

[14]    *Id.* ¶ 5.

[15]    *Id.*  Roseton has an additional handicap in that it is "oil-fired."  *Id.* ¶¶ 6-7 (noting that the Danskammer Plant is coal-fired).  Because the price of oil has increased greatly in recent years, the price of Roseton's oil is almost always above the NYISO's clearing price so that its energy is not dispatched.  *Id.* ¶ 6.  In 2010, for example, Roseton used only 3% of its capacity and so far in 2011, it has used only 1%.  *Id.*

As such, the Plants have become troubled financially and currently have negative financial outlooks. Considering the lease obligations, the Plants are expected to generate negative cash flows ranging on an annual basis between $46 million to $171 million from 2011 to 2015.[16] Indeed, in 2011, Roseton is forecasted to produce approximately $1 million in positive cash flows before considering its approximately $78.6 million lease payment due in November 2011.[17] Together, the Lessees still owe the Lessors approximately $700 million in lease payments.[18] Plaintiffs allege that the Plants never will produce sufficient cash flows to pay these obligations and so satisfaction of Lessees' obligations will remain "entirely dependent" on the Guaranties and the cash flows generated by DHI's other, more profitable plants.

### 4.    DHI's Proposed Transaction

On July 10, 2011, DHI announced publicly that it intended to pursue a reorganization whereby, among other things, substantially all of its coal-fired power generation facilities would be held by Dynegy Midwest Generation, Inc. ("CoalCo") and substantially all of its gas-fired power generation facilities would be held by Dynegy Power Corp. ("GasCo") (the "Proposed Transaction" or "Transaction").[19] These new entities would be indirectly controlled subsidiaries of DHI and structured as "bankruptcy

---

[16]    *See* O'Connor Aff. Ex. J at 1, 6; Aff. of Marc Sherman ("Sherman Aff.) ¶ 6.

[17]    *See* O'Connor Aff. Ex. J at 6; Sherman Aff. ¶ 13.

[18]    Jennings Aff. ¶ 5.

[19]    Alicks Aff. Ex. 3 at 1; *id*. Ex. 4, Dynegy Inc./Dynegy Holdings Inc. Form 8-K dated July 10, 2011 ("DHI Form-8K").

remote" entities.[20]    As bankruptcy remote entities, CoalCo and GasCo would hold themselves out as separate legal entities, not divisions of DHI, and would be subject to customary rating agency "separateness" provisions.[21]    In addition, bankruptcy remote entities frequently require unanimous consent of their boards of managers, including an independent manager, in order to take certain actions, including

> filing any bankruptcy proceeding, seeking or consenting to the appointment of any receiver, making or consenting to any assignment for the benefit of creditors, admitting in writing the inability to pay the applicable bankruptcy remote entity's debts, consenting to substantive consolidation, dissolving or liquidating, [and] engaging in any business.[22]

In addition, the Proposed Transaction contemplates that DHI still would own 100% of the equity interests in Dynegy Northeast Generation, Inc. ("DNG"), which is the entity that

---

[20]    "A bankruptcy remote, special purpose entity is an entity which is unlikely to become insolvent as a result of its own activities and which is adequately insulated from the consequences of any other party's insolvency."  1 Com. Real Estate Forms 3d § 4:2.  Lenders frequently require use of such a structure "before making loans where there is a risk that due to the borrowers other business enterprises, the property being encumbered could become embroiled in a bankruptcy even though it is solvent and successful."  *Id.* at Drafter's Note.

[21]    *See* Alicks Aff. Ex. 6, Limited Liability Company Operating Agreement of Dynegy Power, LLC [*i.e.*, GasCo], § 9; *id.* Ex. 3 at 2 (such provisions would include: "separately appointed board of directors or managers (as applicable), separate books and records, separately appointed officers or separate members (as applicable), separate bank accounts . . . [so the subsidiary] pays [its] liabilities from its own funds, conducts business in its own name (other than any business relating to the trading activities of the Company and its subsidiaries), observes entity level formalities, [does] not pledge its assets for the benefit of other persons and any other provisions reasonably required to effect the bankruptcy remoteness of such entities.").

[22]    Alicks Aff. Ex. 3 at 2

indirectly holds the equity interests in the subsidiaries that operate the Power Plants.[23]
This entity would not be converted into a bankruptcy remote entity.

Thus, following the Transaction, DHI's corporate structure would look as follows:
DHI would own direct interests in DNG and another intermediate subsidiary, Dynegy
Gas Investments, LLC ("Gas Investments").  Gas Investments would own direct interests
in Dynegy Gas Holdco, LLC and Dynegy Coal Holdco, LLC, ("the Holdco Entities")
which would act as holding companies for Dynegy Gas Investments Holdings, LLC and
Dynegy Coal Investments Holdings, LLC, respectively.  The latter entities will be 100%
owned by the Holdco Entities and, in turn, will act as holding companies for GasCo and
CoalCo, which will receive the transfer of approximately fourteen power plants and be
converted into bankruptcy remote entities.[24]

The Proposed Transaction also is part of a larger plan by DHI to obtain new credit
facilities to replace the existing facility, which is at risk of a near term default.[25]  DHI
further contends that the new facilities also would provide it with additional liquidity,
better align its asset base, and maximize its flexibility to address additional potential debt
restructuring transactions.  Specifically, the new credit facilities would consist of a $1.3

---

[23]    *Id*.

[24]    Alicks Aff. Ex. 3 at 1-2.  GasCo would own a portfolio of eight primarily gas-fired
power generation facilities located across the West, Midwest, and Northeast
regions of the U.S.  DHI Form 8-K at 2.  CoalCo would own a portfolio of six
primarily coal-fired power generation facilities located in the Midwest.  *Id*.

[25]    Alicks Aff. Ex. 4 at 2; DAB 6.

billion, six-year senior secured term loan facility available to GasCo and a $400 million, six-year senior secured term loan facility available to CoalCo.[26]

The next day, on July 11, DHI began looking for lenders for the proposed new credit facilities, which it intends to close at the end of July 2011.[27]  According to DHI, the new facilities, and, thus, the entire Proposed Transaction, will enhance DHI's liquidity. They argue, for example, that GasCo and CoalCo can provide to DHI up to $225 million per year and an indirect subsidiary of DHI has the right to sell up to 20% of the equity in GasCo.  That 20% equity stake has an estimated value of approximately $500 million, which would provide DHI with additional liquidity.[28]  Plaintiffs argue, however, that the likely effect of the Proposed Transaction will be that the financing for the new

---

[26]    DHI Form 8-K at 4.  According to DHI's Form 8-K filed on July 10, 2011, the proceeds from the GasCo Term Loan Facility are expected to be used to "(i) repay the outstanding indebtedness under the existing senior secured credit facility at [DHI], (ii) at the option of GasCo, repay up to approximately $192 million of existing debt relating to Sithe Energies, Inc. (the intermediate project holding company that indirectly holds the Independence facility in New York), (iii) make a $400 million restricted payment to a parent holding company of GasCo, (iv) fund cash collateralized letters of credit and cash collateral for existing collateral requirements, (v) pay related transaction fees and expenses and (vi) fund additional cash to the balance sheet for general working capital and liquidity purposes[,] [and] [p]roceeds from the CoalCo Term Loan Facility are expected to be used to (i) fund cash collateralized letters of credit and cash collateral for existing collateral requirements, (ii) pay related transaction fees and expenses and (iii) fund additional cash to the balance sheet to provide the CoalCo portfolio with liquidity for general working capital and general corporate purposes."  *Id*. at 2.

[27]    *See* DAB 7.

[28]    Aff. of Samuel Merksamer ("Merksamer Aff.") ¶ 13 (noting that GasCo's estimated value is $2.5 billion); Tr. of July 25, 2011 Argument ("Tr.") 56-57. DHI allegedly has indicated that the 20% equity interest may be sold to holders of DHI junior debt.  POB 6 n.2 (citing O'Connor Aff. Ex. G at 3).

bankruptcy remote entities will pay off DHI's existing secured line of credit and leave DHI with no liquidity of its own.[29]

Importantly, DHI stresses in its papers that it does not now nor will it under the Proposed Transaction directly own the Power Plants or any of its other power generating facilities as direct subsidiaries.[30]  Rather, DHI indirectly owns them through a series of subsidiaries in which DHI owns equity interests.  Thus, while it acknowledges that the value of the Power Plants and other facilities are embedded in those interests, DHI argues that the only assets it has that could be subject to execution, including under the Guaranties, are those equity interests, and not the physical assets themselves.[31]  Therefore, DHI disputes Plaintiffs' contention that § 2.1 of the Guaranties does not provide that DHI's other physical power generating assets would be available to satisfy the Guaranties, if necessary.  Rather, it argues that because PSEG never obtained guaranties from the entities that directly own those assets, the Guaranties obtained from DHI are backed only by DHI's ownership interests in the entities that own the assets, not revenue from the assets themselves.[32]

---

[29]    POB 6.

[30]    DAB 9; Merksamer Aff. ¶ 9.

[31]    DAB 3.

[32]    *Id*. at 8-10.

### 5.    Plaintiffs take issue with the Proposed Transaction

On July 14, PSEG reportedly advised DHI that it would object to the Proposed Transaction unless the Guaranties were assumed by GasCo and CoalCo, respectively.[33] In particular, PSEG objected to the bankruptcy remote nature of these entities, arguing that, although DHI still technically would own them, DHI no longer would be able to compel cash distributions from them to satisfy its obligations under the Guaranties. Moreover, Plaintiffs contend that the Transaction is suspect because DHI seeks to transfer to GasCo and CoalCo assets that had operating income in 2010 of $77 million and $127 million, respectively, while the assets not transferred to these bankruptcy remote entities had operating losses of $215 million in 2010 and $108 million for the first three months of 2011.[34]

DHI rejects PSEG's characterization of the nature of GasCo and CoalCo.  A bankruptcy remote entity is a subsidiary that has an independent director or manager and is subject to restrictions that would require, for example, the approval of such director or manager before the entity could incur certain additional debt.[35]  According to DHI, this mechanism has a number of benefits including: (1) providing an opportunity for the bankruptcy remote entity to avoid bankruptcy and its associated costs even if its affiliates

---

[33]    POB 28.

