# EXHIBIT 13

# DYNEGY HOLDINGS, LLC

## 8-K
Current report filing
Filed on 09/08/2011
Filed Period 09/01/2011

THOMSON REUTERS ACCELUS™

 THOMSON REUTERS

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported)
**September 8, 2011 (September 1, 2011)**

# DYNEGY HOLDINGS, LLC

(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **000-29311** | **94-3248415** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **1000 Louisiana, Suite 5800, Houston, Texas** | **77002** |
| (Address of principal executive offices) | (Zip Code) |

**(713) 507-6400**
(Registrant's telephone number, including area code)

**Dynegy Holdings Inc.**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01**    **Entry into a Material Definitive Agreement.**

The information set forth in Item 2.01 is incorporated herein by reference.

**Item 2.01**    **Completion of Acquisition or Disposition of Assets**

On September 1, 2011, Dynegy Inc., a Delaware corporation ("Dynegy") and direct parent of Dynegy Holdings, LLC, a Delaware limited liability company ("DH") (f/k/a Dynegy Holdings Inc., a Delaware corporation ), and Dynegy Gas Investments, LLC, a Delaware limited liability company ("DGIN") and a direct wholly owned subsidiary of DH, entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") whereby DGIN sold 100% of the outstanding membership interests of Dynegy Coal HoldCo, LLC, a Delaware limited liability company ("Coal HoldCo") and wholly owned subsidiary of DGIN, to Dynegy. Dynegy's board of directors, as well as DGIN's board of managers, concluded that the fair value of the acquired equity stake in Coal HoldCo at the time of the transaction was approximately $1.25 billion, after taking into account all debt obligations of Coal HoldCo's wholly owned subsidiary, Dynegy Midwest Generation, LLC (" CoalCo"), including in particular CoalCo's new $600 million, five-year senior secured term loan facility. Dynegy provided this fair value to DGIN in exchange for Coal HoldCo through Dynegy's issuance of a undertaking to make certain specified payments over time which coincide in timing and amount to the payments of principal and interest that DH is obligated to make under a portion of its $1.1 billion of 7.75% senior unsecured notes due 2019 and its $175 million of 7.625% senior debentures due 2026 (the "Undertaking Agreement"). The Undertaking Agreement does not provide any rights or obligations with respect to any outstanding DH notes or debentures, including the notes and debentures due in 2019 and 2026.

DGIN assigned its right to receive payments under the Undertaking Agreement to DH in exchange for a promissory note (the "Note") in the amount of $1.25 billion that matures in 2027 (the "Assignment"). The Note bears annual interest at a rate of 4.24%, which will be payable upon maturity. As a condition to Dynegy's consent to the Assignment, the Undertaking Agreement was amended and restated to be between DH and Dynegy and to provide for the reduction of Dynegy's obligations if the outstanding principal amount of any of DH's $3.5 billion of outstanding notes and debentures is decreased as a result of any exchange offer, tender offer or other purchase or repayment by Dynegy or its subsidiaries (other than DH and its subsidiaries, unless Dynegy guarantees the debt securities of DH or such subsidiary in connection with such exchange offer, tender offer or other purchase or repayment); provided, that such principal amount is retired, cancelled or otherwise forgiven.

All of the summaries of the transaction and documents are qualified in their entirety by reference to the text of the Purchase Agreement, Undertaking Agreement, Assignment, Note and A&R Undertaking Agreement, which are attached hereto as Exhibits 2.1, 2.2, 10.1, 4.1 and 2.3 and incorporated herein by reference.

**Item 2.03**    **Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth in Item 2.01 regarding the Note is incorporated herein by reference.

**Item 7.01**    **Regulation FD Disclosure**

A copy of the press release announcing the closing of the transactions is being furnished as Exhibit 99.2 and is herein incorporated by reference.

Pursuant to General Instruction B.2 of Form 8-K and Securities and Exchange Commission Release No. 33-8176, the information contained in the press release furnished as an exhibit hereto shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, is not subject to the liabilities of that section and is not deemed incorporated by reference in any filing under the Securities Act except as shall be expressly set forth by specific reference in such filings. In addition, this Form 8-K and the press release contain statements intended as "forward-looking statements," which are subject to the cautionary statements about forward-looking statements set forth in such press release.

**Item 8.01**    **Other Events.**

On September 1, 2011, DH, then a Delaware corporation, changed its corporate form to a Delaware limited liability company pursuant to Section 266 of the General Corporation Law of the State of Delaware (the "Conversion"). In connection with the Conversion, DH filed a Certificate of Formation of Dynegy Holdings, LLC and a Certificate of Conversion pursuant to the Delaware Limited Liability Company Act with the Delaware Secretary of State. A copy of DH's Certificate of Formation and Limited Liability Company Operating Agreement are attached hereto as exhibits 3.1 and 3.2, respectively.

**Item 9.01**    **Financial Statements and Exhibits.**

(b)    Unaudited pro forma condensed consolidated financial statements of Dynegy Holdings, LLC are attached hereto as Exhibit 99.1 and are incorporated herein by reference.

(d)    Exhibits:

| Exhibit No. | Document |
|---|---|
| 2.1 | Membership Interest Purchase Agreement by and between Dynegy Gas Investments, LLC and Dynegy Inc. dated September 1, 2011. |
| 2.2 | Undertaking Agreement by and between Dynegy Gas Investments, LLC and Dynegy Inc. dated September 1, 2011. |

| | |
|---|---|
| 2.3 | Amended and Restated Undertaking Agreement by and between Dynegy Holdings, LLC and Dynegy Inc. |
| 3.1 | Dynegy Holdings, LLC Certificate of Formation, effective September 1, 2011. |
| 3.2 | Dynegy Holdings, LLC Limited Liability Company Operating Agreement, effective September 1, 2011. |

| | |
|---|---|
| 4.1 | Promissory Note by and between Dynegy Holdings, LLC and Dynegy Gas Investments, LLC dated September 1, 2011. |
| 10.1 | Assignment Agreement by and among Dynegy Gas Investments, LLC, Dynegy Holdings, LLC and Dynegy Inc. dated September 1, 2011. |
| 99.1 | Unaudited pro forma condensed consolidated financial statements of Dynegy Holdings, LLC |
| 99.2 | Press release announcing the membership interest transfer dated September 1, 2011. |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**DYNEGY HOLDINGS, LLC**
(Registrant)

Dated: September 8, 2011

By:     /s/ KENT R. STEPHENSON

Name:  Kent R. Stephenson
Title:    Executive Vice President & General Counsel

3

# EXHIBIT INDEX

| Exhibit No. | Document |
| --- | --- |
| 2.1 | Membership Interest Purchase Agreement by and between Dynegy Gas Investments, LLC and Dynegy Inc. dated September 1, 2011. |
| 2.2 | Undertaking Agreement by and between Dynegy Gas Investments, LLC and Dynegy Inc. dated September 1, 2011. |
| 2.3 | Amended and Restated Undertaking Agreement by and between Dynegy Holdings, LLC and Dynegy Inc. |
| 3.1 | Dynegy Holdings, LLC Certificate of Formation, effective September 1, 2011. |
| 3.2 | Dynegy Holdings, LLC Limited Liability Company Operating Agreement, effective September 1, 2011. |
| 4.1 | Promissory Note by and between Dynegy Holdings, LLC and Dynegy Gas Investments, LLC dated September 1, 2011. |
| 10.1 | Assignment Agreement by and among Dynegy Gas Investments, LLC, Dynegy Holdings, LLC and Dynegy Inc. dated September 1, 2011. |
| 99.1 | Unaudited pro forma condensed consolidated financial statements of Dynegy Holdings, LLC |
| 99.2 | Press release announcing the membership interest transfer dated September 1, 2011. |

**Exhibit 2.1**

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**BY AND BETWEEN**

**DYNEGY GAS INVESTMENTS, LLC**

**AND**

**DYNEGY INC.**

**DATED SEPTEMBER 1, 2011**

Table of Contents

|  |  | Page |
|---|---|---|
| **Article I DEFINITIONS** | | |
| Section 1.1 | Definitions | 2 |
| Section 1.2 | Additional Defined Terms | 4 |
| Section 1.3 | Construction | 4 |
| **Article II SALE OF MEMBERSHIP INTERESTS** | | |
| Section 2.1 | Sale of Membership Interests | 5 |
| Section 2.2 | Undertaking | 5 |
| Section 2.3 | Adjustment Consideration | 5 |
| Section 2.4 | Delivery of Membership Interests | 6 |
| **Article III** | **REPRESENTATIONS AND WARRANTIES OF SELLER** | |
| Section 3.1 | Authorization; Non-Contravention | 6 |
| Section 3.2 | Ownership of Membership Interests | 7 |
| Section 3.3 | Capitalization | 7 |
| Section 3.4 | Company and its Subsidiaries | 7 |
| Section 3.5 | Sufficiency of Assets | 8 |
| **Article IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** | | |
| Section 4.1 | Authorization; Non-Contravention | 9 |
| **Article V MISCELLANEOUS** | | |
| Section 5.1 | Notices | 10 |
| Section 5.2 | Entire Agreement | 10 |
| Section 5.3 | Binding Effect; Benefit; Assignment | 10 |
| Section 5.4 | Amendment and Modification | 10 |
| Section 5.5 | Counterparts | 11 |
| Section 5.6 | Applicable Law and Arbitration | 11 |
| Section 5.7 | Severability | 12 |
| Section 5.8 | Waiver of Jury Trial | 12 |
| Section 5.9 | Headings | 12 |

ANNEXES AND EXHIBITS

| Annex A | Additional Defined Terms |
| Exhibit A | Form of Undertaking Agreement |

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is dated September 1, 2011 by and between Dynegy Gas Investments, LLC ("**Seller**"), a limited liability company organized under the laws of the State of Delaware, and Dynegy Inc. ("**Purchaser**"), a corporation organized under the laws of the State of Delaware.

W I T N E S S E T H:

WHEREAS, Seller owns 100% of the outstanding membership interests (the "**Membership Interests**") of Dynegy Coal Holdco, LLC (the "**Company**"), a limited liability company organized under the laws of the State of Delaware;

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, the Membership Interests pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, it is the intention of the parties hereto that, upon consummation of the purchase and sale of the Membership Interests pursuant to this Agreement, Purchaser shall own all of the Membership Interests.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the parties, intending to be legally bound, agree as follows:

Article I

DEFINITIONS

Section 1.1        Definitions.  When used in this Agreement, the following terms shall have the respective meanings specified therefore below.

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York.

"**CoalCo First Lien Term Loan Credit Agreement**" means that certain first lien term loan facility pursuant to that certain Credit Agreement, dated as of August 5, 2011, among Dynegy Midwest Generation, LLC, Credit Suisse AG, Cayman Islands Branch as Administrative Agent and as Collateral Trustee, Credit Suisse Securities (USA) LLC and Goldman Sachs Lending Partners LLC, as Joint Bookrunners and Joint Lead Arrangers, Barclays Capital, the investment banking division of Barclays Bank PLC, as Co-Manager, and the other agents named therein and lenders from time to time party thereto.

"**Common Stock**" shall mean common stock, par value $0.01 per share of Purchaser.

2

"**Contract**" shall mean any note, bond, mortgage, indenture, guarantee, license, franchise, permit, agreement, understanding, arrangement, contract, commitment, letter of intent, or other instrument or obligation (whether oral or written), and any amendments thereto.

"**Current Market Price Per Share**" shall mean, as of any date, the Quoted Prices of the Common Stock for the thirty (30) consecutive Business Days ending immediately prior to the date in question.  If no such Quoted Prices are available, "Current Market Price Per Share" shall be the equity value per share of Common Stock based on a third party valuation prepared by a nationally recognized outside valuation expert reasonably acceptable to the parties to a dispute referred to in Section 2.3, which shall be based on the total equity value of Purchaser without any discounts for lack of liquidity of the Common Stock.

"**Equity Value**" shall mean the equity value of the Company as of the date of this Agreement based on information available as of the date of this Agreement.

"**Governmental Entity**" shall mean any United States or non-United States federal, state, provincial or local court, arbitral tribunal, administrative agency or commission or other governmental or regulatory agency or authority or any securities exchange.

"**Indebtedness**" shall mean indebtedness for borrowed money.

"**Law**" shall mean any statute, law, ordinance, policy, rule or regulation of any Governmental Entity and all judicial interpretations thereof.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license of any Governmental Entity or any arbitrator.

"**Person**" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a Governmental Entity.

"**Quoted Prices**" shall mean, with respect to any security on any date, the average of the closing prices on such date of such security on all domestic securities exchanges and inter-dealer quotation systems.

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation more than fifty percent (50%) of the stock of any class or classes of which having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

Section 1.2        <u>Additional Defined Terms</u>. In addition to the terms defined in <u>Section 1.1</u>, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated on <u>Annex A</u>.

Section 1.3        <u>Construction</u>.  In this Agreement, unless the context otherwise requires:

(a)        references to "writing" or comparable expressions include a reference to facsimile transmission or comparable means of communication;

(b)        the phrases "delivered" or "made available" shall mean that the information referred to has been physically or electronically delivered to the relevant parties;

(c)        words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)        references to Articles, Sections, Annexes, Exhibits, the Preamble and Recitals are references to articles, sections, annexes, exhibits, the preamble and recitals of this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(e)        whenever this Agreement refers to a number of days, that number shall refer to calendar days unless Business Days are specified and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day;

(f)        the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, shall refer to this Agreement as a whole and not to any provision of this Agreement;

(g)        this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented;

(h)        "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and

(i)        references to "Dollars", "dollars" or "$", without more are to the lawful currency of United States of America.

Article II

<u>SALE OF MEMBERSHIP INTEREST</u>

Section 2.1        <u>Sale of Membership Interests</u>.  On the terms, and subject to the conditions set forth in this Agreement, Seller hereby sells, assigns, transfers and delivers to

4

Purchaser, and Purchaser hereby purchases from Seller, the Membership Interests free and clear of all liens and together with all accrued rights and benefits attached thereto. Contemporaneously herewith, Seller is taking such action as is reasonably necessary and legally required (i) to reflect the sale, assignment, transfer and delivery of the Membership Interests on the books and records of the Company, free and clear of all liens and together with all accrued rights and benefits attached thereto, (ii) to provide Purchaser with such evidence of the same as is legally required or as Purchaser shall reasonably request, and (iii) to cure any deficiencies with respect to the endorsement of the certificates representing the Membership Interests or with respect to the membership interest power accompanying any such certificates.

