WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200
(212) 354-8113 (Fax)
Thomas E Lauria (*pro hac vice*)
Gerard Uzzi
J. Christopher Shore
Elizabeth Feld
Julia M. Winters

*Proposed Special Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DYNEGY HOLDINGS, LLC, et al.,[1] | ) | Case No. 11- 38111 (CGM) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**REPLY IN SUPPORT OF DEBTORS' MOTION**
**TO REJECT THE LEASE DOCUMENTS**

TO THE HONORABLE CECELIA G. MORRIS:

Dynegy Holdings, LLC ("Holdings"), and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), by and though their undersigned counsel, hereby file this reply in support of the motion (the "Motion") for the entry of an order authorizing the Debtors to reject the Facility Leases (as defined in the

---

[1] The Debtors in these chapter 11 cases are Dynegy Holdings, LLC, Dynegy Northeast Generation, Inc., Hudson Power LLC, Dynegy Danskammer, L.L.C. and Dynegy Roseton, L.L.C.  This Reply responds to the following objections:  Objection of U.S. Bank, National Association, As Indenture Trustee (Docket No. 167) (the "US Bank Objection"), Objection to Motion, filed by Resources Capital Management, et al. (Docket No. 164) (the "PSEG Objection"), Central Hudson Gas & Electric Corporation's Objection to Motion (Docket No. 103) (the "Central Hudson Objection"), the Response of the Official Committee of Unsecured Creditors to the Lease Rejection Motion (Docket No. 181) (the "Committee Objection" and along with all other objections, collectively, the "Objections").  As further noted herein, the Debtors have now resolved the PSEG Objection and the Central Hudson Objection.

Motion) and certain other related executory agreements and unexpired leases set forth in the Motion (together with the Facility Leases, the "Lease Documents"). In further support of the Motion, the Debtors respectfully state as follows:

**Preliminary Statement**

1. Notwithstanding the Court's repeated admonitions that all parties in interest in these cases should focus with precision on only those discrete issues that need to be decided on any given day, the Objections that have not been resolved focus on everything *but* the salient issue before the Court on the Motion.

2. The issue framed is not complex—are the Lease Documents sufficiently burdensome to the Debtors so as to support their business decision to reject them under section 365 of the Bankruptcy Code? The evidence supporting a finding of burden here is straightforward and compelling. Two Debtors, Dynegy Danskammer and Dynegy Roseton (the "Debtor Lessees"), are each a party to a prepetition Facility Lease of power generation facilities owned by a PSEG Owner Lessor. Holdings guaranteed the Debtor Lessees' obligations under the Facility Leases. In the year following the petition date, the Facility Leases will require the Debtors to make rent payments totaling over $260 million. None of the Debtors currently have the funds to make those payments, nor do they expect to have sufficient funds to make the payments, nor is there any legitimate business reason for them to make the payments even if they had the funds. Over the same twelve month period, assuming the Debtors did not pay a dollar of the $260 million in rent, they are projected to *lose* tens of millions of dollars operating the leased facilities. Simply put, the generation business built around the two leased facilities does not work, which is exactly why the Debtors are in bankruptcy and why they filed the Motion on the

first day of these cases. The situation is so dire that the PSEG Entities admitted the following in their prepetition litigation against the Debtors:

> The Roseton and Danskammer power generation facilities leased by DHI's subsidiaries have been troubled financially and have a substantially negative financial value and do not themselves provide sufficient cash flow for the lessees to continue to meet their obligations under the long-term leases into which they entered.[2]

(See Docket No. 92-8, PSEG Complaint in Delaware action, ¶ 22.) US Bank was equally dire in its assessment of the Facility Leases in its own prepetition litigation against the Debtors: "Because the Roseton and Danskammer facilities currently produce minimal net operating revenues, Dynegy Holdings directly or indirectly satisfies virtually all of Dynegy Roseton's and Dynegy Danskammer's obligations to Plaintiff, and has been doing so for some time." (See, e.g., The Successor Lease Indenture Trustee, et al. v. Dynegy Inc., et al., Index No. 652642/2011, N.Y. Sup. Ct., Doc. No. 1 (Complaint) at ¶ 33.)