[34]    *Id*. at 12 (citing O'Connor Aff. Ex. C at 13, 16).  In addition, Plaintiffs note the exclusion of the Danskammer plant, which is coal-fired, from the plants transferred to CoalCo.  *Id*.

[35]    Merksamer Aff. ¶ 6.

file for bankruptcy; (2) providing an opportunity for the bankruptcy remote entity to borrow funds at lower cost and gain additional liquidity; and (3) eliminating cross-defaults based on troubled assets, which defaults otherwise would trigger a higher interest rate.[36]  According to DHI, such a structure will not prevent Plaintiffs from executing on the value of GasCo and CoalCo if they ever obtain a judgment against DHI because the value of a bankruptcy remote entity is not shielded from execution on judgment.[37]  Thus, DHI argues that, even after the Proposed Transaction closes, it will continue to own indirectly the same assets it does now.[38]

Based on the parties' disparate views on the propriety of the Proposed Transaction, PSEG suggested a fourteen-day standstill agreement on July 14.   DHI

---

[36]     *Id*. ¶ 8.

[37]     *See* DAB 10-11.  DHI further argues that even under the status quo, Plaintiffs do not have an unfettered right to compel distributions from a DHI subsidiary to DHI in the event they obtain a judgment against DHI.  *Id*. at 10-11, 21-22 (citing *Bird v. Wilm. Soc. of Fine Arts*, 43 A.2d 476, 483 (Del. 1945) ("The owner of the shares of stock in a company is not the owner of the corporation's property. He has a right to his share in the earnings of the corporation, as they may be declared in dividends, arising from the use of all its property."); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006) ("A wholly-owned subsidiary is to be operated for the benefit of its parent. A subsidiary board is entitled to support a parent's business strategy unless it believes pursuit of that strategy will cause the subsidiary to violate its legal obligations.")).

[38]     DAB 10 ("Today, DHI indirectly owns the revenue generating assets at issue, through a series of subsidiaries, and that equity would be subject to execution in the event of a judgment. Following the Reorganization, DHI will continue indirectly to own the same revenue generating assets, through a series of subsidiaries, and that equity will still be subject to execution in the event of a judgment. In short, DHI will continue to own indirectly, just as it does now, 100% of those assets.").

rejected that suggestion.[39]  Plaintiffs learned that "pricing" for DHI's proposed new credit facility was scheduled for Friday, July 22, with a closing scheduled for Friday, July 29. To prevent the closing of the Proposed Transaction, Plaintiffs filed this action and moved for a temporary restraining order ("TRO").

### C.    Procedural History

Plaintiffs filed their Complaint on July 22, 2011.  It asserts three counts against DHI for: (1) breach of § 4.2 of the Guaranties; (2) violation of the Delaware Uniform Fraudulent Transfer Act ("DUFTA")[40]; and (3) a declaratory judgment with respect to the first two counts.  The remedies the Complaint seeks include a permanent injunction enjoining DHI from proceeding with the Proposed Transaction, a declaration that consummating that Transaction would breach provisions of the Guaranties and constitute fraudulent transfers, and an award of damages.  Contemporaneously with the Complaint, Plaintiffs filed a motion for a TRO, seeking to temporarily enjoin DHI from proceeding with the Proposed Transaction until the Court has an opportunity to hold a preliminary injunction hearing.  Plaintiffs' motion has been fully briefed and I heard argument on it on Monday, July 25, 2011 (the "Argument").[41]  This Memorandum Opinion constitutes my ruling on Plaintiffs' application for a TRO.

---

[39]    Alicks Aff. Ex. 7.

[40]    12 *Del. C.* §§ 4301-4311.

[41]    Plaintiffs submitted their opening brief on Friday July 22, DHI submitted its answering brief at or about 10:00 a.m. on Monday, July 25, and several hours later, Plaintiffs filed their reply brief.  The Argument occurred at four o'clock that

## D.    Parties' Contentions

Plaintiffs essentially challenge the Proposed Transaction as a sham transaction designed only to "take all of the DHI operations with any value and shift those assets into bankruptcy remote entities in order to frustrate execution on any judgment against DHI under the Guaranties, while leaving its Roseton and Danskammer leases, which have a negative net value, in a direct, non-bankruptcy remote subsidiary of DHI."[42] Furthermore, because neither GasCo nor CoalCo expressly has agreed to assume DHI's obligations under the Guaranties, Plaintiffs contend that the Transaction violates DHI's covenant in § 4.2 to refrain from transferring its assets substantially as an entirety to any entity unless, among other things, the entity succeeding in interest to DHI expressly assumes all of its obligations under the Guaranties.  For similar reasons, Plaintiffs argue that the proposed transfers would constitute fraudulent conveyances under DUFTA. Moreover, Plaintiffs argue that if the Transaction closes without preliminary relief from

---

day.  The next day, without seeking leave, Plaintiffs filed a supplemental reply (the "First Supplemental Reply) and, later that evening, a second supplemental reply (the "Second Supplemental Reply").  On Wednesday, July 27, DHI moved to strike Plaintiffs' supplemental briefs or, in the alternative, to file a sur-reply, which it attached.  The parties' filings did not stop there.  On July 28, 2011, Plaintiffs filed a third supplemental reply brief ("Third Supplemental Brief"), and DHI filed a second supplemental reply brief.

For purposes of citation, I refer to Plaintiffs' First, Second, and Third Supplemental Briefs as "PFSB," "PSSB," and "PTSB," respectively.  Similarly, I refer to DHI's first and second supplemental briefs as "DSB" and "DSSB," respectively.

[42]    POB 12 (citing O'Connor Aff. Ex. C at 1; *id.* Ex. J at 1).

this Court, they will suffer irreparable harm because DHI no longer will have access to valuable assets to back up its obligations under the Guaranties.

DHI vigorously disputes Plaintiffs' characterizations of the Proposed Transaction and its effects on DHI's obligations under the Guaranties. It contends that Plaintiffs' breach of contract and fraudulent conveyance claims are not even colorable and they are not at risk of suffering irreparable harm because of the Proposed Transaction. On the latter point, DHI emphasizes that the bankruptcy remote nature of GasCo and CoalCo would not remove the value of those entities from the ultimate parent, DHI. Finally, DHI argues a balancing of the equities favors a denial of Plaintiffs' motion for a TRO because, while Plaintiffs still would have the benefit of their bargained-for Guaranties if the deal closed, an order delaying or prohibiting the closing would threaten the successful acquisition of the related approximately $1.7 billion new credit facility DHI seeks.

## II.   ANALYSIS

### A.   DHI's Motion to Strike or, in the Alternative, to File a Sur-Reply

DHI takes issue with Plaintiffs' conduct in filing not one or two, but three supplemental sur-replies after the conclusion of the Argument, without obtaining leave of Court as required by Court of Chancery Rule 171.[43]   Although I take seriously the requirement that a party seek leave before filing a sur-reply, I have considered Plaintiffs' supplemental briefs and the other papers filed regarding them. This action was briefed on

---

[43]   Def.'s Mot. to Strike or in the Alternative to Permit filing of Sur-Reply ("DSR") 1; Ct. Ch. R. 171(a) ("Unless otherwise ordered, no additional briefs or letters containing argument shall be filed without first procuring Court approval.").

an extremely expedited schedule.  While Plaintiffs could and, perhaps should have filed this action sooner, as discussed *infra*, I find that, in the interests of justice and permitting the Court to consider as robust a record as is possible in connection with Plaintiffs' application for injunctive relief, Plaintiffs' supplemental briefs and exhibits should be permitted.  For similar reasons, I have considered DHI's supplemental briefs, as well. Thus, DHI's motion to strike is denied.

## B.    Laches

DHI argues first that the Court should deny Plaintiffs' request for a TRO because they are guilty of laches.  Specifically, it argues that it publicly announced plans for the Proposed Transaction on July 10, 2011 and Plaintiffs waited three days before first advising DHI of their objections to it.  DHI further asserts that, although it responded on July 15, Plaintiffs waited six more days before filing suit on Friday, July 22.  As a result, DHI claims it was prejudiced by being forced to prepare its opposition papers over the weekend and file them less than one business day later.  Plaintiffs contend, on the other hand, that they proceeded as promptly as they could and attributed the twelve-day delay from the time they became aware of the Proposed Transaction to the date they filed suit to their failed interim efforts to negotiate a standstill agreement with DHI.

The defense of laches may bar an action in equity if the moving party waited an unreasonable length of time before asserting its claims and the delay unfairly prejudiced

the nonmoving party.[44]    Generally, laches requires proof of three elements: (1) knowledge of a claim by the claimant; (2) unreasonable delay in bringing the claim; and (3) resulting prejudice to the nonmovant.[45]    An unreasonable delay can range from as long as several years to as little as less than one month, but the temporal aspect of the delay is less important than the reasons for it.[46]    As such, the doctrine of laches permits this Court "to hold a [movant] to a shorter period if, in terms of equity, [it] should have acted with greater alacrity . . . ."[47]    Indeed, under Delaware law, a motion for expedited proceedings, like a TRO or a preliminary injunction hearing, may be denied where the moving party has not proceeded as promptly as it might and, by virtue of its languor, has contributed to the emergency nature of its application for preliminary relief.[48]

As I indicated at the Argument, the doctrine of laches does not bar this action or Plaintiffs' request for a TRO.    Plaintiffs chose to proceed more deliberately than they could have in the hopes of reaching an out-of-court resolution or, at least, some form of standstill agreement.    That is not necessarily unreasonable.    Indeed, this Court has

---

[44]    *See, e.g.*, *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7-8 (Del. 2009); *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 135 (Del. Ch. 2007) (noting that laches may apply if a claimant has knowledge of its claim and prejudices the opposition by unreasonably delaying in bringing the claim).