Section 2.2    Undertaking.    In full consideration for the purchase by Purchaser of the Membership Interests, contemporaneously herewith Seller and Purchaser are entering into that certain Undertaking Agreement by and between Seller and Purchaser in substantially the form attached hereto as Exhibit A (as the same may be amended from time to time, the "**Undertaking**"), which Undertaking is subject to amendment pursuant to Section 2.3.

Section 2.3    Adjustment Consideration.

(a)    If there shall arise any dispute as to whether the Equity Value is greater than or less than $1,250,000,000, either Seller or Purchaser may provide notice in writing (a "**Valuation Dispute Notification**") to the other of such dispute within two (2) years of the date hereof. If no such Valuation Dispute Notification is delivered within such two (2) year period, then the Equity Value, and the Undertaking, shall not be subject to any challenge or adjustment.

(b)    If a Valuation Dispute Notification is timely delivered, the Equity Value shall be determined by final arbitration under Section 5.6 hereof, which arbitration shall be the sole and exclusive remedy for the resolution of any such dispute.

(c)    If the Equity Value as determined pursuant to Section 2.3(b) (the "**Final Equity Value**") is greater than $1,250,000,000 (being the Equity Value upon which the Undertaking is based), then Purchaser shall provide Seller with consideration (the "**Seller Adjustment Consideration**") equal in value to the difference between (i) the Final Equity Value, less (ii) $1,250,000,000. Purchaser may elect to satisfy such obligation to provide the Seller Adjustment Consideration, if any, by paying such amount in (w) cash, (x) shares of Common Stock, valued for this purpose at the Current Market Price Per Share as of the date that Final Equity Value is determined, (y) membership interests in the Company, valued for this purpose based on the Final Equity Value, or (z) any combination of the foregoing, as determined by Purchaser in its sole discretion.

(d)    If the Final Equity Value is less than $1,250,000,000, then Seller shall provide Purchaser with consideration (the "**Purchaser Adjustment Consideration**") equal to the difference between (i) $1,250,000,000, less (ii) the Final Equity Value. Purchaser may elect that Seller satisfy its obligation to provide the Purchaser Adjustment Consideration, if any, by (x) paying such amount in cash, (y) reducing each remaining Payment Amount (as defined in the Undertaking) pro rata based on the amount of the aggregate Payment Amounts remaining in the Payment Stream (as defined in the Undertaking), or (z) any combination of the foregoing, as determined by Purchaser in its sole discretion.

Section 2.4    Delivery of Membership Interests. Contemporaneously herewith, Seller is delivering or causing to be delivered to Purchaser certificates representing the Membership Interests, duly endorsed in blank, or accompanied by either membership interest powers duly executed in blank by Seller or such other instruments of transfer as are reasonably acceptable to Purchaser.

Article III

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows as of the date hereof:

Section 3.1    Authorization; Non-Contravention.

(a)    Seller has the requisite limited liability company power and authority and has taken all limited liability and other action necessary to execute and deliver this Agreement, the Undertaking and all other instruments and agreements to be delivered by Seller as contemplated hereby and thereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Seller of this Agreement, the Undertaking and all other instruments and agreements to be delivered by Seller as contemplated hereby and thereby, the consummation by Seller of the transactions contemplated hereby and thereunder and the performance of its obligations hereunder and thereunder have been duly authorized and approved by all necessary limited liability company or other action.  This Agreement and the Undertaking have been, and all other instruments and agreements to be executed and delivered by Seller as contemplated hereby and thereby will be, duly executed and delivered by Seller.  Assuming that this Agreement and the Undertaking constitute valid and binding obligations of Purchaser, this Agreement and the Undertaking constitute valid and binding obligations of Seller enforceable against Seller in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.  Assuming that all other instruments and agreements to be delivered by Seller as contemplated hereby constitute valid and binding obligations of Purchaser and each other Person (other than Seller and its Subsidiaries) party thereto, such instruments and agreements will constitute valid and binding obligations of Seller enforceable against Seller in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(b)    The execution and delivery of this Agreement, the Undertaking, and all other instruments and agreements to be delivered by Seller as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not (i) conflict with any of the provisions of the certificate of incorporation or by-laws or equivalent charter documents of Seller, the Company or any of its Subsidiaries, in each case as amended to the date of this Agreement, (ii) conflict with or result in a breach of, or constitute a default under, or result in the acceleration of any obligation or loss of any benefits under, any material Contract or

6

other instrument to which Seller, the Company or any of its Subsidiaries is a party or by which any of their respective properties or assets are bound or under any material Contract, or (iii) contravene any Law or any Order applicable to Seller, the Company or any of its Subsidiaries or by which any of their respective properties or assets are bound.

Section 3.2    <u>Ownership of Membership Interests</u>.  Seller has good and valid title to the Membership Interests free and clear of all liens, and is the record and beneficial owner thereof.  The Membership Interests were acquired from the Company in compliance with applicable Law.  There is no outstanding Contract with any Person to purchase, redeem or otherwise acquire any outstanding membership interests of the Company.  Seller is conveying good and valid title to the Membership Interests, free and clear of all liens, Orders, Contracts or other limitations whatsoever. The assignments, endorsements, membership interest powers and other instruments of transfer delivered by Seller to Purchaser are sufficient to transfer Seller's entire interest, record and beneficial, in the Membership Interests to Purchaser.

Section 3.3    <u>Capitalization</u>.

(a)    The Membership Interests constitutes all the issued and outstanding equity interests of the Company. The Membership Interests have been duly authorized and validly issued, and is not subject to, and was not issued in violation of any preemptive rights or other similar rights.  Except for the Membership Interests, no other equity interests of the Company are issued, reserved for issuance or outstanding.  The Company is not a party to any outstanding or authorized option, warrant, right (including any preemptive right), subscription, claim of any character, agreement, obligation, convertible or exchangeable securities, or other commitments contingent or otherwise, relating to the equity or voting interests in the Company or any of its Subsidiaries, pursuant to which the Company is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, equity or voting interests in the Company or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any equity or voting interests in the Company.  There are no outstanding or authorized profit participation or similar rights with respect to the equity or voting interests in the Company.  The Company does not have any authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the members of the Company on any matter.  There are no irrevocable proxies and no voting agreements with respect to any equity or voting interests in the Company.

(b)    All issued and outstanding equity or voting interests of each Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and are not subject to, and were not issued in violation of, any preemptive rights.  Except for equity interests of the Company's Subsidiaries owned by the Company or its Subsidiaries, no equity or voting interests of any Subsidiary of the Company are issued, reserved for issuance or outstanding.  The Subsidiaries of the Company are not party to any outstanding option, warrant, call, subscription, or other right (including any preemptive right), agreement or commitment relating to the equity or voting interests in, the Company or any of its Subsidiaries, pursuant to which any Subsidiary of the Company is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, equity or voting interests in any Subsidiary of the Company or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or

7

acquire, any equity or voting interests in, any Subsidiary of the Company. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity or voting interests in any Subsidiary of the Company. No Subsidiary of the Company has any authorized or outstanding bonds, debentures, notes or other Indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the stockholders of any Subsidiary of the Company on any matter. There are no irrevocable proxies and no voting agreements with respect to any capital stock of, or other equity or voting interests in, any Subsidiary of the Company.

Section 3.4        Company and its Subsidiaries.

(a)        The Company is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)        Each of (i) Dynegy Coal Investments Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, (ii) Dynegy Midwest Generation, LLC, a limited liability company formed under the laws of the State of Delaware, and (iii) Havana Dock Enterprises, LLC, a limited liability company formed under the laws of the State of Delaware, is a Subsidiary of the Company. Each Subsidiary of the Company is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware and each Subsidiary of the Company has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(c)        Neither the Company nor any of its Subsidiaries has any Indebtedness other than Indebtedness arising pursuant to the CoalCo First Lien Term Loan Credit Agreement.

Section 3.5.        Sufficiency of Assets. The Company or one of its Subsidiaries has good and valid title or, in the case of leased assets, a valid leasehold interest, to all of the material real property and material tangible and intangible personal property and assets owned or leased by it. The tangible and intangible personal property owned or leased by the Company and its Subsidiaries, together with all owned and leased real property of the Company and its Subsidiaries, all owned, leased or licensed intellectual property of the Company and its Subsidiaries, and all other assets and rights of the Company and its Subsidiaries, are sufficient for the operation of the business of the Company and its Subsidiaries as currently conducted. Immediately after execution and delivery of this Agreement, the Company and its Subsidiaries will own, or have the unrestricted right to use, all properties and assets that are used (or necessary) in connection with the Company's and its Subsidiaries' business on the same economic basis as before the execution and delivery of this Agreement.

Article IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows as of the date hereof:

Section 4.1         Authorization; Non-Contravention.

(a)        Purchaser has the requisite corporate power and authority and has taken all corporate or other action necessary to execute and deliver this Agreement, the Undertaking and all other instruments and agreements to be delivered by Purchaser as contemplated hereby and thereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement, the Undertaking and all other instruments and agreements to be delivered by Purchaser as contemplated hereby and thereby, the consummation by Purchaser of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been duly authorized and approved by the board of directors of Purchaser.  This Agreement and the Undertaking have been, and all other instruments and agreements to be executed and delivered by Purchaser as contemplated hereby and thereby will be, duly executed and delivered by Purchaser. Assuming that this Agreement and the Undertaking constitute valid and binding obligations of Seller, this Agreement and the Undertaking constitute valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally, and by general equitable principles. Assuming that all other instruments and agreements to be delivered by Purchaser as contemplated hereby constitute valid and binding obligations of Seller and each other Person (other than Purchaser) party thereto, such instruments and agreements  will constitute valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(b)        The execution and delivery of this Agreement, the Undertaking, and all other instruments and agreements to be delivered by Purchaser as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or equivalent charter documents of Purchaser, as amended to the date of this Agreement, (ii) conflict with or result in breach of, or constitute a default under, or result in the acceleration of any obligation or loss of any benefits under, any material Contract or other instrument to which Purchaser is a party or by which Purchaser or any of its properties or assets are bound or (iii) contravene any Law or any Order applicable to Purchaser or by which any of its properties or assets are bound.

9

Article V

## MISCELLANEOUS

Section 5.1        Notices. Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or facsimile transmission and in the case of telecopier or facsimile transmission, with copies by overnight courier service or registered mail to the respective parties as follows (or, in each case, as otherwise notified by any of the parties hereto) and shall be effective and deemed to have been given (i) immediately when sent by telecopier or facsimile between 9:00 A.M. and 6:00 P.M. (Houston, Texas time) on any Business Day (and when sent outside of such hours, at 9:00 A.M. (Houston, Texas time) on the next Business Day), and (ii) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

(a)        If to Seller, to:

Dynegy Gas Investments, LLC
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: Chief Financial Officer
Fax: 713-356-2993

(b)        if to Purchaser to:

Dynegy Inc.
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: General Counsel
Fax: 713-356-2993

Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

Section 5.2        Entire Agreement.  This Agreement, together with the Annexes and Exhibits hereto, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto.

Section 5.3        Binding Effect; Benefit; Assignment.  This Agreement shall inure to the benefit of and be binding upon the parties hereto. No Person not party to this Agreement shall be entitled to the benefits of this Agreement.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party. Any attempted assignment in violation of this Section 5.3 will be void.

Section 5.4        Amendment and Modification.  This Agreement may not be amended except by a written instrument executed by all parties to this Agreement.  No consent of any other Person shall be required in connection with an amendment of this Agreement.

10

Section 5.5    Counterparts.    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument. Signed counterparts of this Agreement may be delivered by facsimile and by scanned .pdf image.

Section 5.6    Applicable Law and Arbitration. (a)  THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF.

(b)    ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREUNDER, SHALL BE FINALLY DETERMINED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION (THE "**AAA**"), WHICH ARBITRATION SHALL BE THE SOLE AND EXCLUSIVE FORUM FOR THE RESOLUTION OF SUCH DISPUTE, CLAIM OR CONTROVERSY AND THE SOLE AND EXCLUSIVE REMEDY FOR SUCH DISPUTE, CLAIM OR CONTROVERSY.  THE ARBITRATION SHALL BE CONDUCTED UNDER THE AAA COMMERCIAL ARBITRATION RULES, EXCEPT WHERE SUCH RULES ARE INCONSISTENT WITH THIS ARBITRATION AGREEMENT. THE ARBITRATOR SHALL HAVE NO AUTHORITY OR JURISDICTION TO ORDER EQUITABLE RELIEF OR EQUITABLE REMEDIES, AND THE PARTIES WAIVE TO THE FULLEST EXTENT THE RIGHT TO SEEK SUCH RELIEF OR REMEDIES.

(c) ANY THIRD PARTY THAT IS DETERMINED BY A COURT OF COMPETENT JURISDICTION TO HAVE STANDING TO BRING ANY CLAIM RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREUNDER (INCLUDING, WITHOUT LIMITATION, FRAUDULENT CONVEYANCE AND TRANSFER CLAIMS) MAY INTERVENE AND PARTICIPATE AS A PARTY TO THE ARBITRATION, PROVIDED THAT SUCH THIRD PARTY AGREES IN WRITING WITH EACH OF THE PARTIES TO THIS AGREEMENT TO BE BOUND BY THIS ARBITRATION AGREEMENT.

(d) THE PLACE OF ARBITRATION SHALL BE NEW YORK, NEW YORK.  THERE SHALL BE A SOLE ARBITRATOR, WHO SHALL BE A RETIRED U.S. FEDERAL JUDGE (THE "**ARBITRATOR**").

(e)    EXPERT DISCLOSURES AND EXPERT DEPOSITIONS SHALL BE AVAILABLE AS SET FORTH IN RULE 26 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

(f)    ALL COSTS AND EXPENSES OF THE ARBITRATORS AND OF THE AAA SHALL BE BORNE BY THE PARTIES EQUALLY.  EACH PARTY TO THE ARBITRATION SHALL BEAR THE COSTS AND EXPENSES, INCLUDING ATTORNEYS' FEES, OF ITS OWN COUNSEL, EXPERTS, WITNESSES AND PREPARATION AND PRESENTATION OF ITS CASE. THE ARBITRATOR SHALL NOT HAVE AUTHORITY TO AWARD ATTORNEYS' FEES OR COSTS.