    3. Given the lack of any appreciable benefit to the estates of retaining the Facility Leases, it is not surprising that the only parties who filed Objections are entities who will be prejudiced *in their individual capacity* by having their claims under the Lease Documents converted into prepetition rejection damage claims: (i) the PSEG landlords who will lose their above-market rents (and their parent who will incur a potential tax loss), (ii) the landlords' lender whose recoveries are secured by those above-market rents, (iii) the prior owner of the facilities, and (iv) a five–member Official Committee whose members include the three other parties who have filed Objections.

    4. The Debtors have now resolved the Objections of the PSEG Entities, as described below, in which they stipulate to rejection of the Lease Documents nunc pro tunc to the

---

[2] The fact that the Debtors cannot operate the facilities profitably under the lease structure should not be taken to mean that the facilities themselves have no value, just that the rents to be paid substantially outstrip what the Debtors can earn from operations.

petition date.  The Debtors have also resolved the Central Hudson Objection, subject to a statement being entered into the record at the hearing.

5.  The remaining Objections do not rebut the claims of burdensomeness. Rather, they focus almost exclusively on the process by which the Debtors reached their decision and their alleged failure to consider other "alternatives" to rejection.  As set forth below and in the accompanying supplemental declarations of Messrs. Stephenson and Daley, the decision to reject on day one of the cases was based on a thorough airing of all relevant financial information by the Debtors' decision-makers and was further based on the advice of experienced legal counsel and financial advisors.  As for alleged "alternatives," the Objections just miss the point.  Under the Code, there are only two options with respect to the Facility Leases: assume them or reject them.  Further, because these are unexpired leases of non-residential real property, that election would at most be open for the 120-day period provided in section 365(d)(4)(A) of the Code.  More critically, because their obligations under the Facility Leases are subject to the "timely performance" requirements of the non-extendable 60-day period provided in section 365(d)(3), practically speaking, these Debtors only had a two-month window in which to act.

6.  Theoretical options aside, there really was no choice for the Debtors here. There is no scenario, much less a credible one, in which the Debtors could ever assume the Facility Leases, cure all defaults and provide adequate assurance of future performance of hundreds of millions of dollars of future rent payments.  The capital needed to assume, and the post-petition liabilities incurred by assuming, far exceed the anticipated returns from operating the facilities. That only leaves the option of deferring the filing of the rejection motion for a few weeks in the hopes that some unspecified deal materializes in which the lease structure could be left intact.

Given the circumstances, however, the Debtors can hardly be faulted for their business decision not to wait.

7.  First, deferral of the rejection decision would almost certainly have required either the payment on November 8, 2011 of $82.5 million in rent that the Debtors did not have or a default in their obligations under section 365(d)(3) of the Code. Neither alternative would have done the estates any good.

8.  Second, by deferring rejection and failing to manifest their unequivocal intent to turn over the facilities on the petition date, the Debtors would have compromised their claims for a nunc pro tunc rejection of the Lease Documents. While that result might help the leasing parties, the estates would clearly be prejudiced.

9.  Third, as US Bank makes clear in its Objection, the leasing parties will be asserting claims for administrative rent on the facilities for every day prior to their turnover (and for every day that they fight that turnover). That means that, while the Debtors explored their negotiating "alternatives," as US Bank suggests they should have done, the estates would have been exposed to as much as $500,000 *per day* in unnecessary administrative rent claims. That accrual would have given US Bank more, not less, leverage with every day that passed.[3]

10. Fourth, as far as any hypothetical white knight on the horizon, the Debtors made extensive efforts prepetition to market the Facility Leases to key industry participants. The best they could solicit was one offer to assume the liability on the Facility Leases in exchange for a $300 million cash payment to the purchaser. As noted, the Debtors did not then, and do not now, have the kind of capital necessary to fund a cash restructuring payment of $300 million to a white knight. As important, and as explained below, in calculating the all-in damages under the

---

[3] The Debtors believe such claims are baseless and reserve all rights. Yet, there is more than a little gamesmanship in the landlords' pleading for delay while their lender asserts that any delay will work to their pecuniary benefit.