[45]    *Whittington*, 991 A.2d at 8 ("This doctrine 'is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights.'") (internal citations omitted).

[46]    *Id*. at 7-8.

[47]    *Id*. at 8.

[48]    *See Moor Disposal Serv., Inc. v. Kent Cty. Levy Ct.*, 2007 WL 2351070, at *1 (Del. Ch. Aug. 10, 2007).

observed that, "[i]n some situations, a movant reasonably might delay in filing suit because it believes in good faith that the parties might resolve their differences out of court, even in a time-sensitive matter."[49]   Given the complexity of this matter and the fact that Plaintiffs waited less than a week after DHI rejected their overtures to resolve their objections to the Transaction, I do not consider Plaintiffs' actions to constitute unreasonable delay.[50]   Moreover, despite the hardship imposed on DHI in having to prepare its papers in less than three days over a weekend, I do not find that this caused any material prejudice to DHI or its legal positions.   Thus, I reject DHI's contention that laches precludes entry of a TRO here.

### C.      Plaintiffs' motion for a TRO

### 1.      The Applicable Standard

PSEG seeks a TRO to prevent the Proposed Transaction from closing.  A TRO is a special remedy of short duration that primarily is designed to prevent imminent irreparable injury.[51]   To prevail on a motion for a TRO, the moving party generally must demonstrate: (i) the existence of a colorable claim, (ii) the irreparable harm that will be

---

[49]   *CNL-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*, 2011 WL 353529, at *6 (Del. Ch. Jan. 28, 2011).

[50]   Plaintiffs filed their complaint approximately twelve days after they received constructive notice of the Proposed Transaction when DHI made it public through a press release and contemporaneous Form 8-K filed on July 10, 2011.  While this alleged "delay" does not support a finding of laches, I do consider it relevant, as discussed *infra*, to determining the appropriate standard for obtaining the injunctive relief Plaintiffs seek.

[51]   *Cottle v. Carr*, 1988 WL 10415, at *2 (Del. Ch. Feb. 9, 1988).

suffered if relief is not granted, and (iii) a balancing of hardships favoring the moving party.[52]  In accordance with these factors, this Court has recognized that motions for TROs may be subject to less exacting merits-based scrutiny than motions for preliminary injunctions, in part, because of the fact that the factual record might not yet be sufficiently developed.[53]

Yet, "[w]here . . . the applicant [for a TRO] has had the opportunity to develop evidence and present a record from which the court may 'responsibly make a more informed judgment concerning the merits,' . . . 'the elements of the equitable test is something akin to the traditional preliminary injunction formulation.'"[54]  In this event, the Court looks "more in the direction of whether there is a probability of success on the merits."[55]  In determining whether to apply the more stringent preliminary injunction standard, Courts may look to the length of time the movant waited before bringing suit, the existence in the record of key evidence, including contracts that are at the center of a dispute between the parties, and the degree to which the movant is in a position to control

---

[52]   *See, e.g.*, *CBOT Hldgs., Inc. v. Chicago Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007); *Stirling Inv. Hldgs., Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at *2 (Del. Ch. Feb. 12, 1997).

[53]   *CBOT Hldgs., Inc.*, 2007 WL 2296356, at *3.

[54]   *E.g.*, *Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure Gp. US, LLC*, 2009 WL 1199588, at *3 (Del. Ch. Apr. 24, 2009) (citing *Insituform Techs., Inc. v. Insitu, Inc.*, 1999 WL 240347, at *7 (Del. Ch. Apr. 19, 1999)); *CBOT Hldgs., Inc.*, 2007 WL 2296356, at *3.

[55]   *CBOT Hldgs., Inc*, 2007 WL 2296356, at *3.

evidence that would permit it to make a more substantial showing on the merits of its claims to the Court.[56]

In the circumstances of this case, I find it more appropriate to apply something more akin to the preliminary injunction standard and, thus, will focus on the probability of success on the merits. While Plaintiffs' twelve-day delay might not have been unreasonable from a laches standpoint, as discussed *supra*, it provided Plaintiffs with sufficient time to explore, at least preliminarily, the relevant facts, their alleged legal rights and obligations, and the legal theories on which they might base an application for a TRO or preliminary injunctive relief.[57] Moreover, the record contains substantially all of the important documents on which Plaintiffs base their allegations against DHI. Specifically, the record contains copies of the Guaranties,[58] drafts of GasCo and CoalCo's LLC agreements,[59] and documents DHI filed with the SEC detailing the Proposed Transaction.[60] Finally, I point out that Plaintiffs' overarching contention is that the Proposed Transaction is violative of the Guaranties to which they are a party and that were executed approximately a decade ago. As such, to the extent Plaintiffs considered

---

[56]    *See CNL-AB LLC*, 2011 WL 353529, at *8.

[57]    In contrast, by waiting until more than 60% of the nineteen-day time period before Closing had elapsed to file their action, Plaintiffs effectively precluded the possibility of discovery and foreshortened the time available to DHI and the Court.

[58]    Compl. Exs. A & B.

[59]    Alicks Aff. Exs. 5-6.

[60]    *See id*. Exs. 1-4.

extrinsic evidence to be relevant, they were in a position to supplement the record with evidence, in the form of affidavits or otherwise, regarding negotiations that took place between them and DHI regarding the interpretation and import of the Guaranties, as well as the alleged intent of the parties when they entered those agreements.[61]

In these circumstances, I find it equitable to hold Plaintiffs to something more like the preliminary injunction standard.[62] Thus, to succeed on their motion, Plaintiffs must demonstrate: (1) a reasonable probability of success on the merits; (2) that they will suffer irreparable injury if an injunction does not issue; and (3) that the balance of the equities favors the issuance of an injunction.[63] As I stated in *CNL-AB v. Eastern Property Fund I SPE (MS Ref) LLC*, these elements are not necessarily weighted equally; in other words, a strong showing on one element may overcome a weak showing on another element, but a failure of proof on one of the elements will defeat the application.[64]

---

[61]    Indeed, Plaintiffs did this when they filed the Affidavit of Ira M. Palgon, who represented PSEG in connection with the Sale-Leaseback Transaction. *See* Docket Item 28.

[62]    Thus, I reject Plaintiffs' request, as articulated in its First Supplemental Brief, to reconsider the inclination I expressed at the Argument to use the preliminary injunction standard here.

[63]    *In re Inergy L.P.*, 2010 WL 4273197, at *9 (Del. Ch. Oct. 29, 2010).

[64]    *See CNL-AB LLC*, 2011 WL 353529, at *8; *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

### 2.    Probability of Success on the Merits

Plaintiffs contend that the Proposed Transaction violates § 4.2 of the Guaranties and various provisions of DUFTA.  I consider each of these arguments in turn.

### a.    Breach of Guaranties Claim[65]

Plaintiffs contend that the Proposed Transaction runs afoul of § 4.2 of the Guaranties because the Proposed Transaction would constitute a transfer of DHI's assets substantially as an entirety to GasCo and CoalCo and neither of those entities expressly assumed DHI's obligations under the Guaranties.  Specifically, Plaintiffs assert that the transfer of DHI's various power plants, aside from the Plants at issue here, to GasCo and CoalCo triggers § 4.2 because it applies to transfers to "any Person," and contains no exception for transfers within the Dynegy corporate structure.  In addition, they assert that DHI's argument to the contrary would lead to the absurd and implausible result that the Guaranties Plaintiffs negotiated for to protect their investment in the Sale-Leaseback Transaction are backed by DHI's assets, but that DHI could turn around the next day and transfer those assets without restriction.  Finally, and most importantly, Plaintiffs contend that even if a transfer within the Dynegy corporate family is permissible under § 4.2, the transfer of the assets at issue from ordinary DHI subsidiaries to bankruptcy remote subsidiaries, which, Plaintiffs claim, are engineered to circumvent distribution demands

---

[65]    New York law governs the Guaranties and Plaintiffs' contract claim.  Guaranties § 8.5.

from their parent, are impermissible because it would leave DHI without assets from which to distribute proceeds and, thus, reduce Plaintiffs' Guaranties to a hollow shell.

DHI disagrees and argues that the Proposed Transaction does not violate § 4.2, even if GasCo and CoalCo do not expressly assume DHI's obligations under the Guaranties. They argue that DHI's assets are not being transferred "substantially as an entirety" and nothing in the Guaranties' restrictions and covenants prevents the internal reorganization contemplated in the Proposed Transaction. First, they contend that only DHI, and not its subsidiaries, is restricted from transferring assets under § 4.2, because the Guaranties impose no similar restriction on the ability of DHI's subsidiaries to make transfers. The entities that directly own the physical assets being transferred in the Proposed Transaction are DHI subsidiaries in which DHI owns stock; DHI will not transfer any physical assets in the Transaction. Second, it avers that even if DHI was transferring assets, the Transaction does not contemplate that DHI would transfer its assets "substantially as an entirety" to GasCo and CoalCo.[66] In any event, DHI argues that "ring-fencing" certain assets in bankruptcy remote subsidiaries would not place them beyond execution in the event Plaintiffs obtain a judgment against DHI and, thus, the assets in those entities would be no farther removed from DHI than they would be under the status quo if the Transaction is not consummated.