(g)    THE AWARD OF THE ARBITRATOR SHALL BE FINAL AND BINDING UPON EACH PARTY HERETO AND ANY THIRD PARTY THAT PARTICIPATES IN THE ARBITRATION, AND JUDGMENT MAY BE ENTERED UPON SUCH AWARD BY THE SUPREME COURT OF THE STATE OF NEW YORK, THE U.S. FEDERAL COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND ANY COURT HAVING JURISDICTION THEREOF.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN SECTION 5.1, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 5.7    Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain valid and binding and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein.

Section 5.8    Waiver of Jury Trial. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 5.9    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

[Remainder of page intentionally left blank.]

12

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

DYNEGY GAS INVESTMENTS, LLC

By:  /s/ Kent R. Stephenson
     Name: Kent R. Stephenson
     Title: Executive Vice President

DYNEGY INC.

By:  /s/ Clint C. Freeland
     Name: Clint C. Freeland
     Title: Chief Financial Officer

**Annex A:  Additional Defined Terms**

| Defined Term | Section |
| --- | --- |
| AAA | Section 5.6(b) |
| Agreement | Preamble |
| Arbitrator | Section 5.6(d) |
| Company | First Recital |
| Final Equity Value | Section 2.3(c) |
| Membership Interests | First Recital |
| Purchaser | Preamble |
| Purchaser Adjustment Consideration | Section 2.3(d) |
| Seller | Preamble |
| Seller Adjustment Consideration | Section 2.3(c) |
| Undertaking | Section 2.2 |
| Valuation Dispute Notification | Section 2.3(a) |

**Exhibit A:  Form of Undertaking Agreement**

See attached.

[See Exhibit 2.2 attached to Dynegy Holdings, LLC Current Report on Form 8-K filed September 8, 2011]

**Exhibit 2.2**

## UNDERTAKING AGREEMENT

This UNDERTAKING AGREEMENT (this "**Agreement**") is dated September 1, 2011 by and between Dynegy Gas Investments, LLC ("**Beneficiary**"), a limited liability company organized under the laws of the State of Delaware, and Dynegy Inc. ("**Obligor**"), a corporation organized under the laws of the State of Delaware.

W I T N E S S E T H:

WHEREAS, contemporaneously herewith, Beneficiary and Obligor are entering into that certain Membership Interest Purchase Agreement, pursuant to which Obligor is purchasing from Beneficiary 100% of the outstanding membership interests of Dynegy Coal Holdco, LLC, a limited liability company organized under the laws of the State of Delaware (the "**Purchase Agreement**");

WHEREAS, in consideration of Beneficiary entering into the Purchase Agreement, Obligor has agreed to make certain payments to Beneficiary pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the parties, intending to be legally bound, agree as follows:

Article I

DEFINITIONS

Section 1.1        Definitions.

"**U.S. Government Obligations**" means securities that are (a) direct obligations of the United States for the payment of which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act of 1933, as amended) as custodian with respect to any such U.S. Government Obligation or a specific payment of principal of or interest on any such U.S. Government Obligation held by such custodian for the account of the holder of such depository receipt, provided, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligation or the specific payment of principal of or interest on the U.S. Government Obligation evidenced by such depository receipt.

Capitalized words used but not defined herein shall have the meanings given to them in the Purchase Agreement. Additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated on Annex A.

Section 1.2        Construction.  In this Agreement, unless the context otherwise requires: (a) references to "writing" or comparable expressions include a reference to facsimile transmission or comparable means of communication; (b) the phrases "delivered" or "made available" shall mean that the information referred to has been physically or electronically delivered to the relevant parties; (c) words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa; (d) references to Articles, Sections, Annexes, the Preamble and Recitals are references to articles, sections, annexes, the preamble and recitals of this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement; (e) whenever this Agreement refers to a number of days, that number shall refer to calendar days unless Business Days are specified and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day; (f) the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, shall refer to this Agreement as a whole and not to any provision of this Agreement; (g) this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented; (h) "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and (i) references to "Dollars", "dollars" or "$", without more are to the lawful currency of United States of America.

Article II

UNDERTAKING

Section 2.1        Undertaking.

(a)        Obligor hereby agrees to make payments to, and for the sole benefit of, Beneficiary (such payments, collectively, the "**Payment Stream**") on such dates (each, a "**Payment Date**") and in such amounts (each, a "**Payment Amount**") as set forth on Annex B, as the same may be amended from time to time pursuant to Section 2.3 of the Purchase Agreement.  Under no circumstances shall Obligor be required to make payments in advance of any Payment Date.

(b)        Notwithstanding anything to the contrary contained in this Section 2.1, the Undertaking shall not constitute a guarantee of any obligations of Beneficiary, but instead is a contractual undertaking by Obligor to Beneficiary to independently make payments to Beneficiary.  The payment obligations of Obligor pursuant to this Agreement shall constitute direct payment obligations of Obligor for the sole benefit of Beneficiary, enforceable against Obligor solely by Beneficiary.  For the avoidance of doubt, no trustee or creditor of Beneficiary shall have any rights against Obligor in respect hereof or any rights as a third party beneficiary hereof.

Section 2.2        Release of Undertaking        Notwithstanding anything to the contrary contained in Section 2.1, Obligor shall be fully and irrevocably released from its

2

obligations with respect to this Agreement if at any time Obligor shall deliver directly to Beneficiary (or to any other recipient at the direction of Beneficiary) any of the following:

(a)         if all Payment Amounts due to date have been paid in full at such time, cash in an amount equal to (i) $1,250,000,000 if such delivery is made on or prior to June 1, 2019 or (ii)  $175,000,000 if such delivery is made after June 1, 2019;

(b)         U.S. Government Obligations which through the scheduled payment of principal and interest in respect thereof in accordance with their terms will provide cash in an amount, sufficient as reasonably determined by the Beneficiary, or in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Beneficiary, to pay and discharge in a timely manner all payments in the Payment Stream that are unpaid as of such time; or

(c)         a combination of (a) and (b), sufficient, as reasonably determined by the Beneficiary, or in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Beneficiary, to pay and discharge in a timely manner all payments in the Payment Stream that are unpaid as of such time (assuming for this purpose that any cash is applied immediately toward the payment of the Payment Amount due on the next Payment Date following the date of such payment or delivery of cash).

Article III

REPRESENTATIONS AND WARRANTIES OF BENEFICIARY

Beneficiary hereby represents and warrants to Obligor as follows as of the date hereof:

Section 3.1         Authorization; Non-Contravention.

(a)         Beneficiary has the requisite limited liability company power and authority and has taken all limited liability company and other action necessary to execute and deliver this Agreement and all other instruments and agreements to be delivered by Beneficiary as contemplated hereby, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Beneficiary of this Agreement and all other instruments and agreements to be delivered by Beneficiary as contemplated hereby, the consummation by Beneficiary of the transactions contemplated hereby and the performance of its obligations hereunder have been duly authorized and approved by all necessary limited liability company or other action.  This Agreement has been, and all other instruments and agreements to be executed and delivered by Beneficiary as contemplated hereby will be, duly executed and delivered by Beneficiary.  Assuming that this Agreement constitutes valid and binding obligations of Obligor, this Agreement constitutes the valid and binding obligation of Beneficiary enforceable against Beneficiary in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.  Assuming that all other instruments and agreements to be delivered

3

by Beneficiary as contemplated hereby constitute valid and binding obligations of Obligor and each other Person (other than Beneficiary and its Subsidiaries) party thereto, such instruments and agreements will constitute valid and binding obligations of Beneficiary enforceable against Beneficiary in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(b)      The execution and delivery of this Agreement, and all other instruments and agreements to be delivered by Beneficiary as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or equivalent charter documents of Beneficiary as amended to the date of this Agreement, (ii) conflict with or result in breach of, or constitute a default under, or result in the acceleration of any obligation or loss of any benefits under, any material Contract or other instrument to which Obligor is a party or by which Beneficiary or any of its properties or assets are bound or (iii) contravene any Law or any Order applicable to Beneficiary or by which any of its properties or assets are bound.

Article IV

REPRESENTATIONS AND WARRANTIES OF OBLIGOR

Obligor hereby represents and warrants to Beneficiary as follows as of the date hereof:

Section 4.1          Authorization; Non-Contravention.

(a)      Obligor has the requisite corporate power and authority and has taken all corporate or other action necessary to execute and deliver this Agreement and all other instruments and agreements to be delivered by Obligor as contemplated hereby, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Obligor of this Agreement and all other instruments and agreements to be delivered by Obligor as contemplated hereby, the consummation by it of the transactions contemplated hereby and the performance of its obligations hereunder have been duly authorized and approved by the board of directors of Obligor.  This Agreement has been, and all other instruments and agreements to be executed and delivered by Obligor as contemplated hereby will be, duly executed and delivered by Obligor. Assuming that this Agreement constitutes valid and binding obligations of Beneficiary, this Agreement constitutes the valid and binding obligation of Obligor, enforceable against Obligor in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally, and by general equitable principles.  Assuming that all other instruments and agreements to be delivered by Obligor as contemplated hereby constitute valid and binding obligations of Beneficiary and each other Person (other than Obligor) party thereto, such instruments and agreements  will constitute valid and binding obligations of Obligor enforceable against Obligor in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(b)        The execution and delivery of this Agreement, the Undertaking, and all other instruments and agreements to be delivered by Obligor as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or equivalent charter documents of Obligor, as amended to the date of this Agreement, (ii) conflict with or result in breach of, or constitute a default under, or result in the acceleration of any obligation or loss of any benefits under, any material Contract or other instrument to which Obligor is a party or by which Obligor or any of its properties or assets are bound or (iii) contravene any Law or any Order applicable to Obligor or by which any of its properties or assets are bound.

Article V

MISCELLANEOUS

Section 5.1        Notices.  Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or facsimile transmission and in the case of telecopier or facsimile transmission, with copies by overnight courier service or registered mail to the respective parties as follows (or, in each case, as otherwise notified by any of the parties hereto) and shall be effective and deemed to have been given (i) immediately when sent by telecopier or facsimile between 9:00 A.M. and 6:00 P.M. (Houston, Texas time) on any Business Day (and when sent outside of such hours, at 9:00 A.M. (Houston, Texas time) on the next Business Day), and (ii) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

(a)        If to Beneficiary, to:

Dynegy Gas Investments, LLC
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: Chief Financial Officer
Fax: 713-356-2993

(b)        if to Obligor to:

Dynegy Inc.
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: General Counsel
Fax: 713-356-2993

Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

5

Section 5.2    Entire Agreement.  This Agreement, together with the Annexes hereto, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto.

Section 5.3    Binding Effect; Benefit; Assignment.  This Agreement shall inure to the benefit of and be binding only upon the parties hereto. No Person not party to this Agreement shall be entitled to the benefits of this Agreement.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party. Any attempted assignment in violation of this Section 5.3 will be void.

Section 5.4    Amendment and Modification.  This Agreement may not be amended except by a written instrument executed by all parties to this Agreement.  No consent of any other Person shall be required in connection with an amendment of this Agreement.

Section 5.5    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument. Signed counterparts of this Agreement may be delivered by facsimile and by scanned .pdf image.

Section 5.6    Applicable Law.  THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF.  THE STATE OR FEDERAL COURTS LOCATED WITHIN NEW YORK COUNTY IN THE STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY AND THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS. EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (B) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (C) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.

THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN SECTION 5.1, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

6

Section 5.7        Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain valid and binding and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein.

Section 5.8        Waiver of Jury Trial. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 5.9        Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, Beneficiary and Obligor have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

DYNEGY GAS INVESTMENTS, LLC

By:  /s/ Kent R. Stephenson
      Name: Kent R. Stephenson
      Title: Executive Vice President

DYNEGY INC.

By:  /s/ Clint C. Freeland
      Name: Clint C. Freeland
      Title: Chief Financial Officer

**Annex A:  Additional Defined Terms**

| Defined Term | Section |
|---|---|
| Agreement | Preamble |
| Beneficiary | Preamble |
| Obligor | Preamble |
| Payment Amount | Section 2.2(a) |
| Payment Date | Section 2.2(a) |
| Payment Stream | Section 2.2(a) |
| Purchase Agreement | First Recital |

**Annex B:   Payment Dates and Payment Amounts**

| Payment Date | Payment Amount |
|---|---|
| December 1, 2011 | $ 22,459,028 |
| April 15, 2012 | $ 6,671,875 |
| June 1, 2012 | $ 41,656,250 |
| October 15, 2012 | $ 6,671,875 |
| December 1, 2012 | $ 41,656,250 |
| April 15, 2013 | $ 6,671,875 |
| June 1, 2013 | $ 41,656,250 |
| October 15, 2013 | $ 6,671,875 |
| December 1, 2013 | $ 41,656,250 |
| April 15, 2014 | $ 6,671,875 |
| June 1, 2014 | $ 41,656,250 |
| October 15, 2014 | $ 6,671,875 |
| December 1, 2014 | $ 41,656,250 |
| April 15, 2015 | $ 6,671,875 |
| June 1, 2015 | $ 41,656,250 |
| October 15, 2015 | $ 6,671,875 |
| December 1, 2015 | $ 41,656,250 |
| April 15, 2016 | $ 6,671,875 |
| June 1, 2016 | $ 41,656,250 |
| October 15, 2016 | $ 6,671,875 |
| December 1, 2016 | $ 41,656,250 |
| April 15, 2017 | $ 6,671,875 |
| June 1, 2017 | $ 41,656,250 |
| October 15, 2017 | $ 6,671,875 |
| December 1, 2017 | $ 41,656,250 |
| April 15, 2018 | $ 6,671,875 |
| June 1, 2018 | $ 41,656,250 |
| October 15, 2018 | $ 6,671,875 |
| December 1, 2018 | $ 41,656,250 |
| April 15, 2019 | $ 6,671,875 |

| Payment Date | Payment Amount |
|---|---|
| June 1, 2019 | $ 1,116,656,250 |
| October 15, 2019 | $ 6,671,875 |
| April 15, 2020 | $ 6,671,875 |
| October 15, 2020 | $ 6,671,875 |
| April 15, 2021 | $ 6,671,875 |
| October 15, 2021 | $ 6,671,875 |
| April 15, 2022 | $ 6,671,875 |
| October 15, 2022 | $ 6,671,875 |
| April 15, 2023 | $ 6,671,875 |
| October 15, 2023 | $ 6,671,875 |
| April 15, 2024 | $ 6,671,875 |
| October 15, 2024 | $ 6,671,875 |
| April 15, 2025 | $ 6,671,875 |
| October 15, 2025 | $ 6,671,875 |
| April 15, 2026 | $ 6,671,875 |
| October 15, 2026 | $ 181,671,875 |

Exhibit 2.3

## AMENDED AND RESTATED UNDERTAKING AGREEMENT

This AMENDED AND RESTATED UNDERTAKING AGREEMENT (this "**Agreement**") is dated September 1, 2011 by and between Dynegy Holdings, LLC ("**Beneficiary**"), a limited liability company organized under the laws of the State of Delaware, and Dynegy Inc. ("**Obligor**"), a corporation organized under the laws of the State of Delaware.