rejected Lease Documents, the Court must take into consideration the present fair market value of the facilities as a direct mitigation against rejection damages.  Thus, the fact that, in an assume-and-assign scenario, a hypothetical third-party might be willing to assume liability on the Facility Leases only means that the all-in prepetition claims in a rejection scenario will have to be reduced by the implied value of that assumption.  For example, if a third party wanted to assume liability on the Facility Leases for a $300 million payment, the all-in rejection claims of the lease parties would be $300 million (i.e., limited to the amount that the payments under the Facility Leases exceed the value of the facilities).  In short, the Debtors see fundamentally little, if any, additional benefit to be conferred by preserving a broken lease structure.

11. Fifth, what US Bank is really advocating for in its Objection is more time for its Certificate Holders to cut a deal with the Debtors.  But, exactly what potential "alternative deal" exists that could warrant a deferral of rejection?  The Debtors sought to engage in restructuring discussions with US Bank prepetition.[4]  Those discussions went nowhere.  If US Bank continues to seek to challenge the Debtors' decision not to "explore" further the possibility of a settlement with it, the Debtors will seek to advise the Court of the exact content of its otherwise protected settlement offers made in prepetition discussions, not to prove liability but rather to show the hopelessness of the Debtors waiting around for a deal.  US Bank should not be permitted to use the shielding protections of FRE 408 as a sword against the Debtors.  Moreover, what delay is necessary for a deal to materialize?  If a deal is to be had, the parties have had months to explore their options.  Contrary to the insinuations in the Objections that others know better how to drive to consensus in a complex chapter 11 case, the Debtors are confident that their decision as to how to proceed is far more likely to bear fruit than an alternative strategy of

---

[4] Because none of the Pass-Through Certificate Holders were willing to restrict themselves pre- or post-petition, the Debtors have not been able to engage with them directly but have had to deal with US Bank, their indenture trustee.

waiting around for the lease debtholders to engage while accruing claims to pay them for the right to lose money operating their collateral. In fact, the Debtors have now reached a settlement with the PSEG Entities that stipulates to a nunc pro tunc rejection of all the Lease Documents and fixes the claims of all of the PSEG Entities in these cases—which the Committee protested could be over $300 million—at a single $110 million claim against Holdings.[5]

12. For all the foregoing and following reasons, the Court should grant the rejection of the Lease Documents and further order that, consistent with the PSEG Entities' settlement, such rejection is nunc pro tunc to November 7, 2011.

## ARGUMENT

### A. The PSEG Entities And US Bank Represent A Single Economic Interest In The Cases: That Of Landlords And Lenders Whose Burdensome Leases Are Being Rejected

13. Before delving into the specifics of the Objections, one legal point requires clarification. The two most vociferous opponents of rejection have been the PSEG Entities and US Bank. The former are the actual landlords of the facilities, and their objections have been resolved. The *only other claim* that can now arise from rejection is that of US Bank, as Lease Indenture Trustee. That claim, which acts as security for repayment of the Pass-Through Certificate Holders' claims against their trust, is capped at a maximum of $550 million plus interest, fees and costs. (The Certificate Holders cannot receive more than payment in full of their debt claims). The Debtors believe that, given the fair market value of the facilities against which the Pass-Through Certificate Holders lent money and/or the application of the claim cap under section 502(b)(6) of the Code, US Bank's claim will be substantially less than $550 million, if a claim exists at all. Thus, while standing may technically exist for US Bank, it

---

[5] A copy of the settlement term sheet will be presented to the Court prior to the hearing and incorporated in a form of lease rejection order. The settlement with the PSEG Entities now leaves one moving piece in the Plan as to the allowable amount of US Bank's claims at Holdings. If it is below $190 million, and as set forth herein the Debtors believe that to be the case, the $300 million threshold in the Plan can be met.

only speaks as an assignee of the interests of the PSEG Entities who have agreed to rejection nunc pro tunc. Practically speaking, US Bank should be bound by that same stipulation.