---

[66] DAB 18-19. DHI also argues that successor obligation clauses, like § 4.2, do not apply to corporate reorganizations like the Proposed Transaction. *Id.* at 19-20.

New York law requires that agreements be construed in accordance with the parties' intent.[67] A contract also should be interpreted in a manner that ascribes meaning to all of its provisions so as not to render a provision superfluous.[68] Thus, where a written agreement is complete, clear, and unambiguous on its face, it must be enforced according to the plain meaning of its terms.[69]

Extrinsic evidence of the parties' intent may be considered only if the contract is ambiguous.[70] That is, a court first must decide whether a contract is unambiguous as a matter of law, and, if it so finds, it must restrict its analysis to the four corners of the document.[71] A contract is ambiguous "where its terms suggest more than one meaning when viewed objectively by a reasonably knowledgeable person who has examined the

---

[67] *See, e.g.*, *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002) (noting that the best evidence of what the parties intend is what they say in their writing); *Law Debenture Trust Co. of N.Y. v. Petrohawk Energy Corp.*, 2007 WL 2248150, at *5 (Del. Ch. Aug. 1, 2007) (citing *Reiss v. Fin. Performance Corp.*, 715 N.Y.S.2d 29, 34 (N.Y. App. Div. 2000)), *aff'd*, 947 A.2d 1121 (Del. 2008).

[68] *See, e.g.*, *Minerals Tech., Inc. v. Omya AG*, 406 F. Supp. 2d 335, 337 (S.D.N.Y. 2005); *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 845 N.E.2d 1265, 1267 (N.Y. 2006).

[69] *See, e.g.*, *Greenfield*, 780 N.E.2d at 170-71; *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002).

[70] *Greenfield*, 780 N.E.2d at 170-71.

[71] *R/S Assocs.*, 771 N.E.2d at 242-43 (extrinsic evidence is generally inadmissible to add to, vary, or create an ambiguity in a written agreement); *see also Master-Built Const. Co. v. Thorne*, 802 N.Y.S.2d 713, 714 (N.Y. App. Div. 2005).

context of the entire integrated agreement."[72]   Conversely, a contract is unambiguous "if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[73]   Thus, if an agreement is reasonably susceptible on its face of only one meaning, a court is not free to reshape the contract to fit its personal notions of fairness and equity.[74]

     1.       **Plaintiffs are not likely to succeed in showing that § 4.2 is ambiguous**

Section 4.2 of the Guaranties provides that

> The Guarantor [*i.e.*, DHI] shall not . . . *transfer . . . its properties and assets substantially as an entirety to any Person* in one or a series of transactions unless . . . (b) such . . . succeeding Person, if other than the Guarantor, shall execute and deliver to the Owner Participant . . . an assignment and assumption agreement in form and substance satisfactory to the Owner Participant, by which such . . . succeeding Person shall expressly assume all of the Guarantor's obligations under this Guaranty[.][75]

---

[72]   *See, e.g.*, *Minerals Techs., Inc.*, 406 F. Supp. 2d at 337 (citing *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001)); *Riverside S. Planning Corp.*, 869 N.Y.S.2d at 516 (noting that a contract is ambiguous "if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings").

[73]   *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569-70, 780 N.E.2d 166, 170-71 (N.Y. 2002).

[74]   *Id.*

[75]   Guaranties § 4.2(b) (emphasis added).

Under the plain language of this provision, DHI may not transfer "its assets substantially as an entirety" to any "Person," broadly defined to encompass LLCs, with no carve-out for internal LLCs within a corporate structure.

Plaintiffs claim that § 4.2's use of the word "assets" reflects the parties' intent that DHI's Guaranties be backed by all of its assets, even those controlled indirectly, such as its power generating facilities.[76] Thus, Plaintiffs assert that the "Guaranties ensured that the cash flow from DHI's other operations would remain available to guarantee lease performance," even assets DHI indirectly owned through directly-owned subsidiaries.[77] For its part, DHI contends that the plain meaning of the phrase "its properties and assets" is assets that DHI directly owns.

I agree with DHI. First, the language of § 4.2 plainly applies to DHI's "properties and assets." That section applies to restrict DHI from transferring such assets, but it conspicuously fails to mention DHI's subsidiaries and their assets when it details restrictions on consolidating, merging, conveying, transferring, or leasing assets. In contrast, the very next section, § 4.3, expressly mentions the Guarantor's subsidiaries and prevents *both* the Guarantor and any "Principal Subsidiary" from taking certain actions with regard to liens.[78] This demonstrates that when the parties intended to make a

---

[76]    Tr. 8-9 ("And so when our clients were looking for a guaranty, they were looking for everything that DHI held.").

[77]    POB 22.

[78]    *Compare* Guaranties § 4.2 *with* § 4.3.

particular restriction applicable to both DHI and its subsidiaries, they knew how to do so and readily could accomplish that objective.

Second, the record suggests that Plaintiffs were represented by sophisticated counsel in negotiating the provisions of the Guaranties. Thus, there may be a number of different explanations for the absence of a successor obligor provision in § 4.2 covering DHI's subsidiaries. Based on the American Bar Foundation's influential *Commentaries on Model Debenture Indenture Provisions* (the "Commentaries"), one reasonable inference, for example, is that Plaintiffs' counsel would have been aware that "[i]ndenture provisions which are made applicable to the consolidated activities of [a] [c]ompany and certain of its subsidiaries would usually include provisions which restrict the consolidation or merger of such subsidiaries and the disposition of their assets as an entirety or substantially as an entirety."[79] The Commentaries also provide several model successor obligor clauses that would cover a company's subsidiaries as well as the company itself.[80] As this Court previously has explained, while the Commentaries are

---

[79]    Alicks Aff. Ex. 8, Am. Bar Found. *Commentaries on Model Debenture Indenture Provisions* (1971) (the "Commentaries"), at 426.

[80]    *Id*. at 430-31 (citing sample covenants 5 and 6). Plaintiffs purport in their Second Supplemental Brief to distinguish the sample clauses on which DHI relies for this point as not being sample successor obligor clauses, but rather only specialized clauses used where a single subsidiary is so important to a transaction that the lender seeks to restrict transfers of assets by that subsidiary, even if the transfers do not involve all or substantially all of the parent's assets. PSSB 4-5 (citing Commentaries § 8-1 at 293). As such, Plaintiffs argue that DHI has not identified any model clause that was widely-used in the market in 2001 that the parties declined to accept. *Id*.

not a substitute for construing the terms of a contract at issue, "they provide powerful evidence of the established commercial expectations of practitioners and market participants."[81]  In addition, reliance on the Commentaries is "consistent with the Second Circuit's approach of analyzing contracts, under New York law, 'as viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as

---

I do not understand, however, that DHI cited to the Commentaries to show conclusively what the parties intended when they agreed to § 4.2; rather, it has offered them as evidence of established commercial knowledge and expectations. Moreover, even if the samples to which DHI cited are applicable to "transfers of less than substantially all" of a company's assets, PSSB Ex. A at 293, they cover situations in which a lender would be concerned that an important subsidiary might transfer its assets after it entered into some sort of indenture agreement with the parent-borrower.  Thus, PSEG likely would have been aware that there were commercially available forms that included language specifically incorporating a company's subsidiaries in successor obligor clauses.  Similarly, Plaintiffs' counsel probably understood DHI's corporate structure and that it held its physical power generating facilities indirectly through a series of subsidiaries.  I draw from these conclusions the limited additional inference that if Plaintiffs were worried about these subsidiaries transferring the physical assets they held, it would have been aware of widely-used commercial language to ensure protection for itself of the type it now seeks.

Finally, Plaintiffs assert that both of DHI's cited sample clauses include exceptions that would permit transfers to a company's wholly-owned subsidiaries. *Id*. at 5 (citing Commentaries at 430).  The absence of such exceptions in § 4.2 supposedly supports Plaintiffs' construction of it.  But, as DHI points out, exceptions are required to take out of a provision "that which otherwise would have been included in it."  DSB 9 (citing 17A C.J.S. Contracts § 457 (2011)).  Here, I have found that § 4.2 probably is not unambiguous and does not restrict DHI's subsidiaries so an exception permitting such subsidiaries to transfer assets would have been unnecessary.

[81]    *See Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 331 (Del. Ch. 2010).

generally understood in the particular trade or business.'"[82]    The Commentaries, thus,

support DHI's view that rather than being a contingency not addressed by the Guaranties

or an implicit right found within § 4.2, Plaintiffs' proposed construction of § 4.2 as

including restrictions on DHI's subsidiaries is simply not present in the Guaranties.[83]

This conclusion is reinforced by the fact that this Court previously has explained that

because of note indentures' ability to constrain economic freedom, their provisions

should not readily be afforded an expansive reading.[84]

---

[82]    *Bank of New York v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 565 (S.D.N.Y. 2009) (internal citations omitted) ("The Second Circuit, however, has on several occasions looked to the American Bar Foundation's *Commentaries on Indentures* for guidance when analyzing boilerplate indenture provisions."), *aff'd*, 607 F.3d 905 (2d Cir. 2010).

[83]    *Bank of New York*, 598 F. Supp. 2d at 564-65.  DHI also cited a number of other publicly available examples of financing documents for the proposition that market participants use specific language when they want to extend restrictions to subsidiaries of an obligor.  *See* DAB 25-26 (citing, among other documents, Barry A. Graynor, Practicing Law Institute, Senior Secured Credit Agreement, PLI Order No. 22488, at *347 (2010); ABA Section of Business Law, *Model Negotiated Covenants and Related Definitions*, 61 BUS. LAW. 1439, 1533-35 (2006); Alicks Aff. Ex. 9).