W I T N E S S E T H:

WHEREAS, Dynegy Gas Investments, LLC ("**DGIN**") and Obligor have entered into that certain Membership Interest Purchase Agreement, pursuant to which Obligor purchased from DGIN 100% of the outstanding membership interests of Dynegy Coal Holdco, LLC, a limited liability company organized under the laws of the State of Delaware (the "**Purchase Agreement**");

WHEREAS, in consideration of DGIN entering into the Purchase Agreement, Obligor agreed to make certain payments to DGIN pursuant to the terms set forth in that certain Undertaking Agreement, dated on or about the date hereof, by and between DGIN and Oligor (the "**Original Undertaking**");

WHEREAS, pursuant to that certain Assignment Agreement, dated on or about the date hereof, by and among Beneficiary, DGIN and Obligor, DGIN assigned to Beneficiary all of its right, title and interest in and to the Original Undertaking (the "**Assignment**");

WHEREAS, as a condition to Obligor's consent to the Assignment, this Agreement has been duly adopted and amends and restates the Original Undertaking in its entirety;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the parties, intending to be legally bound, agree as follows:

Article I

DEFINITIONS

Section 1.1        Definitions.

"**Payment Reduction**" shall mean any decrease in the outstanding principal amount of the Reference Notes as a result of one or more exchange offers, tender offers or other purchases or repayments of any Reference Notes by Obligor or any of its Subsidiaries (other than Beneficiary and its Subsidiaries), including through the issuance of debt instruments in exchange for Reference Notes; provided, that such principal amount is retired, cancelled or otherwise forgiven by Obligor or any of its Subsidiaries (other than Beneficiary and its Subsidiaries) without the payment of any money by Beneficiary or any of its Subsidiaries in exchange for such retirement, cancellation or forgiveness; provided, further,  that notwithstanding anything to the contrary contained in the foregoing, any decrease in the outstanding principal amount of the Reference Notes resulting from an exchange offer, tender offer or other purchase or repayment

of Reference Notes by the Beneficiary or any of its Subsidiaries shall constitute a Payment Reduction to the extent that Obligor has guaranteed the debt securities of Beneficiary or its Subsidiary in connection with such exchange offer, tender offer or other purchase or repayment.

"**Reference Notes**" shall mean the following notes and debentures issued by Assignee and any refinancing thereof: (i) those certain 8.75% senior unsecured notes due 2012 with an aggregate outstanding principal amount of approximately $88,500,000 as of the date hereof; (ii) those certain 7.5% senior unsecured notes due 2015 with an aggregate outstanding principal amount of approximately $785,000,000 as of the date hereof; (iii) those certain 8.375% senior unsecured notes due 2016 with an aggregate outstanding principal amount of approximately $1,047,000,000 as of the date hereof; (iv) those certain 7.125% senior debentures due 2018 with an aggregate outstanding principal amount of approximately $175,000,000 as of the date hereof; (v) those certain 7.75% senior unsecured notes due 2019 with an aggregate outstanding principal amount of approximately $1,100,000,000 as of the date hereof; (vi) those certain 7.625% senior debentures due 2026 with an aggregate outstanding principal amount of approximately $175,000,000 as of the date hereof; and (vii) those certain 8.316% subordinated capital income securities due 2027 with an aggregate outstanding principal amount of approximately $200,000,000 as of the date hereof.

"**U.S. Government Obligations**" means securities that are (a) direct obligations of the United States for the payment of which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act of 1933, as amended) as custodian with respect to any such U.S. Government Obligation or a specific payment of principal of or interest on any such U.S. Government Obligation held by such custodian for the account of the holder of such depository receipt, provided, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligation or the specific payment of principal of or interest on the U.S. Government Obligation evidenced by such depository receipt.

Capitalized words used but not defined herein shall have the meanings given to them in the Purchase Agreement. Additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated on <u>Annex A</u>.

Section 1.2        <u>Construction</u>.  In this Agreement, unless the context otherwise requires: (a) references to "writing" or comparable expressions include a reference to facsimile transmission or comparable means of communication; (b) the phrases "delivered" or "made available" shall mean that the information referred to has been physically or electronically delivered to the relevant parties; (c) words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa; (d) references to Articles, Sections, Annexes, the Preamble and Recitals are references to articles, sections, annexes, the preamble and recitals of this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the

meaning or interpretation of this Agreement; (e) whenever this Agreement refers to a number of days, that number shall refer to calendar days unless Business Days are specified and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day; (f) the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, shall refer to this Agreement as a whole and not to any provision of this Agreement; (g) this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented; (h) "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and (i) references to "Dollars", "dollars" or "$", without more are to the lawful currency of United States of America.

Article II

UNDERTAKING

Section 2.1    Undertaking.

(a)    Obligor hereby agrees to make payments to, and for the sole benefit of, Beneficiary (such payments, collectively, the "**Payment Stream**") on such dates (each, a "**Payment Date**") and in such amounts (each, a "**Payment Amount**") as set forth on Annex B, as the same may be amended from time to time pursuant to Section 2.3 of the Purchase Agreement.  Under no circumstances shall Obligor be required to make payments in advance of any Payment Date.

(b)    Notwithstanding anything to the contrary contained in this Section 2.1, the Undertaking shall not constitute a guarantee of any obligations of Beneficiary, but instead is a contractual undertaking by Obligor to Beneficiary to independently make payments to Beneficiary.  The payment obligations of Obligor pursuant to this Agreement shall constitute direct payment obligations of Obligor for the sole benefit of Beneficiary, enforceable against Obligor solely by Beneficiary.  For the avoidance of doubt, no trustee or creditor of Beneficiary shall have any rights against Obligor in respect hereof or any rights as a third party beneficiary hereof.

Section 2.2    Reduction of Payment Amounts.  The parties hereby agree that for every $1.00 of Payment Reduction, any remaining Payment Stream shall be permanently and irrevocably reduced by $1.678 (any such event, a "**Payment Stream Reduction**").  Upon each Payment Stream Reduction, each remaining Payment Amount shall be reduced pro rata based on the amount of the aggregate Payment Amounts remaining in the Payment Stream.

Section 2.3    Release of Undertaking.    Notwithstanding anything to the contrary contained in Section 2.1, Obligor shall be fully and irrevocably released from its obligations with respect to this Agreement if at any time Obligor shall deliver directly to Beneficiary (or to any other recipient at the direction of Beneficiary) any of the following:

3

(a)        if all Payment Amounts due (after taking into consideration any Payment Stream Reductions) to date have been paid in full at such time, cash in an amount equal to (i) $1,250,000,000 if such delivery is made on or prior to June 1, 2019 or (ii) $175,000,000 if such delivery is made after June 1, 2019;

(b)        U.S. Government Obligations which through the scheduled payment of principal and interest in respect thereof in accordance with their terms will provide cash in an amount, sufficient as reasonably determined by the Beneficiary, or in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Beneficiary, to pay and discharge in a timely manner all Payment Amounts that are unpaid as of such time; or

(c)        a combination of (a) and (b), sufficient, as reasonably determined by the Beneficiary, or in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Beneficiary, to pay and discharge in a timely manner all payments in the Payment Stream that are unpaid as of such time (assuming for this purpose that any cash is applied immediately toward the payment of the Payment Amount due on the next Payment Date following the date of such payment or delivery of cash).

Article III

REPRESENTATIONS AND WARRANTIES OF BENEFICIARY

Beneficiary hereby represents and warrants to Obligor as follows as of the date hereof:

Section 3.1        Authorization; Non-Contravention.

(a)        Beneficiary has the requisite limited liability company power and authority and has taken all limited liability company and other action necessary to execute and deliver this Agreement and all other instruments and agreements to be delivered by Beneficiary as contemplated hereby, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Beneficiary of this Agreement and all other instruments and agreements to be delivered by Beneficiary as contemplated hereby, the consummation by Beneficiary of the transactions contemplated hereby and the performance of its obligations hereunder have been duly authorized and approved by all necessary limited liability company or other action. This Agreement has been, and all other instruments and agreements to be executed and delivered by Beneficiary as contemplated hereby will be, duly executed and delivered by Beneficiary. Assuming that this Agreement constitutes valid and binding obligations of Obligor, this Agreement constitutes the valid and binding obligation of Beneficiary enforceable against Beneficiary in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles. Assuming that all other instruments and agreements to be delivered by Beneficiary as contemplated hereby constitute valid and binding obligations of Obligor and each other Person (other than Beneficiary and its Subsidiaries) party thereto, such instruments and agreements will constitute valid and binding obligations of Beneficiary enforceable against

4

Beneficiary in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(b)　　　The execution and delivery of this Agreement, and all other instruments and agreements to be delivered by Beneficiary as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or equivalent charter documents of Beneficiary, as amended to the date of this Agreement, (ii) conflict with or result in breach of, or constitute a default under, or result in the acceleration of any obligation or loss of any benefits under, any material Contract or other instrument to which Obligor is a party or by which Beneficiary or any of its properties or assets are bound or (iii) contravene any Law or any Order applicable to Beneficiary or by which any of its properties or assets are bound.

Article IV

REPRESENTATIONS AND WARRANTIES OF OBLIGOR

Obligor hereby represents and warrants to Beneficiary as follows as of the date hereof:

Section 4.1　　　Authorization; Non-Contravention.

(a)　　　Obligor has the requisite corporate power and authority and has taken all corporate or other action necessary to execute and deliver this Agreement and all other instruments and agreements to be delivered by Obligor as contemplated hereby, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Obligor of this Agreement and all other instruments and agreements to be delivered by Obligor as contemplated hereby, the consummation by it of the transactions contemplated hereby and the performance of its obligations hereunder have been duly authorized and approved by the board of directors of Obligor.  This Agreement has been, and all other instruments and agreements to be executed and delivered by Obligor as contemplated hereby will be, duly executed and delivered by Obligor. Assuming that this Agreement constitutes valid and binding obligations of Beneficiary, this Agreement constitutes the valid and binding obligation of Obligor, enforceable against Obligor in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally, and by general equitable principles.  Assuming that all other instruments and agreements to be delivered by Obligor as contemplated hereby constitute valid and binding obligations of Beneficiary and each other Person (other than Obligor) party thereto, such instruments and agreements  will constitute valid and binding obligations of Obligor enforceable against Obligor in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(b)　　　The execution and delivery of this Agreement, the Undertaking, and all other instruments and agreements to be delivered by Obligor as contemplated hereby do not, and

the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or equivalent charter documents of Obligor, as amended to the date of this Agreement, (ii) conflict with or result in breach of, or constitute a default under, or result in the acceleration of any obligation or loss of any benefits under, any material Contract or other instrument to which Obligor is a party or by which Obligor or any of its properties or assets are bound or (iii) contravene any Law or any Order applicable to Obligor or by which any of its properties or assets are bound.

Article V

MISCELLANEOUS

Section 5.1        Notices. Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or facsimile transmission and in the case of telecopier or facsimile transmission, with copies by overnight courier service or registered mail to the respective parties as follows (or, in each case, as otherwise notified by any of the parties hereto) and shall be effective and deemed to have been given (i) immediately when sent by telecopier or facsimile between 9:00 A.M. and 6:00 P.M. (Houston, Texas time) on any Business Day (and when sent outside of such hours, at 9:00 A.M. (Houston, Texas time) on the next Business Day), and (ii) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

(a)        If to Beneficiary, to:

Dynegy Holdings, LLC
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: Chief Financial Officer
Fax: 713-356-2993

(b)        if to Obligor to:

Dynegy Inc.
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: General Counsel
Fax: 713-356-2993

Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

Section 5.2        Entire Agreement.  This Agreement, together with the Annexes hereto, contains the entire understanding of the parties hereto with respect to the subject matter

6

contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto.

Section 5.3    <u>Binding Effect; Benefit; Assignment</u>.  This Agreement shall inure to the benefit of and be binding only upon the parties hereto. No Person not party to this Agreement shall be entitled to the benefits of this Agreement. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party. Any attempted assignment in violation of this <u>Section 5.3</u> will be void.

Section 5.4    <u>Amendment and Modification</u>.  This Agreement may not be amended except by a written instrument executed by all parties to this Agreement.  No consent of any other Person shall be required in connection with an amendment of this Agreement.

Section 5.5    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument. Signed counterparts of this Agreement may be delivered by facsimile and by scanned .pdf image.

Section 5.6    <u>Applicable Law</u>.  THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF.  THE STATE OR FEDERAL COURTS LOCATED WITHIN NEW YORK COUNTY IN THE STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY AND THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS. EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (B) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (C) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.

THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN <u>SECTION 5.1</u>, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 5.7    <u>Severability</u>.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms,

7

provisions, covenants and restrictions contained in this Agreement shall remain valid and binding and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein.

Section 5.8    Waiver of Jury Trial. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 5.9    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

[Remainder of page intentionally left blank.]

8

IN WITNESS WHEREOF, Beneficiary and Obligor have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

DYNEGY HOLDINGS, LLC

By:    /s/ Clint C. Freeland
       Name: Clint C. Freeland
       Title: Chief Financial Officer

DYNEGY INC.