        14.     Further, as the voice of a lessor, US Bank's views on rejection are the *least* relevant of any party-in-interest in these cases. Its protests only suggest the obvious: a lease which is burdensome to the estate is beneficial to the landlord; otherwise, it would not be fighting rejection. Burden to the landlord is legally irrelevant to whether a debtor should be permitted to reject. COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008) ("The Code does not condition the right to assume or reject on lack of prejudice to the non-debtor party"). Indeed, courts routinely reject a lessor's self-serving conclusion that its lease is not burdensome to the estate when assessing a rejection motion. In re Wolfin Oil, L.L.C., 318 B.R. 392, 399 (Bankr. N.D. Tex. 2004) (overruling non-debtor landlord's objection because, among other things, the bankruptcy court was "unconvinced" by the landlord's "self-serving testimony"); Mazirow v. Grigsby, Jr. (In re White Motor Co.), 44 B.R. 563, 568-69 (N.D. Ohio 1984) ("the general theme of Section 365 is that the other party to an executory agreement has no protectable interest that offsets the bankruptcy interest of dispensing with burdensome or inconsequential property") (quoting Nimmer, Executory Contracts in Bankruptcy: Protecting the Fundamental Terms of the Bargain, 54 U. COLO. L. REV. 507, 521–22 (1983)).

**B. The Debtors Made An Appropriate, Informed Decision That The Lease Documents Are Burdensome**

        15.     Turning to the merits of the Motion, the two remaining Objections are nearly silent on the key issue of burdensomeness, and no one has offered any evidence that the

Lease Documents are, in fact, not burdensome on the estates.[6] Throughout the Objections, the argument is simply that other, unspecified "alternatives" to rejection should have been explored. There are, in fact, only two alternatives available to a debtor. Under section 365 of the Bankruptcy Code, a debtor must either assume or reject an executory contract or unexpired lease. 11 U.S.C. § 365(a). With respect to unexpired leases of non-residential real property such as those here, a lease is deemed rejected within the earlier of 120 days of the filing of a petition or the entry of a confirmation order, unless extended for cause. Id. at § 365(d)(4)(A). Even then, without a landlord's consent the decision to assume or reject cannot be made more than 210 days from the petition date. Id. at § 365(d)(4)(B). More important, under section 365(d)(3), a debtor must timely comply with its obligations under an unexpired lease of non-residential real property, unless cause is shown. And even where cause exists, a Court has no statutory authority to defer those obligations beyond 60 days. Id. at § 365(d)(3) ("the time for performance shall not extend beyond the 60-day period"). The Debtors will never be able to meet their post-petition rent obligations under the Facility Leases, nor can they responsibly contend, counterfactually, that the two power generation facilities anchored to the bedrock in Newburgh, New York are actually personal property (like two giant RVs parked along the banks of the Hudson River waiting to be driven away by the bondholders). Given these two facts, the Debtors either had to default on their obligations under the Bankruptcy Code or obtain an order allowing rejection within the first 60 days of the case. Waiting would have been a perilous position.

---

[6] At best US Bank takes an unjustified swipe at Mr. Daley for allegedly failing to apprise the Court that, if one completely ignores any rent obligations under the Facility Leases, a document produced in discovery shows that, at one time, the Debtors anticipated that the facilities might produce positive EBITDA in 2014. (US Bank Objection at 17 n. 15.) Not only are the Debtors operating on a more updated (and negative) set of projections, US Bank cannot responsibly claim that, in deciding whether the Debtors should continue to operate the facilities post exit, they should ignore the hundreds of millions of dollars of post-exit rent that would have to be paid if the leases were assumed to allow that operation.

16. Further, no one has contended that any of the Lease Documents can ever be assumed in their present configuration. Under section 365(b)(1), in order to assume, the Debtors would have to cure all monetary defaults under the Facility Leases and provide adequate assurance of future performance of all of the Lease Documents. The Debtors cannot do that, given the earnings projections of these facilities and the enormous lease payments due over the remaining term. Even if the leased facilities may turn profitable again, the Debtors simply do not have the capital to ride through the unprofitable period.