[84]    *See Wilm. Trust Co. v. Tropicana Entm't, LLC*, 2008 WL 555914, at *6 (Del. Ch. Feb. 29, 2008) ("The same 'boilerplate' language [of note indentures] appears over and over again through the years in many similar indentures, and it is important that language routinely and broadly employed in a specific category of agreements be accorded a consistent and uniform construction.  Efforts to give trust indenture provisions expansive readings or some additional force by implication carry the ever present risk of not honoring the careful and sophisticated drafting which is said to go into the preparation of such agreements.  It has been recognized that "the highly-negotiated provisions of notes and debentures that restrict the commercial freedom that issuers otherwise enjoy under default law are traditionally interpreted strictly, precisely because they involve

31

Thus, I find that Plaintiffs are unlikely to show that the phrase "properties and assets" is ambiguous and that it refers to properties and assets held by DHI's indirectly-owned subsidiaries.[85]

### 2.    The Proposed Transaction does not violate § 4.2's plain language

With this construction in mind, Plaintiffs are unlikely to succeed in showing that the terms of the Proposed Transaction breach § 4.2   DHI will not be transferring substantially all or substantially as an entirety *its* assets.   As DHI explained in its papers, it does not own directly any of the power generating facilities that are set to be transferred into GasCo and CoalCo.   Rather, it owns equity interests in subsidiaries that own directly or indirectly such physical assets.   While the assets will be transferred within the Dynegy family from one subsidiary to other bankruptcy remote subsidiaries, DHI will not be transferring the *value* of any of its indirectly-held assets, including its equity interests in

---

specifically extracted limitations on ordinary economic liberties.") (internal citations omitted)).

[85]   Because I have found § 4.2 likely to be unambiguous, extrinsic evidence of the subjective intent of the parties when they entered into the Guaranties is not relevant.  *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002).   As such, the affidavit of Ira M. Palgon regarding his subjective understanding of successor obligor clauses or what he would have understood "as to the protections PSEG was receiving by virtue of § 4.2" is not pertinent.  Palgon Aff. ¶ 2.  Similarly, I do not consider relevant the affidavit of Thomas M. Moore, an attorney with substantial mergers & acquisitions experience, regarding his subjective understanding of how the "mergers and acquisitions communities" interpret successor obligor clauses.  Moore Aff. ¶ 6.  Both documents represent extrinsic evidence, which is not relevant to the construction of an unambiguous contract.  In any event, the substance of their testimony, *i.e.*, their subjective interpretations of § 4.2, would not be very probative, if at all, of PSEG's subjective intent when it agreed to § 4.2 in the Sale-Leaseback Transaction.

any of its subsidiaries, including GasCo and CoalCo, away from the Dynegy corporate family.  While the Proposed Transaction will cause DHI's indirect ownership of the physical assets to take a different form and, as discussed below, reduction of its influence over use of the revenue they generate, the net effect of the Transaction will be that DHI still will own the same assets that it did before the Transaction.

Plaintiffs assert in their Second Supplemental Brief, however, that the Proposed Transaction calls for DHI to transfer assets it owns directly—namely, equity interests in the subsidiaries it directly owns, which, in turn, own interests in other subsidiaries that, ultimately, own the power plant assets.[86]  Relying on a DHI debt offering memorandum ("Offering Memorandum"), Plaintiffs contend that DHI currently owns direct interests in three subsidiaries: (1) Dynegy Power Corp ("DPC"); (2) Sithe Energies, Inc. ("SEI"); and (3) Ontelaunee Power Operating Company, LLC ("OPOC").[87]  They argue further that the first step in the Transaction will involve transferring DHI's equity interests in SEI and OPOC to DPC, resulting in all of the equity interests directly owned by DHI today being concentrated in DPC.  This, Plaintiffs assert, constitutes a transfer of all of DHI's directly-owned equity interests because it requires transferring its interests in SEI and OPOC to DPC, and then transferring its equity interest in DPC to Dynegy Gas

---

[86]    PSSB 6-7.

[87]    *Id*. (citing Supp. Aff. of John O'Connor Ex. B at 20-22).

Investments Holdings, LLC, a new company that would be owned indirectly by DHI through a series of subsidiaries.[88]

Plaintiffs' understanding of the Transaction, however, is not borne out by the record.[89]  First, although DHI owns direct interests in SEI, it does not own direct interests in either DPC or OPOC; instead, each of those entities is owned directly by a subsidiary of DHI.[90]  Importantly, DHI will continue to own the same interests in the intermediate subsidiary owning both DPC and OPOC after the Transaction.[91]  DHI will be transferring its equity in SEI, but, SEI, through a subsidiary, owns a single power plant that provides less than 10% of the total megawatts generated by the approximately seventeen power plants DHI indirectly owns.[92]  As such, DHI will be transferring its equity interests in only one of its subsidiaries, which indirectly owns only one of the power facilities in question.[93]  Finally, I note that Plaintiffs have not articulated any persuasive basis for disregarding the corporate form of DHI and its subsidiaries.  Thus, even under this technical argument, I am not convinced that DHI's transfer of its equity interest in SEI

---

[88]    *Id*. (underlining in original).

[89]    Indeed, Plaintiffs' position is based on a chart in the Offering Memorandum labeled "abbreviated."  Supp. Aff. of Samuel Merksamer ¶ 2.

[90]    *Id*.

[91]    *Id*. ¶ 6.

[92]    *Id*. ¶ 3.

[93]    *See* Merksamer Aff. ¶¶ 3-6; Alicks Aff. Ex. 3 at 1 (identifying DHI as transferring only its interests in SEI).

constitutes a transfer of its assets "substantially as an entirety" within the meaning of §

4.2.

### 3.    Even if § 4.2 was ambiguous, the Proposed Transaction would not constitute a breach of it

Similarly, even if DHI could be found to have transferred assets it indirectly held

through multiple layers of subsidiaries in the Transaction, I find that Plaintiffs are

unlikely to succeed in showing that DHI did so "substantially as an entirety." Plaintiffs

argue to the contrary because they view DHI as moving all of its valuable assets into

GasCo and CoalCo except for the Roseton and Danskammer plants, which essentially

have negative value.  Citing *B.S.F. Co. v. Philadelphia National Bank*, they contend that

the transfer of substantially all of the income-producing assets ultimately owned into

GasCo and Coal Co satisfies the "substantially as an entirety" language.[94]

In determining whether a company has sold "substantially all" of its assets, New

York courts, like Delaware courts, look to both qualitative and quantitative factors.[95]  The

---

[94]    POB 21 (citing *B.S.F. Co. v. Phila. Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964) and noting that, under that case, "a transfer of 75% of a company's assets and its 'only substantial income producing asset' constituted the sale of 'all or substantially all' of the company's assets under the terms of an indenture.").

[95]    *See, e.g.*, *Dukas v. Davis Aircraft Prods. Co.*, 516 N.Y.S.2d 781, 782 (N.Y. App. Div. 1987) (applying, in part, a qualitative analysis in finding that a company did *not* transfer all or substantially all of its assets because the transaction involved "merely a transfer of Davis Aircraft's operations from one building to another" and "Davis Aircraft has engaged in the same business as it had prior to the" transaction); *Story v. Kennecott Copper Corp.*, 394 N.Y.S.2d 353, 354 (N.Y. Sup. Ct. 1977) (identifying as relevant the value of the assets sold in conjunction with the amount of total assets held by a company in determining whether it sold all or substantially all of its assets); *see also U.S. Bank Nat'l Ass'n v. Angeion Corp.*,

qualitative analysis may focus on factors such as the overall effect of the transaction on the company,[96] whereas the quantitative analysis may focus on the economic value and number of assets to be transferred in comparison to the assets retained.[97]

Under both approaches, Plaintiffs have made only a weak showing that DHI will be transferring its assets substantially as an entirety. DHI's corporate purpose and existence are not affected by the Proposed Transaction. At the present time, DHI is a holding company that generally holds indirect interests in companies that own power plants. After the Transaction is consummated, DHI will be a holding company that owns interests in different companies under the same corporate umbrella that own the same power plants. Thus, from a qualitative standpoint, Plaintiffs have not shown they are likely to succeed in proving that DHI transferred its assets substantially as an entirety under § 4.2.

From a quantitative perspective, Plaintiffs arguably have shown that substantially all of its valuable power plant assets would be transferred into GasCo and CoalCo,

---

615 N.W.2d 425, 433 (Minn. Ct. App. 2000) ("Applying New York law and persuasive authority from other jurisdictions interpreting the "all or substantially all" language, we conclude that whether Angeion transferred all or substantially all of its assets depends upon both the quantitative and the qualitative nature of the asset transfer."); *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 377 (Del. Ch. 2004) (noting that a "determination of whether there is a sale of substantially all assets so as to trigger [8 *Del. C.*] 271 depends upon the particular qualitative and quantitative characteristics of the transaction at issue.") (internal quotation marks and citations omitted).

[96] *See Hollinger Inc.*, 858 A.2d at 377.

[97] *Cf. Story*, 394 N.Y.S.2d at 354.

leaving the allegedly negative-cash-flow-generating Roseton and Danskammer plants outside of the ring-fencing contemplated by the Transaction. But, GasCo and CoalCo still will be subsidiaries of DHI; thus, any assets transferred to them are not being transferred away from DHI's ultimate ownership. This fact distinguishes the *B.S.F. Co.* case because there, unlike here, the challenged transfer of assets involved a transfer from a company, B.S.F., to an entity outside of its corporate structure, Glen Alden.[98] In sharp contrast, the transfer at issue here is between subsidiaries having the same parent, *i.e.*, an internal corporate reorganization.[99] Subject to restrictions discussed below, DHI retains the value of the plants embedded in its ownership of the entities that directly own those plants today and will own them after the Transaction is consummated. Thus, Plaintiffs are not likely to succeed in showing quantitatively that DHI transferred away its valuable assets "substantially as an entirety."