By:    /s/ Clint C. Freeland
       Name: Clint C. Freeland
       Title: Chief Financial Officer

**Annex A:  Additional Defined Terms**

| Defined Term | Section |
|---|---|
| Agreement | Preamble |
| Assignment | Third Recital |
| Beneficiary | Preamble |
| DGIN | First Recital |
| Obligor | Preamble |
| Original Undertaking | Second Recital |
| Payment Amount | Section 2.1(a) |
| Payment Date | Section 2.1(a) |
| Payment Stream | Section 2.1(a) |
| Payment Stream Reduction | Section 2.2 |
| Purchase Agreement | First Recital |

**Annex B:   Payment Dates and Payment Amounts**

| Payment Date | Payment Amount |
|---|---|
| December 1, 2011 | $ 22,459,028 |
| April 15, 2012 | $ 6,671,875 |
| June 1, 2012 | $ 41,656,250 |
| October 15, 2012 | $ 6,671,875 |
| December 1, 2012 | $ 41,656,250 |
| April 15, 2013 | $ 6,671,875 |
| June 1, 2013 | $ 41,656,250 |
| October 15, 2013 | $ 6,671,875 |
| December 1, 2013 | $ 41,656,250 |
| April 15, 2014 | $ 6,671,875 |
| June 1, 2014 | $ 41,656,250 |
| October 15, 2014 | $ 6,671,875 |
| December 1, 2014 | $ 41,656,250 |
| April 15, 2015 | $ 6,671,875 |
| June 1, 2015 | $ 41,656,250 |
| October 15, 2015 | $ 6,671,875 |
| December 1, 2015 | $ 41,656,250 |
| April 15, 2016 | $ 6,671,875 |
| June 1, 2016 | $ 41,656,250 |
| October 15, 2016 | $ 6,671,875 |
| December 1, 2016 | $ 41,656,250 |
| April 15, 2017 | $ 6,671,875 |
| June 1, 2017 | $ 41,656,250 |
| October 15, 2017 | $ 6,671,875 |
| December 1, 2017 | $ 41,656,250 |
| April 15, 2018 | $ 6,671,875 |
| June 1, 2018 | $ 41,656,250 |
| October 15, 2018 | $ 6,671,875 |
| December 1, 2018 | $ 41,656,250 |
| April 15, 2019 | $ 6,671,875 |

| Payment Date | Payment Amount |
|---|---|
| June 1, 2019 | $ 1,116,656,250 |
| October 15, 2019 | $ 6,671,875 |
| April 15, 2020 | $ 6,671,875 |
| October 15, 2020 | $ 6,671,875 |
| April 15, 2021 | $ 6,671,875 |
| October 15, 2021 | $ 6,671,875 |
| April 15, 2022 | $ 6,671,875 |
| October 15, 2022 | $ 6,671,875 |
| April 15, 2023 | $ 6,671,875 |
| October 15, 2023 | $ 6,671,875 |
| April 15, 2024 | $ 6,671,875 |
| October 15, 2024 | $ 6,671,875 |
| April 15, 2025 | $ 6,671,875 |
| October 15, 2025 | $ 6,671,875 |
| April 15, 2026 | $ 6,671,875 |
| October 15, 2026 | $ 181,671,875 |

**Exhibit 3.1**

## CERTIFICATE OF FORMATION

### OF

### DYNEGY HOLDINGS, LLC

This Certificate of Formation of DYNEGY HOLDINGS, LLC (the "Company") has been duly executed and is being filed by an authorized person to form a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time.

1. Name.  The name of the limited liability company formed hereby is:

"DYNEGY HOLDINGS, LLC".

2. Registered Office.  The address of the registered office of the Company in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801.

3. Registered Agent.  The name and address of the Company's registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801.

4. Effective Time.  This Certificate of Formation shall be effective upon its filling with the Secretary of State of the State of Delaware.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation this 1st day of September, 2011.

DYNEGY HOLDINGS INC.

By:  /s/ Kimberly M. O'Brien
     Name: Kimberly M. O'Brien
     Title: Secretary

**Exhibit 3.2**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**DYNEGY HOLDINGS, LLC**

This Limited Liability Company Operating Agreement (together with the schedules attached hereto, this "**_Agreement_**") of Dynegy Holdings, LLC, a Delaware limited liability company (the "**_Company_**"), is entered into as of the 1st day of September 2011, by and between Dynegy Inc., a Delaware corporation (the "**_Member_**"), as the sole equity member, and the Company.  Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

W I T N E S S E T H :

WHEREAS, the Company was formed on September 1, 2011, pursuant to the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "**_Act_**"), by the filing of the Certificate of Formation with the Secretary of State of the State of Delaware; and

WHEREAS, the Member desires to enter into this Agreement to govern the operation of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto do hereby mutually covenant and agree as follows:

**ARTICLE I**
Name.

The name of the limited liability company is Dynegy Holdings, LLC.

**ARTICLE II**
Principal Business Office.

The principal business office of the Company shall be located at 1000 Louisiana, Suite 5800, Houston, Texas 77002, or such other location as may hereafter be determined by the Board.

**ARTICLE III**
Registered Office.

The address of the registered office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19808.

1

## ARTICLE IV
<u>Registered Agent</u>.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19808.

## ARTICLE V
<u>Members</u>.

Section 5.01    The mailing address of the Member is set forth on <u>Schedule B</u> attached hereto.

Section 5.02    The Member may act by written consent.

Section 5.03    Each limited liability company interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware ("***Article 8***"), and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.  The limited liability company interests in the Company shall be evidenced by certificates (the "***Membership Certificates***"), and the Membership Certificates shall be signed by any Officer, as authorized signatory on behalf of the Company, and shall be in such form as such Officer determines.  The certificated limited liability company interests shall be "certificated securities" and shall be in registered form within the meaning of Article 8.  Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8, such provision of Article 8 shall be controlling.  Subject to any limitations on the admission of additional Members set forth in this Agreement, additional Membership Certificates may be issued to an additional Member only upon the admission of such additional Member pursuant to this Agreement. Each Membership Certificate issued hereunder shall bear substantially the following legend:

"THIS CERTIFICATE IS ISSUED PURSUANT TO THE TERMS OF THAT CERTAIN LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF DYNEGY HOLDINGS, LLC DATED SEPTEMBER 1 2011, AND EFFECTIVE AS OF SEPTEMBER 1, 2011 (THE "AGREEMENT").  THIS CERTIFICATE EVIDENCES A LIMITED LIABILITY COMPANY INTEREST IN THE COMPANY AND SHALL BE A SECURITY FOR PURPOSES OF (I) ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND (II) ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF ANY OTHER APPLICABLE JURISDICTION THAT NOW OR HEREAFTER SUBSTANTIALLY INCLUDES THE 1994 REVISIONS TO ARTICLE 8 THEREOF AS ADOPTED BY THE AMERICAN LAW INSTITUTE AND THE NATIONAL CONFERENCE OF

2

COMMISSIONERS ON UNIFORM STATE LAWS AND APPROVED BY THE AMERICAN BAR ASSOCIATION ON FEBRUARY 14, 1995.  THE TRANSFER OF THIS CERTIFICATE AND THE INTERESTS REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE AGREEMENT."

## ARTICLE VI
<u>Certificates</u>.

The Certificate of Formation was filed with the Secretary of State of Delaware on September 1, 2011, by an "authorized person" within the meaning of the Act, and the Member hereby ratifies and approves such filing.  The Member shall use its commercially reasonable efforts to cause amendments to the Certificate of Formation to be executed and filed whenever required by the Act.

The Member shall use its commercially reasonable efforts to take such other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware.

The Member shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business in which such qualification, formation or registration is required or desirable.  The Member shall cause the Company to execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business. The Company shall continue in existence from the date hereof and shall continue in perpetuity, or until the Company is terminated pursuant to <u>Article XXII</u>.

## ARTICLE VII
<u>Purposes</u>.

The purpose to be conducted or promoted by the Company is to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware.

## ARTICLE VIII
<u>Powers</u>.

The Company, the Member and the Officers of the Company on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in <u>Article VII</u> and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

3

## ARTICLE IX
### Management.

Section 9.01    <u>Managers</u>.  The Company shall be managed by "managers" of the Company within the meaning of the Act (the "***Managers***") who shall be appointed by the Member and who shall have the authority to manage the Company as a board of managers (the "***Board***").  Each Manager shall hold office until his death, resignation or removal.  Except as provided in the Act or as expressly provided herein, the Board shall have the exclusive power and authority over the conduct of the Company's business, operations and affairs.  The Board is hereby authorized and empowered, on behalf and in the name of the Company (i) to carry out the purposes of the Company and (ii) to perform all acts, and to enter into and to perform all contracts and other undertakings, which the Board may in its sole discretion deem necessary or advisable, or which are incidental, to carry out the purposes of the Company and which are not in contravention of this Agreement.  Any action taken by the Board shall constitute the act of and serve to bind the Company. The Board shall be the sole person with the power to bind the Company, except to the extent that such power and authority is expressly delegated to any other person by the Board or this Agreement.  No delegation of power and authority by the Board shall cause the Board to cease to have the powers and authority, statutory or otherwise, possessed by a manager of a limited liability company under the laws of the State of Delaware.  The initial Managers of the Company are listed on <u>Schedule C</u> hereto.

## ARTICLE X
### Officers.

Section 10.01    <u>Officers</u>.  Subject to the direction of the Board, the day-to-day administration of the business of the Company shall be carried out by persons who may be designated as officers (each an "***Officer***") as and to the extent authorized by the Board.  The additional or successor Officers of the Company shall be chosen by the Board and shall consist of at least a President, a Vice President, Secretary and Treasurer.  Any number of offices may be held by the same person.  The Board may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board.  The Officers of the Company shall hold office until their successors are chosen and qualified.  Any Officer may be removed at any time, with or without cause, by the Board.  Any vacancy occurring in any office of the Company shall be filled by the Board.  The initial Officers of the Company are listed on <u>Schedule D</u> hereto.

Section 10.02    <u>President</u>.  The President shall be the chief operating officer of the Company, and subject to the Board, shall have charge of the to day operations and management of the Company and its properties, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities.

Section 10.03    <u>Vice Presidents</u>.  Each Vice President shall have such powers and duties as may be assigned to him by the Board or the President, and (in order of their seniority as determined by the Board, or, in the absence of such determination, as determined by the length of time they have held the office of Vice President) shall exercise the powers of the President during that Officer's absence or inability to act.  As between the Company and third parties, any

4

action taken by a Vice President in the performance of the duties of the President shall be conclusive evidence of the absence or inability to act of the President at the time such action was taken.

Section 10.04    <u>Treasurer</u>.  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate account of receipts and disbursements, shall deposit all monies and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board, and shall perform such other duties as may be prescribed by the Board or the President.

Section 10.05    <u>Assistant Treasurers</u>.  Each Assistant Treasurer shall have such powers and duties as may be assigned to him by the Board or the President.  The Assistant Treasurers (in the order of their seniority as determined by the Board or, in the absence of such a determination, as determined by the length of time they have held the office of Assistant Treasurer) shall exercise the powers of the Treasurer during that Officer's absence or inability to act.

Section 10.06    <u>Secretary</u>.  The Secretary shall keep the minutes of all meetings of the Member and of the Board in books provided for that purpose, and he shall attend to the giving and service of all notices.  He may sign with the President, in the name of the Company, all contracts of the Company.  He may sign with the President all certificates for membership interests of the Company, and he shall have charge of the certificate books, transfer books, and membership interest papers as the Board may direct, all of which shall at all reasonable times be open to inspection by the Board at the office of the Company during business hours.  He shall in general perform all duties incident to the office of the Secretary, subject to the control of the Board and the President.

Section 10.07    <u>Assistant Secretaries</u>.  Each Assistant Secretary shall have such powers and duties as may be assigned to him by the Board or the President.  The Assistant Secretaries (in the order of their seniority as determined by the Board or, in the absence of such a determination, as determined by the length of time they have held the office of Assistant Secretary) shall exercise the powers of the Secretary during that Officer's absence or inability to act.

Section 10.08    <u>Officers as Agents</u>.  The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Officers taken in accordance with such powers shall bind the Company.

**ARTICLE XI**
<u>Limited Liability</u>.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor any Manager or Officer shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Manager or Officer of the Company. The Member shall not be bound by, or be personally liable for, by reason of being a member of the Company, a judgment, decree or order

5

of a court or in any other manner, for the expenses, liabilities or obligations of the Company, and the liability of the Member shall be limited solely to the amount of its capital contributions.

## ARTICLE XII
Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto. The capital contributions of the Member shall be reflected on the books and records of the Company.

## ARTICLE XIII
Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time in its sole discretion. To the extent that the Member makes an additional capital contribution to the Company, the Board shall revise Schedule B of this Agreement to reflect such capital contribution. The Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

## ARTICLE XIV
Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

## ARTICLE XV
Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Board. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act.

## ARTICLE XVI
Books and Records.

The Board shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The books of the Company shall at all times be maintained by the Board. The Company's books of account shall be kept using the method of accounting determined by the Board. The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Board.

## ARTICLE XVII
### Fiscal Year.

The fiscal year of the Company shall be the calendar year, except for the short taxable years in the years of the Company's formation and termination and as otherwise required by the Internal Revenue Code of 1986 (26 U.S.C.A. § 1, et seq.), as amended from time to time (the "**Code**").

## ARTICLE XVIII
### Other Business.

The Member and any Affiliate of the Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others notwithstanding any provision to the contrary at law or in equity.  The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

## ARTICLE XIX
### Exculpation and Indemnification.

Section 19.01    To the fullest extent permitted by law, neither the Member nor any Manager, Officer, employee or agent of the Company nor any shareholder, member, director, officer, employee, representative, agent or Affiliate of the Member (collectively, the "**Covered Persons**") shall be liable to the Company or any other Person that is a party to or is otherwise bound by this Agreement, for any loss, damage or claim incurred by reason of any act or omission (in relation to the Company or this Agreement, any related document or any transaction contemplated hereby or thereby) performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's fraud, bad faith, gross negligence or willful misconduct.

Section 19.02    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's fraud, bad faith, gross negligence or willful misconduct with respect to such acts or omissions (the termination of any action, suit or proceeding by judgment, order, settlement or upon a plea of nolo contendere or its equivalent shall not of itself (except insofar as

7

such judgment, order, settlement or plea shall itself specifically provide) create a presumption that the Covered Person acted in bad faith or in a manner constituting gross negligence or willful misconduct).

Section 19.03    To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Article XIX.

Section 19.04    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

Section 19.05    To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement, the advice of accountants and counsel or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member to modify to that extent such other duties and liabilities of such Covered Person.

Section 19.06    Except as otherwise provided by the Act, or otherwise agreed in writing, the debts, liabilities and obligations of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, liability or obligation of the Company solely by reason of being a Covered Person.

Section 19.07    The foregoing provisions of this Article XIX shall survive any termination of this Agreement.

## ARTICLE XX
### Assignments.

The Member may transfer, convey, sell or assign its limited liability company interest in the Company. Subject to Article XXII, if the Member transfers, conveys, sells or assigns all of its limited liability company interest in the Company pursuant to this Article XX, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall

8

be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.  Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

## ARTICLE XXI
### Admission of Additional Members and Transfers of Indirect Interests.

One or more additional members of the Company may be admitted to the Company with the written consent of the Board.

## ARTICLE XXII
### Dissolution.

Section 22.01     The Company shall dissolve, and its affairs shall be wound up upon the election by the Member so to dissolve, liquidate and terminate the Company.