17. The only long-term alternative, then, is rejection, and US Bank has already conceded the business case supporting rejection. (See, e.g., The Successor Lease Indenture Trustee, et al. v. Dynegy Inc., et al., Index No. 652642/2011, N.Y. Sup. Ct., Doc. No. 1 (Complaint) at ¶ 33 ("Because the Roseton and Danskammer facilities currently produce minimal net operating revenues, Dynegy Holdings directly or indirectly satisfies virtually all of Dynegy Roseton's and Dynegy Danskammer's obligations to Plaintiff, and has been doing so for some time.")). No amount of "process" employed by the Debtors could have resulted in a different conclusion. Accordingly, the Court need not conduct an evidentiary hearing on exactly what the Debtors did and did not consider in connection with their decision to seek rejection. See Lubrizoil Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047-48 (4th Cir. 1985) ("the business judgment rule require[s] that the debtor's factual evaluation be accepted by the court"); Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987) ("[W]hether the debtor is making the best or even a good business decision is not a material issue of fact under the business judgment test"). Consistent with the decisions of many other judges to have considered the issue, Judge D. Michael Lynn explained in this regard that, "whatever authority a bankruptcy court has to

question the business judgment of a debtor in possession, the court may not go so far as to second guess a choice of business strategy." In re Pilgrim's Pride Corp., 403 B.R. 413, 430 (Bankr. N.D. Tex. 2009).

18.     Nevertheless, and notwithstanding the Objections, the Debtors did give substantial attention, inquiry and consideration to the decision to reject. As described more fully in the supplemental declarations of Messrs. Stephenson and Daley, the Debtors (as well as their common parent, Dynegy Inc.) recognized that the Facility Leases were burdensome and needed to be addressed long before the prepetition restructuring transactions complained about in the Objections. Starting in 2008, Dynegy began discussions with PSEG regarding ways to refinance the Facility Leases. In 2009, it considered selling the Debtors' interests in the Facility Leases, and engaged Bank of America Merrill Lynch to market the interests. Those efforts, as noted, resulted in only the one expression of interest from Constellation Energy. (A copy of the Dynegy board presentation discussing the situation is appended to Mr. Stephenson's reply declaration at Exhibit B.) In 2011, the board of Dynegy Holdings received input from management and advisors concerning possible restructuring alternatives, including, but not limited to, a potential rejection of the Facility Leases. All of these efforts—including projections gathered and analyzed over the course of several years—led the Holdings board of managers to conclude that the Facility Leases are burdensome and becoming more so every day. As such, the Holdings board and, through a unanimous written consent, the Debtor Lessees properly sought to reject the Lease Documents immediately.[7]

---

[7] Even were the Court to assess that process and the ultimate decision under an entire fairness standard, the decision to reject the Lease Documents is, of course, entirely fair. The mere fact that members of Holdings' board are also officers or directors of Dynegy Inc. (or that a parent and subsidiary share legal and financial advisors) is not an indication that the decision to reject the Lease Documents was made unfairly.

**C. There Is No Cost Avoidance In An Assume And Assign Scenario And No Additional Claims Result From A Rejection Versus A "Preservation" Of The Deal Structure**

19. Boiled to its essence, the challenge to the Debtors' decision to reject is that, even if correct and entirely fair, the decision was allegedly precipitous and should have been delayed to some future, unspecified date to capture some future, unspecified benefit. For example, throughout the Objections, statements are made which insinuate that, if the Debtors were to defer the decision on rejection, the claims arising therefrom would somehow be smaller than those arising from the immediate rejection. That is clearly not the law. No matter when rejection occurs during the case, rejection creates a prepetition damages claim as of the day before the petition date. 11 U.S.C. § 365(g) ("the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . . immediately before the date of the filing of the petition"); see also 11 U.S.C. § 502(g) ("A claim arising from the rejection, under section 365 of this title . . . of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed . . . or disallowed . . . the same as if such claim had arisen before the date of the filing of the petition").