---

[98] *See B.S.F. Co. v. Phila. Nat'l Bank*, 204 A.2d 746, 748-50 (Del. 1964).

[99] This case, therefore, is more like the situation in *Bank of New York v. Tyco Int'l Group, S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y 2008). In determining whether Tyco violated an indenture covenant that prevented it from, among other things, conveying all or substantially all of its assets unless the successor entity assumed its obligations under related guaranties, the court explained that the effect of the transaction at issue merely was Tyco spinning off two of the four lines of business it maintained through a single holding company. *Id*. at 320. The court found that the successor obligor clauses involved "were [not] intended to require consent from the noteholders for such internal restructuring, even when coupled with a spin-off of some of the obligor's assets." *Id*. at 321. As such, the court rejected Bank of New York's argument that the transaction should be invalidated pursuant to the successor-obligor clauses. *Id*.

### 4.    DHI's construction of § 4.2 does not appear to be absurd

Plaintiffs also assert an alternative theory in support of their breach of contract claim. Specifically, they contend that the Proposed Transaction violates § 4.2 because construing it as DHI does would lead to the absurd result that the very assets that Plaintiffs negotiated to have support DHI's Guaranties, *e.g.*, the other more valuable power plants DHI owns indirectly, could be transferred away from DHI in a manner that would deprive it of the cash flows generated by such other physical assets. They argue that DHI's interpretation would render § 4.2 superfluous in that it would allow "a transfer of all the assets to which the Guaranties were to secure access."[100] In fact, Plaintiffs state that it would be "inconceivable" for them to have agreed to accept a one billion-dollar guaranty from DHI, knowing that DHI's only directly held assets are equity interests in layers of subsidiaries that own the physical assets they sought to have support that guaranty, without having obtained some protection against DHI's subsidiaries transferring those assets to another person or entity.[101]

On the preliminary record before me, however, I am not persuaded by Plaintiffs' argument. A finding that § 4.2 does not apply to DHI's subsidiaries is not an absurd one; rather, it reasonably could reflect the commercial reality that Plaintiffs negotiated in the Sale-Leaseback Transaction. Plaintiffs try to take advantage of a principle of contract construction that avoids an interpretation that renders a contractual provision absurd.

---

[100]    *Id*. at 18-19.

[101]    PRB 2; Tr. 8-10.

But, the interpretation I consider likely to prevail is not absurd, so that principle is inapposite.  As discussed *supra*, the plain language of § 4.2 cannot be reconciled with Plaintiffs' position that the Court should imply that it also covers subsidiaries when that term is not present.  Even when a contingency is omitted from a contract, a New York court will not "necessarily imply a term since courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."[102]

Finally, I note that the fact that DHI seeks to transfer the profitable physical assets from certain existing subsidiaries into bankruptcy remote entities, GasCo and CoalCo, does not affect this outcome.  While DHI will have less ability to influence these entities because of their limited insulation from DHI under their bankruptcy remote status, DHI ultimately still will own them as an indirect parent and be able to retain their value within its corporate structure.

Thus, on the record before me, I find that Plaintiffs are not likely to succeed in proving that the Proposed Transaction breaches § 4.2 of the Guaranties.

### b.    Fraudulent transfer claim

Plaintiffs next argue that the Proposed Transaction, specifically the transfer of the profitable power generation facilities, and not Roseton and Danskammer, to GasCo and

---

[102]    *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001) (internal quotation marks and citations omitted) (noting that an omission in a contract does not constitute an ambiguity); *see also Capricorn Invs. III, L.P. v. Coolbrands Int'l, Inc.*, 2009 WL 2208339, at *9 (N.Y. Sup. Ct. July 14, 2009).

CoalCo constitutes a fraudulent transfer under DUFTA.[103]   Preliminarily, they contend that the statute imposes on DHI the burden of showing that the Proposed Transaction is not a fraudulent transfer.   Specifically, Plaintiffs assert that Delaware law shifts the burden to the defendant in the fraudulent transfer context when the transfer at issue takes place between entities with a "confidential relationship," including between corporations and their affiliates.   Because the Proposed Transaction involves transfers of assets among various DHI subsidiaries, Plaintiffs argue that DHI should have the burden to show the Transaction is not fraudulent.

As DHI points out,[104] however, the locus of the burden of persuasion at a trial on the merits is not always coterminous with the relevant burdens on an application for preliminary injunctive relief.   Indeed, because Plaintiffs have moved for such preliminary relief, they bear the burden of showing that there is a reasonable probability of their prevailing on the merits if a trial were held, regardless of where the burden of persuasion would fall at trial.[105]

Turning to the merits of Plaintiffs' fraudulent transfer claims, I note that they offer two separate grounds for them.   First, Plaintiffs claim that the transfers at issue would

---

[103]    6 *Del. C.* §§ 1301-1311.

[104]    DAB 27 n.9.

[105]    *Dewolf v. Datapoint Corp.*, 1985 WL 21153, at *3 (Del. Ch. Oct. 28, 1985) (citing *Joseph v. Shell Oil Co.*, 482 A.2d 335, 340 (Del. 1984)).   The cases Plaintiffs cite for their argument that DHI has the burden on the issue here are inapposite because those cases did not arise in the context of applications for a TRO or preliminary injunctive relief.

violate 6 *Del. C.* §§ 1304(a)(2) or 1305(a) in that (a) DHI made a transfer without receiving a reasonably equivalent value in exchange for the transfer and (b) DHI was insolvent at the time of the transfer, became insolvent as a result of the transfer, or was engaged in a transaction for which its remaining assets would be unreasonably small in relation to the Transaction.[106]  Plaintiffs argue that while GasCo and CoalCo will obtain loans and use a portion of them to pay certain of DHI's revolving debt, the value of the assets that will be transferred to those subsidiaries greatly outweighs such loan proceeds.[107]  They further aver that the assets not fenced off into GasCo and CoalCo are "clearly insufficient" to meet DHI's ongoing cash obligations, rendering it insolvent. Second, Plaintiffs argue the Transaction would violate § 1304(a)(1) in that it is designed to delay or hinder Plaintiffs' ability to collect on the Guaranties once the Lessees default.[108]

DHI, for its part, denies that Plaintiffs are likely to succeed on either of their arguments and further contends, for reasons discussed *supra*, that DHI has not transferred any of "its" assets in the first instance, thereby depriving Plaintiffs of a necessary predicate transfer for their claim.

---

[106]    POB 23.

[107]    *Id*. at 24 (asserting that the Transaction is a scheme designed solely to shield DHI's profitable assets from its general unsecured creditors like Plaintiffs).

[108]    *Id*. at 27.

I begin with DHI's contention that Plaintiffs' DUFTA claims fail because they did not allege a predicate transfer with respect to DHI's assets. Having considered the preliminary record available, I find that DHI likely is correct on this point. The necessary predicate to Plaintiffs' claims under DUTFA is that DHI fraudulently transferred the profitable power plants to GasCo and CoalCo. DUFTA focuses on "transfers" of an "asset," which is defined to mean the "property of the debtor."[109] As explained *supra*, however, Plaintiffs' allegations as to the physical power plants at issue do not involve the "transfer" of any "asset" of DHI because DHI does not directly own any of the power plants subject to transfer in the Proposed Transaction. Instead, it owns equity interests in multiple subsidiaries that directly own the physical assets. Because the Proposed Transaction does not contemplate a predicate transfer of property belonging to DHI, Plaintiffs' DUFTA claims are unlikely to succeed.[110]

---

[109]    6 *Del. C.* § 1301.

[110]    *See Reserves Mgmt. Corp. v. 30 Lots, LLC*, 2009 WL 4652991, at *5 (Del. Super. Nov. 30, 2009) ("Consideration of certain definitions under the Act exposes a fatal defect in the plaintiff's case. A fraudulent transfer is one made by the debtor. The Act defines 'transfer,' in pertinent part, as 'every mode, direct or indirect, ... of disposing of or parting with an asset.' Therefore, in order to have a transfer, there must be an 'asset.'"); *see also In re Regency Hldgs. (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) ("As a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's. . . . Hence, the parent's creditors have no claim to the subsidiary's assets, and *vice versa.* A party seeking to overcome the presumption of separateness must pierce the corporate veil, or prove that the two entities should be substantively consolidated.") (internal citations omitted). As discussed *supra*, DHI arguably is transferring *its* interests in SEI, which indirectly owns one of DHI's seventeen indirectly-owned power generating facilities, as part of the Transaction. See Supp.

Even assuming the Proposed Transaction would constitute a "Transfer" of DHI's "Assets" so as to come under the purview of DUFTA, I still conclude that Plaintiffs would be unlikely to succeed on their claims here.  First, under § 1304(a)(2), a transfer made by a debtor, such as DHI, is fraudulent under DUFTA if the debtor made the transfer: (1) "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and (2) either "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[111]

Plaintiffs are not likely to succeed in showing that DHI transferred the profitable power plants to GasCo and CoalCo without receiving a reasonably equivalent value. This is because DHI did not transfer any valuable assets away from its corporate structure.  The Transaction contemplates only transferring such assets from one subsidiary of DHI to another, albeit bankruptcy remote subsidiary.  DHI will have the

---

Merksamer Aff. ¶ 3.  This fact does not change my analysis because, as discussed in the text, Plaintiffs are not likely to succeed on their DUFTA claims even if the Transaction constitutes a transfer of DHI's assets.