Section 22.02     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or any additional member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

Section 22.03     Notwithstanding any other provision of this Agreement, each of the Member and any additional member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member, or any additional member, or the occurrence of an event that causes the Member, or any additional member to cease to be a member of the Company.

Section 22.04     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

Section 22.05     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

## ARTICLE XXIII
### Waiver of Partition; Nature of Interest.

To the fullest extent permitted by law, the Member and any additional member admitted to the Company hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any

9

proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Article XV hereof.  The interest of the Member in the Company is personal property.

### ARTICLE XXIV
Tax Status.

It is intended that the Company shall be a disregarded entity for federal, state, and local income tax purposes. The Company's books of account shall be maintained on a basis consistent with such treatment and on the same basis utilized in preparing the Member's U.S. federal income tax return.  The Board shall take all reasonable action, including the amendment of this Agreement and the execution of other documents, as may reasonably be required in order for the Company to be disregarded as a separate entity for U.S. federal income tax purposes.

### ARTICLE XXV
Benefits of Agreement; No Third Party Rights.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member, and nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person.

### ARTICLE XXVI
Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

### ARTICLE XXVII
Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

### ARTICLE XXVIII
Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member in accordance with its terms.

## ARTICLE XXIX
### Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

## ARTICLE XXX
### Amendments.

This Agreement may only be modified, altered, supplemented or amended pursuant to a written agreement duly executed and delivered by the Company and the Member.

## ARTICLE XXXI
### Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

## ARTICLE XXXII
### Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Article II, (b) in the case of the Member, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

## ARTICLE XXXIII
### Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the date of the date first written above.

**[SIGNATURE PAGE FOLLOWS]**

11

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the date first written above with the intent that it be made effective as of the formation date.

**MEMBER:**

DYNEGY INC., a Delaware corporation

By:   /s/ Kent R. Stephenson

Name:  Kent R. Stephenson

Title:   Executive Vice President

**COMPANY:**

DYNEGY HOLDINGS, LLC, a Delaware limited liability company

By:   /s/ Kent R. Stephenson

Name:  Kent R. Stephenson

Title:   Executive Vice President

[Signature Page to Limited Liability Company Agreement of DH]

## SCHEDULE A
## DEFINITIONS

A.    <u>Definitions</u>

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"*<u>Affiliate</u>*" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such Person.

"*<u>Bankruptcy</u>*" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"*<u>Control</u>*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "*<u>Controlling</u>*" and "*<u>Controlled</u>*" shall have correlative meanings.

"*<u>Person</u>*" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

B.    <u>Rules of Construction</u>

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, paragraph or subdivision. The Article and Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All Article, Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

SCHEDULE B
MEMBER

| Name | Mailing Address | Agreed Value of Capital Contribution | Limited Liability Company Interest |
|------|-----------------|--------------------------------------|-----------------------------------|
| Dynegy Inc. | 1000 Louisiana, Suite 5800 Houston, Texas 77002 | Amount in the capital account at 12/31/10 | 100% |

B-1

SCHEDULE C

MANAGERS

Clint C. Freeland
Kevin T. Howell
Robert C. Flexon

C-1

SCHEDULE D
OFFICERS

| Name: | Title: |
| --- | --- |
| Robert C. Flexon | President and Chief Executive Officer |
| Clint C. Freeland | Executive Vice President and Chief Financial Officer |
| Kevin T. Howell | Executive Vice President and Chief Operating Officer |
| Kent R. Stephenson | Executive Vice President and General Counsel |
| Lynn A. Lednicky | Executive Vice President - Operations |
| Carolyn J. Burke | Executive Vice President and Chief Administrative Officer |
| Carolyn J. Stone | Senior Vice President and Chief Accounting Officer |
| Jason A. Buchman | Vice President and Group General Counsel |
| Kimberly M. O'Brien | Secretary |
| James Horsch | Vice President — Internal Audit |
| Heidi D. Lewis | Assistant Secretary |
| Gregory D. Kingsley | Assistant Treasurer |
| Mario Alonso | Vice President and Treasurer |
| Julius Cox | Vice President — Human Resources |
| Michael Sanders | Vice President — Business Services |
| Rudi Zipter | Vice President — Financial Trading |
| James Tharp | Vice President — Operations Support |
| Michael Gray | Vice President — Financial Planning & Analysis |
| Rocco Ivanovich | Vice President — Information Technology |

3

**Exhibit 4.1**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE.  NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF OTHER THAN (A) IN ACCORDANCE WITH THE TERMS HEREOF AND (B) PURSUANT TO THE ACT OR UNDER AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE ACT.

**PROMISSORY NOTE**

$1,250,000,000                                                                                                    September 1, 2011

    **FOR VALUE RECEIVED**, DYNEGY HOLDINGS, LLC, a Delaware limited liability company ("**Debtor**"), promises to pay DYNEGY GAS INVESTMENTS, LLC, a Delaware limited liability company, or its registered assigns ("**Lender**"), the principal sum of $1,250,000,000 and to pay interest on the outstanding principal of this Promissory Note (this "**Note**"), in accordance with Section 2 hereof.

    1.    Maturity.  Debtor shall repay the unpaid principal in full, together with all accrued and unpaid interest thereon, on September 1, 2027 (the "**Repayment Date**").  All payments under this Note shall be paid in cash in United States dollars in immediately available funds.

    2.    Interest.  Interest shall accrue and be payable (net of any withholding required by law) on the Repayment Date on the unpaid principal balance of this Note, at the rate of 4.24% per annum (the "**Note Rate**"), calculated on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed in the period in which interest accrues (including post-petition interest in any proceeding under the Federal Bankruptcy Code or other applicable bankruptcy or insolvency laws).

    3.    Optional Prepayment.  Debtor may prepay in cash, in whole or in part, at any time and from time to time prior to the Repayment Date, without premium or prepayment penalty, any unpaid principal balance, together with accrued and unpaid interest (to the date of such prepayment).  All payments hereunder shall be credited first to accrued but unpaid interest, and then to principal.

    4.    Manner of Payment.  Payments hereunder shall be made by bank or certified check drawn on immediately available funds or by wire transfer of immediately available funds to such account or accounts that are specified by Lender to Debtor from time to time.

    5.    Organization; Authority; Enforceability; No Conflict.  Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to enter into this Note and consummate the transactions contemplated hereby.  This Note has been duly authorized, executed and delivered by Debtor and constitutes a legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of

creditors generally and the availability of equitable remedies. The execution and delivery of this Note, the incurrence of the obligations set forth in this Note and the performance of such obligations will not violate, or constitute a breach of or default under, the governing documents of Debtor or, to the best of such Debtor's knowledge, any law, rule, regulation, order, license, permit, consent, authorization or approval applicable to Debtor of any court or any governmental body or administrative agency or self-regulatory authority having jurisdiction over Debtor or its property.

6.    Default. For purposes of this Note, the term "**Default**" shall mean any of the following:

(a)    The failure by Debtor to pay any principal amount of this Note when and as the same shall become due and payable;

(b)    The failure by Debtor to pay any interest on this Note or any fee or other amount (other than an amount referred to in clause (a) above) payable hereunder, when and as the same shall become due and payable;

(c)    Debtor or any direct or indirect subsidiary of Debtor shall (i) make an assignment for the benefit of creditors or petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets, (ii) commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, (iii) have had any such petition or application filed or any such proceeding commenced against it that is not dismissed within 30 days, (iv) indicate, by any act or intentional and purposeful omission, its consent to, approval of or acquiescence in any such petition, application, proceeding or order for relief or the appointment of a custodian, receiver or trustee for it or a substantial part of its assets, or (v) suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of 60 days or more; or

(d)    Debtor or any direct or indirect subsidiary of Debtor shall adopt a plan of liquidation or dissolution, or the certificate of incorporation of Debtor shall expire or be revoked.

Debtor shall promptly inform Lender of the occurrence of any of the events described in this Section 6. Upon each such Default, Lender may, at its option, exercised by delivering written notice to Debtor, accelerate repayment of this Note, in which case the principal amount outstanding under this Note and all interest accrued thereon shall be due and payable immediately; provided, that if there shall occur a Default described in subparagraph (c) or (d) above, the entire unpaid balance of principal with interest accrued thereon shall be immediately due and payable without the giving of notice or the taking of any other action by Lender.

7.    Default Interest. Any amount in default under this Note shall bear interest from and after the date of such default at the Note Rate plus two percent (2%) per annum.

2

8.    _Replacement of the Note_.  Upon receipt by Debtor of notice from Lender of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated) and an indemnity in favor of Debtor, reasonably acceptable to Debtor (which indemnity shall be deemed to be acceptable even if it is an unsecured indemnity of Lender), against any loss, cost, expense, liability or claim as a result of the presentation of the original Note by any other person, Debtor shall execute and deliver to Lender a replacement Note of like date, tenor and denomination.

9.    _Notices_.  Any notice or communication shall in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or facsimile transmission and in the case of telecopier or facsimile transmission, with copies by overnight courier service or registered mail to the respective parties as follows (or, in each case, as otherwise notified by any of the parties hereto) and shall be effective and deemed to have been given (i) immediately when sent by telecopier or facsimile between 9:00 A.M. and 6:00 P.M. (Houston, Texas time) on any business day (and when sent outside of such hours, at 9:00 A.M. (Houston, Texas time) on the next business day), and (ii) when received if delivered by hand or overnight courier service or certified or registered mail on any business day:

If to Debtor:

Dynegy Holdings, LLC
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: Chief Financial Officer
Fax: 713-356-2993

If to Lender:

Dynegy Gas Investments, LLC
1000 Louisiana Street, Suite 5800
Houston, TX 77002
Attention: General Counsel
Fax: 713-356-2993

10.    _Miscellaneous_.

(a)    Debtor hereby waives presentment, demand, protest, notice of dishonor, diligence and all other notices, any release or discharge arising from any extension of time, discharge of a prior party, release of any or all of any security given from time to time for this Note.

(b)    Any term of this Note may be amended or waived with the prior written consent of each party hereto.  No party hereto shall be deemed, by any act or omission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by such party and then only to the extent specifically set forth in such writing.  A waiver with reference to one event shall not be construed as continuing or as a bar to or

3

waiver of any right or remedy as to a subsequent event.  No delay or omission of Lender to exercise any right, whether before or after the occurrence of a Default hereunder, shall impair any such right or shall be construed to be a waiver of any right or Default, and the acceptance at any time by Lender of any past-due amount shall not be deemed to be a waiver of the right to require prompt payment when due of any other amounts then or thereafter due and payable.

(c)        Upon any Default hereunder, Lender may exercise all rights and remedies provided for herein and by law or equity or otherwise, including, but not limited to, the right to immediate payment in full of this Note.

(d)        The rights and remedies of Lender as provided herein, or any one or more of them, or in law or in equity, shall be cumulative and concurrent, and may be pursued singularly, successively or together at Lender's sole discretion and may be exercised as often as occasion therefor shall occur.

(e)        This Note shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflict of law principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

(f)        This Note shall be binding upon the parties and their respective successors and assigns.  This Note may not be assigned or transferred by either party hereto without the prior written consent of the other party, such consent not to be unreasonably withheld; provided, however, that Lender may assign this Note to a Permitted Transferee (as defined below) without the prior written consent of Debtor.  "Permitted Transferee" shall mean any individual, corporation, limited liability company, partnership or other entity that, directly or indirectly, controls, is controlled by, or is under common control with Lender; provided that, for the purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by agreement or otherwise.

(g)        If any provision of this Note is held to be invalid, illegal, void or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect and shall be liberally construed in order to effect the provisions of this Note.  It is hereby stipulated and declared to be the intention of Debtor and Lender that they would have executed the remaining terms and provisions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(h)        The headings contained in this Note are for reference purposes only and shall not affect in any way the meaning or interpretation of this Note.

(i)        All payments (including prepayments) to be made by Debtor hereunder, whether on account of principal, interest or otherwise, shall be made no later that 2:00 p.m. New York City time on the date when due without setoff or counterclaim.

4

(j)        This Note constitutes the entire understanding between Debtor and Lender with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

*[signature page follows]*

5

**IN WITNESS WHEREOF,** Debtor has executed this Note as of the date first above written.

                    **DYNEGY HOLDINGS, LLC as Debtor**

            By:    /s/ Clint C. Freeland
                    Name: Clint C. Freeland
                    Title: Chief Financial Officer

6

**Exhibit 10.1**

## ASSIGNMENT AGREEMENT

This Assignment Agreement (the "**Agreement**"), is dated September 1, 2011 by and among Dynegy Gas Investments, LLC ("**Assignor**"), a limited liability company organized under the laws of the State of Delaware, Dynegy Holdings, LLC ("**Assignee**"), a limited liability company organized under the laws of the State of Delaware, and Dynegy Inc. ("**Obligor**"), a corporation organized under the laws of the State of Delaware.

WHEREAS, Assignor and Obligor are party to that certain Undertaking Agreement, dated as of the date hereof (the "**Undertaking**"), pursuant to which Obligor agreed to make certain payments to Assignor as set forth on Annex B to the Undertaking;

WHEREAS, Assignor has agreed to assign to Assignee the Undertaking and Assignee has agreed to assume the Undertaking (as amended and restated) and issue the Note (as defined below);

WHEREAS, Obligor is willing to consent to the assignment by Assignor of the Undertaking to Assignee and to the admission of Assignee as the substitute Beneficiary under the Undertaking as of the date hereof, upon the terms and conditions hereinafter set forth, including the express condition that the Assignee agree to the Amended and Restated Undertaking attached hereto as <u>Exhibit A</u> (the "**Amended and Restated Undertaking**");

NOW, THEREFORE, in consideration of the mutual agreements, covenants and conditions contained herein, and other good and valuable consideration:

Section 1.          <u>Definitions</u>. Capitalized words used but not defined herein shall have the meanings given to them in the Undertaking.  Additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated on <u>Annex A</u>.

Section 2.          <u>Construction</u>.  In this Agreement, unless the context otherwise requires: (a) references to "writing" or comparable expressions include a reference to facsimile transmission or comparable means of communication; (b) the phrases "delivered" or "made available" shall mean that the information referred to has been physically or electronically delivered to the relevant parties; (c) words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa; (d) references to Articles, Sections, Annexes, Exhibits, the Preamble and Recitals are references to articles, sections, annexes, exhibits, the preamble and recitals of this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement; (e) whenever this Agreement refers to a number of days, that number shall refer to calendar days unless Business Days are specified and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day; (f) the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, shall refer to this Agreement as a whole and not to any provision of this Agreement; (g) this "Agreement" or any other agreement or document shall be construed as a reference to this

Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented; (h) "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and (i) references to "Dollars", "dollars" or "$", without more are to the lawful currency of United States of America.