20. Similarly misplaced are the protests that the estates will be creating "additional" or "new" liabilities by rejecting today that which could be avoided if the Debtors were to preserve the structure of the sale/leaseback deal. First, no one has proposed any form of deal in which the sale-leaseback structure can be preserved while relieving the Debtors of their incredible and unsustainable burdens under the Facility Leases, and the Debtors themselves have been unable to construct one. Among other things, amendment of the payment terms of the Facility Leases could require the impossible task of obtaining the consent of 100% of the Pass-Through Certificate Holders. Second, in light of the PSEG Entities' recent settlement with the Debtors, there is only one rejection claim left to be determined—that of US Bank, as assignee of

collection rights under the Facility Leases. As noted above, the Lease Indenture secures the right of the Lease Indenture Trustee to be paid the currently outstanding debt owed to the Pass-Through Certificate Holders of $550,400,000 in principal, plus interest, costs and expenses. Once these amounts are paid, the lien of the Lease Indenture Trustee, and thus the right to seek payment under the Facility Leases, is released. In short, all the Lease Indenture Trustee can claim against these Debtors is a general, unsecured claim for up to a maximum of approximately $550 million for damages arising from rejection of the Facility Leases.

21. That rejection damage claim, however, is subject to a critical qualification that none of the Objections addresses—the offsets to damages required under the terms of the Facility Leases. Upon a Lease Event of Default (i.e., rejection), the Lease Indenture Trustee can pursue various assigned remedies under Section 17 of each of the Facility Leases. These remedies can include (i) the right to seek specific performance, (ii) the right to terminate the Facility Lease and repossess the facilities, (iii) the right to sell the facilities in which case the Debtor Lessees' rent obligations will cease upon sale (except to the extent included in a claim for Termination Value), (iv) the right to hold the facilities idle or lease them to others, with the Debtor Lessees remaining liable for Periodic Lease Rent reduced by the net proceeds from the rental of the facilities to others, and (v) the right to seek Termination Value, with offsets, at the election of the Lease Indenture Trustee, for Fair Market Sales Value, Fair Market Rental Value, or the net proceeds received from the sale of the Facility.

22. All of this is to say that, upon rejection, any calculation of damages under the Facility Leases have to take into consideration the value of the facilities to reflect the fact that neither the Owner Lessors nor US Bank can be put in a *better* position than if they had never consummated the transaction. If, for example, the Court determines that the facilities have a

value of $550 million, then there may be *no* rejection damage claim owing to US Bank—US Bank can simply take the facilities in satisfaction of its claims.  By the same token, the Debtors would still reject the Facility Leases because, with a facility value of only $550 million, the Facility Leases are hundreds of millions of dollars underwater.  That calculus, which is not a "today issue" will hold true no matter when a rejection order is entered.

### D.   Any Delay Of The Rejection Approval Prejudices The Debtors And Their Estates

23.   In contrast to the lack of any appreciable benefit to delaying rejection, the Debtors' estates are exposed to material, substantial prejudice in any delay of rejection beyond the petition date, largely in the form of accrual of unnecessary administrative expense claims which will be asserted by US Bank.

24.   As noted in the Motion, the Debtor Lessees are currently operating the facilities at a loss and will continue to operate the facilities until they can obtain regulatory authority to transition them off to another operator.  Until that transition is complete, US Bank has whatever rights it has under the Facility Leases to force the Debtor Lessees to vacate the facilities.[8]  Barring such a turn of events, the day after the effective date of the rejection order, the Debtor Lessees will be holdover tenants, and US Bank will assert whatever administrative expense claims it has for the holdover period.  That too is not a today issue, except insofar as US Bank contends that the additional delay is without prejudice.[9]

---

[8] In fact, following rejection, the Debtors' interests in the Leased Facilities will no longer be property of the estate and U.S. Bank would not need relief from the automatic stay to dispossess the Debtor Lessees.  Prior to rejection, U.S. Bank is entitled to seek relief from the automatic stay to recover possession of the Facilities pursuant to section 362 of the Bankruptcy Code.  See, e.g., In re Palace Quality Servs. Indus., Inc., 283 B.R. 868, 878 (Bankr. E.D. Mich. 2002).