[111]   6 *Del. C.* § 1304(a)(2).  Plaintiffs also rely on § 1305(a), which is substantially similar to § 1304(a)(2) and states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  6 *Del. C.* § 1305(a).

same indirect ownership interests in the physical assets after that Transaction as it did

before it.  Concededly, the bankruptcy remote nature of GasCo and CoalCo will deprive

DHI of the same level of potential control over their assets as it had before the

Transaction, but DHI also will enjoy, at least indirectly, the benefits of those entities'

statuses.  Such benefits include the ability to borrow funds at a lower cost, increased

liquidity, and the reduction of risk of cross-defaults based on DHI's other, troubled power

generating facilities.[112]   In addition, the transfers would directly improve DHI's own

liquidity in that it forms part of a transaction that will allow it to obtain a new, more

favorable credit facility.[113]

Similarly, I do not find that Plaintiffs would be likely to succeed on a claim that

DHI is insolvent, likely would become insolvent as a result of the Transaction, or

otherwise entered into a transaction such that its remaining assets paled in comparison to

the transaction.  For purposes of § 1304(a)(2), a "debtor is insolvent if the sum of the

debtor's debts is greater than all of the debtor's assets, at a fair valuation" and  a "debtor

who is generally not paying debts as they become due is presumed to be insolvent."[114]

Plaintiffs have not demonstrated a likelihood of success in proving the existence of either

of these conditions.  They have not shown, for example, that the effect of the Transaction

---

[112]    *See* Merksamer Aff. ¶ 8.

[113]    *Id.* ¶¶ 10-13; Dynegy Form 8-K at 4.  As noted above, proceeds from the new
facility will help pay some of DHI's outstanding debt under the existing credit
facility.  Merksamer Aff. ¶¶ 11-12.

[114]    6 *Del. C.* § 1302(a)-(b).

would be to deprive DHI of its indirect equity interests in the assets of either CoalCo or GasCo.

While those two entities will have a greater degree of separation and autonomy from their indirect parent, DHI, and DHI may be less able to control distributions from those entities to it, it has not been shown that such characteristics will render DHI insolvent under DUFTA. Under the terms of the Proposed Transaction and related documents, for example, CoalCo and GasCo, collectively, are able to provide up to $225 million in dividends to DHI on an annual basis.[115] In addition, an intermediate subsidiary between DHI and GasCo, for example, will receive $400 million at the Transaction's closing, which will have no restrictions on its use. Further, if the Transaction closes, DHI expects to obtain a new credit facility that will eliminate a covenant it is at risk of violating later in 2011 and provide DHI with an additional $800 million in liquidity.[116] Finally, as part of the Transaction, an indirect subsidiary of DHI, which is not a bankruptcy remote entity, will have the right to sell up to 20% of GasCo, which could provide an additional $500 million of liquidity to DHI.[117] According to DHI, these funds, taken together, would permit it to pay its debts as they become due, including to Plaintiffs if the Lessees default.

---

[115]    Merksamer Aff. ¶ 13.

[116]    *Id*.

[117]    Tr. 56-57; Merksamer Aff. ¶ 13.

In arguing that DHI will be unable to pay its bills as they come due, with or without the Transaction, Plaintiffs noted evidence that DHI will need to make an upcoming payment of $270 million to its creditors, including Plaintiffs.[118]  Even assuming that is true, however, I find that the record contains persuasive evidence that the Transaction would not render DHI insolvent.  Therefore, I conclude that Plaintiffs are not likely to succeed on their fraudulent transfer claim under § 1304(a)(2) or § 1305(a).

Plaintiffs also assert that the proposed transfers to GasCo and CoalCo as part of the Proposed Transaction would violate § 1304(a)(1) because DHI seeks to undertake such transfers with "actual intent to hinder, delay, or defraud" its creditors, including Plaintiffs.  Specifically, they contend that, "[h]aving singled out Roseton and Danskammer to be excluded from the new bankruptcy remote entities, even though Danskammer is a coal-fired plant and the restructuring is ostensibly intended to consolidate coal assets within CoalCo, it is clear that DHI is simply trying to wall off its profitable assets from the Roseton and Danskammer leases, and to thereby frustrate PSEG's efforts to collect on its Guaranty."[119]

Section 1304(a)(1) prohibits transfers of assets made with "actual intent" to defraud or hinder a debtor's creditors.[120]  Having considered the available record, I find

---

[118]    *See* Tr. 34.

[119]    POB 27.

[120]    6 *Del. C.* § 1304(a)(1); *see also id*. § 1304(b) (listing factors to consider in determining actual intent under § 1304(a)(1)).

that Plaintiffs are not likely to prevail on this aspect of their claim. DHI's Form 8-K and the other documents regarding the Proposed Transaction indicate that Dynegy and DHI faced a number of financial challenges and have put forward the challenged Transaction in an effort to improve their situation and DHI's prospects for the future. The Roseton and Danskammer plants evidently contributed to those financial difficulties. In that regard, it is not surprising that they receive special treatment in the Transaction. Plaintiffs, however, have not adduced any evidence that DHI had an "actual intent" to undergo the reorganization contemplated in the Transaction in order to hinder Plaintiffs' ability to execute on their Guaranties from DHI should the Lessees default. To the contrary, the evidence to date supports a reasonable inference that the Transaction's effects would provide actual and substantial financial benefits to DHI, which potentially could rebound to Plaintiffs' benefit over time. As such, I similarly find Plaintiffs are not likely to succeed on their claim under § 1304(a)(1).

### 3.    Irreparable Harm

Preliminary injunctive relief in the form of a TRO or otherwise is an extraordinary remedy that should not be issued in the absence of a clear showing of imminent irreparable harm to the moving party.[121] To make such a showing, a plaintiff must demonstrate harm for which she has no adequate remedy at law and that refusal to issue

---

[121]    *See Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at *4 (Del. Ch. Mar. 11, 1999) (noting that a preliminary injunction should be issued only with the full conviction on the part of the court of its urgent necessity).

an injunction would be a denial of justice.[122]   The alleged harm must be imminent and genuine, as opposed to speculative.[123]   This Court has found a threat of irreparable harm, for example, "in cases where an after-the-fact attempt to quantify damages would 'involve [a] costly exercise[ ] in imprecision' and would not provide full, fair, and complete relief for the alleged wrong."[124]   Potential harm that may occur in the future, however, does not constitute imminent and irreparable injury for the purposes of a TRO or preliminary injunction.[125]

Plaintiffs offer several grounds for their contention that they will suffer imminent irreparable harm if the Proposed Transaction is not enjoined.  I discuss them in turn.

First, Plaintiffs argue that they negotiated for valuable Guaranties that were protected by anti-transfer provisions, or successor obligor provisions, found in § 4.2 of the relevant agreements.  They assert that the Proposed Transaction flies in the face of § 4.2 and would render those Guaranties "permanently worthless."[126]   Second, as discussed *supra*, Plaintiffs argue that the Transaction is an effort by DHI to transfer assets to frustrate the potential claims of its creditors, including Plaintiffs, and, therefore, constitutes irreparable harm.

---

[122]   *See Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002).

[123]   *Id*.

[124]   *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2367669, at *5 (Del. Ch. June 7, 2010).

[125]   *Am. Gen. Corp. v. Unitrin, Inc.*, 1994 WL 512537, at *4 (Del. Ch. Aug. 26, 1994).

[126]   POB 14.

Neither of these arguments is persuasive, however, because they are essentially rehashes of Plaintiffs' failed arguments on the merits. For the reasons stated above, the Transaction will not render the Guaranties "worthless." Following the Transaction, DHI will continue to own indirectly the same power generating facilities through its equity interests in its subsidiaries. Moreover, as discussed above, the record supports a preliminary finding that the Transaction may provide actual and substantial benefits to DHI that might prove valuable to Plaintiffs.

Despite these potential benefits, Plaintiffs characterize the Transaction as an effort by DHI to hinder execution on an award of money damages against DHI. In particular, they focus on the fact that DHI orchestrated a transaction in which most of its valuable indirect assets will be transferred into bankruptcy remote entities, which, they assert, will render the proceeds of the transferred assets unavailable for judgment creditors. The following hypothetical sequence of events illustrates the problem as Plaintiffs perceive it. Assume the Lessees default, then DHI defaults under its obligations in the Guaranties, then Plaintiffs obtain a judgment against DHI, and attempt to execute on that judgment. In such a scenario, Plaintiffs contend that the Transaction's ring-fencing of DHI's valuable indirect assets into GasCo and CoalCo will make it more difficult for Plaintiffs to collect on a future judgment.

Specifically, Plaintiffs argue that CoalCo and GasCo's bankruptcy remote status will cause them irreparable harm. They assert first that DHI's counsel recently conceded that these entities will have independent directors who will have the authority to block

distributions to DHI or any creditor that might execute on DHI's interests.[127]  The record does not support this contention, however.  GasCo, for example, is set up to have, at least initially, three managers, including one independent manager.[128]  At the Argument, however, counsel for DHI effectively retracted the statement relied upon by Plaintiffs as an incorrect assessment of the facts.[129]  GasCo's Operating Agreement supports that retraction as it states that "[f]or the avoidance of doubt, the vote of the Independent Manager is not required for the distribution of earnings or capital."[130]

Even so, Plaintiffs contend that the Operating Agreement limits a Member's ability to exercise control over the entity because the Member will not have authority to bind GasCo except as required under the Delaware Limited Liability Company Act, 6 *Del. C.* §§ 18-101 to 111.  In addition, Plaintiffs aver that the Operating Agreement limits the Managers' ability to make upstream distributions to the parent because their fiduciary duties are owed solely to GasCo and, because DHI is considered a "Restricted Affiliate" of GasCo, DHI is not permitted to dictate to GasCo how to run its business.[131]  Thus,

---

[127]    PRB 4 (citing DHI's counsel's statements in a related proceeding in New York state court).