Section 3.          Assignment; Note.

(a)          In consideration for Assignee issuing to Assignor the Note (as defined below), Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to the Undertaking, and all of Assignor's rights, claims and causes of action related thereto.

(b)          Contemporaneously herewith, Assignee is issuing to Assignor a Promissory Note substantially in the form attached hereto as Exhibit B (the "**Note**").

Section 4.          Representations and Warranties.

(a)          Assignor hereby represents and warrants to Assignee and Obligor that Assignor has the power, authority and legal capacity, and is duly authorized, to enter into this Agreement and perform its obligations hereunder and this Agreement is a valid and binding obligation of Assignor.

(b)          Assignee hereby represents and warrants to Assignor and Obligor that Assignee has the power, authority and legal capacity, and is duly authorized, to enter into this Agreement and the Amended and Restated Undertaking and perform its obligations hereunder and thereunder and this Agreement and the Amended and Restated Undertaking are valid and binding obligations of Assignee.

(c)          Obligor hereby represents and warrants to Assignor and Assignee that Obligor has the power, authority and legal capacity, and is duly authorized, to enter into this Agreement and the Amended and Restated Undertaking and perform its obligations hereunder and thereunder and this Agreement and the Amended and Restated Undertaking are valid and binding obligations of Obligor.

Section 5.          Consent to Assignment.

(a)          In reliance on the representations and warranties of Assignor and Assignee herein and the condition that Obligor and Assignee enter into the Amended and Restated Undertaking, Obligor hereby consents, in accordance with Section 5.3 of the Undertaking, to the transfer of the Undertaking to Assignee by Assignor and agrees that Assignee shall be entitled to all of the right, title, interest, claims and causes of action related thereto.

(b)          Obligor hereby releases Assignor from all liabilities and obligations relating to the Undertaking and the Amended and Restated Undertaking and agrees that Assignee shall henceforth be solely liable for all such obligations.

2

Section 6.    <u>Miscellaneous</u>.

(a)    <u>Binding Effect; Benefit; Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto. No Person not party to this Agreement shall be entitled to the benefits of this Agreement.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party. Any attempted assignment in violation of this <u>Section 6(a)</u> will be void.

(b)    <u>Amendment and Modification</u>.  This Agreement may not be amended except by a written instrument executed by all parties to this Agreement.  No consent of any other Person (including any holder of Reference Notes) shall be required in connection with an amendment of this Agreement.

(c)    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument. Signed counterparts of this Agreement may be delivered by facsimile and by scanned .pdf image.

(d)    <u>Applicable Law</u>.  THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF.  THE STATE OR FEDERAL COURTS LOCATED WITHIN NEW YORK COUNTY IN THE STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY AND THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS. EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (B) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (C) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.

THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN <u>SECTION 5.1</u> OF THE UNDERTAKING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

(e)    <u>Severability</u>.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain valid and binding and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and

3

enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein.

(f)    <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(g)    <u>Headings</u>.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

[Remainder of page intentionally left blank.]

4

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

**Dynegy Gas Investments, LLC**

By:   /s/ Kent R. Stephenson
       Name: Kent R. Stephenson
       Title: Executive Vice President

**Dynegy Holdings, LLC**

By:   /s/ Clint C. Freeland
       Name: Clint C. Freeland
       Title: Chief Financial Officer

**Dynegy Inc.**

By:   /s/ Clint C. Freeland
       Name: Clint C. Freeland
       Title: Chief Financial Officer

5

**Annex A:  Additional Defined Terms**

| Defined Term | Section |
|---|---|
| Agreement | Preamble |
| Amended and Restated Undertaking | Third Recital |
| Assignee | Preamble |
| Assignor | Preamble |
| Note | Section 3(b) |
| Obligor | Preamble |
| Undertaking | First Recital |

**Exhibit A:   Amended and Restated Undertaking**

See attached.

[See Exhibit 2.3 attached to Dynegy Holdings, LLC Current Report on Form 8-K filed September 8, 2011]

7

**Exhibit B:   Promissory Note**

See attached.

[See Exhibit 4.1 attached to Dynegy Holdings, LLC Current Report on Form 8-K filed September 8, 2011]

**Exhibit 99.1**

# DYNEGY HOLDINGS, LLC
## (f/k/a DYNEGY HOLDINGS INC.)
## UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

The following unaudited pro forma condensed consolidated financial statements of Dynegy Holdings, LLC (f/k/a Dynegy Holdings Inc.) ("DH") and its consolidated subsidiaries ("we" or "the Company") are included herein:

- Unaudited Pro Forma Condensed Consolidated Balance Sheet as of June 30, 2011

- Unaudited Pro Forma Condensed Consolidated Statement of Operations for the six months ended June 30, 2011

- Unaudited Pro Forma Condensed Consolidated Statement of Operations for the six months ended June 30, 2010

- Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2010

- Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2009

- Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2008

- Notes to the Unaudited Pro Forma Condensed Consolidated Financial Statements

The above referenced unaudited pro forma condensed consolidated financial statements reflect the sale by DH's direct wholly owned subsidiary, Dynegy Gas Investments, LLC ("DGIN") of the Company's coal-fired power generation business to DH's parent, Dynegy Inc. ("Dynegy") (the "CoalCo Sale") which was consummated on September 1, 2011. Because the CoalCo Sale represents discontinued operations for the Company, unaudited pro forma condensed consolidated statements of operations for the years ended December 31, 2009 and 2008 and the six months ended June 30, 2010 have also been included herein. Dynegy's Board of Directors ,as well as DGIN's Board of Managers, concluded that the fair value of the acquired equity stake in Dynegy Coal HoldCo, LLC ("Coal HoldCo") at the time of the transaction was approximately $1.25 billion, after taking into account all debt obligations of Coal HoldCo's wholly owned subsidiary, Dynegy Midwest Generation, LLC ("CoalCo"), including in particular CoalCo's new $600 million, five-year senior secured term loan facility. Dynegy provided this fair value to DGIN in exchange for Coal HoldCo through Dynegy's issuance of an undertaking to make certain specified payments over time which coincide in timing and amount to the payments of principal and interest that DH is obligated to make under a portion of its $1.1 billion of 7.75% senior unsecured notes due 2019 and its $175 million of 7.625% senior debentures due 2026 (the "Undertaking Agreement"). The Undertaking Agreement does not provide any rights or obligations with respect to any outstanding DH notes or debentures, including the notes and debentures due in 2019 and 2026. DGIN assigned its right to receive payments under the Undertaking Agreement to DH and the Undertaking Agreement was amended and restated to be between DH and Dynegy and to provide for the reduction of Dynegy's obligations if the outstanding principal amount of any of DH's $3.5 billion of outstanding notes and debentures is decreased as a result of any exchange offer, tender offer or other purchase or repayment by Dynegy or its subsidiaries (other than DH and its subsidiaries, unless Dynegy guarantees the debt securities of DH or such subsidiary in connection with such exchange offer, tender offer or other purchase or repayment); provided, that such principal amount is retired, cancelled or otherwise forgiven.

In August 2011, Dynegy completed a reorganization of its subsidiaries (the "Reorganization"), following which (i) substantially all of its coal-fired power generation facilities are held by CoalCo, an indirect wholly-owned subsidiary of Dynegy Coal HoldCo, , (ii) substantially all of its natural gas-fired power generation facilities are held by Dynegy Power, LLC ("GasCo"), an indirect wholly-owned subsidiary of Dynegy Gas HoldCo, LLC and (iii) 100 percent of the ownership interests of Dynegy Northeast Generation ("DNE"), the entity that indirectly holds the equity interest in the subsidiaries that operate the Roseton and Danskammer power generation facilities are held by DH. The Reorganization was completed to facilitate the execution of two new credit facilities. The new credit facilities, which were entered into on August 5, 2011, consist of a $1,100 million, five year senior secured term loan facility available to GasCo and a $600 million, five year senior secured term loan facility available to CoalCo (the "CoalCo Facility"). Also in connection with the Reorganization, GasCo and CoalCo entered into service agreements, energy management agreements, a tax sharing agreement, and cash management agreements (collectively, the "Service Agreements") with other DH subsidiaries. For additional information on the Restructuring, please see "Note 13—Subsequent Events" in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 (the "2011 Form 10-Q").

The unaudited pro forma condensed consolidated financial statements have been prepared by applying pro forma adjustments to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K") and the unaudited condensed consolidated financial statements included in the 2011 Form 10-Q. The unaudited pro forma condensed consolidated statements of operations for the six months ended June 30, 2011 and 2010 and the year ended December 31, 2010 reflect the sale of CoalCo, assuming the transaction had been consummated as of the beginning of the year ended December 31, 2010. The unaudited pro forma condensed consolidated statements of operations for the years ended December 31, 2009, 2008 and the six months ended June 30, 2010 are only presented because the Company has not yet been required to reflect CoalCo as discontinued operations in its historical financial statements. The unaudited pro forma condensed consolidated balance sheet reflects the conversion of DH to a limited liability company and the subsequent sale of CoalCo, assuming the transaction had been consummated as of June 30, 2011.

The pro forma adjustments, as described in the notes to the unaudited pro forma condensed consolidated financial statements, are based on currently available information and management believes such adjustments are reasonable, factually supportable and directly attributable to the aforementioned sale of CoalCo. The unaudited pro forma condensed consolidated financial statements are

presented for informational purposes only and are not necessarily indicative of operating results or financial position that would have occurred had the CoalCo sale been consummated on, or as of, the dates indicated, nor are they necessarily indicative of future operating results or financial position. The pro forma adjustments do not include the effects of the GasCo Facility or the CoalCo Facility because they are not directly related to the CoalCo sale and were executed after June 30, 2011, the latest period presented in the unaudited pro forma condensed consolidated financial statements.

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET**
**As of June 30, 2011**
**(in millions)**

| | Dynegy Holdings Inc. Consolidated (a) | CoalCo (b) | Pro Forma Adjustments | Dynegy Holdings LLC Pro Forma Consolidated |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | $ 354 | $ — | $ — | $ 354 |
| Restricted cash and investments | 878 | — | — | 878 |
| Short-term investments | 94 | — | — | 94 |
| Accounts receivable, net of allowance for doubtful accounts | 168 | (1) | — | 167 |
| Accounts receivable, affiliates | — | 52(c) | — | 52 |
| Inventory | 125 | (54) | — | 71 |
| Assets from risk-management activities | 989 | — | — | 989 |
| Assets from risk-management activities, affiliates | — | 77(d) | — | 77 |
| Deferred income taxes | 4 | — | — | 4 |
| Broker margin account | 202 | (40)(e) | — | 162 |
| Prepayments and other current assets | 136 | (7) | — | 129 |
| **Total Current Assets** | 2,950 | 27 | — | 2,977 |
| **Property, Plant and Equipment** | 8,700 | (4,802) | — | 3,898 |
| Accumulated depreciation | (2,499) | 1,472 | — | (1,027) |
| **Property, Plant and Equipment, Net** | 6,201 | (3,330) | — | 2,871 |
| **Other Assets** | | | | |
| Restricted cash and investments | 9 | — | — | 9 |
| Assets from risk-management activities | 84 | — | — | 84 |
| Assets from risk-management activities, affiliates | — | 11(d) | — | 11 |
| Undertaking, affiliate | — | — | 1,250(f) | 1,250 |
| Intangible assets | 116 | — | — | 116 |
| Other long-term assets | 436 | — | — | 436 |
| **Total Assets** | $ 9,796 | $ (3,292) | $ 1,250 | $ 7,754 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current Liabilities** | | | | |
| Accounts payable | $ 111 | $ (10) | $ — | $ 101 |
| Accounts payable, affiliates | — | 67(g) | — | 67 |
| Accrued interest | 51 | — | — | 51 |
| Accrued liabilities and other current liabilities | 85 | (17) | — | 68 |
| Liabilities from risk-management activities | 1,043 | — | — | 1,043 |
| Liabilities from risk-management activities, affiliates | — | 108(d) | — | 108 |
| Notes payable and current portion of long-term debt | 1,008 | — | — | 1,008 |
| **Total Current Liabilities** | 2,298 | 148 | — | 2,446 |
| Long-term debt | 3,852 | — | — | 3,852 |
| Long-term debt to affiliates | 200 | — | — | 200 |
| **Long-Term Debt** | 4,052 | — | — | 4,052 |
| **Other Liabilities** | | | | |
| Liabilities from risk-management activities | 123 | — | — | 123 |
| Liabilities from risk-management activities, affiliates | — | 6(d) | — | 6 |
| Deferred income taxes | 474 | (331) | (10)(h) | 133 |
| Other long-term liabilities | 321 | (60) | — | 261 |
| **Total Liabilities** | 7,268 | (237) | (10) | 7,021 |
| **Commitments and Contingencies** | | | | |
| **Stockholders'/Member's Equity** | | | | |
| Member's equity | — | (3,055) | 3,788(i) | 733 |
| Capital Stock | — | — | — | — |

| | | | | |
|---|---:|---:|---:|---:|
| Additional paid-in capital | 5,135 | — | (5,135)(j) | — |
| Affiliate receivable | (812) | — | 812(j) | — |
| Accumulated other comprehensive loss, net of tax | (51) | — | 51(j) | — |
| Accumulated deficit | (1,744) | — | 1,744(j) | — |
| **Total Stockholders'/Member's Equity** | 2,528 | (3,055) | 1,260 | 733 |
| **Total Liabilities and Stockholders'/Member's Equity** | $ 9,796 | $ (3,292) | $ 1,250 | $ 7,754 |

See the notes to unaudited pro forma condensed consolidated financial statements.

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**For the Six Months Ended June 30, 2011**
**(in millions)**

| | Dynegy Holdings Inc. Consolidated (a) | CoalCo (k) | Pro Forma Adjustments | Dynegy Holdings LLC Pro Forma Consolidated |
|---|---|---|---|---|
| Revenues | $ 831 | $ (328) | $ — | $ 503 |
| Cost of sales | (503) | 177 | — | (326) |
| Operating and maintenance expense, exclusive of depreciation shown separately below | (216) | 79 | — | (137) |
| Depreciation and amortization expense | (201) | 130 | — | (71) |
| Impairment and other charges | (1) | — | — | (1) |
| General and administrative expenses | (64) | — | 25(l) | (39) |
| Operating loss | (154) | 58 | 25 | (71) |
| Interest expense | (178) | — | — | (178) |
| Other income and expense, net | 4 | — | — | 4 |
| Loss from continuing operations before income taxes | (328) | 58 | 25 | (245) |
| Income tax benefit | 133 | (23) | (10)(m) | 100 |
| Loss from continuing operations | $ (195) | $ 35 | $ 15 | $ (145) |

See the notes to unaudited pro forma condensed consolidated financial statements.