[9] If such a claim is filed, the issue will be what holdover claims will be allowable as administrative expenses.  That interplay is best demonstrated by focusing on the $82.5 million rent payment which was deferred pursuant to this Court's order, as extended on November 28, 2011 (the "365(d)(3) Order").  Upon rejection, US Bank's claim for that rent payment will be a part of the up to $550 million general unsecured claim that US Bank can assert against the Debtors.  US Bank, however, will likely be asserting that the entire $82.5 million payment obligation is entitled to an administrative expense priority to be paid by the Debtor Lessees in whole dollars, regardless of whether those

25. To the extent that the Court grants rejection of the Lease Documents prior to December 28th (the current expiry of the 365(d)(3) Order), the Debtors will have "timely" performed all of their obligations under the Facility Leases. US Bank's claim for $82.5 million in rent—an obligation that will now only become due after rejection—should therefore be treated the same as the claim for all other rent payments that will become due after rejection, as a general unsecured prepetition claim. See 11 U.S.C. §§ 365(g); 502(g). Any other result would be punitive on the Debtors and their estates and penalize the Debtors for striving to meet their regulatory obligations.

26. This is exactly the point of US Bank's lead case. In In re Bio-Med Laboratories, 131 B.R. 72 (Bankr. N.D. Ohio 1991), the debtor's leases were deemed rejected sixty days after the case was converted from chapter 11 to chapter 7. Thereafter, the bankruptcy trustee discovered hazardous waste on a leased property, which, if the estate did not remediate, would prevent the trustee from abandoning the property under certain environmental laws. Id. at 74. The trustee elected to remain in possession of the property until remediation was completed. Id. The Court determined that, for the period after rejection and before the remediation was completed, the landlord was entitled to be compensated for the holdover as an administrative expense under section 503(b)(1)). In so ruling, the Court stated:

> It is unquestioned that Gateway's allowing the Debtor to remain on the premises in a holdover status effectively preserved the estate. This holdover status occurred post-petition. <u>While the Debtor occupied the premises post-petition, and beyond the lease period, Gateway was precluded from making further disposition of the</u>

---

two estates obtained any benefit from the operation of the facilities. (US Bank Obj. ¶ 8.) Normally, under section 503(b), administrative expenses must relate to a benefit conferred on an estate. See 11 U.S.C. 503(b)(1). Yet, with respect to an unexpired lease of real property, rent must be paid timely "notwithstanding section 503(b)(1)." Absent relief from section 365(d)(3), then, rent that becomes due before rejection can become an administrative expense regardless of whether the use of the leased facilities actually benefits the estate. See In re S. Lincoln Med. Group, P.C., 2008 Bankr. LEXIS 468, *5 (Bankr. D. Neb. Feb. 21, 2008). That is exactly why responsible debtors seek retroactive relief on rejections of leases that are substantially underwater, and why debtors seek to extend the time to pay rent under section 365(d)(3).

<u>same premises. The Debtor's occupancy was beneficial to the estate, as the estate was preserved during the subject period</u>.

<u>Id</u> at 75 (emphasis added). Assuming that, in the period up until regulatory approvals are obtained, the Owner Lessors will be "precluded from making further disposition of the [facilities]," US Bank could potentially assert a 503(b)(1) claim against the Debtor Lessees. (Given that the facilities are projected to operate at a loss over that period, however, such claims would have to be inconsequential, if allowable at all.)

27. Despite any of the foregoing and notwithstanding when rejection occurs, US Bank makes the extraordinary claim that the Debtor Lessees are, in fact, incurring daily section 365(d)(3) administrative rent expenses of up to $500,000 per day, even though the Debtors are admittedly losing money operating the facilities. That is so, claims US Bank, because the Debtor Lessees failed to make applications prepetition to be able to transfer the facilities to the Owner Lessors on the day that they filed for bankruptcy. The Court should reject that argument out of hand. <u>First</u>, the Debtor Lessees could not have sought relief "years ago" as claimed by US Bank. As will be shown at the hearing, any approval received substantially prior to the petition date would have become untimely. Moreover, the mere act of making a pre-petition application to transfer the facilities back to the Owner Lessors could have been deemed an anticipatory repudiation of the Facility Leases. <u>Second</u>, whether an expense should be treated as a post-petition administrative one should not be determined by a non-debtor's pre-petition conduct. Whatever actions were or were not taken pre-petition, these Debtors sought rejection on the first day of these cases, and their Motion would have been heard in the first days of these cases had other parties not sought adjournments. Indeed, no one has suggested how these Debtors could have moved any faster to avoid unnecessary expense. <u>Third</u>, as will be shown at the hearing, US Bank is currently opposing the Debtors' efforts to transition the facilities back to