[128]    Alicks Aff. Ex. 6, Limited Liability Company Operating Agreement of GasCo (the "Operating Agreement"), § 8(a).

[129]    Tr. 54.

[130]    Operating Agreement § 8(c).

[131]    PRB 4-5 (citing Operating Agreement §§ 9(e), 13).  Section 9(i) further provides that GasCo "shall not enter into any guaranty or otherwise assume or hold itself out or permit itself to be held out as having guaranteed or otherwise assumed, or otherwise become liable (other than as required by law) or pledge any assets, with

Plaintiffs contend that the corporate organization envisioned by the Proposed Transaction is designed to prevent GasCo's Member, and thus DHI, from controlling its affairs and access to distributions from its assets.[132]

These restrictions on DHI's control of its new bankruptcy remote subsidiaries can be expected to complicate Plaintiffs' effort to enforce the Guaranties it received from DHI. Nevertheless, I find Plaintiffs' claim of irreparable injury to be unconvincing. Rather, it is a speculative claim that if various contingencies occur, including DHI's default under the Guaranties, Plaintiffs might have a more difficult time collecting on a future judgment against DHI. The fact that DHI might not be able to tap into cash distributions from GasCo and CoalCo to the same extent as it might have with regular subsidiaries does not support a finding of irreparable harm.[133] In *Angelo, Gordon & Co.*, for example, subordinated noteholders moved for a preliminary injunction to enjoin a proposed merger, in part, because they asserted that underlying insolvency issues and

---

respect to any liability or obligation of any of its Restricted Affiliates." "Restricted Affiliate" is defined in Schedule A of the Operating Agreement as "Dynegy Inc. and any of Dynegy Inc.'s Affiliates other than [GasCo's] direct and indirect subsidiaries." Operating Agreement Schedule A.

[132]    PRB 6. I note that GasCo's "Member" is Dynegy Gas Investments Holdings, LLC. This entity has an operating agreement substantially identical to GasCo's. Alicks Aff. Ex. 5. Its Member is Dynegy Gas Holdco, LLC, its 100% owner and an entity that is outside of the prospective ring-fencing contemplated in the Proposed Transaction. *Id.*; Alicks Aff. Ex. 3 at 1-2.

[133]    *See Angelo, Gordon & Co. v. Allied Riser Commc'ns Corp.*, 805 A.2d 221, 231 (Del. Ch. 2002).

cash expenditures would prevent them from collecting on a future damages judgment.[134]

The Court acknowledged that

> there will be potentially more enterprise risk after the Merger than there is now within ARC itself and that this additional risk poses some greater threat to the due performance on the Notes. That is so because ARC, having sold most of its operating assets and drastically cut expenses, has scaled back its operating units and is sitting on a pot of cash.[135]

Nevertheless, the Court denied the preliminary injunction, finding that this possibility alone did not justify entry of an injunction because the alleged injury asserted by the plaintiffs was "both speculative and [would] not result from the Merger itself but [would] only be felt, if at all, with the passage of time after the Merger."[136]

The same reasoning applies here. DHI's Restricted Affiliate status with respect to GasCo and CoalCo, along with those entities' collective $225 million cap on annual distributions to DHI, in fact, might make it more difficult to collect on a judgment against DHI. But, this harm merely is speculative at this point. The record reflects that in addition to the $225 million potentially available to DHI on a yearly basis, DHI would have access to $400 million that an intermediate subsidiary will receive at the close of the Transaction, which is not subject to restrictions and would be outside the ring-fence.[137]

---

[134]    *Id*. at 230-31.

[135]    *Id*.

[136]    *Id*. at 231 (acknowledging that it was possible "that the Cogent/ARC Merger [would] not prove to be a profitable enterprise and, as plaintiffs suggest, [would] not be able to pay damages if plaintiffs obtain a money judgment in this action.").

[137]    *See* Merksamer Aff. ¶ 13; O'Connor Aff. Ex. G at 2.

In addition, as discussed above, if the Transaction closes, DHI's new credit facility will provide DHI with an additional $800 million in liquidity with no material restriction on its use by DHI.[138]   Lastly, an indirect subsidiary of DHI, which is not a bankruptcy remote entity, has the right to sell up to 20% of GasCo, which could provide an additional $500 million of liquidity to DHI.[139]   Thus, even if DHI defaults and Plaintiffs obtain a judgment against DHI, Plaintiffs may have an adequate remedy at law in that they could execute on that judgment against funds available to DHI.

Finally, Plaintiffs assert that because the Proposed Transaction involves GasCo and CoalCo raising an additional $1.7 billion in new secured financing, Plaintiffs, as unsecured creditors, would be forced to assume an inferior credit position thereby diminishing the likelihood of their success in collecting on the Guaranties.  In addition, they argue that without preliminary injunctive relief, Plaintiffs are subject to the continuing risk that GasCo and CoalCo could sell off certain of DHI's gas and coal assets in an effort to raise capital.  And, in the same vein, they worry that because up to 20% of GasCo may be transferred to third parties, there is a risk that a delay will substantially impair the Court's ability to unwind the Transaction.

These arguments also lack merit.  Nothing in the Guaranties, which define the rights and obligations of Plaintiffs with respect to DHI and the Lessees, prohibits DHI subsidiaries from taking on new debt, issuing securities, or otherwise raising capital in

---

[138]     Merksamer Aff. ¶ 13.

[139]     *Id.*; Tr. 56-57.

the manner contemplated by the Transaction. Moreover, the Transaction will not increase the net debt held by DHI's direct and indirect subsidiaries.[140]

Thus, for all of these foregoing reasons, I find that Plaintiffs have not met their burden to show they face a risk of imminent irreparable harm.

### 4.    Balance of the Equities

The final factor in adjudicating PSEG's application for a TRO or preliminary injunctive relief is which of the parties here, if any, a balancing of the equities would favor. A moving party must demonstrate that "the harm that would result if an injunction does not issue outweighs the harm that would befall the opposing party if the injunction is issued."[141] Hence, I also must engage in a pragmatic balancing of the equities in this case.[142]

Plaintiffs assert that allowing DHI to close on the Proposed Transaction will deprive them of their bargained-for protections in § 4.2 of the Guaranties and, in the event of a default by DHI, prevent them from executing on DHI's ownership interests. Moreover, PSEG argues that DHI has failed to produce any detailed evidence to support

---

[140]    *See* Merksamer Aff. ¶ 10.

[141]    *Draper Commc'ns, Inc. v. Delaware Valley*, 505 A.2d 1283, 1288 (Del. Ch. 1985).

[142]    *In re Holly Farms Corp. S'holders Litig.*, 564 A.2d 342, 348 (Del. Ch. 1989).

its assertion that the issuance of preliminary injunctive relief will result in bankruptcy or other significant harm to DHI.[143]

DHI argues that the harm that would befall it should the Court issue an injunction here far outweighs any potential harm to Plaintiffs. It asserts that, given the troubled state of the global economy, an injunction likely would prevent DHI from obtaining the $1.7 billion in new credit currently being negotiated, and that it has no assurances of being able to obtain comparable replacement financing. DHI further alleges that its failure to refinance its debt and obtain additional liquidity may force it to file chapter 11 bankruptcy. Finally, it asserts that permitting the Transaction to close so it can reorganize itself would preserve Plaintiffs' present rights under the Guaranties while materially benefiting DHI by creating additional liquidity without diminishing the value of its assets or increasing its net debt.

Having considered the parties' arguments and the preliminary record, I am convinced that if the equities favor any party, that party is DHI. The immediate potential harm to DHI if this Court were to enjoin the Transaction for even a relatively short period of one month likely outweighs the somewhat speculative harm Plaintiffs suggest they would suffer if the Transaction closes. DHI has spent considerable time negotiating the terms of its new credit facility and the reorganization at issue in this case,[144] and, given its

---

[143]    Plaintiffs argue that if the result of an injunction was to thrust bankruptcy upon DHI, the proper remedy would be to allow DHI to file for bankruptcy and undergo an orderly reorganization under the law. PRB 8.

[144]    *See* O'Connor Aff. Ex O.

immediate need for capital and the present state of the domestic credit markets, it is at substantial risk of being unable to obtain comparable replacement financing. Moreover, under its current credit facility, DHI is "at risk of violating a covenant in Q3 or Q4," which would bar its access to additional credit under that agreement[145] and accelerate its repayment obligation thereunder.[146] If DHI was unable to pay those amounts, lenders could foreclose on "substantially all of [DHI's] assets, which would have a material adverse impact on [DHI's] financial condition."[147] This would put DHI at "material risk of having to file for bankruptcy" because DHI's assets and subsidiaries are subject to cross-default provisions.[148] This threat of substantial harm to DHI is at least sufficient to counterbalance the somewhat speculative harm identified by Plaintiffs and discussed *supra*. Therefore, I find that the equities here are essentially neutral or weigh slightly in favor of denying Plaintiffs' application for a TRO or preliminary injunctive relief.

*    *    *    *

In summary, having carefully considered the parties' numerous submissions and their oral arguments, I conclude that Plaintiffs did not carry their burden to establish the elements required for a TRO or preliminary injunction. They have made only a weak showing as to the probability of success on the merits and have failed to persuade me that

---

[145]    Merksamer Aff. ¶ 13.

[146]    DAB 35.

[147]    Alicks Aff. Ex. 1 at 7-8.

[148]    Tr. 58.

they face irreparable harm if I permit the Proposed Transaction to close. Finally, the equities in this case do not favor the issuance of injunctive relief. Therefore, I hold that Plaintiffs are not entitled to a preliminary injunction.

### III.    CONCLUSION

For the reasons stated above, I deny Plaintiffs' motion for a TRO or preliminary injunction.

**IT IS SO ORDERED**.