3

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**For the Six Months Ended June 30, 2010**
**(in millions)**

| | Dynegy Holdings Inc. Consolidated (a) | CoalCo (k) | Pro Forma Adjustments | Dynegy Holdings LLC Pro Forma Consolidated |
|---|---:|---:|---:|---:|
| Revenues | $ 1,097 | $ (426) | $ — | $ 671 |
| Cost of sales | (539) | 166 | — | (373) |
| Operating and maintenance expense, exclusive of depreciation shown separately below | (231) | 90 | — | (141) |
| Depreciation and amortization expense | (165) | 94 | — | (71) |
| Impairment and other charges | (1) | — | — | (1) |
| General and administrative expenses | (59) | — | 24(l) | (35) |
| Operating income | 102 | (76) | 24 | 50 |
| Losses from unconsolidated investments | (34) | — | — | (34) |
| Interest expense | (180) | — | — | (180) |
| Other income and expense, net | 2 | — | — | 2 |
| Loss from continuing operations before income taxes | (110) | (76) | 24 | (162) |
| Income tax benefit | 56 | 26 | (9)(m) | 73 |
| Loss from continuing operations | $ (54) | $ (50) | $ 15 | $ (89) |

See the notes to unaudited pro forma condensed consolidated financial statements.

4

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**For the Year Ended December 31, 2010**
**(in millions)**

| | Dynegy Holdings Inc. Consolidated (n) | CoalCo (k) | Pro Forma Adjustments | Dynegy Holdings LLC Pro Forma Consolidated |
|---|---|---|---|---|
| Revenues | $ 2,323 | $ (835) | $ — | $ 1,488 |
| Cost of sales | (1,181) | 355 | — | (826) |
| Operating and maintenance expense, exclusive of depreciation shown separately below | (450) | 175 | — | (275) |
| Depreciation and amortization expense | (392) | 256 | — | (136) |
| Impairment and other charges | (148) | 4 | — | (144) |
| General and administrative expenses | (158) | — | 53(l) | (105) |
| Operating income (loss) | (6) | (45) | 53 | 2 |
| Losses from unconsolidated investments | (62) | — | — | (62) |
| Interest expense | (363) | — | — | (363) |
| Other income and expense, net | 4 | — | — | 4 |
| Loss from continuing operations before income taxes | (427) | (45) | 53 | (419) |
| Income tax benefit | 184 | 33 | (22)(m) | 195 |
| Loss from continuing operations | $ (243) | $ (12) | $ 31 | $ (224) |

See the notes to unaudited pro forma condensed consolidated financial statements.

5

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**For the Year Ended December 31, 2009**
**(in millions)**

| | Dynegy Holdings Inc. Consolidated (n) | CoalCo (k) | Dynegy Holdings LLC Pro Forma Consolidated |
|---|---|---|---|
| Revenues | $ 2,468 | $ (940) | $ 1,528 |
| Cost of sales | (1,194) | 345 | (849) |
| Operating and maintenance expense, exclusive of depreciation shown separately below | (521) | 182 | (339) |
| Depreciation and amortization expense | (335) | 161 | (174) |
| Goodwill impairment | (433) | — | (433) |
| Impairment and other charges | (538) | 42 | (496) |
| Loss on sale of assets, net | (124) | 6 | (118) |
| General and administrative expenses | (159) | — | (159) |
| Operating loss | (836) | (204) | (1,040) |
| Losses from unconsolidated investments | (72) | — | (72) |
| Interest expense | (415) | — | (415) |
| Debt extinguishment costs | (46) | — | (46) |
| Other income and expense, net | 10 | (2) | 8 |
| Loss from continuing operations before income taxes | (1,359) | (206) | (1,565) |
| Income tax benefit | 313 | 88 | 401 |
| Loss from continuing operations | $ (1,046) | $ (118) | $ (1,164) |

See the notes to unaudited pro forma condensed consolidated financial statements.

6

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**For the Year Ended December 31, 2008**
**(in millions)**

| | Dynegy Holdings Inc. Consolidated (n) | CoalCo (k) | Dynegy Holdings LLC Pro Forma Consolidated |
|---|---|---|---|
| Revenues | $ 3,324 | $ (1,232) | $ 2,092 |
| Cost of sales | (1,693) | 373 | (1,320) |
| Operating and maintenance expense, exclusive of depreciation shown separately below | (466) | 170 | (296) |
| Depreciation and amortization expense | (346) | 144 | (202) |
| Gain on sale of assets, net | 82 | — | 82 |
| General and administrative expenses | (157) | — | (157) |
| Operating income | 744 | (545) | 199 |
| Losses from unconsolidated investments | (40) | — | (40) |
| Interest expense | (427) | — | (427) |
| Other income and expense, net | 83 | — | 83 |
| Income (loss) from continuing operations before income taxes | 360 | (545) | (185) |
| Income tax (expense) benefit | (138) | 201 | 63 |
| Income (loss) from continuing operations | $ 222 | $ (344) | $ (122) |

See the notes to unaudited pro forma condensed consolidated financial statements.

7

**DYNEGY HOLDINGS, LLC**
**(f/k/a DYNEGY HOLDINGS INC.)**
**NOTES TO THE UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

(a)    Amounts represent historical financial information from the 2011 Form 10-Q.

(b)    Reflects the assets and liabilities of CoalCo that were sold by DH in the CoalCo Sale, inclusive of the marketing and hedging activities discussed in notes (c), (d), (e) and (g) below.  Pursuant to the energy management agreements and historical practice, DH and its subsidiaries perform certain commercial marketing and hedging activities on behalf of CoalCo and DH's other generation businesses.

(c)    Reflects receivables of (i) $40 million of collateral posted by DH or its subsidiaries on behalf of CoalCo and (ii) $12 million as a result of marketing activities performed by DH or its subsidiaries on behalf of CoalCo.

(d)    Reflects the fair value of derivatives entered into by DH or its subsidiaries on behalf of CoalCo to reduce market and financial risks associated with CoalCo's generation business.

(e)    Represents a reduction in DH's collateral.  The collateral is related to CoalCo marketing and hedging activities and therefore any collateral postings made by DH or its subsidiaries on behalf of CoalCo are reflected as receivables from affiliate as discussed in (c) above.

(f)    Reflects the value of the consideration received by DH in exchange for its ownership interests in CoalCo.  This value was provided to DH through Dynegy Inc.'s issuance of an undertaking to make certain specified payments over time which coincide in timing and amount to the payments of principal and interest that DH is obligated to make under a portion of its $1.1 billion of 7.75% senior unsecured notes due 2019 and its $175 million of 7.625% senior debentures due 2026.  Because the consideration to be received pursuant to the undertaking coincides with a portion of the principal and interest payments to be made by DH pursuant to these notes and debentures, the value of the consideration is reflected in the unaudited pro forma condensed balance sheet as being equal to such amount of the principal of these notes and debentures.

(g)    Amount represents the amounts payable to CoalCo as a result of marketing activities performed by DH, or its subsidiaries, on behalf of CoalCo.

(h)    Reflects the remeasurement of the Company's net deferred tax liability due to a change in the effective state tax rate as well as a valuation allowance for certain state NOL's due to a change in the business presence in those states as a result of the CoalCo Sale.

(i)    Reflects (i) $2.5 billion due to the change in DH's legal structure from a corporation to a limited liability company which causes the historical equity balances to be reflected in a single line item and (ii) $1.25 billion for the consideration provided by Dynegy Inc. to DH as discussed in note (f) above.  The difference between the consideration received and the carrying value of CoalCo is approximately $1.8 billion and is reflected as a distribution within Member's Equity because the CoalCo Sale is a transaction between entities under common control.

(j)    Amounts were reclassified to Member's equity upon conversion of DH from a corporation to a limited liability company.

(k)    Reflects the results of operations of CoalCo, including the related marketing and hedging activities performed by DH or its subsidiaries on CoalCo's behalf.  Pursuant to the energy management agreements and historical practice, DH and its subsidiaries perform certain commercial marketing and hedging activities on behalf of CoalCo and DH's other generation businesses.  The tax impact was determined by calculating a tax provision on a consolidated basis for the Company before and after the CoalCo Sale.

(l)    Reflects the estimated amount of general and administrative costs that would have been charged to CoalCo had the Service Agreements been in place as of January 1, 2010.  The estimate was determined by allocating costs to CoalCo based on the number of plants included in CoalCo's operations relative to the Company's generation fleet and, for personnel related expenses, headcount at CoalCo facilities relative to the headcount at the remainder of the Company's generation facilities.

(m)    Represents the tax impact associated with the allocation of general and administrative costs.

(n)    Amounts represent historical financial information from the 2010 Form 10-K.

**Exhibit 99.2**



**FOR IMMEDIATE RELEASE**                                                                                 **NR11-27**

**DYNEGY INC. ACQUIRES DIRECT OWNERSHIP
OF SUBSIDIARY DYNEGY COAL HOLDCO, LLC**

HOUSTON, September 1, 2011 — Dynegy Inc. (the Company) (NYSE: DYN) today announced that it has acquired direct ownership of Dynegy Coal Holdco, LLC (Coal Holdco), the indirect parent of the Company's subsidiary Dynegy Midwest Generation, LLC (CoalCo).  As announced on August 8, 2011, the Company established CoalCo as part of an internal restructuring designed to increase flexibility and optimize asset value by creating separate coal-fueled and gas-fueled power generation units, for which $1.7 billion in stand alone first lien financings were obtained.  The transfer of Coal Holdco will help the Company delever its consolidated balance sheet by facilitating one or more potential transactions, which are currently under consideration by the Finance and Restructuring Committee of the Board.  These potential transactions include exchanges of some or all of Dynegy Holdings' outstanding $3.5 billion in notes for new notes and/or cash.  Such transactions may be implemented in privately-negotiated transactions or otherwise.

The Company's management and Board of Directors concluded that the fair value of the acquired equity stake in Coal Holdco, after taking into account all debt obligations of CoalCo, including in particular its new $600 million, five-year senior secured term loan facility, is approximately $1.25 billion.  This value was provided to Coal Holdco's former direct parent, Dynegy Gas Investments, LLC (DGI) through the Company's issuance of an undertaking to make proportionate payments at the times that Dynegy Holdings is obligated to make payments of principal and interest under its $1.1 billion of 7.75% notes due 2019 and its $175 million of 7.625% notes due 2026. The undertaking does not provide any rights or obligations with respect to any outstanding Dynegy Holdings notes, including the notes due in 2019 and 2026.

Immediately after closing the transfer, the undertaking was assigned by DGI to its parent, Dynegy Holdings, for a note in the amount of $1.25 billion that matures in 2027. The undertaking provides for the reduction of the Company's obligations if it or its subsidiaries (other than Dynegy Holdings and its subsidiaries) acquire or retire any of Dynegy Holdings' outstanding $3.5 billion of notes.

FORWARD LOOKING STATEMENTS

This press release contains statements reflecting assumptions, expectations, projections, intentions or beliefs about future events that are intended as "forward-looking statements," particularly those statements concerning the Acquisition and the expected benefits therefrom, as well as any further restructuring steps. Discussion of risks and uncertainties that could cause actual results to differ materially from current projections, forecasts, estimates and expectations of Dynegy is contained in Dynegy's filings with the Securities and Exchange Commission (the SEC). Specifically, Dynegy makes reference to, and incorporates herein by reference, the section entitled "Risk Factors" in its most recent Form 10-K and subsequent reports on Form 10-Q. In addition to the risks and uncertainties set forth in Dynegy's SEC

filings, the forward-looking statements described in this press release could be affected by, among other things,(i) the anticipated effectiveness of the overall restructuring activities and any additional strategies to address Dynegy's liquidity and capital resources including accessing the capital markets; (ii) limitations on Dynegy's ability to utilize previously incurred federal net operating losses or alternative minimum tax credits; (iii) the timing and anticipated benefits to be achieved through Dynegy's cost savings programs; (iv) beliefs and assumptions relating to liquidity, available borrowing capacity and capital resources generally, including the extent to which such liquidity could be affected by poor economic and financial market conditions or new regulations and any resulting impacts on financial institutions and other current and potential counterparties; (v) expectations regarding environmental matters, including costs of compliance, availability and adequacy of emission credits, and the impact of ongoing proceedings and potential regulations or changes to current regulations, including those relating to climate change, air emissions, cooling water intake structures, coal combustion byproducts, and other laws and regulations to which Dynegy is, or could become, subject; (vi) beliefs about commodity pricing and generation volumes; (vii) beliefs, assumptions and projections regarding the demand for power, generation volumes and commodity pricing, including natural gas prices and the impact on such prices from shale gas proliferation and the timing of a recovery in natural gas prices, if any; (viii) sufficiency of, access to and costs associated with coal, fuel oil and natural gas inventories and transportation thereof; (ix) beliefs and assumptions about market competition, generation capacity and regional supply and demand characteristics of the wholesale power generation market, including the anticipation of higher market pricing over the longer term; (x) beliefs and assumptions regarding Dynegy's ability to enhance or protect long-term value for stockholders; (xi) the effectiveness of Dynegy's strategies to capture opportunities presented by changes in commodity prices and to manage its exposure to energy price volatility; (xii) beliefs and assumptions about weather and general economic conditions; (xiii) expectations regarding Dynegy's new credit facilities compliance, collateral demands, interest expense and other payments; (xiv) Dynegy's focus on safety and its ability to efficiently operate its assets so as to maximize its revenue generating opportunities and operating margins; (xv) beliefs about the outcome of legal, regulatory, administrative and legislative matters; and (xvi) expectations and estimates regarding capital and maintenance expenditures, including the Midwest Consent Decree and its associated costs. Any or all of Dynegy's forward-looking statements may turn out to be wrong. They can be affected by inaccurate assumptions or by known or unknown risks, uncertainties and other factors, many of which are beyond Dynegy's control.

SOURCE: Dynegy Inc.

Dynegy Inc.
Media: 713-767-5800
or
Analysts: 713-507-6466