their owners or lienholders. Until those entities have approval to run, neither the Owner Lessors nor US Bank can do anything with the facilities without regulatory approval. Thus, there is nothing the Debtors are doing now to interfere with the Owner Lessors' ability to enjoy use and occupancy of the facilities.

28. For all of these reasons, rejection should be retroactive to the petition date. US Bank effectively concedes that this Court has discretion to grant such relief by citing <u>In re KP Fashion Co.</u>, 2011 U.S. Dist. LEXIS 96466, *11 ("the relevant question here is not whether the Bankruptcy Court had the discretion to issue a retroactive order, but rather whether the Bankruptcy Court abused its discretion by not doing so in this case.") and *11 n. 7 (quoting Bankruptcy Court, which stated: "I certainly have granted retroactive orders, retroactive to the date of the bringing of the motion and notice. Especially when the property is vacant, <u>and the landlord can take possession of it</u>.") (emphasis added). Retroactive relief is also absolutely warranted under the circumstances presented here. <u>In re Jamesway</u>, in which the District Court affirmed the Bankruptcy Court's grant of retroactive rejection, the Court made clear that a landlord cannot use the provisions of section 365 to accrue administrative expenses when the debtor does not benefit from its continued possession of the leased property:

> If [delay in the effective date of rejection] is allowed to accrue to the benefit of Landlord, then other creditors will have an incentive to delay decisions, by whatever method possible, in order to expand the time before rejection receives court approval. By so doing, creditors will increase the period to which § 365(d)(3) applies and during which the debtor must continue to satisfy its obligations to the creditor. <u>This Court will not create the perverse incentives and moral hazard that necessarily result from requiring bankruptcy courts to allow landlords to benefit from frivolous objections</u>.

<u>In re Jamesway</u>, 179 B.R. 33, 38 (S.D.N.Y. 1995) (emphasis added). The other cases cited by US Bank do not hold otherwise. <u>In re Chi-Chi's Inc.</u>, 305 B.R. 396 (Bankr. D. Del. 2004) (landlord, not debtor, sought rejection and repossession); <u>In re Cafeteria Operators, L.P.</u>, 299

B.R. 384 (Bankr. N.D. Tex. 2003) (bankruptcy court granted retroactive rejection because, "[t]he Debtors are receiving no benefit from the leased properties and by vacating the leased locations, [landlord] had unequivocal notice of Debtors' intent to reject prior to the filing of the Motions").

**E.    Those Lease Documents That Are Not Executory Can
        Be Treated as Giving Rise to Prepetition Claims**

29.    At paragraphs 28-31 of its Objection, US Bank contends that the Guaranties, Participation Agreements and Pass Through Trust Agreement are not executory contracts within the meaning of section 365 of the Code. The Debtors have no reason to contest that statement and the rejection order should so provide. All claims arising under those agreements can thus be treated as prepetition claims against the Debtors.

WHEREFORE, for the reasons stated herein and in the Motion, the Debtors respectfully request that the Court (i) enter an order deeming the Facility Leases and Tax Indemnity Agreements rejected <u>nunc pro tunc</u> as of November 7, 2011 and determining that the Guaranties, Participation Agreements and Pass Through Trust Agreement are not executory contracts and (ii) grant such other and further relief as the Court deems appropriate.

Dated:  December 14, 2011
        New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Thomas E Lauria (*pro hac vice*)
Gerard Uzzi
J. Christopher Shore
Elizabeth Feld
Julia M. Winters

By:  */s/ J. Christopher Shore*

*Proposed Special Counsel to the Debtors*